# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, KATHERINE KENDALL, ZOE BROCK, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA SAGEMILLER, and NANNETTE KLATT, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX, LLC, MIRAMAX FILM CORP., MIRAMAX FILM NY LLC, HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MIRAMAX DOES 1-10, and JOHN DOES 1-50, inclusive,<br><br>     Defendants. | No.<br><br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    THE PARTIES.....................................................................................................6

        A.      Plaintiffs ..................................................................................................6

        B.      Defendants ...............................................................................................7

IV.     FACTS .................................................................................................................10

        A.      Weinstein's power in the entertainment industry – from his time at both Miramax and TWC – was extensive....................................................................10

        B.      Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class. .........................................12

        C.      Like the Class Members and countless others, Plaintiffs' experiences followed the same script. ......................................................................20

                1.      Plaintiff Katherine Kendall's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.....................................................20

                2.      Plaintiff Zoe Brock's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.....................................................25

                3.      Plaintiff Melissa Sagemiller's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise .............................................28

                4.      Plaintiff Louisette Geiss's experience with Weinstein, TWC and the Weinstein Sexual Enterprise .................................................30

                5.      Plaintiff Sarah Ann Thomas's (a/k/a Sarah Ann Masse) experience with Weinstein, TWC and the Weinstein Sexual Enterprise ...........................32

                6.      Plaintiff Nannette Klatt's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.....................................................34

        D.      Miramax and TWC facilitated Weinstein's predatory behavior............................35

        E.      The Weinstein Sexual Enterprise or "Army of Spies"...........................................40

                1.      The common purpose of the enterprise was to harass and mislead Class members and the media to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence..............................................40

2.      Each member of the Enterprise played a role in directing and participating in the Weinstein Sexual Enterprise. ........................................................41

3.      The Weinstein Sexual Enterprise engaged in a pattern of racketeering activity.........................................................................................................42

F.      The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress pursuant to which Weinstein threatened the Class if they complained. ......................................................................................47

V.     CLASS ALLEGATIONS ................................................................................51

VI.    CAUSES OF ACTION ....................................................................................55

COUNT I VIOLATION OF 18 U.S.C. § 1962(C) (PLAINTIFFS VERSUS THE WEINSTEIN SEXUAL ENTERPRISE)..................................................................................55

COUNT II  VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (PLAINTIFFS  VERSUS THE WEINSTEIN SEXUAL ENTERPRISE).......59

COUNT III  NEGLIGENT SUPERVISION AND RETENTION  (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT ...........................60

VERSUS MIRAMAX AND ROBERT WEINSTEIN)..................................................60

COUNT IV  NEGLIGENT SUPERVISION AND RETENTION  (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS TWC AND TWC'S BOARD MEMBERS) ............61

COUNT V  CIVIL BATTERY (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT VERSUS MIRAMAX AND WEINSTEIN) ...............................................................................................62

COUNT VI CIVIL BATTERY  (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS TWC AND WEINSTEIN)..................................................................63

COUNT VII  ASSAULT  (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER, AND NANNETTE KLATT  VERSUS WEINSTEIN AND MIRAMAX) ...............................................................................................65

COUNT VIII  ASSAULT  (LOUISETTE GEISS AND SARAH ANN THOMAS  VERSUS WEINSTEIN AND TWC)................................................................................66

COUNT IX  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT VERSUS WEINSTEIN AND MIRAMAX)...................................................68

COUNT X  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS WEINSTEIN AND TWC)................69

COUNT XI  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT VERSUS WEINSTEIN AND MIRAMAX).......................................................................71

COUNT XII  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS WEINSTEIN AND TWC)............................72

COUNT XIII  RATIFICATION  (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER, AND NANNETTE KLATT VERSUS MIRAMAX AND ROBERT WEINSTEIN) ...............................................................................................................73

COUNT XIV  RATIFICATION  (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS TWC AND TWC'S BOARD OF DIRECTORS)...............................................74

PRAYER FOR RELIEF ..............................................................................................................75

010717-11 1002900 V1

Plaintiffs Louisette Geiss, Katherine Kendall, Zoe Brock, Sarah Ann Thomas, Melissa Sagemiller, and Nannette Klatt, individually and on behalf of all others similarly situated, allege as follows:

## I.     INTRODUCTION

1.     The proverbial "casting couch" was Harvey Weinstein's office of choice, a choice facilitated and condoned by Miramax,[1] The Weinstein Company ("TWC") and its Board of Directors.  Plaintiffs, and hundreds of other females like them, found themselves with Weinstein on the casting couch at offices, in hotel rooms, in his homes, or in rooms at industry functions. Under the guise of meetings ostensibly to help further Plaintiffs' careers, or to hire them, or to socialize at industry events, Weinstein isolated Plaintiffs and Class Members in an attempt to engage in unwanted sexual conduct that took many forms: flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape and/or completed rape.

2.     Plaintiffs and Members of the Class had or wanted to have careers in the entertainment industry and correctly understood that Weinstein was a powerful force in the production world.  At all times, Plaintiffs and the Class operated under duress and the credible and objective threat of being blacklisted by Weinstein and major film producers such as Miramax and TWC if they refused Weinstein's unwanted sexual advances or complained about his behavior. To the extent a woman was "lucky" enough to escape physically unscathed, Weinstein's behavior (and the fact it was facilitated by TWC and Miramax, the "Complicit Producers") nonetheless caused injury to their business prospects, career, reputation, and severe emotional and physical distress.

---

[1] "Miramax" collectively refers to Miramax, LLC, Miramax Film Corp., and Miramax Film NY LLC.

3.     Weinstein's power and the pervasiveness of his misconduct was recently summarized in *The New Yorker* as follows:

> Since the establishment of the first studios, a century ago, there have been few movie executives as dominant, or as domineering, as Harvey Weinstein.  He co-founded the production-and-distribution companies Miramax and the Weinstein Company, helping to reinvent the model for independent films with movies including "Sex, Lies, and Videotape," "The Crying Game," "Pulp Fiction," "The English Patient," "Shakespeare in Love," and "The King's Speech."  Beyond Hollywood, he has exercised his influence as a prolific fund-raiser for Democratic Party candidates, including Barack Obama and Hillary Clinton.  Weinstein combined a keen eye for promising scripts, directors, and actors with a bullying, even threatening, style of doing business, inspiring both fear and gratitude.  His movies have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies, he has been thanked more than almost anyone else in movie history, ranking just after Steven Spielberg and right before God.
>
> For more than twenty years, Weinstein, who is now sixty-five, has also been trailed by rumors of sexual harassment and assault.  His behavior has been an open secret to many in Hollywood and beyond, but previous attempts by many publications, including *The New Yorker*, to investigate and publish the story over the years fell short of the demands of journalistic evidence.  Too few people were willing to speak, much less allow a reporter to use their names, and Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts.  Asia Argento, an Italian film actress and director, said that she did not speak out until now—Weinstein, she told me, forcibly performed oral sex on her—because she feared that Weinstein would "crush" her.  "I know he has crushed a lot of people before," Argento said.  "That's why this story—in my case, it's twenty years old, some of them are older—has never come out."

4.     On October 5, 2017, *The New York Times*, in a powerful report by Jodi Kantor and Megan Twohey, revealed multiple allegations of sexual harassment against Weinstein, an

- 2 -

article that led to the resignation of four members of the Weinstein Company's all-male board and to Weinstein's firing.[2]

5.      Weinstein's widespread sexual misconduct did not occur without the help of others.  Rather, over time, Weinstein enlisted the aid of the Complicit Producers, along with other firms and individuals, to facilitate and conceal his pattern of unwanted sexual conduct. This coalition of firms and individuals became part of the growing "Weinstein Sexual Enterprise," a RICO enterprise.  The Weinstein Sexual Enterprise had many participants, grew over time as the obfuscation of Weinstein's conduct became more difficult to conceal, and included (i)  TWC, TWC's Board of Directors (including Robert Weinstein, Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, and Paul Tudor Jones – collectively, the "Board"), Weinstein, and Miramax, all of whom are responsible for Weinstein's sexual offenses because Weinstein acted within the scope of his employment and/or these persons and entities ratified or concealed Weinstein's conduct (collectively, the "Weinstein Participants"); (ii) third parties Kroll Associates, Inc. and Corporate Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence; B.C. Strategy U.K. Ltd. ("Black Cube"), a company composed of a "select group of veterans from the Israeli elite intelligence units that specializes in tailored solutions to complex business and litigation challenges"[3]; Jack Palladino and Sara Ness of Palladino & Sutherland; and other investigators whose identities are currently unknown (collectively, the "Intelligence Participants"); (iii) lawyers and law firms, including but not limited to David Boies and Boies Schiller Flexner LLP; K&L Gates; BCL Burton Copeland; and Gross, Klatthandler, Hodak, Halevy, Greenberg & Co. (collectively, the "Law Firm

---

[2] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[3] *See* www.blackcube.com (last accessed Nov. 7, 2017).

- 3 -

Participants"); (iv) casting directors and agencies, directors, co-producers of Miramax and TWC, and other entertainment industry members (the "Film Participants"); and (v) journalists, including an unnamed freelance reporter, along with reporters from and the chief content officer (Dylan Howard) for American Media Inc., which publishes the *National Enquirer* (collectively, "Journalist Participants").  The identities of many of the members of the Weinstein Sexual Enterprise are currently unknown but discoverable through the discovery process.

6.     After the initial assault(s) were over, Weinstein engaged or directed private investigators, a "global provider of risk solutions," lawyers, and others (collectively, the "Weinstein Sexual Enterprise"), or, as *The New Yorker* calls them, "Weinstein's Army of Spies"[4]) to harass, threaten, extort, and mislead both Weinstein's victims and the media to prevent, hinder and avoid the prosecution, reporting, or disclosure of his sexual misconduct. Weinstein and members of the Weinstein Sexual Enterprise also either directed or facilitated the Weinstein Sexual Enterprise's destruction, mutilation, and concealment of records, documents, and/or other evidence in an effort to prevent the use of such evidence to reveal his sexual offenses.

7.     The Weinstein Sexual Enterprise's long-running practice of isolating and blacklisting Weinstein's victims (which occurred as recently as the summer of 2017 to Plaintiff Katherine Kendall) and covering up Weinstein's predatory tactics (which occurred, on information and belief, as recently as October 2017) should not be permitted to overcome the interests of the Plaintiffs and the Class Members to proceed collectively, with strength together, in a unified manner in this class action. Plaintiffs seek certification of a Rule 23(c)(4) class for

---

[4] Ronan Farrow, "Harvey Weinstein's Army of Spies," The New Yorker (Nov. 6, 2017), available at https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies/amp (last accessed Nov. 7, 2017).

liability for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
civil battery, assault, and intentional and negligent infliction of emotional distress against the
Complicit Producers and Weinstein.  Plaintiffs will also seek certification of a Rule 23(c)(4)
class for liability against the Complicit Producers for the negligent supervision or retention of an
unfit officer, director and/or employee. Defendants' conduct has caused widespread damage,
including personal injury, emotional distress, and damage to the careers of Plaintiffs and the
Class, for which Defendants must be held responsible.

## II.      JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because
this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this
action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1962.

9.      This Court also has subject-matter jurisdiction pursuant to the Class Action
Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims
asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil
Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate
amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the Complicit
Producers are citizens of a State different from that of Plaintiffs and members of the Class. This
Court also has subject matter jurisdiction over Plaintiffs' and the proposed Class's claims
pursuant to 28 U.S.C. § 1367(a).

10.      Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*,
substantial parts of the events or omissions giving rise to the claim occurred in the District and/or
a substantial part of property that is the subject of the action is situated in the District.

