# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, KATHERINE KENDALL, ZOE BROCK, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA SAGEMILLER, and NANNETTE KLATT, individually and on behalf of all others similarly situated, | No. 17-CV-09554 (AKH) |
| Plaintiff, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX, LLC, MIRAMAX FILM CORP., MIRAMAX FILM NY LLC, HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MIRAMAX DOES 1-10, and JOHN DOES 1-50, inclusive, | |
| Defendant. | |

## PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACT SUMMARY............................................................................................. 4

       A.     Harvey Weinstein was the most powerful movie executive in the
              world. ................................................................................................. 4

       B.     Weinstein used TWC and Miramax to procure hundreds of women
              which he harassed and assaulted.......................................................... 5

       C.     Each Plaintiff was assaulted by Weinstein as a Miramax or TWC
              executive. ............................................................................................ 6

       D.     Miramax, TWC, and TWC's Directors ratified Weinstein's pattern
              of abuse, and carried out orders to punish women who complained
              about Weinstein or refused his sexual advances................................... 10

       E.     Weinstein enlisted the help of the Weinstein Sexual Enterprise to
              cover up the abuse by spying on, threatening, and extorting
              victims.................................................................................................. 10

       F.     Plaintiffs and Class Members have sustained damage as a result of
              Weinstein's predatory behavior and Defendants' efforts to
              facilitate and cover it up...................................................................... 11

III.   ARGUMENT ................................................................................................... 13

       A.     Defendants' burden to prevail on a motion to dismiss is significant. .............. 13

       B.     Plaintiffs have alleged a plausible RICO claim under Section
              1962(c). ............................................................................................... 14

              1.     The Weinstein Sexual Enterprise is an associated-in-fact
                     RICO enterprise. ...................................................................... 14

                     a.     The Weinstein Sexual Enterprise members shared a
                            common purpose................................................................ 16

                     b.     Plaintiffs have alleged relationships among those
                            associated with the enterprise. ....................................... 17

                     c.     Each Defendant played some part in directing the
                            affairs of the Weinstein Sexual Enterprise.................... 18

                     d.     The members of the Weinstein Sexual Enterprise
                            are jointly and severally liable. ..................................... 23

2.      Defendants engaged in a pattern of racketeering. ...................................24

      a.      Plaintiffs allege the predicate acts of mail and wire fraud as to all Defendants. ..........................................25

      b.      Plaintiffs allege at least two predicate acts of sex trafficking as to each of Miramax, TWC and Weinstein. .................................................29

      c.      Plaintiffs allege at least two predicate acts of tampering with victims and/or witnesses as to Miramax, TWC, and Weinstein. .................................32

      d.      A closed-ended pattern of racketeering activity exists. ................................................................34

3.      Plaintiffs have alleged RICO injury. .......................................35

C.      Plaintiffs have alleged a plausible RICO conspiracy claim under Section 1962(d). ................................................................39

D.      Plaintiffs have plausibly alleged that Miramax, TWC, and the Directors are liable under state law. ...............................................39

1.      Miramax, TWC, and the Directors are on notice of the claim that they ratified Weinstein's conduct. ...........................40

2.      Plaintiffs plausibly allege negligent retention and supervision where Miramax, TWC, and the Board knew Weinstein presented a foreseeable risk to others. ....................43

3.      Plaintiffs plausibly allege that Miramax, TWC, and the Directors are vicariously liable for Weinstein's conduct because it was reasonably foreseeable. ....................................45

E.      Statutes of limitations do not bar Plaintiffs' claims. ............................47

1.      Dismissal under Rule 12 based on a statute of limitations affirmative defense is strongly disfavored. ...............................47

2.      Plaintiffs discovered their RICO injuries just eight months ago. ..........................................................................47

3.      Alternatively, equitable tolling principles toll the statute of limitations for Plaintiffs' RICO and state-law claims. ...........................49

      a.      Equitable estoppel applies to the federal and state-law claims. .................................................49

b.      Equitable tolling applies to the federal and state-law claims. ........................................................... 53

c.      Tolling applies to the limitations periods for the RICO and state-law claims due to duress. ................................... 54

F.      Rule 12 and not Rule 23 governs at the pleading stage. ....................................... 57

1.      Consideration of class certification factors at the pleading stage is rare and disfavored. ........................................ 57

2.      Plaintiffs have Article III standing to sue and any inquiry into their ability to satisfy Rule 23 criteria regarding commonality and typicality is premature. ................................. 58

3.      Courts frequently certify RICO claims and group state laws by similarities as a means of handling class certification. ...................... 58

4.      Defendants' attack on Plaintiffs' proposed class definition is premature and without merit. .............................................. 61

G.      Plaintiffs seek relief from all Defendants, including the Directors. .................... 62

IV.     REQUEST FOR LEAVE TO AMEND .......................................................................... 62

V.      CONCLUSION ........................................................................................................... 62

010717-11 1035711 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*4 K & D Corp. v. Concierge Auctions, LLC*,
2 F. Supp. 3d 525 (S.D.N.Y. 2014)......................................................................27

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
2007 WL 1689899 (N.D. Cal. June 11, 2007)..................................................59, 60

*AIU Ins. Co. v. Olmecs Med. Supply, Inc.*,
2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. Feb. 22, 2005).....................................19

*Allstate Ins. Co. v. Yehudian*,
2018 U.S. Dist. LEXIS 27129 (E.D.N.Y. Feb. 15, 2018).....................................23

*In re Amla Litig.*,
2017 U.S. Dist. LEXIS 116139 (S.D.N.Y. July 17, 2017) ...................................61

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)..........................................................................14, 21

*Angermeir v. Cohen*,
14 F. Supp. 3d 134 (S.D.N.Y. 2014)...................................................................48

*Aramony v. United Way of Am.*,
969 F. Supp. 226 (S.D.N.Y. 1997).....................................................................35

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) ............................................................................58

*Astech-Marmon, Inc. v. Lenoci*,
349 F. Supp. 2d 265 (D. Conn. 2004)............................................................38, 39

*Atlas Pile Driving Co. v. Di Con Fin. Co.*,
886 F.2d 986 (8th Cir. 1989) .............................................................................2

*Baby Neal for & by Kanter v. Casey*,
43 F.3d 48 (3d Cir.1994)...................................................................................59

*Bankers Tr. Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988)........................................................................47, 48

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................13, 14

*Black v. Gen. Info. Servs., Inc.*,
2016 WL 899295 (N.D. Ohio Mar. 2, 2016) .......................................................61

*Boyle v. United States*,
    556 U.S. 938 (2009)........................................................................................15, 16, 17, 27

*Brown v. Burlington Indus., Inc.*,
    378 S.E.2d 232 (N.C. Ct. App. 1989) ......................................................................40

*Bunnett & Co. v. Gearheart*,
    2018 U.S. Dist. LEXIS 31873 (N.D. Cal. Feb. 27, 2018) .......................................25

*Campbell v. Parking Auth.*,
    1995 Conn. Super. LEXIS 2554 (Conn. Super. Ct. Sept. 6, 1995).........................41

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    315 F.R.D. 116 (D. Mass. 2016)..............................................................................59

*Chen-Oster v. Goldman, Sachs & Co.*,
    877 F. Supp. 2d 113 (S.D.N.Y. 2012).......................................................................58

*Childers v. N.Y. & Presbyterian Hosp.*,
    36 F. Supp. 3d 292 (S.D.N.Y. 2014).........................................................................47

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
    187 F.3d 229 (2d Cir. 1999)......................................................................................39

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
    235 F. Supp. 3d 1132 (E.D. Cal. 2017)....................................................................26

*In re Copley Pharm., Inc.*,
    161 F.R.D. 456 (D. Wyo. 1995) ...............................................................................60

*Cordero-Hernandez v. Hernandez-Ballesteros*,
    449 F.3d 240 (1st Cir. 2006).....................................................................................27

*Cullen v. Margiotta*,
    811 F.2d 698 (2d Cir. 1987)................................................................................54, 55

*De Falco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001)................................................................................18, 34

*De Sole v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 387 (S.D.N.Y. 2015).......................................................................20

*Delaney v. Skyline Lodge*,
    642 N.E.2d 395 (Ohio Ct. App. 1994)......................................................................40

*Doe v. Abdulaziz Bin Fahd Alsaud*,
    12 F. Supp. 3d 674 (S.D.N.Y. 2014).........................................................................46

010717-11 1035711 V1

*Doe v. Kolko*,
    2008 U.S. Dist. LEXIS 71174 (E.D.N.Y. Sept. 4, 2008)........................................................53

*Doninger v. Pac. Nw. Bell, Inc.*,
    564 F. 2d 1304 (9th Cir. 1977) ...........................................................................................58

*Dornberger v. Metro. Life Ins. Co.*,
    961 F. Supp. 506 (S.D.N.Y. 1997)......................................................................................22

*Ehrens v. Lutheran Church*,
    385 F.3d 232 (2d. Cir. 2004)...............................................................................................43

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)................................................................................................19

*Friedman v. 24 Hour Fitness USA, Inc.*,
    2009 U.S. Dist. LEXIS 81975 (C.D. Cal. Aug. 25, 2009)....................................................59

*GICC Capital Corp. v. Tech. Fin. Grp.*,
    67 F.3d 463 (2d Cir. 1995)...........................................................................................25, 34

*Grange Mut. Cas. Co. v. Mack*,
    2009 U.S. Dist. LEXIS 33143 (E.D. Ky. Apr. 17, 2009) .......................................................37

*H.J. Inc. v. Nw Bell Tel. Co.*,
    492 U.S. 229 (1989).............................................................................................................34

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .............................................................................................60

*Havoco of Am., Ltd. v. Shell Oil Co.*,
    626 F.2d 549 (7th Cir. 1980) ..............................................................................................24

*Holck v. Town of Hempstead Dist. No. 2*,
    394 N.E.2d 281 (N.Y. 1979)................................................................................................46

*Hollander v. Flash Dancers Topless Club*,
    340 F. Supp. 2d 453 (S.D.N.Y. 2004)............................................................................35, 36

*Holmes v. S.I.P.C.*,
    503 U.S. 258 (1992).............................................................................................................35

*Home Orthopedics Corp. v. Rodríguez*,
    781 F.3d 521 (1st Cir. 2015)................................................................................................14

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)................................................................................................15

*Int'l Motor Sports Grp., Inc. v. Gordon*,
  1999 U.S. Dist. LEXIS 12610 (S.D.N.Y. Aug. 10, 1999) ......................................27

*Int'l Telecomms. Satellite Org. v. Colino*,
  1992 U.S. Dist. LEXIS 4887 (D.D.C. 1992) .........................................................22

*Jacobson v. Cooper*,
  882 F.2d 717 (2d Cir. 1989)...................................................................................34

*Jay E. Haden Found. v. First Neighbor Bank, N.A.*,
  610 F.3d 382 (7th Cir. 2010) .................................................................................48

*JG v. Card*,
  2009 U.S. Dist. LEXIS 85372 (S.D.N.Y. Sep. 16, 2009)......................................45

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ...............................................................................59

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................................24

*Kennington v. 226 Realty LLC*,
  2013 NY Slip Op 32708(U) (N.Y. Sup. Ct. 2013) .................................................41

*Koch v. Christie's Int'l, PLC*,
  699 F.3d 141 (2d Cir. 2012)...................................................................................48

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) .................................................................................38

*Krystal G. v. Roman Catholic Diocese of Brooklyn*,
  933 N.Y.S.2d 515 (N.Y. Sup. Ct. 2011) ...............................................................44

*Levine v. Torino Jewelers, Ltd.*,
  2006 U.S. Dist. LEXIS 11932 (S.D.N.Y. Mar. 22, 2006) .....................................22

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982).................................................................................................37

*In re Lupron Mktg. & Sales Practices Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003) ...............................................................16, 26

*Machen v. Childersburg Bancorporation, Inc.*,
  761 So.2d 981 (Ala. 2000).......................................................................................40

*Mack v. Parker Jewish Inst. for Health Care & Rehab.*,
  2014 U.S. Dist. LEXIS 154577 (E.D.N.Y. Oct. 30, 2014)...............................36, 37

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*,
   792 F.2d 341 (3d Cir. 1986), *aff'd*, 483 U.S. 143 (1987) .......................................37

*Mayfield v. Asta Funding, Inc.*,
   95 F. Supp. 3d 685 (S.D.N.Y. 2015) .......................................................................57

*Mazzola v. Roomster Corp.*,
   849 F. Supp. 2d 395 (S.D.N.Y. 2012) ......................................................................57

*In re: McCormick & Co., Inc.*,
   217 F. Supp. 3d 124 (D.D.C. 2016) ........................................................................59

*Metromedia Co. v. Fugazy*,
   983 F.2d 350 (2d Cir. 1992) ...................................................................................34

*Miller v. Carpinello*,
   2007 WL 4207282 (S.D.N.Y. Nov. 20, 2007) ..........................................................34

*Murillo v. Rite Stuff Foods, Inc.*,
   77 Cal. Rptr. 2d 12 (Cal. Ct. App. 1998) ...............................................................40

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................................58

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
   635 F. Supp. 2d 1170 (S.D. Cal. 2009) ...................................................................17

*New England Data Servs. Inc. v. Becher*,
   829 F.2d 286 (1st Cir. 1987) ..................................................................................27

*New York Dist. Council of Carpenters Pension Fund v. Forde*,
   939 F. Supp. 2d 268 (2d Cir. 2013) ........................................................................54

*Nigro v. Pickett*,
   39 A.D.3d 720 (N.Y. App. Div. 2007) .....................................................................55

*In re Nissan Motor Corp. Antitrust Litig.*,
   430 F. Supp. 231 (S.D. Fla. 1977) ..........................................................................24

*O'Keefe v. Mercedes-Benz U.S., LLC*,
   214 F.R.D. 266 (E.D. Pa. 2003) ..............................................................................59

*Overall v. Klotz*,
   846 F. Supp. 297 (S.D.N.Y. 1994) ..........................................................................55

*Parker v. Walker*,
   6 Cal. Rptr. 2d 908 (Cal. Ct. App. 1992) ...............................................................37

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    252 F.R.D. 83 (D. Mass. 2008)........................................................................61

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
    262 F.3d 260 (4th Cir. 2001) .........................................................................37

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).............................................................................60

*Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*,
    295 F.R.D. 18 (E.D.N.Y. 2013).......................................................................42

*Ramos v. Jake Realty Co.*,
    21 A.D.3d 744 (N.Y. App. Div. 2005) ......................................................45, 46

*RD Mgmt. Corp. v. Samuels*,
    2003 U.S. Dist. LEXIS 9013 (S.D.N.Y. May 28, 2003) ..........................16, 18

*Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*,
    2009 U.S. Dist. LEXIS 101943 (S.D.N.Y. Oct. 23, 2009) ...............................47

*Republic of Colom. v. Diageo N. Am. Inc.*,
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) .............................................................19

*Reynolds v. Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015)..............................................................57

*Rivera v. Puerto Rican Home Attendants Servs.*,
    930 F. Supp. 124 (S.D.N.Y. 1996)............................................................41, 42

*Riviello v. Waldron*,
    391 N.E.2d 1278 (N.Y. 1979).....................................................................45, 46

*Rodriguez v. It's Just Lunch, Int'l*,
    300 F.R.D. 125 (S.D.N.Y. 2014) .....................................................................60

*Rotella v. Wood*,
    528 U.S. 549 (2000)..................................................................................28, 29

*S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*,
    241 F.R.D. 85 (D. Mass. 2007).......................................................................60

*Saveria JFK, Inc v. Wien*,
    2016 U.S. Dist. LEXIS 60737 (E.D.N.Y. May 3, 2016) ...........................49, 50

*Schmuck v. United States*,
    489 U.S. 705 (1989)..................................................................................25, 26

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995)......................................................................................35

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)......................................................................................14, 35

*Shockley v. Vt. State Colls.*,
    793 F.2d 478 (2d Cir. 1986)......................................................................................47

*Simcuski v. Saeli*,
    377 N.E.2d 713 (N.Y. 1978)......................................................................................53

*Sinclair v. Hawke*,
    314 F.3d 934 (8th Cir. 2003)......................................................................................14

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006)......................................................................................34

*Sky Med. Supply Inc. v. SCS Support Claims Servs.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014)......................................................................................19

*Matter of Smith Barney, Harris Upham & Co. v. Luckie*,
    647 N.E.2d 1308 (N.Y. 1995)......................................................................................49

*Smith v. Wash. Post Co.*,
    962 F. Supp. 2d 79 (D.D.C. 2013)......................................................................................58

*Snowden v. Lexmark Int'l, Inc.*,
    237 F.3d 620 (6th Cir. 2001)......................................................................................30, 31

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017)......................................................................................54

*Spira v. Nick*,
    876 F. Supp. 553 (S.D.N.Y. 1995)......................................................................................25

*State of N.Y. v. Hendrickson Bros., Inc.*,
    840 F.2d 1065 (2d Cir. 1998)......................................................................................49

*Stohlts v. Gilkinson*,
    867 A.2d 860 (Conn. App. Ct. 2005)......................................................................................40

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)......................................................................................59

*Tarango Trucking v. Cty. of Contra Costa*,
    181 F. Supp. 2d 1017 (N.D. Cal. 2001)......................................................................................40

*In re Telectronics Pacing Sys. Inc.*,
   172 F.R.D. 271 (S.D. Ohio 1997) .........................................................................59

*Tho Dinh Tran v. Alphonse Hotel Corp.*,
   281 F.3d 23 (2d Cir. 2002), *overruled on other grounds*, 460 F.3d 215 (2d Cir.
   2006) .....................................................................................................................54

*Thompson v. Merck & Co., Inc.*,
   2004 WL 62710 (E.D. Pa. Jan. 6, 2004) ..............................................................58

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*,
   886 F. Supp. 1134 (S.D.N.Y. 1995)......................................................................38

*Twersky v. Yeshiva Univ.*,
   993 F. Supp. 2d 429 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).............49, 51, 52

*United States v. Allen*,
   155 F.3d 35 (2d Cir. 2004) ....................................................................................19

*United States v. Angiulo*,
   897 F.2d 1169 (1st Cir. 1990).................................................................................2

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)...................................................................................25

