i9cnweia                    CORRECTED

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  LOUISETTE GEISS, et al.,

4              Plaintiffs,

5              v.                      17 CV 9554 (AKH)

6  THE WEINSTEIN COMPANY HOLDINGS
   LLC, et al.,
7                                      Oral Argument

              Defendants.
8
   ------------------------------x
9
                                       New York, N.Y.
10                                     September 12, 2018
                                       2:30 p.m.
11
   Before:
12
         HON. ALVIN K. HELLERSTEIN
13
                                       District Judge
14

15

16

17          APPEARANCES

18
   HAGENS BERMAN SOBOL SHAPIRO LLP
19      Attorneys for Plaintiffs
   BY:  ELIZABETH A. FEGAN
20           and
   THE ARMENTA LAW FIRM
21      Attorneys for Plaintiffs
   BY:  CREDENCE SOL
22

23  SEYFARTH SHAW LLP
       Attorneys for Defendant Weinstein Company
24  BY:  GERALD L. MAATMAN

25

```
 1              APPEARANCES (Continued)

 2    LATHAM & WATKINS LLP
           Attorneys for Defendants Miramax and Sarnoff
 3    BY:  MARVIN S. PUTNAM
           LAURA R. WASHINGTON
 4

 5    KUPFERSTEIN MANUEL LLP
           Attorneys for Defendant Harvey Weinstein
 6    BY:  PHYLLIS KUPFERSTEIN

 7
      SCHULTE ROTH & ZABEL LLP
 8         Attorneys for Defendant Robert Weinstein
      BY:  GARY STEIN
 9

10    PATTERSON BELKNAP WEBB & TYLER LLP
           Attorneys for Defendants Lasry, Jones, and Dolan
11    BY:  JAMES V. MASELLA, III

12
      FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
13         Attorneys for Defendants Maerov and Sackman
      BY:  ISRAEL DAVID
14

15    REED SMITH LLP
           Attorneys for Defendant Koenigsberg
16    BY:  JOHN C. SCALZO

17
      SKADDEN ARPS SLATE MEAGHER & FLOM LLP
18         Attorneys for Defendants Ziff and Dolan
      BY:  ABIGAIL E. DAVIS
19         LAWRENCE S. SPIEGEL

20
      PAUL WEISS RIFKIND WHARTON & GARRISON LLP
21         Attorneys for Defendant Lasry
      BY:  ROBERTO FINZI
22         SARA F. NICHOLS

23

24

25
```

1          (Case called)

2          MS. FEGAN:  Good afternoon, your Honor.  Elizabeth

3    Fegan and Credence Sol, for plaintiffs.

4          MR. PUTNAM:  Marvin Putnam of Latham & Watkins, on

5    behalf of Miramax as well as Tim Sarnoff.

6          THE COURT:  Why don't you introduce everybody on the

7    bench.

8          MR. PUTNAM:  I couldn't do so if I wanted to, your

9    Honor.

10          THE COURT:  Try.

11          MR. PUTNAM:  This is Laura Washington.  She works with

12    me at Latham.  She's also here on behalf of Miramax as well as

13    Tim Sarnoff.

14          Next, I have Gary Stein.

15          Gary Stein is here on behalf of one of the independent

16    directors.

17          MR. STEIN:  Not quite correct.  I am here on behalf of

18    defendant Bob Weinstein, your Honor.

19          Good afternoon.  Gary Stein from Shulte Roth & Zabel.

20          MS. KUPFERSTEIN:  Good afternoon, your Honor.

21          Phyllis Kupferstein, of behalf of Harvey Weinstein.

22          THE COURT:  My apologies to you, Ms. Kupferstein

23    again.

24          MS. KUPFERSTEIN:  Thank you so much, your Honor.  I

25    appreciate that.

1          THE COURT:  Had I been aware, I would not have

2     scheduled it this way.  It just happened.  I'm very flexible.

3          MR. MAATMAN:  Good afternoon, your Honor.

4          Gerald Maatman of Seyfarth Shaw, on behalf of the

5     Weinstein Company.

6          MS. DAVIS:  Good afternoon, your Honor.  Abby Davis,

7     of Skadden Arps, on behalf of Dirk Ziff and James Dolan.

8          MR. SPIEGEL:  Lawrence Spiegel, Skadden Arps, same

9     defendants.

10          MR. FINZI:  Good afternoon, your Honor.

11          Roberto Finzi, with my colleague Sara Nichols.  We are

12     here for Marc Lasry.

13          MR. MASELLA:  Good afternoon, your Honor.  James

14     Masella from Patterson Belknap Webb & Tyler, on behalf of Paul

15     Tudor Jones.

16          MR. SCALZO:  Good afternoon, your Honor.  John Scalzo,

17     of Reed Smith, on behalf of Richard Koenigsberg.

18          MR. DAVID:  Good afternoon, your Honor.  Israel David

19     from Fried Frank on behalf of Lance Maerov and Jeff Sackman.

20          THE COURT:  Anyone else?

21          Never again will I receive ten briefs from the

22     defendants.  Never again.  If that happens, I will read the

23     first brief and throw away the rest.

24          You are seriously imposing on the judge just to

25     aggrandize yourselves.  Your job is to put it all together and

1   just present one brief, unless there are separate issues, and

2   then only on the separate issues should there be a separate

3   brief.

4               Is that clear?

5           I will have one lawyer for each side, one for the

6   plaintiff and one for the defendant.  Who is going to be

7   plaintiffs' lawyer?

8               MS. FEGAN:  I will be, your Honor.

9               THE COURT:  Ms. Fegan?

10              MS. FEGAN:  Yes.

11              THE COURT:  And who will be the defendants' lawyer?

12              MR. STEIN:  Your Honor, the defense group did caucus

13  before this argument to try to deliver it in the most efficient

14  manner possible for the Court.  We don't plan to have every --

15              THE COURT:  Who is going to be the lawyer?

16              Don't give me the talk.  Who's going to be the lawyer?

17              MR. STEIN:  We had planned, your Honor, to have

18  three --

19              THE COURT:  One.

20              MR. STEIN:  Three or four separate because of the

21  different groups involved.

22              THE COURT:  One.  You are all going to argue RICO,

23  right?

24              MR. STEIN:  We were all going to argue separate

25  issues.

1            MR. PUTNAM:  Actually, your Honor --

2            THE COURT:  That is all.  You are not talking anymore.

3            MR. PUTNAM:  Your Honor --

4            THE COURT:  Unless you are answering my question, you

5    are not talking.

6            MR. PUTNAM:  I am going to answer your question, your

7    Honor.

8            THE COURT:  Yes.

9            MR. PUTNAM:  What we did is we broke it up by separate

10   issues so one person is not arguing the same issue as another.

11           We have different people arguing different issues.

12   For example, I was going to run through statute of limitations

13   as well as the beginning of RICO in terms of standing and

14   injury.

15           Then I was going to turn to Mr. Stein, and then he was

16   going to go through the various RICO elements.

17           THE COURT:  No.  You do everything, Mr. Stein.

18           MR. STEIN:  Me?  I will do my best, your Honor.

19           THE COURT:  What is your name, sir?

20           MR. PUTNAM:  Sorry.  I'm Marvin Putnam.

21           THE COURT:  Mr. Putnam, you do everything.

22   OK.

23           THE COURT:  I don't see where you are.  What is your

24   firm?

25           MR. PUTNAM:  Latham & Watkins, sir.

1          THE COURT:  Your name again?

2          MR. PUTNAM:  Marvin Putnam, P-u-t-n-a-m.

3          THE COURT:  OK.  Mr. Putnam, you do everything.

4          MR. PUTNAM:  Shall I begin now, your Honor?

5          THE COURT:  All right.

6          So let's do this.  I have a number of issues which I

7    have organized.

8          Can you hear me?

9          MR. PUTNAM:  Yes, your Honor.

10          THE COURT:  And I am going to call upon one side or

11    the other to discuss various issues.  So let me start with the

12    plaintiff.

13          Ms. Fegan, would you take the podium, please.

14          MS. FEGAN:  Yes, your Honor.

15          THE COURT:  One of the main points defendants have is

16    an allegation, claim, argument that the four-year statute of

17    limitations under RICO bars the claims against everybody.

18          You have argued that, although there is not fraudulent

19    concealment in that every plaintiff knew about the cause of

20    action when she was violated, that the intimidation that

21    occurred and the aftereffects of the violations have caused an

22    intimidation that has prevented the plaintiffs from suing.