### III.    THE PARTIES

**A.    Plaintiffs**

11.    Plaintiff Louisette Geiss is a citizen of the United States and resident of Santa Monica, California. Geiss met with Weinstein, at his invitation, to pitch him a script to be produced by TWC.  During her pitch, Geiss was assaulted by Weinstein, threatened, and falsely imprisoned. She suffered emotional and physical distress and was injured in her property or livelihood as a result of Weinstein's actions.

12.    Plaintiff Katherine Kendall is a citizen of the United States and resident of Los Angeles, California.  Kendall met with Weinstein to discuss roles in movies to be produced by Miramax and because he told her he would introduce her to people in the industry. During the course of their meetings, Weinstein imprisoned her in his apartment, threatened and assaulted her, causing her physical and emotional distress and injury to her property or livelihood.

13.    Plaintiff Zoe Brock is a lawful permanent resident of the United States who previously resided in the state of California and is temporarily residing in New Zealand. Miramax employees tricked Brock into being alone in Weinstein's hotel room with him during the Cannes Film Festival. Brock was assaulted by Weinstein, threatened, and falsely imprisoned. She suffered emotional and physical distress and was injured in her property or livelihood as a result of Weinstein's actions.

14.    Plaintiff Sarah Ann Thomas is a citizen of the United States and resident of North Hollywood, California. Thomas is registered as Sarah Ann Masse with SAG-AFTRA. TWC employees arranged for Thomas to interview with Weinstein at his home. Weinstein conducted the interview in his underwear, embraced Thomas in a sexual manner, and did not give her the job when she did not take him up on his sexual propositions. She suffered emotional and physical distress, and injury to her property or livelihood as a result of Weinstein's actions.

- 6 -

15.     Plaintiff Melissa Sagemiller is a citizen of the United States and resident of Los Angeles, California. During the filming of a movie that was being distributed by Miramax, Sagemiller met with Weinstein to discuss changes to the script. Weinstein imprisoned her in his hotel room and later on his airplane, and he threatened and assaulted her, causing her emotional and physical distress and injury to her property or livelihood.

16.     Plaintiff Nannette Klatt is a citizen of the United States and a resident of Lancaster, California.  Klatt auditioned with Weinstein for a part in a Miramax production. During her audition, Klatt was assaulted by Weinstein, threatened, falsely imprisoned, and suffered emotional and physical distress, and was injured in her property or livelihood as a result of Weinstein's actions.  Weinstein told Klatt that if she refused his advances and his requests, he would ruin her, and he ultimately withdrew the offer he had given her for a part because she would not accede to his advances.

**B.     Defendants**

17.     Defendant The Weinstein Company Holdings, LLC is a Delaware limited liability company whose principal place of business is in New York City, New York.

18.     Defendant Miramax LLC is a Delaware corporation headquartered in Santa Monica, California.

19.     Defendant Miramax Film Corp., was a New York corporation headquartered in New York City, New York.

20.     Miramax Film NY, LLC is a New York corporation with its principal place of business in Santa Monica, California.

21.     The true names and capacities of the defendants named herein as Miramax Does 1-10 are unknown to Plaintiffs, who therefore sue them under these fictitious names.  Plaintiffs will amend their complaint to add their true names and capacities when they become known.

22.     Defendant Harvey Weinstein is a citizen of the United States and a resident of New York, New York.  He is a former co-chairman of Miramax, and was a director and employee of TWC from 2005 to October 2017.

23.     Defendant Robert Weinstein is a citizen of the United States and a resident of Greenwich, Connecticut.  Robert Weinstein is the brother of Harvey Weinstein, the former chairman of Miramax, and is and was a director of TWC from 2005 to the present. Robert Weinstein has known of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women, including during the time the brothers worked at Miramax and TWC.

24.     Defendant Dirk Ziff is a citizen of the United States and a resident of New York, New York.  Dirk Ziff was a director of TWC from in or about September 2015 to October 2017. Ziff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

25.     Defendant Tim Sarnoff is a citizen of the United States and a resident of Westlake Village, California.  Tim Sarnoff was a director of TWC until October 2017.  Sarnoff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

26.     Defendant Marc Lasry is a citizen of the United States and a resident of New York, New York.  Marc Lasry was a director of TWC from in or about mid-2016 to October 2017. Lasry knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

27.     Defendant Tarak Ben Ammar is a citizen of Tunisia and currently resides in France.   Tarak Ben Ammar was and continues to be a director of TWC.  Ammar knew of

- 8 -

Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC.  Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[5]  According to Ammar, the majority of the then-TWC Board members supported renewing Weinstein's contract despite the serious assault allegations.[6]

28.     Defendant Lance Maerov is a citizen of the United States and a resident of Bedford, New York.  Lance Maerov was a director of TWC, including as a non-voting observer from 2005 to 2013 and then as a voting member through the present. Maerov knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC. According to Maerov, for years prior to the 2015 Gutierrez allegations, he had heard from TWC employees about complaints against Weinstein.[7]

29.     Defendant Richard Koenigsberg is a citizen of the United States and a resident of Franklin Lakes, New Jersey.  Richard Koenigsberg was a director of TWC from TWC's 2005 inception through October 2017. Koenigsberg knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

30.     Defendant Paul Tudor Jones is a citizen of the United States and a resident of Palm Beach, Florida.  Jones was a director of TWC from December 2015 to October 2017. Jones

---

[5] Elsa Keslassy, "TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015," *Variety* (Oct. 11, 2017).

[6] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

[7] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

31.     Defendant Jeff Sackman is a citizen of the United States and, on information and belief, a resident of Toronto, Canada.  Sackman was a director of TWC from, on information and belief, TWC's inception to 2015. Sackman knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

32.     Defendant James L. Dolan is a citizen of the United States and a resident of Miller Place, New York. Dolan was a director of TWC from in or about mid-2015 to June 2016. Dolan knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

33.     By virtue of their positions as a board member, each of the Director Defendants availed themselves of the laws of New York and are subject to jurisdiction in New York.

### IV.     FACTS

**A.     Weinstein's power in the entertainment industry – from his time at both Miramax and TWC – was extensive.**

34.     In the late 1970s, using profits from their concert promotion business, brothers Harvey and Bob Weinstein created a small independent film-distribution company named Miramax, named after their parents, Miriam and Max.  The company's first releases were primarily music-oriented concert films such as Paul McCartney's *Rockshow.  The Secret Policeman's Other Ball*, released in May 1982, became Miramax's first hit.  The Weinsteins slowly built upon this success throughout the 1980s with films that achieved both critical attention and modest commercial success.  Harvey Weinstein and Miramax gained wider attention in 1988 with the release of Errol Morris' documentary *The Thin Blue Line*, which

detailed the struggle of Randall Adams, a wrongfully convicted Death Row inmate.  The

publicity that soon surrounded the case resulted in Adams' release and nationwide publicity for

Miramax.  In 1989, Steven Soderbergh's *Sex, Lies, and Videotape* propelled Miramax to become

the most successful independent studio in America.

35.     Miramax continued to grow its library of films and directors. In 1993, after the

success of *The Crying Game*, Disney offered to purchase Miramax from the Weinsteins for $80

million.  The Weinstein brothers agreed to the deal, which promised to cement their Hollywood

clout and ensure that they would remain at the head of their company. The next year, Miramax

released its first blockbuster, Quentin Tarantino's *Pulp Fiction*, and distributed the popular

independent film *Clerks*.

36.     Miramax won its first Academy Award for Best Picture in 1997 with the victory

of *The English Patient* (*Pulp Fiction* was nominated in 1995 but lost to *Forrest Gump*).  This

was the first in a series of critical successes that included *Good Will Hunting* (1997) and

*Shakespeare in Love* (1998), both of which won numerous Academy Awards.

37.     The Weinstein brothers left Miramax on September 30, 2005, to form their own

production company, TWC, with several other media executives.  Attached as Exhibit A is a list

of Weinstein-produced films that demonstrates Weinstein's power and influence in the film

industry.

38.     Plaintiffs and the Class were aware of Weinstein's ability to make or break their

careers, as well as to continue to inflict emotional distress.  Moreover, Weinstein wielded and

was outspoken about his power and ability to either launch their careers or ruin their personal

and professional reputations forever.

**B.**   **Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class.**

39.   Wielding unfettered power in the movie and television industry, Weinstein has admitted that his predatory and sexually harassing behavior toward women was his *modus operendi*. For example, in an audio recording captured during a 2015 New York Police Department sting operation, Weinstein admitted that he groped a model named Ambra Battilana Gutierrez, describing it as behavior he is "used to."[8]

40.   An executive who worked for Weinstein for many years reportedly told *The New Yorker*, "This wasn't a one-off. This wasn't a period of time. This was ongoing predatory behavior toward women—whether they consented or not."[9]

41.   The manner in which Weinstein set up, harassed and assaulted Plaintiffs and the members of the Class followed a pattern. As *The New York Times* explained,

> Across the years and continents, accounts of Mr. Weinstein's conduct share a common narrative: Women reported to a hotel for what they thought were work reasons, only to discover that Mr. Weinstein, who has been married for most of three decades, sometimes seemed to have different interests. His home base was New York, but his rolling headquarters were luxury hotels: the Peninsula Beverly Hills and the Savoy in London, the Hôtel du Cap-Eden-Roc near the Cannes Film Festival

---

[8] A 2015 audio recording of Weinstein aggressively attempting to coerce Battilana Gutierrez to come into his hotel room was published by *The New Yorker* on October 10, 2017 and is available at  https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed Nov. 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed Nov. 2, 2017). When Battilana Gutierriez refused, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

[9] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

010717-11 1002900 V1

in France and the Stein Eriksen Lodge near the Sundance Film Festival.[10]

42.    An employee who worked for Weinstein told *The New Yorker* that "the pattern of meetings was nearly uninterrupted in her years of working for Weinstein."[11]

43.    Since October 10, 2017, more than 60 women have reported that Weinstein used his power in the entertainment industry to sexually harass them. On information and belief, these reports are just the beginning of the revelation of the full scope of Weinstein's misconduct. All of these reports follow the same pattern. For illustrative purposes of Weinstein's pattern and practice of sexual harassment against Plaintiff and the Class, Plaintiff provides the following non-exhaustive list of examples of Weinstein's predatory behavior that have been widely reported in the media:

44.    *Weinstein's pattern of using the guise of helping women with their careers was typically the start:*

    a.    After Weinstein hired her for the lead in *Emma*, but before shooting began in or about 1994, Gwyneth Paltrow received a faxed schedule from her agents at Creative Artists Agency scheduling a meeting with Weinstein in his suite at the Peninsula Beverly Hills for a work meeting.[12]

---

[10] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[11] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[12] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

- 13 -

     b.    In 1996, starring in a new film to which Miramax had just obtained the rights, Judith Godrèche was invited to a breakfast meeting with Weinstein and a female executive to discuss the movie.[13]

     c.    Asia Argento, a 21-year-old actress with a role in a Miramax film released in the United States in 1999, was told during filming in 1997 to attend a party thrown by Miramax at a hotel and was brought to the hotel by another producer.[14]

     d.    In the 1990s, Rosanna Arquette was told to meet Weinstein for dinner at a hotel to pick up the script for a new film.[15]

     e.    In the 1990s, Weinstein invited Ashley Judd to the Peninsula Hotel for a business breakfast meeting.[16]

     f.    In or about 1997, Weinstein invited himself to Mira Sorvino's apartment – after midnight – to tell her about "new marketing ideas" for a film she was in.[17]

     g.    In 2003, Dawn Dunning was invited by Weinstein's assistant to a meal with Weinstein at a New York hotel.[18]