*United States v. Blackmon*,
   839 F.2d 900 (2d Cir. 1988)............................................................................24, 39

*United States v. Campanale*,
   518 F.2d 352 (9th Cir. 1975) .................................................................................31

*United States v. Dallas*,
   229 F.3d 105 (2d Cir. 2000)...................................................................................23

*United States v. Fruchter*,
   411 F.3d 377 (2d Cir. 2005)...................................................................................23

*United States v. Garcia*,
   1997 U.S. App. LEXIS 8092 (2d Cir. Apr. 14, 1997) ..........................................24

*United States v. Lee*,
   374 F.3d 637 (8th Cir. 2004) .................................................................................16

*United States v. Paris*,
   2007 U.S. Dist. LEXIS 78418 (D. Conn. Oct. 23, 2007) ......................................30

*United States v. Philip Morris USA*,
    316 F. Supp. 2d 19 (D.D.C. 2004), *report and recommendation adopted*, 2014
    U.S. Dist. LEXIS 71215 (E.D.N.Y. May 23, 2014) ................................................................23

*United States v. Ron Pair Enters.*,
    489 U.S. 235 (1989)................................................................................................................31

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)......................................................................................................23

*United States v. Triumph Capital Grp., Inc.*,
    260 F. Supp. 2d 444 (D. Conn. 2002)......................................................................................19

*United States v. Turkette*,
    452 U.S. 576 (1981)................................................................................................................15

*United States Fire Ins. Co. v. United Limousine Serv.*,
    303 F. Supp. 2d 432 (S.D.N.Y. 2004)................................................................................20, 21

*Velasquez v. 40 Cent. Park S. Inc.*,
    2008 NY Slip Op 32799(U) (N.Y. Sup. Ct. 2008) ..................................................................41

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................................59

*Walker v. Mills*,
    2017 U.S. Dist. LEXIS 87492 (E.D.N.Y. June 6, 2017) ...........................................................1

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)........................................60

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000)...................................................................................................60

*Williams v. Affinion Grp., LLC*,
    2018 U.S. App. LEXIS 11909 (2d Cir. May 7, 2018)........................................................25, 39

*Wirig v. Kinney Shoe Corp.*,
    448 N.W.2d 526 (Minn. Ct. App. 1989), *aff'd in part & rev'd in part on other
    grounds*, 461 N.W.2d 374 (Minn. 1990) ..............................................................................40

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ..................................................................................................61

*Zimmerman v. Poly Prep Country Day Sch.*,
    888 F. Supp. 2d 317 (E.D.N.Y. 2012) ........................................................................50, 51, 52

*Zumpano v. Quinn,*
    849 N.E.2d 926 (N.Y. 2006)........................................................................51, 52

## STATUTES

18 U.S.C. § 1341 ...........................................................................................25

18 U.S.C. § 1343 ...........................................................................................25

18 U.S.C. § 1512 ....................................................................................... *passim*

18 U.S.C. § 1590 .......................................................................................25, 55

18 U.S.C. § 1591 .......................................................................................25, 55

18 U.S.C. § 1961 .......................................................................................15, 24

18 U.S.C. § 1962 .......................................................................................14, 18

18 U.S.C. § 1964 ...........................................................................................14

18 U.S.C. § 3673 ...........................................................................................32

CONN. GEN. STAT. § 52-584 ...........................................................................49

N.Y. BUS. CORP. LAW § 906 ............................................................................3

N.Y. CPLR § 202 ...........................................................................................49

N.Y. CPLR § 214 ...........................................................................................49

## OTHER AUTHORITIES

Blakey, "Time-Bars: Rico-Criminal and Civil Federal and State," 88 NOTRE
    DAME L. REV. 1581, 1740 (2013)................................................................49

S. Rpt. 91-617, 91st Cong., 1st Sess. (1969) ....................................................31

2 James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 9.03[1][b] (3d ed.
    1999) ...........................................................................................................29

Fed. R. Civ. P. 15(a) ......................................................................................62

Fed. R. Civ. P. 23(c)(4).................................................................................62

# I.    INTRODUCTION

On May 25, 2018, after Harvey Weinstein surrendered to police on charges of first- and third-degree rape and a criminal sex act in the first degree for forcible sexual acts against multiple women,[1] his criminal defense lawyer proclaimed: "Mr. Weinstein did not invent the casting couch in Hollywood."[2] In the same vein, The Weinstein Company has mockingly referred to this litigation in bankruptcy pleadings as the "'casting couch' class action litigation."[3] It has apparently been lost on Defendants that forcible rape and sexual assault (not to mention sex trafficking, witness tampering, and mail and wire fraud) are not glib topics. Defendants have seized every opportunity to thwart, silence, and shut down Plaintiffs and the Class in an attempt to discredit their interests and voices. Their blockade ends now.

Defendants filed nine briefs comprised of nearly 300 pages with the goal of viewing each Defendant's actions in a vacuum.[4] The law is clear, however, that "no one fact in isolation

---

[1] The Court can take judicial notice of Harvey Weinstein's charges. *See* N.Y. State Unified Ct. Sys., WebCriminal, available at https://iapps.courts.state.ny.us/webcrim_attorney/AttorneyWelcome (defendant identified by name). *See, e.g., Walker v. Mills*, 2017 U.S. Dist. LEXIS 87492 (E.D.N.Y. June 6, 2017) (taking judicial notice of information provided by N.Y. State Unified Ct. Sys., WebCriminal website).

[2] *See* https://www.nbcnews.com/news/us-news/how-weinstein-lawyer-s-casting-couch-comment-could-impact-his-n877916 (last accessed May 27, 2018).

[3]    *See In re: The Weinstein Co. Holdings, LLC, et al.*, Case No. 18-10601 (MWF) (Bankr. D. Del.), Debtors' Objection to Motion of Louisette Geiss, Katherine Kendall, Zoe Brock, Sarah Ann Thomas, Melissa Sagemiller, and Nannette Klatt for Relief From Automatic Stay and Related Relief (Dkt. #930), at 2.

[4] This combined opposition is filed in response to (i) Motion of Defendants James Dolan, Paul Tudor Jones, Marc Lasry and Dirk Ziff to Dismiss Counts I, II, IV, and XIV of the Complaint (Dkt. #54) ("Outside Dir. Br."); (ii) Defendant Richard Koenigsberg's Motion to Dismiss Counts I, II, IV, and XIV of the Complaint (Dkt. #56) ("Koenigsberg Br."); (iii) Defendant Harvey Weinstein's Motion To Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and to Strike Class Allegations Pursuant to Fed. R. Civ. P. 12(f) (Dkt. #58) ("H.W. Br."); (iv) Defendants Miramax LLC, Miramax Film Corp., and Miramax Film NY, LLC's Motion To Dismiss Plaintiffs' Class Action Complaint (Dkt. #67) ("Miramax Br."); (v) Defendant Tim Sarnoff's Motion To Dismiss The Class Action Complaint (Dkt. #71) ("Sarnoff Br."); (vi) Defendant Lance Maerov's Motion To Dismiss Counts I, II, IV and XIV of the Complaint (Dkt. #87) ("Maerov Br."); (vii) Defendant Jeff Sackman's Motion To Dismiss Counts I, II, IV, and XIV

demonstrates" the existence or damage caused by the Weinstein Sexual Enterprise.[5] "Rather, when the facts are viewed in their entirety and inferences are made therefrom, a scheme [] emerges."[6] Thus, RICO allegations must not be viewed "piecemeal" but be considered "as a whole."[7]

Viewed as a whole,[8] Plaintiffs' Complaint details a decades-long scheme by Defendants to facilitate Harvey Weinstein's sexual assaults; squelch complaints and illegally procure the silence of victims, witnesses and others; harass, threaten, extort, and mislead both Weinstein's victims and the media to prevent, hinder and avoid the prosecution, reporting, or disclosure of his sexual misconduct; destroy, mutilate, and conceal records, documents, and/or other evidence in an effort to prevent the use of such evidence to reveal Weinstein's sexual offenses; and blacklist and damage the careers of Plaintiffs and Class Members in retaliation for attempting to thwart Weinstein's assaults or for reporting them.

As further explained below, Defendants' arguments for dismissal fail. First, for their claims under the Racketeering and Corrupt Organizations Act ("RICO"), Plaintiffs allege that the

---

of the Complaint (Dkt. #90) ("Sackman Br."); and (viii) Defendant Robert Weinstein's Motion To Dismiss Counts I, II, III, IV, XIII and XIV of the Complaint (Dkt. #102) ("R.W. Br.").

While Defendant The Weinstein Company Holdings, LLC ("TWC") also filed a Motion To Dismiss (Dkt. #48) ("TWC Br."), TWC has filed for bankruptcy, and objected to Plaintiffs' request for relief from the automatic stay. Accordingly, Plaintiffs cannot take any action in furtherance of their action against TWC in this Court until stay relief is granted. The citations to TWC Br. throughout are for reference only.

[5] *Atlas Pile Driving Co. v. Di Con Fin. Co.*, 886 F.2d 986, 991 (8th Cir. 1989).

[6] *Id.*

[7] *United States v. Angiulo*, 897 F.2d 1169, 1180 (1st Cir. 1990) (citing *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*) ("For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise.")).

[8] Because of the volume and redundancy of the briefing, Plaintiffs have not cited every instance where a Defendant raised an issue, but rather cite examples. Any omission of citation is not a concession.

Defendants participated in an associated-in-fact enterprise for the common purpose of ensuring Weinstein's sexual offenses remained hidden while Defendants reaped the profits of Miramax[9] and TWC productions. Plaintiffs' allegations easily satisfy the requirements that an association-in-fact enterprise reflect three structural features: (i) a purpose; (ii) relationships among the associated members; and (iii) longevity sufficient to pursue the enterprise's purpose.

Second, Plaintiffs allege that Defendants engaged in a pattern of racketeering activity, engaging in mail and wire fraud to perpetrate the scheme to defraud victims (all Defendants), sex trafficking (Miramax, TWC and Weinstein), and witness tampering (Miramax, TWC and Weinstein). Pursuant to Rule 9(b) for mail and wire fraud, Plaintiffs provide specific details of the negotiation and contracting process—and the cover up of the scheme.

Third, Plaintiffs have alleged RICO injury. An allegation of damage to Plaintiffs' careers caused by the predicate acts sufficiently alleges an injury to property. Dismissal of Plaintiffs' RICO claims should be denied.

Plaintiffs also allege that Miramax, TWC, and the Directors are liable for Weinstein's state-law violations because they ratified his misconduct when they facilitated the conduct, failed to discharge or reprimand Weinstein for his sexual misconduct, and/or condoned it by entering into employment agreements that permitted such misconduct absent a felony conviction. Miramax, TWC, and the Directors are also vicariously liable given that Weinstein's conduct was reasonably foreseeable. Further, Plaintiffs allege Miramax, TWC, and the Directors are liable for

---

[9] Miramax represents that Miramax Film Corp. is the non-surviving corporation of a merger that occurred in 2010, and therefore it cannot be sued. *See* Miramax Br. at 5 n.4. Based on Miramax's representation that Miramax Film Corp. merged with Miramax Film NY, LLC in 2010, *see* Putnam Decl. (Dkt. #66), Ex. E, Plaintiffs understand that Miramax Film NY, LLC assumed all liabilities of Miramax Film Corp. *See* N.Y. BUS. CORP. LAW § 906(b)(3) ("The surviving or consolidated corporation shall assume and be liable for all the liabilities, obligations and penalties of each of the constituent entities. No liability or obligation due or to become due, claim or demand for any cause existing against any such constituent entity, …, shall be released or impaired by such merger or consolidation.").

negligent retention and supervision because they knew or should have known of Weinstein's propensity for the conduct prior to each sex act, and each sex act was conducted on or using Defendants' property.

Defendants' statute of limitations arguments also fail. First, Plaintiffs could not have discovered the cause of the damage to their careers inflicted by the enterprise prior to October 2017 at the earliest. Moreover, the statute of limitations for the state-law claims was tolled due to equitable estoppel, equitable tolling, and duress. Finally, Defendants' Rule 23 arguments are premature and undeveloped.

Nonetheless, given the complexity of the enterprise and the facts that continue to unfold (even over the last week with the first criminal charges filed against Harvey Weinstein), Plaintiffs respectfully request leave to amend in the event that the Court grants Defendants' motions.

## II.     FACT SUMMARY

### A.     Harvey Weinstein was the most powerful movie executive in the world.

Harvey Weinstein was the most powerful movie executive in the world.[10] In the 1970s, he and his brother Robert Weinstein co-founded Miramax, which they sold to (while continuing to work for) Disney in 1993 for $80 million. In 2005, the brothers left Miramax to form The Weinstein Company ("TWC"). Weinstein has produced and distributed countless critically acclaimed films, including *Pulp Fiction*, *Good Will Hunting*, *Shakespeare in Love*, and Academy Award Best Picture winner, *The English Patient*. As *The New Yorker* describes, "His movies have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies,

---

[10] ¶¶ 3, 38. All references to "¶ __" are to the Class Action Complaint (Dkt. #1), filed December 6, 2017, unless otherwise indicated.

he has been thanked more than almost anyone else in movie history, ranking just after Steven Spielberg and right before God."[11]

**B.      Weinstein used TWC and Miramax to procure hundreds of women which he harassed and assaulted.**

Weinstein's *modus operandi* was to meet with women in his capacity as an executive at Miramax and TWC under the guise of hiring them, collaborating with them, or otherwise helping their careers.[12] Actresses received faxed schedules from their agents or demands from Miramax and TWC employees scheduling meetings with Weinstein at hotels.[13] Weinstein showed up at victims' homes to talk about Miramax and TWC projects.[14] Even when women tried to move the meetings to public places, TWC and Miramax employees insisted the women do as told.[15]

During those meetings, TWC and Miramax employees set the women up, delivering them to Weinstein under the auspices of official business.[16] For instance, female employees of TWC were often used to make Weinstein's victims feel safe. The employees would initially join Weinstein's meeting with a woman in whom he was interested, only to leave her alone with Weinstein.[17] In addition, Weinstein used Miramax and TWC employees to schedule private audiences with aspiring actors, holding illusory follow-up meetings with his victims to discuss

---

[11] ¶¶ 34-38.

[12] ¶¶ 42-44.

[13] ¶¶ 42-44.

[14] ¶¶ 44(f).

[15] ¶ 86.

[16] ¶¶ 44-45.

[17] ¶¶ 45(f), 124-125.

casting.[18] Miramax and TWC employees have admitted that knowledge of Weinstein's behavior was widespread and that any concerns expressed by victims or witnesses were silenced.[19]

Once the women were isolated, Weinstein sexually harassed and assaulted his victims. He stripped down, sometimes wearing a robe or a towel, and sometimes wearing nothing at all. He regularly tried to force his victims to give him massages and oral sex. Weinstein tried to cajole his victims with quid pro quo offers for business deals. When that didn't work, he used force. His actions included flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape and/or completed rape.[20] After the assaults, TWC and Miramax employees cleaned up the evidence.

**C.      Each Plaintiff was assaulted by Weinstein as a Miramax or TWC executive.**

*Nanette Klatt and Miramax.* Nannette Klatt was in the Miramax offices reading for a part when a Weinstein associate invited her to meet with Weinstein in his office. After Klatt read a script for him, Weinstein told her that she had the part, and that he had other big projects for her. Then he said he needed to see her breasts, claiming that the role required him to approve them. When Klatt refused, Weinstein became angry, told her to give him back the script, led her into a pitch-black stairwell and locked the door behind her. A security guard found her screaming and distressed, and knew she came from the Miramax floors.[21]

*Katherine Kendall and Miramax.* At age 23, Katherine Kendall met Weinstein at the New York Miramax office. After the meeting, Weinstein invited her to a screening, which she attended in a car arranged by Weinstein's Miramax assistant. After the movie, Kendall asked

---

[18] ¶ 125.

[19] *See, e.g.,* ¶¶ 122-26, 132.

[20] *See* ¶ 45(a)-(p).

[21] Compl., § IV(C)(6).

Weinstein for directions to the subway. Instead, Weinstein stopped in front of an apartment, claiming that he lived there, and said that he needed to go up and get something. Once inside, Weinstein talked to Kendall for an hour, and he promised to help her get parts in movies. He then excused himself, returned in a bathrobe, and demanded that Kendall give him a massage. When she refused, he berated her for making a "big deal" out of his demand for sexual favors, and claimed that other actresses "did it all the time." When Weinstein finally agreed to release Kendall from the apartment, he insisted on taking her himself in a taxi. Because she felt unsafe, Kendall asked that Weinstein drop her off at a bar to meet her boyfriend. After he did, he waited outside the bar in the taxi for 20 minutes, watching her every move. In 2017, Kendall was contacted by a member of the Weinstein Sexual Enterprise to elicit information about her experience with Weinstein.[22]

*Zoe Brock and Miramax.* In May 1998, Plaintiff Zoe Brock was seated next to Weinstein at a group dinner at the Hôtel Barrière Le Majestic during the Cannes Film Festival. A 24-year-old model, she was attending with her agent to help her career, and staying on a yacht in the bay. After the dinner, Weinstein and Miramax employees Rick Schwartz and Fabrizio Lombardo deliberately separated Brock from her group and put her in a car with them to the Hôtel du Cap Eden-Roc. When they arrived in Weinstein's hotel suite, the other men made an excuse to leave Brock and Weinstein alone together. Weinstein then left the room and emerged naked, demanded a massage, and physically maneuvered Brock into his bedroom. Brock managed to elude Weinstein's force and lock herself in the bathroom. When Weinstein finally agreed not to assault her further, he, Schwartz, and Lombardo drove Brock back to the harbor, and when it was too late to get onto her boat, checked her into Weinstein's "emergency" suite at the Hôtel Barrière

---

[22] Compl., § IV(C)(1).

Le Majestic. During the check-in process, Schwartz apologized to Brock for Weinstein's behavior, admitting that it had happened before.