23          It is only now, with lots of women coming forward

24    against lots of executives, that they have gained the courage

25    to sue, the lawsuit having been filed December 6, 2017.

1          Is that a fair summary of your position?

2          MS. FEGAN:  Your Honor, with respect to the RICO claim

3    in particular, it wasn't until the fall of last year that the

4    plaintiffs even knew that Harvey Weinstein and the Weinstein

5    Company and others had blacklisted them, had put them on a hit

6    list.

7          THE COURT:  They couldn't have been intimidated then.

8          MR. PUTNAM:  Your Honor, separately we do suggest with

9    respect to witness tampering and the predicate acts of witness

10   tampering that for some of them immediately after the assaults

11   Mr. Weinstein took certain steps to ensure that they would be

12   quiet.

13         THE COURT:  But they didn't know about it.

14         MS. FEGAN:  There's two separate things.

15         First, there was the prevention of them going to a

16   federal officer or a law enforcement officer to report the

17   assaults in the first instance.

18         THE COURT:  What prevented them?

19         MS. FEGAN:  Your Honor, Mr. Weinstein --

20         THE COURT:  Their fear?

21         MS. FEGAN:  Their fear, your Honor.

22         THE COURT:  They were afraid to come forward, whether

23   through embarrassment or for fear that there would be serious

24   repercussions and so on, but it was their choice.  There was no

25   separate act that caused them to be intimidated.

i9cnweia                    CORRECTED

1          MS. FEGAN:  So the assaults themselves -- there were

2     multiple acts that he took, not just the assaults.  For

3     example, with respect to Melissa Sagemiller one of our

4     plaintiffs, she was on set up in Toronto, Canada.  She wanted

5     nothing to do with him after the assault.

6          She went to the airport to go home.  She was paged in

7     the airport, went to a phone not knowing who it was.  It turned

8     out Mr. Weinstein had the power to take her bags off the

9     commercial airline.

10          THE COURT:  And put it in a private airplane.

11          MS. FEGAN:  And put it in a private airplane.  He

12     wanted to make sure -- and he did this with several

13     plaintiffs -- that they knew that he could get them.

14          THE COURT:  That is not essentially getting them.  It

15     is asserting a certain degree of power, but that didn't prevent

16     them from suing other than their own personal embarrassment.

17          MS. FEGAN:  Your Honor, what we see across the board

18     with respect to class members is that he used particular women

19     to ensure that they knew that, the class of women knew that if

20     they complained that they would be blacklisted and they would

21     never work again.

22          THE COURT:  Before I get into the class, I have to

23     deal with the six individual plaintiffs, so let's focus on

24     them.

25          MS. FEGAN:  Understood, your Honor.  If we are talking

1   about the RICO claim, they could not have discovered their

2   injury until the time, because in this case we are talking

3   about for RICO --

4            THE COURT:  The injury was to business or property,

5   and I assume the business was their being able to be actresses?

6            MS. FEGAN:  In part, your Honor.

7            THE COURT:  But there's no allegation that they tried

8   to get parts and were denied parts or that they should have

9   gotten parts.

10           There is an allegation that at the time of the sexual

11  assault, if you want to put it that way, if they rebuffed

12  Weinstein, they lost their parts.  That's true.  I accept it as

13  true.  But there is no allegation of anything after that.

14           MS. FEGAN:  Your Honor, what we know is that there is,

15  I am going to call it the hit list.  That's what it's called in

16  the common vernacular.

17           THE COURT:  But no one knew it at the time.

18           MS. FEGAN:  That's right.

19           So, when they were denied parts, they didn't know that

20  he could have had a hand in it.  They could not have discovered

21  that until this past November.

22           THE COURT:  It may be that you can make out a case,

23  but there is no allegation of their even trying to get parts.

24           What was it that was injury to their business or

25  property?

1          MS. FEGAN:  Your Honor, in that case we could

2    certainly allege their history of auditioning or pitching and

3    being denied or --

4          THE COURT:  You asked for leave to amend, and I grant

5    that.

6          MS. FEGAN:  Thank you, your Honor.

7          THE COURT:  But I am dealing with the present

8    complaint.  Unless there is something to show an injury to

9    business or property that warrants this finding of

10   intimidation, you can't go further.

11         MS. FEGAN:  I think that that is something that we can

12   cure on amendment, your Honor.  At the time that we filed the

13   complaint, it was right after the -- within months of the hit

14   list becoming released.

15         What we do know is since the complaint was filed that

16   there have been directors who have come forward and identified

17   particular parts that people didn't get because Mr. Weinstein

18   picked up the phone and said, Not her, we are not going to cast

19   her.  The directors didn't know why and went along with it, and

20   they have come forward.  That is something I believe we can

21   cure.

22         THE COURT:  You have to allege Weinstein was doing

23   this up to four years before December 6, 2017 so that you are

24   within the statute of limitations period.

25         MS. FEGAN:  But, your Honor, in that respect we would

1    assert that tolling applies, because they could not have known.

2    The directors did not tell them at the time that the reason

3    they didn't get the part was because Mr. Weinstein intervened

4    and said that.  They just knew they didn't get the part.

5            Of course, there's going to be parts that people get

6    or don't get.  The difference here is that if Mr. Weinstein

7    intervened --

8            THE COURT:  You are saying that their cause of action

9    was not necessarily the predatory act that occurred with

10   Ms. Kendall in 1993, with Ms. Brock in 1998 and so on.  It was

11   the continued inability to get parts that continued up to and

12   through the four-year period before the filing of the

13   complaint?

14           MS. FEGAN:  That's exactly right, your Honor.

15           THE COURT:  That is something that needs to be shown.

16           MS. FEGAN:  OK.

17           THE COURT:  So, Mr. Putnam, supposing they show

18   that -- you may stay in your place, Ms. Fegan.

19           MS. FEGAN:  OK.

20           THE COURT:  You can stand up, Mr. Putnam.

21           MR. PUTNAM:  Yes, sir.

22           THE COURT:  Suppose they are able to show that.

23           Wouldn't that be sufficient to make out an equitable

24   estoppel, at least from the point of view of the pleadings?

25           MR. PUTNAM:  For the pleadings, I think not, your

1  Honor, because I think that you have to do it as to each

2  individual defendant.  They talk about a hit list.

3          THE COURT:  I grant you that.  But let's start with

4  the whole notion.

5          MR. PUTNAM:  OK.

6          THE COURT:  The whole notion I think, as Ms. Fegan

7  points out and says that she will be able to do with an

8  amendment, would arguably at least one defendant within the

9  statute of limitations.  Whether there is a RICO claim is

10  another story that we'll get into.

11          MR. PUTNAM:  Yes.

12          THE COURT:  What is your take on that?

13          MR. PUTNAM:  My take on it, your Honor, is this, to be

14  frank.  We were here at a status conference several months ago

15  where you brought up this very issue.  You asked Ms. Fegan this

16  very question in reference to whether or not there would be

17  something that would be brought in.  We were told she would

18  look at that.

19          I was admonished at the beginning of this, your Honor,

20  for too much briefing.  All of this briefing we have now done

21  becomes unnecessary because she is going to be able to do what

22  you asked to be done when we all met months ago.

23          THE COURT:  What is your backup argument?

24          MR. PUTNAM:  I am going to give you my backup

25  argument.

1          THE COURT:  Plan A is not working.

2          MR. PUTNAM:  My backup argument, your Honor, is this:

3     Throughout the present complaint, and perhaps why Ms. Fegan

4     said she didn't need to amend is because throughout what she

5     talks about is the idea of what you started with your Honor,

6     which is the idea that, because of fear, these people say

7     throughout the complaint that they stopped going to get try to

8     get parts.  They were not given parts because of it.  They

9     stopped into the business.  They left the business.

10          THE COURT:  She's adding one thing crucial.  She is

11     adding calls from for Mr. Weinstein to various producers, Don't

12     give her the part.

13          MR. PUTNAM:  You have to show that they in fact didn't

14     get the part for that reason.

15          THE COURT:  They would have to be able to plead it in

16     good faith.

17          MR. PUTNAM:  Yes.

18          THE COURT:  Supposing they did.

19          MR. PUTNAM:  If they could plead that in good faith,

20     your Honor, they might have a cause of action as to that one

21     person.