---

[13] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[14] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[15] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[16] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[17] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[18] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

h.  Lucia Stoller was approached by Weinstein in 2004, who had an assistant call to set up a daytime meeting at the Miramax office in Tribeca, first with Weinstein and then with a casting executive, who was a woman (which made Lucia feel safer).[19]

i.  In 2010, Weinstein told actress Emma de Caunes he was interested in casting her in the lead role of a movie adapted from a book, asking her to come to his hotel room after lunch to get the book.

j.  In January 2011, Weinstein invited Jessica Barth to a business meeting at the Peninsula Hotel to talk "career stuff." [20]

45.  *When the women arrived for their "meeting," they were isolated from the public or witnesses:*

a.  Although Lucia Stoller's meeting took place at Miramax, "[s]he was led to an office with exercise equipment in it, and takeout boxes on the floor. Weinstein was there, alone."[21]

b.  A producer led Asia Argento to what she thought was a Miramax party at a hotel, taking her to a hotel room "empty but for Weinstein."[22]

---

[19] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[20] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[21] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[22] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

c.      When Rosanna Arquette showed up for dinner at a hotel restaurant with Weinstein, she was told to meet him in his room.[23]

d.      When Jessica Barth arrived at the Peninsula Hotel for a business meeting, Weinstein told her on the phone to come to his room.[24]

e.      When Ashley Judd arrived at the Peninsula Hotel for a business meeting, she was told to meet him in his room.[25]

f.      After a breakfast meeting with Weinstein and a female executive, the female executive left, leaving Judith Godrèche alone with Weinstein, who told her to join him in his room to discuss the film's marketing and an Oscar campaign.[26]

g.      When Dawn Dunning arrived at the hotel for a meeting, she was told that Weinstein's earlier meeting was running late and to go to his suite.[27]

46.     *Once isolated, Weinstein battered, assaulted or attempted to assault the women:*

a.      Rose McGowan: In a hotel room in 1997, "...HW raped me."[28]

---

[23] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[24] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[25] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[26] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[27] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[28] https://www.thesun.co.uk/news/4673738/rose-mcgowan-harvey-weinstein-rape-claims-amazon-jeff-bezos/, *quoting* tweet from Rose McGowan.

b.      Lucia Stoller: "'He forced me to perform oral sex on him.' As she

objected, Weinstein took his penis out of his pants and pulled her head down onto it. 'I

said, over and over, 'I don't want to do this, stop, don't.''"[29]

c.      Asia Argento: Weinstein left the hotel room and returned "wearing a

bathrobe and holding a bottle of lotion. 'He asks me to give a massage. I was, like, 'Look,

man, I am no fucking fool.'" "[A]fter she reluctantly agreed to give Weinstein a massage,

he pulled her skirt up, forced her legs apart, and performed oral sex on her as she

repeatedly told him to stop." [30]

d.      Mira Sorvino: In a hotel room, Weinstein started massaging her shoulders

and then chased her around the room.[31]

e.      Sophie Dix: Weinstein masturbated in front of her after Dix said "no a

thousand times," causing Dix to lock herself in the bathroom.[32]

f.      Emma de Caunes: Weinstein went into the hotel bathroom, turned on the

shower, returned naked with an erection, and demanded she lie on the bed.[33]

---

[29] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[30] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[31] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[32] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[33] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

g.      Rosanna Arquette: Weinstein answered his hotel door in a bathroom, tried to force Arquette to give him a neck massage, and pulled her hand toward his erect penis.[34]

h.      Jessica Barth: Weinstein demanded a naked massage in his bed.[35]

i.      Ashley Judd: Weinstein appeared in a bathrobe, asking if he could give her a massage or she could watch him shower.[36]

j.      Gwyneth Paltrow: Weinstein touched her, suggesting they head to his bedroom for massages.[37]

k.      Angelina Jolie: Weinstein made unwanted advances on her in a hotel room.[38]

l.      Judith Godrèche: After Godrèche declined to give him a massage, "he's pressing against me and pulling off my sweater."[39]

m.      Dawn Dunning: Weinstein, who had worn a bathrobe for their meeting, told Dunning that he had contracts for her for his next three films, but that she could only sign them if she would have three-way sex with him. When Dunning laughed, assuming

---

[34] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[35] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[36] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[37] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[38] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[39] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

Weinstein was joking, Weinstein became angry, stating: "You'll never make it in this business. This is how the business works."[40]

n.      Darryl Hannah: On multiple occasions, Weinstein tried to barge into her hotel room at night; she escaped out back doors; she used furniture to bar the door; and she had her male make-up artists present when Weinstein was able to secure a key to her room without her consent. *The New Yorker* reported: Weinstein "'had a key,' Hannah recalled. 'He came through the living room and into the bedroom. He just burst in like a raging bull. And I know with every fibre of my being that if my male makeup artist was not in that room, things would not have gone well. It was scary.' [Hannah's make-up artist] remembered the incident vividly. 'I was there to keep her safe,'" he told *The New Yorker*.[41]

o.      Paz de la Huerta – first rape: In November 2010, Weinstein offered de la Huerta a cab ride home after bumping into her at a hotel bar in New York and then demanded to come in for a drink: "'Immediately when we got inside the house, he started to kiss me and I kind of brushed [him] away,' de la Huerta said. 'Then he pushed me onto the bed and his pants were down and he lifted up my skirt. I felt afraid… It wasn't consensual… It happened very quickly… He stuck himself inside me… When he was done he said he'd be calling me. I kind of just laid on the bed in shock.'"[42]

---

[40] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[41] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein (last accessed Nov. 7, 2017).

[42] https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations (last accessed Nov. 7, 2017).

p.      Paz de la Huerta – second rape: In December 2010, Weinstein showed up in her building lobby after she came home from a photo shoot: "'He hushed me and said, 'Let's talk about this in your apartment,'" de la Huerta said. 'I was in no state. I was so terrified of him… I did say no, and when he was on top of me I said, 'I don't want to do this.' He kept humping me and it was disgusting. He's like a pig… He raped me.'"[43]

47.      These were not isolated instances, but the practiced role and pattern of a sexual predator.

## C.      Like the Class Members and countless others, Plaintiffs' experiences followed the same script.

### 1.      Plaintiff Katherine Kendall's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.

48.      In 1993, when Kendall was 23 years old, her mother met Harvey Weinstein at a small industry party on Martha's Vineyard. Weinstein provided his contact information to Kendall's mother and insisted she have Kendall contact him to discuss her career.

49.      Kendall did not feel comfortable contacting Weinstein personally, so she passed the information to her agency.  Kendall's agent then contacted Weinstein at Miramax and scheduled a meeting. Kendall went to the meeting at Miramax, where she met with Weinstein in his office. Weinstein gave her scripts and told her she was a great fit. He welcomed her to "the Miramax family." The meeting was professional, the doors to his office were open and Kendall felt safe because female employees from Miramax were present.

---

[43] https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations.

50.     After the meeting, Weinstein walked her to the elevator, and invited her to a "screening" of *Red Rock West* that afternoon. Weinstein stated that he would use the opportunity to introduce her to numerous people.

51.     Weinstein's assistant from Miramax contacted Kendall to arrange for a car to pick her up to take her to the screening.

52.     When the car arranged by Miramax arrived, Weinstein was the only other passenger. He took her to a regular movie showing – not a private screening with industry participants. Kendall felt very uncomfortable because Weinstein was treating the outing like a date.  Kendall decided she wanted to leave the outing on her own and not with Weinstein.

53.     After the movie, Kendall told Weinstein she was going to take the subway home and asked him to point the way. Weinstein responded that he lived "right here" and had to go up to get something first. Kendall said she would wait downstairs. Weinstein, using intimidation and manipulation, bullied her into coming up to his apartment. He said he would walk her to the subway thereafter. Kendall declined several times, but finally gave in because she did not know where she was, and he was supposed to walk her to the subway.

54.     Once they were in the apartment, Kendall thought she might not be in danger. Pictures of Weinstein's wife were on display. Weinstein treated Kendall as an intellectual equal. They talked for approximately one hour, discussing art, politics, books and movies. Weinstein again promised to help her out and find her parts. He told her:  "You're in good hands."

55.     Then Weinstein went to the bathroom and returned wearing a robe. Kendall became distressed. Weinstein repeatedly requested a massage, and Kendall refused.  Weinstein told Kendall that "everyone does it," claiming that specific actresses "did it all the time" and asking why Kendall was making "a big deal" out of the situation. Kendall again refused,

- 21 -

informed Weinstein that he was making her very uncomfortable. She was visibly upset, shaking and on the verge of tears.

56.     Weinstein then went back to the bathroom; when he returned, he was naked. She felt an immediate "fight or flight" response, with a burst of adrenaline and fear. He then stood between Kendall and the door, informing Kendall that her refusal to provide sexual services had "insulted" him. Weinstein chased Kendall around the apartment, demanding that she kiss him, that she touch him, and that she allow him to see her breasts.

57.     Weinstein barred Kendall in the apartment, placing her in imminent fear for her life and her safety.  She believed that she was about to be raped.

58.     After a distressing amount of time, Weinstein finally agreed to allow Kendall to leave if she would allow him to accompany her to a taxicab.  Weinstein then took her to a taxi, but physically forced his way into the taxi with her. For that reason, Kendall claimed she was meeting her boyfriend at a bar.  When the taxi arrived at the bar and Kendall was allowed to exit, Weinstein remained in the taxi for approximately 20 minutes, watching her movements in the bar.

59.     After the assault, Kendall experienced both emotional distress and physical pain, along with shame, depression, and a loss of self-worth. However, she believed that if she were to disclose the assault, she would be blacklisted and blamed as a result of Weinstein's power in the industry.

60.     Weinstein called Kendall several times after the assault. Each time he attempted to contact her, Kendall became upset. She knew Weinstein could hurt her career, but did not want to return to a situation in which a powerful figure in the industry could demand sexual favors from her.

61.     Since the assault, Kendall has experienced depression. She has lived her life "smaller," feeling like she doesn't have what it takes (if what it takes includes providing sexual favors) to be in the film business.  At various times since the assault, Kendall has had to remove herself completely off from the entertainment industry in an effort to address her post-traumatic stress and emotional trauma.

62.     Twice during the summer of 2017, an English-accented man identifying himself as "Seth Freeman" telephoned Kendall.  "Freeman" claimed that he was a reporter for *The Guardian* and that he was doing a story on the Hollywood casting couch. "Freeman" told Kendall that Rose McGowan was going to come forward in *The New York Times* about a "powerful producer."

63.     "Freeman" continued to press Kendall, attempting to get her to say that she had or was going to talk reporters at *The New York Times* about her experiences with the casting couch and producers.  These contacts, which had come from "out of the blue," caused Kendall to experience emotional distress.

64.     Reporters from the BBC subsequently informed Kendall that a person identifying himself as "Seth Freeman" had also contacted other women who may have been harassed or assaulted by Weinstein.

65.     Based on counsel's pre-filing investigation, no one named Seth Freeman worked for *The Guardian* during the summer of 2017.

66.     On November 18, 2017, *The Observer* (a sister publication to *The Guardian*) reported that it had gained access "to a secret hit list of almost 100 prominent individuals targeted by Harvey Weinstein in an extraordinary attempt to discover what they knew about

- 23 -

sexual misconduct claims against him and whether they were intending to go public."[44] Prepared in early 2017, the list was "part of a strategy to prevent accusers from going public with sexual misconduct claims against him" and was distributed to a team that included the Intelligence Participants for the purpose of "suppress[ing] claims that he had sexually harassed or assaulted numerous women."[45]

67.     According to *The Observer*, "Individuals named on the list were to be targeted by investigators who would covertly extract and accumulate information from those who might know of claims or who might come forward with allegations against the film producer. Feedback was then to be relayed to Weinstein and his lawyers."[46]

68.     Composed of 85 names, with an addendum identifying another six individuals, the list reportedly includes individuals working in acquisitions, marketing and distribution, along with producers, publicists, human resources staff, and actors. Forty-three men and 48 women are named. The majority live in New York, with others from London and Los Angeles.[47]

69.     Weinstein's 2017 list of targets included Kendall.  Based on Kendall's inclusion on the list, and the fact that no "Seth Freeman" worked at *The Guardian*, the man who contacted Kendall purporting to be "Seth Freeman" in the summer of 2017 was, on information and belief, an Intelligence Participant.