Brock told her agent she never wanted to see Weinstein again. The next day, her agent invited her to a private screening gifted by an anonymous donor. When they showed up, Weinstein showed up, sat directly behind Brock with his hand on her chair during the entire film, implicitly threatening her and dissuading her from reporting him.[23]

*Melissa Sagemiller and Miramax.* A 24-year old actress, Melissa Sagemiller was working on the set of Miramax-produced *Get Over It* in Toronto, Canada. Weinstein's female assistant called Sagemiller and invited her to lunch with Weinstein, during which Weinstein asked questions about the men she liked to date. Shortly after their lunch meeting, another female assistant summoned Sagemiller to Weinstein's hotel room. When Sagemiller expressed reservations and asked to meet in a public location, the assistant told her not to worry, that the meeting would be short, and that it was "very important" that she attend. Sagemiller arrived at the hotel room for the meeting, and Weinstein opened the door in a bathrobe. He then poured two drinks, asked Sagemiller for a massage, and demanded that Sagemiller kiss him. When she refused, Weinstein asked her "Don't you want your career to be more than just this little teen film?," boasting sexual favors from Charlize Theron and Renee Zellweger. Weinstein then blocked the door, forcibly kissing her. When he let her go, Weinstein said "Ok, you can go now. That's all I wanted. Just do what I say and you can get your way."[24]

Later, when the film wrapped, Weinstein insisted that Sagemiller fly back to the U.S. with him on his private plane. She declined. The next day at the airport, Weinstein's assistant

---

[23] Compl., § IV(C)(2).

[24] Compl., § IV(C)(3).

called her, informing her that her bags had been moved to Weinstein's plane, against her will. When she entered the private plane, Weinstein said "See Melissa, you can't say no to me. I always get what I want."[25]

*Louisette Geiss and TWC*. When Louisette Geiss met Weinstein in 2008, she was pitching a script at Sundance Film Festival in Park City, Utah. Weinstein asked Geiss to meet him in an office adjacent to his hotel room. After 30 minutes, Weinstein went to the bathroom. Returning in an open bathrobe, naked underneath, he entered the hot tub and began to masturbate. Frightened and distressed, Geiss tried to leave the room, but Weinstein jumped from the hot tub and grabbed her. He pulled her into his bathroom, insisting she watch him masturbate in exchange for green lighting her script. When she refused, he offered the quid pro quo of an introduction to his brother, Robert Weinstein, and a three-film deal as an actress. Terrified and disgusted, Geiss managed to escape his grip and flee, with Weinstein giving chase.[26]

*Sarah Ann Thomas (TWC)*. Applying to be a nanny for Weinstein's children in 2008, Sarah Ann Thomas was screened by Weinstein's TWC assistants. One assistant told Thomas that she would join her for an interview at Weinstein's home, but called Thomas the night before to inform her that she would have to attend alone. Weinstein conducted the entire interview in his underwear. He leered at Thomas, asking her if, given that she was also an actor, she would flirt with his friends to get ahead. When Weinstein's children entered the room, he angrily screamed at them to leave and not return. At the end, Weinstein grabbed Thomas and pulled her in tight against his barely-clothed body, holding her forcefully for an uncomfortably long period.[27]

---

[25] Compl., § IV(C)(3).

[26] Compl., § IV(C)(4).

[27] Compl., § IV(C)(5).

**D.**     **Miramax, TWC, and TWC's Directors ratified Weinstein's pattern of abuse, and carried out orders to punish women who complained about Weinstein or refused his sexual advances.**

Miramax, TWC, and TWC's Board of Directors ("Complicit Producers") facilitated, condoned, and covered up Weinstein's abuse. Miramax and TWC employees admitted that knowledge of Weinstein's behavior was widespread, and that concerns of victims or employees were quickly silenced. Weinstein's lawyer publicly stated that the Directors knew of all complaints and settlements reflected in Weinstein's personnel file.[28]

TWC's knowledge of Weinstein's abuse of women ran so deep that it took steps to protect itself from liability. Weinstein's 2015 contract, negotiated by the TWC Directors, provided that Weinstein would pay the company in the event he was sued for sexual harassment. The contract allegedly provides a liquidated damages scale for any sexual harassment lawsuits, but did not permit him to be fired absent a felony conviction.[29]

**E.**     **Weinstein enlisted the help of the Weinstein Sexual Enterprise to cover up the abuse by spying on, threatening, and extorting victims.**

Throughout the class period, Weinstein also enlisted the help of spies (Intelligence Participants), lawyers (Law Firm Participants), and tabloid newspapers (Journalist Participants) to threaten, extort, and silence victims.[30] Together with Miramax, TWC, and TWC's Board of Directors (Complicit Producers) these associates comprise The Weinstein Sexual Enterprise.[31]

In October 2016, the law firm of Boies Schiller signed a contract to help The Weinstein Sexual Enterprise cover up Weinstein's history of sexual abuse, wiring $100,000 to Intelligence

---

[28] ¶¶ 129-30.

[29] ¶¶ 127-33.

[30] ¶¶ 142-67.

[31] *Id.*

Participant Black Cube on or about October 28, 2016, to halt a book by Rose McGowan detailing a rape by Weinstein and stop an investigative report about Weinstein's pattern of sex abuse.[32]

Black Cube used at least two undercover agents to meet with Class Members and reporters under false pretenses to extract information about disclosure of Weinstein's sexual abuse. Black Cube also enlisted a freelance journalist to conduct secretly-recorded interviews to be used by the Weinstein Sexual Enterprise to suppress reports on Weinstein's pattern of abuse. He contacted Class Members, including actress Anna Sciorra and, on information and belief, Katherine Kendall, as well as reporters Ben Wallace and Ronan Farrow.[33]

In addition, the Weinstein Sexual Enterprise enlisted Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*. Howard directed his reporters to obtain information that would discredit Class Members, and he shared with Weinstein secret recordings of his reporters' conversations with them. The Weinstein Sexual Enterprise also used Kroll America's Investigations and Disputes practice to destroy evidence and to provide information intended to discredit Class Members.[34]

**F.**     **Plaintiffs and Class Members have sustained damage as a result of Weinstein's predatory behavior and Defendants' efforts to facilitate and cover it up.**

Plaintiffs and Class Members have suffered a wide range of damages to their persons and property. First, with respect to personal injuries, Plaintiffs have been traumatized by Weinstein's conduct, with feelings of severe anxiety and depression following them throughout the decades. Some Plaintiffs have recently been diagnosed with forms of post-traumatic stress disorder. And Weinstein's victims have found their personal and professional relationships strained,

---

[32] ¶¶ 149-52.

[33] ¶¶ 62-69, 154-63

[34] ¶¶ 164-67.

particularly those with men. All have suffered serious professional and career damages, with some leaving the entertainment industry altogether.[35]

Moreover, Plaintiffs and Class Members have suffered damage to their careers caused by the enterprise. Plaintiffs and Class Members were directly threatened by Weinstein to keep them from reporting his assaults, and they knew that Weinstein ruined women's careers if they reported his conduct. Even when they didn't report him, Plaintiffs and Class Members were blacklisted by Weinstein, causing damage to their careers. However, with respect to being blacklisted, Plaintiffs did not and could not know that Weinstein blacklisted them, because he concealed all evidence of doing so.[36] The first time that Weinstein's practice of blacklisting was confirmed was on December 15, 2017.[37] Moreover, evidence of who Weinstein blacklisted and how is still unknown in many respects. Contrary to Defendants' arguments, many actresses to this day suspect but do not yet have proof (which the Defendants alone possess) that they did not get certain parts because Harvey Weinstein blacklisted them.[38]

Finally, Defendants have damaged, or attempted to damage, Plaintiffs' causes of action. For example, in a related case filed contemporaneously herewith, Plaintiff Melissa Thompson (who was assaulted in 2011) and two other victims were contacted by Ambassador Paolo Zampolli shortly after the October 5, 2017 press reports of Mr. Weinstein's conduct. Zampolli told Thompson that he had the best attorney in America, who was handling class claims for Weinstein's victims. He emphasized that Benjamin Brafman was representing the victims, who

---

[35] Compl., § IV(C).

[36] ¶¶ 171-74, 77, 82.

[37] *See* http://www.latimes.com/entertainment/la-et-entertainment-news-updates-peter-jackson-ashley-judd-mira-sorvino-weinstein-1513362464-htmlstory.html (Dec. 15, 2017) (last accessed May 30, 2018).

[38] ¶¶ 171-74, 77, 82.

should join his case. He then put all three victims in contact via email with Benjamin Brafman's

associate, Alex Spiro, at an official email address of Mr. Brafman's firm.[39]

Thompson contacted Spiro via email and telephone and shared her evidence of assault

with him. They discussed the statute of limitations and he assured her she did not need to hurry,

because he had ways around it. Spiro, in writing, made it clear that he was representing

Thompson as to her claims against Weinstein.[40] In early November 2017, it was publicly

disclosed that Brafman was not class action counsel for plaintiff victims: he was chief criminal

defense counsel for Weinstein. That was the first Thompson learned that Harvey Weinstein's

lawyer had taken possession of her evidence. Neither Brafman nor Spiro have returned

Thompson's evidence, nor have they followed the ethical rules pertaining to conflicts.[41]

Weinstein's and the enterprise's use of confidential information of victims to pressure, silence,

ostracize or in other ways damage them continued at least through November 2017.

## III.   ARGUMENT

## A.   Defendants' burden to prevail on a motion to dismiss is significant.

A motion to dismiss must be denied if the complaint alleges "enough facts to state a

claim [for] relief that is plausible on its face."[42] As the Supreme Court held in *Twombly*, pleading

with sufficient plausibility "does not impose a probability requirement at the pleading stage; it

simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

---

[39] Complaint, ¶¶ 126-129, *Dulany, et al. v. Miramax Film NY, LLC, et al.,* No. 1:18-cv-4857 (S.D.N.Y. June 1, 2018) ("*Dulany* Compl.).

[40] *Dulany* Compl., ¶¶ 130-35.

[41] *Dulany* Compl., ¶¶ 136-45.

[42] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

of illegal agreement."[43] "[A] well-pleaded complaint may proceed if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."[44] At the pleading stage the Court should not weigh competing theories and dismiss a complaint by choosing "among plausible alternatives."[45]

**B.     Plaintiffs have alleged a plausible RICO claim under Section 1962(c).**

RICO prohibits a person associated with an "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity" and provides a private right of action for treble damages to any person "injured in his business or property by reason of a violation."[46] To prove a RICO violation, Plaintiffs must demonstrate: (1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4) defendant's actions constitute a pattern of racketeering activity.[47] In addition, Plaintiffs must demonstrate that they have "been injured in [their] business or property by the conduct constituting the violation."[48]

**1.     The Weinstein Sexual Enterprise is an associated-in-fact RICO enterprise.**

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact

---

[43] *Id*. at 556.

[44] *Id*.

[45] *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 189-90 (2d Cir. 2012) (internal quotation omitted).

[46] 18 U.S.C. §§ 1962(c), 1964(c).

[47] *Sinclair v. Hawke*, 314 F.3d 934, 943 (8th Cir. 2003). *Cf. Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 528 (1st Cir. 2015) ("To state a civil RICO claim, then, a plaintiff must allege: '(1) conduct, (2) of an enterprise, (3) through [] a pattern … of racketeering activity[.]'") (quoting *Kenda Corp. v. Pot O'Gold Money Leagues, Inc*., 329 F.3d 216, 233 (1st Cir. 2003)).

[48] *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 496 (1985).

although not a legal entity."[49] In *Turkette*, the Supreme Court described an association-in-fact

RICO enterprise as "a group of persons associated together for a common purpose of engaging in

a course of conduct."[50] Such an enterprise is proved "by evidence of an ongoing organization,

formal or informal, and by evidence that the various associates function as a continuing unit."[51]

In *Boyle*, the Supreme Court rejected the notion that such an enterprise must have any

particular organizational structure:

> Such a group need not have a hierarchical structure or a "chain of
> command"; decisions may be made on an ad hoc basis and by any
> number of methods—by majority vote, consensus, a show of
> strength, etc. Members of the group need not have fixed roles;
> different members may perform different roles at different times.
> The group need not have a name, regular meetings, dues,
> established rules and regulations, disciplinary procedures, or
> induction or initiation ceremonies.[52]

Under *Boyle*, an alleged association-in-fact enterprise requires only three structural features:

"[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity

---

[49] 18 U.S.C. § 1961(4).

[50] *United States v. Turkette*, 452 U.S. 576, 583 (1981).

[51] *Id.*

[52] *Boyle v. United States*, 556 U.S. 938, 948 (2009); *accord In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010) ("[A]fter *Boyle*, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity.").

Thus, the pre-*Boyle* (pre-2009) cases discussed by Sarnoff and copied by Maerov concerning the necessity of a hierarchy are no longer good law. Sarnoff Br. at 8-9; Maerov Br. at 9-10. Similarly, Robert Weinstein's reliance on a 2009 case decided two weeks after *Boyle* is not good law, as that case cites only to pre-2009 cases requiring definitive allegations concerning hierarchy and ignores the direction provided by the *Boyle* court. *See* R.W. Br. at 17 (citing *Cont'l Fin. Co. v. Ledwith*, 2009 U.S. Dist. LEXIS 52618 (S.D.N.Y. June 22, 2009)).

sufficient to permit these associates to pursue the enterprise's purpose."[53] "Courts in this Circuit construe the enterprise element of RICO liberally."[54]

### a. The Weinstein Sexual Enterprise members shared a common purpose.

To demonstrate that a RICO enterprise exists, Plaintiffs must show "*a common purpose that animates the individuals associated with it.*"[55] "'Common purpose' does not mean commonality of motive, it means coordinated activity in pursuit of a common objective."[56]

Here, Plaintiffs allege that the Weinstein Sexual Enterprise had two purposes, one legal and one illegal. The legal purpose was to produce and promote movies and entertainment. The illegal purpose of the enterprise was to procure women for Weinstein's assaults and to cover up Harvey Weinstein's pattern of sexual harassment and assault through intimidation, threats, payoffs and deception and to silence victims through duress, induced agreements and threats. Several Defendants insist that they cannot imagine what they gained from Weinstein's conduct— or their participation in it.[57] This line of argument ignores all they did gain—money, power, and prestige—by covering up Weinstein's conduct and allowing him to continue to bully Hollywood in the name of ensuring continued profits.

---

[53] *Boyle*, 556 U.S. at 946.

[54] *RD Mgmt. Corp. v. Samuels*, 2003 U.S. Dist. LEXIS 9013, at *14 (S.D.N.Y. May 28, 2003) (citing *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) ("the language and the history suggest that Congress sought to define that term as broadly as possible") (construing 18 U.S.C. § 1961(4))).

[55] *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004) (emphasis added). *See also Boyle*, 556 U.S. at 946 ("That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, *i.e.*, a 'venture,' 'undertaking,' or 'project.' Webster's Third New International Dictionary 757 (1976). The concept of 'associat[ion]' requires both interpersonal relationships and a common interest.").

[56] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173 (D. Mass. 2003) (citing *Welch*, 53 F.3d at 443).

[57] Miramax Br. at 28; Koenigsberg Br. at 13.

While Miramax asserts that each member of the Weinstein Sexual Enterprise did not have a relationship with every other member of the enterprise,[58] it is clear that "… all members of the enterprise need not be directly working with all other members of that enterprise."[59] In sum, Plaintiffs have plausibly alleged that the Defendants were members of the Weinstein Sexual Enterprise and shared a common purpose.

> **b.** **Plaintiffs have alleged relationships among those associated with the enterprise.**

Miramax contends that Plaintiffs have failed to plead the enterprise's "hierarchy, structure and activities to establish that its members functioned as a continuing unit"[60]—despite the fact that the Supreme Court expressly rejected the necessity of such facts in *Turkette* and again in *Boyle*. The Supreme Court explained that a RICO enterprise need not have "a structural hierarchy," "a chain of command," or "regular meetings regarding enterprise affairs."[61] In fact, the Supreme Court noted that "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach."[62] Plaintiffs have alleged exactly what the Supreme Court requires: a continuing unit that functions with a common purpose.

"The existence of an association-in-fact enterprise 'is oftentimes more readily proven by what it *does* rather than by abstract analysis of its structure,' and evidence of its structure is

---

[58] Miramax Br. at 18-19.

[59] *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009) (citing *United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988)).

[60] Miramax Br. at 18.

[61] *Boyle*, 556 U.S. at 948.

[62] *Id*.

merely one means of demonstrating enterprise."[63] Nonetheless, Plaintiffs have alleged

interpersonal relationships between Miramax and The Weinstein Company, including a listing of

movies on Exhibit A to their complaint, some of which were co-produced by both companies.[64]

The Directors also assert that Plaintiffs haven't alleged contacts between them and other

members of the enterprise.[65] Plaintiffs clearly allege contacts between TWC, Weinstein and the

Directors, and Koenigsberg admits to contacts with Law Firm Participant David Boies.[66]

Accordingly, Plaintiffs have plausibly alleged relationships among those associated with the

enterprise.

### c.     Each Defendant played some part in directing the affairs of the Weinstein Sexual Enterprise.

A civil RICO plaintiff must also allege that each defendant "conduct[ed] or participate[d]

directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). The

Supreme Court has interpreted this statutory language to mean that the RICO defendant must

have participated "in the operation or management of the enterprise."[67] In the Second Circuit,

"the 'operation or management' test typically has proven to be a relatively low hurdle for

---

[63] *RD Mgmt. Corp. v. Samuels*, 2003 U.S. Dist. LEXIS 9013, at *19-20 (quoting *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir. 1991)) (emphasis in original).

[64] Moreover, the *Dulany* Plaintiffs allege that Miramax continued to have a close relationship with Harvey Weinstein and TWC through May 2018. For example, Miramax and The Weinstein Company co-produce the television show Project Runway (which has continuously aired since 2004), on which Harvey's wife Georgina Chapman was a regular judge. Moreover, in addition to individual movie deals throughout 2005 to 2017, Miramax and TWC entered a production and distribution deal in 2013, giving TWC rights to co-produce sequels to Miramax titles. *Dulany* Compl., ¶ 172.

[65] *See, e.g.,* Koenigsberg Br. at 12-13; Sarnoff Br. at 9-10.

[66] Koenigsberg Br. at 3.