22          THE COURT:  OK.  Got you.

23          Ms. Fegan, don't you have to show that -- well, I

24     guess that depends if you are going to show an association and

25     an enterprise.

1          MS. FEGAN:  That's correct, your Honor.

2          THE COURT:  But you would have to show that enterprise

3     and association continuing into the period of limitations --

4          MS. FEGAN:  Absolutely, your Honor.

5          THE COURT:  -- against each defendant.

6          MS. FEGAN:  That we can do.

7          THE COURT:  How would you do that?

8          MS. FEGAN:  Well, in several ways, your Honor.

9          THE COURT:  Let's say I grant you the right to plead

10    another claim, a more plausible claim against Harvey Weinstein.

11         What about the others?

12         MS. FEGAN:  Your Honor, there is a number of ways we

13    can do that.  I will try, your Honor, the list here.  By way of

14    example --

15         THE COURT:  You can look at your notes.  This is not a

16    memory test.

17         MS. FEGAN:  If we start with Miramax, your Honor, even

18    post when Harvey Weinstein left and started the Weinstein

19    Company with his brother, Miramax and the Weinstein Company

20    continued to coproduce movies, some of the very movies that we

21    are talking about and would be the subject of an amended

22    complaint.  They coproduced Project Runway, a very famous show.

23         THE COURT:  Lots of good movies.  No question about

24    it.

25         MS. FEGAN:  Exactly.

1    THE COURT:  They were not the only movies in

2  Hollywood.  Those were the only good movies in Hollywood.

3    MS. FEGAN:  Certainly ones that won a lot of the

4  awards, your Honor.

5    What we can see is, for those particular types of

6  movies and those particular projects, we would be able to show

7  continuing association between Miramax and the Weinstein

8  Company that perpetuated one Mr. Weinstein's conduct.

9    THE COURT:  With Miramax that is an imputation

10  argument:  Because it's president did it, therefore the company

11  is liable.  But that won't help you in a RICO case.

12    MS. FEGAN:  I agree, your Honor.

13    THE COURT:  You will have other issues with that, too.

14    At the moment you have to plead that each defendant --

15    MS. FEGAN:  Correct.

16    THE COURT:  -- that each defendant knew that Harvey

17  Weinstein was attempting to blacklist the plaintiffs, each of

18  the plaintiffs until the statute of limitations period would be

19  tolled.

20    MS. FEGAN:  Your Honor, I don't think we have to show

21  that each of the defendants knew that Mr. Weinstein had

22  targeted the particular plaintiffs.  I think what we have to

23  show for purposes of an association in fact is that each of the

24  defendants knew that Mr. Weinstein was, one, continuing to

25  assault women and, two, was smearing them and blacklisting

1   them.

2        The knowledge in a conspiracy like this doesn't mean

3   that each participant has to know each time he targeted a

4   particular person, but they do need to know the common purpose.

5        THE COURT:  How do you allege enough to make it proper

6   that each defendant is held in the case?

7        Isn't it required to plead for each person separately

8   that they knew of this continuing effort of Harvey Weinstein to

9   blacklist the plaintiffs.  You have to allege that in good

10  faith.

11       MS. FEGAN:  I think we have to allege in good faith --

12       THE COURT:  Can you do that?

13       MS. FEGAN:  I think we can allege in good faith, your

14  Honor, that each of the defendants knew that he was engaged in

15  a campaign of coverup against his victims.

16       THE COURT:  Coverup, what does that mean?

17       MS. FEGAN:  Coverup means that he was hiring spies to

18  go talk to them to ensure that they weren't going to talk about

19  their experiences with Mr. Weinstein.

20       THE COURT:  That happened a lot later.

21       MS. FEGAN:  It happened through 2017.

22       THE COURT:  Through when?

23       MS. FEGAN:  It happened through 2017, your Honor.

24       THE COURT:  You only allege it happening in 2017.  It

25  is not continuous.

1          MS. FEGAN:  Your Honor, at this point what we have

2     that's been leaked to the media -- not by us, but that's where

3     we got it -- were certain Black Cube contracts, for example,

4     that Mr. Weinstein entered into using his lawyer's name.

5          THE COURT:  Right.

6          MS. FEGAN:  We don't have all of them.  They are in

7     the hands of the defendants.

8          THE COURT:  But it's the expression of that, not the

9     hiring, but the expression.  It is not just an investigation of

10    a person.  It's a certain way of intimidating the person by the

11    manner of investigation.

12         So, if a reporter for Page Six of the New York post

13    calls, that is not intimidation.  It's a certain way of

14    questioning to let the person know that she is being

15    threatened.

16         MS. FEGAN:  It is a part.

17         THE COURT:  Yes.

18         MS. FEGAN:  It is after getting the information then

19    letting them know that they have it and they're going to use it

20    to smear them.  So it may not be in that conversation itself.

21    It may occur after.  That is certainly true for the predicate

22    acts of the witness tampering, your Honor.

23         THE COURT:  I think you need, Ms. Fegan, to show that

24    each defendant personally was aware of the continuing effort by

25    Harvey Weinstein to intimidate them.

1          MS. FEGAN:  OK, your Honor.

2          THE COURT:  If you can't do that, I think that

3   defendant has to be dismissed.

4          MS. FEGAN:  Your Honor, that is just one of three

5   types of predicate acts we have.

6          So, in the event that, for example, we weren't able to

7   connect a particular director to witness tampering, we

8   nonetheless have the mail and wire fraud predicate acts here.

9   That in and of itself is sufficient.

10         THE COURT:  You would have to prove the mail and wire

11  fraud for each defendant.

12         MS. FEGAN:  Correct.

13         THE COURT:  You are talking about conspiracy.

14         MS. FEGAN:  Correct.

15         THE COURT:  So, to prove a conspiracy, you need to

16  prove that the person implicated knew about the conspiracy and

17  consciously made it his own.  You would have to at least plead

18  in good faith that each defendant knew of this effort by Harvey

19  Weinstein and others whom he enlisted to silence the women and

20  that they participated in some fashion in doing that.

21         MS. FEGAN:  I agree, your Honor.

22         That we can do, and we can certainly demonstrate

23  through the mail and wire fraud their participation.

24         THE COURT:  So, Mr. Putnam, let's take Ms. Fegan at

25  her word.

1          If she does that, would you concede that a cause of

2    action has been alleged?

3          MR. PUTNAM:  I would have to see that, as you note,

4    your Honor, as to every defendant.  Most important, your Honor,

5    what I want -- if I am going concede, I am not going to concede

6    what Ms. Fegan alleged.  She said that it was sheer knowledge

7    of Mr. Weinstein doing so.

8          THE COURT:  She has to allege that in good faith.  I

9    know you deny it.  That is not the point.  My question is, if

10   she alleges it, and you don't have a Rule 11 objection, would

11   she make shake out a good cause of action?

12         MR. PUTNAM:  The answer I was going to say -- I am

13   sorry I didn't get there quickly enough -- was, no, she would

14   not.

15         THE COURT:  You don't have to get there quickly.

16         MR. PUTNAM:  The reason she would not, your Honor, is

17   because mere knowledge is not enough.  You have to actually

18   have an interest.  You have to have some kind of control over

19   the ongoing continuous action.  That's not alleged there.

20         THE COURT:  Not control, Mr. Putnam.

21         MR. PUTNAM:  Operation and management, your Honor.

22         THE COURT:  You need to make yourself part of it.

23         MR. PUTNAM:  Exactly.

24         THE COURT:  You need to have some overt act by which

25   maw make yourself a part of the -- I am not sure about the

1    overt act either.  But you have to make yourself part of the

2    conspiracy.  You have to adopt it.  You have to make it your

3    own project.

4            MR. PUTNAM:  To do so, your Honor, that is more than

5    just knowledge.  The Second Circuit has made clear knowledge is

6    not enough.

7            THE COURT:  But she says that she can do more than

8    knowledge.  She can show that.  For example, their continued

9    interest in their positions in Miramax, the continued amount of

10   money that Harvey Weinstein brought in to Miramax, so they all

11   helped him in his way, helped him intimidate.  It is a tall

12   order, but if she says she can do it, I am taking her at her

13   word now, and let's see if she can do it.

14           MR. PUTNAM:  If I may, your Honor, I am not quite sure

15   what that means, to continue to bring money into Miramax.  I

16   think if one is operating with one's normal business

17   operations, that is not a RICO violation.