---

[44] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[45] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[46] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[47] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

70.     The fact that Kendall has been targeted for apparent surveillance and investigation by the Weinstein Sexual Enterprise has caused Kendall significant additional distress and significant fear.

**2.     Plaintiff Zoe Brock's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.**

71.     In 1998, Zoe Brock was a 24-year-old model. Together with her agent, Vittorio Zeviani, Brock attended the Cannes Film Festival (May 13-24, 1998), under the guise that the trip would be good for her career.  They stayed on a yacht moored in the bay.

72.     One evening, Brock attended a group dinner at the Hotel Barrière Le Majestic with her agent and his friends. Weinstein, accompanied by his Miramax assistant Rick Schwartz, sat next to Brock. Also in attendance was Fabrizio Lombardo, a friend of Brock's agent, who officially was the head of Miramax's Italian operations, but actually was a "procurer" of women for Weinstein.

73.     After the dinner and party, Brock was deliberately separated from her agent and his friends, who were herded into a separate car by Weinstein, Schwartz, and Lombardo. Brock found herself in a car alone with the three men, who told her that there had been a change of plans and her friends were going to meet them at Hótel du Cap Eden-Roc for a drink.

74.     When they arrived at the hotel, all four went to Weinstein's room to have a drink. After Lombardo made excuses to leave the room, Brock asked Schwartz to contact her friends immediately and find out where they were. Schwartz left, saying he would go downstairs to see whether they were having trouble getting up to the room. Brock then realized her friends were not coming.  Lacking a cell phone or wallet, Brock did not know how she was going to get back to the yacht where she was staying.

75.     Weinstein then left the room, re-emerging in the nude and demanding a massage. When Brock refused, Weinstein asked if she would like a massage instead, and physically maneuvered her into his bedroom.

76.     Brock took note of the room's thick walls and realized that nobody was likely to hear her if she were to cry out.  Moreover, she had observed the hotel staff attempting to ingratiate themselves to Weinstein when they had arrived.  Finally, she realized that Weinstein's associates had lied about their intentions in order to convince her to come to the hotel in the first place. She was terrified that Weinstein was going to rape her, and she feared for her life.

77.     Brock was able to elude Weinstein's grasp and escape to the bathroom, where she locked herself in.  The bathroom did not have a telephone that would have allowed her to call for help.  Weinstein then began to bang on the bathroom door and demand that Brock come out. Convinced that he would rape her, Brock refused.

78.      Eventually, after Brock started yelling, Weinstein promised to put his clothes on. When Brock emerged from the bathroom, Weinstein was in a bathrobe. Weinstein promised to make it up to her and told her he would have Schwartz take her into town. Weinstein then got dressed, contacted Schwartz to return, and the three of them took a car back to the harbor. During the car ride, Weinstein repeatedly told Zoe how much he wanted to help her with her career. Weinstein told her she was special, amazing and a star. He told Brock that he wanted to be her "Rock of Gibraltar."

79.     When they arrived at the harbor, there was no way for Brock to return to the yacht where she was staying. Weinstein then offered her his penthouse suite at Hotel Barrière Le Majestic, which he claimed to keep for "emergencies."  During the check-in process, Schwartz apologized for Weinstein's behavior, admitting that it had happened before.  Schwartz then

grabbed a business card, wrote his contact information on the back, and handed it to Zoe. A true and correct copy of the card follows:

 

80. When Brock arrived at the room, she triple locked the door, called her mother to tell her what happened, and called Rufus Sewell, an actor who was staying at the hotel, to tell him what happened. Sewell responded, "Don't tell me. You've been Weinsteined?" He then warned Brock not to go to sleep because Weinstein would be back.[48]

81. The next morning, Brock took the first-available water taxi back to the yacht, narrowly avoiding another encounter with Weinstein, who returned to the Majestic at 7 a.m. in an attempt to intercept her. Later that day, Weinstein invited Brock and her friends to return to the Majestic.

82. When Brock told her agent that she never wanted to see Weinstein again, the agent said "Oh, of course." Shockingly, that very night—and without disclosing that Weinstein would be present—Brock's agent took her and a group to a private film screening. The agent informed the group that the theatre rental had been a gift. As the lights dimmed, Weinstein entered the cinema and sat directly behind Brock. In an apparent (and successful) attempt to

---

[48] On October 13, 2017, Rufus Sewell confirmed Zoe's version of events via Twitter.

intimidate her, Weinstein kept his hand on Brock's chair the entire movie. Throughout the

movie, Brock was nauseous and shaking, fearful of being assaulted.

83.     After Weinstein assaulted her, Brock suffered from depression, a lack of self-

confidence and a loss of reputation. Because of the actions of Weinstein and his enablers, Brock

was afraid to audition for roles that required her to travel to Hollywood and avoided going there

for several years.  Weinstein and his Miramax colleagues significantly affected Brock's

confidence and her ability to be a professional actor.

### 3.     Plaintiff Melissa Sagemiller's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.

84.     During the summer of 2000, Sagemiller was a 24-year-old actress filming *Get

Over It*.  Because Miramax was distributing the firm, Weinstein was on the set throughout the

two-month shoot.

85.     Right after shooting started, Weinstein's female assistant called Sagemiller to

invite her to lunch with Weinstein. Sagemiller was excited to be invited to lunch with the head of

Miramax. During the lunch, Weinstein asked Sagemiller what she liked to do and what kind of

men she liked to date. Weinstein then took her to a bookstore and offered to purchase numerous

books for her, informing her that he was "the last tycoon," a reference to the Fitzgerald novel of

the same name.

86.     As production continued, Sagemiller was contacted by another female assistant,

who asked Sagemiller to go to Weinstein's hotel room. Sagemiller told the assistant she was not

comfortable about doing so and asked whether she could meet Weinstein the following day in

her trailer instead. The assistant told her not to worry, that the meeting would be short, and that it

was "very important" that she attend so that Weinstein could "discuss" the script with her.

87.     Although Sagemiller had misgivings, which she expressed to her then-boyfriend, she believed she had no choice but to attend. The producer of her film was demanding, through Miramax employees, that she attend the meeting.

88.     Sagemiller went to Weinstein's room at the scheduled time. Weinstein answered the door in his robe. He had poured drinks.

89.     Weinstein asked Sagemiller if she would give him a massage, and then he demanded a kiss. In response to her refusal, Weinstein responded that he would not allow her to leave until she kissed and touched him.  He blocked the door, placing Sagemiller in fear of an impending assault.

90.     Weinstein then told Sagemiller that Renée Zellweger, Charlize Theron and other actresses gave sexual favors. Weinstein asked her, "Don't you want your career to be more than just this little teen film?"

91.     Weinstein continued to prevent Sagemiller from leaving. In an effort to be permitted to depart, Sagemiller finally submitted to a forcible kiss.  Weinstein then said, "OK, you can go now. That's all I wanted. Just do what I say and you can get your way."  She was then permitted to leave.

92.     When Sagemiller disclosed the assault to her castmates, the implicit warning from others on the set was not to cause any trouble, because it would hurt her career to discuss what happened to her.

93.     Sagemiller did everything she could for the rest of the shoot to make sure she was not alone with Weinstein. At the wrap party however, each actor was supposed to thank the producer. Not wanting to do it, but feeling pressure, Sagemiller thanked Weinstein.  He then insisted that she travel back to the United States on his private plane.  Sagemiller refused.  She

010717-11 1002900 V1

subsequently instructed her agent not to allow the cancellation of her reservation on a commercial flight.

94.     The next day at the airport, after Sagemiller checked her bags and proceeded to the gate, she was instructed to report to the security desk.  When she picked up the security phone, it was Weinstein's assistant, who informed her that Weinstein had directed the removal of her luggage from the commercial flight and had the luggage delivered to him.  With her personal effects held hostage, Sagemiller was forced to travel on Weinstein's plane.  When she arrived at his plane, Weinstein said: "See, Melissa, you can't say no to me. I always get what I want."

95.      The fact that Weinstein wielded so much power that he could prevent her from traveling on public transportation, over her objections, frightened Sagemiller.

**4.     Plaintiff Louisette Geiss's experience with Weinstein, TWC and the Weinstein Sexual Enterprise.**

96.     Geiss ran into Weinstein, whom she met once before, at the 2008 Sundance Film Festival, in Park City, Utah. Weinstein invited Geiss to the premiere of the movie *Where In the World Is Osama Bin Laden*, which was distributed by TWC. After the movie, Weinstein inquired about Geiss's music company, the script she was pitching at the festival, and her acting career. Weinstein asked Geiss to meet in an office adjacent to his hotel room.

97.     Because Geiss had heard rumors about Weinstein, she was skeptical, but the reason for attending Sundance was to secure a deal for her script. She decided to bluntly express her concerns and asked Weinstein to shake her hand – in front of security cameras in the hotel lobby – and agree that he would not touch her during the meeting. He agreed.

98.     In Weinstein's office, Weinstein and Geiss had a professional conversation for approximately 30 minutes, in which Weinstein expressed enthusiasm about both her script and roles she could play as an actress. Then, Weinstein excused himself to go to the bathroom.

99.    Weinstein emerged from the bathroom in an open bathrobe, naked underneath. He informed Geiss that he would listen to the remainder of her pitch from the hot tub. He then disrobed, entered into the hot tub and began to masturbate.  His demeanor had changed from professional and helpful to belligerent and overbearing. He told her to keep talking while he masturbated.

100.    Distressed, Geiss began to leave the room.  Weinstein quickly climbed out of the hot tub and grabbed her arm. He pulled her to his bathroom, insisting she watch him masturbate. He told her he would "greenlight" her script if she watched him masturbate. Louise repeatedly said no. She felt violently ill and distressed.

101.    Continuing to hold on to her arm, Weinstein told Geiss that he would introduce her to his brother, Bob, and she could act in films through Dimension Films, a TWC subsidiary, if she watched him masturbate. She said no. He then offered her a three-film deal as an actress to stay. She said no. Fearing an imminent sexual assault, Geiss escaped Weinstein's grasp and fled, with Weinstein giving chase.

102.    Weinstein's assault deeply distressed Geiss. She felt defenseless against Weinstein's power. She experienced fear, helplessness, anger and depression and sought professional help. Although Geiss had spent nearly her entire life dedicated to her craft, working diligently to become a performer, writer and producer, she concluded that she could not perform sexual acts with Weinstein in exchange for a career.

103.    As a result, Geiss lost both the three-film deal and other opportunities at TWC. Ultimately, Geiss's professional career in the entertainment industry was damaged, causing her to leave the industry.

### 5.   Plaintiff Sarah Ann Thomas's (a/k/a Sarah Ann Masse) experience with Weinstein, TWC and the Weinstein Sexual Enterprise.

104.    In 2008, Sarah Ann Thomas was working as a nanny to support herself as she pursued an acting career in New York City. Her resume included both her acting and her nanny experience. Thomas's agency informed her of the availability of a job babysitting Weinstein's three children from his first marriage.

105.    Prior to meeting Weinstein, Thomas was interviewed several times by Weinstein's female assistants from TWC.  Weinstein's assistants inquired several times whether she could work for Weinstein while pursuing her acting career without it becoming a conflict of interest. Thomas was clear that she did not use her nanny work as an opportunity to try to advance her acting career.