[67] *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)).

plaintiffs to clear, [] especially at the pleading stage ….'"[68] In fact, "where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question."[69]

Miramax argues that Plaintiffs' RICO claims fail because they do not adequately allege that Miramax directed the enterprise's affairs.[70] However, Miramax misstates both the law and the facts. Here, Miramax did more than merely produce movies at Harvey Weinstein's behest or in partnership with TWC. Plaintiffs' allegations demonstrate that Miramax was a vital actor that enabled the scheme by:

- Facilitating Harvey's conduct through Miramax employees who lured victims to Harvey's hotel rooms and then left the victims alone with him (e.g., ¶¶ 44(a)-(h), 51, 72-74, 86, 115, 124-45), including, but not limited to, the head of Miramax's Italian operations who operated as a procurer of women (¶ 72);[71]

- Covering up Harvey's conduct through Miramax employees who actively hid the assaults after they occurred (e.g., ¶ 137), dissuaded victims from reporting the assaults, and persuaded victims to enter into confidential settlements to avoid public disclosure of the events or further reporting of the assaults (e.g., ¶ 169);[72]

---

[68] *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (internal citations omitted). *See also United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) (holding the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact).

[69] *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 U.S. Dist. LEXIS 29666, at *26 (E.D.N.Y. Feb. 22, 2005). *See also id.* at *9 ("Given the early stage of the proceedings, plaintiff[] may not yet have had the opportunity to fully understand the nature of the roles of each category of defendant with regard[] to their respective management or operation capacity."); *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 225 (E.D.N.Y. 2014) (finding that "plaintiff has alleged enough to withstand a motion to dismiss on this issue, and '[a]ny future doubts involving moving defendants' relative level of participation should be resolved on summary judgment'").

[70] Miramax Br. at 20-21.

[71] *See, e.g., Republic of Colom. v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 429 (E.D.N.Y. 2007) (denying motion to dismiss in part, finding "Plaintiffs have alleged that Defendants, with the knowledge and support of high-level executives, have controlled the enterprise. They have accomplished this through a variety of means, including … being present when the money laundering was actually occurring, and having frequent communications with other participants in the RICO enterprise.").

[72] *See, e.g., United States v. Triumph Capital Grp., Inc.*, 260 F. Supp. 2d 444, 450 (D. Conn. 2002) (denying motion to dismiss superseding indictment's RICO claims, where the government alleged that the

- Allowing hotel suites to be used for Miramax meetings knowing that victims were to be lured there for the purpose of sexual assault (e.g., ¶¶ 41, 44);[73] and

- Actively engaging in retribution for complaining, including, but not limited to, blacklisting victims, spying on them, smearing them in the press, otherwise sabotaging them in their profession, and sabotaging their legal claims (e.g., ¶¶ 171-72, 174, 177).

These allegations go far beyond those that were found wanting in the cases cited by Miramax. For example, in *United States Fire Ins. Co. v. United Limousine Serv.*, the Second Circuit pointed to cases involving participants who were merely alleged to have provided services to a RICO enterprise as insufficient to state a claim.[74] Miramax's reliance on other cases is similarly inapposite where the complaints failed to allege facts demonstrating racketeering activity[75] beyond merely taking directions[76] or passing along information.[77]

In contrast, the *United States Fire Ins.* court held that conduct rising to the level of a RICO violation was adequately pleaded where the complaint stated that the defendants, *inter*

---

defendants conducted and participated in the affairs of the enterprise by attempting to conceal a third-party defendant's corruption and through obstruction of justice and witness tampering).

[73] *See, e.g., De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 403 (S.D.N.Y. 2015) (denying motion to dismiss and finding that Plaintiff adequately alleged art gallery defendant's managing member participated in the RICO enterprise by (1) knowingly permitting the gallery's former president to use the gallery to fraudulently sell forged artworks; (2) by rewarding the former president for her unlawful conduct and incentivizing her to continue it; and (3) by taking the ill-gotten gains from the fraudulent sales for his own benefit).

[74] 303 F. Supp. 2d 432, 452 (S.D.N.Y. 2004) (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521-22 (2d Cir. 1994) (provision of legal services alone was not management of a RICO enterprise); *Hayden v. Paul, Weiss, Rifkin, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (mere provision of accounting services alone was not direction of a RICO enterprise); *Indus. Bank of Latvia v. Baltic Fin. Corp.*, 1994 WL 286162, at *3 (S.D.N.Y. June 24, 1994) (mere provision of banking services was not adequate participation)).

[75] Miramax Br. at 21 (citing *Jones v. Nat'l Commc'ns & Surveillance Networks*, 409 F. Supp. 2d 456, 473-474 (S.D.N.Y. 2006)).

[76] *Id*. (citing *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997)).

[77] *Id*. (citing *Redtail Leasing, Inc. v. Bellezza*, 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997)).

*alia*, made critical misrepresentations and served as the point of communication—conduct that is more closely akin to what Miramax did than what the lawyers, accountants, and bankers cited in *United States Fire Ins.* did.[78] Accordingly, Plaintiffs have adequately alleged facts that pass the "operation or management" test as to Miramax.

The Directors assert that the Complaint fails to allege that they participated in the enterprise.[79] However, Plaintiffs allege that all of the Directors, including the Outside Directors, negotiated and agreed to increasingly protective employment agreements with Harvey Weinstein from 2005 through 2015 *in direct response to his history of assault*.[80] While the Outside Directors have publicly disclaimed knowledge of all of the assaults, David Boies—Harvey's lawyer—made clear that the Directors knew that settlements to female victims had been paid.[81] By 2015, the Directors had explicitly agreed that Weinstein could not be fired unless he was *convicted* of a felony involving moral turpitude—and just as explicitly agreed that settlements of civil matters would result in little more than a slap on the wrist.[82] This type of set-up encouraged Harvey (and the enterprise) to ensure that victims never reported Weinstein and/or were discredited if they did. Plaintiffs allege that this type of provision in an employment agreement is

---

[78] 303 F. Supp. 2d at 453 (denying motion to dismiss RICO complaint as to one defendant and dismissing without prejudice as to other defendants).

[79] Outside Dir. Br. at 20-21; Koenigsberg Br. at 3, 14.

[80] ¶¶ 127-33, 139. Koenigsberg's arguments that the substantial financial fines in Weinstein's employment contract for violations of TWC's Company Conduct reflects that the Directors were adverse to Weinstein and/or didn't know of Weinstein's conduct is contrary to the allegations of the Complaint. Koenigsberg Br. at 3. *See also* R.W. Br. at 18 n.15. At the pleading stage the Court should not weigh competing theories and dismiss a complaint by choosing "among plausible alternatives." *Anderson News*, 680 F.3d at 189 (internal quotation omitted).

[81] ¶¶ 129-30.

[82] ¶¶ 127-28, 131-32.

unique and reflects the Directors' knowledge and participation in the enterprise and agreement to participate in the scheme.[83]

Participating in the cover-up of crimes (part of the scheme to defraud) by the Directors is sufficient to survive a motion to dismiss.[84] The Second Circuit has described the "operation or management" test as "a relatively low hurdle for plaintiffs to clear, especially at the pleading stage,"[85] which Plaintiffs clear here.

---

[83] Robert Weinstein's argument that he cannot be held liable merely based on his familial relationship ignores the allegations that he participated as an officer and director at both Miramax and TWC. R.W. Br. at 16. *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 529 (S.D.N.Y. 1997) ("The same reasoning holds true for those individual Defendants who sat on MetLife's Board of Directors. *See* RICO Stmt. at 20. Plaintiff alleges that these Defendants sat on various committees, including the Audit and Legal and Social Responsibility Committees. *Id*. This creates an inference that these Defendants were aware of the illegality of MetLife's alleged conduct, especially in light of facts such as the arrest of a MetLife agent in Switzerland and the British investigation, events which must have put MetLife on notice of the possible illegality of its insurance sales.") (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989) (holding that plaintiff satisfied Rule 9(b) where facts gave rise to strong inference that individuals, as directors of corporation, were aware of import restrictions which were not disclosed to plaintiff); *Hallet v. Li & Fung, Ltd.*, 1996 WL 487952, at *4 (S.D.N.Y. Aug. 27, 1996) (holding that plaintiff satisfied Rule 9(b) as to individual director where director sat on board committees and had access to financial information, thus creating strong inference that director was aware of misrepresentations); *Bausch & Lomb*, 941 F. Supp. at 1361-62 (holding that plaintiff satisfied Rule 9(b) as to individual officers where corporation received information about declining distributorship sales, thus creating strong inference that officers were aware of scheme to hide corporation's declining growth)).

[84] *Int'l Telecomms. Satellite Org. v. Colino*, 1992 U.S. Dist. LEXIS 4887, at *56-57 (D.D.C. 1992) ("Whether or not the above uses of the interstate mail and wires were essential to the execution of a fraudulent scheme is immaterial here because, clearly, all of the uses were at the very least, either (i) made to promote a fraudulent scheme, (ii) related to the acceptance of the proceeds of a fraudulent scheme, or (iii) facilitated the concealment of a fraudulent scheme. As such, they were all incidental to an essential part of a fraudulent scheme and this is all the plaintiff needs to prove to establish a violation of the mail and wire fraud statutes.").

[85] *Levine v. Torino Jewelers, Ltd.*, 2006 U.S. Dist. LEXIS 11932, at *17 (S.D.N.Y. Mar. 22, 2006) (denying directors' motion to dismiss, finding that allegation that defendants were each "officers, directors, and/or shareholders" in the RICO enterprise sufficient to show they participated in the operation or management). While Sarnoff asserts that being a director is not sufficient to tag him with the fraud or tortious conduct of others, the case he cites stands only for the unremarkable proposition that "district courts in the Second Circuit have repeatedly rejected attempts to convert a breach of contract claim into a fraud claim …," including a claim against officers of a bankrupt corporation. Sarnoff Br. at 1 (citing *Productores Asociados de Cafe Rio v. Moreno*, 1999 U.S. Dist. LEXIS 6627, at *12 (S.D.N.Y. May 5, 1999)).

> **d.      The members of the Weinstein Sexual Enterprise are jointly and severally liable.**

Miramax argues that the TWC class representatives' RICO claims against Miramax should be dismissed (or limited to the pre-2005 period); similarly, TWC argues that the Miramax class representatives' claims should be dismissed as to it; and the Outside Directors claim that injuries before they took seats on the board should not inure to them.[86] However, "[c]ourts in this district 'routinely find defendants jointly and severally liable in relation to civil RICO claims.'"[87] Accordingly, this Court should not parse and dismiss the RICO claim by Plaintiffs based on which Defendant employed Weinstein at the time of each Plaintiff's injury.

Further, it is a question of fact whether Miramax is responsible for acts that occurred after Weinstein left for TWC. A person can withdraw from a conspiracy "'either [by] making … a clean breast to the authorities … or communicat[ing] … the abandonment in a manner reasonably calculated to reach co-conspirators.'"[88] If the discovery demonstrates Miramax withdrew at that time, "withdrawal from a conspiracy serves only to end a conspirator's liability for acts taken thereafter by another conspirator."[89] Although Weinstein left Miramax in 2005,

---

[86] TWC Br. at 25; Outside Dir. Br. at 23.

[87] *Allstate Ins. Co. v. Yehudian*, 2018 U.S. Dist. LEXIS 27129, at *59 (E.D.N.Y. Feb. 15, 2018) (quoting *Nazarov*, 2015 U.S. Dist. LEXIS 134481, 2015 WL 5774459, at *17 (citations omitted)). *See also United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations."), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 71215, 2014 WL 2169642 (E.D.N.Y. May 23, 2014). Although not addressed in a civil case, the Second Circuit has allowed joint and several liability in a criminal RICO case. *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005).

[88] *United States v. Salameh*, 152 F.3d 88, 150 (2d Cir. 1998) (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964)).

[89] *United States v. Dallas*, 229 F.3d 105, 110 (2d Cir. 2000) (quoting *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981)).

victims from the Miramax era were targets of the Weinstein Sexual Enterprise in 2017.[90]

Accordingly, until discovery is completed, the extent of Miramax's liability for the RICO claims

cannot be certain.

With respect to TWC and the Directors, the mere fact that they joined the conspiracy later

does not absolve them from liability for acts preceding their joinder.[91] According to the Second

Circuit, as "to liability for conspiracy, a defendant may be legally responsible for acts of

coconspirators prior to that defendant's entry into the conspiracy ...."[92] Thus, it will be a

question of fact whether the later-joining Defendants had "knowledge as to its general scope and

purpose;" if so, they may be held liable for the entirety of the conspiracy.[93]

### 2.    Defendants engaged in a pattern of racketeering.

Plaintiffs must demonstrate a "pattern of racketeering activity," with at least two acts of

racketeering activity within ten years.[94] The minimum two acts must be "related," and be "either

an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat

---

[90] ¶¶ 62-69.

[91] *See, e.g.,* Koenigsberg Br. at 3 (asserting he is not liable for RICO claims for acts occurring before 2005). *See Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) (recognizing that "a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) (noting that "a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy"); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. 231, 232 (S.D. Fla. 1977) (explaining that "proof of the unlawful affiliation is sufficient to render a co[-]conspirator liable for all damages that the conspiracy caused, regardless of the exact time defendant became a member or the extent of its participation").

[92] *United States v. Blackmon*, 839 F.2d 900, 908 (2d Cir. 1988) (citing *United States v. Guillette*, 547 F.2d 743, 751 (2d Cir. 1976), *cert. denied*, 434 U.S. 839, 54 L. Ed. 2d 102, 98 S. Ct. 132 (1977)).

[93] *United States v. Garcia*, 1997 U.S. App. LEXIS 8092, at *13 (2d Cir. Apr. 14, 1997) (citations and internal quotations omitted).

[94] *See* 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1).

of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct 'extending over a substantial period of time')."[95]

Defendants argue that Plaintiffs' RICO claims fail because they do not allege a single RICO predicate act, let alone the required pattern of racketeering.[96] As set forth below, Plaintiffs have alleged the predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), sex trafficking (18 U.S.C. §§ 1590, 1591), and witness tampering (18 U.S.C. § 1512).

As explained with examples below, Plaintiffs have alleged at least two predicate acts with respect to each Defendant.[97]

> ### a.   Plaintiffs allege the predicate acts of mail and wire fraud as to all Defendants.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires."[98] A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching."[99] The Second Circuit has recently reaffirmed that "the mail or wire communications themselves need not contain a false statement."[100] "The use of the mails (or the wires) need not be essential to the

---

[95] *GICC Capital Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 466 (2d Cir. 1995).

[96] *See, e.g.*, Miramax Br. at 20-23.

[97] *Bunnett & Co. v. Gearheart*, 2018 U.S. Dist. LEXIS 31873, at *16 (N.D. Cal. Feb. 27, 2018) ("While defendants … argue that these allegations do not pertain specifically to them, there is no requirement that Plaintiffs allege direct involvement in each predicate act by each defendant so long as each defendant is involved in at least two predicate acts.").

[98] *Williams v. Affinion Grp., LLC*, 2018 U.S. App. LEXIS 11909, at *14 (2d Cir. May 7, 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).

[99] *Autuori*, 212 F.3d at 115 (citing *McNally v. United States*, 483 U.S. 350, 358, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987)).

[100] *Williams*, 2018 U.S. App. LEXIS 11909, at *15 (citations omitted). *See also Schmuck v. United States*, 489 U.S. 705 (1989) (holding "innocent" mailings sufficient for purposes of mail fraud statute); *Spira v. Nick*, 876 F. Supp. 553, 558-559 (S.D.N.Y. 1995) (same). Thus, TWC's argument that Plaintiffs need to allege "two separate acts of fraud for each Defendant" is incorrect and not supported by its citations. TWC Br. at 19. Plaintiffs need only allege a scheme to defraud, and (as correctly stated in the

scheme to defraud, *or even done by a defendant*, so long as the mailing is a closely related and reasonably foreseeable incident of the scheme."[101]

Here, the scheme to defraud is clearly pled. The Weinstein Sexual Enterprise initially used Miramax and TWC to deceive women into meeting with Weinstein under the guise of business, when in fact the purpose was to sate Weinstein's sexual appetite.[102] The Weinstein Sexual Enterprise then used Miramax and TWC employees, spies, the media and lawyers to deceive Weinstein's victims, to blacklist victims, as well as to turn over or share their evidence of assault under the guise it would be used to expose Weinstein's wrongdoing (in the media) or to prosecute a claim against Weinstein (in a civil action). The material misrepresentations were made in writing via email and texts, and in telephone calls (several of which were made across state lines)—each holds out the sender as someone who is sympathetic to and willing to help the victims, when they were actually working for Weinstein. In fact, the Weinstein Sexual Enterprise used the victims' evidence of assault against Plaintiffs and the Class to blacklist them and

---

case on which TWC relies) "that defendants committed at least two of the statutorily enumerated predicate acts." *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017).

[101] *In re Lupron*, 295 F. Supp. 2d at 165 (emphasis added) (citations omitted). *See also Schmuck*, 489 U.S. at 710-11 (declaring that the mails had to be used in connection with the fraud but their use "need not be an essential element of the scheme" and could be merely "incident[al] to an essential part of the scheme" or "a step in [the] plot").

[102] Indeed, Harvey Weinstein has admitted the use of the wires to communicate with the Class Members in recent filings. *See* Motion for Entry of an Order Compelling Limited Discovery Under Rule 2004 of the Federal Bankruptcy Procedure and Reply (Dkt. #729), at 2, 10, *In re Weinstein Co. Holdings, LLC, et al.*, No. 18-10601 (Bankr. D. Del.) (Weinstein seeking his "electronically stored information" at TWC, consisting of "his own email communications where he was the sender/recipient," including "hundreds of thousands of emails, texts and pieces of personal correspondence.").

publish false stories about them. Members of the enterprise also destroyed evidence. The scheme

to defraud is clearly pled separate from the predicate acts of mail and wire fraud.[103]

Moreover, Plaintiffs satisfy Rule 9(b) with respect to mail and wire fraud.[104] "[U]nder

Rule 9 the [RICO] pleader is required to go beyond a showing of fraud and state the time, place

and content of the alleged mail and wire communications perpetrating that fraud."[105] "However,

the particularity requirement is not a mechanical formula demanding exacting precision but must

instead be applied in view of its express purposes and the facts of each case."[106]

Examples of the mail and wire fraud include:

- Mails and wires were used by Weinstein, his Miramax assistant, and Miramax's
  accounting department to: (i) speak with Brock's agent after her assault to set up
  the private screening at which Weinstein threatened Brock; (ii) to rent and pay for

---

[103] Thus, Miramax's argument that Plaintiffs have failed to allege "a course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves" should be rejected. Miramax Br. at 19 (citing *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)) (emphasis omitted). Even if the allegations fell short however, the Supreme Court rejected Miramax's argument in *Boyle v. United States*. *See* 556 U.S. at 947 ("As we explained in *Turkette*, the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' 452 U.S., at 583, 101 S. Ct. 2524. On the other hand, if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.' *Ibid*.").