18           THE COURT:  I understand that.

19           MR. PUTNAM:  A coproduction --

20           THE COURT:  I have dealt enough with conspiracy cases,

21   and what I don't remember Mr. Finzi will teach me again, but I

22   am assuming that she would be able to allege it in good faith.

23           Now the next thing I want to ask you about is the

24   question of injury to business or property.  Essentially these

25   are personal injuries.  The persona of the plaintiff has been

1    violated in a profound way.

2          She claims -- and there's no reason not to believe

3    it -- that she lost her sense of autonomy and integrity and

4    self-awareness, self-confidence because of the way that she was

5    treated by Harvey Weinstein.

6          At the pleading stage I have to accept that.  But is

7    that personal injury an injury to business because she makes an

8    allegation that her acting career was harmed?

9          MS. FEGAN:  No, your Honor.

10         THE COURT:  No?

11         MS. FEGAN:  I believe that the emotional distress and

12   physical symptoms that these women had after the assaults is

13   not what we're trying to recover under the RICO claim.  We are

14   pleading those with respect to the state law claims.

15         THE COURT:  Say that again.

16         MS. FEGAN:  We are pleading those injuries with

17   respect to the state law claims, but not the RICO claim.  The

18   RICO claim we are alleging two types of injuries, injury to

19   their reputations and to their careers.

20         THE COURT:  I don't think that qualifies for business

21   or property.

22         MS. FEGAN:  Your Honor, it does under a Second Circuit

23   case named *Securitron Magnalock*.  It is at 65 F.3d 256.

24         There, the Second Circuit affirmed a verdict --

25         THE COURT:  Spell the name.

1          MS. FEGAN:  *Securitron*, S-e-c-u-r-i-t-r-o-n.

2          In that particular case, the Second Circuit affirmed a

3    verdict on a RICO claim where there were damages of $100,000

4    for an injury to reputation and loss of goodwill.

5          In that particular case the underlying predicate acts

6    were that the RICO conspiracy targeted the reputation of the

7    business to ensure that it didn't continue to get contracts.

8          THE COURT:  What was the business?

9          MS. FEGAN:  In that particular case I believe it was

10   some kind of keylock-type service.

11         But the point there is that --

12         THE COURT:  So does a personal service equate to a

13   business?

14         MS. FEGAN:  Your Honor, I would not call an actor's

15   job a personal service.  I think, just like a lawyer provides a

16   service -- and I would call my career a business -- I think

17   that is the same for actors and actresses.

18         THE COURT:  It's a business because you --

19         MS. FEGAN:  You have a service to sell.

20         THE COURT:  An office, you have help, you have

21   telephones.  I guess you could say the actor does that the same

22   way through an agent.

23         MS. FEGAN:  Exactly.  They have to work the phones,

24   they have to attend meetings, they have to do the same types of

25   correspondence that we would do to make sure that we are

1    marketing and our services are sold.

2             If someone interferes with that and there is an injury

3    to your reputation, there is a loss of goodwill, because

4    Mr. Weinstein says that that movie is not going to make money

5    if we cast Louisette Geiss or we cast Zoe Brock.  So the

6    director doesn't know that he has an ulterior motive and says

7    OK, and they blacklist that actress.

8             THE COURT:  If you spurn me, you will never work

9    again.

10            MS. FEGAN:  That's right.  Your Honor, in this

11   context --

12            THE COURT:  And enough threats to make that palpable.

13            So how can damages be more than speculative?

14            You have the type of business that acting in the

15   movies reflects.

16            MS. FEGAN:  Your Honor, it is actually an interesting

17   question that has been batted around respect to the Game of

18   Thrones.

19            What we have seen there is that a director has come

20   forward and said that Ashley Judd was not cast in the Game of

21   Thrones because Mr. Weinstein intervened and said don't.  What

22   we know is how much money the Game of Thrones series has made.

23   We know what the actual actors and actresses that were cast in

24   those movies made and will make in royalties and other types of

25   agreements.

1              THE COURT:  When was she denied the role in that --

2              Don't shake your head, please, Mr. Putnam.  That is

3    not professional.

4              When was she denied a role in Game of Thrones?

5              MS. FEGAN:  When was she denied it?

6              THE COURT:  When?

7              MS. FEGAN:  At the outset.

8              THE COURT:  When?

9              MS. FEGAN:  The director wanted to cast her after

10   auditions, and Mr. Weinstein --

11             THE COURT:  So when did that occur?  That is more than

12   four years ago?

13             MS. FEGAN:  I understand what you are saying.  I

14   apologize.  I didn't understand.

15             THE COURT:  All right.

16             MS. FEGAN:  Your Honor, I think that --

17             THE COURT:  What about that argument, Mr. Putnam?

18   That seems to be a really good argument, that acting is a

19   business like any other business --

20             MR. PUTNAM:  Sure, your Honor.

21             THE COURT:  -- any other personal service business.

22             If you injure the ability to earn money as an actor,

23   you are injuring an interest in a business.

24             MR. PUTNAM:  If I may, your Honor, the reason I shook

25   my head is because Ashley Judd is not a plaintiff in this

 1  lawsuit.  The reason I did that, your Honor, is because here --

 2          THE COURT:  She's just using that as an example.

 3          MR. PUTNAM:  But there's no such example in the

 4  complaint or even alleged here today.

 5          THE COURT:  I know.  But she says that she can do it,

 6  right?

 7          MS. FEGAN:  That's correct, your Honor.

 8          MR. PUTNAM:  As to *Securitron*, your Honor, it is a

 9  lock case.  It is not a services case.  It's about locks, like

10  actual locks.

11          THE COURT:  Locks.

12          MR. PUTNAM:  Like locking a door.

13          THE COURT:  I understand.  It is a business.

14          Ms. Fegan says that an actor sets up a place, the

15  actor's home, or more likely the agent, and there are

16  telephones and there are services and there's percentages and

17  there's commissions.  It is a business.  Acting is a business.

18          I mean, you could say a lawyer is a professional.

19  He's not a businessman.  We all know that that is a charade.

20          MR. PUTNAM:  That I agree with.

21          Your Honor, I think in this instance --

22          THE COURT:  Only judges work for free.

23          MR. PUTNAM:  I think, your Honor, we have actually

24  cited to cases that show this is not the case.  In *WWE*, which

25  is the wrestling case, they are talking about the speculative

1    nature of such claims.  The idea is you have to have a certain

2    specificity here.

3         That is why Rule 9 applies in these instances.  It is

4    the idea that you not only have to have an example like a Games

5    of Thrones example, where a specific contract was not received

6    by the person, but it also has to be that the person decided,

7    the casting agent and/or director for Game of Thrones,

8    Mr. Benioff, would have had to have come in and said, I am not

9    hiring this person because I was convinced by Mr. Weinstein or

10   others in the conspiracy that she should not be hired.

11        THE COURT:  That seems right, Ms. Fegan.  What do you

12   think about that?

13        MS. FEGAN:  Your Honor, first, Rule 9 does in the

14   apply to RICO injury.  Rule 8 does.  Rule 9(b) only applies --

15        THE COURT:  It has to be plausible.  There has to be a

16   finding of plausibility.

17        Mr. Putnam's point is that acting is so unpredictable

18   that anything is speculative unless you get a specific job.  If

19   the plaintiff was involved with Games of Thrones and she was

20   denied a job sometime after December 2013, you could sue.  But

21   if we don't have any specified, identifiable jobs, all we have

22   is the actor's ability to get a job, and the actor can get a

23   job with someone that doesn't throw off any money.  How do we

24   fix damages?

25        MS. FEGAN:  Your Honor, first of all, at this point,

1    we don't need to actually affix damages.  What we do need to be

2    able to say --

3            THE COURT:  I know.  But we can't say it's

4    speculative.

5            MS. FEGAN:  That's right, your Honor.  What we do need

6    to be able to say is our particular plaintiffs were targets of

7    this scheme.

8            What we can't know until discovery is, for example,

9    who Mr. Weinstein spoke to.  I can't ask Mr. Weinstein that.

10   We don't have his e-mails where he e-mailed -- and we know that

11   there were e-mails going around -- where he e-mailed particular

12   people and said, no, we are not going to hire her.

13           THE COURT:  I don't think I can decide this at this

14   go-round.  I think we are going to have another go-round.