106.    After approximately one month of these interviews, Weinstein's assistant told Thomas that Weinstein wanted to meet her. The assistant scheduled the interview to take place at Weinstein's Connecticut home. The night before the interview, Weinstein's assistant contacted Thomas to let her know that she could not accompany Thomas to the meeting.

107.    Thomas drove to Weinstein's home. When she arrived, Weinstein opened the door in his boxer shorts and an undershirt. Thomas assumed Weinstein had forgotten about the interview, and that he would excuse himself to go change. But he did not.

108.    Weinstein then proceeded to conduct the "interview" in his underwear. The intimidation engendered by Weinstein's industry power was multiplied by his strange behavior. Weinstein's behavior made Thomas very uncomfortable.

109.    During the interview, two of Weinstein's children ran into the room, curious to see who was visiting. Weinstein screamed at them to leave, which was odd because in Thomas's experience, parents typically are eager for children to meet a potential nanny during the

interview.  The fact that Weinstein yelled at his children not to come back also made Thomas feel unsafe, given he was in his underwear and they were otherwise alone in the house. Moreover, Weinstein's temper and the way he screamed at his children frightened Thomas.

110.     Eventually, leaning forward and wiggling his eyebrows as if leering at her, Weinstein asked whether she would "flirt" with his friends to "get ahead."  Thomas was disgusted and uncomfortable.

111.     At the conclusion of the interview, still clad only in his underclothes, Weinstein grabbed Thomas and pulled her tight against his body. The hug was uncomfortably close, and lasted too long. She did not know how to get out of his embrace. Weinstein then told Thomas that he loved her. Thomas felt unsafe and sexualized. She was afraid to try and pull away or push him off or even ask him to stop because she feared he may become violent.

112.     Thomas left feeling upset, shaken, afraid and disrespected.  When she returned home, she told the story to her mother.

113.     A few days later, Weinstein's assistant informed Thomas that she did not get the job because she was an actor. On information and belief, the reason Thomas was not hired was because she did not respond to Weinstein's propositions.

114.     After Weinstein was terminated from TWC, Thomas finally felt she could speak publicly about Weinstein's predatory behavior. She has also publicly declared that she will not audition for roles for productions in which known predators are involved. In early December 2017, Thomas was informed that several casting directors had complained about Thomas's public position, implicitly threatening to blacklist her.

- 33 -

6.    **Plaintiff Nannette Klatt's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise.**

115.    While at an audition on the first floor of a building also occupied by Miramax, an associate of Weinstein's invited Klatt to meet Weinstein in his private office on another floor, because he was reportedly casting a film and was looking for an actress who had her "look".  The meeting was timed for the end of the workday.  Klatt shook hands, provided her headshot and resume to Weinstein and engaged in cordial pleasantries and polite conversation.

116.    Weinstein then asked her to read from a script, explaining that he was looking for a new face with a "very European look."  Klatt and Weinstein then read from three pages of the untitled script; she read a few more pages with him upon his request.  Weinstein appeared very happy and pleased and told her he had several other projects she might "be right for."  He told Klatt that she was "exactly what I am looking for" and that she had gotten the part and told her to take the script home to study. Klatt placed the script in her briefcase and prepared to leave.

117.    Weinstein then told her he "just needed one more thing from you." He asked her to disrobe and explained he needed to see her breasts, repeatedly stating, "It's just your breasts." When Klatt refused repeatedly, Weinstein told her to "take your dress down" and "you are going to need to expose them."  Weinstein told Klatt that the role required him to review and approve of her breasts.  Klatt, realizing she was about to be sexually assaulted, was terrified.

118.    When Klatt continued to refuse, Weinstein angrily inquired whether she knew who he was, told her he could "make" her or "break" her, and that she would "never work in this town again."  "You know, I could launch your career and I can make you or I can break you," he insisted, again demanding that she expose her breasts.  Weinstein then told Klatt to "Give me my script back."  Weinstein was belligerent and ranting.  He told her, "Without me, you will never work again."

- 34 -

119.     Weinstein then told Klatt to show herself out and advised her she could not use the main door.  He corralled her to a side door that led into a pitch-black stairwell. He then locked the door behind her.   Klatt, realizing she was locked in, banged on the door and begged to be let out.  Scared and upset, she panicked, walking up and down flights of stairs, banging on doors and yelling on each landing that she was locked in - all the while not knowing whether Weinstein would return and assault her further. Terrified and sweating through her dress, Klatt feared for her safety and life.  Finally, a maintenance worker heard her yelling and let her out; that worker immediately asked Klatt if she was coming from Weinstein's floor.

120.     This assault was profoundly disturbing and life changing for Klatt. As a result, Klatt has changed how she conducts her life, pursues her career, takes meetings and interacts with men both personally and professionally.  She limits interactions that are one-on-one, even though those meetings are necessary to connect and bond with both professional colleagues and personal acquaintances. Her professional and personal interactions are thus limited by her fears generated by Weinstein's assault. In other words, Klatt lost the part Weinstein offered, lost other opportunities at Miramax and TWC, and has lost other professional opportunities as the consequence of Weinstein's assault.

**D.     Miramax and TWC facilitated Weinstein's predatory behavior.**

121.     The "Complicit Producers" Miramax and TWC often aided and abetted Weinstein in the commission of his sexual misconduct. For example, female employees of TWC were often used as "honeypots" to make Weinstein's victims feel safe. The "honeypots" would initially join

a meeting along with a Class Member or woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[49]

122.    Sixteen current and former executives and assistants at TWC told a reporter from *The New Yorker* about a pattern of professional meetings that were pretexts for sexual advances on young actresses and models. "All sixteen said that the behavior was widely known within both Miramax and the Weinstein Company."[50]

123.    Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting at TWC from 2005 to the present, who previously worked in the same capacity at Miramax from 1989 to 2005,[51] sent messages to Emily Nestor, a temporary employee of TWC, who alleged that she was harassed, describing Weinstein's "mistreatment of women" as an ongoing problem at TWC.[52]

124.    A female executive at the Complicit Producers told *The New Yorker*: "There was a large volume of these types of meetings that Harvey would have with aspiring actresses and models." "He would have them late at night, usually at hotel bars or in hotel rooms. And, in order to make these women feel more comfortable, he would ask a female executive or assistant to start those meetings with him."[53]

---

[49] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[50] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[51] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[52] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[53] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

125.     A female employee at TWC, Lauren O'Connor, wrote in a memo obtained by *The New York Times* that Weinstein required her to schedule casting discussions with aspiring actresses after they had private appointments in his hotel room. "She suspected that she and other female Weinstein employees, she wrote, were being used to facilitate liaisons with 'vulnerable women who hope he will get them work.'"[54]

126.     Mark Gil, the former president of Miramax Los Angeles from approximately 1994 to 2002,[55] told *The New York Times* that behind the scenes at Miramax, Weinstein's treatment of women "was the biggest mess of all."[56]

127.     TWC ratified Weinstein's conduct – and found it an acceptable part of his employment, contracting with Weinstein that he could not be fired for it. TWC's Board of Directors approved employment contracts for Weinstein for the periods 2005 to 2010 and 2010 to 2015; those contracts provided that Weinstein could only be terminated for two types of offenses. The first was a conviction for a felony involving "moral turpitude."  The second was a major misuse of TWC funds, although Weinstein had a cure period.[57]

128.     As to sexual assault, according to Director Maerov: "He had to be *convicted* of a felony, and not just any felony, only one involving moral turpitude.  If we'd had documentary evidence of sexual harassment, the absurdity of his old contract still would have prevented us from terminating him."[58]

---

[54] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[55] http://articles.latimes.com/2002/oct/16/business/fi-gill16.

[56] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[57] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

[58] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

129.    During the negotiations to renew Weinstein's contract in 2015, Maerov requested to see Weinstein's personnel file, thus indicating that the Board had knowledge of Weinstein's misconduct. Law Firm Participant Boies not only withheld Weinstein's file but also tried to cover up Weinstein's pattern and practice of sexual assault. Nonetheless, he confirmed that settlements to women had been paid.  Boies has indicated that Weinstein's file was subsequently turned over to the Board, which "has not identified anything in it of which the Board was not aware in 2015." [59]

130.    Boies also said, in a letter to the *Financial Times* on October 24, 2017, that the assertion "that Messrs. Maerov and Ben Ammar did not know about Mr. Weinstein's settlements with women when they approved his 2015 contract… is simply false." [60]

131.    According to TMZ.com, which reportedly obtained a copy of Weinstein's 2015 employment contract, Weinstein and TWC agreed that "if he gets sued for sexual harassment or any other 'misconduct' that results in a settlement or judgment against TWC, all Weinstein has to do is pay what the company's out, along with a fine, and he's in the clear."[61]

132.    Allegedly, the contract provides that, if Weinstein "'treated someone improperly in violation of the company's Code of Conduct,' he must reimburse TWC for settlements or judgments. Additionally, 'You [Weinstein] will pay the company liquidated damages of $250,000 for the first such instance, $500,000 for the second such instance, $750,000 for the

---

[59] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

[60] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

[61] https://www.tmz.com/2017/10/12/weinstein-contract-the-weinstein-company-sexual-harassment-firing-illegal/ (last accessed November 7, 2017).

third such instance, and $1,000,000 for each additional instance.'"[62]  The Code of Conduct, adopted in September 2015, provides for standard violations such as "sexual harassment," "intimidating or threatening behavior," and receiving "a personal benefit as a result of the employee's position with TWC." [63] Weinstein and TWC further agreed that Weinstein's payment "constitutes a 'cure' for the misconduct and no further action can be taken."[64]

133.    These provisions in an employment contract are unique – and reflect TWC's knowledge that Weinstein was more likely than not to engage in sexual harassment and other misconduct affecting the Class and female employees.

134.    TWC and Miramax are liable for Weinstein's conduct, because it was perpetuated within the scope of his employment.

135.    Miramax and TWC's executives, officers and employees had actual knowledge of Weinstein's repeated acts of sexual misconduct with women. In particular, Defendants were aware of Weinstein's pattern of using his power to coerce and force young women to engage in sexual acts with him. This knowledge was possessed by Miramax and TWC's Board of Directors,

136.    Defendants were aware of allegations of sexual misconduct against Weinstein going back to the 1990s.

---

[62] *Id.*

[63] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

[64] *Id.*

137.    Mira Sorvino, who was harassed by Weinstein, told a Miramax female employee about the harassment. Rather than shock and horror at Weinstein's action, the employee's reaction "was shock and horror that I had mentioned it."[65]

138.    Kathy DeClesis, Bob Weinstein's assistant in the early 1990s at Miramax stated to *The New York Times*: "It [Weinstein's harassment of women] wasn't a secret to the inner circle."[66]

139.    Weinstein's 2015 employment contract with TWC also reflects that these acts of sexual harassment did or were highly likely to occur within the scope of his employment, providing contingency payments to cover the business expenses associated with such occurrences.

### E.    The Weinstein Sexual Enterprise or "Army of Spies"

#### 1.    The common purpose of the enterprise was to harass and mislead Class members and the media to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence.

140.    Throughout the Class Period, the Weinstein Sexual Enterprise had the common purpose of preventing (or attempting to prevent) the reporting, prosecution, or disclosure of Weinstein's sexual misconduct through harassment, threats, extortion, and misrepresentations to Weinstein's victims and the media.

141.    The Weinstein Sexual Enterprise also shared the common purpose of destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report, prosecute, and/or publicize Weinstein's sexual offenses, including, but not limited to, the execution of non-disclosure agreements intended to cover up, squelch, and

---

[65] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[66] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

- 40 -

maintain the veil of secrecy around Weinstein's offenses, with threat of legal proceedings or financial duress if the victims were to disclose their experiences.