[104] Fed. R. Civ. P. 9(b).

[105] *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (internal quotation marks and citations omitted). *See also New England Data Servs. Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud. This degree of specificity is no more nor less than we have required in general fraud and securities fraud cases.").

[106] *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 538 (S.D.N.Y. 2014). *See also Int'l Motor Sports Grp., Inc. v. Gordon*, 1999 U.S. Dist. LEXIS 12610, at *11 (S.D.N.Y. Aug. 10, 1999) ("Thus, a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'") (quoting *Spear, Leeds & Kellogg v. Public Serv. Co.*, 700 F. Supp. 791, 793 (S.D.N.Y. 1988) and citing 2 James Wm. Moore et al., Moore's Federal Practice § 9.03[1][b], at 9-18 (3d ed. 1999) ("Moore") ("Plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.")).

the theater and private screening at which Weinstein threatened Brock; (iii) to schedule and pay for the private plane on which Sagemiller was forced to fly after her assault (and to contact Sagemiller at the airport to redirect her);[107]

- Mails and wires were likely used by Miramax and Weinstein to remove women from projects or dissuade other people from hiring the women;[108]

- Mails and wires were likely used by Miramax to (i) discuss complaints of sexual assault and harassment against Weinstein as they occurred; (ii) negotiate non-disclosure agreements to conceal Weinstein's assaults after they occurred;[109]

- Wires were used by a "fake" journalist hired by unidentified members of the enterprise in the summer of 2017 to contact Miramax-era victim Katherine Kendall, who was also on the Black Cube list, as well as other Intelligence Participants targeting victims;[110]

- Wires were used by Ambassador Paolo Zampolli (telephone across state lines) and Alex Spiro, Esq. (telephone calls, emails, and text messages across state lines) to contact proposed plaintiff Melissa Thompson (a TWC-era victim) in October 2017 to entice her to retain Spiro at Benjamin Brafman's firm to prosecute her claims and then to share her evidence against Weinstein (when in fact Brafman was Weinstein's lawyer);[111]

- Mails and wires were used by TWC's Board of Directors (who live in New York, Connecticut, California, New Jersey, Florida, Canada, and Europe) to (i) discuss and edit Weinstein's employment contracts, which specifically incorporated clauses to address Weinstein's sexual assaults; (ii) negotiate Weinstein's employment contracts with him; (iii) correspond with TWC and Weinstein's lawyer concerning Weinstein's personnel file and the lawyer's withholding of the file from the Board; (iv) correspond about and discuss each complaint against Weinstein as it occurred; (v) negotiate post-assault non-disclosure agreements with Weinstein's victims; and (vi) discuss, negotiate, and/or approve employment contracts with TWC employees precluding the employees from criticizing the company or its leaders;[112] and

---

[107] ¶¶ 82, 94.

[108] ¶¶ 171, 174, 175.

[109] ¶¶ 123, 126, 169, 176-77.

[110] ¶¶ 62-69.

[111] *Dulany* Compl., ¶¶ 200-02.

[112] ¶¶ 127-33. Arguments by Koenigsberg and Sarnoff (Br. at 11) that Plaintiffs have not identified a specific communication as to them ignores the reality that they hold the emails and evidence of calls in their possession. *Rotella v. Wood*, 528 U.S. 549, 560 (2000) (citing *Corley v. Rosewood Care Ctr., Inc. of*

- Mails and wires were used between Weinstein, his lawyers and the Intelligence Participants to retain, pay, and discuss the findings of the Intelligence Participants.[113]

As further detailed in the Complaint, Plaintiffs have included extensive details to inject precision or some measure of substantiation into their allegations of mail and wire fraud.[114] To the extent more is needed, the Supreme Court has recognized that Rule 9(b) can be relaxed for a RICO claim where the necessary evidence is likely to come through discovery.[115]

### b.   Plaintiffs allege at least two predicate acts of sex trafficking as to each of Miramax, TWC and Weinstein.

Plaintiffs allege multiple instances of obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18 U.S.C. §§ 1590, 1591, committed by Miramax, TWC, and Weinstein.[116] Plaintiffs have alleged the elements of (i) recruiting, enticing, transporting, providing, and obtaining victims; (ii) the use of force, fraud or coercion to accomplish or attempt to accomplish the sex trafficking; (iii) the sex trafficking

---

*Peoria*, 142 F.3d 1041, 1050-1051 (7th Cir. 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim)).

The Outside Directors argue that Plaintiffs have failed to allege facts demonstrating the requisite scienter or knowledge on the part of the Outside Directors. Outside Dir. Br. at 18. However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

[113] ¶¶ 148-67.

[114] 2 James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 9.03[1][b], at 9-18 (3d ed. 1999) ("Plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.").

[115] *Rotella*, 528 U.S. at 560 (citing *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1050-1051 (7th Cir. 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim)).

[116] Plaintiffs have not alleged, at this stage, predicate acts of sex trafficking against the Directors, but do not concede that they were ignorant of the sex trafficking that occurred. *See* Outside Dir. Br. at 12-15; Koenigsberg Br. at 10-11; Sarnoff Br. at 12-13. Plaintiffs reserve the right to seek leave to amend.

affected interstate or foreign commerce (e.g., Miramax filming in Canada and promoting at film festivals in Cannes, France; TWC promoting at film festivals in Utah); and (iv) the sexual assaults were commercial in that Weinstein either linked the sex acts to quid pro quo for the victims, or the Complicit Producers paid the employees to procure Weinstein's victims.[117]

By way of example only, the following predicate acts of sex trafficking are alleged in this Complaint or can be alleged as set forth in the *Dulany* Complaint:

*For Defendants Miramax and Harvey Weinstein*:

- In 1998, Miramax employees (including Miramax's head of Italian operations who was a "procurer" of women for Weinstein) transported Plaintiff Zoe Brock to Harvey Weinstein's hotel room at the Cannes Film Festival in France, where they left her alone and Weinstein attempted to assault her;[118] and

- In 2000, during filming of the Miramax film *Get Over It* in Toronto, Canada, Miramax employees deceived Plaintiff Melissa Sagemiller into attending a meeting in Weinstein's hotel room (over her objections), telling her the meeting was to the discuss the script. In fact, Weinstein attempted to sexually assault her.[119]

*For Defendants TWC and Harvey Weinstein*:

- In 2008, TWC employees—via telephone and email—caused Plaintiff Sarah Ann Thomas to travel from New York to Weinstein's home in Connecticut under the guise that the meeting was for a job opportunity and with the promise that a TWC female employee would attend; in reality, the female employee cancelled and the meeting was an attempted assault by Weinstein, interrupted by his children.[120]

Miramax oversimplifies *Snowden v. Lexmark Int'l, Inc.*,[121] suggesting that sex trafficking cannot form the basis of a RICO claim because Congress did not include it as a predicate offense

---

[117] *See generally United States v. Paris*, 2007 U.S. Dist. LEXIS 78418 (D. Conn. Oct. 23, 2007) (discussing the elements of sex trafficking violations). Weinstein argues that Plaintiffs have not alleged that money changed hands. H.W. Br. at 18. In fact, Plaintiffs allege that Miramax and TWC paid employees to lure women to non-consensual sexual encounters with Harvey Weinstein.

[118] Compl., § IV(C)(2).

[119] Compl., § IV(C)(3). *See also Dulany* Compl., ¶ 56.

[120] Compl., § IV(C)(5).

[121] 237 F.3d 620, 624 (6th Cir. 2001).

until 2003.[122] But even under *Snowden*, Plaintiffs need only allege one act of racketeering after the amendment's effective date to avoid implicating the prohibition against *ex post facto* laws[123]—a scenario Congress explicitly addressed.[124] Unsurprisingly, the government has successfully prosecuted criminals under RICO based on predicate acts committed *prior to its existence*.[125] Given that, here, Plaintiffs plead several predicate acts occurring after the amendment in 2003, Defendants' arguments regarding retroactivity must fail.

Weinstein claims that none of Plaintiffs' allegations of attempted rape, masturbation, groping, and non-consensual touching amount to a "sex act" in violation of the statute. However, he admits the statute (18 U.S.C. § 1512) does not define "sex act."[126] Thus, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"[127] The

---

[122] Miramax Br. at 23.

[123] *See* 237 F.3d at 624 ("In this case, Mr. Snowden's infringing activity before July 2, 1996—the effective date of the Anticounterfeiting Consumer Protection Act—cannot serve as a predicate act unless he *also* infringed *after* July 2, 1996. This he did not do.") (emphasis in original).

[124] S. Rpt. 91-617, 91st Cong., 1st Sess. p. 158 (1969) ("One act in the pattern must be engaged in after the effective date of the legislation. This avoids the prohibition against ex post facto laws, and bills of attainder. Anyone who has engaged in the prohibited activities before the effective date of the legislation is on prior notice that only one further act may trigger the increased penalties and new remedies of this chapter.").

[125] *See, e.g.*, *United States v. Campanale*, 518 F.2d 352, 365 (9th Cir. 1975) ("[A]ppellants were not convicted … for acts committed prior to October 15, 1970; rather they were convicted for having performed post-October 15, 1970, acts in furtherance of their continued racketeering conspiracy after being put on notice that these subsequent acts would combine with prior racketeering acts to produce the racketeering pattern against which this section is directed.").

[126] H.W. Br. at 19.

[127] *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

plain meaning of "sex act" encompasses far more than sexual intercourse, including any "action performed with another for sexual gratification."[128]

> ### c. Plaintiffs allege at least two predicate acts of tampering with victims and/or witnesses as to Miramax, TWC, and Weinstein.

Plaintiffs also allege the predicate acts of tampering with a witness or victim. 18 U.S.C. § 1512. Plaintiffs allege that certain Defendants used the threat of physical force to cause the victim not to report the assaults to a law enforcement officer.[129] To allege a predicate act of witness tampering, however, it is sufficient that the harassing conduct be "intended to badger, disturb, or pester,"[130] like the conduct directed at Kendall.[131] Moreover, the conduct need not be directed at the plaintiff, if the conduct is directed at a third party with the intent to intimidate the plaintiff.[132]

By way of example only, the following predicate acts of tampering with a victim are alleged:

---

[128] https://www.merriam-webster.com/dictionary/sex%20act (last accessed May 21, 2018). Nonetheless, the *Dulany* Complaint specifically alleges Weinstein sexually penetrated Thompson.

[129] Law enforcement officer is defined as "public servant authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, or prosecution of an offense." 18 U.S.C. § 3673(3). Plaintiffs have not alleged, at this stage, predicate acts of witness tampering against the Directors, but do not concede that they were ignorant of the witness tampering that occurred and reserve the right to amend. *See* Outside Dir. Br. at 15-16; Koenigsberg Br. at 10; Sarnoff Br. at 12-13.

[130] U.S. Attorneys' Criminal Resource Manual, § 1729, available at https://www.justice.gov/usam/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or (last accessed May 27, 2018). Robert Weinstein's position that the procurement of silence through "settlement agreements" is not witness tampering ignores (1) the threats to the women that preceded any alleged settlements; and (2) that those settlements were intended to hide illegal conduct. Moreover, his case citation does not exclude all settlement agreements from the definition of witness tampering, but instead merely demonstrates it is a question of fact. R.W. Br. at 14 n.13.

[131] ¶¶ 62-69.

[132] U.S. Attorneys' Criminal Resource Manual, § 1729, available at https://www.justice.gov/usam/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or (last accessed May 29, 2018).

*For Defendants Miramax and Harvey Weinstein*:

- The night after assaulting and attempting to assault Plaintiff Zoe Brock in Cannes, France, Weinstein and Miramax rented out a theater (unbeknownst to Brock) for a private screening for Brock's group. After the lights dimmed, Weinstein entered the theater, sat right behind Brock and kept his hand on Brock's chair to intimidate her into silence;[133]

- At the end of shooting the Miramax movie in Toronto and after having been assaulted, Sagemiller declined Weinstein's invitation to travel back to the United States on his private plane. Nonetheless, Weinstein's assistant tracked Sagemiller down at the airport and told her that her bags had been removed from the commercial airline. After Sagemiller was forced to board Weinstein's plane, Weinstein directly threatened and intimidated her into silence;[134]

- After attempting to assault Klatt at Miramax's offices, Weinstein locked her in a pitch-black stairwell to prevent her from going to the authorities and intimidate her into silence;[135]

- Other acts include blacklisting, threatening victims with pulling the release of their films if they reported, leaving a victim stranded after she resisted, tampering with witnesses generally, and entering into contracts with the purpose of investigating, slandering, blacklisting, and blackmailing victims.[136]

Defendants' argument that Plaintiffs' allegations of victim tampering are inadequate should be rejected.[137] First, contrary to Miramax's protest, nothing in Section 1512 requires Plaintiffs to identify a specific "federal proceeding" in order to prosecute a case of tampering. Indeed, such a requirement would eviscerate Section 1512, a major portion of which is aimed at tampering that is intended to prevent complaints to a law enforcement officer.[138] Similarly, the argument that Weinstein would need to be aware that he was the subject of a federal investigation to fall within the statute would undermine the provision that "an official proceeding

---

[133] Compl., § IV(C)(2).

[134] Compl., § IV(C)(3).

[135] Compl., § IV(C)(6).

[136] ¶¶ 171, 176, 177, 196, 197.

[137] Miramax Br. at 22-23.

[138] *See, e.g.,* 18 U.S.C. §§ 1512(a)(2), (b), (c), (d).

- 33 -

need not be pending or about to be instituted at the time of the offense."[139] Here, the very gravamen of this claim is that the RICO enterprise's purpose was to prevent Plaintiffs, the Class, and others from reporting Harvey Weinstein's criminal conduct, which constituted a federal crime of, *inter alia*, sex trafficking pursuant to 18 U.S.C. § 1590.[140]

### d.     A closed-ended pattern of racketeering activity exists.

Closed-ended continuity can be shown through past criminal conduct extending over a substantial period of time.[141] The Second Circuit has found closed-ended continuity to exist with predicate acts occurring over as little as two years.[142] Courts have denied motions to dismiss where there are a number of victims and separate incidents, even where the time period is less than two years.[143] Here, Plaintiffs allege predicate acts occurring from at least 1993 to October 2017, and thus satisfy closed-ended continuity.

---

[139] 18 U.S.C. § 1512(f)(1). For this reason, to the extent that it states that a federal proceeding must be pending for a tampering charge to stand, *Miller v. Carpinello*, 2007 WL 4207282, at *7 and n.6 (S.D.N.Y. Nov. 20, 2007) (*cited in* Miramax Br. at 22-23), is simply incorrect. *See also* R.W. Br. at 14 n.13; TWC Br. at 15.

[140] In the event that this Court finds that the Complaint should have more specifically pleaded the tampering allegations, Plaintiffs respectfully request leave to amend.

[141] *H.J. Inc. v. Nw Bell Tel. Co.*, 492 U.S. 229, 242 (1989); *GICC Capital Corp.*, 67 F.3d at 466. Although at the time Plaintiffs filed the Complaint, it was unclear whether the pattern was open- or closed-ended, it appears now that the conduct has likely ended with the sale of TWC in bankruptcy. *Cf.* TWC Br. at 20-21 (arguing that Plaintiffs cannot allege an open-ended scheme due to Harvey Weinstein's termination).

[142] *Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992). *See also Jacobson v. Cooper*, 882 F.2d 717 (2d Cir. 1989) (concluding that predicate acts occurring from approximately 1980 to 1988 satisfied the continuity requirement").

[143] *See, e.g., SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (17 months). *See also id.* ("While Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity."); *De Falco*, 244 F.3d at 321 ("Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.").

### 3. Plaintiffs have alleged RICO injury.

Under Title 18 U.S.C. § 1964(c), a RICO plaintiff has standing where "he has been injured in his business or property by the conduct constituting the violation."[144] In order to establish a cognizable RICO injury, a plaintiff must show not only that the defendant's alleged RICO violation was the "but-for" or cause-in-fact of his injury, but also that the violation was the legal or proximate cause.[145] Plaintiffs have alleged that two purposes of the RICO scheme were: (i) to blacklist victims and cause career damage; and (ii) to impede and injure Class Members' legal claims against Weinstein.

Reputational damage, in fact, is a RICO injury when the purpose of the RICO scheme was to injure the Plaintiffs' reputation to keep them from getting jobs.[146] In other words, where the reputational damage is proximately caused by the RICO scheme, it is a RICO injury.

Miramax's reliance on *Hollander v. Flash Dancers Topless Club* for the proposition that reputational damage can never constitute RICO injury is misplaced.[147] *Hollander* held that a plaintiff lacks standing "where the plaintiff's injuries are caused not by the RICO violations themselves, but by the exposure of those acts, or where plaintiff seeks to recover for injuries

---

[144] *Sedima*, 473 U.S. at 496.

[145] *See Holmes v. S.I.P.C.*, 503 U.S. 258, 265-68 (1992).

[146] *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262, 264 (2d Cir. 1995) (affirming verdict for plaintiff on RICO claim and damages of $100,000 in "injury to reputation and/or loss of goodwill," explaining "[o]ne objective of the unlawful conduct was to create multiple sources for rumors concerning the supposed dangers of Securitron locks. *** [T]he jury could conclude that there was a deliberate effort to use both independent entities to give a spurious validity to the rumors."). *See also Aramony v. United Way of Am.*, 969 F. Supp. 226, 233 (S.D.N.Y. 1997) (explaining that "[t]he plaintiff in *Securitron* succeeded because the underlying predicate acts included deliberate and fraudulent misrepresentations designed to malign the plaintiff's reputation in the marketplace as a lock manufacturer. The damage contemplated by the predicate acts was reputational injury to the plaintiff, thus fulfilling the proximate cause requirement of *Holmes*.") (citations omitted).