15           MS. FEGAN:  Agreed.

16           THE COURT:  The standard is laid out in *First*

17   *Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768, where

18   the Second Circuit said in 1994:  "Thus, the courts regularly

19   have held that a plaintiff who alleges injuries that are

20   indefinite and unprovable does not have standing under and

21   cannot recover damages pursuant to RICO.  Furthermore, a mere

22   expectation cannot constitute business or property under RICO."

23   And for that is *Villoldo v. BNP Paribas S.A*.  That's Federal

24   Appendix, so it's not supposed to be cited, but I remember that

25   because it was a reversal of one of my cases.

1            MS. FEGAN:  Your Honor, we will take that into

2    consideration.

3            THE COURT:  You have to bring yourself under that

4    rule.  It is a pretty high standard.  It is a pretty high bar.

5            MS. FEGAN:  Understood.

6            THE COURT:  Next defendants challenge the issue of the

7    pattern of racketeering activity.  They say it can't be

8    slavery, forced labor, or sex trafficking under 18 U.S.C.

9    Section 1590 and 1591 because there was no commercial sex act,

10   no offer of something valuable in exchange for sex.  But I

11   think you would argue that the explicit exchange was a job in a

12   good movie for sex.

13           MS. FEGAN:  That is absolutely right, your Honor.

14   Judge Sweet --

15           THE COURT:  If you indulge me, you get the part.  If

16   you don't indulge me, no part.

17           Right?

18           MS. FEGAN:  That is exactly right.  That is a

19   portion --

20           THE COURT:  Mr. Putnam, that seems to be a good

21   argument.

22           MR. PUTNAM:  This is one of the arguments we didn't

23   make in our papers, your Honor, so I am just going wing it,

24   because I know --

25           THE COURT:  You read the others.

i9cnweia                    CORRECTED

1          MR. PUTNAM:  I will rest on the papers of my

2     colleagues.

3          THE COURT:  If you don't do a good job whoever is the

4     author of that part can stop you.  You better do a good job.

5     You go.

6          MR. PUTNAM:   I think it depends on how alleged, your

7     Honor.  Generally the allegations of the complaint go into no

8     specificity.  Therefore, to simply state that it is part of a

9     predicate act because of a general allegation should not and is

10    not enough.

11         THE COURT:  We don't know.  We don't know what

12    happened.  Harvey was not attractive in such a way as Paul

13    Newman was attractive.  He wanted sex, and he was trading in

14    it.  Give me sex, you got a job.  Don't give me sex, no job.

15    That is the allegation.

16         MR. PUTNAM:  Yes, your Honor.

17         THE COURT:  It is not proved.  It is the allegation.

18    It seems to me it is a good allegation.

19         MR. PUTNAM:  OK.

20         THE COURT:  Yes?

21         MR. PUTNAM:  OK.

22         THE COURT:  Another predicate act that they allege is

23    witness tampering.

24         Where is the official proceeding that was involved?  I

25    don't think you have that.

i9cnweia                    CORRECTED

1          MS. FEGAN:  Your Honor, there need not be an official

2    proceeding pending at the time that the witness is tampered

3    with.

4          In fact, we believe and I think that the criminal

5    resource manual for the Department of Justice shows that there

6    may not be an actual federal proceeding or proceeding pending

7    at the time because that would eviscerate the purpose of the

8    witness tampering,

9          THE COURT:  Who was tampered?  Who was the witness?

10          MS. FEGAN:  In this particular case it's in some

11    instances the victims themselves where they are threatened.

12          THE COURT:  Can that be witness tampering?

13          MS. FEGAN:  That can be, your Honor, to prevent them

14    from going to complain in the first instance.

15          THE COURT:  Mr. Putnam, can that be witness tampering?

16          MR. PUTNAM:  No, it can't, your Honor, particularly

17    when they don't say who tampered, when tampered, how tampered.

18    Beyond the fact that one can't tamper with one's self, it

19    wouldn't be witness tampering.

20          THE COURT:  If they do that, can they allege it with

21    respect to a victim?

22          MR. PUTNAM:  If they did it as to witnessing

23    another's.  But as indicated and as your Honor indicated --

24          THE COURT:  You can be a witness for yourself.

25          MR. PUTNAM:  Well, then there would be a RICO claim

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

i9cnweia                    CORRECTED

1    for every -- witness tampering that exists in every such

2    instance.

3              THE COURT:  That would be the predicate act.  That is

4    what she alleges.  I don't know the answer.  I don't have any

5    cases on that point.  Anybody want to add to that point?

6              Anybody found a case?

7              MR. PUTNAM:  Yes.  Why don't we hand our briefing,

8    your Honor --

9              THE COURT:  Why don't you take it down a step to the

10   law clerks.

11             MR. PUTNAM:  And, better yet, partners, who know

12   better than you do.

13             What we had in our brief your Honor is what I think

14   you were alluding to in the beginning.  The idea from *Miller*

15   2007 WL 4207282 at *7, Southern District.  It is in footnote 6.

16   Where it dismisses the RICO claim because the plaintiff failed

17   to allege any federal proceeding, or the defendants hindered

18   communication or information between a law enforcement officer

19   or a federal judge relating to any federal offense, which is

20   what I thing you were referring to.

21             THE COURT:  I don't think Sam could take that down.

22             Why don't you repeat it slower.

23             MR. PUTNAM:  Please, your Honor.

24             *Miller*, 2007 WL 4207282 at *7, note 6.

25             THE COURT:  OK.  So that's dealing with section

1    1512(a), a crime to kill or attempt to kill another person or

2    use physical force of the threat of physical force or the

3    threat of physical force against any person to prevent the

4    attendance or testimony of any person in an official

5    proceeding, or the production of a record, document or other

6    object in an official proceeding.

7              That's the case that says official proceeding.

8              How do you get around that, Ms. Fegan?

9              MS. FEGAN:  In that case, your Honor, the Court was

10   specifically focused on the fact that the witness tampering had

11   to do with state proceedings.  It wasn't with respect to

12   federal crimes for which there could be federal proceedings.

13             THE COURT:  That's the way you distinguish it.

14             MS. FEGAN:  That's the way I distinguish it.  Here we

15   are talking about sex trafficking violations.

16             THE COURT:  What is plan B if that doesn't work?

17             MS. FEGAN:  Your Honor, I don't have a case with me on

18   that point, but I do believe that the cases are consistent that

19   the question is whether there is a potential federal crime to

20   be reported.

21             THE COURT:  I think *Miller* has got it right.  Who was

22   the judge in *Miller*?  LAP?

23             MR. PUTNAM:  Preska.

24             THE COURT:  I think she's got it right.  Witness

25   tampering is out.

1      Mail or wire fraud.  All of these allegations that you

2  make are person-to-person.  No one has written any letters.  No

3  one sent any e-mails.

4          MS. FEGAN:  Yes, your Honor, they have.

5          THE COURT:  They have?

6          MS. FEGAN:  Yes.

7      What we know, for instance, with respect to the

8  directors is that they weren't all coming in to town, into New

9  York to meet in a room, for example, to negotiate

10  Mr. Weinstein's 2015 employment agreement.  They were in

11  California, they were in Florida, they were in France, they

12  were in Toronto.

13          THE COURT:  Let's say that Harvey Weinstein was the

14  worst person in the world who produced the greatest movies in

15  the world.  Why is it is a wrongful act to let him stay as

16  president?  In a different time every one did.

17          MS. FEGAN:  They built into his employment agreement a

18  way for the company to actually make money on the assaults.  By

19  way of example, if he were to assault the first woman, he would

20  pay a fine of $250,000.

21          THE COURT:  They tried to put a damper on his conduct.

22  They knew about these allegations, and they were embarrassed by

23  them and they wanted to stop them.  But they didn't want to

24  sacrifice their gifted president.

25          MS. FEGAN:  So they decided to partake in the

1    conspiracy to keep him in office, not to protect the women or

2    his victims.

3             THE COURT:  I don't think so.

4             It didn't enable -- they didn't fire him.  It shows

5    they knew about it, and they didn't like it.  But they didn't

6    fire him.

7             MS. FEGAN:  That's right, your Honor.

8             THE COURT:  They didn't fire him because he was making

9    gifted movies, and they were making a lot of money for the

10   company.

11            MS. FEGAN:  On the backs of the women he was

12   assaulting.  They didn't try to keep him from the women.