### 2. Each member of the Enterprise played a role in directing and participating in the Weinstein Sexual Enterprise.

142.    The Weinstein Participants determined the members of the Weinstein Sexual Enterprise and assigned each member of the enterprise a task or tasks to fulfill the common purpose of using false pretenses to prevent the publication or reporting of Weinstein's sexual misconduct and to destroy evidence. Weinstein personally monitored the progress of the investigations.

143.    The Complicit Producers—TWC and Miramax—each allowed Weinstein to conduct business at their offices, were aware of his misconduct and agreed to conceal it so that they could continue to benefit from their lucrative collaborations with Weinstein.

144.    The Intelligence Participants targeted dozens of Class Members and reporters, using false names and identities to gather information from them regarding Weinstein's sexual offenses, illegally recording conversations, and compiling psychological profiles that focused on the Class Members' personal or sexual histories that could be used to extort those individuals' silence. The Intelligence Participants also destroyed or concealed evidence, including but not limited to documents and recordings.

145.    The Film Participants collected names of Class Members and reporters with information concerning Weinstein's sexual offenses and placed calls to the Class Members and reporters to intimidate them and prevent them from reporting Weinstein's sexual misconduct.

146.    The Law Firm Participants provided cover and shield to the Weinstein Participants by contracting with the Intelligence Participants on behalf of the Weinstein Participants and permitting the Weinstein Participants to protect evidence of Weinstein's

- 41 -

misconduct under the guise of the attorney-client privilege or the doctrine of attorney work product when that was not the case. The Law Firm Participants also approved the Intelligence Participants' "operational methodologies," which were illegal.

147.    The Journalist Participants also gathered information from Weinstein's victims regarding Weinstein's sexual offenses under the pretense of writing a story, illegally recorded conversations, and compiled profiles that focused on their personal or sexual histories that could be used to extort those individuals' silence.

### 3.    The Weinstein Sexual Enterprise engaged in a pattern of racketeering activity.

148.    As an example of how the Enterprise worked, in 2016 and 2017, Weinstein learned that several reporters were talking to Class Members regarding their allegations of rape, battery and assault by Weinstein. Weinstein directed the Law Firm Participant Boies Schiller to retain the Intelligence Participant Black Cube to investigate which Class Members were providing information, to gather intelligence to prevent the reporting or publication of the accusations, and to secretly record Class Members' conversations.[67]

149.    In October 2016, Boies Schiller and Black Cube signed a contract to help the Weinstein Sexual Enterprise. They also signed several subsequent contracts for the same purposes. On or about October 28, 2016, Boies Schiller wired Black Cube an initial payment of $100,000 to fulfill those purposes. [68]

---

[67] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[68] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

150.    Rose McGowan intended to publish a book detailing how Weinstein raped her in 1997. Weinstein directed the Law Firm Participant Boies Schiller to retain the Intelligence Participant Black Cube to prevent the reporting of the rape, [69] and Black Cube agreed to do so.

151.    Boies Schiller did retain Black Cube pursuant to a contract dated July 11, 2017, providing that the project's "primary objectives" are to "provide intelligence which will help the Client's efforts to completely stop the publication of a new negative article in a leading NY newspaper" and to "obtain additional content of a book which currently being written and includes harmful negative information on and about the Client," who allegedly is identified as Weinstein in multiple documents obtained by *The New Yorker*. [70]

152.    The July 11, 2017, contract included several "success fees" if Black Cube met its goals, including $300,000 if the agency "provide[d] intelligence which will directly contribute to the efforts to completely stop the Article from being published at all in any shape or form" and $50,000 if it secured "the other half" of McGowan's book "in readable book and legally admissible format." [71]

153.    The contract between Boies Schiller and Black Cube included a description of the duplicitous tactics to be used to accomplish the objectives of the Weinstein Sexual Enterprise. [72]

154.    Black Cube agreed to provide "a dedicated team of expert intelligence officers that will operate in the USA and any other necessary country," including a project manager, intelligence analysts, linguists, and "Avatar Operators" specifically hired to create fake identities on social media, along with "operations experts with extensive experience in social engineering."

---

[69] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[70] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[71] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[72] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

The agency also said that it would provide "a full time agent by the name of 'Anna' (hereinafter 'the Agent'), who will be based in New York and Los Angeles as per the Client's instructions and who will be available full time to assist the Client and his attorneys for the next four months." According to *The New Yorker*, four sources with knowledge of Weinstein's work with Black Cube confirmed that this was the same woman who would meet with McGowan and Ben Wallace, a reporter from New York who was working on a story about Weinstein, under false pretenses. [73]

155.    Black Cube also agreed to hire "an investigative journalist, as per the Client request," who would be required to conduct ten interviews a month for four months and be paid forty thousand dollars. Black Cube agreed to "promptly report to the Client the results of such interviews by the Journalist." [74]

156.    Black Cube did fulfill its contract with Boies in furtherance of the Weinstein Sexual Enterprise's objectives. In May 2017, Rose McGowan received an e-mail from a literary agency introducing her to a woman who identified herself as Diana Filip, the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. In reality, Filip was an employee of Black Cube, which had developed the fictional Reuben Capital Partners. According to *The New Yorker*, "Diana Filip" was an alias for a former officer in the Israeli Defense Forces who originally hailed from Eastern Europe. [75]

157.    Duplicitously claiming in an email that she was launching an initiative to combat discrimination against women in the workplace, Filip asked McGowan to speak at a gala kickoff

---

[73] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[74] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[75] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

event for a fee of sixty thousand dollars. Using false pretenses, Filip met with McGowan on at least four occasions, including at the Peninsula Hotel in Beverly Hills, in hotel bars in Los Angeles and New York, and on the Venice boardwalk.  Filip repeatedly told McGowan that she wanted to make a significant investment in McGowan's production company. The purpose of these meetings, which were secretly recorded by the Intelligence Participant Black Cube, was to extract information regarding Weinstein and to prevent the publication of McGowan's book and/or the reporting of accusations against Weinstein. [76]

158.    At one meeting in September 2017, Filip was joined by another Black Cube operative, who used the name Paul and claimed to be Filip's colleague at Reuben Capital Partners. The purpose of the meeting was to pass McGowan to another operative to extract more information. [77]

159.    Black Cube used information extracted from McGowan regarding McGowan's reporting of the rape to a reporter at *The New Yorker* to contact the reporter in an attempt to prevent the publication of the accusation. [78]

160.    In 2016, Black Cube's Filip used a second alias, "Anna," to meet twice with Ben Wallace, suggesting she had an allegation against Weinstein. However, Anna never shared information, but instead pushed the reporter for information about what he knew and who he was talking to.  During their second meeting, Anna requested that they sit close together, leading Wallace to suspect that she was secretly recording their conversation. [79]

---

[76] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[77] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[78] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[79] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

161.    Filip also allegedly used her alias to email Jodi Kantor, a reporter for *The New York Times*, regarding a story about Weinstein. [80]

162.    Black Cube also retained a freelance journalist to further the objectives of the Weinstein Sexual Enterprise, providing the journalist with contact information for victims, journalists, and Weinstein's business rivals. The freelancer conducted interviews to be used by the Weinstein Sexual Enterprise and provided summaries of those interviews to Black Cube, which then sent the summaries to one or more Law Firm Participants, including Boies Schiller. [81]

163.    In January 2017, the freelance journalist called McGowan and secretly recorded their lengthy conversation. He also contacted other Class Members (including the actress Annabella Sciorra and, on information and belief, Plaintiff Katherine Kendall), Ben Wallace, Ronan Farrow (*The New Yorker*) in furtherance of the objectives of the enterprise. [82]

164.    Weinstein also enlisted Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*, to have his reporters obtain information that would discredit McGowan.  Howard obtained secret recordings of those interviews from his reporters and shared them with Weinstein to be used to discredit victims of Weinstein's sexual offenses. [83]

165.    Kroll's participation in the Weinstein Sexual Enterprise included the destruction of evidence.  After Ambra Battilana Gutierrez, an Italian model, accused Weinstein of sexually

---

[80] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[81] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[82] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[83] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

assaulting her in 2015, Weinstein required her to surrender all her personal devices to Kroll so that evidence of a conversation in which Weinstein admitted to groping her could be deleted. [84]

166.     E-mails obtained by *The New Yorker* also purportedly show that Dan Karson, the chairman of Kroll America's Investigations and Disputes practice, contacted Weinstein at his personal e-mail address with information intended to discredit Class Members.[85]

167.     Other unidentified Intelligence Participants prepared similar reports. One such profile targeted Rosanna Arquette, an actress who later, in *The New Yorker*, accused Weinstein of sexual harassment. The file mentions Arquette's friendship with McGowan, Arquette's social-media posts about sexual abuse, and the fact that a family member had gone public with an allegation that Arquette had been molested as a child. [86]

## F.     The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress pursuant to which Weinstein threatened the Class if they complained.

168.     The power Weinstein wielded – and his ability to blacklist an actress or model for complaining about his predatory behavior – was so legendary that it was the rule in the entertainment industry that women needed to acquiesce to Weinstein to succeed. This rule was so widely accepted that male producers and actors laughingly voiced their expectations that Plaintiff and the Class had and would follow it to further their careers. For example, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, was onstage to

---

[84] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[85] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[86] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

- 47 -

announce the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[87]

169.    If women did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[88] This uniform response to those who challenged Weinstein's behavior, which was widely known throughout the industry, actually and reasonably placed class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

170.    For example, Asia Argento, an Italian film actress and director, said that she did not speak out until 2017, after Weinstein had "forcibly performed oral sex on her" years before, "because she feared that Weinstein would 'crush' her. 'I know he has crushed a lot of people before… That's why this story—in my case, it's twenty years old, some of them are older—has never come out.'"[89]

171.    Four actresses, including Mira Sorvino and Rosanna Arquette, told *The New Yorker* that "they suspected that, after they rejected Weinstein's advances or complained about them to company representatives, Weinstein had them removed from projects or dissuaded people from hiring them." Multiple sources told the same reporter that "Weinstein frequently bragged about planting items in media outlets about those who spoke against him; these sources feared similar retribution."

---

[87] http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/ (last accessed Nov. 1, 2017).

[88] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[89] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

172.     Several sources "pointed to Gutierrez's case: after she went to the police, negative items discussing her sexual history and impugning her credibility began rapidly appearing in New York gossip pages. (In the taped conversation, part of which *The New Yorker* posted online, Weinstein asks Gutierrez to join him for "five minutes," and warns, "Don't ruin your friendship with me for five minutes.")[90]

173.     Women who spoke to *The New Yorker* on condition of anonymity "were too afraid to allow me to use their names, but their stories are uncannily similar to these allegations. One, a woman who worked with Weinstein, explained her reluctance to be identified. 'He drags your name through the mud, and he'll come after you hard with his legal team.'"[91]

174.     Mira Sorvino, who rejected Weinstein's advances and complained about his harassment to Miramax, "felt that saying no to Weinstein and reporting the harassment had ultimately hurt her career." She told a reporter from *The New Yorker*, "…I definitely felt iced out and that my rejection of Harvey had something to do with it."[92]

175.     After Gwyneth Paltrow was harassed, she complained to her then-boyfriend Brad Pitt, who confronted Weinstein, who subsequently called and berated Paltrow for disclosing what happened. Paltrow feared she would be fired from the Miramax film *Emma* if she complained further.[93]

---

[90] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[91] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[92] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[93] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

176.     After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told not to say anything so as not to endanger the release of the Miramax films in which she appeared.[94]

177.     Darryl Hannah felt immediate repercussions from turning down Weinstein's advances and sexual demands. A Miramax plane on a film tour left without her, her plane and hotel reservations were cancelled, and her hair and make-up artist was let go.[95]  Hannah was not about to let Weinstein's actions go, however – she complained to her manager, a producer on the film, and her director, Quentin Tarantino, who has since admitted that he did nothing.[96] Nonetheless, Hannah not only was not believed but also, consistent with the objectives of the Weinstein Sexual Enterprise, was "berated, criticized, and blamed."[97]

178.     Moreover, "Weinstein enforced a code of silence; employees of the Weinstein Company have contracts saying they will not criticize it or its leaders in a way that could harm its 'business reputation' or 'any employee's personal reputation,' a recent document shows."[98]

179.     Shortly before *The New York Times* and *The New Yorker* finally revealed the decades-long pattern of harassment, Weinstein and his legal team began calling Class Members,

---

[94] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[95] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[96] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[97] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[98] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

threatening them for talking. They also threatened to sue *The New York Times* and other media outlets.[99]

180.    The type of emotional and physical abuse Weinstein used to command silence from his victims and cover up his assaults has been studied by psychologists. Psychologists John Gottman and Neil Jacobsen, authors of *When Men Batter Women* (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from systematic abuse at the hands of a partner. The four factors that determine emotional violence, Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage.  Each of these factors can be found in Weinstein's abuse of Plaintiffs and the Class.