[147] 340 F. Supp. 2d 453, 459-60 (S.D.N.Y. 2004), *cited in* Miramax Br. at 15.

caused by his refusal to aid and abet the violations."[148] The *Hollander* court dismissed plaintiff's allegation of reputational harm because he "was not a target of the Scheme," nor was the scheme intended "to cause harm to plaintiff's reputation or goodwill or business."[149]

The allegations here stand in stark contrast. The Class Members were injured by the secret scheme to target the Class Members' reputations and cause them to lose business. That is the essence of a RICO injury. Not only were the Class Members the explicit targets of the scheme—the scheme itself was explicitly intended to harm them in their professions. Accordingly, *Hollander* is entirely distinguishable.

The Directors' reliance on *Mack v. Parker Jewish Inst. for Health Care & Rehab.* is similarly misplaced.[150] In *Mack*, the defendants reported the plaintiff pharmacist to the licensing board for diversion of drugs. Although the plaintiff claimed she was innocent, she did not allege that the defendants had taken affirmative steps to blacklist her from employment nor caused other employers not to hire her. Rather, she alleged she was "slandered, libeled, and defamed," suffered "immense pain and suffering," and was "unable to seek employment that reflects her level of professional achievement and standing within her field, or to further her career due to the

---

[148] 340 F. Supp. 2d at 459-60.

[149] *Id.* at 462. The Directors cite cases where the purpose of the RICO scheme was not aimed at ruining the plaintiffs' job prospects and thus are inapposite. *See* Sarnoff Br. at 6 (citing *inter alia Roitman v. N.Y.C. Transit Auth.*, 704 F. Supp. 346 (E.D.N.Y. 1989) (RICO claim dismissed against police officer who arrested an offender who sexually assaulted a woman on the train where the offender claimed he might not be able to get a teaching job with the "sex offender" label); *Mackin v. Auberger*, 59 F. Supp. 3d 528, 558 (W.D.N.Y. 2014) (rejecting RICO injury as "the loss of Plaintiff's reputation and resulting inability to gain future employment" where plaintiff police officer was let go due to misconduct on the job, including the destruction of evidence, and there was no evidence that the RICO scheme was designed to prevent the police officer from gaining future employment)). *See* Maerov Br. at 16 (same).

[150] *Mack v. Parker Jewish Inst. for Health Care & Rehab.*, 2014 U.S. Dist. LEXIS 154577 (E.D.N.Y. Oct. 30, 2014), *cited in* Koenigsberg Br. at 16. *See also* Maerov Br. at 16 (same).

- 36 -

damage done to her reputation by defendants."[151] Dismissing her RICO claim, the court held:

"While Plaintiff argues that her injuries involve more than just damage to her reputation, she

fails to cite to any specific injury to her business or her property."[152] Unlike the *Mack* Plaintiff,

here Plaintiffs allege that the Defendants did take affirmative steps to blacklist them and interfere

with their careers, with the full extent of those affirmative steps to be obtained in discovery.

Moreover, Plaintiffs have alleged that Defendants purposefully obstructed justice,

destroyed evidence, manipulated and deceived Class Members to make statements to be used

against them. In other words, one purpose of the Weinstein Sexual Enterprise was to injure

Plaintiffs' and the Class's causes of action against Defendants, including for the damage to their

careers. A cause of action is a property right.[153] In fact, the Third Circuit reversed a district

court's decision to dismiss a similar RICO claim, explaining:

> The district court dismissed the RICO claims predicated on the
> alleged obstructions of justice . . . because, it held, interference
> with a lawsuit did not constitute an injury to 'business or property'
> within the meaning of RICO. We believe, especially in light of the
> Supreme Court's intervening decision in Sedima, that this
> constituted reversible error. . . . A cause of action, of course, is a
> form of "property[.]"[154]

Finally, "courts do not require a civil RICO plaintiff to quantify the exact amount of her

injury in order to allege such injury,"[155] as some Defendants contend. It is sufficient to allege the

---

[151] *Mack*, 2014 U.S. Dist. LEXIS 154577, at *13.

[152] *Id.* at *13-14.

[153] *Parker v. Walker*, 6 Cal. Rptr. 2d 908, 912 (Cal. Ct. App. 1992) ("A cause of action to recover money in damages, as well as money recovered in damages, is a . . . form of personal property."). *See also Logan v. Zimmerman Brush Co*., 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause").

[154] *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 354 (3d Cir. 1986), *aff'd*, 483 U.S. 143 (1987).

[155] *Grange Mut. Cas. Co. v. Mack*, 2009 U.S. Dist. LEXIS 33143, at *15 (E.D. Ky. Apr. 17, 2009). *See also Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001)

fact of injury, as Plaintiffs have here.[156] "Whether experts will be able to measure the [damages] remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative."[157]

Moreover, it is not speculative to allege damage to Plaintiffs' careers merely because the claims involve Hollywood.[158] Plaintiffs "should have the opportunity to discover evidence showing that" their careers were damaged and they would have "reaped profits if Defendants had not subverted" their ability to participate in the industry.[159] Plaintiffs have alleged facts demonstrating that such damage is plausible.

As one court explained in denying a motion to dismiss a RICO claim in response to an argument that damages were speculative:

> [Dismissal] would ignore not only how Defendants corrupted the City bidding process, but also the Second Circuit's admonition that courts should avoid applying a 'mechanical test detached from the policy considerations . . . at play in [a civil RICO case.' *Commercial Cleaning*, 271 F.3d at 381. Thus, the court declines to

---

(noting that it "has not held that quantifiable damages are a necessary precondition to RICO liability; instead, this Circuit has formulated the requirement in terms of the necessity of proving some damages, not a specific amount"); *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 271 (D. Conn. 2004) (stating "Although it is axiomatic that a plaintiff must plead concrete damages, Fed. R. Civ. P. 12(b)(6) does not require a complaint to plead the amount of damages with mathematical precision.").

[156] ¶¶ 209, 217.

[157] *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000).

[158] Outside Dir. Br. at 22.

[159] *Astech-Marmon*, 349 F. Supp. 2d at 271. *See also Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995) ("Here, notwithstanding the fact that plaintiffs have not specified an exact dollar amount of damages, plaintiffs' allegations that defendants withheld contributions and other payments sufficiently state a RICO injury. This is not an instance where the RICO injury is mere conjecture because plaintiffs may ultimately recover their losses through alternate or independent means. Rather, plaintiffs have alleged a non-speculative loss; they simply cannot ascertain the precise amount of that loss at this time because information is peculiarly within defendants' knowledge.").

> reward the Defendants for their allegedly illegal conduct by
> immunizing them from civil RICO liability.[160]

Likewise, Defendants here should not get a free pass merely because their hunting ground was

Hollywood. Dismissal should be denied.

## C.     Plaintiffs have alleged a plausible RICO conspiracy claim under Section 1962(d).

Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate

any of the provisions of [§ 1962(a)-(c)]." To establish a RICO conspiracy, a plaintiff must prove

that each defendant agreed to commit at least two predicate acts of racketeering in furtherance of

the conspiracy.[161] Plaintiffs here have alleged facts demonstrating that each Defendant

knowingly agreed to join the conspiracy and involved itself (or himself) in the commission of at

least two predicate acts. Accordingly, the motions to dismiss should be denied.[162]

## D.     Plaintiffs have plausibly alleged that Miramax, TWC, and the Directors are liable under state law.

Plaintiffs have alleged that Miramax, TWC, and the TWC Board members, for the

respective time periods in which they employed Weinstein, are liable for battery (Counts V and

VI), assault (Counts VII and VIII), intentional infliction of emotional distress (Counts IX and X),

and negligent infliction of emotional distress (Counts XI and XII), because (i) they ratified his

conduct (Counts XIII and XIV); and (ii) they are vicariously liable (¶¶237, 244, 250, 256, 264,

---

[160] *Astech-Marmon*, 349 F. Supp. 2d at 271.

[161] *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244-45 (2d Cir. 1999). *See also Williams*, 2018 U.S. App. LEXIS 11909, at \*13 ("And to state a RICO conspiracy, a plaintiff must allege 'the existence of an agreement to violate RICO's substantive provisions.'") (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997) (internal quotation marks omitted)).

[162] *See generally* Miramax Br. at 23; Outside Dir. Br. at 23-24. The Directors reassert that they cannot be liable for acts prior to joining the Board (or, as Plaintiffs allege, joining the conspiracy). *But see United States v. Blackmon*, 839 F.2d at 908 ("…a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy….") (citations omitted).

272, 280, 288, 289-294, 295-300).[163] Plaintiffs also assert Defendants are directly liable for

negligent retention and supervision (Counts III and IV).

### 1.    Miramax, TWC, and the Directors are on notice of the claim that they ratified Weinstein's conduct.

Under the doctrine of ratification, a defendant who deliberately allows illegal conduct to

continue when he can stop it is liable for ratifying the conduct.[164] Plaintiffs allege that Miramax,

TWC, and the Directors knowingly ratified Weinstein's practice of assaulting women under the

guise of business in Miramax's and TWC's names.[165] As reflected in the Restatement (Second)

on Torts, ratification is hardly limited to contract law.[166] Thus, courts have found that an

employer's ongoing tolerance of sexual harassment logically amounts to ratification.[167] To that

---

[163] TWC argues that it is not liable for negligent infliction of emotional distress absent a duty to Plaintiffs. *See* TWC Br. at 38-39. However, liability is based on ratification and *respondeat superior*.

[164] *Tarango Trucking v. Cty. of Contra Costa*, 181 F. Supp. 2d 1017, 1032 (N.D. Cal. 2001) (citing *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir. 1984)).

[165] *See* Compl., Counts XIII (Ratification versus Miramax and Robert Weinstein), XIV (Ratification versus TWC and TWC's Board of Directors).

[166] *See, e.g., Stohlts v. Gilkinson*, 867 A.2d 860, 874 (Conn. App. Ct. 2005) ("'Punitive damages can properly be awarded against a master or other principal because of an act by an agent if… the principal or a managerial agent of the principal ratified or approved the act.' 4 Restatement (Second) Torts, § 909 (1979)"). *Cf.* TWC Br. at 36 (claiming ratification fails absent a contract claim), 39 (same).

[167] *Machen v. Childersburg Bancorporation, Inc.*, 761 So.2d 981, 984-986 (Ala. 2000) (employer ratifies acts of sexual harassment if it expressly adopts misconduct or implicitly approves it); *Murillo v. Rite Stuff Foods, Inc.*, 77 Cal. Rptr. 2d 12, 24 (Cal. Ct. App. 1998) (principal is liable when it ratifies an originally unauthorized tort); *Delaney v. Skyline Lodge*, 642 N.E.2d 395, 402 (Ohio Ct. App. 1994) (employer potentially liable for punitive damages for ratifying acts of sexual harassment); *Wirig v. Kinney Shoe Corp.*, 448 N.W.2d 526, 534 (Minn. Ct. App. 1989), *aff'd in part & rev'd in part on other grounds*, 461 N.W.2d 374 (Minn. 1990) (employer may ratify or approve acts of employee by failing to discharge or reprimand agent for sexual harassment); *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 236 (N.C. Ct. App. 1989) (jury may find ratification of sexual misconduct from any act or omission by employer which tends to show intention to ratify unauthorized acts).

end, New York and Connecticut courts regularly deny motions to dismiss claims that a corporate defendant ratified the sexual harassment of the plaintiff.[168]

First, Plaintiffs allege that every meeting—in his office, hotel, or at industry parties—was taken by Weinstein in his role as an officer of (or using the employees and assets of) Miramax or TWC. Second, Plaintiffs allege Miramax employees and TWC employees set up those meetings knowing the female invitees would be assaulted, purposefully acted as procurers of women, knowingly lulled women into a false sense of security, cleaned up and covered up the assaults after they occurred, and paid for Weinstein's hotel rooms knowing he used them to set up meetings under the companies' names and then to assault the female attendees. Furthermore, with full knowledge of Weinstein's sexual misconduct, TWC and the Directors continued to offer him contracts with increasing levels of job security—including protections from being terminated for sexual assault *absent a felony conviction*—year after year.[169] These are hardly "bare assertions," as Defendants contend.[170]

Instructive is the court's analysis in *Rivera v. Puerto Rican Home Attendants Servs.*, 930 F. Supp. 124 (S.D.N.Y. 1996). In *Rivera*, plaintiff alleged sexual harassment, assault, battery, and retaliation claims by a supervisor and owner of the company. The court denied the motion to dismiss, in part finding that plaintiff's internal complaints about the "high level, supervisory positions . . . may establish knowledge or ratification of the alleged conduct on the part of the

---

[168] *See, e.g., Velasquez v. 40 Cent. Park S. Inc.*, 2008 NY Slip Op 32799(U), ¶ 4 (N.Y. Sup. Ct. 2008) (denying motion to dismiss of corporate defendant who plaintiff alleged ratified sexual harassment); *Kennington v. 226 Realty LLC*, 2013 NY Slip Op 32708(U), ¶ 7 (N.Y. Sup. Ct. 2013) (denying motion to dismiss complaint that the corporate hotel ratified the employee's sexual harassment of plaintiff); *Campbell v. Parking Auth.*, 1995 Conn. Super. LEXIS 2554, at *2 (Conn. Super. Ct. Sept. 6, 1995) (denying motion to strike complaint alleging that the Authority and the City ratified sexual harassment).

[169] ¶¶ 127-28.

[170] Miramax Br. at 28; Outside Directors Br. at 34.

employer."[171] The court also denied the motion, explaining that ratification may occur where the offensive conduct was "open and notorious."[172] Given that witnesses had seen the sexual harassment and the complaint asserted that "everyone in the office observed it from time to time," the court denied the motion to dismiss the defendant corporation which "may be blind to the reality of the workplace only at its peril."[173] The same analysis applies here.

Further, the Directors' argument that Weinstein was not their agent is a question of fact.[174] And, their argument that they lacked knowledge is contradicted by the Complaint, including the direct quotes from Weinstein's lawyer.[175]

Defendants also insist that they cannot imagine what they gained from Weinstein's conduct—or their participation in it.[176] This line of argument ignores all they did gain—money, power, and prestige—by covering up Weinstein's conduct and allowing him to bully and assault Hollywood. Accordingly, the motion to dismiss Counts XIII and XIV should be denied.

---

[171] *Rivera*, 930 F. Supp. at 133 n.9.

[172] *Id.* at 131 (citing *McKenney v. New York City Off-Track Betting Corp.*, 903 F. Supp. 619, 621 (S.D.N.Y 1995) ("open and notorious" sexually based verbal abuse may be chargeable to employer)).

[173] *Id.*

[174] *Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*, 295 F.R.D. 18, 26 (E.D.N.Y. 2013) ("Whether an agency relationship exists is a question of fact.") (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 385-86 (2d Cir. 1994)). *See, e.g.*, Sarnoff Br. at 22.

[175] ¶¶ 129-30.

[176] Miramax Br. at 28.

2.     **Plaintiffs plausibly allege negligent retention and supervision where Miramax, TWC, and the Board knew Weinstein presented a foreseeable risk to others.**

Plead in the alternative to *respondeat superior*,[177] negligent supervision and retention claims require plaintiffs to plead (i) an employer-employee relationship; (ii) the employer knew or should have known of the employees' propensity for the offensive conduct prior to the injury; and (iii) the tort was committed on the employer's premises or with its chattels.[178]

First, Plaintiffs have clearly alleged an employer-employee relationship between Miramax and Weinstein from the company's inception to 2005 and between TWC and Weinstein from 2005 to October 2017.

Second, Plaintiffs have alleged facts showing Miramax knew of Weinstein's behavior dating to at least the 1990s,[179] given that Weinstein used Miramax offices, funds, and personnel to assault women. As for TWC and the Directors,[180] 16 current and former executives and assistants at TWC told a reporter from *The New York Times* about a pattern of professional meetings that resulted in sexual advances on young women.[181]

Knowledge of Weinstein's behavior went all the way up to the Directors.[182] TWC Directors documented in Weinstein's employment agreements: "if he gets sued for sexual

---

[177] Claims pled in the alternative are permitted by Fed. R. Civ. P. 8(d)(2), and should not be dismissed even if Plaintiffs' claims for vicarious liability of the Directors survives the motion, contrary to Sarnoff's contention. Sarnoff Br. at 18 n.10.

[178] *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d. Cir. 2004).

[179] ¶¶ 126, 136-38.

[180] The claim for negligent retention is only subject to Rule 8's pleading standards and not Rule 9(b).

[181] ¶¶ 122, 125.

[182] Sarnoff's contention that he did not have a duty to supervise in 2008 ignores that he did have a duty to supervise assaults that occurred while he was on watch from 2013-17. Sarnoff Br. at 19. Moreover, Maerov's contention that his role as a non-voting Board observer from 2005-2013 means that he did not exercise control over Weinstein pre-2013 is factually disputed. *See* Maerov Br. at 20 n.7.

- 43 -

harassment or any other 'misconduct' that results in a settlement or judgment against TWC, all Weinstein had to pay what the company's out, along with a fine, and he's in the clear."[183] Thus, the TWC Directors saw it necessary to make contingencies for repeated sexual offenses, which they knew were certain to occur.[184] Moreover, Weinstein's lawyer confirmed that the Directors knew of settlements with victims during contract negotiations.[185]

Against this backdrop, the Directors' argument that they didn't supervise him is ludicrous.[186] Plaintiffs allege that the Directors had the means through the employment agreements to control Weinstein—and created clear-cut exceptions permitting Weinstein's assaults long as he avoided a felony conviction.[187] The fact that the Directors deliberately chose to give sexual assaults a free pass does not absolve them.

Finally, Plaintiffs allege that the torts were committed on either Miramax's or TWC's premises (offices and company-funded hotel rooms) or with their personnel and chattels (employees who set up the meetings and use of company-funded cars and planes).[188] The

---

[183] ¶ 131.

[184] The Directors' attempts to have this Court draw inferences in their favor concerning the employment agreements' terms is impermissible. *See, e.g.,* R.W. Br. at 18 n.15. Moreover, Plaintiffs have alleged that TWC's entire board negotiated and approved Harvey Weinstein's contracts. *Cf.* R.W. Br. at 21 (relying on cases that say directors and officers are not liable for an act of nonfeasance merely based on their positions).