13            THE COURT:  Not necessarily.

14            The fact that these movies were great successes was a

15   consequence of many inputs, including extraordinary actors and

16   actresses that Weinstein was able to get.

17            People wanted to work for him.  That was part of the

18   problem that these women had.  But I don't see a mail or wire

19   fraud because of this kind of activity on the part of the

20   directors.

21            I think you are reduced to sex trafficking.  You need

22   a pattern of sex trafficking to show RICO fraud.  If you do

23   that, you can pass the bar.

24            Any further comment from anybody?

25            THE COURT:  Yes.

1    MR. STEIN:  If I may, your Honor.

2    THE COURT:  Yes.

3    MR. STEIN:  Just on that point about sex trafficking,

4    I would just like to mention plaintiff's counsel referred to a

5    decision by Judge Sweet in a case called *Noble*, in which Judge

6    Sweet --

7    THE COURT:  Is it the same thing?

8    MR. STEIN:  The claims in that case, your Honor, were

9    brought against Harvey Weinstein and Bob Weinstein.  We both

10   moved to dismiss.  Judge Sweet did allow the claims against

11   Harvey Weinstein to go forward, but he dismissed the claims

12   against Bob Weinstein, my client, because there were no

13   allegations, sufficient allegations that Bob Weinstein had in

14   any way known about or participated in the sex trafficking

15   scheme.

16   THE COURT:  What is the case, Mr. Stein?

17   MR. STEIN:  It is *Noble v. Weinstein* 2018 WL 3863452.

18   It's Southern District, August 14, of this year.  The civil

19   action number is 17 Civ. 9260.

20   As Judge Sweet said there, guilt -- or in this case

21   liability -- cannot be established by association alone.  And

22   he found that that's essentially what the claimant was trying

23   to do.  In this --

24   THE COURT:  I've got the point.

25   MR. STEIN:  Got it.

1          MS. FEGAN:  We have an additional set of allegations,

2     your Honor, that I would like focus on.  We have allegations

3     from women inside the company that they complained and wrote

4     memos to the executives outside of Mr. Weinstein, Harvey

5     Weinstein, to advise them of the wrongdoing within the company,

6     to advise them that they were being taken to meetings by

7     Mr. Weinstein to act as these honeypots to lure the victims in,

8     to make them comfortable, and that they knew that these women

9     were then assaulted.  In fact, the employees had to go in and

10    clean up after that.

11         THE COURT:  After what?

12         MS. FEGAN:  The women had to clean up after the

13    assaults, the employee women.

14         So what we know is it is not just that they wanted to

15    keep him in with this employment agreement.  We know that

16    within the company there was correspondence that went to the

17    board that advised them that these things were going on and

18    that it was wrong.

19         Rather than change, rather than do anything to ensure

20    that the pattern of assaults stopped, they ignored it.  They

21    put one of the women who wrote one of memos under an NDA, a

22    nondisclosure agreement, to insure that she didn't tell anyone

23    what Mr. Weinstein was doing, to ensure that he couldn't be

24    stopped.

25         So we think that the employment agreement is an

1   example, but that is not the only thing.  It is not just

2   passive.  It is actually hiding, burying, and concealing what

3   was occurring.  And those discussions occurred with the use of

4   the mails and wires, your Honor.

5          So, in any event, we can certainly plead those

6   allegations.

7          THE COURT:  Let me get this right.

8          MS. FEGAN:  Yes.

9          THE COURT:  So the effort to conceal shows the

10  complicity of whoever was concealing?

11         MS. FEGAN:  That's correct.

12         THE COURT:  And who was that?

13         MS. FEGAN:  Who was concealing, or who was --

14         THE COURT:  Yes.

15         MS. FEGAN:  The directors.

16         THE COURT:  For example, to whom were these letters

17  written?

18         MS. FEGAN:  They were written up through the COO and

19  shared with the board, your Honor, and the COO being David

20  Glasser.

21         THE COURT:  The provision in the contract with Harvey

22  Weinstein is if you do it one time you get fined a certain

23  amount, you do it two times, a higher amount and so on.  So

24  they knew it.  No question that they knew.

25         MS. FEGAN:  They knew, and they helped cover it up.

1        THE COURT:  The question is whether they were

2    obligated to fire him.

3        MS. FEGAN:  Your Honor, I think that becomes a

4    question of fact.

5        THE COURT:  No.  It is not a question of fact.  The

6    facts are clear.  The facts are that the board knew but didn't

7    fire him.

8        MS. FEGAN:  They are other steps they could have taken

9    to ensure that he couldn't continue the conduct.

10        THE COURT:  How?

11        MS. FEGAN:  They could ensure that when he walked in

12    his office with one of our clients he didn't lock the door and

13    keep her in there while he assaulted her.

14        THE COURT:  How would you do that?

15        MS. FEGAN:  Well, first of all, I --

16        THE COURT:  Hire a policeman to stand at Harvey

17    Weinstein's door?

18        MS. FEGAN:  No, but I think you would make sure that

19    he didn't lock women in with him when the people outside that

20    office knew exactly what was going to happen.  Not only did

21    they know what was going to happen, they had to supply him --

22        THE COURT:  They were rather powerless, though,

23    weren't they?

24        MS. FEGAN:  No, your Honor.  Absolutely not.

25        THE COURT:  They were secretaries and clerks.

1      MS. FEGAN:  These secretaries and clerks went to the

2  men with power.

3      THE COURT:  They did and wrote the letter, and the

4  letter resulted in a contract, and the contract had a clause

5  about a fine and a sanction.  But the directors decided that

6  they did not want to terminate.  I can't see how that is a

7  wrongful act.

8      MS. FEGAN:  There are other steps that the directors

9  could have taken to ensure that this didn't continue to happen,

10  your Honor, and still keep him in his on job.  They chose not

11  to do it, your Honor.  I do believe that it is a question.

12      THE COURT:  Other than unlocking the door or taking

13  out the locks in the doors, what?

14      MS. FEGAN:  Well, by way of example, he would set up

15  office like at the Sundance film festival or the Cannes

16  Festival in France.  He would set up his office in a hotel

17  suite.  He would knowingly have, for example, the head of

18  Miramax Italia and other employees go out there and procure

19  women for him.  Say, oh, Harvey Weinstein wants to see you.  I

20  think you would be perfect for this part.  Knowing they weren't

21  delivering those women for a part.  They were delivering those

22  women because they knew that Mr. Weinstein was --

23      THE COURT:  Anybody who did that I think you would

24  have a very good argument.

25      MS. FEGAN:  But those acts were reported.  So those

1  executives are the ones that report to the various boards.  So,

2  your Honor --

3            THE COURT:  You haven't named anybody.  I think you

4  have to name people.

5            MS. FEGAN:  All right.  We will do that, your Honor.

6            MR. FINZI:  Your Honor?

7            THE COURT:  Yes, Mr. Finzi.

8            MR. FINZI:  Along those lines, I just want to make

9  sure the record is clear.  There have been references here to

10  the outside directors as a group, and the work they did in 2015

11  in terms --

12            THE COURT:  She has to be specific.  She can't say

13  outside directors.  She has to be specific.

14            MR. FINZI:  Even more than that, your Honor, there's

15  two defendants here that weren't members of the board at the

16  time.  There are two defendants --

17            THE COURT:  What about this, Ms. Fegan.

18            MR. FINZI:  Just one more second, your Honor.  It is

19  alleged in the complaint.

20            THE COURT:  I have the point.

21            What is the response?

22            MS. FEGAN:  I think that gets to what we are talking

23  about, about these complaints.

24            The employment agreement is one piece that we would

25  argue fits that.  There's other -- for example, in 2016 at the

1    time that Mr. Lasry was on the board, which is with after when

2    the 2015 employment agreement was signed, there were additional

3    complaints made that the board was aware of.

4              THE COURT:  Not by these women.  You have to have an

5    allegation by these identifiable plaintiffs.  I think Mr. Finzi

6    is right.  I don't think you can have a cause of action against

7    people who weren't on the board at the time.

8              MS. FEGAN:  It depends on what the act is.  I hear

9    what your Honor is saying.  When we amend, we will make sure

10   that we have connected each one to a particular act.

11             THE COURT:  All right.  Hold onto your argument, Mr.

12   Finzi, you will make it a second time.

13             Let me ask you whether or not you can claim as an

14   enterprise or association in fact employees of a company and

15   the company.  Isn't the company the personality that you wish

16   to sue, and don't all these people work for that company?