181.    The statute of limitations was thus tolled at least until *The New York Times* published a powerful report revealing allegations of sexual harassment against Weinstein, which led to the resignation of four members of TWC's Board and to the firing of Weinstein.

182.    According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain.  Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally.  Firing him was crucial to opening the floodgates."[100]

## V.    CLASS ALLEGATIONS

183.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(c)(4) on behalf of themselves and the following "Nationwide Class":

---

[99] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[100] Shawn Tully, "How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power," *Fortune* (Nov. 24, 2017).

> All women who met with Harvey Weinstein in person (i) to
> audition for or to discuss involvement in a project to be produced
> or distributed by either The Weinstein Company Holdings, LLC
> or, prior to September 30, 2005, Miramax LLC, or (ii) in a meeting
> or event facilitated, hosted, or underwritten by TWC or, prior to
> September 30, 2005, Miramax LLC.

184.    In addition, Plaintiffs Zoe Brock, Katherine Kendall, and Melissa Sagemiller

assert certain state law claims on behalf of the "Miramax Subclass," defined as:

> All women who met with Harvey Weinstein in person, before
> September 30, 2005, (i) to audition for or to discuss involvement in
> a project to be produced or distributed by Miramax LLC or (ii) in a
> meeting or event facilitated, hosted, or underwritten by Miramax
> LLC.

185.    Plaintiffs Louisette Geiss and Sarah Ann Thomas also assert certain state law

claims on behalf of the "TWC Subclass," defined as:

> All women who met with Harvey Weinstein in person (i) to
> audition for or to discuss involvement in a project to be produced
> or distributed by The Weinstein Company Holdings, LLC, or (ii) in
> a meeting or event facilitated, hosted, or underwritten by The
> Weinstein Company Holdings, LLC.

The Nationwide Class, Miramax Subclass, and TWC Subclass are hereinafter referred to as the

"Classes."

186.    The Classes consist of dozens, if not hundreds, of women, making joinder

impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the

identities of the individual members are ascertainable through records maintained by Weinstein,

the Complicit Producers, and members of the Weinstein Sexual Enterprise. For example, one

former employee of the Complicit Producers told *The New Yorker* that "she was asked to keep

track of the women, who, in keeping with a practice established by Weinstein's assistants, were all filed under the same label in her phone: F.O.H., which stood for 'Friend of Harvey.'"[101]

187.    The claims of Plaintiffs are typical of the Class and the respective Subclasses. The claims of the Plaintiff and the Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

188.    There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

189.    Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

a.    Whether Defendants engaged in a scheme with the Intelligence Participants, Law Firm Participants, Journalist Participants and others to use false pretenses to tamper with victims and witnesses of Weinstein's sexual misconduct in order to prevent the publication, prosecution or reporting of Weinstein's sexual misconduct and to destroy evidence.

b.    Whether Defendants violated RICO, 18 U.S.C. § 1962.

c.    Whether Weinstein engaged in a pattern and practice of sexual harassment, assault, and battery.

d.    Whether Weinstein's pattern and practice of sexual harassment, assault and battery was committed within the scope of his employment at Miramax or TWC.

---

[101] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

010717-11 1002900 V1

e.  Whether TWC, TWC's Board, or Miramax had knowledge of Weinstein's pattern and practice of sexual harassment, assault, and battery.

f.  Whether TWC, TWC's Board, or Miramax facilitated Weinstein's pattern and practice of sexual harassment, assault, and battery.

g.  Whether TWC, TWC's Board, or Miramax ratified Weinstein's pattern and practice of sexual harassment, assault, and battery.

h.  Whether Weinstein, TWC, TWC's Board, or Miramax engaged in conduct designed to suppress complaints or reports regarding Weinstein's conduct.

i.  Whether Miramax, TWC or TWC's Board negligently retained or supervised Weinstein.

j.  Whether Miramax and/or TWC are responsible for Weinstein's conduct under the doctrine of *respondeat superior*.

190.  Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to TWC and Miramax's legal responsibility for Weinstein's actions, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

191.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and have the financial resources to do so.

- 54 -

Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Classes.

## VI.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(C)
### (PLAINTIFFS VERSUS THE WEINSTEIN SEXUAL ENTERPRISE)

192.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.  Plaintiffs assert Count I on behalf of the Nationwide Class.

193.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

194.    The Weinstein Sexual Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; (ii) the Weinstein Participants; (iii) the Intelligence Participants; (iv) the Firm Participants; (v) the Journalist Participants; (v) the Film Participants, and other unnamed co-conspirators as set forth *supra*. The Weinstein Sexual Enterprise is an ongoing organization that functions as a continuing unit. The Weinstein Sexual Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Weinstein Sexual Enterprise.

195.    The Weinstein Sexual Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) harassing, threatening, extorting, and misleading Weinstein's victims and the media to prevent the reporting, disclosure, or prosecution of his sexual misconduct, and (ii) destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report (or prosecute) his sexual offenses.

196.     Defendants have conducted and participated in the affairs of the Weinstein Sexual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of tampering with a witness or victim in violation of 18 U.S.C. § 1512, and multiple instances obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18 U.S.C. §§ 1590 and 1591 as described above. The pattern of racketeering activity also included multiple instances of mail and wire fraud as described below.

197.     The Weinstein Sexual Enterprise engaged in and affected interstate commerce, because, *inter alia*, Weinstein, TWC, and Miramax contracted with multinational corporations not only for movie and television productions but also for the investigation, slander, blacklisting and blackmail of Weinstein's victims.

198.     Defendants exerted control over the Weinstein Sexual Enterprise, and Defendants participated in the operation or management of the affairs of the Weinstein Sexual Enterprise.

199.     Within the Weinstein Sexual Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Weinstein Sexual Enterprise used this common communication network for the purpose of enabling Weinstein's sexual activities.

200.     Each participant in the Weinstein Sexual Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities. Through the Weinstein Sexual Enterprise, the Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

201.    The RICO Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

(a)    Contracts between Weinstein and the Law Firms and Intelligence Participants;

(b)    Wires among the Complicit Producers about Weinstein's sexual misconduct;

(c)    Wires and mails between the Law Firms and the Intelligence Participants on the subject of Weinstein's sexual activities, his victims, and concealing his acts of sexual misconduct;

(d)    Payments to the Law Firm Participants and Intelligence Participants to perform their roles in concealing Weinstein's sexual misconduct;

(e)    Emails from the Law Firm Participants to lawyers retained by Class Members to encourage confidentiality in connection with accusations of sexual misconduct by Weinstein;

(f)    Emails from the Intelligence Participants to Class Members in connection with inquiries or meetings designed to elicit information from Class Members using deception;

(g)    Use of the wires by the Intelligence Participants to construct false identities and websites to deceive Class Members and journalists.

202.    The RICO Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

- 57 -

203.    The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

204.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions,   and other third-party entities in furtherance of the scheme.

205.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive the public about Weinstein's sexual activities.

206.    To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness of Weinstein's conduct and the RICO Defendants suppressed and/or ignored warnings from third parties about his conduct.

207.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to hide and conceal Weinstein's conduct.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

208.    The pattern of racketeering activity alleged herein and Weinstein are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Weinstein Sexual Enterprise.

209.    Plaintiffs have been injured in their property and business by reason of these violations.  Defendants interfered with Plaintiffs' current and prospective contractual relations,

- 58 -

because Plaintiffs lost employment and employment opportunities, as well contractual and contractual opportunities, as a result of Weinstein's conduct.

210.     Had members of the Weinstein Sexual Enterprise not been complicit and had they revealed instead of concealed Weinstein's predatory behavior, Plaintiffs and members of the Class would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

211.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (PLAINTIFFS  VERSUS THE WEINSTEIN SEXUAL ENTERPRISE)

212.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein. Plaintiffs bring this Count II on behalf of the Nationwide Class.

213.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

214.     Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

215.     As demonstrated in detail above, Defendants' co-conspirators, including, but not limited to, the Weinstein Participants, the Intelligence Participants, the Law Firm Participants, the Film Participants, and the Journalist Participants have engaged in numerous overt and

predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of tampering with a victim or witness in violation of 18 U.S.C. § 1512.

216.    The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.  At all relevant times, all Defendant and all Defendants' co-conspirators were aware of the essential nature and scope of the Weinstein Sexual Enterprise and intended to participate in it.

217.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

218.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT III

### NEGLIGENT SUPERVISION AND RETENTION
### (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT
### VERSUS MIRAMAX AND ROBERT WEINSTEIN)

219.    Plaintiffs Zoe Brock, Katherine Kendall, Melissa Sagemiller, and Nannette Klatt restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring Count III against Miramax and Robert Weinstein on behalf of the Miramax Subclass.

220.    At all times material prior to September 30, 2005, Miramax employed Weinstein and Weinstein was an executive and/or director of Miramax.  Robert Weinstein was also an executive and/or director of Miramax.

221.    Weinstein was unfit or incompetent to work directly with Class Members and posed a particular risk of sexually harassing and assaulting them.

222.    Miramax and Robert Weinstein knew or should have known not only that Weinstein was unfit or incompetent to work directly with women and posed a particular risk of sexually harassing and assaulting them but also that this unfitness created a particular risk to Plaintiff and the Class.

223.    Weinstein's unfitness and particular risk to Class Members and women in the entertainment industry harmed Plaintiff and the Class.

224.    Miramax and Robert Weinstein's negligence in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiff and the Class.

### COUNT IV

### NEGLIGENT SUPERVISION AND RETENTION
### (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS TWC
### AND TWC'S BOARD MEMBERS)

225.    Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring Count IV against TWC and TWC's Board of Directors on behalf of the TWC Subclass.

226.    At all times material from September 30, 2005, to October 2017, TWC employed Weinstein and Weinstein was an executive and/or director of TWC.

227.    Weinstein was unfit or incompetent to work directly with Class Members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them.

010717-11 1002900 V1

228.     TWC and TWC's Board of Directors knew or should have known not only that Weinstein was unfit or incompetent to work directly with Class Members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them but also that this unfitness created a particular risk to Plaintiffs and the Class.

229.     Weinstein's unfitness and particular risk to women in the entertainment industry harmed Plaintiffs and the Class.

230.     TWC and its Board of Directors' negligence in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiffs and the Class.