[185] ¶ 130.

[186] Outside Dir. Br. at 24-25. Koenigsberg also argues that he is not Weinstein's employer. Koenigsberg Br. at 18. However, an employer relationship is not required under New York law. *Krystal G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515, 522 (N.Y. Sup. Ct. 2011).

[187] ¶¶ 129-32.

[188] Defendants' attempt to argue that Plaintiff Klatt's assault by Weinstein in a Miramax office on a separate floor in the same building might imply that the office was not, in fact, a Miramax office contradicts the plain allegations of the Complaint. *Cf.* R.W. Br. at 26 n.18 *with* ¶¶ 115, 119. At this stage, Plaintiffs have not alleged any of the tortious conduct occurred on the personal properties owned by the Outside Directors, but reserve the right to do so after discovery.

Directors' argument that TWC did not exercise control over the hotel rooms is a question of fact,[189] given that TWC employees scheduled and attended business meetings in the hotel rooms and Harvey used TWC as his piggybank.

### 3. Plaintiffs plausibly allege that Miramax, TWC, and the Directors are vicariously liable for Weinstein's conduct because it was reasonably foreseeable.

While the general rule limits an employer's vicarious liability to conduct within the scope of employment,[190] it is clear that physical assault can occur within such scope.[191] In fact, "'[t]he employer need not have foreseen the precise act or manner of the injury as long as the general type of conduct may have been reasonably expected.'"[192] The doctrine applies depending upon:

> The connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.[193]

Application of these factors supports denial of the motions to dismiss here.

First, Miramax and TWC knew of the time, place, and occasion for many of the sexual assaults, having specifically set the logistics up and/or covered up after. Plaintiffs have

---

[189] Outside Dir. Br. at 32.

[190] *JG v. Card*, 2009 U.S. Dist. LEXIS 85372, at *31 (S.D.N.Y. Sep. 16, 2009).

[191] *Ramos v. Jake Realty Co*., 21 A.D.3d 744 (N.Y. App. Div. 2005) (reversing summary judgment for the employer where a fact question existed as to whether a building superintendent acted within the scope of his employment when he physically assaulted a tenant). *See also Riviello v. Waldron*, 391 N.E.2d 1278, 1282 (N.Y. 1979) (in action against a tavern where an employee poked a patron's eye out with a pocket knife, court held that the employer could have foreseen the event, noting "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment").

[192] *Ramos*, 21 A.D.3d at 745 (quoting *Riviello*, 391 N.E.2d 1278).

[193] *Id.* (quoting *Riviello*, 391 N.E.2d 1278) (internal quotations omitted).

- 45 -

unquestionably alleged facts showing the assaults were "commonly done by" Weinstein; they were not a departure from his normal method of performance.

Moreover, Defendants ignore the exception to the rule for vicarious liability: even if the misconduct was not within the scope of employment, vicarious liability can be imposed for intentional torts that are reasonably foreseeable and a natural incident of employment.[194] Weinstein's assaults were reasonably foreseeable by Miramax and TWC, with TWC's Board going so far as to account for future assaults in Weinstein's employment contracts. Moreover, the assaults were "incident of his employment" with Miramax's and TWC's direct participation. This highly unusual (and sickening) fact pattern—where the employer sets the scene for the tortious conduct and covers it up after—does not exist in any of the cases cited by Defendants. Because the question whether conduct is "an incident of employment" is one of fact,[195] the motions to dismiss as to vicarious liability for Counts V-XII should be denied.

Defendants rely on *Doe v. Alsaud*, in which a woman sued the employer of her rapist, who was a member of a Saudi prince's entourage.[196] She alleged the employee's duties involved luring women to the prince.[197] The *Alsaud* court held that the plaintiff had not established a sufficient nexus between those duties (luring women for the prince) and the employee's own sexual misconduct (raping the plaintiff).[198] This case could not be more different. Plaintiffs plead

---

[194] *Id.*

[195] *Riviello*, 391 N.E.2d at 1281 ("Thus formulated, the rule may appear deceptively simple but, because it depends largely on the facts and circumstances peculiar to each case, it is more simply said than applied. *** [T]he question is ordinarily one for the jury.") (internal citations and quotations omitted). *See also Holck v. Town of Hempstead Dist. No. 2*, 394 N.E.2d 281 (N.Y. 1979) ("Whether claimant's noontime recreational activity was an incident of employment so as to arise out of and in the course of employment is a question of fact.") (citations omitted).

[196] *Doe v. Abdulaziz Bin Fahd Alsaud*, 12 F. Supp. 3d 674, 676 (S.D.N.Y. 2014).

[197] *Id.*

[198] *Id.* at 678.

that Miramax and TWC employees had the responsibility to lure the women victims to Weinstein to be assaulted (and not that they separately sexually assaulted the women). Thus, his conduct was within the scope of employment, and the motions should be denied.

## E. Statutes of limitations do not bar Plaintiffs' claims.

### 1. Dismissal under Rule 12 based on a statute of limitations affirmative defense is strongly disfavored.

"[G]enerally '[because] defendants have the burden of raising [an affirmative defense] in their answer and establishing [it] at trial or on a motion for summary judgment, a plaintiff, in order to state a claim . . . need not plead facts showing the absence of such a defense.'"[199] Thus, "[w]hether a defendant should be estopped from asserting the statute of limitations as an affirmative defense 'is not a question of law, but rather a question of fact, which should be fully developed and determined [at] trial.'"[200]

### 2. Plaintiffs discovered their RICO injuries just eight months ago.

While a four-year limitations period applies to RICO,[201] the Second Circuit recognizes:

> RICO takes a unique approach; it looks for a 'pattern' of illegal acts--each of which, standing alone, may injure a plaintiff--and then views them together as a single violation. As a result, there may be encompassed within a single RICO violation injuries, both multiple and independent, that occur over a broad span of time.
>
> With these multiple injuries in mind, congress tied the right to sue for damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property' from the violation. Consequently, a

---

[199] *Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc*., 2009 U.S. Dist. LEXIS 101943, at *5 (S.D.N.Y. Oct. 23, 2009) (quoting *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996)).

[200] *Childers v. N.Y. & Presbyterian Hosp*., 36 F. Supp. 3d 292, 314 (S.D.N.Y. 2014) (quoting *Schirano v. Paggioli*, 99 A.D.2d 802 (2d Dep't 1984)). *See also Shockley v. Vt. State Colls.*, 793 F.2d 478, 485 (2d Cir. 1986) (whether a defendant should "be equitably estopped from relying on the statute of limitations[] was a question of fact to be decided by the factfinder at trial").

[201] *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988).

> plaintiff's action accrues against a defendant for a specific injury
> on the date that plaintiff discovers or should have discovered that
> injury.[202]

RICO thus requires discovery of the "injury and the injurer" to trigger the statute.[203] Plaintiffs alleged that they could not have discovered and did not discover Weinstein's network of professional spies had targeted them until October 2017 at the earliest—well within the statute.

Several Defendants argue that the date on which each Plaintiff was sexually assaulted triggered the four-year statute of limitations for RICO.[204] Rape and assault, however, do not result in RICO injury.[205] Here, the RICO injuries comprise the damage to Plaintiffs' careers through blacklisting by a shadowy network of spies, lawyers, and media that was concealed and could not be discovered until 2017, along with the injury to their causes of action through the destruction of evidence and interference.

---

[202] *Id.* at 1103 (internal citations omitted).

[203] *Jay E. Haden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 387 (7th Cir. 2010) (noting that accrual of RICO claim requires discovery of both the injury *and* the injurer), *cited in Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 149 (2d Cir. 2012).

[204] Miramax Br. at 12; TWC Br. at 12; Outside Dir. Br. at 37-40; H.W. Br. at 11. Weinstein also argues that the statute of limitations was triggered when Plaintiffs were injured by the first predicate act— but fails to define when that purportedly occurred. H.W. Br. at 11. And thus, Weinstein tacitly admits that only discovery will reveal when the "first" predicate act revealing injury and injurer occurred.

[205] *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152 (S.D.N.Y. 2014) (rejecting "embarrassment, emotional distress, and mental anguish" as RICO injuries) (citations omitted). For this reason, the statute of limitations analysis should be separate for the RICO and tort claims.

### 3.    Alternatively, equitable tolling principles toll the statute of limitations for Plaintiffs' RICO and state-law claims.

The doctrines of equitable estoppel, equitable tolling, and duress also toll the limitations periods.[206] "These are fact-based doctrines and, at this stage of the litigation, all factual and legal ambiguities must be resolved in plaintiffs' favor."[207]

### a.    Equitable estoppel applies to the federal and state-law claims.

"The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense."[208] It would be unjust where "a plaintiff is 'induced by fraud, misrepresentations or deception to refrain from filing a timely action.'"[209]

Analyzing facts analogous to those here, the court in *Saveria JFK, Inc. v. Wien* denied a motion to dismiss a RICO claim, finding that equitable estoppel tolled the statute of limitations. In *Saveria*, the Indian-born, Austrian-citizen plaintiff alleged that Austrian officials undertook a secret, ethnic-smear campaign to undermine his business prospects in New York.[210] Dubbed the

---

[206] New York's borrowing statute provides that, when a non-resident files suit to recover for torts committed outside of the state, the claims must be timely under both the law of New York and the law of the state where the tort occurred. *See* N.Y. CPLR § 202. Where they differ, the shorter of the two periods applies, and the tolling rules of that state. *Matter of Smith Barney, Harris Upham & Co. v. Luckie*, 647 N.E.2d 1308, 1316 (N.Y. 1995). Here, all of Plaintiffs' state-law claims are subject to New York tolling rules (the situs of the injuries or the shorter of the statutes), except for Thomas's claims for negligence, which fall within Connecticut. *See* CONN. GEN. STAT. § 52-584; N.Y. CPLR § 214(5). The principles of tolling under New York and Connecticut law do not materially differ unless noted.

Plaintiffs concede that the continuing violations doctrine does not apply to toll the statutes of limitations for Plaintiffs' claims.

[207] *Saveria JFK, Inc v. Wien*, 2016 U.S. Dist. LEXIS 60737, at *28 (E.D.N.Y. May 3, 2016).

[208] *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).

[209] *Twersky*, 993 F. Supp. 2d at 442. *See also* Blakey, "Time-Bars: Rico-Criminal and Civil Federal and State," 88 NOTRE DAME L. REV. 1581, 1740 (2013); *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1998) ("[T]he … doctrine is to prevent a defendant from … committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.") (citation omitted).

[210] *Saveria JFK, Inc*, 2016 U.S. Dist. LEXIS 60737, at *6-7.

"Dirty Laundry Affair" by defendants, they secretly conspired to destroy plaintiff and his business by (i) hiring an Austrian attorney to spread defamatory allegations against him within the New York business community; (ii) wiretapping the cell phones of plaintiff and his family; and (iii) hiring a private detective to spy on them.[211] As a result, plaintiff lost significant business opportunities, which "support[ed] the application of tolling or estoppel."[212]

Just as in *Saveria*, Plaintiffs allege that Defendants (i) hired journalists to spread lies about them; (ii) hired spies to pose as legitimate media personnel to extricate and destroy their evidence against Weinstein, Miramax, and TWC; (iii) hired lawyers to both facilitate the spy campaign and to directly deceive Plaintiffs that they were working for victims when in fact they were working for Weinstein.[213] These allegations justify application of tolling.

Also instructive is the court's decision in *Zimmerman v. Poly Prep Country Day School*,[214] in which the court applied estoppel to allow state-law claims to proceed to discovery. In *Zimmerman*, ten plaintiffs who were sexually abused by their football coach between 1966-91 filed an amended complaint in 2009, naming the school, two headmasters, and trustees for RICO, Title IX, and state-law violations.[215] The court found that equitable estoppel had been adequately pled and was a question of fact.[216]

---

[211] *Id.*

[212] *Id.* at *6-7, 28-29.

[213] Defendants' surveillance, blacklisting, and reputation-besmirching activities have been so widely reported since late 2017 that they are colloquially referred to as "Black Cubing," referring to the spies hired by Boies Schiller to target Plaintiffs and the Class.

[214] 888 F. Supp. 2d 317 (E.D.N.Y. 2012).

[215] *Zimmerman*, 888 F. Supp. 2d at 323.

[216] *Id.* at 326, 338, 341.

Several facts were critical to the *Zimmerman* decision. First, the court found allegations that defendants took affirmative steps to hide their knowledge of the abuse was a "game changer."[217] Second, plaintiffs alleged that they had justifiably relied on the school's representations that it was unaware of the coach's misconduct, and therefore their claims against the school "could not possibly have been independently uncovered."[218] The court concluded that, although plaintiffs' estoppel claim faced "several hurdles," it survived the motion to dismiss.[219]

Analogous to *Zimmerman*, Plaintiffs allege that all defendants knew of Harvey Weinstein's abusive conduct and took affirmative steps to prevent victims from 1) learning of the defendants' knowledge; or 2) mounting any claims against Harvey Weinstein or his employers. Thus, dismissal is not warranted at this stage.

Defendants claim two cases, *Zumpano v. Quinn*[220] and *Twersky v. Yeshiva University*,[221] are dispositive here. However, both focused on the lack of a duty "to make a public confession… to get the benefit of a statute of limitations."[222] In other words, "passive concealment" is not sufficient to estop application of the statute of limitations.

In *Zumpano*, plaintiffs alleged that bishops and the diocese were aware that priests had abused children, yet "fail[e]d to investigate and report the conduct to law enforcement

---

[217] *Id.* at 339-40 ("A review of [New York cases], however, reveals that in each the court recognized that affirmative misrepresentations or deceitful conduct designed to keep a potential plaintiff from gaining knowledge of an essential element of a viable cause of action for a claim of negligent retention or supervision by an employer of a sexual-predator employee would be a game-changer.").

[218] *Id.* at 341.

[219] *Id.*

[220] 849 N.E.2d 926 (N.Y. 2006). *See, e.g.,* Miramax Br. at 11.

[221] 993 F. Supp. 2d 429 (S.D.N.Y. 2014). *See, e.g.,* TWC Br. at 32.

[222] *Zampano*, 849 N.E.2d at 930.

authorities."[223] The court held that the lack of affirmative steps to silence victims was not fraudulent concealment, which "means employment of artifice, plan[ing] to prevent inquiry or escape investigation and mislead or hinder acquirement of information disclosing a right of action."[224] Here, on the other hand, Plaintiffs have asserted, *ad nauseum*, multiple allegations of affirmative steps to silence victims.

Similarly, in *Twersky*, plaintiffs alleged that a boarding school knew several teachers and administrators sexually abused students in decades past. Rejecting the application of equitable estoppel to toll the limitations periods, the court explained: "passive concealment falls short of the sort of specific and affirmative misrepresentation required to trigger an equitable estoppel defense."[225] Considering the closest set of facts—but still short of Black Cubing, the *Twersky* court rejected plaintiffs' allegations that they reported their abuse to school administrators, who failed to take action.[226] Here, in contrast, Plaintiffs do not allege passive concealment.

Rather, the RICO Defendants hired lawyers and spies, pushed women into NDAs, blacklisted victims, and intimidated journalists and others who threatened to blow the whistle. The RICO Defendants' actions here went far beyond "passive concealment" to active participation in the Weinstein Sexual Enterprise's efforts to suppress victims' claims, using threats, intimidation, and extortion.[227] Accordingly, unlike the institutions in *Twerksy* and

---

[223] *Id.* at 928.

[224] *Zimmerman*, 888 F. Supp. 2d at 339 (quoting *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*, 264 Mich. App. 632 (2004)).

[225] *Twersky*, 993 F. Supp. 2d at 444.

[226] *Id.* at 448.

[227] ¶¶ 168-178.

- 52 -

*Zumpano* that turned a blind eye to bad behavior and dismissed victim's allegations, the RICO

Defendants here built an elaborate system to illegally procure victims' and witnesses' silence.

Robert Weinstein's reliance on *Doe v. Kolko*, 2008 U.S. Dist. LEXIS 71174 (E.D.N.Y.

Sept. 4, 2008), is similarly misplaced.[228] The *Kolko* court did not reject the equitable tolling

claim merely because the abusive rabbi directed threats at third-party victims and not directly at

the plaintiffs, as Robert Weinstein contends. Instead, the *Kolko* court granted dismissal because

the plaintiffs "do not offer an explanation about why they waited so many years to bring an

action or, more importantly, what event or series of events prevented them from filing their

actions before they did."[229] Here, on the other hand, Plaintiffs have alleged that they did not

know of Harvey Weinstein's "Army of Spies," and Defendants engaged in harassment and

intimidation intended to procure their silence.

Finally, a plaintiff invoking estoppel must bring her action within a "reasonable time after

the facts giving rise to the estoppel have ceased to be operational."[230] Having learned in October

2017 of Defendants' years-long practice of Black Cubing, Plaintiffs swung into action, filing suit

in just a few months' time. Accordingly, the statutes of limitations are tolled.

### b.      Equitable tolling applies to the federal and state-law claims.

Equitable tolling also applies. The statute of limitations for RICO claims "may be tolled

due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant

wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment

prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3)

---

[228] R.W. Br. at 8.

[229] *Kolko*, 2008 U.S. Dist. LEXIS 71174, at *15.

[230] *Simcuski v. Saeli*, 377 N.E.2d 713, 717 (N.Y. 1978) (discussing fraud, misrepresentation, and deception as grounds for estoppel).

the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled."[231] Recently, in *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, a court in this District found that the statute of limitations for plaintiff's RICO claims was tolled because "defendants' alleged collusion and manipulation by its very nature was concealed from the public, which prevented plaintiffs from having notice of their claims until at earliest December of 2012."[232] This result should be equally easy to reach here, given the highly secretive nature of the Black-Cubing campaign. Accordingly, the statutes of limitations should be equitably tolled for the federal and state-law claims.