17   Leave out the directors, but the officers, employees?

18             MS. FEGAN:  Your Honor, if our enterprise alone was a

19   single company and its employees, we would not be able to state

20   a claim because we wouldn't have separate person.

21             Where we are talking here about a conspiracy that

22   includes others --

23             THE COURT:  Who are the others?

24             MS. FEGAN:  So here we have alleged that there are the

25   spies that were hired through the lawyers.  We have alleged

1    that the publishers, by way of example, the National Enquirer,

2    and other media who helped engage in this --

3            THE COURT:  You would have to allege that they were

4    part of a pattern of racketeering activity.

5            MS. FEGAN:  That's correct.

6            THE COURT:  And if they hire investigators at a

7    certain point in time, where they expressed themselves or they

8    manifest themselves at a certain point in time, that doesn't

9    show that they were there throughout.  It doesn't show that

10   they were involved in a pattern.

11           They hire themselves out as investigators.  It depends

12   on what they do as investigators.  You can't say just because

13   investigators were hired that there was a wrong.

14           MS. FEGAN:  You're right, your Honor.

15           THE COURT:  There has to be instruction to them.  It

16   has to go along a certain way, and it has to be expressed a

17   certain way.

18           MS. FEGAN:  There are two ways that those were

19   expressed.  First, we have the deception.

20           THE COURT:  What is the deception?

21           MS. FEGAN:  In this particular case the spies

22   contacted victims pretending to be people they weren't in order

23   to elicit information about their causes of action against

24   Mr. Weinstein.

25           You can't use deception --

1          THE COURT:  Let's they did that.

2          What does that mean?

3          What is the consequence?

4          MS. FEGAN:  As a consequence of that, information

5    would be delivered back to Mr. Weinstein, and then he would

6    turn around and smear these women to ensure that they couldn't

7    and didn't have credibility.

8          So it's the deception that's involved.

9          THE COURT:  Did he let that be known to these women?

10         MS. FEGAN:  Well, the women knew that they were being

11   smeared in the press.  They didn't know where it was coming

12   from, and they couldn't have known where it was coming from

13   until October of last year when they discovered that

14   Mr. Weinstein was behind this.

15         They didn't even know where the information, to whom

16   the information had been shared with until the fall of last

17   year, your Honor.

18         THE COURT:  Mr. Putnam?

19         MR. PUTNAM:  Your Honor, even accepting all of that as

20   true, which is not in the complaint, what you know your

21   Honor --

22         THE COURT:  She wants to put it in.

23         MR. PUTNAM:  Yes.  All of that, furthest back would be

24   2016 for everything we have heard in the last 20 minutes.

25         And there were a number of people, as noted, Miramax

1    included, that had nothing to do with any of these incidents,

2    one from 2005, others up through say 2014.

3            THE COURT:  Apart from the name of the company was

4    changed, I mean Miramax was a subsidiary of Disney --

5            MR. PUTNAM:  Yes.

6            THE COURT:  -- and they broke in 2005 and Weinstein

7    set up his own company.

8            MR. PUTNAM:  Yes, your Honor.

9            THE COURT:  So your argument is that Miramax shouldn't

10   be sued?

11           MR. PUTNAM:  At all.  There's nothing in the

12   complaint.

13           THE COURT:  Miramax shouldn't be sued for what

14   happened afterwards, and Weinstein shouldn't be sued for what

15   happened under Miramax.

16           MR. PUTNAM:  Nothing can be said and nothing has been

17   said as a fact as to something that Miramax did inappropriately

18   prior to 2005.

19           THE COURT:  But if the purpose of what Harvey

20   Weinstein was doing, there was a consistency between Miramax

21   and Weinstein as far as being complicit, I think she can come

22   in under the wire.  I think she has a claim.

23           MR. PUTNAM:  I missed one of the words, your Honor.

24           THE COURT:  I said, if there was one stream of

25   activity by Weinstein and his associates, first as employees of

1  Miramax and continuing as employees of the Weinstein Company,

2  you would have a relationship and complicity that might satisfy

3  the pleading requirements.

4           MR. PUTNAM:  Just so I understand, would that be

5  because Harvey Weinstein worked with both?

6           THE COURT:  And others with them.

7           MR. PUTNAM:  But you would have to have the others

8  alleged --

9           THE COURT:  You would have to show a consistency.

10           MR. PUTNAM:  That is what I am saying.

11           THE COURT:  You would have on show a continuity.

12           MR. PUTNAM:  I assume your Honor is not saying it

13  isn't just that Mr. Weinstein worked at both.

14           THE COURT:  No, it can't be.

15           It has to be a continuity of people around him.  It

16  doesn't have to be exactly the same, but there has to be an

17  essential continuity.

18           Do you have that, Ms. Fegan?

19           MS. FEGAN:  Yes your Honor.

20           THE COURT:  I am finished with RICO unless somebody

21  wants to add something.

22           OK.  Now there are two bases of federal jurisdiction

23  of what would otherwise be a state law cause of action.  RICO

24  is one.  If RICO fails, you have the Class Action Fairness Act.

25           MS. FEGAN:  Correct.

i9cnweia                    CORRECTED

1      THE COURT:  If the statute of limitations applies it

2  applies also to the Class Action Fairness Act, and you would be

3  out there, right?

4      MS. FEGAN:  The statute of limitations applies to the

5  state law claims.  The Class Action Fairness Act gives us

6  diversity jurisdiction.

7      THE COURT:  Let me amend that.

8      If you are dealing with the state causes of action,

9  you have statute of limitations pertaining to those state

10  causes of action.  Assuming that the statute of limitations is

11  either tolled or is not a bar, the question I am putting to

12  everyone is whether or not a claim is stated under the Class

13  Action Fairness Act and essentially two or three points to

14  inquire into.

15      First, are there other class actions pending?

16      MS. FEGAN:  There are not, your Honor.

17      THE COURT:  There are not.

18      MR. PUTNAM:  Your own.

19      THE COURT:  I didn't mean her own.

20      MS. FEGAN:  We have two lawsuits before you.

21      THE COURT:  I mean other class actions pending.

22      Are there, Mr. Putnam?

23      MR. PUTNAM:  Not that I am aware of, your Honor.

24      THE COURT:  OK.

25      Second, class certifications and class definitions are

1  generally not decided at the pleading stage.  But if the matter

2  is crucial to federal jurisdiction, I would think it would be

3  decided at the pleading stage because the federal court is

4  enjoined to examine issues in jurisdiction at the earliest

5  possible time.

6          MS. FEGAN:  Is there a particular issue you would like

7  me to address, your Honor?

8          I do think that what we have seen post *Wal-Mart* is

9  that Supreme Court demands that we provide for purposes of Rule

10  23 not just a legal argument, as we used to do even 15 years

11  ago.  Rule 23, we would do a class certification brief that

12  wasn't accompanied by evidence.

13          Now the Supreme Court demands that we provide evidence

14  to demonstrate to the Court that common questions of fact

15  predominate.  In order to do that, your Honor, the Supreme

16  Court has stated that it is now typical to conduct discovery --

17          THE COURT:  I agree, and I don't want to do that.

18          MS. FEGAN:  But we would like a fast track, your

19  Honor.  I am not suggesting that we want to draw this out.

20          THE COURT:  The only point is whether I need to decide

21  some of these issues at least at the pleading stage.  If I

22  can't --

23          MS. FEGAN:  Your Honor, I don't think it is

24  appropriate to decide them at the pleading stage.

25          THE COURT:  These are six individuals --

1     MS. FEGAN:  Correct.

2     THE COURT:  -- who have sizeable claims, each of them.

3     Whether they aggregate to $5 million is another

4  question.  We'll get into that in a minute.

5     But the individual situations it seems to me are going

6  to predominant over the class issues.  I am not clear that a

7  class action is suitable.  Nobody has briefed this issue.

8     I don't want to make any rulings without having briefs

9  on this issue, but I would like briefs on this issue.

10     Yes, Mr. Putnam?

11     MR. PUTNAM:  One brief?

12     THE COURT:  One brief, yes.  It is good for everybody.

13     You are taking the initiative for this, with the

14  participation of your colleagues.

15     I would like to address two things:  Whether this is a

16  proper class action; and, second, whether the statutory minimum

17  of $5 million exclusive of interest and costs can be aggregated

18  for a class.

19     Who would the class be?  Injured women, many of whom

20  are suing in their own right?  And when and how was there

21  consent to any of them?

22     These are all issues.  I think the defendants would

23  argue that these women came in.  Weinstein had a reputation not

24  unique in Hollywood, and anybody who was going in to see him

25  could expect the worst.

1            MS. FEGAN:  Your Honor, may I address that?

2            THE COURT:  I am just musing, Ms. Fegan.

3            MS. FEGAN:  I understand.  But I think it is an

4    important point, though.

5            THE COURT:  On the other hand, it is a very important

6    that you don't blame the victim for the perpetrator's acts, and

7    what I would suggest would be blaming the victim.

8            MS. FEGAN:  In part, your Honor, although I was going

9    to give an example of women who tried --

10           THE COURT:  There can't be consent actually, given the

11   allegations.

12           MS. FEGAN:  That's right.

13           THE COURT:  They're contradictory.

14           MS. FEGAN:  That is exactly right.

15           THE COURT:  Because at some point the allegation of

16   each woman is that she said no to Harvey Weinstein and he

17   wouldn't take no for an answer.  That enough is sufficient to

18   prove that there were predicate acts, and they overrode any

19   issue of consent.

20           But probably the jury could take that issue in fixing

21   damages I would suppose.

22           MS. FEGAN:  They might, your Honor.

23           I mean, what we do have, for example, Melissa

24   Sagemiller, one of our plaintiffs, when she was told she needed

25   to go meet on the set with Mr. Weinstein in his trailer she

1    said no.  She asked that the meeting be rescheduled for a

2    public place, and his assistant said no.  She was going to get

3    kicked out and off the set if she didn't go to this meeting.

4    This is not a situation --

5                THE COURT:  I have seen your application.

6                MS. FEGAN:  Thank you, your Honor.

7                THE COURT:  But I am just thinking -- you will brief

8    this -- whether these are individual issues that will

9    predominate over the class issues.

10               There are cases all over the lot.  Judge Engelmayer's

11   case.  I think Judge Oetken has a case.  I've got six cases.

12   The assignment committee of the court doesn't want all these

13   assigned to one judge, although one judge can take the lead.

14   But I think there probably are cases in other courts as well,

15   state and federal.

16               I think it would be useful to know that, because it's

17   relevant to a class action and to whether or not the class

18   action is a more suitable way of proceeding than individual

19   actions.

20               In the class action I would work toward some kind of

21   global settlement, which will probably involve all of the

22   attorneys.  But there is a question of how to divide that among

23   each of the plaintiffs.

24               MS. FEGAN:  Understood, your Honor.

25               THE COURT:  You would have a serious conflict of

1    interest in that regard.

2            MS. FEGAN:  Your Honor, typically what we have seen,

3    how this plays out, and I would only hope some day there was a

4    resolution for the women, but you can see it, for example,

5    there was a Johns Hopkins settlement recently, the last several

6    years.  There the allegations were a physician on the college

7    campus who had assaulted women, had taken pictures of them

8    naked without their consent and that type of thing.

9            Then you can see the archdiocese cases.  One of the

10   ways that's dealt with is that typically forensic psychologists

11   are brought in during the allocation stage to deal with issues

12   of impact with respect to particular women and allocation.  But

13   that's down the road, your Honor.  There are ways --

14           THE COURT:  There are ways to allocate.

15           MS. FEGAN:  There are ways to allocate.  That isn't me

16   making that decision, your Honor.

17           THE COURT:  But the tendency is to fix a settlement

18   amount before people prove their individual damages.

19           MS. FEGAN:  There is.  There are ways to assess that

20   from jury verdicts and other ways.

21           THE COURT:  The problem is that you are working on

22   some perception of adequacy in a class settlement without

23   allowing each individual to prove a case.

24           In the 9/11 cases, this question arose, and we were

25   able, because of having a common answers and common

interrogatories, to get a fix on who suffered what kind of
damage, to have an idea of what would be an adequate amount of
damage.  That presented a floor for the settlement.

          As you know, the first settlement was rejected by me.

          I am not sure you can do this in this case.  If these
plaintiffs win, they are going to -- you are alleging that they
will get a million dollars each.  I don't know if they will win
a million dollars each or close to it.  I don't know if they
will win a million dollars each, but those numbers are big
enough to have individual attorneys.

          MS. FEGAN:  For purposes of the Class Action Fairness
Act and diversity jurisdiction, the $5 million minimum is an
aggregated sum for the class as a whole.

          THE COURT:  I understand.

          But we don't know how many are going to be in the
class.  I don't know how you can get a fix for an aggregate
number without a certification and notices.

          It's complicated.  I don't want to deal with that now.
It is a very complicated issue.  It hasn't been briefed, and I
like briefs.

          So, step one, Ms. Fegan, how much time do you want to
amend your complaint?

          MS. FEGAN:  Your Honor, could we have 45 days?

          There is significant legwork, but I think it can be
done.

1    THE COURT:  I think that is fair.  I don't want

2    extensions, so pick a time you want.  I will give you whatever

3    you want.  If you want 60 days, you have 60 days.

4    MS. FEGAN:  The end of October.  I don't have a

5    calendar with me.

6    THE COURT:  October 31.

7    MS. FEGAN:  Thank you, your Honor.

8    THE COURT:  Let's say a month after that defendants

9    will move.

10    MR. PUTNAM:  Yes, your Honor.

11    THE COURT:  November 30.  I don't know if it's a

12    weekend.  If there are weekends, go to the following Monday.

13    MS. FEGAN:  Thank you.

14    THE COURT:  One motion for all who want to join.  One

15    brief.  It is a common issue.

16    Two weeks to reply.

17    MR. PUTNAM:  Thank you.

18    MS. FEGAN:  Thank you.

19    THE COURT:  December 15.  We will fix the dates in our

20    order.

21    Yes, Mr. Putnam?

22    MR. PUTNAM:  The class briefing that you requested,

23    your Honor.  You want that --

24    THE COURT:  Do it at the time of the opposition to the

25    complaint.

i9cnweia                    CORRECTED

1          MR. PUTNAM:  If I may, your Honor?

2          THE COURT:  Ms. Fegan, will not have to support her

3    complaint with a brief.  She will wait until you first expose

4    yourself.

5          MR. PUTNAM:  So we will have an opposition as well as

6    class briefing due at the time of opposition on November 30 or

7    thereafter?

8          THE COURT:  I wouldn't call it class briefing.  It is

9    a motion to dismiss the CAFA basis for jurisdiction.

10          MR. PUTNAM:  In terms of Dunleavy, your Honor, I

11    assume we can extend that beyond the time of this briefing, the

12    other class action?

13          THE COURT:  Which other class?

14          MR. PUTNAM:  Right now there is another class action

15    that has been stayed during the pendency of this briefing.

16          THE COURT:  Did I stay it?

17          MR. PUTNAM:  Yes.

18          MS. FEGAN:  The Delaney class action, your Honor.

19          MR. PUTNAM:  The Delaney class action.

20          MS. FEGAN:  I would suggest when we file --

21          THE COURT:  Do we have separate lawyers for Delaney?

22          MS. FEGAN:  It is me.  What I would suggest that we do

23    Your Honor is, when we file the amended complaint we will

24    consolidate the plaintiffs so we are not dealing with two

25    separate cases.

1       THE COURT:  OK.  That does it.

2       MS. FEGAN:  Thank you.

3       Mr. Finzi?

4       MR. FINZI:  Your Honor, how do you want us to deal

5  with -- many of the issues are common issues, and they are

6  actually the same for all the defendants.  There are some

7  issues based on differences between us, sometimes plainly

8  factual --

9       THE COURT:  You can do one of two things.  You can

10  file your brief at the same time, but dealing only with your

11  individual issues, nothing else.

12       MR. FINZI:  OK.

13       THE COURT:  Or you can give Mr. Putnam a section to

14  add on.

15       MR. FINZI:  We will figure it out, your Honor.

16       THE COURT:  Either one.  But I will take separate

17  briefs that are confined to a particular issue.

18       MR. PUTNAM:  Thank you, your Honor.

19       THE COURT:  Anything else?

20       Thank you for splendid argument.

21       Thank you, Ms. Fegan.

22       Thank you, Mr. Putnam.

23       MS. FEGAN:  Thank you, your Honor.

24       MR. PUTNAM:  Thank you, your Honor.

25       (Adjourned)