## COUNT V

### CIVIL BATTERY
### (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT
### VERSUS MIRAMAX AND WEINSTEIN)

231.     Plaintiffs Zoe Brock, Katherine Kendall, Melissa Sagemiller, and Nannette Klatt restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count V on behalf of the Miramax Subclass.

232.     Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class Members. He did so by, *inter alia*:

       a.     Isolating Plaintiffs and Class Members in closed quarters and dismissing any bystanders; and

       b.     Demanding or threatening sexual contact.

233.     Weinstein did commit an unwanted contact with Plaintiffs and the Class Members' person or property in a harmful or offensive manner, including but not limited to causing sexual contact between Weinstein and each Class Member.

- 62 -

234.    Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm to each Class Member.

235.    Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class Member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

236.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

237.    Holding Miramax liable furthers the policy goals of *respondeat superior,* including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT VI
## CIVIL BATTERY
## (LOUISETTE GEISS AND SARAH ANN THOMAS
## VERSUS TWC AND WEINSTEIN)

238.    Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count VI against TWC and Weinstein on behalf of the TWC Subclass.

239.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class Members. He did so by, *inter alia*:

a.    Isolating Plaintiffs and Class Members in closed quarters and dismissing any bystanders; and

b.    Demanding or threatening sexual contact.

240.    Weinstein did commit an unwanted contact with Plaintiffs and the Class Members' person or property in a harmful or offensive manner, including, but not limited to, causing sexual contact between Weinstein and each Class Member.

241.    Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class Member.

242.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class Member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia,* the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

243.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

- 64 -

244.     Holding TWC liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT VII

### ASSAULT
### (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER, AND NANNETTE KLATT
### VERSUS WEINSTEIN AND MIRAMAX)

245.     Plaintiffs Zoe Brock, Katherine Kendall, Melissa Sagemiller, and Nannette Klatt restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count VII against Weinstein and Miramax on behalf of the Miramax Subclass.

246.     Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiff and the Class Members. He did so by, *inter alia*:

   a.   Isolating Plaintiffs and the Class Members in closed quarters and dismissing any bystanders;

   b.   Demanding or threatening sexual contact;

   c.   Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

   d.   Threatening harm to the careers and reputations of Plaintiffs and the Class Members if they did not participate in such conduct.

247.     Weinstein's actions did, in fact, cause Plaintiffs and the Class Members to fear imminent harmful or offensive contact by Weinstein.

- 65 -

248.     Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class Member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

249.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

250.     Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

### COUNT VIII

### ASSAULT
### (LOUISETTE GEISS AND SARAH ANN THOMAS
### VERSUS WEINSTEIN AND TWC)

251.     Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count VIII against Weinstein and TWC on behalf of the TWC Subclass.

252.     Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiffs and the Class Members. He did so by, *inter alia*:

a.   Isolating Plaintiffs and the Class Members in closed quarters and dismissing any bystanders;

b.   Demanding or threatening sexual contact;

c.   Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.   Threatening harm to the careers and reputations of Plaintiffs and the Class Members if they did not participate in such conduct.

253.   Weinstein's actions did, in fact, cause Plaintiffs and the Class Members to fear imminent harmful or offensive contact by Weinstein.

254.   Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class Member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia,* the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

255.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class Members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

- 67 -

256.     Holding TWC liable advances the policy goals of *respondeat superior*, including

the prevention of future injuries and the assurance of compensation to victims, given that

Plaintiff and the Class Members do not have separate remedies under Title VII because they

were not employees of TWC.

## COUNT IX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE KLATT VERSUS WEINSTEIN AND MIRAMAX)

257.     Plaintiffs Zoe Brock, Katherine Kendall, Melissa Sagemiller, and Nannette Klatt

restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein,

and bring this Count IX on behalf of the Miramax Subclass.

258.     Weinstein's extreme and outrageous conduct intentionally or recklessly caused

severe emotional distress to Plaintiffs and the Class Members.

259.     Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious

behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all

possible bounds of decency.

260.     Weinstein acted with intent or recklessness, knowing that his female victims were

likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the

women and prevent them from complaining or suing based on his actions.  He did so with

deliberate disregard as to the high possibility that severe emotional distress would occur.

261.     Weinstein's conduct caused suffering for Plaintiffs and the Class Members at

levels that no reasonable person should have to endure.

262.     Weinstein's conduct was committed within the scope of his employment at

Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the

entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter

those women.  Each act of battery of a Class Member lured with the prospect of being cast in a

Miramax production or to meet or work with Miramax and Weinstein was foreseeable given,

*inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on

Miramax property or at locations paid for by Miramax.

263.    Weinstein's conduct is not so unusual or startling that it would seem unfair to

include the loss resulting from it among other costs of Miramax's business. Assaults in the

context of the "casting couch" are exactly why Class Members and other female members of the

entertainment industry would expect production companies to take extra precautions to ensure

that they are protected from abuse by a powerful executive.

264.    Holding Miramax liable advances the policy goals of *respondeat superior*,

including the prevention of future injuries and assurance of compensation to victims, given that

Plaintiff and the Class Members do not have separate remedies under Title VII because they

were not employees of Miramax.

## COUNT X

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS WEINSTEIN AND TWC)

265.    Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein

by reference the preceding paragraphs as if fully set forth herein, and bring this Count X on

behalf of the TWC Subclass.

266.    Weinstein's extreme and outrageous conduct intentionally or recklessly caused

severe emotional distress to Plaintiff and the Class Members.

267.    Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious

behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all

possible bounds of decency.

268.     Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

269.     Weinstein's conduct caused suffering for Plaintiffs and the Class Members at levels that no reasonable person should have to endure.

270.     Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class Member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia,* the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

271.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class Members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

272.     Holding TWC liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of TWC.

**COUNT XI**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER AND NANNETTE**
**KLATT VERSUS WEINSTEIN AND MIRAMAX)**

273.    Plaintiffs Zoe Brock, Kathereine Kendall, Melissa Sagemiller, and Nannette Klatt

restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein,

and bring this Count XI on behalf of the Miramax Subclass.

274.    Weinstein's conduct negligently caused emotional distress to Plaintiffs and the

Class Members.

275.    Weinstein could reasonably foresee that his action would have caused emotional

distress to Plaintiffs and the Class Members.

276.    Plaintiffs and the Class Members were in a specific zone of danger meeting with

Weinstein and at risk of physical harm, causing their fear.

277.    Plaintiffs and the Class Members, immediately or shortly after meeting with

Weinstein, suffered distress and emotional harm.

278.    Weinstein's conduct was committed within the scope of his employment at

Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the

entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter

those women.  Each act of battery of a Class Member lured with the prospect of being cast in a

Miramax production or to meet or work with Miramax and Weinstein was foreseeable given,

*inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on

Miramax property or at locations paid for by Miramax.

279.    Weinstein's conduct is not so unusual or startling that it would seem unfair to

include the loss resulting from it among other costs of Miramax's business. Assaults in the

context of the "casting couch" are exactly why Class Members and other female members of the

- 71 -

entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

280.    Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT XII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (LOUISETTE GEISS AND SARAH ANN THOMAS VERSUS WEINSTEIN AND TWC)

281.    Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XII on behalf of the TWC Subclass.

282.    Weinstein's conduct negligently caused emotional distress to Plaintiffs and the Class Members.

283.    Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class Members.

284.    Plaintiffs and the Class Members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

285.    Plaintiffs and the Class Members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

286.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class Member lured with the prospect of being cast in a TWC production

or to meet or work with TWC and Weinstein was foreseeable given, *inter alia,* the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

287.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class Members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

288.    Holding TWC liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT XIII

### RATIFICATION
### (ZOE BROCK, KATHERINE KENDALL, MELISSA SAGEMILLER, AND NANNETTE KLATT VERSUS MIRAMAX AND ROBERT WEINSTEIN)

289.    Plaintiffs Zoe Brock, Katherine Kendall, Melissa Sagemiller, and Nannette Klatt restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XIII on behalf of the Miramax Subclass.

290.    Weinstein was an agent, director, and employee of Miramax prior to September 30, 2005.

291.    At the time of the acts prior to September 30, 2005, there was an actual or assumed agency relationship between Weinstein and Miramax, as well as between Weinstein and Robert Weinstein.

292.     All acts or omissions alleged for the period before September 30, 2005 were ratified by Miramax and Robert Weinstein. Miramax and Robert Weinstein had investigated or knew of the acts and omissions of Weinstein, and Miramax's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, Miramax's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for Miramax.

293.     Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on Miramax business.

294.     Miramax and Robert Weinstein are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

## COUNT XIV

### RATIFICATION
### (LOUISETTE GEISS AND SARAH ANN THOMAS
### VERSUS TWC AND TWC'S BOARD OF DIRECTORS)

295.     Plaintiffs Louisette Geiss and Sarah Ann Thomas restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XIV on behalf of the TWC Subclass.

296.     Weinstein was an agent, director, and employee of TWC until October 2015.

297.     At the time of the acts alleged herein, there was an actual or assumed agency relationship between Weinstein and TWC, as well as between Weinstein and TWC's Board of Directors.

298.     All acts or omissions alleged herein after September 30, 2005, were ratified by TWC and TWC's Board of Directors. TWC and TWC's Board of Directors had investigated or knew of the acts and omissions of Weinstein, and TWC's employees, managers, supervisors,

executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, TWC's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for TWC.

299.    Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on TWC business.

300.    TWC and TWC's Board of Directors are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members pray that this Court:

1.    Certify the Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages and pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief, name Plaintiffs as representative of the Class and the respective Subclasses, and appoint their lawyers as Class Counsel;

2.    Enter judgment against Harvey Weinstein on liability on Counts I-XII in favor of Plaintiff and the Classes;

3.    Enter judgment against Robert Weinstein on liability on Counts I-XIV in favor of Plaintiffs and the Classes;

3.    Enter judgment against Miramax LLC on liability on Counts I, II, III, V, VII, IX, XI, and XIII in favor of Plaintiffs and the Classes;

4.    Enter judgment against The Weinstein Company Holdings LLC on liability on Counts I, II, IV, VI, VIII, X, XII and XIV in favor of Plaintiffs and the Classes;

- 75 -

5.      In individual damage proceedings and prove-ups, award Plaintiffs and the Class

Members damages for pain and suffering, and compensatory and punitive damages.

010717-11 1002900 V1

DATED: December 6, 2017                 HAGENS BERMAN SOBOL SHAPIRO LLP

                                        By /s/ Jason Zweig_____
                                            Jason Zweig
                                        555 Fifth Avenue
                                        Suite 1700
                                        New York, NY 10017
                                        *jasonz@hbsslaw.com*

                                        Steve W. Berman
                                        Shelby Smith
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 Eighth Avenue, Suite 3300
                                        Seattle, WA  98101
                                        Telephone:  (206) 623-7292
                                        *steve@hbsslaw.com*
                                        *shelbys@hbsslaw.com*

                                        Elizabeth A. Fegan
                                        Emily Brown
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        455 N. Cityfront Plaza Dr., Suite 2410
                                        Chicago, IL 60611
                                        Telephone: (708) 628-4949
                                        Facsimile: (708) 628-4950
                                        *beth@hbsslaw.com*
                                        *emilyb@hbsslaw.com*

                                        Robert B. Carey
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        11 West Jefferson Street, Suite 1000
                                        Phoenix, Arizona 85003
                                        Telephone: (602) 840-5900
                                        Facsimile: (602) 840-3012
                                        *rob@hbsslaw.com*

                                        M. Cris Armenta
                                        Credence E. Sol
                                        THE ARMENTA LAW FIRM, APC
                                        1230 Rosecrans Ave, Suite 300
                                        Manhattan Beach, CA 90266
                                        Telephone:  (310) 826-2826 Ext. 108
                                        *cris@crisarmenta.com*
                                        *credence.sol@orange.fr*