### c.    Tolling applies to the limitations periods for the RICO and state-law claims due to duress.

The statute of limitations is also tolled based on the doctrine of duress.[233] "'[W]hen duress is part of the cause of action alleged,' the statute of limitations is tolled until the duress has ended 'because the offensive conduct is regarded as a continuous wrong.'"[234] The Second Circuit has instructed that the "fact-specific nature of the duress contention" is one that should be addressed at summary judgment or trial.[235] Here, duress is an element of Plaintiffs' RICO claim and state-law claims for infliction of emotional distress.[236]

---

[231] *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36-37 (2d Cir. 2002) (internal quotation marks omitted), *overruled on other grounds*, 460 F.3d 215 (2d Cir. 2006). *See also New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 278 (2d Cir. 2013).

[232] 277 F. Supp. 3d 521, 583 (S.D.N.Y. 2017).

[233] ¶¶ 47-51.

[234] *Cullen v. Margiotta*, 811 F.2d 698, 722 (2d Cir. 1987) (quoting *Baratta v. Kozlowski*, 94 A.D.2d 454, 458-59, 464 N.Y.S.2d 803, 806 (2d Dep't 1983) (citations omitted)).

[235] *Id.* at 724.

[236] Accordingly, the cases on which Defendants rely in which duress was not an element of the claims asserted are inapposite. *See, e.g.,* H.W. Br. at 15.

In *Cullen*, the Second Circuit found that the doctrine of duress applied, in part, to toll the statute of limitations where plaintiffs alleged extortion (a violation of the Hobbs Act) as a RICO predicate act.[237] Like in *Cullen*, Plaintiffs have alleged the RICO predicate act of witness or victim tampering (18 U.S.C. § 1512), in that certain Defendants used the threat of physical force in order to cause the victim not to report the assaults to a law enforcement officer. Plaintiffs further allege the predicate act of sex trafficking (18 U.S.C. §§ 1590, 1591), which includes the use of force, fraud or coercion to accomplish or attempt to accomplish the sex trafficking. Thus, duress is clearly an element of Plaintiffs' RICO claims, and tolling applies.

Moreover, Plaintiffs allege intentional infliction of emotional distress, in which the duress they were placed under certainly played a role.[238] Weinstein's power to destroy lives and careers was widely known throughout the industry. Almost every woman who has come forward has said that she did not do so sooner because she was afraid of him.[239] Indeed, just days before *The New York Times* first reported on his pattern of sexual abuse, Weinstein and his legal team telephoned Class Members and threatened them for talking.[240] Plaintiffs allege that Weinstein used emotional and physical abuse and industry and economic power to command silence.[241]

---

[237] 811 F.2d at 722.

[238] *See, e.g., Nigro v. Pickett*, 39 A.D.3d 720, 721-22 (N.Y. App. Div. 2007). *See also Overall v. Klotz*, 846 F. Supp. 297, 300 n.2 (S.D.N.Y. 1994) (stating, in an action to recover for intentional infliction of emotional distress: "Duress, defined under New York law as 'actual or threatened violence or restraint contrary to law,' tolls the running of a statute of limitations only if the alleged duress is an element of the cause of action asserted. The Court will assume that this requirement is satisfied here.") (internal citations omitted).

[239] ¶¶ 168-180.

[240] ¶ 179.

[241] ¶ 180.

Miramax worked with Harvey Weinstein and the Weinstein Sexual Enterprise to silence victims. For instance, Harvey Weinstein used Miramax funds and personnel to intimidate Zoe Brock into remaining silent after he assaulted her.[242] Judith Godrèche was told by a producer at Miramax to remain silent so as not to endanger the release of her movie.[243] Clearly, then, there was a continuing effort dating back to Miramax's inception to keep Class Members silent.[244]

Plaintiffs also allege that TWC, as part of the Weinstein Sexual Enterprise, participated in a scheme to threaten, extort, and silence victims.[245] In 2016 and 2017, the Weinstein Sexual Enterprise employed the intelligence firm Black Cube to meet with Class Members under false pretenses to "provide intelligence which will help the Client's efforts to completely stop the publication of a new negative article in a leading NY newspaper," and to "obtain additional content of a book which is currently being written and includes harmful negative information on and about the Client."[246] Their aim was to pressure victims into remaining silent.

In November 2017, *The Observer* reported that it gained access to "a secret hit list of 100 prominent individuals targeted by Harvey Weinstein in an extraordinary attempt to discover what they knew about sexual misconduct claims against him and whether they were intending to go

---

[242] ¶¶ 72-84.

[243] ¶ 176.

[244] Weinstein, on the other hand, gives an example of Gwyneth Paltrow who was assaulted during the filming of Miramax's *Emma* in 1994, which caused her to fear being fired. Weinstein (grossly) argues that the fact that Paltrow later starred in TWC's *Shakespeare in Love* shows she was not so offended as to turn down offers. H.W. Br. at 15 n.8. First, this argument raises more questions than it answers about the specific nature of Harvey's threats to Paltrow, including threats to blacklist or strong-arm her. Second, since the filing of his brief, Weinstein issued a statement "…that Weinstein was unhappy that his civil counsel had 'improperly' sought to include the names of all actresses he had worked with in his defense against his lawsuit …." https://www.mercurynews.com/2018/02/22/harvey-weinstein-apologizes-to-meryl-streep-jennifer-lawrence-but-not-to-gwyneth-paltrow/ (last accessed May 21, 2018).

[245] ¶¶ 140-47.

[246] ¶ 151. *See also* ¶¶ 62-65, 163.

public."[247] The list was "part of a strategy to prevent accusers from going public with sexual

misconduct claims against [Weinstein]" and it was distributed to a team, including spies in the

Weinstein Sexual Enterprise for the purpose of "suppress[ing] claims that [Weinstein] had

sexually harassed or assaulted numerous women."[248] Duress has been pled and must be

presumed to be true at this stage. Accordingly, the statutes of limitations are tolled.

**F.      Rule 12 and not Rule 23 governs at the pleading stage.**

**1.      Consideration of class certification factors at the pleading stage is rare and disfavored.**

Defendants' motions to strike Plaintiffs' class allegations pursuant to Rule 12(f) "are

rarely successful."[249] As one court in this district explained:

> This is particularly true in the class-action context because a Rule
> 12(f) motion requires a reviewing court to preemptively terminate
> the class aspects of litigation, solely on the basis of what is alleged
> in the complaint, and before plaintiffs are permitted to complete
> the discovery to which they would otherwise be entitled on
> questions relevant to class certification.[250]

The motion is thus premature and should only be granted if defendants can "demonstrate from

the face of the Complaint that it would be impossible to certify the alleged class regardless of the

facts the Plaintiffs may be able to obtain during discovery."[251]

---

[247] ¶ 66.

[248] ¶ 66. The list included, on information and belief, Katherine Kendall. ¶¶ 68, 69.

[249] *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015). *See* TWC Br. at 41; H.W. Br. at 20, *et seq*. TWC also seeks to strike pursuant to Fed. R. Civ. P. 23(d)(1)(D), asserting the dismissal of the class claims is warranted if all of the causes of action are dismissed. TWC Br. at 41.

[250] *Reynolds*, 136 F. Supp. 3d at 511 (internal quotations and citations omitted); *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) ("[D]istrict courts in this Circuit have frequently found that a determination of whether Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination.")).

[251] *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015) (internal alterations omitted)). *See also Reynolds*, 136 F. Supp. 3d at 515 ("Accordingly, given the hesitancy of courts in the

As a wealth of authority dictates, discovery—not dismissal—is the appropriate remedy to

test Plaintiffs' class claims, and "[t]he Court should not 'litigate prematurely . . . the

appropriateness of class certification.'"[252]

> **2.    Plaintiffs have Article III standing to sue and any inquiry into their ability to satisfy Rule 23 criteria regarding commonality and typicality is premature.**

TWC argues, without any citations to the Complaint or analogous cases, that Plaintiffs

cannot satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality or adequacy.

However, courts are not inclined to analyze an individual plaintiff's ability to represent a class

under Rule 12(b)(6), when the only inquiry is the plaintiff's Article III standing.[253]

> **3.    Courts frequently certify RICO claims and group state laws by similarities as a means of handling class certification.**

The standard for commonality is whether there is a common question that is "of such a

nature that it is capable of classwide resolution—which means that the determination of its truth

or falsity will resolve an issue that is central to the validity of each one of the claims in one

---

Second Circuit to strike class allegations before a class certification motion is filed, the Court will therefore not "strike Plaintiff's class allegations prior to learning more about the nature of the refund campaign at issue."); *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking . . . motions [to strike class allegations] are deemed procedurally premature.").

[252] *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 90 (D.D.C. 2013) (citations omitted); *see also Doninger v. Pac. Nw. Bell, Inc.*, 564 F. 2d 1304, 1313 (9th Cir. 1977) ("[T]he better and more advisable practice for a District Court to follow is to afford the litigants an opportunity to present evidence as to whether a class action [is] maintainable."); *Thompson v. Merck & Co., Inc.*, 2004 WL 62710, at *2 (E.D. Pa. Jan. 6, 2004) (courts rarely grant motions to strike under Rule 23(d)(1)(D) prior to class discovery). TWC also seeks to strike Plaintiffs' allegations regarding an "injunctive-relief" class pursuant to Rule 23(b)(2). TWC Br. at 43. Given that there is no pending motion to certify any Class, the Court need not prematurely rule on the scope of any class.

[253] *See, e.g.*, *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) ("In our view, it is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or her ability to satisfy the Rule 23 criteria."); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504-05 (S.D.N.Y. 1996) ("the question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23").

stroke."[254] "Because the requirement may be satisfied by a single common issue, it is easily met."[255] As a general matter, courts note that "[c]ommon issues frequently predominate in RICO actions that allege injury as a result of a single fraudulent scheme,"[256] and thus certify RICO classes.[257] Given this one central issue, Weinstein's motion to strike should be denied.

Weinstein also incorrectly suggests the differences between state laws necessarily preclude class treatment. To the contrary, "if the elements of the cause of action are the same and the legal standards on 'important/ meaningful/significant/pivotal' issues are substantially similar[,] the state laws can be grouped for purposes of class certification."[258] Practically speaking, "'[t]here will never be 50 different substantive rules, or even fifteen or ten. States tend to copy their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations.'"[259] Thus, courts regularly certify multi-state class actions, grouping claims with similar elements.[260] Even

---

[254] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

[255] *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994).

[256] *Friedman v. 24 Hour Fitness USA, Inc.*, 2009 U.S. Dist. LEXIS 81975, at *22 (C.D. Cal. Aug. 25, 2009).

[257] *See, e.g., Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 89 (2d Cir. 2015) (affirming class certification where "individual considerations did not outweigh other issues which were common," such as the definition of the RICO enterprise and the pattern of racketeering activity); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 n.3 (9th Cir. 2017) (certifying RICO claim, because the issues "focus on [] Defendants' conduct"); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 315 F.R.D. 116, 124 (D. Mass. 2016) (certifying a RICO class action because "first-party reliance is not an element of proximate cause for RICO claims predicated on mail fraud").

[258] *In re Telectronics Pacing Sys. Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997).

[259] *O'Keefe v. Mercedes-Benz U.S., LLC*, 214 F.R.D. 266, 291 n.19 (E.D. Pa. 2003) (quoting Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rᴇᴠ. 547, 583 (1996)).

[260] *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016) ("On a motion for class certification, … nationwide class action movants must creditably demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles' because the 'variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines.'") (quoting *Walsh v. Ford Motor Co*., 807 F.2d 1000, 1017 (D.C. Cir. 1986)). *See also, e.g., In re Abbott Labs. Norvir Anti-Trust Litig*., 2007 WL 1689899, at *10 (N.D.

---

- 59 -

Weinstein's brief ironically recognizes how such laws tend to cluster into definable, workable groups.[261] Not surprisingly, a wealth of authority exists certifying classes through the grouping of similar state laws.[262] And, likewise, there remains the possibility of certifying individual state classes, negating the argument that variations in state law preclude class treatment.

Finally, courts rarely deny certification (much less strike allegations) based on the defense of statute of limitations.[263] One court in this District recently held: "common questions

---

Cal. June 11, 2007) (holding that "sub-classes can be identified to group residents of various States with identical common law requirements [such that these] problems are manageable….").

[261] *See* H.W. Br. at 23 (noting that California and New York laws on civil battery and consent are similar). Nonetheless, were this Court to determine that the issue of consent mandated dismissal of the class allegations, that decision should be appropriately limited to the assault and battery claims.

[262] *See, e.g., Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (affirming district court's certification of grouping of eight states and rejecting defendant's arguments that "idiosyncratic" differences among state law precluded certification because "[a]s long as a sufficient constellation of common issues binds class members together," state law variations "will not automatically foreclose class certification under Rule 23(b)(3)"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998) (explaining that where multistate claims apply in a class action any "differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit," where the plaintiffs "compiled a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims" in support of certification); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998) (explaining that "[v]ariations in state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate the commonality of substantive law applicable to all class members"); *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 90 (D. Mass. 2007) (certifying twenty-three state breach of warranty group "after reviewing the extensive analysis and comparative charts created by the plaintiffs"); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250 (D. Del. 2002) (certifying settlement class over objections that variations of state consumer fraud and antitrust laws defeat predominance where "these issues can be minimized by grouping state statutes and common law that share common elements of liability or common defenses, particularly where the lawsuits do not involve personal injuries"), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 469 (D. Wyo. 1995) (denying defendant's motion to decertify class, explaining that "[i]f the law of a particular state appears to be idiosyncratic, the residents from that state can be excised from the class" and "[e]ven if such idiosyncrasies remove half the jurisdictions in the United States, which the Court believes is highly unlikely, the application of common issues concerning the other twenty-five states should conserve judicial and litigation resources for all involved").

[263] H.W. Br. at 22-23. *See Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 143 n.5 (S.D.N.Y. 2014) ("The Court does not anticipate that any variations in the statutes of limitations will affect the manageability of this case to proceed as a class action.") (citations and quotations omitted).

may predominate, and certification of a class may be appropriate, even where there are possible differences in the application of a statute of limitations to individual class members."[264]

Ultimately, Weinstein merely complains of the manageability of Plaintiffs' state-law claims, a concern with a viable solution (with which Plaintiffs' counsel has had success) and one that simply does not compel dismissal.[265] While the process can be challenging, such is the nature of complex litigation and highlights precisely why resolving the issue on a motion to dismiss would be particularly rash.

### 4. Defendants' attack on Plaintiffs' proposed class definition is premature and without merit.

Defendants also prematurely attack the proposed class definition.[266] Defendants argue, if they are ultimately found liable, it would be too burdensome for them to identify the women that Weinstein assaulted or the enterprise targeted.[267] Not only is this argument contrary to the allegations of the Complaint,[268] it has been rejected by many courts because, "if accepted, [it] would undercut the entire purpose of class litigation."[269] This is precisely the type of inquiry in

---

[264] *In re Amla Litig.*, 2017 U.S. Dist. LEXIS 116139, at *23-24 (S.D.N.Y. July 17, 2017) (citations and quotations omitted).

[265] *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (certifying 36 state consumer fraud class of end payors of pharmaceuticals after plaintiffs "shoulder[ed] the herculean burden of conducting an extensive review of state law variances to demonstrate how grouping would work").

[266] H.W. Br. at 24-25.

[267] *Id*.

[268] ¶¶ 66, 69, 144, 186.

[269] *Black v. Gen. Info. Servs., Inc.*, 2016 WL 899295, at *3 (N.D. Ohio Mar. 2, 2016). *See also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 540 (6th Cir. 2012) ("It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies. We reject Defendants' attacks on administrative feasibility..."); *Id*. at *8 ("the argument that ascertainability would be difficult because Defendant has no easily available list of affected individuals is without merit….").

which discovery is necessary, not just advisable. Defendants have not cited a single class action

dismissed on a 12(b)(6) motion for administrative feasibility. This Court should not be the first.

**G.      Plaintiffs seek relief from all Defendants, including the Directors.**

The Directors assert that Plaintiffs' failure to seek damages from them dooms their

claims.[270] The argument is nonsensical. Plaintiffs explicitly request that the Court "[c]ertify the

Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages…."[271] Certification

of a liability class is permitted by the Federal Rules. Plaintiffs further request that the Court

"[e]nter judgment against Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance

Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan on liability on

Counts I, II, IV, VIII, X, XII, and XIV in favor of Plaintiffs and the Classes."[272] Thus, the

Directors' final play should be rejected.

## IV.      REQUEST FOR LEAVE TO AMEND

Plaintiffs respectfully request leave to amend if the Court dismisses any portion of

Plaintiffs' claims. Fed. R. Civ. P. 15(a).

## V.      CONCLUSION

Harvey Weinstein may not have invented the casting couch, but he and those who

protected his illegal conduct for decades should be held responsible for their actions. Plaintiffs

respectfully request that the Court deny the motions to dismiss (reserving decision as to The

Weinstein Company until the motion for stay relief is granted), and grant such other and further

relief as this Court deems appropriate.

---

[270] Outside Dir. Br. at 44; Koenigsberg Br. at 19; Maerov Br. at 30.

[271] *See* Compl., at 90, Prayer for Relief, ¶ 1. *See also* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

[272] *See* Compl., at 90, Prayer for Relief, ¶ 5.

- 62 -

DATED: June 1, 2018                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                            By  */s/ Elizabeth A. Fegan*
                                                Elizabeth A. Fegan
                                            Emily Brown
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            455 N. Cityfront Plaza Dr., Suite 2410
                                            Chicago, IL 60611
                                            Telephone: (708) 628-4949
                                            Facsimile: (708) 628-4950
                                            beth@hbsslaw.com
                                            emilyb@hbsslaw.com

                                            Steve W. Berman
                                            Shelby Smith
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1918 Eighth Avenue, Suite 3300
                                            Seattle, WA  98101
                                            Telephone:  (206) 623-7292
                                            steve@hbsslaw.com
                                            shelbys@hbsslaw.com

                                            Jason Zweig
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            555 Fifth Avenue
                                            Suite 1700
                                            New York, NY 10017
                                            jasonz@hbsslaw.com

                                            M. Cris Armenta
                                            Credence E. Sol
                                            THE ARMENTA LAW FIRM, APC
                                            1230 Rosecrans Ave, Suite 300
                                            Manhattan Beach, CA 90266
                                            Telephone:  (310) 826-2826 Ext. 108
                                            cris@crisarmenta.com
                                            credence.sol@orange.fr

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on June 1, 2018, which will send notification of such filing to the e-mail addresses registered.

 */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan