**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUISETTE GEISS, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA THOMPSON, MELISSA SAGEMILLER, NANNETTE MAY (f/k/a NANNETTE KLATT), KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, and JANE DOE, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX FILM NY LLC, THE WALT DISNEY COMPANY, DISNEY ENTERPRISES, INC., BUENA VISTA INTERNATIONAL, INC., HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MICHAEL EISNER, IRWIN REITER, DAVID GLASSER, FRANK GIL, RICK SCHWARTZ, FABRIZIO LOMBARDO, MARK GILL, NANCY ASHBROOKE, BARBARA SCHNEEWEISS, MIRAMAX DOES 1-10, TALENT AGENCY DOES 1-100, and JOHN DOES 1-50, inclusive,<br><br>     Defendants. | No. 1:17-cv-09554-AKH<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

**FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ............................................................................8

III.   THE PARTIES......................................................................................................9

      A.     Plaintiffs .....................................................................................................9

              1.     Louisette Geiss...............................................................................9

              2.     Katherine Kendall. ........................................................................9

              3.     Zoe Brock......................................................................................10

              4.     Sarah Ann Thomas.........................................................................10

              5.     Melissa Sagemiller.......................................................................11

              6.     Nannette Klatt. .............................................................................11

              7.     Caitlin Dulany...............................................................................11

              8.     Larissa Gomes................................................................................12

              9.     Melissa Thompson. .......................................................................12

             10.    Jane Doe.........................................................................................13

      B.     Defendants .................................................................................................13

IV.   FACTS ..................................................................................................................22

      A.     Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive........................................................22

      B.     Hollywood business, which includes the business of performing, is regularly conducted on the road and at hotels........................................................23

      C.     Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class. ...........................28

      D.     Like many of the Class members, Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, and Larissa Gomes, were assaulted when Weinstein worked for Miramax and Disney................................39

              1.     Plaintiff Nannette Klatt's experience (1993 or 1994)...............39

2. Plaintiff Katherine Kendall's experience (1993). .....................................41

3. Plaintiff Caitlin Dulany's experience (1996). ............................................46

4. Plaintiff Zoe Brock's experience (1998)....................................................52

5. Plaintiff Melissa Sagemiller's experience (2000)......................................55

6. Plaintiff Larissa Gomes' experience (2000). .............................................58

E. Like many Class members, Plaintiff Jane Doe's experience with Weinstein
occurred over a period of years (2002-2011) when Weinstein worked for Disney
and Miramax, and then TWC................................................................................62

F. Like many Class members, Plaintiffs Lousiette Geiss, Sarah Ann Thomas, and
Melissa Thompson's experiences followed the same script when Weinstein
worked for TWC. ...................................................................................................70

1. Plaintiff Louisette Geiss's experience (2008)............................................70

2. Plaintiff Sarah Ann Thomas's (a/k/a Sarah Ann Masse) experience
(2008)........................................................................................................72

3. Plaintiff Melissa Thompson's experience (2011). .....................................74

G. Employees and Executives of Miramax and Disney facilitated, had knowledge of
or should have known of Weinstein's predatory behavior. ...................................86

1. Employees and executives of Miramax and Disney often aided and abetted
Weinstein in the commission of his sexual misconduct. ...........................86

2. Disney Officer Michael Eisner (1993-2005) knew or should have known
of Weinstein's pattern of sexual misconduct. ............................................94

3. Miramax Officer Robert Weinstein (1979-2005) knew or should have
known of Harvey Weinstein's predatory sexual misconduct. ...................97

4. Miramax Officer Irwin Reiter (1989-2005) knew or should have known of
Harvey Weinstein's predatory sexual misconduct...................................102

5. Miramax Officer Mark Gill (1997-2002) knew or should have known of
Harvey Weinstein's predatory sexual misconduct...................................103

6. Miramax Officer Barbara Schneeweiss (1996-2005) knew or should have
known of Harvey Weinstein's predatory sexual misconduct. .................105

7. Miramax Officer Rick Schwartz (1999-2006) knew or should have known
of Harvey Weinstein's predatory sexual misconduct. .............................107

010717-11 1076419 V1

8.      Miramax Officer Fabrizio Lombardo (1999-2004) knew or should have known of Harvey Weinstein's predatory sexual misconduct. .................108

9.      Miramax Officer Nancy Ashbrooke (1991-2000) knew or should have known of Harvey Weinstein's predatory sexual misconduct. .................110

H.      Officers, Directors, and Employees of TWC facilitated, had knowledge of or should have known of Weinstein's predatory behavior......................................112

1.      Harvey Weinstein's employment contracts, approved by the Board, served to insulate him from recourse for sexual misconduct. .............................112

2.      Employees of TWC often aided and abetted Weinstein in the commission of his sexual misconduct..........................................................................115

3.      Director Robert Weinstein (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................118

4.      Director Lance Maerov (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator............126

5.      Director Tarak Ben Ammar (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................132

6.      Director Richard Koenigsberg (October 21, 2005-October 14, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................137

7.      Director Dirk Ziff (October 21, 2005-April 30, 2009; in or about 2011 - October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator..........................................................................143

8.      Director Jeff Sackman (September 21, 2010-October 6, 2015) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................148

9.      Director Tim Sarnoff (June 25, 2013-October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator............153

10.     Director James Dolan (September 30, 2015 - June 20, 2016) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................158

11.     Director Paul Tudor Jones (October 20, 2015-October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................................................164

12. Director Marc Lasry (June 20, 2016 to October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. ...........168

13. TWC's President and Chief Operating Officer David Glasser (2008-February 16, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................................171

14. TWC's Vice President of Human Resources Frank Gil (2007-October 9, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. .......................................................................173

15. Irwin Reiter, TWC's Executive Vice President for Accounting and Financial Reporting (October 21, 2005-2017), knew or should have known that Harvey Weinstein was a serial sexual predator. ...............................175

16. TWC Officer Barbara Schneeweiss (2005-2017) knew or should have known of Harvey Weinstein's predatory sexual misconduct. .................176

I. The TWC Board's termination of Harvey Weinstein is too little, too late. .........178

J. The statutes of limitations are tolled by equitable estoppel, duress, and the continuing violations doctrine...............................................................180

1. The statutes of limitations for negligent retention and supervision, ratification, and RICO claims are tolled by equitable estoppel. ..............181

2. The statutes of limitations for Plaintiffs' RICO and infliction of emotional distress claims are tolled by duress. .........................................188

3. The statutes of limitations for Plaintiffs' RICO and state law tort claims are tolled by the continuing violations doctrine......................................195

V. CLASS ALLEGATIONS .................................................................198

VI. CAUSES OF ACTION .................................................................202

COUNT I VIOLATION OF 18 U.S.C. § 1591, 1595 (SEX TRAFFICKING) (PLAINTIFFS GEISS, THOMAS AND THOMPSON VERSUS HARVEY WEINSTEIN)................202

COUNT II VIOLATION OF 18 U.S.C. § 1591, 1595 (PARTICIPATION IN A VENTURE ENGAGED IN SEX TRAFFICKING) (PLAINTIFFS GEISS, THOMAS AND THOMPSON VERSUS TWC, THE TWC DIRECTORS AND TWC OFFICERS)......205

COUNT III NEGLIGENT SUPERVISION AND RETENTION (KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX OFFICERS) .................................................................207

COUNT IV  NEGLIGENT SUPERVISION AND RETENTION  (GEISS, THOMAS, THOMPSON, AND JANE DOE VERSUS TWC, TWC'S DIRECTORS, AND TWC'S OFFICERS) ..................................................................................................208

COUNT V  VIOLATION OF 18 U.S.C. § 1962(C) (ALL PLAINTIFFS VERSUS MIRAMAX, MIRAMAX OFFICERS, TWC, TWC DIRECTORS, TWC OFFICERS) ....................209

    1.    The association in fact. ..........................................................................209

    2.    The common purpose.............................................................................210

    3.    The roles of the participants..................................................................211

    4.    Pattern of racketeering and predicate acts. ..........................................213

    5.    Predicate acts of tampering with a victim.............................................221

    6.    Predicate acts of mail and wire fraud....................................................222

    7.    Affected interstate commerce. ..............................................................233

    8.    Operation and management. ..................................................................233

    9.    RICO injury. ..........................................................................................234

COUNT VI  VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (ALL PLAINTIFFS VERSUS MIRAMAX, MIRAMAX OFFICERS, TWC, TWC OFFICERS, TWC DIRECTORS)............................................237

COUNT VII  CIVIL BATTERY (MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS DISNEY, MICHAEL EISNER, MIRAMAX, MIRAMAX OFFICERS)..................................................................................................238

COUNT VIII  CIVIL BATTERY  (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON, AND JANE DOE VERSUS TWC, TWC DIRECTORS AND TWC OFFICERS)................................................................................................240

COUNT IX  ASSAULT  (MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS DISNEY, MICHAEL EISNER, MIRAMAX, MIRAMAX OFFICERS).......241

COUNT X  ASSAULT  (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)................................................................................................243

COUNT XI  FALSE IMPRISONMENT (KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES,

010717-11 1076419 V1

BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX
OFFICERS)....................................................................................................244

COUNT XII  FALSE IMPRISONMENT  (LOUISETTE GEISS, SARAH ANN THOMAS,
MELISSA THOMPSON, AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND
TWC OFFICERS)...........................................................................................245

COUNT XIII  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (KATHERINE
KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT,
CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX,
WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL,
MICHAEL EISNER AND MIRAMAX OFFICERS)......................................247

COUNT XIV  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (LOUISETTE
GEISS, SARAH ANN THOMAS, MELISSA THOMPSON, AND JANE DOE VERSUS
TWC, TWC DIRECTORS, AND TWC OFFICERS)......................................248

COUNT XV  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (KATHERINE
KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT,
CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX,
WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL,
MICHAEL EISNER AND MIRAMAX OFFICERS)......................................250

COUNT XVI  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (LOUISETTE
GEISS, SARAH ANN THOMAS, MELISSA THOMPSON AND JANE DOE VERSUS
TWC, TWC DIRECTORS, AND TWC OFFICERS)......................................251

COUNT XVII  RATIFICATION  (KATHERINE KENDALL, ZOE BROCK, MELISSA
SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND
JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES,
BUENA VISTA INTERNATIONAL, EISNER AND MIRAMAX OFFICERS)..........253

COUNT XVIII  RATIFICATION  (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA
THOMPSON AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC
OFFICERS)....................................................................................................254

PRAYER FOR RELIEF ............................................................................................255

010717-11 1076419 V1

Plaintiffs Louisette Geiss, Katherine Kendall, Zoe Brock, Sarah Ann Thomas, Melissa Sagemiller, Nannette May (f/k/a Nannette Klatt) ("Nannette Klatt"), Caitlin Dulany, Larissa Gomes, Melissa Thompson, and Jane Doe, individually and on behalf of all others similarly situated, complain of The Weinstein Company Holdings, LLC ("TWC"), Miramax Film NY LLC ("Miramax"), The Walt Disney Company ("Walt Disney"), Disney Enterprises, Inc. ("Disney Enterprises"), Buena Vista International, Inc. ("Buena Vista") (Walt Disney, Disney Enterprises and Buena Vista may collectively be referred to as "Disney"), Harvey Weinstein ("Weinstein" or "Harvey Weinstein"), Robert Weinstein ("Robert Weinstein"), Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan (Harvey Weinstein, Robert Weinstein, Ziff, Sarnoff, Sackman, Lasry, Ben Ammar, Maerov, Koenigsberg, Jones, and Dolan may collectively be referred to as "TWC Directors" or "Board"), Irwin Reiter, David Glasser, Frank Gil (Harvey Weinstein, Robert Weinstein, Reiter, Glasser, Gil, and Schneeweiss may collectively be referred to as "TWC Officers"), Michael Eisner, Nancy Ashbrooke, Rick Schwartz, Fabrizio Lombardo, Mark Gill (Harvey Weinstein, Robert Weinstein, Ashbrooke, Schwartz, Lombardo, Reiter, Schneeweiss, and Gill may collectively be referred to as "Miramax Officers"),  as follows:

## I.    INTRODUCTION

1.    When this lawsuit and later the *Dulany* action were launched, Plaintiffs attacked the proverbial "casting couch" as Harvey Weinstein's office of choice, which they alleged was a choice facilitated and condoned by Miramax, Disney, TWC, and their respective officers and directors.  What they did not know was just how deep the knowledge ran.

2.    Today, just over one year since the filing of the original complaint and without the benefit of any investigative powers or discovery, Plaintiffs have learned that knowledge of

- 1 -

Harvey Weinstein's "odious" and "rotten" sexual misconduct – his "voracious rapacity; like a gluttonous ogre out of the Brothers Grimm" – ran deep.[1]

3.      Defendants knew. According to a Miramax screenwriter from 1994 to the early 2000s, "Everybody-f******- knew." [2]

4.      What did they know? They knew of "a certain pattern of overly-aggressive behavior that was rather dreadful. We knew about the man's hunger; his fervor; his appetite. All couched in vague promises of potential movie roles." [3]

5.      But women were silenced. According to the screenwriter:

> …if they [Harvey Weinstein's victims] discussed it with their representatives? Agents and managers, who themselves feared The Wrath Of The Big Man? The agents and managers would tell them to keep it to themselves. Because who knew the repercussions? That old saw "You'll Never Work In This Town Again" came crawling back to putrid life like a re-animated cadaver in a late-night zombie flick. But, yes, everyone knew someone who had been on the receiving end of lewd advances by him. Or knew someone who knew someone.[4]

6.      So, why did Defendants remain silent? Because (according to the Miramax screenwriter):

> The most epic Oscar weekends.
> That seemed to last for weeks!
> Sundance! Cannes! Toronto!
> Telluride! Berlin! Venice!
> Private jets! Stretch limousines! Springsteen shows!

---

[1] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[2] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[3] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[4] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

           \*      \*      \*

> So what if he was coming on a little strong to some young models who
> had moved mountains to get into one of his parties?
> So what if he was exposing himself, in five-star hotel rooms, like a
> cartoon flasher out of "MAD MAGAZINE" (just swap robe for raincoat!)
> Who were we to call foul?
> Golden Geese don't come along too often in one's life.
>
> Which goes back to my original point:
> Everybody-f\*\*\*\*\*\*-knew.
> But everybody was just having too good a time.
> And doing remarkable work; making remarkable movies.[5]

7.      And, the TWC Directors, who "all had close social ties to the famous producer,"

didn't speak up about Harvey Weinstein's conduct either, because:

> 'Weinstein traded on those friendships, on his social currency,'
> says Maerov. 'He spun a kind of spiderweb,' says Ben Ammar.
> 'He had three tables at the Oscars, he had Emmy parties, he hosted
> bankers, investors and politicians at glamorous events. He could be
> so charming. He was Mr. Charming and Mr. Bully all in one. Lots
> of prominent people, including TWC directors, got caught in the
> spiderweb.'[6]

8.      Plaintiffs, and hundreds of other females like them, found themselves with

Weinstein on the casting couch at offices, in hotel rooms, in his homes, or in rooms at industry

functions. Under the guise of meetings ostensibly to help further Plaintiffs' careers, or to hire

them, or to make a business deal with them, or to network at industry events, Weinstein isolated

Plaintiffs and Class members in an attempt to engage in unwanted sexual conduct that took many

forms: flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault,

attempted rape, and/or completed rape.

---

[5] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[6] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

9.      Plaintiffs and members of the Class had or wanted to have careers or wanted to make deals in the entertainment industry and correctly understood that Weinstein was a powerful force in the entertainment production world.  At all times, Plaintiffs and the Class operated under duress and the credible and objective threat of being threatened, deceived, or blacklisted by Weinstein and major film producers such as Miramax and TWC if they refused Weinstein's unwanted sexual advances or complained about his behavior. To the extent a woman was "lucky" enough to escape physically unscathed, Weinstein's behavior (and the fact it was facilitated by Defendants) nonetheless caused injury to her business prospects, career, and reputation, and caused severe emotional and physical distress.

10.     Weinstein's power and the pervasiveness of his misconduct were summarized in *The New Yorker* as follows:

> Since the establishment of the first studios, a century ago, there have been few movie executives as dominant, or as domineering, as Harvey Weinstein.  He co-founded the production-and-distribution companies Miramax and the Weinstein Company, helping to reinvent the model for independent films with movies including "Sex, Lies, and Videotape," "The Crying Game," "Pulp Fiction," "The English Patient," "Shakespeare in Love," and "The King's Speech."  Beyond Hollywood, he has exercised his influence as a prolific fund-raiser for Democratic Party candidates, including Barack Obama and Hillary Clinton.  Weinstein combined a keen eye for promising scripts, directors, and actors with a bullying, even threatening, style of doing business, inspiring both fear and gratitude.  His movies have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies, he has been thanked more than almost anyone else in movie history, ranking just after Steven Spielberg and right before God.

> For more than twenty years, Weinstein, who is now sixty-five, has also been trailed by rumors of sexual harassment and assault.  His behavior has been an open secret to many in Hollywood and beyond, but previous attempts by many publications, including *The New Yorker*, to investigate and publish the story over the years fell short of the demands of journalistic evidence.  Too few people were willing to speak, much less allow

010717-11 1076419 V1

a reporter to use their names, and Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts.  Asia Argento, an Italian film actress and director, said that she did not speak out until now—Weinstein, she told me, forcibly performed oral sex on her—because she feared that Weinstein would "crush" her.  "I know he has crushed a lot of people before," Argento said.  "That's why this story—in my case, it's twenty years old, some of them are older—has never come out."

11.     On October 5, 2017, *The New York Times*, in a report by Jodi Kantor and Megan Twohey, revealed multiple allegations of sexual harassment against Weinstein, an article that led to the resignation of four members of the TWC's all-male board and to Weinstein's firing.[7]

12.     Weinstein's widespread sexual misconduct did not occur without the help of others.  Rather, over time, Weinstein enlisted the aid:

a.     of Miramax and Disney employees to help procure and deceive potential victims, whom they delivered to Harvey Weinstein under the guise of official business knowing that the victims would be sexually assaulted;

b.     of Miramax Officers Lombardo, Schwartz and Schneeweiss to help procure and deceive potential victims, who they delivered to Harvey Weinstein under the guise of official business knowing that the victims would be sexually assaulted;

c.     of Eisner and Disney who reviewed, approved and paid Miramax's and Harvey Weinstein's expense reports, which included expenses for hotel suites and other expenses associated with assault victims;

d.     of Disney employees, including Eisner, and Miramax Officers who knew of and approved Weinstein's use of corporate funds to perpetuate the assaults, knew of

---

[7] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

complaints against Weinstein but took no action in dereliction of their duties (or took action to silence the victims rather than address the perpetrator), and/or who made or knew of and approved settlement payouts to victims of Harvey Weinstein's sexual assaults;

e.    of TWC Officer Schneeweiss and employees to help procure and deceive potential victims, who they delivered to Harvey Weinstein under the guise of official business knowing that the victims would be sexually assaulted;

f.    of TWC which paid, at the direction of TWC Officers, lawyer David Boies, Kroll Associates, Inc. and Corporate Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence, and other companies to cover-up Harvey Weinstein's pattern of assault and to silence his victims;

g.    of TWC's Directors, Robert Weinstein, Ziff, Sarnoff, Sackman, Lasry, Ben Ammar, Maerov, Koenigsberg, Jones, and Dolan, who knew of many complaints against Weinstein but who nonetheless deliberately chose not to conduct an independent investigation of any misconduct but instead took the word of the perpetrator at face value in dereliction of their duties;

h.    of TWC Officers Robert Weinstein, Reiter, Glasser, Gil, and Schneeweiss, who knew of and approved Weinstein's use of corporate funds to perpetuate the assaults and silence his victims, knew of complaints against Weinstein but took no action in dereliction of their duties (or took action to silence the victims rather than address the perpetrator), implemented human resources procedures that would result in retaliation against victims, and/or made or knew of and approved settlement payouts to victims of Harvey Weinstein's sexual assaults.

13.     Weinstein also engaged or directed private investigators, a "global provider of risk solutions," lawyers, and others (collectively, the "Weinstein Sexual Enterprise," or, as *The New Yorker* calls them, "Weinstein's Army of Spies"[8]) to harass, threaten, extort, and mislead both Weinstein's victims and the media to prevent, hinder, and avoid the prosecution, reporting, or disclosure of his sexual misconduct. Weinstein and certain members of the Weinstein Sexual Enterprise also either directed or facilitated the Weinstein Sexual Enterprise's destruction, mutilation, and concealment of records, documents, and/or other evidence in an effort to prevent the use of such evidence to reveal his sexual offenses.

14.     Plaintiffs seek certification of a Rule 23(c)(4) class for liability for sex trafficking, negligent retention and supervision, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil battery, assault, false imprisonment, intentional and negligent infliction of emotional distress, and ratification.  Defendants' conduct has caused widespread damage, including personal injury, emotional distress, and damage to the careers of Plaintiffs and the Class, for which Defendants must be held responsible.

15.     Plaintiffs Geiss, Thomas and Thompson bring Count I, individually and on behalf of the TWC Subclass, for violations of 15 U.S.C. § 1591 (sex trafficking) against Harvey Weinstein and Count II for violations of 15 U.S.C. § 1591, 1595 (participation in a venture engaged in sex trafficking) against TWC, the TWC Directors and TWC Officers.

16.     All Plaintiffs bring Count V for violation of 18 U.S.C. § 1962(c) and Count VI for violation of 18 U.S.C. § 1962(d), individually and on behalf of the Nationwide Class, against Miramax, Miramax Officers, TWC, TWC Directors, and TWC Officers.

---

[8] Ronan Farrow, *Harvey Weinstein's Army of Spies*, THE NEW YORKER (Nov. 6, 2017), https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies/.

17.     Plaintiffs Kendall, Brock, Sagemiller, Klatt, Dulany, Gomes and Doe bring Count III for negligent retention and supervision, Count VII for battery, Count IX for assault, Count XI for false imprisonment, Count XIII for intentional infliction of emotional distress, Count XV for negligent infliction of emotional distress, and Count XVII for ratification, individually and on behalf of the Miramax Subclass, against Miramax, Walt Disney, Disney Enterprises, Buena Vista International, Eisner and the Miramax Officers.

18.     Plaintiffs Geiss, Thomas, Thompson and Doe bring Count IV for negligent retention and supervision, Count VIII for battery, Count X for assault, Count XII for false imprisonment, Count XIV for intentional infliction of emotional distress, Count XVI for negligent infliction of emotional distress, and Count XVIII for ratification, individually and on behalf of the TWC Subclass, against TWC, TWC Directors, and TWC Officers.

## II.     JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

20.     This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a State different from that of Plaintiffs and members of the Class. This Court also has subject matter jurisdiction over Plaintiffs' and the proposed Class's claims pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*,

substantial parts of the events or omissions giving rise to the claim occurred in the District and/or

a substantial part of property that is the subject of the action is situated in the District.

### III.     THE PARTIES

**A.     Plaintiffs**

22.     Full descriptions of each of the Plaintiffs' experiences can be found in Section IV,

*infra.*

### 1.     Louisette Geiss.

23.     Plaintiff Louisette Geiss is a citizen of the United States and resident of Santa

Monica, California. Geiss met with Weinstein, at his invitation, to pitch him a script to

potentially be produced by TWC.  During her pitch, and while being offered a three-picture deal

as an actress, Geiss was assaulted by Weinstein, threatened, and falsely imprisoned. She suffered

and continues to suffer emotional and physical distress. Geiss was injured in her property or

livelihood as a result of Weinstein's actions, because Weinstein did not follow-through on his

promise of a three-picture deal through TWC and/or Dimension Films as an actress.

### 2.     Katherine Kendall.

24.     Plaintiff Katherine Kendall is a citizen of the United States and resident of Los

Angeles, California.  Kendall met with Weinstein to discuss roles in movies to be produced by

Miramax and because he told her he would introduce her to people in the industry. During the

course of their meetings, Weinstein imprisoned her in his apartment, threatened and assaulted

her, causing her significant and ongoing physical and emotional distress. Kendall was injured in

her property or livelihood as a result of Weinstein's actions, because Weinstein and Miramax did

not cast Kendall in the movies Beautiful Girl and Things to Do In Denver When You're Dead –

even though Weinstein gave her the scripts and told her he had parts for her in those movies, and

even after she was expressly welcomed into the "Miramax family." In 2017 Kendall was further injured when she was targeted by spies whose purpose was to gather information concerning her assault for the purpose of harming her causes of action and/or preventing her from filing suit.

  **3. Zoe Brock.**

25. Plaintiff Zoe Brock is a lawful permanent resident of the United States who previously resided in the state of California and is currently residing in Australia.  Miramax employees tricked Brock into being alone in Weinstein's hotel room with him during the Cannes Film Festival. Brock was assaulted by Weinstein, threatened, and falsely imprisoned. She suffered and continues to suffer significant emotional and physical distress.  Brock was injured in her property or livelihood as a result of Weinstein's actions; Weinstein did not give her any work after telling her he was going to "make her a star" and be her "Rock of Gibraltar."

  **4. Sarah Ann Thomas.**

26. Plaintiff Sarah Ann Thomas is a citizen of the United States and resident of North Hollywood, California. Thomas is registered as Sarah Ann Masse with the union known as SAG-AFTRA, which is a combination of the two labor unions known as the Screen Actors Guild and the American Federation of Television and Radio Artists. TWC employees arranged for Thomas to interview with Weinstein for a nanny position at his home. Ms. Thomas arrived and was shocked to find Weinstein in his underwear. Weinstein conducted the interview in his underwear, embraced Thomas in a sexual manner, and did not give her the job when she did not take him up on his sexual propositions. She suffered significant emotional and physical distress. Thomas was injured in her property or livelihood as a result of Weinstein's actions, because Thomas did not receive the job as Weinstein's nanny. Moreover, Thomas was told in December 2017 that she was blacklisted as an actress as a result of her accusations against Weinstein and has since seen an 86% drop in auditions.

### 5.    Melissa Sagemiller.

27.    Plaintiff Melissa Sagemiller is a citizen of the United States and resident of Los

Angeles, California. During the filming of a movie that was being distributed by Miramax,

Sagemiller met with Weinstein at his assistant's request purportedly to discuss changes to the

script. Weinstein imprisoned her in his hotel room and later on his airplane, and he threatened

and assaulted her, causing her significant emotional and physical distress. Sagemiller was injured

in her property or livelihood as a result of Weinstein's actions, because Sagemiller auditioned for

a movie called 40 Days and 40 Nights, but did not get the part. On information and belief, the

casting director Joseph Middleton was told by Weinstein to blacklist Sagemiller, resulting in

Middleton making it known that he did not like Sagemiller.

### 6.    Nannette Klatt.

28.    Plaintiff Nannette Klatt is a citizen of the United States and a resident of

Lancaster, California.  Klatt auditioned with Weinstein for a part in a Miramax production.

During her audition, Klatt was assaulted by Weinstein, threatened, falsely imprisoned, and

suffered significant emotional and physical distress.  Klatt was injured in her property or

livelihood as a result of Weinstein's actions, because Weinstein withdrew the offer he had given

her for a part because she would not accede to his advances.

### 7.    Caitlin Dulany.

29.    Plaintiff Caitlin Dulany is a citizen of the United States and resident of Studio

City, California. Dulany met Weinstein outside the Miramax offices in New York City in 1996.

From there, she began to spend time with Weinstein, and he took steps to earn her trust as a

friend and mentor. That same year, Weinstein assaulted, threatened, and falsely imprisoned

Dulany in her apartment in New York City. Then several months later, Weinstein sexually

assaulted, battered, threatened, and falsely imprisoned Dulany in his Miramax hotel suite at the

- 11 -

Cannes Film Festival. As a result, Dulany suffered severe emotional and physical distress.

Dulany was injured in her property or livelihood as a result of Weinstein's actions, because she

was not cast in several films for which she auditioned that were being produced by Miramax's

Scott Rosenberg, who was told, on information and belief, by Weinstein to not cast Dulany

despite Weinstein's promises to her and despite Rosenberg's statements that Dulany was "really

good."

        **8.**    **Larissa Gomes.**

      30.     Plaintiff Larissa Gomes is a citizen of Canada and a lawful permanent resident of

the United States. She resides in Los Angeles, California. Gomes met with Weinstein twice to

discuss opportunities to work as an actor, singer, and dancer in Miramax films. On the second

occasion, Weinstein imprisoned Gomes in his hotel room and threatened, battered, and assaulted

her, causing her significant physical and emotional distress.  Gomes was injured in her property

or livelihood as a result of Weinstein's actions: Gomes was not included on Miramax's roster of

go-to talent in Toronto as Weinstein had promised; and Gomes was not cast in any Miramax

films in Canada as Weinstein had promised.

        **9.**    **Melissa Thompson.**

      31.     Plaintiff Melissa Thompson is a citizen of the United States and a resident of

Stamford, Connecticut. Thompson pitched a new technology platform for use in marketing TWC

films and productions. During the pitch at TWC's offices, Thompson was sexually harassed by

Weinstein. Weinstein subsequently sexually assaulted Thompson, causing her severe emotional,

psychological, and physical distress.  Thompson was injured in her property or livelihood as a

result of Weinstein's actions, because Weinstein did not produce the TV show in which he cast

Thompson (and several other victims), which was promised as payback to her and several other

assault victims.  Moreover, in October 2017, Weinstein's attorneys, Benjamin Brafman and Alex

Spiro, used deceptive tactics to cause her to believe that Brafman and Spiro were working for the victims in order to entice her to turn over her visual and audio evidence of Weinstein's actions (which she did). She did not learn that Brafman was actually Weinstein's attorney until after turning over the evidence in her possession, causing her credible fear for her safety, severe emotional distress, and injury to her causes of action.

**10.    Jane Doe.**

32.      Jane Doe is a resident and citizen of Poland. She met Weinstein when she was 16 years old at an event with her modeling agency in New York City. He then lured her to his apartment and sexually assaulted her, and he continued to emotionally abuse and sexually harass her for nearly a decade thereafter. As a result, Jane Doe has experienced severe emotional and physical distress. Jane Doe was injured in her property or livelihood as a result of Weinstein's actions, because Weinstein told Jane Doe he would help her secure an ensemble role in a movie, but he never did despite years of acting as the gatekeeper for and barrier to the industry because she would not give in to his sexual demands.

**B.    Defendants**

33.      Defendant The Weinstein Company Holdings, LLC is a Delaware limited liability company whose principal place of business is in New York City, New York.

34.      Miramax Film NY, LLC is a New York corporation with its principal place of business in Santa Monica, California.  In 2010, Miramax Film NY, LLC merged with and assumed all liabilities of Miramax Film Corp., which was the Miramax entity that employed Harvey Weinstein or for which Harvey Weinstein acted as an officer or director. Miramax Film Corp. was a subsidiary of The Walt Disney Company.

35.      The true names and capacities of the defendants named herein as Miramax Does 1-10 are unknown to Plaintiffs, who therefore sue them under these fictitious names.  Plaintiffs'

counsel has asked Miramax's counsel on several occasions for information about the various Miramax entities to identify the correct entities to be sued, but Miramax's counsel has not shared any information other than as to the Miramax entity named in this complaint. Plaintiffs will amend their complaint to add their true names and capacities when they become known.

36.     The Walt Disney Company ("Walt Disney") is a Delaware corporation with its principal place of business located in Burbank, California. Miramax Film Corp., Walt Disney and Harvey Weinstein entered into two employment agreements effective for the periods 1993 to 1995 and 1995 to 1999.[9] According to a former employee of Disney and Miramax, Walt Disney paid Miramax's employees; Walt Disney controlled the budget for Miramax; Walt Disney approved (or vetoed) requests for increased film budgets from Miramax; Walt Disney audited Miramax's books; and Walt Disney reviewed, approved and paid the business expenses of Miramax.[10]  According to former Miramax employee and Harvey Weinstein's executive assistant Barbara Schneeweiss, Schneeweiss was jointly employed by Miramax and Walt Disney from 1997 until the end of 2000.[11]

37.     Michael D. Eisner is a resident of Bel Air, California and a citizen of the United States. Eisner was Chairman and CEO of Walt Disney from 1984-2005.[12]  On behalf of Walt Disney, Eisner agreed to purchase Miramax, despite "the parade of controversy the Weinsteins

---

[9] *Doe v. Weinstein*, 2018 ONSC 2122 (Can. Ont. S.C.J. Mar. 19, 2018), available at http://canlii.ca/t/hrg30.

[10] Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. Justice).

[11] Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. Justice).

[12] Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. Justice).

- 14 -

trailed in their wake. To [his direct reports'] surprise, he went for it."[13]  "As for controlling the

brothers, …Eisner had always been able to hammer anyone who got out of line, so he didn't

think he needed to worry about that." [14] Harvey Weinstein reported directly to Eisner. Despite

knowledge of Harvey Weinstein's conduct, Eisner delegated responsibility and oversight of

Harvey Weinstein and Miramax to one or more Walt Disney employees.

38.     Disney Enterprises, Inc. ("Disney Enterprises") is a Delaware corporation with its

principal place of business in Burbank, California. Disney Enterprises and Miramax entered a

1999 employment agreement with Harvey Weinstein, and Disney Enterprises' agreed to be

jointly and severally liable with Miramax from 1999 until the expiration of the employment

agreement in or about 2005.

39.     Buena Vista International, Inc. ("Buena Vista") is a California corporation with

its principal place of business located at 500 S. Buena Vista St., Burbank, CA 91521-0001.

Buena Vista is a subsidiary of Disney Enterprises.  Buena Vista employed and paid the salaries

of many of the people who performed work for Miramax and who helped facilitate Harvey

Weinstein's pattern of assaults overseas, including but not limited to Defendant Fabrizio

Lombardo, who was head of Miramax's Italian division.[15]

40.     Defendant Harvey Weinstein is a citizen of the United States and a resident of

Westport, Connecticut.  He is a former co-chairman of Miramax, and was Co-Chairman and a

Director of TWC from October 21, 2005 to October 7, 2017.

---

[13] Peter Biskind, Down and Dirty Pictures (2004), at 149.

[14] Peter Biskind, Down and Dirty Pictures (2004), at 150.

[15] https://www.vanityfair.it/people/mondo/2017/10/13/fabrizio-lombardo-im-not-man-procured-girls-harvey-weinstein

41.     Defendant Robert Weinstein is a citizen of the United States and a resident of Greenwich, Connecticut.  Robert Weinstein is the brother of Harvey Weinstein, the former chairman of Miramax, and was a Director and Co-Chairman of TWC from October 21, 2005 to July 13, 2018. Robert Weinstein has known of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women, including during the time the brothers worked at Miramax and TWC.

42.     Defendant Dirk Ziff is a citizen of the United States and a resident of New York, New York.  Dirk Ziff was a director of TWC from October 2005 to April 30, 2009, and from in or about 2011 to October 6, 2017. A couple of years after TWC's launch, Ziff allegedly extended TWC a lifeline in the form of a loan worth tens of millions of dollars. In 2009, TWC underwent a major restructuring in which the lenders exchanged debt for a large portion of the equity.  Ziff and Harvey Weinstein were renowned in show-biz circles for partying together. In a 2012 interview on CNN, Weinstein boasted that he and Ziff had a blast when years earlier they had chaperoned a young Chelsea Clinton at a concert at a rock club on Martha's Vineyard. Ziff was considered by members of the TWC Board as a "Harvey Loyalist," who made decisions based on his personal friendship with Weinstein and the benefits Harvey would throw his way – such as invites to the Oscars and other Hollywood events. Ziff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

43.     Defendant Tim Sarnoff is a citizen of the United States and a resident of Westlake Village, California.  Sarnoff is the President of Technicolor's Production Services Division, which counted TWC as one of its customers.  Tim Sarnoff was a director of TWC from June 25, 2013 to October 6, 2017.  Sarnoff was considered by members of the TWC Board as a "Harvey

- 16 -

Loyalist," who made decisions based on his personal friendship with Weinstein and the benefits Harvey would throw his way such as invites to the Oscars and other Hollywood events. Sarnoff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

44.    Defendant Marc Lasry is a citizen of the United States and a resident of New York, New York.  Marc Lasry was a director of TWC from in or about June 20, 2016 to October 6, 2017. Lasry knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

45.    Defendant Tarak Ben Ammar is a citizen of Tunisia and currently resides in France.   Tarak Ben Ammar was a director of TWC from October 21, 2005 to July 13, 2018. Ammar knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC.  Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[16] According to Ammar, the majority of the then-TWC Board members supported renewing Weinstein's contract despite the serious assault allegations.[17]

46.    Defendant Lance Maerov is a citizen of the United States and a resident of Bedford, New York.  Maerov is an Executive Vice President at WPP, which is a holding group that invests in media companies.  Maerov serves on the boards of multiple media companies in which the holding group invests in order to protect WPP's interests. Because WPP became a

---

[16] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[17] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

minority stakeholder in The Weinstein Company in late 2005, Maerov was designated to sit on

TWC's Board.  Maerov was a director of TWC from March 18, 2013 to July 13, 2018, and was a

non-voting observer from late 2005 to March 17, 2013. Maerov knew of Weinstein's pattern and

practice of predatory sexual conduct toward women from his position as a director of TWC.

According to Maerov, for years prior to the 2015 Gutierrez allegations, he had heard from TWC

employees about complaints against Weinstein.[18]

48.     Defendant Richard Koenigsberg is a citizen of the United States and a resident of

Franklin Lakes, New Jersey.  Richard Koenigsberg was a director of TWC from October 21,

2005 through on or about October 14, 2017. Harvey and Robert Weinstein's long-time personal

accountant, Koenigsberg listed his firm's address as the main address for the Miriam and Max

Weinstein Foundation, which Harvey and Robert Weinstein formed in their parents' names to

support underprivileged children.   Koenigsberg was considered by the other Directors to be a

"Harvey Loyalist." Koenigsberg knew of Weinstein's pattern and practice of predatory sexual

conduct toward women from his personal relationship with Weinstein and his position as a

director of TWC.

48.     Defendant Paul Tudor Jones is a citizen of the United States and a resident of

Palm Beach, Florida.  Jones was a director of TWC from October 20, 2015 to October 7, 2017. A

personal friend of Harvey Weinstein, Jones was considered by the other Directors to be a

"Harvey Loyalist." Jones knew of Weinstein's pattern and practice of predatory sexual conduct

toward women from his personal relationship with Weinstein and his position as a director of

TWC.  In fact, even when the stories of assault were published in The New York Times, Jones

---

[18] *Id.*

was the only Director who did not vote to terminate Harvey Weinstein and the only then-acting Director who did not sign a statement condemning Harvey Weinstein's actions.

49.    Defendant Jeff Sackman is a citizen of the United States and, on information and belief, a resident of Toronto, Canada.  Sackman was a director of TWC from September 2010 to October 2015. Sackman knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

50.    Defendant James L. Dolan is a citizen of the United States and a resident of Miller Place, New York. Dolan was a director of TWC from about September 30, 2015 (before Harvey Weinstein's 2015 contract was approved) to June 20, 2016. Dolan was considered by members of the TWC Board as a "Harvey Loyalist," who made decisions based on his personal friendship with Weinstein and the benefits Harvey would throw his way such as invites to the Oscars and other Hollywood events.  Harvey publicly praised Dolan as "one of my and Bob's best friends" when Dolan left the board in June of 2016. Dolan knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

51.    Defendant David Glasser is a citizen of the United States and a resident of New York. Glasser was TWC's President and Chief Operating Officer since 2011. He worked at TWC from 2008 until his termination in February 2018.[19] He was known as Harvey Weinstein's and Robert Weinstein's "third brother," serving as Harvey Weinstein's right-hand man.[20] Glasser

---

[19] He purportedly left TWC for just a one-month hiatus in 2015 but returned for a three-year deal. http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

[20] http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his

personal relationship with Weinstein and his position as an officer of TWC.

52.     Defendant Irwin Reiter is a citizen of the United States and a resident of New

York. Reiter was the Executive Vice President for Accounting and Financial Reporting at TWC

from 2005 to at least 2017, and held the same position at Miramax from 1989-2005.[21] Reiter

knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his

long-time working relationship with Weinstein at both Miramax and TWC.

53.     Defendant Frank Gil is a citizen of the United States and a resident of New York.

Gil was the Vice President of Human Resources for TWC from April 2007 to October 2017. Gil

knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his

position in human resources at TWC.

54.     Defendant Rick Schwartz is a citizen of the United States and a resident of New

York. Schwartz was the Senior Vice President of Production at Miramax, where he worked from

1999 to 2006. Schwartz knew of Weinstein's pattern and practice of predatory sexual conduct

toward women from his personal relationship with Weinstein and his position as an officer at

Miramax.

55.     Defendant Fabrizio Lombardo is a citizen of Italy, who worked for Miramax and

was paid by Buena Vista from 1999-2004. Lombardo became friends with Harvey Weinstein in

the 1990s, accompanying Weinstein to the Cannes Film Festival from 1995 onward.  Miramax

hired Lombardo in late 1999 at Harvey Weinstein's insistence, despite the fact he had little to no

film experience.  Miramax identified Lombardo as a "handler of talent," Schwartz identified

---

[21] https://www.linkedin.com/in/irwin-reiter-58828a4/ (last accessed September 19, 2018).

Lombardo as working "in the area of personal relations," Lombardo described himself as being a "sort of cultural mediator,"[22] and a producer and friend of Lombardo described his role as a "broker of personal relations." Lombardo knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position at Disney and Miramax.

56.     Defendant Mark Gill is a resident of California and citizen of the United States. Gill joined Miramax in 1994 as head of marketing, based at its New York headquarters. Three years later, Gill relocated to Southern California and was named president of Miramax's Los Angeles office with responsibilities for development, production, post-production and acquisitions.[23] He left Miramax in 2002. Gill knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his positions at Miramax.

57.     Defendant Nancy Ashbrooke is a resident of New York and citizen of the United States. Ashbrooke was Vice President of Human Resources of Miramax from 1991 to 2000. Ashbrook knew of Weinstein's pattern and practice of predatory sexual conduct toward women from her position in human resources at Miramax.

58.     Defendant Barbara Schneeweiss is a resident of New York and citizen of the United States. Schneeweiss was the Vice President of Production and Development, Film & Television, for TWC from 2005 until in or about October 2017, and was the Vice President of Television Development at Miramax from 1996 to 2005. Throughout the period since 1996, Schneeweiss worked for and reported directly to Harvey Weinstein, and regularly procured and

---

[22] https://www.vanityfair.it/people/mondo/2017/10/13/fabrizio-lombardo-im-not-man-procured-girls-harvey-weinstein

[23] http://articles.latimes.com/2002/oct/16/business/fi-gill16

delivered victims to Harvey Weinstein in his office and hotel rooms knowing the women would be assaulted.

59.     By virtue of their positions as officers or directors of New York-based corporations, each of the Officer and Director Defendants availed themselves of the laws of New York and are subject to jurisdiction in New York.

## IV.     FACTS

**A.     Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive.**

60.     In the late 1970s, using profits from their concert promotion business, brothers Harvey and Robert Weinstein created a small independent film-distribution company named Miramax, named after their parents, Miriam and Max.  The company's first releases were primarily music-oriented concert films such as Paul McCartney's *Rockshow.  The Secret Policeman's Other Ball*, released in May 1982, became Miramax's first hit.  The Weinsteins slowly built upon this success throughout the 1980s with films that achieved both critical attention and modest commercial success.  Harvey Weinstein and Miramax gained wider attention in 1988 with the release of Errol Morris' documentary *The Thin Blue Line*, which detailed the struggle of Randall Adams, a wrongfully convicted Death Row inmate.  The publicity that soon surrounded the case resulted in Adams' release and nationwide publicity for Miramax.  In 1989, Steven Soderbergh's *Sex, Lies, and Videotape* propelled Miramax to become the most successful independent studio in America.

61.     Miramax continued to grow its library of films and directors. In 1993, after the success of *The Crying Game*, Disney offered to purchase Miramax from the Weinsteins for $80 million.  The Weinstein brothers agreed to the deal, which promised to cement their Hollywood clout and ensure that they would remain at the head of their company. The next year, Miramax

released its first blockbuster, Quentin Tarantino's *Pulp Fiction*, and distributed the popular

independent film *Clerks*.

62.     Miramax won its first Academy Award for Best Picture in 1997 with the victory

of The English Patient (Pulp Fiction was nominated in 1995 but lost to Forrest Gump).  This was

the first in a series of critical successes that included Good Will Hunting (1997) and Shakespeare

in Love (1998), both of which won numerous Academy Awards.

63.     The Weinstein brothers left Miramax on September 30, 2005, to form their own

production company, TWC, with several other media executives.  Attached as Exhibit A is a list

of Weinstein-produced films that demonstrates Weinstein's power and influence in the film

industry.

64.     Despite Disney's and Miramax's knowledge of Weinstein's conduct, Miramax

continued to work with Harvey Weinstein after he and his brother started TWC, including but

not limited to on the long-running Project Runway TV show.

65.     Plaintiffs and the Class were aware of Weinstein's ability to make or break their

careers, as well as to continue to inflict emotional distress.  Moreover, Weinstein wielded and

was outspoken about his power and ability to either launch their careers or ruin their personal

and professional reputations forever.

**B.      Hollywood business, which includes the business of performing, is regularly
         conducted on the road and at hotels.**

66.     The entertainment business encompasses more than acting – it requires producers,

directors, engineers, lawyers, agents, writers, artists, publicists, advertisers, sales-people, chefs,

drivers, and many other roles. Thus, while many of the class members are actors – the class also

includes any woman who was meeting with Harvey Weinstein for business-related purposes.

67.     And, like lawyers or engineers, actors are pursuing a career that is a business. It takes more to launch a performing career than majoring in drama and getting on the bus for New York or L.A.

68.     Actors are independent contractors. They work for film and television companies in what is essentially a gig economy structure, i.e. an environment in which temporary positions are common and organizations contract with independent workers for short-term engagements.

69.     Actors hire talent agencies and management companies to solicit auditions (job interviews) and offers of employment. These companies act as employment agencies. They submit their clients for auditions and offers through casting companies that have been hired by production companies.

70.     Actors sign contractual agreements with talent agencies and management companies, who receive a commission payment on all film and television work for which an actor is hired. The agencies negotiate the contractual terms of employment on each actor's behalf, including pay rate, days of work, per diem and travel if applicable, publicity obligations and terms of use, credits (job title) and future residual payments. All of these terms are governed by the SAG-AFTRA collective bargaining agreement, which all production companies must enter in order to work with union actors. Salaries are negotiable but there is a base salary for all jobs.

71.     Professional actors become members of the labor union SAG-AFTRA upon being hired for their first job as a Principal Player on a production that has a collective bargaining deal with SAG-AFTRA. Actors pay union dues, and receive health and pension benefits through the union. Actors also audition (job interview) and work under union guidelines.

010717-11 1076419 V1

72.     The business of film and television is a business of connections and relationships, like most businesses. Actors establish relationships with directors, producers and studio executives either by working with them or through conversations and connections made at social or work-related events. It is common to receive opportunities to audition or receive an offer for a project through these connections. Networking at industry and social events is thus an important part of the business – and in fact, costs to attend such events are recognized by the IRS as business expenses.

73.     For example, Plaintiff Caitlin Dulany's son attended elementary school with the child of a producer of a television series. As a result of knowing one another through events at their children's school, this producer requested that the casting office audition her on three separate occasions for acting roles in the series. Dulany was offered the third role, a guest spot on the CBS series, Eleventh Hour.

74.     The Internal Revenue Service recognizes the monies that actors must pay out of pocket to pursue their career as business expenses. Specifically, any ordinary and necessary expenses that actors paid for out of their own pockets that were directly related to their acting activity are deductible as a business expense.

75.     Typical deductible expenses for actors include, but are not limited to, the following:

- Business Travel: Airfare or other transportation costs and hotel or other lodging expenses, and 50% of the cost of meals;

- Local Travel Expenses: Deductible local travel may include trips to performances (both as player and observer), rehearsals, acting classes, auditions, and to pick up supplies;

- Agent Fees: All fees an actor pays to an agent;

- Manager Fees: Talent manager fees;

- Office Expenses: An outside office or office in the home used exclusively for an acting business;

- Property and Supplies Used for Acting: The cost of video cameras, sound equipment, digital cameras, theater and film books, musical scores, computers, and cell phones;

- Union Dues: Dues to belong to Actors Equity or other unions or organizations;

- Education: Acting classes and coaching lessons;

- Promotional expenses: Photos, videos, websites (including Internet connection costs), listings in professional registries, advertisements in trade publications, business cards, and other promotional expenses;

- Make-up and Hair Care: Related expenses are deductible when incurred in connection with a specific job;

- Wardrobe: The cost of any clothing not suitable for street wear--for example, the cost of a modern business suit is not deductible, but a gorilla costume is deductible;

- Subscriptions: The cost of magazine, journal, newsletter, and other subscriptions useful for your acting business--for example, trade newspapers like Daily Variety;

- Legal and Professional Services: Fees paid to attorneys, accountants, consultants, and other professionals;

- Tickets for Viewing Films and Plays: Actors need to attend plays and films to keep up with what's going on in their industry. They may also subscribe to services like Netflix and HBO. These costs are deductible as research.

All of these expenses add up for professional actors, easily equaling 20 to 35 percent of acting income.

76.     Much of the entertainment business is conducted on the road, on location where productions are filmed, at film festivals where new ideas are pitched, at awards shows where new contacts are made, and on tours of visiting various cities to identify new talent.  Networking and making contacts is crucial for actors.

77.     Thus, it is not unusual for participants in the film industry to set up offices in hotel suites, and to schedule meetings in those suites. The business of being an actor requires actors to meet with producers in hotel rooms.  The fact that meetings take place in hotel rooms does *not* indicate that sexual misconduct will occur. Many business meetings that take place in hotel rooms are completely professional – and expected.

78.     In fact, talent agencies, including agencies that represented Class members such as Creative Arts Agency and William Morris, regularly scheduled meetings for their clients with Weinstein and other producers in hotel rooms.

79.     According to a Miramax and TWC officer who also regularly acted as Weinstein's assistant, Defendant Barbara Schneeweiss, "it was customary for Weinstein to book a hotel suite in whichever city he found himself. That suite would typically include meeting spaces, in addition to personal living space."[24]

---

[24] Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, ¶¶ 6-7, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. of Justice).

80.     Schneeweiss also stated: "even when Weinstein was located in a city in which Miramax did maintain an office, Weinstein would at times often book a suite with meeting space anyway."[25] She explained that "Weinstein would then use those meeting spaces for the[sic] much of the business he could conduct in that city, including for meetings."[26]

81.     In fact, according to Schneeweiss, "while at times he would conduct business meetings in the lobbies or restaurants of such hotels, the majority of his meetings would be conducted in his hotel suite." [27]

82.     Even when actors expressed concern about meeting with Weinstein in his hotel room for business purposes, they were told by Weinstein's assistants and their talent agents that they had no choice but to do so for whatever audition, part, pitch or business proposal was involved.

83.     In sum, acting is a career cultivated within an industry that performs and provides services, just like professional athletes, lawyers, physicians, therapists and various other industries which are critical to the economy but nonetheless don't produce widgets.

**C.     Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class.**

84.     Wielding unfettered power in the movie and television industry, Weinstein has admitted that his predatory and sexually harassing behavior toward women was his modus operandi. For example, in an audio recording captured during a 2015 New York Police

---

[25] *Id.*, ¶ 8-9.

[26] *Id.*

[27] *Id.*, ¶ 10.

Department sting operation, Weinstein admitted that he groped a model named Ambra Battilana Gutierrez, describing it as behavior he is "used to."[28]

85.    An executive who worked for Weinstein for many years reportedly told The New Yorker, "This wasn't a one-off. This wasn't a period of time. This was ongoing predatory behavior toward women—whether they consented or not."[29]

86.    The manner in which Weinstein set up, harassed, and assaulted Plaintiffs and the members of the Class followed a pattern. As *The New York Times* explained,

> Across the years and continents, accounts of Weinstein's conduct share a common narrative: Women reported to a hotel for what they thought were work reasons, only to discover that Weinstein, who has been married for most of three decades, sometimes seemed to have different interests. His home base was New York, but his rolling headquarters were luxury hotels: the Peninsula Beverly Hills and the Savoy in London, the Hôtel du Cap-Eden-Roc near the Cannes Film Festival in France and the Stein Eriksen Lodge near the Sundance Film Festival.[30]

87.    An employee who worked for Weinstein told The New Yorker that "the pattern of meetings was nearly uninterrupted in her years of working for Weinstein."[31]

---

[28] A 2015 audio recording of Weinstein aggressively attempting to coerce Battilana Gutierrez to come into his hotel room was published by *The New Yorker* on October 10, 2017 and is available at https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed Nov. 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed Nov. 2, 2017). When Battilana Gutierrez refused, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

[29] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, THE NEW YORKER (Oct. 10, 2017), https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[30] Kantor & Twohey, *supra* note 1.

[31] Farrow, *supra* note 10.

88.     Since October 10, 2017, more than 100 women have reported that Weinstein used his power in the entertainment industry to sexually harass them. On information and belief, these reports are just the beginning of the revelation of the full scope of Weinstein's misconduct. All of these reports follow the same pattern. For illustrative purposes of Weinstein's pattern and practice of sexual harassment against Plaintiffs and the Class, Plaintiffs provides the following non-exhaustive list of examples of Weinstein's predatory behavior that have been widely reported in the media:

89.     *Weinstein's pattern of using the guise of helping women with their careers was typically the start:*

        a.      After Weinstein hired her for the lead in the Miramax-produced *Emma*, but before shooting began in or about 1994, Gwyneth Paltrow received a faxed schedule from her agents at Creative Artists Agency scheduling a meeting with Weinstein in his suite at the Peninsula Beverly Hills for a work meeting.[32]

        b.      In 1996, starring in a new film to which Miramax had just obtained the rights, Judith Godrèche was invited to a breakfast meeting with Weinstein and a female Miramax executive to discuss the movie.[33] She later called a female Miramax executive to seek advice about the situation. The executive told her not to say anything, lest she hurt

---

[32] Jodi Kantor & Rachel Abrams, *Gwyneth Paltrow, Angelina Jolie and Others Say Weinstein Harassed Them*, N.Y. TIMES (Oct. 10, 2017), https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html.

[33] *Id.*

the film's release.[34] As Godrèche described, "This is Miramax … You can't say anything."[35]

      c.    Asia Argento, a 21-year-old actress with a role in a Miramax film released in the United States in 1999, was told during filming in 1997 to attend a party thrown by Miramax at a hotel and was brought to the hotel by another producer.[36]

      d.    In the 1990s, Rosanna Arquette was told to meet Weinstein for dinner at a hotel to pick up the script for a new Miramax film.[37]

      e.    In the 1990s, Weinstein invited Ashley Judd to the Peninsula Hotel for a business breakfast meeting concerning Miramax projects.[38]

      f.    In or about 1997, Weinstein invited himself to Mira Sorvino's apartment—after midnight—to tell her about "new marketing ideas" for a Miramax film she was in.[39]

      g.    In 2003, Dawn Dunning was invited by Weinstein's assistant to a meal with Weinstein at a New York hotel.[40] She had met Weinstein while she was waitressing in a nightclub, and he offered her a screen test at Miramax.[41]

---

[34] *Id.*

[35] *Id.*

[36] Farrow, *supra* note 10.

[37] *Id.*

[38] Kantor & Twohey, *supra* note 1.

[39] Farrow, *supra* note 10.

[40] Kantor & Abrams, *supra* note 13.

[41] *Id.*

h.      Lucia Stoller was approached by Weinstein in 2004, who had a Miramax assistant call to set up a daytime meeting at the Miramax office in Tribeca, first with Weinstein and then with a casting executive, who was a woman (which made Lucia feel safer).[42]

i.      In 2010, Weinstein told actress Emma de Caunes he was interested in casting her in the lead role of a TWC movie adapted from a book, asking her to come to his hotel room after lunch to get the book.[43]

j.      In January 2011, Weinstein invited Jessica Barth to a business meeting at the Peninsula Hotel to talk about TWC projects and her career.[44]

k.      In 2015, Italian model Amber Battilana Gutierrez met with Weinstein in the TWC offices for what she was told would be a "business meeting."[45]

90.      *When the women arrived for their "meeting," they were isolated from the public or witnesses:*

a.      Although Lucia Stoller's meeting took place at Miramax, "[s]he was led to an office with exercise equipment in it, and takeout boxes on the floor. Weinstein was there, alone."[46]

b.      A producer invited Asia Argento, who was working on the Miramax-distributed movie *B. Monkey*, to what she thought was a party thrown by Miramax at the

---

[42] Farrow, *supra* note 10.

[43] *Id.*

[44] *Id*.

[45] *Id*.

[46] *Id*.

Hotel du Cap-Eden-Roc. She felt obligated to attend, but when the producer led her

upstairs, he took her to a hotel room "empty but for Weinstein."[47]

        c.       Weinstein sexually assaulted dancer Ashley Matthau when he visited the

set of Miramax's *Dirty Dancing: Havana Nights* in Puerto Rico in 2004.[48] He ordered her

into a car that took her to his hotel room, where he attacked her after she declined his

suggestion that she follow the lead of other high profile actresses whose careers he had

launched by sleeping with him.[49]

        d.       After Lena Heady appeared in a TWC film, Weinstein harassed her in

2005 at the Venice Film Festival, but Heady tried to laugh it off at the time.  Years later,

after a breakfast work meeting in a Los Angeles hotel, Weinstein told Heady to come to

his hotel room to pick up a script. In the elevator, the energy shifted, causing Headey to

warn Weinstein not to expect anything physical.  She described that Weinstein went

silent, apparently furious at her words. Weinstein's hand was on Heady's back, marching

her forward, while she felt completely powerless. When his key card didn't work,

Weinstein got very angry.  Weinstein then walked her back downstairs and paid for a car

to take her away from the hotel, whispering in her ear not to tell anyone about the

incident.[50]

---

[47] *Id.*

[48] Ellen Gabler *et al.*, *New Accusers Expand Harvey Weinstein Sexual Assault Claims Back to '70s*, N.Y. TIMES (Oct. 30, 2017), https://www.nytimes.com/2017/10/30/us/harvey-weinstein-sexual-assault-allegations.html.

[49] *Id.*

[50] Joyce Chen, *Lena Headey of 'Game of Thrones' Alleges Harvey Weinstein Sexual Harassment*, ROLLING STONE (Oct. 18, 2017), https://www.rollingstone.com/movies/news/game-of-thrones-lena-headey-alleges-weinstein-harassment-w509515.

e.      When Rosanna Arquette showed up for dinner at a hotel restaurant with Weinstein, she was told to meet him in his room.[51]

f.      When Jessica Barth arrived at the Peninsula Hotel for a business meeting, Weinstein told her on the phone to come to his room.[52]

g.      When Ashley Judd arrived at the Peninsula Hotel for a business meeting, she was told to meet him in his room.[53]

h.      After a breakfast meeting with Weinstein and a female executive, the female executive left, leaving Judith Godrèche alone with Weinstein, who told her to join him in his room to discuss the Miramax film's marketing and an Oscar campaign.[54]

i.      When Dawn Dunning arrived at the hotel for a meeting, she was told that Weinstein's earlier meeting was running late and to go to his suite.[55]

91.    *Once isolated, Weinstein battered, assaulted, or attempted to assault the women:*

a.      Rose McGowan: In a hotel room in 1997, "…HW raped me."[56]

---

[51] Farrow, *supra* note 10.

[52] *Id.*

[53] Kantor & Twohey, *supra* note 1.

[54] Kantor & Abrams, *supra* note 13.

[55] *Id.*

[56] Holly Christodoulou, *'I told you he raped me,'* THE SUN (Oct. 13, 2017), https://www.thesun.co.uk/news/4673738/rose-mcgowan-harvey-weinstein-rape-claims-amazon-jeff-bezos/, *quoting* tweet from Rose McGowan.

b.      Lucia Stoller: "'He forced me to perform oral sex on him.' As she objected, Weinstein took his penis out of his pants and pulled her head down onto it. 'I said, over and over, "I don't want to do this, stop, don't."'"[57]

c.      Asia Argento: Weinstein left the hotel room and returned "wearing a bathrobe and holding a bottle of lotion. 'He asks me to give a massage. I was, like, "Look, man, I am no f****** fool."'" "[A]fter she reluctantly agreed to give Weinstein a massage, he pulled her skirt up, forced her legs apart, and performed oral sex on her as she repeatedly told him to stop."[58]

d.      Mira Sorvino: In 1995, while Sorvino was at the Toronto International Film Festival promoting the Miramax-produced *Mighty Aphrodite*, she found herself in a hotel room alone with Weinstein. Weinstein started massaging her shoulders and then chased her around the room.[59]

e.      Sophie Dix: Weinstein masturbated in front of her after Dix said "no a thousand times," causing Dix to lock herself in the bathroom.[60]

f.      Emma de Caunes: Weinstein went into the hotel bathroom, turned on the shower, returned naked with an erection, and demanded she lie on the bed.[61]

---

[57] Farrow, *supra* note 10.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

g.      Rosanna Arquette: Weinstein answered his hotel door in a bathrobe, tried to force Arquette to give him a neck massage, and pulled her hand toward his erect penis.[62] After Arquette refused Weinstein's unwanted sexual advances, the role she wanted in a Miramax movie went to somebody else.[63]

h.      Jessica Barth: Weinstein demanded a naked massage in his bed.[64]

i.      Ashley Judd: Weinstein appeared in a bathrobe, asking if he could give her a massage or she could watch him shower.[65] Describing her fear and panic at being propositioned by Weinstein, Judd said, "There's a lot on the line, the cachet that came with Miramax."[66]

j.      Gwyneth Paltrow: Weinstein touched her, suggesting they head to his bedroom for massages.[67]

k.      Angelina Jolie: Weinstein made unwanted advances on her in a hotel room.[68]

l.      Judith Godrèche: After Godrèche declined to give him a massage, "he's pressing against me and pulling off my sweater."[69]

---

[62] *Id.*

[63] Kantor & Abrams, *supra* note 13.

[64] Farrow, *supra* note 10.

[65] Kantor & Twohey, *supra* note 1.

[66] *Id.*

[67] Kantor & Abrams, *supra* note 13.

[68] *Id.*

[69] *Id.*

m.      Dawn Dunning: Weinstein, who had worn a bathrobe for their meeting, told Dunning that he had contracts for her for his next three films, but that she could only sign them if she would have three-way sex with him. When Dunning laughed, assuming Weinstein was joking, Weinstein became angry, stating: "You'll never make it in this business. This is how the business works."[70]

n.      Daryl Hannah: On multiple occasions, Weinstein tried to barge into her hotel room at night; she escaped out back doors; she used furniture to bar the door; and she had her male make-up artists present when Weinstein was able to secure a key to her room without her consent. *The New Yorker* reported: Weinstein "'had a key,' when Hannah was in Rome for the Italian premiere of Miramax's Kill Bill: Volume 2. Hannah recalled. 'He came through the living room and into the bedroom. He just burst in like a raging bull. And I know with every fiber of my being that if my male makeup artist was not in that room, things would not have gone well. It was scary.' [Hannah's make-up artist] remembered the incident vividly. 'I was there to keep her safe,'" he told *The New Yorker*.[71]

o.      Weinstein sat next to Amber Battilana Gutierrez on the couch in the TWC offices and began staring at her breasts, asked if they were real, and "lunged" at her, groping her breasts and attempting to put his hand up her skirt.[72]

---

[70] *Id.*

[71] Ronan Farrow, *Weighing the Costs of Speaking Out About Harvey Weinstein*, THE NEW YORKER (Oct. 27, 2017), https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[72] *Id.*

p.      Paz de la Huerta—first rape: In November 2010, Weinstein offered de la Huerta a cab ride home after bumping into her at a hotel bar in New York and then demanded to come in for a drink: "'Immediately when we got inside the house, he started to kiss me and I kind of brushed [him] away,' de la Huerta said. 'Then he pushed me onto the bed and his pants were down and he lifted up my skirt. I felt afraid…. It wasn't consensual… It happened very quickly…. He stuck himself inside me…. When he was done he said he'd be calling me. I kind of just laid on the bed in shock.'"[73]

q.      Paz de la Huerta—second rape: In December 2010, Weinstein showed up in her building lobby after she came home from a photo shoot: "'He hushed me and said, "Let's talk about this in your apartment,"' de la Huerta said. 'I was in no state. I was so terrified of him…. I did say no, and when he was on top of me I said, "I don't want to do this." He kept humping me and it was disgusting. He's like a pig…. He raped me.'"[74]

92.      These were not isolated instances, but the practiced role and pattern of a sexual predator.

---

[73] Rebecca Keegan, *Paz de la Huerta Says Harvey Weinstein Raped Her Twice. Will That Bring Him to Justice?*, VANITY FAIR (Nov. 2, 2017), https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations (alterations in original).

[74] *Id*. (alterations in original).

D.     **Like many of the Class members, Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, and Larissa Gomes, were assaulted when Weinstein worked for Miramax and Disney.**

1.     **Plaintiff Nannette Klatt's experience (1993 or 1994).**

93.     In 1993 or 1994, Nannette Klatt had an interview scheduled for an audition at an office on the first floor of a building also occupied by Miramax.  During this meeting, she sat at a table next to the man interviewing her.  The door to the office where they sat was open.

94.     During the meeting, Harvey Weinstein walked slowly past the open door and looked in. He then turned around and walked past the open door again, looking into the office as he did so.  Finally, on his third trip past the office, he asked the person who was interviewing Klatt to come out into the hallway.

95.     When the interviewer returned, he told Klatt that Weinstein would like to meet with her in his office because he was casting a film and was looking for an actress who had her "look".   He invited Klatt to meet Weinstein in his private office on another floor. Klatt agreed, given the opportunity to be cast in a Miramax film.

96.     The meeting occurred at the end of the workday.  When she arrived in his office, Klatt shook hands, provided her headshot and resume to Weinstein and engaged in cordial pleasantries and polite conversation.

97.     Weinstein then asked her to read from a script, explaining that he was looking for a new face with a "very European look."  Klatt and Weinstein then read from three pages of the untitled script; she read a few more pages with him upon his request.  Weinstein appeared very happy and pleased and told her he had several other projects she might "be right for."  He told Klatt that she was "exactly what I am looking for" and that she had gotten the part and told her to take the script home to study. Klatt placed the script in her briefcase and prepared to leave.

98.     Weinstein then told her he "just needed one more thing from you." He asked her to disrobe and explained he needed to see her breasts, repeatedly stating, "It's just your breasts." When Klatt refused repeatedly, Weinstein told her to "take your dress down" and "you are going to need to expose them."  Weinstein told Klatt that the role required him to review and approve of her breasts.  Klatt, realizing she was about to be sexually assaulted, was terrified.

99.     When Klatt continued to refuse, Weinstein angrily inquired whether she knew who he was, told her he could "make" her or "break" her, and that she would "never work in this town again."  "You know, I could launch your career and I can make you or I can break you," he insisted, again demanding that she expose her breasts.  Weinstein then told Klatt to "Give me my script back."  Weinstein was belligerent and ranting.  He told her, "without me, you will never work again."

100.    Weinstein then told Klatt to show herself out and advised her she could not use the main door.  He corralled her to a side door that led into a pitch-black stairwell. He then locked the door behind her.   Klatt, realizing she was locked in, banged on the door and begged to be let out.  Scared and upset, she panicked, walking up and down flights of stairs, banging on doors and yelling on each landing that she was locked in - all the while not knowing whether Weinstein would return and assault her further. Terrified and sweating through her dress, Klatt feared for her safety and life.  Finally, a maintenance worker heard her yelling and let her out; that worker immediately asked Klatt if she was coming from Weinstein's floor.

101.    This assault was profoundly disturbing and life-changing for Klatt. As a result, Klatt has changed how she conducts her life, pursues her career, takes meetings and interacts with men both personally and professionally.  She limits interactions that are one-on-one, even though those meetings are necessary to connect and bond with both professional colleagues and

personal acquaintances. Her professional and personal interactions are thus limited by her fears

generated by Weinstein's assault. In other words, Klatt lost the part Weinstein offered, lost other

opportunities at Miramax and TWC, and has lost other professional opportunities as the

consequence of Weinstein's assault.

## 2.      Plaintiff Katherine Kendall's experience (1993).

102.    In 1993, when Kendall was 23 years old, her mother met Harvey Weinstein at a

small industry party on Martha's Vineyard. Weinstein provided his contact information to

Kendall's mother and insisted she have Kendall contact him to discuss her career.

103.    Kendall did not feel comfortable contacting Weinstein personally, so she passed

the information to her agency.  Kendall's agent then contacted Weinstein at Miramax and

scheduled a meeting. Kendall went to the meeting at Miramax, where she met with Weinstein in

his office. Weinstein gave her the scripts for the Miramax movies *Beautiful Girls* and *Things To

Do In Denver When You're Dead*, told her she was a great fit, and he had parts for her in those

movies. He welcomed her to "the Miramax family." Kendall was very excited to receive these

opportunities. The meeting was professional, the doors to his office were open and Kendall felt

safe because female employees from Miramax were present.

104.    After the meeting, Weinstein walked her to the elevator, and invited her to a

"screening" of *Red Rock West* that afternoon. Weinstein stated that he would use the opportunity

to introduce her to numerous people.

105.    Weinstein's assistant from Miramax contacted Kendall via telephone to arrange

for a car to pick her up to take her to the screening.

106.    When the car arranged by Miramax arrived, Weinstein was the only other

passenger. He took her to a regular movie showing – not a private screening with industry

participants. Kendall felt very uncomfortable because Weinstein was treating the outing like a

date.  Kendall decided she wanted to leave the outing on her own and not with Weinstein.

107.    After the movie, Kendall told Weinstein she was going to take the subway home

and asked him to point the way. Weinstein responded that he lived "right here" and had to go up

to get something first. Kendall said she would wait downstairs. Weinstein, using intimidation and

manipulation, bullied her into coming up to his apartment. He said he would walk her to the

subway thereafter. Kendall declined several times, but finally gave in because she did not know

where she was, and he was supposed to walk her to the subway.

108.    Once they were in the apartment, Kendall thought she might not be in danger.

Pictures of Weinstein's wife were on display. Weinstein treated Kendall as an intellectual equal.

They talked for approximately one hour, discussing art, politics, books and movies. Weinstein

again promised to her the two parts, as well as helping her find additional opportunities. He told

her:  "You're in good hands."

109.    Then Weinstein went to the bathroom and returned wearing a robe. Kendall

became distressed. Weinstein repeatedly requested a massage, and Kendall refused.  Weinstein

told Kendall that "everyone does it," claiming that specific actresses "did it all the time" and

asking why Kendall was making "a big deal" out of the situation. Kendall again refused,

informed Weinstein that he was making her very uncomfortable. She was visibly upset, shaking

and on the verge of tears.

110.    Weinstein then went back to the bathroom; when he returned, he was naked. She

felt an immediate "fight or flight" response, with a burst of adrenaline and fear. He then stood

between Kendall and the door, informing Kendall that her refusal to provide sexual services had

"insulted" him. Weinstein chased Kendall around the apartment, demanding that she kiss him, that she touch him, and that she allow him to see her breasts.

111.    Weinstein barred Kendall in the apartment, placing her in imminent fear for her life and her safety.  She believed that she was about to be raped.

112.    After a distressing amount of time, Weinstein finally agreed to allow Kendall to leave if she would allow him to accompany her to a taxicab.  Weinstein then took her to a taxi, but physically forced his way into the taxi with her. For that reason, Kendall claimed she was meeting her boyfriend at a bar.  When the taxi arrived at the bar and Kendall was allowed to exit, Weinstein remained in the taxi for approximately 20 minutes, watching her movements in the bar.

113.    After the assault, Kendall experienced both emotional distress and physical pain, along with shame, depression, and a loss of self-worth. However, she believed that if she were to disclose the assault, she would be blacklisted and blamed as a result of Weinstein's power in the industry. Neither Weinstein nor Miramax followed through on the two promised films.

114.    Weinstein called Kendall several times after the assault. Each time he attempted to contact her, Kendall became upset. She knew Weinstein could hurt her career, but did not want to return to a situation in which a powerful figure in the industry could demand sexual favors from her.

115.    Since the assault, Kendall has experienced depression. She has lived her life "smaller," feeling like she doesn't have what it takes (if what it takes includes providing sexual favors) to be in the film business.  At various times since the assault, Kendall has had to remove herself completely from the entertainment industry in an effort to address her post-traumatic stress and emotional trauma.

116.    Twice during the summer of 2017, an English-accented man identifying himself as "Seth Freeman" (spelled phonetically; exact spelling or name unknown) telephoned Kendall. "Freeman" claimed that he was a reporter for The Guardian and that he was doing a story on the Hollywood casting couch. "Freeman" told Kendall that Rose McGowan was going to come forward in The New York Times about a "powerful producer."

117.    "Freeman" continued to press Kendall, attempting to get her to say that she had or was going to talk to reporters at The New York Times about her experiences with the casting couch and producers.  These contacts, which had come from "out of the blue," caused Kendall to experience emotional distress.

118.    Reporters from the BBC subsequently informed Kendall that a person identifying himself as "Seth Freeman" had also contacted other women who may have been harassed or assaulted by Weinstein.

119.    Based on counsel's pre-filing investigation, no one named Seth Freeman worked for The Guardian during the summer of 2017.

120.    On November 18, 2017, The Observer (a sister publication to The Guardian) reported that it had gained access "to a secret hit list of almost 100 prominent individuals targeted by Harvey Weinstein in an extraordinary attempt to discover what they knew about sexual misconduct claims against him and whether they were intending to go public."[75] Prepared in early 2017, the list was "part of a strategy to prevent accusers from going public with sexual misconduct claims against him" and was distributed to a team that included the Intelligence

---

[75] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

Participants for the purpose of "suppress[ing] claims that he had sexually harassed or assaulted numerous women."[76]

121.    According to The Observer, "Individuals named on the list were to be targeted by investigators who would covertly extract and accumulate information from those who might know of claims or who might come forward with allegations against the film producer. Feedback was then to be relayed to Weinstein and his lawyers." [77]

122.    Composed of 85 names, with an addendum identifying another six individuals, the list reportedly includes individuals working in acquisitions, marketing and distribution, along with producers, publicists, human resources staff, and actors. Forty-three men and 48 women are named. The majority live in New York, with others from London and Los Angeles.[78]

123.    Weinstein's 2017 list of targets included Kendall.  Based on Kendall's inclusion on the list, and the fact that no "Seth Freeman" worked at The Guardian, the man who contacted Kendall purporting to be "Seth Freeman" in the summer of 2017 was, on information and belief, an Intelligence Participant.

124.    The fact that Kendall has been targeted for apparent surveillance and investigation by the Weinstein Sexual Enterprise has caused Kendall significant additional distress and significant fear.

---

[76] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[77] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[78] https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

### 3.      Plaintiff Caitlin Dulany's experience (1996).

125.    Caitlin Dulany met Harvey Weinstein while she was standing outside the Miramax office on a winter day in 1996. She had been working as an actor for several years, and had moved to New York to pursue work in independent film when Weinstein—the most important independent film producer in the world—stopped to introduce himself as he was walking into the building, she felt very lucky. Weinstein asked Dulany what she was doing at the office, and she told him that she was there to do a reading. They talked for several minutes about the business; he said that he remembered what it was like for him starting out. To Dulany, Weinstein was relatable and disarming—he seemed as though he wanted to befriend and mentor her with no strings attached. They exchanged contact information.

126.    In short order, Weinstein's assistant contacted Dulany via telephone and invited her to a screening of one of his movies. When Dulany met Weinstein in the lobby after the screening, surrounded by his employees, he introduced her as "my friend Caitlin." He asked Dulany what she thought of the film, and she shared her opinion, joining in the conversation with his young employees.  She was grateful to meet people in the independent film business.

127.    Later, Weinstein's assistant called to invite Dulany to a party in Tribeca, near the Miramax offices. The party was comfortable and enjoyable; there were many industry people talking shop, and she was again grateful to join in. Weinstein was friendly but proper; he acted like a professional mentor. Throughout their time together, Weinstein told Dulany that he wanted to help her with her career because he felt that she had potential. She trusted him. In general, Dulany felt engaged with the independent film community and excited about her work.

128.    Weinstein proposed to host a meeting between Dulany and a high-powered manager of several famous people as a favor. Dulany had an uneasy feeling about being offered

"a favor," in part because her agent discouraged it. Weinstein's assistants scheduled the meeting via telephone.

129.     In the lobby before the meeting, the high-powered manager told Dulany that Weinstein had forced her to come. Dulany told the manager that she did not want to be there either. In the meeting, the manager seemed angry and nervous, as though she knew Weinstein was trying to bully her. Weinstein made a pitch for Dulany. He said that he really believed in her and thought she was special, and he demanded that the manager take her on "as a favor to me." It seemed to Dulany as though Weinstein was trying to demonstrate he held power over her career. The manager refused Weinstein's demand because she already represented Suzie Amis, who would be competing against Dulany for parts. Weinstein relented. When the manager left, Weinstein turned to Dulany and told her he would think of a next step.

130.     Weinstein's assistant then called Dulany to invite her to dinner, and he offered to pick her up at her apartment. Based on their previous encounters, there was no indication that the dinner would be anything but platonic. When Weinstein arrived, Dulany let him into her long, narrow studio apartment. They walked in the door through the kitchen and past her bed, and they sat down in the "living area" to chat. After the conversation dragged on, Dulany became anxious to leave for dinner. She excused herself to use the bathroom.

131.     When she emerged from the bathroom, Dulany was shocked and alarmed to find Weinstein naked, in her bed. He stood up. She rushed past him into the living area and said, with her adrenalin pumping, "Harvey put your clothes back on." Weinstein stood for what seemed to Dulany like an eternity, staring blankly, as if they were in a standoff. Finally, he dropped his eyes and mumbled something to the effect of, "fine, if it's such a big deal to you." He then got dressed and left the apartment.

132.     When Weinstein left, Dulany felt shocked, angry, and betrayed. But she remained optimistic. She told herself the whole thing must have been a misunderstanding. And given that he had never acted improperly toward her before, and he got dressed and left when she asked him to, she did not give up on Weinstein as a mentor. She did not want to lose the mentorship of an important, powerful person in the industry. Weinstein had gone to great lengths to gain her trust, and to make her believe that he would be loyal to her. Even after the incident in her apartment, Dulany believed that their friendship was important to him.

133.     Dulany confided in her sister and several close friends about the incident with Weinstein. She told them that she was unnerved and angry by his behavior. They agreed. Still, no one was surprised that a movie producer propositioned a young actor inappropriately. To Dulany, navigating those situations was part of being in the business at the time.

134.     Two months later, Dulany attended the Cannes Film Festival to promote her most recent film, Rescuing Desire. There she ran into Weinstein, whom she had not spoken to since the incident in her apartment. He greeted her, acting like nothing had happened, and invited her to a gathering on a friend's yacht. She was relieved that she had not alienated Weinstein by refusing him in her apartment. Dulany accepted the invitation to the yacht, where Weinstein introduced her to industry people.

135.     Several days later, Weinstein's assistant telephoned Dulany to invite her to a premiere of a Miramax film, followed by a benefit dinner for the Elizabeth Taylor AIDS Foundation.  Dulany sat alone in the theater during the film premiere, and sat at a dinner table with Elton John and Leonardo DiCaprio. Weinstein stopped at her table to greet her in front of a crowd of A-list celebrities. She appreciated him being friendly toward her, but she felt uneasy in a room full of famous strangers with Weinstein as her only lifeline.

136.     After the dinner, Weinstein's assistant told Dulany that there was a car waiting outside to take her to the after party at Hotel du Cap. As she drove along the water toward the exclusive hotel, about eight miles from the city, she tried to understand why she was in the car alone. Why wasn't she sharing a car with other after-party attendees? If she wanted to leave, how would she get back to her hotel? Why, given that the dinner was in walking distance to many hotels and bars, was the after party being hosted far away, on the outskirts of town?

137.     At that moment, Dulany realized she was trapped. She realized that Weinstein was an important guest at Hotel du Cap, and that he had ordered the car. As the drive continued, she prayed for her own safety.

138.     Once they were alone in his hotel room, Weinstein did not say much to Dulany. At that point, Dulany was at once terrified and resigned; she knew that Weinstein had managed to isolate her. She was too far from her hotel or anyone who could provide help to try to escape. Not only that, she thought that Weinstein would hurt her physically if she tried—after all, he was about three times her size. If he did not become violent, he would certainly hurt her career if she tried to leave.

139.     Weinstein imprisoned Dulany in his room and sexually assaulted her. First he undressed her and performed oral sex on her without her consent. She stared at the ceiling, frozen solid with fear, and waited in agony for him to finish. She did not consent, reciprocate, or respond in any way. Inside, she felt herself shutting down.

140.     As her mind raced with fear and panic, she realized that Weinstein expected sex from her in return for entertaining her at an A-list party. She closed her eyes, disgusted and ashamed, and prayed that Weinstein would not try to penetrate her. Then Weinstein began to

masturbate. When he ejaculated, Dulany felt a wave of nausea run through her body. She remained on the bed, frozen and silent, and fell asleep.

141.     When Dulany woke up and opened the hotel room door, there was a small crowd of Miramax staffers waiting outside the suite to go in and start their day. No one said anything or looked at her. Dulany then suspected that seeing a woman emerge from Weinstein's hotel suite in the morning was a regular occurrence for them.

142.     When Dulany left Hotel du Cap, she decided that she would wipe the assault from her memory. She swore to herself that she would never speak of that night to anyone, ever. She knew that if she reported him, Weinstein would destroy her life.

143.     But even though she did not tell a soul for more than twenty years, her life changed from that moment forward. Weinstein's assault traumatized Dulany. It had devastating effects on Dulany's personal and professional life, and it caused her extreme pain and suffering and emotional distress.

144.     Nonetheless, after the assaults, Dulany did audition for several productions being produced by Miramax producer Scott Rosenberg, who later told a group of people she "was great." However, on information and belief, Dulany was not cast in those productions because Harvey Weinstein interfered and told Rosenberg not to cast Dulany.

145.     Four months after the assault at Cannes, Dulany moved to Los Angeles. She did not want to be involved in the independent film business at all—it felt tainted to her. Even though she loved independent films, she convinced herself that she would rather work in television. She was afraid to be in Weinstein's world.

146.     In Los Angeles, she quickly married a person with whom she felt safe and secure. Her anxiety was unbearable, and she desperately needed someone to support her. At the same time, she felt that she was hiding a secret; that part of her was missing. She could never truly be herself around anyone, because Weinstein had taken a part of her that she would never get back. Weinstein's assault had a profoundly negative effect on her marriage, as it has on all her romantic relationships since then.

147.     After Dulany gave birth to her son, she spent the first few years in a state of debilitating anxiety about her child's safety and security. It seemed as though parenting was more frightening and anxiety-ridden for her than it was for others. Again, she felt anxious, isolated, strained, and lonely; she felt as though she was different from everyone around her.

148.     Dulany suffered from severe anxiety and depression. With an intense feeling of detachment, she went through the motions of life—attending auditions, acting on television shows, interacting with friends and colleagues. It took tremendous effort to make it through simple auditions and readings. Work that had felt effortless before Weinstein's assault now took everything she had. She shied away from auditions for roles that she would have tried for with confidence and excitement prior to the assault.

149.     In nearly twenty-two years since Weinstein's assault, Dulany has experienced a pervasive feeling that she would rather be dead. She did not consider taking her life, but there have been times when she desperately wished that she could give up. Things that had previously brought her joy—particularly her work as an actor—now only caused her to struggle.

150.     Dulany has attempted to compartmentalize what happened to her in the Hotel du Cap, but she was only able to divide herself. The image she attempted to present to the world

was happy and secure, but inside she was deeply anxious, fearful, and exhausted. The divide only made her feel more detached, isolated, and lonely.

151.    Dulany did not tell anyone what happened in Cannes until she spoke to law enforcement in December 2017. She wrote a story for The Wrap about Weinstein taking his clothes off in her apartment, and did a BBC Radio interview.[79] However, even after widespread reporting on Weinstein's sexual abuse, she still could not bring herself to share the story of Weinstein's assault in the Hotel du Cap. She continued to fear retaliation and damage to her reputation. The filing of the *Dulany* action was the first time she publicly shared her story.

### 4.    Plaintiff Zoe Brock's experience (1998).

152.    In 1998, Zoe Brock was a 24-year-old model. Together with her agent, Vittorio Zeviani, Brock attended the Cannes Film Festival (May 13-24, 1998), under the guise that the trip would be good for her career. They stayed on a yacht moored in the bay.

153.    One evening, Brock attended a group dinner at the Hotel Barrière Le Majestic with her agent and his friends. Weinstein, accompanied by his Miramax assistant Rick Schwartz, sat next to Brock. Also in attendance was Fabrizio Lombardo, a friend of Brock's agent, who officially was the head of Miramax's Italian operations, but actually was a "procurer" of women for Weinstein.

154.    After the dinner and party, Brock was deliberately separated from her agent and his friends, who were herded into a separate car by Weinstein, Schwartz, and Lombardo. Brock

---

[79] Caitlin Dulany, *Why I Waited So Long to Share My Harvey Weinstein Saga (Guest Blog)*, THE WRAP (Nov. 28, 2017), https://www.thewrap.com/harvey-weinstein-story-waited-so-long-sexual-misconduct/; Dulany's story also appeared in a Radar Online Article. *See* Radar Staff, *New Harvey Weinstein Claims Victim Claims Shocking Sex Assault*, RADAR ONLINE (Nov. 14, 2017), https://radaronline.com/videos/harvey-weinstein-alleged-sex-assault-victim-caitlin-dulany-speaks-new-interview/

found herself in a car alone with the three men, who told her that there had been a change of plans and her friends were going to meet them at Hótel du Cap Eden-Roc for a drink.

155.    When they arrived at the hotel, all four went to Weinstein's room to have a drink. After Lombardo made excuses to leave the room, Brock asked Schwartz to contact her friends immediately and find out where they were. Schwartz left, saying he would go downstairs to see whether they were having trouble getting up to the room. Brock then realized her friends were not coming.  Lacking a cell phone or wallet, Brock did not know how she was going to get back to the yacht where she was staying.

156.    Weinstein then left the room, re-emerging in the nude and demanding a massage. When Brock refused, Weinstein asked if she would like a massage instead, and physically maneuvered her into his bedroom.

157.    Brock took note of the room's thick walls and realized that nobody was likely to hear her if she were to cry out.  Moreover, she had observed the hotel staff attempting to ingratiate themselves to Weinstein when they had arrived.  Finally, she realized that Weinstein's associates had lied about their intentions in order to convince her to come to the hotel in the first place. She was terrified that Weinstein was going to rape her, and she feared for her life.

158.    Brock was able to elude Weinstein's grasp and escape to the bathroom, where she locked herself in.  The bathroom did not have a telephone that would have allowed her to call for help.  Weinstein then began to bang on the bathroom door and demand that Brock come out. Convinced that he would rape her, Brock refused.

159.    Eventually, after Brock started yelling, Weinstein promised to put his clothes on. When Brock emerged from the bathroom, Weinstein was in a bathrobe. Weinstein promised to make it up to her and told her he would have Schwartz take her into town. Weinstein then got

- 53 -

dressed, contacted Schwartz to return, and the three of them took a car back to the harbor.

During the car ride, Weinstein repeatedly told Zoe how much he wanted to help her with her

career. Weinstein told her she was special, amazing and a star. He told Brock that he wanted to

be her "Rock of Gibraltar."

160.    When they arrived at the harbor, there was no way for Brock to return to the yacht

where she was staying. Weinstein then offered her his penthouse suite at Hotel Barrière Le

Majestic, which he claimed to keep for "emergencies."  During the check-in process, Schwartz

apologized for Weinstein's behavior, admitting that it had happened before.  Schwartz then

grabbed a business card, wrote his contact information on the back, and handed it to Zoe. A true

and correct copy of the card follows:

 

161.    When Brock arrived at the room, she triple-locked the door, called her mother to

tell her what happened, and called Rufus Sewell, an actor who was staying at the hotel, to tell

him what happened. Sewell responded, "Don't tell me. You've been Weinsteined?" He then

warned Brock not to go to sleep because Weinstein would be back.[80]

162.    The next morning, Brock took the first-available water taxi back to the yacht,

narrowly avoiding another encounter with Weinstein, who returned to the Majestic at 7 a.m. in

_____

[80] On October 13, 2017, Rufus Sewell confirmed Zoe's version of events via Twitter.

an attempt to intercept her. Later that day, Weinstein invited Brock and her friends to return to the Majestic.

163.     When Brock told her agent that she never wanted to see Weinstein again, the agent said "Oh, of course."  Shockingly, that very night—and without disclosing that Weinstein would be present—Brock's agent took her and a group to a private film screening. The agent informed the group that the theatre rental had been a gift. As the lights dimmed, Weinstein entered the cinema and sat directly behind Brock. In an apparent (and successful) attempt to intimidate her, Weinstein kept his hand on Brock's chair the entire movie. Throughout the movie, Brock was nauseous and shaking, fearful of being assaulted.

164.     After Weinstein assaulted her, Brock suffered from depression, a lack of self-confidence and a loss of reputation. Because of the actions of Weinstein and his enablers, Brock was afraid to audition for roles that required her to travel to Hollywood and avoided going there for several years.  Weinstein and his Miramax colleagues significantly affected Brock's confidence and her ability to be a professional actor.

**5.     Plaintiff Melissa Sagemiller's experience (2000).**

165.     During the summer of 2000, Sagemiller was a 24-year-old actress filming *Get Over It*.  Because Miramax was distributing the film, Weinstein was on the set throughout the two-month shoot.

166.     Right after shooting started, Weinstein's female assistant called Sagemiller to invite her to lunch with Weinstein. Sagemiller was excited to be invited to lunch with the head of Miramax. During the lunch, Weinstein asked Sagemiller what she liked to do and what kind of men she liked to date. Weinstein then took her to a bookstore and offered to purchase numerous books for her, informing her that he was "the last tycoon," a reference to the Fitzgerald novel of the same name.

- 55 -

167.     As production continued, Sagemiller was contacted by another female assistant, – who, on information and belief, was Barbara Schneeweiss, and was told to go to Weinstein's hotel room. Sagemiller told the assistant she was not comfortable about doing so and asked whether she could meet Weinstein the following day in her trailer instead. The assistant told her not to worry, that the meeting would be short, and that it was "very important" that she attend so that Weinstein could "discuss" the script with her.

168.     Although Sagemiller had misgivings, which she expressed to her then-boyfriend, she believed she had no choice but to attend. The producer of her film was demanding, through Miramax employees, that she attend the meeting.

169.     Sagemiller went to Weinstein's room at the scheduled time. Weinstein answered the door in his robe. He had poured drinks.

170.     Weinstein asked Sagemiller if she would give him a massage, and then he demanded a kiss. In response to her refusal, Weinstein responded that he would not allow her to leave until she kissed and touched him.  He blocked the door, placing Sagemiller in fear of an impending assault.

171.     Weinstein then told Sagemiller that Renée Zellweger, Charlize Theron and other actresses gave sexual favors. Weinstein asked her, "Don't you want your career to be more than just this little teen film?"

172.     Weinstein continued to prevent Sagemiller from leaving. In an effort to be permitted to depart, Sagemiller finally submitted to a forcible kiss.  Weinstein then said, "OK, you can go now. That's all I wanted. Just do what I say and you can get your way."  She was then permitted to leave.

173.     When Sagemiller disclosed the assault to her castmates, the implicit warning from others on the set was not to cause any trouble, because it would hurt her career to discuss what happened to her.

174.     Sagemiller did everything she could for the rest of the shoot to make sure she was not alone with Weinstein. At the wrap party however, each actor was supposed to thank the producer. Not wanting to do it, but feeling pressure, Sagemiller thanked Weinstein.  He then insisted that she travel back to the United States on his private plane.  Sagemiller refused.  She subsequently instructed her agent not to allow the cancellation of her reservation on a commercial flight.

175.     The next day at the airport, after Sagemiller checked her bags and proceeded to the gate, she was instructed to report to the security desk.  When she picked up the security phone, it was Weinstein's assistant, who informed her that Weinstein had directed the removal of her luggage from the commercial flight and had the luggage delivered to him.  With her personal effects held hostage, Sagemiller was forced to travel on Weinstein's plane.  When she arrived at his plane, Weinstein said: "See, Melissa, you can't say no to me. I always get what I want."

176.      The fact that Weinstein wielded so much power that he could prevent her from traveling on public transportation, over her objections, frightened Sagemiller.

177.     Sagemiller auditioned for 40 Days and 40 Nights, a Miramax movie. Sagemiller's manager, Christian Donatelli, told Sagemiller that Middleton had "made it known" throughout Hollywood that he did not like her and would not cast her. On information and belief, Weinstein fed Middleton negative information about Sagemiller.

178.     Sagemiller later auditioned for a movie called Sin City being produced by Buena Vista, and successfully read for director Robert Rodriguez, but did not get the part. On

- 57 -

information and belief, Sagemiller did not get the part because Weinstein intervened and told Rodriguez not to cast her.

179.    On information and belief, Weinstein's interventions to ensure Sagemiller was blacklisted also resulted in her not getting parts in the movies "Pearl Harbor" (distributed by Buena Vista) and "National Treasure" (produced by Disney and distributed by Buena Vista).

**6.    Plaintiff Larissa Gomes' experience (2000).**

180.    In 2000, Gomes was working as an ensemble dancer and actor on the set of the Miramax-produced movie *Get Over It* in Toronto, Ontario, Canada. As Gomes was sitting on set between takes, Weinstein approached her and introduced himself. As they talked, Weinstein told Gomes that he was impressed by her and would like to schedule a meeting.

181.    At the time, Gomes was a young, relatively inexperienced dancer, singer, and actress, Gomes found Weinstein's interest in developing her talent "intoxicating." She hoped to use the opportunity to show Weinstein her value as a performer.

182.    Gomes arrived at the Sutton Place hotel in Toronto at 8:30 a.m. for the meeting. When Gomes arrived at the hotel, she called up to Weinstein's penthouse room and suggested that they meet in a bistro across the street. He refused, commanding, "I don't bite, come on up."

183.    Gomes then called her agent to tell her that she did not feel comfortable meeting in Weinstein's hotel room. The agent placed a call to Weinstein, who berated her for not accepting that people set up meetings in hotel rooms in Hollywood all the time. Another agent on the call challenged Weinstein's assertion, and he then agreed to have his head of casting present for the meeting. Gomes then agreed and proceeded to Weinstein's room.

184.    As Gomes approached Weinstein's room on the penthouse floor, she saw an assistant scurrying with a pile of papers. Although Gomes had been wary of meeting Weinstein

in his hotel room, she felt relieved when she found that the penthouse floor had the air of an intense office suite.

185.    Jill Messick, a Miramax executive who Weinstein described as his "right hand," and Randy Spendlove, the film's music director, attended the meeting. During the meeting, Weinstein told Gomes that he would like her to read for three upcoming films, all to be shot in Toronto, and that Miramax shot eight films per year in Canada. He impressed upon her that he needed a pool of local talent that he could rely on, and that her ability to act, sing, and dance made her a perfect fit.

186.    Weinstein then arranged for Gomes to perform background vocals on "The September Song" of the *Get Over It* soundtrack, and to spend some social and professional time with Spendlove. Gomes appreciated the opportunities Weinstein was giving her and felt that he was bringing her into his inner circle.

187.    Shortly thereafter, Weinstein set up an early evening meeting with Gomes in his hotel room. Gomes felt comfortable because their previous meeting had been professional. After Weinstein opened the door to his room, he immediately excused himself for a phone call. After screaming throughout the phone call, he hung up forcefully, yelling that Martin Scorsese was killing him with his budget for *Gangs of New York*. Gomes felt intimidated.

188.    Weinstein then placed a stack of scripts on the table front of Gomes, and told her that she would read for the upcoming productions of *Serendipity* and *40 Days and 40 Nights* because she'd be "perfect." He offered her champagne, and his demeanor changed from agitated to calm. Feeling comfortable, she accepted the drink.

189.    Weinstein then told her that he does not often meet women like her, explaining when he meets someone he likes "they usually don't mind being treated elegantly when I come

into town." Gomes responded, "You mean like a prostitute?" Weinstein laughed. Gomes's spirits began to sink as she realized Weinstein had scheduled their meeting for sex. She began trying to figure out how to escape the room without offending him. Her heart was racing and she felt sick.

190.    She asked nervously, "Aren't you married?" "Yes, I am happily married," he responded. Then he stood up and retreated to the bedroom. Gomes breathed in relief, thinking she may have diffused the situation. She felt frozen to her seat.

191.    After approximately five minutes, Weinstein called to Gomes from the bedroom. With a feeling of dread, she approached the bedroom slowly. Weinstein was laying on his back on the bed. He claimed to have a headache. Very frightened and uncomfortable, Gomes offered to find some Advil and leave him in peace.

192.    Weinstein demanded she lay down with him instead and told her she should give him a massage. He then said "take off your top, show me your breasts." Gomes was shocked.

193.    Instinctively, her mind frozen and unable to respond with words, Gomes left the bedroom and went to the sofa, where she had left her bag. At that point, Gomes felt that everything was happening in slow motion. She began to gather her belongings as she sat on the sofa. Her heart was racing and she desperately wanted to leave. Still, she felt frozen in place. Weinstein followed her out of the bedroom in his bathrobe. Gomes prayed she could get out of the hotel room without being assaulted.

194.    Weinstein used his bulk to lean over the back of the sofa where Gomes was sitting. He began to massage her shoulders and neck. Gomes felt nauseated and her breath became short. Extremely uncomfortable, Gomes tried to pull away but Weinstein would not let her. Gomes felt trapped and could not get out of Weinstein's grasp.

- 60 -

195.    Weinstein then forcefully pushed his hands toward her breasts, saying "you're so tense, just relax, friends can give each other massages you know." Weinstein seemed smug, as if he was amused by Gomes's fear and anxiety. Gomes wriggled out of his grasp and jumped off the couch away from Weinstein's reach. She was in imminent fear for her life and safety.

196.    Weinstein reacted angrily, yelling at Gomes in a threatening tone: "You know Gwyneth Paltrow and Ashley Judd were exactly where you are at one point. Look at them now. Ashely Judd had no problem f****** me." Gomes felt paralyzed with disbelief.  Scared, she blamed herself for having been naïve enough to think Weinstein would conduct himself professionally.

197.    As her fear and panic multiplied, Gomes tried to come up with a plan to leave the room. But she was trapped. Weinstein would not let her leave. He seemed angry and agitated. She was a small woman trying to escape a huge, hulking man who made it clear he was going to get what he wanted.

198.    She tried to remain calm and said the only thing she could think of that might convince Weinstein to release her: "I think I should go now, my boyfriend is waiting for me, and he will be worried." Weinstein laughed. As Gomes began to retreat, Weinstein put his hand on the door so that she could not open it. He then grabbed her and tried to kiss her. Gomes refused and turned away, as Weinstein sneered and pointed to himself, "Who could kiss a face like this?" Gomes responded "your wife?" Weinstein then sneered and released his hand from the door.

199.    Gomes ran out of the room distraught and shaking with fear. She never wanted to see Weinstein again, let alone work with him. At the same time, she was devastated that his interest in her talent had not been genuine, and that she would never be part of the Miramax talent pool.

200.   Gomes confided in her agent and her close friends about the assault, but she did not report it because she feared for her safety and career. Gomes knew—because after her assault, she heard another actor's account—that Weinstein could and would destroy her if she complained about his sexual misconduct.

201.   At the time, Gomes questioned whether what happened to her was "normal" and thought that it "didn't count" because she got away. But she could not shake the extreme physical and emotional distress she felt. Since then, she has tried to avoid working with men, for fear of her safety.

202.   Although she continued to work as an actor, Gomes carried the trauma of Weinstein's attack with her. She never worked with Miramax or Weinstein again, and she never regained the momentum that she had before meeting Weinstein. Feelings of fear and shame have resurfaced regularly, which have negatively affected her personal and professional life. Harvey Weinstein's attack damaged Gomes physically and emotionally, and it damaged her career.

**E.     Like many Class members, Plaintiff Jane Doe's experience with Weinstein occurred over a period of years (2002-2011) when Weinstein worked for Disney and Miramax, and then TWC.**

203.   In or about September 2002, 16-year-old Jane Doe was attending an event with Next, her modeling agency, in Manhattan. Jane Doe had moved to the United States from Poland with dreams of become an actress.

204.   At the event, Jane Doe met Harvey Weinstein, who she learned was a producer. When Weinstein learned Jane Doe was interested in becoming an actress, he gave her his card and directed her to give him her phone number. He told Jane Doe that they would have lunch to discuss her future.

205.   Approximately three days later, Weinstein called to inform Jane Doe that he would pick her up with his driver for lunch. Jane Doe understood that the lunch would be for

business purposes.  In the car, Weinstein asked her where she was from and how old she was. She replied that she was 16 and from Poland.

206.    Instead of taking them to a restaurant, Weinstein's driver dropped the two at Weinstein's Soho apartment. As Jane Doe rode the elevator with Weinstein, she became nervous. When the elevator door opened directly into Weinstein's apartment, Jane Doe realized that they were completely alone.

207.    Once alone with Jane Doe, Weinstein wasted no time in aggressively and threateningly demanding sex. He told her that if she want to be an actress, she would have to be comfortable doing whatever the director told her to do—including losing her inhibitions and getting naked. He then instructed Jane Doe to take off her clothes.

208.    Terrified and struggling to hold back tears, Jane Doe said she would not and resisted his demands. Jane Doe was a virgin, and had no intention or understanding when she agreed to a business lunch that she would be put in this alarming position.

209.    Weinstein threatened and pressured Jane Doe, saying that he had "made" the careers of Penelope Cruz and Gwyneth Paltrow, and that neither would be working without him. He intimated that Jane Doe would never work as an actress unless she acquiesced to his demands. He then took off his pants and forcibly held Jane Doe while taking her hand and making her touch and massage his penis.

210.    As Weinstein forcibly caused her to touch him, Jane Doe continuously protested. However, Weinstein's demeanor became intense, as if he was hunting prey. Jane Doe realized then Weinstein was determined to claim her as his prize.

- 63 -

211.     Overwhelmed by fear and emotion, Jane Doe tried to leave the apartment. She began to scream at Weinstein, telling him that she did not want to touch him or do what he wanted of her. Weinstein returned Jane Doe's shouting with anger.

212.     Throughout the incident, Jane Doe berated herself. She felt angry at Weinstein's demands, and ashamed that Weinstein was causing her to unwillingly engage in sex acts. Weinstein made clear that, by refusing his sexual demands, Jane Doe was giving up her opportunity to make it in Hollywood.

213.     As Weinstein finally let Jane Doe leave, Weinstein told her that she needed to work on her stubbornness. Jane Doe did not know at the time that she was not finished with Weinstein. Indeed—he fully intended to wear her down. After their first encounter, Jane Doe endured nearly a decade of sexual harassment and emotional abuse at his hands.

214.     Approximately one week after the incident at his apartment, Weinstein called Jane Doe to ask how she was doing. She had spent the week worrying that she had destroyed her life by refusing Weinstein.

215.     Thereafter, Weinstein called and texted Jane Doe approximately once every two weeks. He used each opportunity to make sure that she understood that he was the only person who could help her become an actress.

216.     Weinstein's assistant from Miramax also called Jane Doe to try to set up appointments with Weinstein, but Jane Doe said no.

217.     In approximately 2004-2005, Weinstein again called Jane Doe.  Trying to get him to leave her alone, she told him on the phone that she was dating a wealthy man. Upon learning this information, he became possessive and repeatedly chastised Jane Doe for being "unavailable" for his sexual demands.

218.    Weinstein then showed up at The Four Seasons, where Jane Doe was living, and attempted to gain entry to her room, but security refused to allow him up. When Jane Doe learned of the incident, she confided in her friend, and the person who had recruited her to a modeling agency, Ramsey Elkholey. Elkholey told Jane Doe that she should be afraid of Weinstein because he had a bad reputation and was a powerful bully.

219.    Weinstein continuously contacted Jane Doe during 2004-2005, often making verbal sexual advances and emphasizing that he held the keys to Hollywood. Jane Doe was living between Poland and New York City, and Weinstein often asked her to meet when she was in New York. Wanting to avoid his wrath, and still wanting to become an actor, Jane Doe became well versed in the art of letting Weinstein down gently. She knew from her experience and Elkholey's warning that he was powerful and dangerous.

220.    In 2004, Weinstein offered Jane Doe a role as an extra on the Nanny Diaries, but he said that in exchange, she would have to be "very good to him." Jane Doe took the opportunity, but was determined to avoid giving him sexual favors in return.

221.    On the set of the Nanny Diaries in 2004, it seemed to Jane Doe that every person on the crew knew that she was there because of her association with Weinstein. As a result, Jane Doe received special treatment – she was sent to lunch with the main actors, even though she was only an extra. People made comments to the effect of "Harvey said to treat you very well." Still very young and inexperienced, Jane Doe did not understand that people were implying that she had a sexual relationship with Weinstein.

222.    Shortly after appearing on the Nanny Diaries, in 2004 or 2005, Jane Doe and her sister met Weinstein at Tribeca Grill. Jane Doe had confided in her sister about what happened, and her sister became worried. At lunch, Weinstein asked Jane Doe to go up to a room in the

- 65 -

hotel with him to have a "word". Jane Doe refused, giving the excuse that she could not leave her sister.

223.     In approximately 2006, Jane Doe asked Weinstein for a recommendation to acting school.  He provided her with a letter from Kelly Carmichael, TWC's Senior Vice President of Production. When Jane Doe picked up her letter at his office, Weinstein asked her if she would like to get a drink afterward, but Jane Doe declined.

224.     After he provided the letter, the frequency of Weinstein's calls and text messages increased. He sent Jane Doe a large box of movies from the 1920s for her "education," adding that they would have to arrange a time to discuss the movies in person.

225.     Jane Doe went to Los Angeles for approximately one week in 2006. Weinstein arranged for her to meet with Ashely Josephine at William Morris Endeavor Entertainment LLC, a talent agency, while she was there. Later that day, Weinstein called Jane Doe to ask how the meeting went, and whether she "appreciates the things he does for her."

226.     During the same trip, Jane Doe met with an independent producer who was trying to do a film about the Polish social worker, Irena Sendler. Jane Doe casually mentioned that she knew Harvey Weinstein. The producer told Jane Doe to be very careful, because Weinstein could crush people.

227.     Weinstein continued his efforts to keep Jane Doe under his control. He constantly reminded her how much he had done for her, always emphasizing that he was the only person who could help her become an actor. He repeatedly implored her to keep their association secret because he is a "very public person." Weinstein's ongoing emotional abuse, and the guilt, shame, and anxiety that flowed from the 2002 incident—when she was 16 and alone with Harvey Weinstein—took a toll on Jane Doe.

228.    Weinstein's demands for quid pro quo continued even after Jane Doe left New York City. When she moved to Los Angeles for a short time, she ran into Weinstein while out with an aspiring movie producer, also her boyfriend at the time. Weinstein was dining with Veronica Rosatti, a Polish actress. When they met, Jane Doe's boyfriend told Weinstein that he wanted to be a movie producer. Weinstein replied that he would help him, but only "if Jane Doe stays in touch."

229.    In 2008, at age 23, Jane Doe returned to New York to make one final attempt at becoming an actress. When Weinstein heard that she was in town, he suggested that they meet because he "might have some ideas" to help. Jane Doe agreed. She felt more mature and capable of handling Weinstein. She thought he might be impressed that she was studying psychology in university, and that he might treat her as a person, not a sex object.

230.    Jane Doe was wrong. The meeting took place at TWC offices on Greenwich Street after business hours. Weinstein met Jane Doe in the lobby of the building and walked her upstairs where they sat alone in his office. The meeting started out professional, although not as Jane Doe had hoped. Weinstein said that he would help her become an actress eventually, but that she would have to go back to modeling first. Then, if she did well as a model, he would consider helping her further. Jane Doe protested—she did not want to be a model; she had waited long enough for his help with acting. But Weinstein insisted. He assured her that things had worked out well for others who gave sexual favors—specifically Julie Ordon, who was doing Chanel ads at the time. Jane Doe would have to trust him, and give him the control. Weinstein insisted that his final offer was to set her up with representation from Marilyn, a modeling agency.

231.    He also told Jane Doe that she needed to get in shape before her meeting with Marilyn, because she was very skinny at the time. He said that he would set up an appointment for her with a celebrity trainer—a friend of his—who had also trained Eva Mendes.

232.    Meanwhile, the television in his TWC office showed Christina Aguilera performing. Weinstein paused their conversation to look up at the TV, and declared, "Wow, I'd really like to fuck that pussy." He then unzipped his pants and began touching his penis. Jane Doe first froze, and then fled the office.

233.    After the meeting at his office, Harvey called Jane Doe to ask if she was interested in working as a model on Project Runway, which was jointly produced by TWC and Miramax. She said yes.

234.    Barbara Schneeweiss, a producer at TWC, followed up with Jane Doe by email to set up the meeting with Marilyn and discuss Project Runway. The two exchanged several calls and emails in 2010 about both topics, and Schneeweiss handled the logistics for the Marilyn meeting.

235.    Schneeweiss scheduled a meeting for Jane Doe with the head booker of Marilyn, Kwok Kan Chan, and the agency's founder, Marilyn Gauthier, who was friends with Weinstein. The meeting took place in person with Weinstein on speakerphone. Jane Doe and Marilyn were not interested in working together, but Weinstein was in charge. Jane Doe reluctantly signed to work with Marilyn, but it was clear to her that she was viewed as a mere favor to Weinstein. Again, she felt embarrassed and ashamed. She felt like a joke.

236.    In 2010, while with Marilyn, Jane Doe went on a casting for a Marchesa fashion show. There, she saw Harvey Weinstein's wife, Georgina Chapman, holding the couple's baby.

- 68 -

Jane Doe's anguish and guilt at seeing Weinstein's wife, knowing that he had been sexually

harassing her for years.  She did not get the job.

237.    During that time, she struggled with depression and anorexia, knowing that she

could not make it in acting without acceding to Weinstein's demands. After a few months, she

left New York for the final time and returned to Los Angeles.

238.    While in Los Angeles, Weinstein called Jane Doe to ask if she would meet him

for coffee. He had heard that she was dating a well-known actor, and repeatedly asked her on the

call "what she was doing" with him. Afraid of Weinstein's temper, and exhausted from the years

of abuse and harassment, Jane Doe declined his invitation to meet, and did not see him again

after 2011.

239.    Jane Doe's encounters with Weinstein over the years caused her great stress and

anxiety. She understood that she would never get cast in a production unless she gave Weinstein

sexual favors.

240.    Weinstein told Jane Doe, starting when she was 16 years old, that she could not

be successful without engaging in unwanted sexual contact with him; he was the sole gatekeeper

to the industry, and she would have to give him sexual favors in exchange for becoming an actor.

241.    Because Jane Doe was unwilling to give Weinstein the sexual favors he

demanded, Weinstein never gave her work and made sure others didn't either.

242.    In addition to acting as a barrier to her acting career, her encounter with

Weinstein—her first sexual encounter—was deeply traumatizing. And the ensuing abuse,

harassment, and manipulation has had compounding negative effects on her mental health. To

this day, she has suffered from depression and anorexia, and she has found it difficult to maintain

healthy relationships with men.

**F.     Like many Class members, Plaintiffs Lousiette Geiss, Sarah Ann Thomas, and Melissa Thompson's experiences followed the same script when Weinstein worked for TWC.**

**1.     Plaintiff Louisette Geiss's experience (2008).**

243.    Geiss ran into Weinstein at the 2008 Sundance Film Festival in Park City, Utah while he was eating with Barbara Schneeweiss. She had met him the year before at The Cannes International Film Festival and reintroduced herself. Weinstein invited Geiss to the premiere of the movie *Where In the World Is Osama Bin Laden*, which was distributed by TWC. He told her that  Schneeweiss would contact her to set it up.

244.    After the movie, Weinstein inquired about Geiss's music company, the script she was pitching at the festival, and her acting career.  Weinstein asked Geiss to meet in the lobby of The Stein Eriksen Lodge. When they arrived in the lobby, they sat down and began to speak about her project. They were quickly told that the bar was closing. Weinstein suggested that they go to his office.

245.    Because Geiss had heard rumors about Weinstein, she was skeptical, but the reason for attending Sundance was to secure a deal for her script. She decided to bluntly express her concerns and asked Weinstein to shake her hand – in front of security cameras in the hotel lobby – and agree that he would not touch her during the meeting. He agreed.

246.    In Weinstein's office, Weinstein and Geiss had a professional conversation for approximately 30 minutes, in which Weinstein expressed enthusiasm about both her script, music, and roles she could play as an actress. He said that she should meet his brother Bob because she would be great for his movies. Then, Weinstein excused himself to go to the bathroom.

247.    Weinstein emerged from the bathroom in an open bathrobe, naked underneath. He informed Geiss that he would listen to the remainder of her pitch from the hot tub. He then

- 70 -

disrobed, entered into the hot tub and began to masturbate.  His demeanor had changed from professional and helpful to belligerent and overbearing. He told her to keep talking while he masturbated.

248.    Distressed, Geiss began to leave the room.  Weinstein quickly climbed out of the hot tub and grabbed her arm while his other hand was touching his penis. He pulled her to his bathroom, insisting she watch him masturbate. He told her he would "greenlight" her script if she watched him masturbate. Geiss repeatedly said no and "this is so ridiculous." She felt violently ill and distressed.

249.    Continuing to hold on to her arm, Weinstein told Geiss not to be "stupid," and that if she watched him masturbate he would greenlight her script and give her a three-film deal. As Geiss made her way to the door, Weinstein grabbed both of her arms forcefully and kissed her. Fearing an imminent sexual assault, Geiss escaped Weinstein's grasp and fled, with Weinstein giving chase.

250.    Weinstein's assault deeply distressed Geiss. She felt defenseless against Weinstein's power. She experienced fear, helplessness, anger and depression and sought professional help. Although Geiss had spent nearly her entire life dedicated to her craft, working diligently to become a performer, writer and producer, she concluded that she could not perform sexual acts with Weinstein in exchange for a career.

251.    As a result, Geiss lost both the three-film deal and other opportunities at TWC. Ultimately, Geiss's professional career in the entertainment industry was damaged, causing her to leave the industry.

252.    After the assault, Geiss met with Schneeweiss on one occasion for dinner, where she talked to Schneeweiss about Weinstein's inappropriate behavior.  Schneeweiss responded:

"He's never done anything to me," but did not deny that Weinstein was inappropriate with other women.

253.    In May 2017, Weinstein became more concerned about the reporting and investigations being conducted by reporters at The New Yorker and New York Times. On information and belief, Weinstein directed Schneeweiss to contact Geiss so that she would not speak to the press. Schneeweiss reached out to and connected with Geiss via Linked In in May 2017.

**2.    Plaintiff Sarah Ann Thomas's (a/k/a Sarah Ann Masse) experience (2008).**

254.    In 2008, Sarah Ann Thomas was working as a nanny to support herself as she pursued an acting career in New York City. Her resume included both her acting and her nanny experience. Thomas's agency informed her of the availability of a job babysitting Weinstein's three children from his first marriage.

255.    Prior to meeting Weinstein, Thomas was interviewed several times by Weinstein's female assistants from TWC, including Danielle Prussin (who holds herself out as a Project Manager at Marchesa/Weinstein Co. since February 2006[81]) and Kate Cook (who communicated from a TWC email address). Weinstein's assistants inquired several times whether she could work for Weinstein while pursuing her acting career without it becoming a conflict of interest. Thomas was clear that she did not use her nanny work as an opportunity to try to advance her acting career.

256.    After approximately one month of these interviews, Weinstein's assistant told Thomas that Weinstein wanted to meet her. The assistant scheduled the interview to take place at

---

[81] https://www.linkedin.com/in/danielle-prussin-6b13644/

Weinstein's Connecticut home. The night before the interview, Weinstein's assistant contacted Thomas to let her know that she could not accompany Thomas to the meeting.

257.    Thomas drove to Weinstein's home. When she arrived, Weinstein opened the door in his boxer shorts and an undershirt. Thomas assumed Weinstein had forgotten about the interview, and that he would excuse himself to go change. But he did not.

258.    Weinstein then proceeded to conduct the "interview" in his underwear. The intimidation engendered by Weinstein's industry power was multiplied by his strange behavior. Weinstein's behavior made Thomas very uncomfortable.

259.    During the interview, two of Weinstein's children ran into the room, curious to see who was visiting. Weinstein screamed at them to leave, which was odd because in Thomas's experience, parents typically are eager for children to meet a potential nanny during the interview.  The fact that Weinstein yelled at his children not to come back also made Thomas feel unsafe, given he was in his underwear and they were otherwise alone in the house. Moreover, Weinstein's temper and the way he screamed at his children frightened Thomas.

260.    Eventually, leaning forward and wiggling his eyebrows as if leering at her, Weinstein asked whether she would "flirt" with his friends to "get ahead."  Thomas was disgusted and uncomfortable.

261.    At the conclusion of the interview, still clad only in his underclothes, Weinstein grabbed Thomas and pulled her tight against his body. The hug was uncomfortably close, and lasted too long. She did not know how to get out of his embrace. Weinstein then told Thomas that he loved her. Thomas felt unsafe and sexualized. She was afraid to try and pull away or push him off or even ask him to stop because she feared he may become violent.

- 73 -

262.     Thomas left feeling upset, shaken, afraid and disrespected.  When she returned home, she told the story to her mother.

263.     A few days later, Weinstein's assistant informed Thomas that she did not get the job because she was an actor. However, the fact that Thomas was an actor was known to the assistants and Weinstein before they interviewed her.  The reason Thomas was not hired was because she did not respond to Weinstein's propositions.

264.     Ever since her encounter with Weinstein, Thomas has experienced severe anxiety and emotional distress, which have manifested into physical symptoms. Because Weinstein assaulted her during a job interview, she often does not feel safe to attend interviews and auditions alone, and requires her husband to accompany her.

265.     After Weinstein was terminated from TWC, Thomas finally felt she could speak publicly about Weinstein's predatory behavior. She has also publicly declared that she will not audition for roles for productions in which known predators are involved. In early December 2017, Thomas was informed that several casting directors had complained about Thomas's public position, and threatened to (and did) blacklist her.

### 3.     Plaintiff Melissa Thompson's experience (2011).

266.     Upon receiving her MBA from Columbia Business School in 2011, Thompson consulted for a technology startup, which included Intercast Network Inc. ("Intercast")[82] in its portfolio.  Intercast is marketed as an enterprise video platform that enables the distribution of time-sensitive live or recorded video at scale, wrapping it with viewer engagement functionality, and allowing real-time optimization and analyses. Intercast was launched by the founders, with

---

[82] https://www.linkedin.com/in/bizmelizz/; http://www.melissathompson.com/

Thompson as the Director of Business Development, on September 12, 2011, in San Francisco at the TechCrunch Disrupt Conference.[83] Early clients included NBC Universal Pictures, President Obama, and Organizing for Action.[84]

267.    While Thompson was out to dinner in or about mid-September 2011 with friends, Harvey Weinstein approached their table to say hello to her friends who then introduced her to Weinstein. Later, as she went to the bathroom, he literally bumped into her in a narrow corridor. Thompson knew she had one chance to make a pitch for the venture for which she worked, so she did—quickly explaining how the technology could be used in the film industry. Weinstein wrote his email on the back of a business card and told her to email him to set up a meeting with his marketing team. Thompson did email Weinstein, and Weinstein confirmed a meeting at his TWC office via email.

268.    On September 29, 2011, Thompson met with Weinstein to pitch Intercast at The Weinstein Company's office at 375 Greenwich Street in New York City. Thompson was shown to Weinstein's empty office where she set up her laptop to demonstrate the digital marketing platform. She turned on the video recording on her computer to use the live feed of her and the pitch attendees to demonstrate how Intercast works.

269.    As Weinstein walked into his office, he repeated several times to the people just outside his office, "Don't interrupt, don't interrupt."  He then shut and locked his office door. He was alone.

---

[83] https://www.youtube.com/watch?v=fONEJOsgUrY. *See also* Sarah Perez, *Live Streaming Video Platform IntercastNetwork Brings Real-Time Feedback To Online Broadcasters*, TECHCRUNCH (Sept. 15, 2011), https://techcrunch.com/2011/09/15/live-streaming-video-platform-intercastnetwork-brings-real-time-feedback-to-online-broadcasters/

[84] Brand Knew, *Case studies*, https://www.brand-knew.com/case-studies/intercast/ (last visited May 30, 2018); Propper Daley, *Intercast*, http://dev.propperdaley.com/intercast/ (last visited May 30, 2018).

270.     Thompson stood up from her seat and extended her right hand to shake his hand. Weinstein deflected her hand with his left hand, moving her right hand towards his shoulder, and then ran his hands from her upper back around to her lower back, commenting "That's nice."

271.     After making small talk, Weinstein asked Thompson "So am I allowed to flirt with you?" Thompson responded: "Ummmmm. We'll see. A little bit." Thompson felt cornered, as if she had to play along to not blow the pitch before it had even started. Weinstein became curt and said: "Oh, then I won't. What do you want?" making clear that she had to play if she wanted his business.

272.     Thompson then redirected Weinstein's attention to business and to the technology demonstration on her computer. She explained Intercast, its technological capabilities, and how President Obama and TWC's competitors were using the technology.

273.     Weinstein then asked how the technology would work if he wanted to show a trailer of his Marilyn Monroe movie.  As Thompson began to respond, Weinstein reached down and began caressing her leg and moving her hand under her dress. Thompson panicked. Her legs felt wobbly.  Her speech was interrupted. She hesitated and then continued with the pitch, believing that if she didn't react he would stop.  Weinstein mumbled: "it's fun when you do this," referring to his hand caressing her thigh, but then tried to reassure her that it was part of the deal, stating: "but I am actually seriously having a conversation with you."

274.     Thompson continued her pitch, focusing on the technology's capabilities and the cost of the options. She tried to keep the pitch business-like, not returning Weinstein's caresses and keeping her elbows on the table.  She worried that he would perceive any response to his behavior as welcoming his actions. She also feared that, if she angered him, his advances would become more forceful.

275.     As Thompson continued to make the pitch and run through examples of where and how Intercast had been used, Weinstein caressed her shoulder, and ran his hand up and down her arm. When he ran his hand up her leg and under her dress, Thompson moved away from him and attempted to delicately balance saving face, while shutting down his actions, to get through the meeting. Thompson felt her brain shifting between fight or flight mode. As his caresses increased, she lost her ability to focus on the pitch, forgot what she was saying, and could not think clearly.

276.     During the pitch, Weinstein stood up to call Stephen Bruno, TWC's President of Marketing (who is now at Netflix). Weinstein said, "Steve, what are you doing? Where are you, at 99 Hudson? Can you take 5 minutes out? I want you to meet Melissa Thompson, whose got this Intercast to do spots and all sorts of things. Come up with a 375. Ok. Thanks."

277.     Weinstein hung up and asked Thompson if she wanted a glass of water. He told her to follow him to the kitchen attached to his office. She thought this was a good diversion to the pattern of impropriety and power-wielding that Weinstein orchestrated. But, when they got to the kitchen, Harvey quickly pivoted and captured her, pinning her against the refrigerator, making sure he was between her and the exit.

278.     When they returned to the office, Weinstein told Thompson he needed to work on editing a movie for an hour. Weinstein told Thompson that they would meet for a drink at Tribeca Grand Hotel at 5:30 p.m. Thompson felt pressured to do so in order to secure the deal.

279.     After her initial meeting with Weinstein and while waiting for Bruno, Thompson emailed her partners to let them know she "sold" the technology to do the trailer for TWC's upcoming Marilyn Monroe movie, she was about to meet with Stephen Bruno to work out some cost details, and "[t]hen Harvey coming back and going out with the two of them @ 5:30."

280.     Bruno never showed up to meet with her at TWC's offices. Thompson thus went to the Tribeca Grand, set up her laptop to work in the restaurant area, and ordered a Diet Coke, believing that Bruno and Weinstein would be present for the 5:30 p.m. meeting.

281.     At 5:30 p.m., Weinstein arrived in the restaurant alone, and without pause, asked for the check. He then threw cash on the table, told Thompson to grab her drink and follow him. He departed towards the elevators, moving Thompson along with him.

282.     Thompson knew that there were screening rooms at the Tribeca Grand, regularly used for entertainment business meetings, and expected that was where they were headed. They exited the elevator on the third floor.

283.     During this time, Weinstein was talking to Thompson about their mutual friends, including her boyfriend, as well as Weinstein's wife. Based on the nature of the conversation, Thompson felt more comfortable, believing that Weinstein was acknowledging he was not going to try anything untoward given their respective relationships.

284.     Just a short distance down the hall, Weinstein opened a door and hustled Thompson into a sitting room in his hotel suite. Thompson was surprised that she found herself in his private room. In a desperate attempt to set a professional tone for the meeting, Thompson opened her laptop on the coffee table directly in front of the entrance and kneeled down to set it up. Weinstein walked to a refrigerator in the far corner of the room, opened a Diet Coke, and then sat behind her on the couch and began rubbing her shoulders.

285.     Thompson kept trying to shift away from him, but Weinstein used his strength to maintain contact and continued to massage her shoulders. Thompson racked her brain on how to distract him.  She had gone through all of the pitch materials and made a quick and desperate decision to try to distract him with a new video. As he was watching it, Thompson excused

herself to use the bathroom and tried to figure out how to leave the hotel room politely. She sat in the bathroom, running through scenarios on how to excuse herself from the room. She racked her brain, scared and upset that she was in Weinstein's hotel room.

286.    When Thompson came out of the bathroom, however, Weinstein had no pants on. Weinstein walked towards her, naked from the waist down, and told her to join him in the shower. She declined. He then reached behind her dress and pulled the zipper down. Thompson panicked and tried to pull away.

287.    Thompson tried to pull the zipper back up. As she did so, Weinstein lowered himself to his knees and tried to take her stockings off. As he pushed one leg of her stockings down, she tried to pull the other one up. His hands were everywhere and she could not get out of his grasp or keep up with deflecting him. While Weinstein ran his hand up Thompson's bare leg, she tried to back away from him and declared in a raised voice that she did not think her boyfriend would appreciate what he was doing. While maintaining a hold on her and with his face below her waist, Weinstein responded in a resolute tone: "Fuck him."

288.    By then, he had maneuvered Thompson into the bedroom. Blocked by Weinstein's position and size, Thompson was petrified and felt cornered. She felt nauseous, and did not know how to extricate herself from the situation.

289.    Weinstein then took off his shirt and laid face down on the bed. Apparently sensing her hypervigilance, Weinstein told her "you don't have to do anything; just rub my shoulders." Thompson felt she had no good choice in the situation. She told herself that if she could leave after the massage—if this was the extent of the assault—that she would be relatively unscathed.  It seemed like the only way out of a situation over which she had no control.

010717-11 1076419 V1

290.    When she sat on the bed, he flipped over onto his back and aggressively tried to undress her. He tried to pull off her stockings again, while she resisted, leaving one stocking on and one stocking off. He pulled her dress up, exposing her underwear, despite her attempts to keep herself covered.

291.    Weinstein then started to masturbate, demanded that she "come here," and pushed her head between his legs, in an attempt to force her to fellate him. Thompson viscerally and forcibly refused. She jerked away as hard as she could, visibly upset. Thompson was shaking uncontrollably and breaking out in hives.

292.    In response to Thompson's jerking away, Weinstein grabbed her, using brute force to push her flat on the bed on her stomach as he pulled her dress up and moved her underwear to the side. Thompson was fighting back, but could not out-muscle him.

293.    Weinstein held Thompson down and raped her. Thompson closed her eyes, traumatized, praying for the assault to end. Eventually, Weinstein withdrew and began masturbating next to her as she scrambled to create distance from him. Weinstein ejaculated on the bed, immediately following which his demeanor changed and he acted like nothing had happened.

294.    Thompson felt completely dissociated and ill. Covered in hives, Thompson couldn't think straight or breathe.

295.    Acting like everything was normal, Weinstein again asked Thompson to take a shower with him. She refused and Weinstein proceeded to shower alone. He masturbated in the shower where Thompson could see him while Thompson got dressed and gathered her things to leave.

296.    Before she left, Weinstein began talking to her about contracts with Intercast and for roles he had in mind for her, and told her he would set up a meeting with TWC colleagues.

297.    Thompson was completely unnerved, panic-stricken, and in a state of shock and disbelief.  Thompson felt nauseous and distressed. Moments of the assault that just occurred flashed in her mind—something that would continue for years to come. She tried to gather herself and left the room alone, Weinstein now standing in an open bathrobe after his shower. Thompson felt dirty and ashamed.

298.    Thompson confided shortly thereafter in her then-friend, Ambassador Paolo Zampolli, who told her these things happen in business and she would need to deal with it.  She also confided in a girlfriend, but she did not report it because she feared for her safety and career. She knew that Weinstein could and would destroy her if she complained about his sexual misconduct.

299.    Two days after the assault occurred, Weinstein emailed Thompson and copied Barbara Schneeweiss and other TWC employees about the Intercast projects, but Thompson went to great lengths to make sure she was never alone again with Weinstein.

300.    In October 2011, Barbara Schneeweiss and other female TWC executives suggested Thompson and several other women do test screenings for a docu-series on women starting businesses in New York called Women Inc. Thompson later learned that one of the writers of the docu-series was also a victim of sexual assault by Weinstein – and the docu-series was supposed to be the payback because he had promised to produce the writer's work.

301.    In or about January 2012, Thompson told Nina Garcia – a judge on the television show Project Runway which was jointly produced by Miramax and The Weinstein Company -- about being assaulted by Weinstein.

302. On October 8, 2017, just days after the *New York Times* story broke uncovering Weinstein's pattern of assaults, Thompson received the first of several emails from Zampolli. Zampolli insisted she call him ASAP. Thompson was suspicious given the timing of his urgent outreach because she had not spoken with Zampolli in five years.

303. On October 12, 2017, Thompson called Zampolli and, given her suspicions, recorded the call.

304. On this call, Zampolli described a feud he had with Weinstein, pitting a team of Hillary Clinton and Harvey Weinstein against a team of Zampolli and Donald Trump. Zampolli described threats Weinstein had purportedly made against Zampolli and his family. Zampolli described a campaign of fear apparently designed (for purposes of the call) to make Thompson believe that Zampolli was on her side against Weinstein, saying "I just wanted to bury the guy," referring to Harvey Weinstein.

305. During this October 12, 2017 call, Zampolli described several other women (by name) who were forced to "f***" Weinstein or "suck his dick" because one had a project which Weinstein was producing and another was a model on Project Runway. Zampolli then said:

> All of these girls are getting together and they are going to be represented by Brafman.
>
> *Benjamin Brafman.* [said with emphasis in audio recording]
>
>       *            *            *
>
> He is the biggest criminal lawyer in America. I think you should speak to him.

After additional cajoling from Zampolli, including implying that Thompson could easily settle her claims with Weinstein through Brafman's representation of her, Thompson agreed that Zampolli could put her in touch with Brafman's firm.

306.     The next morning, on October 13, 2016, Zampolli sent an email introducing Thompson and Alex Spiro, an attorney then working for Brafman.

307.     Over the course of multiple telephone conversations, texts, and emails (to and from Spiro's email address at aspiro@braflaw.com) in the next few days, Spiro purported to interview Thompson for the purpose of analyzing her claim against Weinstein. Thompson understood throughout the conversations and correspondence that everything she sent Spiro was confidential and for the purpose of seeking legal advice.

308.     Thompson and Spiro even exchanged communications on legal strategy to be employed by the victims against Weinstein.

309.     On October 13, 2017, Thompson expressed concern that her case had passed the statute of limitations. In response, Spiro indicated that there were "loopholes" for that. This further cemented Thompson's belief that Spiro was working on a case on her behalf.

310.     On October 16, 2017, Thompson inquired of Spiro whether he was still interested in representing her. He responded, in writing: "Correct stick with me."

311.     On October 20, 2017, Spiro suggested that Thompson also speak to attorney Judd Grossman, who was known to specialize in arts, for purposes of mounting a media-related strategy in addition to Brafman's pursuit of litigation.

312.     On October 23, 2017, Thompson signed a retainer agreement with Grossman, LLP, which provided in pertinent part: "Other attorneys, professionals, and outside counsel, including Alex Spiro, Esq., also will work in connection with your representation...."

313.    On November 8, 2017, Weinstein publicly announced that he had hired Benjamin Brafman to represent him in New York regarding allegations of sexual assault. According to Brafman, he had been on Weinstein's defense team "for awhile."[85]

314.    Yet, as of November 8, 2017, neither Brafman, Spiro, nor anyone else from Brafman & Associates LLP had declined or terminated their representation of Thompson. Grossman LLP also had not terminated its agreement with Thompson.

315.    On November 8, 2017, upon hearing the news that Brafman represented Weinstein, Thompson called Zampolli, upset that he had referred her to Weinstein's lawyer under the guise that Brafman was representing women against Weinstein.

316.    At the outset of the call, Thompson said she had just read a headline that Benjamin Brafman was representing Weinstein. After some hemming and hawing, Zampolli responded: "I don't really care, you know."

317.    Upset, Thompson explained that she had sent video evidence of Weinstein's assault of her to Alex Spiro, an attorney at Brafman & Associates, based on Zampolli's introduction:

> Zampolli:    "To which email you sent the video?"
>
> Thompson:   "Brafmanlaw."
>
> Zampolli:    "Wow. …That's a huge, huge, huge case of collusion…"

318.    Thompson confirmed with Zampolli that Brafman purportedly told him that he was representing victims of Weinstein. Zampolli stated: "Yes, the guy was representing girls…. I

---

[85] Karen Freifeld, *Harvey Weinstein hires NY defense lawyer Benjamin Brafman*, REUTERS (Nov. 8, 2017), https://www.reuters.com/article/us-weinstein-assault-lawyer/harvey-weinstein-hires-ny-defense-lawyer-benjamin-brafman-idUSKBN1D908C.

just wanted to help the girls because I think you all f****** got screwed.…"  Thompson asked

again at the end of the conversation: "I have a question: At the time did Brafman say he was

representing girls?"  Zampolli responded: "Yes, that's what he told me."

319.    Also, at 9:26 p.m. on November 8, 2017, Thompson texted Spiro, inquiring of the

apparent connection with Weinstein "through Brafman" and advising that she felt "super

uneasy."

320.    Spiro texted in response:

> What? No. I don't work there.
> Nor do I rep anyone involved.

And then he went silent.  Spiro had never informed Thompson that he intended to or had

changed firms, nor what happened to the confidential information she had shared with him for

purposes of representing her.

321.    Thompson immediately felt ill and fearful. She had shared important evidence

against Weinstein with the very law firm who represented Weinstein—unbeknownst to her. She

felt like she could not trust anyone. That law firm had informed her she did not need to worry

about the statute of limitations and lulled her into a sense of security regarding her claims. All of

her fears—the very reasons she did not come forward immediately after she was assaulted—had

been realized. Weinstein had used his network to show her just how far his reach stretched into

her own circle.

322.    Thompson closed all the blinds in her home, worried that Weinstein would go to

any means to ensure she was silenced. Thompson withdrew into herself again, unsure of whom

she could trust.

323.    The fact that Thompson has been targeted for apparent investigation and

deception by the Weinstein Sexual Enterprise has caused Thompson significant additional

distress and fear, as well as damage to her business and property, including but not limited to her causes of action against the members of the Weinstein Sexual Enterprise.

**G.    Employees and Executives of Miramax and Disney facilitated, had knowledge of or should have known of Weinstein's predatory behavior.**

   **1.    Employees and executives of Miramax and Disney often aided and abetted Weinstein in the commission of his sexual misconduct.**

324.    Disney employed and paid the salaries of many of the people who performed work for Miramax and who helped facilitate Harvey Weinstein's pattern of assaults.

325.    For example, female employees that worked for Miramax, but who were paid by Disney, such as Barbara Schneeweiss, were often used to make Weinstein's victims feel safe. The employees would initially join a meeting along with a Class member or woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[86] This behavior was reportedly "widely known" within Miramax.[87]

326.    Disney also paid the head of Miramax's Italian division, Fabrizio Lombardo.  A number of women, including Plaintiff Zoe Brock, have come forward to identify Lombardo as one of the executives at Miramax who would procure victims for Harvey Weinstein.[88]  These allegations are consistent with how Lombardo's role was contemporaneously described by Miramax and his colleagues. For example, Miramax identified Lombardo as a "handler of talent,"[89] Defendant Rick Schwartz identified Lombardo as working "in the area of personal

---

   [86] Farrow, *supra* note 10.

   [87] Farrow, *supra* note 10.

   [88] https://www.thewrap.com/harvey-weinstein-fabrizio-lombardo-four-women-corroborate-2004-new-york-times-reporting/

   [89] https://www.nytimes.com/2004/12/13/business/media/miramax-sues-exchief-in-italy-saying-he-had-2-jobs.html

relations," Lombardo described himself as being a "sort of cultural mediator,"[90] and a producer and friend of Lombardo described his role as a "broker of personal relations."

327.    According to producer Nigel Cole, "I met Fabrizio at a Weinstein lunch party. I asked him what he did for Harvey. 'I'm his pimp' he eventually replied."[91]

328.    Defendant Rick Schwartz who both helped isolate and deliver Plaintiff Zoe Brock to Harvey Weinstein at the Cannes Film Festival also admitted to Brock that her experience with Harvey was not isolated but had "happened before."

329.    Miramax and its management were well aware of Harvey Weinstein's penchant for attending meetings naked but for a towel or bathrobe, yet took no steps to require him to attend meetings in clothes. For example, a book published in 2004 described a 7 a.m. meeting in Harvey's hotel suite at the Cannes Film Festival attended by Miramax executives and staffers where "Harvey was in his towel…."[92] This was not an isolated instance, but an example referred to in passing because it occurred regularly.

330.    But that wasn't all Miramax management was aware of. Miramax, its executives, and employees knew that Harvey Weinstein was regularly preying on young actresses. But they looked the other way.  The question is, why?

331.    Scott Rosenberg, who was a screenwriter for Miramax-produced films from 1994 to the early 2000s, wrote a Facebook post on or about October 16, 2017, explaining:

> So, uh, yeah.
> We need to talk about Harvey.
>
> I was there, for a big part of it.

---

[90] https://www.vanityfair.it/people/mondo/2017/10/13/fabrizio-lombardo-im-not-man-procured-girls-harvey-weinstein

[91] https://twitter.com/asiaargento/status/917941421440684032?lang=en

[92] Peter Biskind, Down and Dirty Pictures (2004), at 70.

From, what, 1994 to the early 2000s?
Something like that.
Certainly The Golden Age.
The "PULP FICTION", "SHAKESPEARE IN LOVE", "CLERKS",
"SWINGERS", "SCREAM", "GOOD WILL HUNTING", "ENGLISH
PATIENT", "LIFE IS BEAUTIFUL" years…

Harvey and Bob made my first two movies.
Then they signed me to an overall deal.
Then they bought that horror script of mine about the Ten Plagues.
For a lot of money.
Also bought that werewolf-biker script.
That no one else liked but was my personal favorite.
They were going to publish my novel.
They anointed me.
Made it so other studios thought I was the real deal.
They gave me my career.

I was barely 30.
I was sure I had struck gold.
They loved me, these two brothers, who had reinvented cinema.
And who were fun and tough and didn't give an East Coast fuck about all the
slick pricks out in L.A.

And those glory days in Tribeca?
The old cramped offices?
That wonderful gang of executives and assistants?
All the filmmakers who were doing repeat business?
The brothers wanted to create a "family of film".
And they did just that…
We looked forward to having meetings there.
Meetings that would turn into plans that would turn into raucous nights out on the
town.
Simply put: OG Miramax was a blast.

So, yeah, I was there.
And let me tell you one thing.
Let's be perfectly clear about one thing:

Everybody-f******-knew.

Not that he was raping.
No, that we never heard.
But we were aware of a certain pattern of overly-aggressive behavior that was
rather dreadful.
We knew about the man's hunger; his fervor; his appetite.

- 88 -

There was nothing secret about this voracious rapacity; like a gluttonous ogre out of the Brothers Grimm.
All couched in vague promises of potential movie roles.
(and, it should be noted: there were many who actually succumbed to his bulky char Willingly. Which surely must have only impelled him to cast his fetid net even wider).

But like I said: everybody-f******-knew.

And to me, if Harvey's behavior is the most reprehensible thing one can imagine, a not-so-distant second is the current flood of sanctimonious denial and condemnation that now crashes upon these shores of rectitude in gloppy tides of bullshit righteousness.

Because everybody-f******-knew.

And do you know how I am sure this is true?
Because I was there.
And I saw you.
And I talked about it with you.
You, the big producers; you, the big directors; you, the big agents; you, the big financiers.
And you, the big rival studio chiefs; you, the big actors; you, the big actresses; you, the big models.
You, the big journalists; you, the big screenwriters; you, the big rock stars; you, the big restaurateurs; you, the big politicians.

I saw you.
All of you.
God help me, I was there with you.

Again, maybe we didn't know the degree.
The magnitude of the awfulness.
Not the rapes.
Not the shoving against the wall.
Not the potted-plant f******.
But we knew something.
We knew something was bubbling under.
Something odious.
Something rotten.

But…
And this is as pathetic as it is true:
What would you have had us do?
Who were we to tell?
The authorities?

- 89 -

What authorities?
The press?
Harvey owned the press.
The Internet?
There was no Internet or reasonable facsimile thereof.
Should we have called the police?
And said what?
Should we have reached out to some fantasy Attorney General Of Movieland?
That didn't exist.

Not to mention, most of the victims chose not to speak out.
Aside from sharing the grimy details with a close girlfriend or confidante.
And if they discussed it with their representatives?
Agents and managers, who themselves feared The Wrath Of The Big Man?
The agents and managers would tell them to keep it to themselves.
Because who knew the repercussions?
That old saw "You'll Never Work In This Town Again" came crawling back to
putrid life like a re-animated cadaver in a late-night zombie flick.
But, yes, everyone knew someone who had been on the receiving end of lewd
advances by him.
Or knew someone who knew someone.

A few actress friends of mine told me stories: of a ghastly hotel meeting; of a
repugnant bathrobe-shucking; of a loathsome massage request.
And although they were rattled, they sort of laughed at his arrogance; how he had
the temerity to think that simply the sight of his naked, doughy, carbuncled flesh
was going to get them in the mood.
So I just believed it to be a grotesque display of power; a dude misreading the
room and making a lame-if-vile pass.

It was much easier to believe that.
It was much easier for ALL of us to believe that.

Because…

And here's where the slither meets the slime:
Harvey was showing us the best of times.
He was making our movies.
Throwing the biggest parties.
Taking us to The Golden Globes!
Introducing us to the most amazing people (Meetings with Vice President Gore!
Clubbing with Quentin and Uma! Drinks with Salman Rushdie and Ralph
Fiennes! Dinners with Mick Jagger and Warren-freaking-Beatty!).

The most epic Oscar weekends.
That seemed to last for weeks!

- 90 -

Sundance! Cannes! Toronto!
Telluride! Berlin! Venice!
Private jets! Stretch limousines! Springsteen shows!
Hell, Harvey once took me to St. Barth's for Christmas.
For 12 days!
I was a broke-ass kid from Boston who had never even HEARD of St. Barth's
before he booked my travel.
He once got me tickets to the seven hottest Broadway shows in one week. So I
could take a new girlfriend on a dazzling tour of theater.
He got me seats on the 40-yard-line to the Super Bowl, when the Patriots were
playing the Packers in New Orleans.
Even got me a hotel room, which was impossible to get that weekend.
He gave and gave and gave and gave.
He had a monarch's volcanic generosity when it came to those within his circle.
And a Mafia don's fervent need for abject loyalty from his capos and soldiers.

But never mind us!
What about what he was doing for the culture?
Making stunningly splendid films at a time when everyone else was cranking-out
simpering "INDEPENDENCE DAY" rip-offs.

It was glorious.
All of it.

So what if he was coming on a little strong to some young models who had
moved mountains to get into one of his parties?
So what if he was exposing himself, in five-star hotel rooms, like a cartoon flasher
out of "MAD MAGAZINE" (just swap robe for raincoat!)
Who were we to call foul?
Golden Geese don't come along too often in one's life.

Which goes back to my original point:
Everybody-f******-knew.
But everybody was just having too good a time.
And doing remarkable work; making remarkable movies.

As the old joke goes:
We needed the eggs.

Okay, maybe we didn't NEED them.
But we really, really, really, really LIKED them eggs.
So we were willing to overlook what the Golden Goose was up to, in the murky
shadows behind the barn…

And for that, I am eternally sorry.
To all of the women that had to suffer this…

I am eternally sorry.
I've worked with Mira and Rosanna and Lysette.
I've known Rose and Ashley and Claire for years…
Their courage only hangs a lantern on my shame.
And I am eternally sorry to all those who suffered in silence all this time.
And have chosen to remain silent today.

I mostly lost touch with the brothers by the early 2000s.
For no specific reason.
Just that there were other jobs, other studios.
But a few months ago, Harvey called me, out of the blue.
To talk about the bygone days.
To talk about how great it would be to get some of the gang back together.
Make a movie.
He must have known then the noose was tightening.
There was a wistfulness to him that I had never heard before.
A melancholy.
It most assuredly had a walking-to-the-gallows feel.
When we hung up I wondered: "what was that all about?"
In a few short weeks I would know.
It was the condemned man simply wanting to comb some of the ruins of his old stomping grounds.
One last time.

So, yeah, I am sorry.
Sorry and ashamed.
Because, in the end, I was complicit.
I didn't say shit.
I didn't do shit.
Harvey was nothing but wonderful to me.
So I reaped the rewards and I kept my mouth shut.
And for that, once again, I am sorry.

But you should be sorry, too.
With all these victims speaking up…
To tell their tales.
Shouldn't those who witnessed it from the sidelines do the same?
Instead of retreating to the cowardly, canopied confines of faux-outrage?
Doesn't being a bystander bring with it the responsibility of telling the truth, however personally disgraceful it may be?

You know who you are.
You know that you knew.
And do you know how I know that you knew?

Because I was there with you.

And because everybody-f******-knew.[93]

332.    According to a former Miramax marketing executive Eamonn Bowles, "There isn't a woman in that office that wasn't made to cry," acknowledging that everyone within Miramax knew of Weinstein's serial targeting of women. [94]

333.    Many of Harvey Weinstein's victims complained to Miramax employees about his actions. For example, Mira Sorvino, who was harassed by Weinstein, told a Miramax female employee about the harassment. Rather than shock and horror at Weinstein's action, the employee's reaction "was shock and horror that I had mentioned it."[95]

334.    After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told not to say anything so as not to endanger the release of the Miramax films in which she appeared.

335.    Daryl Hannah complained to a Miramax producer on the set where she was harassed, nothing was done. [96]

336.    Even the maintenance worker who worked at Miramax knew of Harvey Weinstein's assaults and threats to women, as reflected by the fact that when he found Plaintiff Nannette Klatt locked in the stairwell in the Miramax building after hours in response to her screams, he asked her if she was coming from Weinstein's floor.

---

[93] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[94] Peter Biskind, Down and Dirty Pictures (2004), at 71.

[95] Farrow, *supra* note 10.

[96] *Id.*

2. **Disney Officer Michael Eisner (1993-2005) knew or should have known of Weinstein's pattern of sexual misconduct.**

337.     In or about 1993, Disney began looking at purchasing Miramax from Harvey and Robert Weinstein. Disney and CEO Michael Eisner knew that Harvey Weinstein and Robert Weinstein were "among the industry's toughest and roughest customers," and the brothers "brutalized their staff."[97] "On the Disney side, everyone was worried about [CEO Michael] Eisner's take on it, given the Disney brand name and the parade of controversy the Weinsteins trailed in their wake. To their surprise, he went for it."[98]

338.     At the time Disney decided to purchase Miramax, Eisner was aware of Harvey Weinstein's pattern of sexual harassment, as he "was keenly interested in any gossip about rival entertainment executives…."[99]

339.     "As for controlling the brothers, [Walt Disney Studios chairman] Katzenberg and Eisner had always been able to hammer anyone who got out of line, so he [Eisner] didn't think he needed to worry about that." [100]

340.     Walt Disney purchased Miramax in 1993, assuming all of the company's debts, including the payables of approximately $22 million and the bank lines of $20 million. Walt Disney also agreed to pay salaries to Harvey Weinstein and Robert Weinstein of $1.5 million each.[101]

---

[97] The Keys to the Kingdom, at 292.

[98] Peter Biskind, Down and Dirty Pictures (2004), at 149.

[99] James Stewart, Disney War (2005), at 246.

[100] Peter Biskind, Down and Dirty Pictures (2004), at 150.

[101] Peter Biskind, Down and Dirty Pictures (2004), at 151.

341.     Harvey Weinstein initially entered two employment agreements to which both Miramax and Walt Disney were signatories, the first of which was effective from in or about 1993-1995 and the second from 1995-1999.[102] Harvey Weinstein's third employment agreement, to which Disney Enterprises and Miramax were signatories and pursuant to which Disney Enterprises was jointly and severally liable with Miramax, was effective from 1999 until in or about 2005.

342.     Harvey Weinstein reported directly to Michael Eisner, who was Walt Disney's principal.[103]  However, Eisner delegated oversight of Harvey Weinstein to a series of Disney executives who did not adequately supervise him. While Eisner originally delegated oversight to Katzenberg, Katzenberg delegated oversight of the Weinstein brothers in 1994 to a marketing and distribution executive Dick Cook, who could not control the brothers. So, after just a few months, Katzenberg put Bill Mechanic, then head of Walt Disney's international and worldwide video division, in charge of Miramax. Mechanic quickly identified that Miramax did not follow the law in its human resources practices.

343.     After Mechanic left Walt Disney in the fall of 1994 for Fox, Eisner assigned Joe Roth to oversee Miramax and Harvey Weinstein. Roth found himself "putting out fires the brothers had started," including with talent agents and talent agencies who the Weinsteins were always battering to, inter alia, "get somebody off of a picture, deliver a client, whatever the issue

---

[102] *Doe v. Weinstein*, 2018 ONSC 2122 (Can. Ont. S.C.J. Mar. 19, 2018), available at http://canlii.ca/t/hrg30.

[103] Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. Justice).

was."[104]  These issues included Harvey Weinstein's sexual harassment of women. And, despite the fact that Roth was actively overseeing them, Harvey and Robert Weinstein nonetheless "always wanted to go directly to Michael [Eisner]." [105]

344.    Eisner thus did not permit Miramax to be completely autonomous and had knowledge not only of financial matters but also Weinstein's pattern of misconduct with class members.

345.    Harvey Weinstein's executive assistant Barbara Schneeweiss was jointly employed by Miramax and Disney. According to  Schneeweiss, Disney paid Miramax's employees, controlled Miramax's budget, approved (or vetoed) Miramax's requests for increased film budgets, audited Miramax's books, and reviewed, approved (or rejected), and paid for Miramax's business expenses.

346.    During the time Disney owned Miramax, Miramax paid settlements to multiple women who were victims of Harvey Weinstein's sexual harassment and abuse.  Based on Disney's control of Miramax finances, Disney knew or should have known of these payments, which should have caused additional inquiry and investigation.

347.    Moreover, given that Eisner had assigned eyes and ears from Disney to watch over Harvey Weinstein – and those persons had knowledge of Harvey Weinstein's conduct, Eisner and Disney knew or should have known of Harvey Weinstein's sexual harassment and abuse.

348.    Disney – through its Buena Vista International divisions - employed and paid the salary of Defendant Fabrizio Lombardo, who was head of Miramax's Italian division. Lombardo

---

[104] Peter Biskind, Down and Dirty Pictures (2004), at 198.

[105] Peter Biskind, Down and Dirty Pictures (2004), at 198.

actively procured women who were then assaulted by Harvey Weinstein, including but not limited to Plaintiff Zoe Brock. Disney knew or should have known of Lombardo's participation in Weinstein's pattern of abuse given that Lombardo had no film production experience, performed no substantive work for Miramax, and was known to handle "personal relations" for Harvey Weinstein on vacations and trips.

349.    Instead of taking action, including but not limited to an independent investigation of Weinstein's conduct and/or the implementation of controls to prevent further abuse and/or the termination of Weinstein, Eisner and Disney chose to publicly misrepresent that they did not have the right to exercise control over Weinstein.  In fact, every corporation has the duty to oversee and supervise its employees; it is not a duty that can be contractually waived.

**3.      Miramax Officer Robert Weinstein (1979-2005) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

350.    Defendant Robert Weinstein was well aware of his brother's pattern of using his power to coerce and force young women to engage in sexual acts with him. Robert and Harvey Weinstein formed Miramax together in 1979.

351.    Robert Weinstein knew or should have known that his brother was a danger to Plaintiffs and the Class members, given that he:

a.      witnessed his brother's physically and verbally abusive behavior;

b.      attended meetings with Harvey and other Miramax executives and employees while Harvey was wearing only a bathrobe or underwear;

c.      knew that Harvey was serially targeting women for sex;

d.      saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

- 97 -

e.     received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

f.     personally paid £ 250,0000 to settle claims by a woman that was sexually assaulted by Harvey and her colleague who reported it;

g.     knew of and authorized Miramax and TWC to make payments to settle claims by women who were sexually assaulted by Weinstein;

h.     knew that TWC paid Boies Schiller, Kroll and other enterprise participants and should have known the purpose was to cover up Harvey's pattern of assault.

352.    During his time at Miramax, Robert Weinstein paid – using his personal funds – several of Harvey Weinstein's victims to stay silent and release their claims. He was also aware that Miramax funds were used to pay Harvey Weinstein's victims.

353.    Robert Weinstein knew that Harvey Weinstein's pattern of assault was a problem, but deliberately chose to cover it up and pretend it wasn't happening.

354.    For example, when he started dating Ivana Lowell, who was the Vice President of the book division at Miramax in the 1990s, Robert Weinstein asked if she had slept with his brother, and she responded "no, but not for want of him aggressively trying, and all the other women…," at which point Robert cut her off and said: "No, I don't want to know."[106] (Books overseen by Lowell at Miramax were published by Disney's Hyperion division after Disney purchased Miramax).

---

[106] "Former Miramax Executive Describes Working for Harvey Weinstein as a 'Madhouse'", Inside Edition (October 17, 2017), available at https://www.youtube.com/watch?v=ULejo9adUqg (last accessed September 22, 2018).

355.     Kathy DeClesis, Robert Weinstein's assistant in the early 1990s at Miramax stated to *The New York Times*: "It [Weinstein's harassment of women] wasn't a secret to the inner circle,"[107] which included Robert Weinstein.

356.     In fact, DeClesis confronted Robert Weinstein directly about the fact his brother was sexually harassing actresses and female employees throughout their working career together. In one example, a young female employee quit abruptly after an "encounter" with Harvey Weinstein, reportedly "fleeing so quickly that she never claimed the extra shoes under her desk." DeClesis has stated she personally handed Robert Weinstein a demand letter from the woman's lawyer, telling Robert Weinstein: "Your brother is a pig."[108]

357.     While Robert Weinstein says he "did not know the extent" of his brother's actions, he knew enough to pay personal funds to settle sexual assault claims on his brother's behalf and obtain releases for himself from Harvey's victims.

358.     Robert Weinstein  personally paid £250,000 — equivalent to about $600,000 today — to settle two claims against Miramax, himself, and his brother in 1998. The money was split between Harvey's former assistant Zelda Perkins and another female employee in the U.K.

359.     Perkins told investigators from the Women and Equalities Committee of the U.K. Parliament that she left her job after Weinstein "sexually assaulted and attempted to rape a colleague of mine" at the Venice Film Festival in 1998.[109]

---

[107] Kantor & Twohey, *supra* note 1.

[108] http://www.vulture.com/2017/10/bob-weinstein-ex-assistant-he-knew-about-harvey-decades-ago.html

[109] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear

360.    Robert Weinstein's claim that he believed Harvey Weinstein had consensual relationships and the women were black-mailing him is not credible.  Robert Weinstein's attempt to deflect knowledge is not credible because Miramax Film Corp. and Robert Weinstein were parties to the settlement agreements. And Miramax lawyers, including Mark Mansell at Allen & Overy, were involved in the negotiations with the two women.

361.    Zelda Perkins and Miramax Film Corp. entered a settlement agreement dated October 23, 1998, as well as a letter agreement dated October 23, 1998 concerning tax reporting.[110]

362.    First, the settlement agreement expressly provided:

   a.    The agreement was entered on behalf of "the Company," which was Miramax Film Corp.;

   b.    The released parties included, among others, Miramax and its officers, explicitly including Harvey Weinstein and Robert Weinstein;

   c.    The Company would advise new employees about its human resources policies and the existence of three complaint handlers.[111]

363.    Second, the agreement expressly acknowledged that Miramax was aware of "the conduct alleged by you that led to the termination of your employment," i.e. her constructive discharge, and that Perkins may need to seek treatment from a medical practitioner as a result.

---

[110] Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf (last accessed September 28, 2018.

[111] *Id*.

However, the agreement muzzled Perkins on the ability to disclose Harvey or Robert Weinstein's names to any medical practitioner.[112]

364.     Finally, as part of the agreement, Harvey Weinstein agreed to attend therapy, and Miramax was required to dismiss Weinstein if there were any further complaints (although it never did despite additional subsequent complaints).[113]

365.     Moreover, the letter agreement expressly provided that the £125,000 she received was for "compensation for loss of office from my employers Miramax Film Corp. This was paid to me on behalf of my employer by solicitors Allen & Overy."[114]

366.     The settlement's requirement that Miramax provide a commitment that Harvey Weinstein would undergo therapy and that a proper human resources complaint procedure would be implemented could not have been agreed to or implemented without Robert Weinstein's assent.

367.     Despite Robert Weinstein's personal and Miramax's corporate knowledge of the settlement agreement with Miramax, Robert Weinstein did not take any action or implement any of the required terms of the settlement that could have prevented additional sexual assaults by Harvey Weinstein. Nor did Robert Weinstein or Miramax take any action against Harvey Weinstein when they learned of additional complaints about Harvey's conduct.

---

[112] *Id.*

[113] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear; https://www.bbc.com/news/av/entertainment-arts-42420389/harvey-weinstein-s-former-personal-assistant-zelda-perkins-speaks-to-bbc

[114] Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf (last accessed September 28, 2018.

368.    In fact, one year later, in or about May 1999, Perkins ran into Harvey Weinstein at the Cannes Film Festival, where he told her that everything she "had done was pointless."[115]

369.    Finally, what Robert Weinstein admits to knowing is sufficient to demonstrate actual or constructive knowledge: according to The Hollywood Reporter, Robert Weinstein stated in response to the 2017 reports regarding his brother: "'I'll tell you what I did know,' Robert Weinstein said. 'Harvey was a bully, Harvey was arrogant, he treated people like sh*t all the time. That I knew. And I had to clean up for so many of his employee messes. People that came in crying to my office: 'Your brother said this, that and the other.' And I'd feel sick about it.'"[116]

### 4.    Miramax Officer Irwin Reiter (1989-2005) knew or should have known of Harvey Weinstein's predatory sexual misconduct.

370.    Defendant Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting for Miramax from 1989 to 2005 (when he left for TWC where he worked until 2017),[117] has admitted that Weinstein's "mistreatment of women" was an ongoing problem.[118]

371.    Reiter's knowledge came from the fact that women complained to and confided in him after assaults or harassment occurred.  Reiter was known as a sympathetic ear who would listen to Weinstein's assault victims and reassure them it was not their fault. However, as an

---

[115] Jill Lawless, "Ex-Weinstein assistant says she tried to stop him in 1998" (Associated Press Mar. 27, 2018), available at https://apnews.com/2036175b01ff44d8b1ba38b81037a7db (last accessed Sept. 28, 2018).

[116] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

[117] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[118] Farrow, *supra* note 10.

officer of Miramax, Reiter had a responsibility to do more than comfort the victims; he had a

duty to prevent further assaults from occurring.

372.    Reiter discussed Harvey Weinstein's pattern if sexual harassment and assaults of

women with other officers within Miramax, including Robert Weinstein.

373.    Reiter reviewed and handled payments to Harvey Weinstein's victims from

Miramax funds, as well as caused Disney to contribute to such payments directly or indirectly.

374.    Reiter reviewed and handled payments for Harvey Weinstein's use of hotel rooms

where sexual assaults occurred, as well reviewed and submitted business expense reports

containing such expenses to Disney for payment.

375.    Despite his extensive knowledge, Reiter failed to cause any independent

investigations to be undertaking, failed to take any actions to prevent or diminish the likelihood

of further assaults, and facilitated payments that would cover up the ongoing pattern of assaults

throughout his tenure at both Miramax and TWC

### 5.    Miramax Officer Mark Gill (1997-2002) knew or should have known of Harvey Weinstein's predatory sexual misconduct.

376.    Mark Gill was head of marketing from approximately 1994 to 1997 in Miramax's

New York office.  He then was the President of Miramax's Los Angeles division from

approximately 1997 to 2002.[119]

377.    Gill told *The New York Times* that, behind the scenes at Miramax, Weinstein's

treatment of women "was the biggest mess of all."[120]

---

[119] Claudia Eller, *Abrupt Departure by Gill Surprises Many at Miramax*, LOS ANGELES TIMES (Oct. 16, 2002), http://articles.latimes.com/2002/oct/16/business/fi-gill16.

[120] Kantor & Twohey, *supra* note 1.

378.    Gill has admitted that Miramax's human resources division was so weak and ineffective at combatting Harvey Weinstein's mistreatment of women that female employees had to band together:  "If a female executive was asked to go to a meeting solo, she and a colleague would generally double up" so as not to be alone with Harvey Weinstein.[121]

379.    Gill's knowledge came from witnessing Weinstein sexually-inappropriate and harassing behavior.  Gill also received direct complaints from women after assaults or harassment occurred.

380.    Gill discussed Harvey Weinstein's pattern if sexual harassment and assaults of women with other officers within Miramax, including Robert Weinstein.

381.    Despite his extensive knowledge, Gill failed to cause any independent investigations to be undertaking or take any actions to prevent or diminish the likelihood of further assaults.

382.    After his departure from Miramax in 2002, Gill continued his association with Weinstein, Miramax and TWC despite his knowledge of Weinstein's pattern of assaults.

383.    For instance, TWC helped Gill with his struggling independent film venture, The Film Department. Founded in 2007, The Film Department only produced three films.[122] TWC had a principal role in selling and distributing two out of the three.[123] TWC distributed The Rebound in 2009, and acted as sales representative for A Little Bit of Heaven in 2011.[124]

---

[121] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html

[122] https://pro.imdb.com/company/co0187451/filmography

[123] https://pro.imdb.com/company/co0187451/filmography

[124] https://www.imdb.com/title/tt1205535/?ref_=nm_flmg_prd_28; https://pro.imdb.com/title/tt1440161/companycredits

384.    Moreover, despite knowledge of Weinstein's pattern of harassing and procuring victims at industry parties and film festivals, Gill continued to socialize with and support Weinstein and his business ventures, including but not limited to TWC-sponsored events such as a TWC cocktail party at the 2010 Cannes Film Festival.

385.    Thus, while Gill had the opportunity to disclaim the Weinstein Sexual Enterprise, he did not, but instead continued to profit financially and socially from Weinstein's ventures.

**6.    Miramax Officer Barbara Schneeweiss (1996-2005) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

386.    Miramax (and later TWC) Officer Barbara Schneeweiss knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.  Schneeweiss worked at Miramax from 1996-2005 and at TWC from 2005-2017.

387.    Schneeweiss was regularly tasked with scheduling appointments with Weinstein's victims at hotels. She would meet the victims in the hotel restaurant or lobby where the victims understood the meeting would take place. Schneeweiss would then advise the women that Weinstein was running late or stuck on a telephone call, so the meeting had been moved to his hotel suite.

388.    Sometimes Schneeweiss would lead to the women up to Weinstein's hotel suite to give the meeting an air of legitimacy; sometimes, she would direct the victims to go up to his hotel suite, reassuring them that the meeting was for a legitimate purpose.

389.    Schneeweiss would then leave the meeting, or ensure that the victim was left alone with Weinstein while the assault occurred.

390.     By way of example only, Schneeweiss facilitated several assaults against a Jane Doe who has filed a lawsuit in Canada ("Jane Doe Canada"). Jane Doe Canada was on the same set as Plaintiffs Melissa Sagemiller and Larissa Gomes.

391.     According to Jane Doe Canada, Schneeweiss lured Doe away from the purported site of a breakfast meeting scheduled to be held in public to a private hotel room where Weinstein could sexually harass and assault Doe. When instructed to do so by Weinstein, and without warning, Schneeweiss left Doe with Weinstein in his hotel room, where he sexually assaulted her. After Doe pointedly refused his advance regarding massages, Weinstein overpowered Doe, forced her onto a bed, removed his penis, forced down her skirt, held her down by her wrists, and forcibly performed oral sex on her.

392.     Schneeweiss also facilitated a second assault against Jane Doe Canada. When Doe returned to the hotel with her agent to confront Weinstein about the first assault, Schneeweiss persuaded Doe that Weinstein wanted to privately apologize for his behaviour. Schneeweiss encouraged Doe to believe that it would be safe for her to return to the room to facilitate this private apology. It was not safe, and Schneeweiss knew it was not safe. Jane Doe Canada was assaulted by Weinstein a second time.

393.     Schneeweiss has declared on various occasions that she was not aware that the victims were assaulted. However several Class members have publicly described seeing Schneeweiss after the assault occurred but Schneeweiss would purposefully not look them in the eyes.

394.     Moreover, Plaintiff Louisette Geiss confronted Schneeweiss in or about 2011 after she was assaulted, and told her that Weinstein was a "bad" guy. Schneeweiss's only response was that Weinstein had never assaulted her.

395.     Despite her extensive knowledge, Schneeweiss failed to cause any independent investigations to be undertaking or take any actions to prevent or diminish the likelihood of further assaults – but rather continued to facilitate the assaults throughout her tenure at Miramax and TWC.

**7.     Miramax Officer Rick Schwartz (1999-2006) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

396.     Miramax Officer Rick Schwartz   knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

397.     As the Senior Vice President of Production at Miramax from 1999 to 2006, Schwartz had direct knowledge and facilitated assaults by Harvey Weinstein, including of Plaintiff Zoe Brock.

398.     Schwartz was regularly tasked with luring victims to Weinstein's hotel suites. Sometimes Schwartz would lead to the women up to Weinstein's hotel suite to give the meeting an air of legitimacy. Schwartz would then leave the meeting, or ensure that the victim was left alone with Weinstein while the assault occurred.

399.      Schwartz was also regularly tasked with taking care of the victims after the assaults occurred.  After Plaintiff Zoe Brock was assaulted, Schwartz apologized for Weinstein's behavior, admitting that it had happened before.

400.     Despite his extensive knowledge, Schwartz failed to cause any independent investigations to be undertaking or take any actions to prevent or diminish the likelihood of further assaults – but rather continued to facilitate the assaults throughout his tenure at Miramax.

401.     On information and belief, Schwartz's participation in the Weinstein Sexual Enterprise ended in or about 2006; however, investigation continues.

### 8. Miramax Officer Fabrizio Lombardo (1999-2004) knew or should have known of Harvey Weinstein's predatory sexual misconduct.

402.    Miramax officer Fabrizio Lombardo knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As the head of Miramax's office in Italy from approximately 1999 to 2004, Lombardo's main responsibility was to procure women for Weinstein's sexual pleasure while Weinstein was traveling in Europe or at international film festivals, such as Cannes.

403.    Miramax hired Lombardo in late 1999 at Harvey Weinstein's insistence, despite the fact he had little to no film experience.

404.    A number of women, including Plaintiff Zoe Brock, have come forward to identify Lombardo as one of the executives at Miramax who deceived them and delivered them to Harvey Weinstein to be assaulted.[125]

405.    These allegations are consistent with how Lombardo's role was contemporaneously described by Miramax and his colleagues. For example, Miramax identified Lombardo as a "handler of talent,"[126] Defendant Rick Schwartz identified Lombardo as working "in the area of personal relations," Lombardo described himself as being a "sort of cultural mediator,"[127] and a producer and friend of Lombardo described his role as a "broker of personal relations."

---

[125] https://www.thewrap.com/harvey-weinstein-fabrizio-lombardo-four-women-corroborate-2004-new-york-times-reporting/

[126] https://www.nytimes.com/2004/12/13/business/media/miramax-sues-exchief-in-italy-saying-he-had-2-jobs.html

[127] https://www.vanityfair.it/people/mondo/2017/10/13/fabrizio-lombardo-im-not-man-procured-girls-harvey-weinstein

406.     According to producer Nigel Cole, "I met Fabrizio at a Weinstein lunch party. I asked him what he did for Harvey. 'I'm his pimp' he eventually replied."[128]

407.     During this period, Lombardo regularly delivered women to Harvey Weinstein – under the guise of casting calls, parties, and film festivals to his rooms at the Hotel Eden in Rome, Italy and the Hotel du Cap-Eden-Roc in Antibes, France (Weinstein's home base during the Cannes Film Festival).

408.     At the height of Weinstein's power at Miramax, in the late 1990s and early 2000s, "unease about Lombardo's role in the company was so great that Weinstein attempted to allay concerns, according to Elizabeth Dreyer, a senior executive who was in charge of international acquisitions at the time."[129] After senior staff raised concerns, Weinstein denied that Lombardo was his "pimp" in a meeting with "his senior international staff," including Dreyer, but it "did not entirely dispel suspicions inside the company."[130]

409.     Weinstein's denial was "'an 'ah-ha' moment for me,' [Dreyer] said, recalling thinking, 'I get what Fabrizio is about now. I get the relationship.'"

410.     In fact, at the time Dreyer worked in Miramax's New York office, she was responsible for reserving hotel rooms for the Cannes Film Festival. At one point, she attempted to reserve a room at the Hôtel du Cap-Eden-Roc for Lombardo, but was told that Lombardo "was barred because the owner said he 'brings too many girls.'"[131]

---

[128] https://twitter.com/asiaargento/status/917941421440684032?lang=en

[129] https://www.nytimes.com/2017/10/24/world/europe/fabrizio-lombardo-harvey-weinstein-italy.html

[130] Id.

[131] Id.

411.    After the New Yorker and New York Times broke the stories of Weinstein's predatory conduct in October 2017, Lombardo sent threatening text messages to at least one victim who he had procured for and was assaulted by Weinstein in the late 1990s.

**9.    Miramax Officer Nancy Ashbrooke (1991-2000) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

412.    Miramax officer Nancy Ashbrooke knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As the Vice President of Human Resources for Miramax from 1991 to 2000, Ashbrooke had direct knowledge of complaints regarding Weinstein's sexual misconduct and directly witnessed sexual harassment of women.

413.    Ashbrooke was responsible for the human resources department at Miramax, where numerous complaints of sexual misconduct and assault against Harvey Weinstein were not properly handled.

414.    Ashbrooke implemented or ratified the practice of the human resources department of forwarding complaints about Weinstein's sexual misconduct to Weinstein, resulting in retaliation against the accusers.

415.    Ashbrooke was aware that Weinstein "sexually assaulted and attempted to rape" a Miramax employee at the Venice Film Festival in 1998.[132]

416.    Ashbrooke was aware that Miramax entered a settlement agreement dated October 23, 1998 with the victim and Zelda Perkins, Weinstein's assistant who complained about the attempted rape.

---

[132] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear

417.    Ashbrooke was aware that the settlement agreement provided for a release of her as an officer of Miramax.

418.    Ashbrooke was aware that, under the settlement agreement, she was supposed to advise new employees about Miramax's human resources policies and the existence of three complaint handlers.[133]  She failed to do so, however.

419.    Ashbrooke was aware that Miramax was required to dismiss Weinstein if there were any further complaints (although it never did despite additional subsequent complaints).[134]

420.    The settlement's requirement that Miramax implement a proper human resources complaint procedure could not have been agreed to without Ashbrooke's knowledge.

421.    Despite Miramax's corporate knowledge of the settlement agreement with Miramax, Ashbrooke did not take any action or implement any of the required terms of the settlement that could have prevented additional sexual assaults by Harvey Weinstein. Nor did Ashbrooke or Miramax take any action against Harvey Weinstein when they learned of additional complaints about Harvey's conduct.

422.    On information and belief, Ashbrook's participation in the Weinstein Sexual Enterprise ended when she departed Miramax in 2000.

---

[133] *Id.*

[134] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear; https://www.bbc.com/news/av/entertainment-arts-42420389/harvey-weinstein-s-former-personal-assistant-zelda-perkins-speaks-to-bbc

**H.    Officers, Directors, and Employees of TWC facilitated, had knowledge of or should have known of Weinstein's predatory behavior.**

**1.    Harvey Weinstein's employment contracts, approved by the Board, served to insulate him from recourse for sexual misconduct.**

423.    Harvey Weinstein's first five-year contract, which began in 2005 ("2005 Contract"), stipulated that Weinstein could only be terminated for two types of offenses. The first was a conviction for a felony involving "moral turpitude."  While being accused of assault or even sexual harassment would normally cause a Board to conduct a serious investigation, the Board hid behind the agreement claiming it couldn't do anything absent a *conviction*.[135] The second type of offense was for the misuse of corporate funds, but for which Weinstein would be granted a cure period.

424.    The 2005 Contract also mandated that all subsequent employment contracts incorporate at least "equal or better terms." Accordingly, when it expired in 2010, Harvey Weinstein received a second five-year contract with the same favorable safeguards ("2010 Contract").

425.    When the 2010 Contract was up for renewal in 2015, the negotiations were left to the compensation committee – which was comprised of Maerov and Jeff Sackman. Sackman resigned in the midst of the negotiations.[136]

---

[135] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[136] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

426.    Director Maerov thus took the lead in negotiating Weinstein's 2015 contract. According to Maerov, his chief concern was whether Weinstein's behavior posed a threat of legal liability for the business.[137]

427.    As to sexual assault, according to Director Maerov: "He had to be *convicted* of a felony, and not just any felony, only one involving moral turpitude.  If we'd had documentary evidence of sexual harassment, the absurdity of his old contract still would have prevented us from terminating him." [138]

428.    The contract provides that if TWC was obligated to make a payment to satisfy a claim that Weinstein "treated someone improperly in violation of the company's Code of Conduct," he must reimburse TWC for settlements or judgments. Additionally, "You and the Company recognize that, in addition to being indemnified for the amount of payments the Company is obligated to make as a result of your misconduct, such misconduct can cause significant damage to the Company which is difficult or impossible to measure. Accordingly, if youre misconduct results in the Company making an Obligated Payment to a person damaged by such misconduct, in addition to the indemnification set forth in subparagraph i.(a), you will pay the company liquidated damages of $250,000 for the first such instance, $500,000 for the second such instance, $750,000 for the third such instance, and $1,000,000 for each additional instance."[139]  The Code of Conduct, adopted in September 2015, provides for standard violations

---

[137] Megan Twohey, *Weinstein Company Was Aware of Payouts in 2015* , N.Y. TIMES (Oct. 11, 2017), https://www.nytimes.com/2017/10/11/business/weinstein-company.html

[138] Tully, *supra* note 7.

[139] Oct. 20, 2015 Employment Agreement ("Employment Agreement")) ¶ 11 (i)(i)(b), attached as Exhibit B.

- 113 -

such as "sexual harassment," "intimidating or threatening behavior," and receiving "a personal benefit as a result of the employee's position with TWC." [140] Weinstein and TWC further agreed that Weinstein's payment "constitutes a 'cure' for the misconduct and no further action can be taken."[141]

429.    These provisions in an employment contract are unique—and reflect TWC's knowledge that Weinstein had in the past engaged in, and therefore was more likely than not to engage in, sexual harassment and other misconduct affecting the Class and female employees.

430.    TWC is liable for Weinstein's conduct, because it was perpetuated within the scope of his employment, and even permitted Weinstein a "cure" if he persisted on that course of conduct.

431.    On October 5, 2017, The New York Times published the story. That evening, all nine directors – including Harvey Weinstein, Robert Weinstein, Lance Maerov, Tarak Ben Ammar, Paul Tudor Jones, Dirk Ziff, Marc Lasry, and Tim Sarnoff - met via conference call. During the telephone call, Harvey insisted that the stories were not true. Nonetheless, Harvey agreed to a temporary leave of absence.  However, he insisted that the telephone call did not count as an official board meeting, and that the Board had no legal authority to remove him.[142]

432.    Jones also expressed doubts on the Board's ability to legally remove Harvey. Jones stated that terminating Harvey could be viewed by lenders as a "material event," triggering a debt default by TWC.[143]

---

[140] Tully, *supra* note 7.

[141] Employment Agreement (Exhibit B) ¶ 14.

[142] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[143] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

433.    On October 6, 2017, Dirk Ziff, Marc Lasry, and Tim Sarnoff resigned as Board members.

434.    That evening, four Board members issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "it's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation.  Jones did not sign the release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul"

435.    On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to "Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

436.    Jones resigned from the Board on October 7, 2017.

437.    On Sunday, October 8, 2017, the Board met again, and voted to terminate Harvey.

438.    After the sale of TWC in bankruptcy, Robert Weinstein, Ben Ammar and Maerov resigned on July 13, 2018.

**2.    Employees of TWC often aided and abetted Weinstein in the commission of his sexual misconduct.**

439.    Female employees of TWC – including Schneeweiss - were often used to make Weinstein's victims feel safe. The employees would initially join a meeting along with a Class member or woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[144]

---

[144] Farrow, *supra* note 10.

440.     Sixteen current and former executives and assistants at TWC told a reporter from *The New Yorker* about a pattern of professional meetings that were pretexts for sexual advances on young actresses and models. "All sixteen said that the behavior was widely known within both Miramax and the Weinstein Company."[145]

441.     Weinstein also required multiple groups of TWC employees to facilitate his sexual encounters with women. In part, Weinstein required executive assistants to schedule and help arrange sexual (or possible sexual) encounters for him, even directing them to essentially badger women who refused or expressed reluctance into accepting a "meeting" with him. Additionally, on multiple occasions, Weinstein required junior executives to meet a woman and discuss working in the entertainment industry generally or on specific TWC projects, because he was interested in her sexually and wanted the executives to help put the woman at ease before he made any sexual advances or because she had already submitted to his advances.[146]

442.     Female assistants at TWC were also required to procure Weinstein's erectile dysfunction shots, one of whom received a bonus for obtaining them and was at times directed to administer the injections. Other TWC witnesses described ensuring that Weinstein had an adequate supply of erectile dysfunction shots in his travel bags at all times. Some were tasked with preparing a private room at TWC where Weinstein was to have sexual encounters, and then cleaning up the room when the encounters were over. They occasionally found articles of women's clothing that had been left behind.[147]

---

[145] Farrow, *supra* note 10.

[146] Verified Petition ¶ 25, *People v. The Weinstein Company LLC et al.*, No. 0450293/2018 (N.Y. Sup. Ct. Feb. 11, 2018).

[147] *Id.* ¶ 45.

443.    Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting at TWC from 2005 to the present, who previously worked in the same capacity at Miramax from 1989 to 2005,[148] sent messages to Emily Nestor, a temporary employee of TWC, who alleged that she was harassed, describing Weinstein's "mistreatment of women" as an ongoing problem.[149]

444.    A female executive told *The New Yorker*: "There was a large volume of these types of meetings that Harvey would have with aspiring actresses and models." "He would have them late at night, usually at hotel bars or in hotel rooms. And, in order to make these women feel more comfortable, he would ask a female executive or assistant to start those meetings with him."[150]

445.    A female employee at TWC, Lauren O'Connor, wrote in a 2015 memo obtained by *The New York Times* that Weinstein required her to schedule casting discussions with aspiring actresses after they had private appointments in his hotel room. "She suspected that she and other female Weinstein employees, she wrote, were being used to facilitate liaisons with 'vulnerable women who hope he will get them work.'"[151] However, in a settlement, O'Connor was required to submit a letter saying that she had had a good experience at the company which the Board then used as proof that there was nothing to investigate.

---

[148] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[149] Farrow, *supra* note 10.

[150] *Id.*

[151] Kantor & Twohey, *supra* note 1.

3.      **Director Robert Weinstein (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

446.    As reflected above, Robert Weinstein had knowledge throughout the time he was at Miramax of his brother's pattern of sexual misconduct. However, he nonetheless joined with his brother to found TWC in 2005.

447.    As Co-Chairman and a Director of TWC, Robert Weinstein had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

448.    In 2005, Robert Weinstein was aware that, on the red carpet for the 2005 Comedy Central celebrity roast of Pamela Anderson, Courtney Love was asked to give advice to young actresses coming to Hollywood. Love stated: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go."[152]

449.    Robert Weinstein was aware of and received complaints from women about being sexually harassed or abused throughout the life of TWC.

450.    In 2010, Robert Weinstein's former girlfriend Ivana Lowell published a book entitled "Why Not Say What Happened? A Memoir." She describes an event that took place in or about 1991. She wrote:

> I KNEW ABOUT HARVEY'S REPUTATION as a womanizer; tales of his trying to seduce every young actress in town were infamous. However, I wasn't quite prepared for being on the receiving end of his onslaught.

---

[152] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018). MacFarlane recently explained the "joke" was intended to be a "hard swing" at Weinstein based on actress Jessica Barth's account of her encounter with Weinstein. https://www.youtube.com/watch?v=G2AIIHqjm8M (last accessed Sept. 21, 2018).

- 118 -

She described being chased around his desk in the Miramax office on multiple occasions.[153]

451.    Lowell also described one evening where Harvey Weinstein showed up late at night at her apartment she shared with her roommate who was also a Miramax employee. He laid down on a bed, spread-eagled and groaned: "Which one of you girls is giving me a back massage?"[154]

452.    Even if Robert Weinstein could pretend not to recall when Lowell tried to tell him what happened when they were dating, Robert Weinstein was aware Lowell published a book in 2010 that included a truncated narrative of her experiences with him and his brother.[155] In fact, Lowell disclosed in a 2017 Facebook post that, when the book was published in 2010, Robert Weinstein admitted he was aware of the disclosures:

> "When my book was first published, Harvey called me up, screaming, and said that I made him look like a pervert. I replied 'Yes, so?' " Ivana posted on Facebook.
>
> "He threatened to sue me, and then both Harvey and [younger brother] Bob called me a liar."[156]

---

[153]  Ivana Lowell, "Why Not Say What Happened? A Memoir," at 113-116 (all caps in original).

[154]  Ivana Lowell, "Why Not Say What Happened? A Memoir," at 113-116 (all caps in original).

[155]  On October 11, 2017, Lowell stated: "I left out a lot of sordid details because I still considered Bob a friend and I didn't realize the extent and consequences of Harvey's sickening ways. This whole thing has left me reeling." Richard Johnson, Weinstein staffer called him out years ago in memoir, Page Six (October 11, 2017), available at https://pagesix.com/2017/10/11/weinstein-staffer-outed-him-years-ago-in-memoir/ (Last accessed September 27, 2018).

[156] Richard Johnson, Weinstein staffer called him out years ago in memoir, Page Six (October 11, 2017), available at https://pagesix.com/2017/10/11/weinstein-staffer-outed-him-years-ago-in-memoir/ (Last accessed September 27, 2018).

453.     Robert Weinstein's quick dismissal of Lowell as a liar was not precipitated by an investigation of the prior events, nor an investigation of whether his brother's attempts "to seduce every young actress in town" continued while at TWC.

454.     According to Robert Weinstein, he was well aware that his brother engaged in verbal and physical abuse.  Yet, he "tolerated" his brother's behavior because he was more interested in profits than the assaults. Rather than take actions to help or protect the victims, Robert Weinstein has admitted that he just told people to "leave." And he himself moved to Los Angeles to run the TWC office there so he would not have to take action. However, moving does not absolve Robert Weinstein of liability.

455.     While Robert Weinstein said that, he "divorced" his brother "literally" in 2012 – he did not terminate him from TWC or take any action to protect the class. Rather, Robert Weinstein focused only on how Harvey Weinstein's abuses and misconduct affected him personally. In a dereliction of his duties. Robert Weinstein explained: "…those that know me personally in [TWC] understood how I could not take being around him on any level. And certainly my daughters and my family knew it. *I could not take his cheating*, his lying and also his attitude toward everyone. I had to divorce myself to survive."[157]  He "apologize[d] for my own lack of strength at times" in dealing with his brother's abuses. [158]

456.     Robert Weinstein also admitted he was aware of the number of women Harvey Weinstein targeted: "I actually was quite aware that Harvey was philandering with every woman

---

[157] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905 (emphasis supplied).

[158] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

he could meet." He stated: "For me, I thought he was literally just going out there cheating in a pervasive way. It wasn't like he even had a mistress. It was one after another and that I was aware of." [159]

457.    Even though Robert Weinstein was aware of his brother's serial sexual pursuit of women who were required to meet with his brother for business, he did not investigate nor cause an independent investigation of his brother's actions. Robert Weinstein's attempt to deflect knowledge based on assumptions that the "cheating" was consensual is a pretext, given that it is standard for a Board to require a full investigation of such acts and not to take the perpetrator at his word.  It is also a pretext given that Robert Weinstein was personally aware of and personally paid for settlements with victims of his brother's assaults.

458.    Robert Weinstein was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five." [160] Yet Robert Weinstein did not take action nor cause an independent investigation to be conducted.

459.    According to one of Harvey Weinstein's TWC assistants from February 2013 to February 2015, Sandeep Rehal: "Harvey Weinstein's sexual abuse and conduct, and his use of the office, TWC and staff to enable it, was common knowledge in the office, to management, to his brother Robert Weinstein, and to Frank Gil." [161]

---

[159] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

[160] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[161] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. #1).

460.   During this period from 2013 to 2015, among other things, Rehal was required to clean Harvey Weinstein's semen off the couch in his TWC office "three or so times a week when Harvey Weinstein was in New York."[162] Rehal alleges that Robert Weinstein was aware of Weinstein's sexual acts in his TWC office.

461.   Robert Weinstein was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

462.   Robert Weinstein was aware that, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[163] Yet Robert Weinstein did not take action nor cause an independent investigation to be conducted.

463.   Robert Weinstein was aware of Irwin Reiter's complaints made in November 2013 about Harvey's mistreatment of women, which resulted in Reiter being labeled the "sex police."

464.   Robert Weinstein was aware of a complaint submitted to the human resources department in December 2014 by a male TWC employee regarding sexually-inappropriate behavior directed at Emily Nestor. Robert Weinstein knew that Nestor never pursued the

---

[162] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. #1).

[163] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

complaint because HR told Nestor that Harvey Weinstein would be informed (and would retaliate) if she pursued the complaint.

465.    Robert Weinstein was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[164] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Robert Weinstein did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

466.    Robert Weinstein received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[165]

467.    Robert Weinstein also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

---

[164] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

[165] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

468.    The Board, including Robert Weinstein, purportedly "relied" on – and hid behind -- Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham, say the two directors."[166]  Yet neither the Board nor Robert Weinstein conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

469.    While the Board could have sued for access to the file, Robert Weinstein and the Board decided not to because he knew it "could have been very damaging to the company."[167] Moreover, the Board's decision was motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [168] thus putting their personal interests over their duties as Directors.

470.    After the sting, the Board decided to renew Harvey Weinstein's employment contract.

471.    Robert Weinstein was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich

---

[166] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[167] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[168] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

wrote that, during one of his meetings with Harvey to try and persuade him to cooperative,

Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm
> telling. ***People have told me some salacious stories***, but I'm not
> going down that road. This is a film about you and your movies, so
> you have nothing to worry about.[169]

And Avrich hinted at other sexual improprieties in the book.[170]

472.    Yet, despite knowledge of the book and its substance in 2016, Robert Weinstein

did not conduct an independent investigation or cause TWC or the Board to conduct an

investigation of the alleged "salacious conduct" by Harvey Weinstein.

473.    Given the fact that Robert Weinstein (i) personally paid for settlements with his

brother's assault victims, (ii) was aware of complaints made by female victims at both Miramax

and TWC, (iii) was aware of his brother's physically and verbally abusive behavior, and (iv) was

aware that Harvey Weinstein was serially targeting women for sex, Robert Weinstein knew or

should have known that his brother was a danger to Plaintiffs and the Class members. [171]

474.    Robert Weinstein also admitted that he was not alone in his knowledge. He stated

that he and the Board "begged" Harvey Weinstein to get help for years. In response to witnessing

his brother engaging in verbal and physical abuse, Robert Weinstein explained: "I asked him to

get help for many years. And that's the truth. He avoided getting the help. We begged him." [172]

---

[169] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[170] *Id.* at 279.

[171] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

[172] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

4. **Director Lance Maerov (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

475.    Board Member Lance Maerov knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from October 21, 2005 through July 13, 2018, Maerov was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

476.    Maerov knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

b.    was aware that Weinstein was serially targeting women for sex;

c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

d.    received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f.    knew of payments made by TWC to settle claims by women who were sexually assaulted by Weinstein;

g.    had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

g.    knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

477.    According to Fortune magazine, Maerov "assert[ed] that Weinstein for years bullied and insulted employees, directors, and his brother, squandered outside investors' money, and ran TWC not to earn profits for its outside investors, but as a personal fiefdom that bestowed celebrity and power."[173]  Maerov stated that Harvey Weinstein "wasn't interested in running the studio honestly and responsibly. He was running it for his own self-aggrandizement."[174]

478.    As a Board member, Maerov had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

479.    In fact, according to Maerov, during his tenure as director, he had heard from TWC employees and others about complaints against Weinstein. [175]

480.    Maerov has admitted that he was aware of settlements with Harvey Weinstein's victims but assumed "they were used to cover up consensual affairs," as Weinstein "insinuated that he was a philanderer."[176]  Maerov's attempt to deflect knowledge based on assumptions and insinuations is non-sensical, given that it is standard for a Board to require a full investigation of such acts and not to take the perpetrator at his word.

481.    Maerov was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example:

    a.    In 2005, Maerov was aware of a statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey

---

[173] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[174] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[175] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

[176] https://www.vanityfair.com/hollywood/2017/10/harvey-weinstein-company-lawyer

Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [177]

b.      In 2010, Maerov was aware of a book published by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

c.      Maerov was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five." [178]

d.      Maerov was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

e.      In 2013, Maerov was aware that, at the Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein." [179]

---

[177] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

[178] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[179] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

482.    Maerov was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[180] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Maerov did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

483.    Maerov also knew of Harvey Weinstein's conduct because he received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[181]

484.    Maerov also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

---

[180] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

[181] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

485.    Maerov told Fortune Magazine that the Board relied (or hid behind) on
Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he
said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the
alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the
affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham,
say the two directors."[182]   Yet neither the Board nor Maerov conducted an independent
investigation, nor requested to see the standard types of documents that would be produced in
such an investigation including correspondence, any settlement agreements, and records of
payments.

486.    While Maerov did demand to see Weinstein's personnel file, he backed down
after David Boies accused Maerov of leaking sensitive information.[183]   While the Board could
have sued for access to the file, Maerov said he consulted with the other Board members but
decided not to because it "could have been very damaging to the company."[184]

487.    The Board's decision was also motivated by the fact that Harvey Weinstein
"agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense
resulting from any incident, resolved or unresolved, disclosed in his personnel file," [185] thus
putting their personal interests over their duties as Directors.

488.    After the sting, the Board decided to renew Harvey Weinstein's employment
contract. Maerov agreed to be responsible for handling the contract negotiations and thus was

---

[182] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[183] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[184] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[185] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

familiar with – or should have been familiar with – all relevant information to his continued employment.

489.    Attorney David Boies said, in a letter to the Financial Times on October 24, 2017, that the assertion "that Messrs, Maerov and Ben Ammar did not know about  Weinstein's settlements with women when they approved his 2015 contract… is simply false."

490.    Apparently, Maerov's decision to acquiesce and permit Harvey Weinstein to continue business as usual was the result, in part, of threats Weinstein made to Maerov that he would find embarrassing details from his past and use them against him if he spoke out.[186]

491.    Maerov's decision to give Harvey Weinstein a pass for the years-long abuse was also motivated, in part, by the fact that the purpose of his position on the Board was to protect WPP's investment in TWC; any actions to oust TWC's Co-Chairman or smear his name (even with truth) would have a detrimental impact on WPP's stake.

492.    Lance Maerov was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[187]

And Avrich hinted at other sexual improprieties in the book.[188]

---

[186] https://www.nytimes.com/interactive/2017/12/05/us/harvey-weinstein-complicity.html

[187] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[188] *Id.* at 279.

493.    Yet, despite knowledge of the book and its substance in 2016, Lance Maerov did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

**5.    Director Tarak Ben Ammar (October 21, 2005-July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

494.    Board Member Tarak Ben Ammar knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from October 21, 2005 through July 13, 2018, Ben Ammar was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

495.    Ben Ammar knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

b.    was aware that Weinstein was serially targeting women for sex;

c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

d.    received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f.    knew of payments made by TWC to settle claims by women who were sexually assaulted by Weinstein;

g.    had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

h.      knew that TWC paid Boies Schiller and other enterprise participants, and

knew or should have known the purpose of those payments was to cover up Harvey's

pattern of assault.

496.    According to Fortune magazine, Ben Ammar "assert[ed] that Weinstein for years

bullied and insulted employees, directors, and his brother, squandered outside investors' money,

and ran TWC not to earn profits for its outside investors, but as a personal fiefdom that bestowed

celebrity and power."[189] Ben Ammar explained that Harvey Weinstein thought he was

"untouchable."[190]

497.    As a Board member, Ben Ammar had access to Harvey Weinstein's personnel

file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

498.    Ben Ammar had heard about complaints of Weinstein's sexual misconduct

directly from victims as well as through Maerov who heard complaints directly.

499.    Ben Ammar was aware of settlements paid by TWC with victims who were

assaulted by Weinstein.

500.    Ben Ammar was aware of references on red carpets, television shows, and

publications concerning Harvey Weinstein's sexual misconduct. By way of example:

a.      In 2005, Ben Ammar was aware of a statement made by Courtney Love on

the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about

Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood,

---

[189] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[190] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

- 133 -

Love said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [191]

b.      In 2010, Ben Ammar was aware of a book published by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

c.      Ben Ammar was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[192]

d.      Ben Ammar was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

e.      In 2013, Ben Ammar was aware that, at the Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[193]

---

[191] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

[192] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[193] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

010717-11 1076419 V1

501.    Ben Ammar was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[194] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Ben Ammar did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

502.    Ben Ammar also knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[195]

503.    According to Robert Weinstein, he and the Board – which included Ben Ammar – had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

504.    Ben Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[196]  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the

---

[194] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

[195] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[196] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

Company's new Code of Conduct.  However, he and the Board did not actually require Harvey

Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District

Attorney declined to press charges.

505.    Ben Ammar and Maerov told Fortune Magazine that the Board relied on

Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he

said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the

alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the

affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham,

say the two directors."[197]  Yet neither the Board nor Maerov conducted an independent

investigation, nor requested to see the standard types of documents that would be produced in

such an investigation including correspondence, any settlement agreements, and records of

payments.

506.    After the sting, the Board decided to renew Harvey Weinstein's employment

contract.  Attorney David Boies said, in a letter to the Financial Times on October 24, 2017, that

the assertion "that Messrs, Maerov and Ben Ammar did not know about  Weinstein's settlements

with women when they approved his 2015 contract… is simply false."

507.    Ben Ammar was aware of a book published in 2016 by a producer named Barry

Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended

to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote

that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said

to Harvey:

---

[197] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[198]

And Avrich hinted at other sexual improprieties in the book.[199]

508.    Yet, despite knowledge of the book and its substance in 2016, Ben Ammar did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

### 6.    Director Richard Koenigsberg (October 21, 2005-October 14, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.

509.    Board Member Richard Koenigsberg knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from its inception on October 21, 2005 through October 14, 2017, Koenigsberg was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

510.    Koenigsberg knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

    a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

    b.    was aware that Weinstein was serially targeting women for sex;

    c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

    d.    received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

---

[198] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[199] *Id.* at 279.

e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f.     knew of payments made by Robert Weinstein personally and by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.     as a "W" series shareholder, he had full access to and duty to operate the day-to-day operations of TWC, and thus had a duty to know of Harvey Weinstein's day-to-day- misconduct;

h.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.     knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

511.    Koenigsberg was the only other Director, besides the Weinstein brothers, who owned "W" shares." "W" shareholders had full control over all decisions involved in running the studio under the TWC operating agreement. Koenigsberg thus had a duty to exercise that control on an informed basis.

512.    Koenigsberg was also Harvey and Robert Weinstein's long-term personal accountant.  He was thus aware or should have been aware of the settlements with Harvey Weinstein's victims that were paid out of Harvey Weinstein and Robert Weinstein's personal funds, including but not limited to the 1998 settlement with Zelda Perkins and her colleague, in which Robert Weinstein paid £250,000 from his personal funds.

513.    As a Board member, Koenigsberg had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

514.   According to Robert Weinstein, he and the Board – which included Koenigsberg – had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

515.   Koenigsberg was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example, Koenigsberg was aware of:

a.   A statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [200]

b.   A book published in 2010 by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

c.   A 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[201]

---

[200] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

[201] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

d.      A January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

e.      A 2013 Academy Awards ceremony where Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[202]

516.    Koenigsberg was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[203] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Koenigsberg did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

517.    Koenigsberg knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other

---

[202] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[203] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[204]

518.     Koenigsberg also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

519.     Yet neither the Board nor Koenigsberg conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

520.     While the Board did demand to see Weinstein's personnel file, Harvey's attorney, David Boies, refused.[205]  While the Board could have sued for access to the file, the Board decided not to because it "could have been very damaging to the company."[206]

521.     Moreover, the Board's decision also motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [207] thus putting their personal interests over their duties as Directors.

---

[204] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[205] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[206] *Id.*

[207] *Id.*

522.    After the sting, and without requiring full access to all relevant information that they knew existed, the Board decided to renew Harvey Weinstein's employment contract.

523.    Konigsberg was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstien's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. **People have told me some salacious stories**, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[208]

And Avrich hinted at other sexual improprieties in the book.[209]

524.    Yet, despite knowledge of the book and its substance in 2016, Koenigsberg did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

525.    Koenigsberg failed to take action because he was caught in the spiderweb of the social benefits and power provided by Harvey Weinstein, and benefitted financially by continued retention as the Weinstein's personal accountant. He understood that Harvey Weinstein appointed him as a "W" series shareholder in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

---

[208] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[209] *Id.* at 279.

**7.    Director Dirk Ziff (October 21, 2005-April 30, 2009; in or about 2011 - October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

526.    Board Member Dirk Ziff knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. Considered a "Harvey Loyalist" by other Board members, Ziff and Harvey Weinstein were renowned in show biz circles for partying together.

527.    As a Board member of TWC from its inception in 2005 through October 6, 2017 (with an approximate one-year break), Ziff was responsible for oversight of the Board's Co-Chairman Harvey Weinstein. In 2009, the Wall Street Journal reported that the Weinsteins did not pay back a $75 million bridge loan from Ziff Brothers Investments and that Dirk Ziff resigned from the TWC Board earlier that year.  TWC refinanced the loan in early 2012. However, Ziff was a Board member again by 2011 (and could have been earlier).[210]

528.    Ziff knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

    a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

    b.    was aware that Weinstein was serially targeting women for sex;

    c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

    d.    received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

    e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

---

[210] https://www.vanityfair.com/news/2011/03/weinstein-miramax-201103

f.      knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.      as one of three shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

529.    As a Board member, Ziff had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

530.    Ziff was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example, Ziff was aware of:

a.      A statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go."[211]

---

[211] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

b.      A book published in 2010 by Robert Weinstein's former girlfriend, Ivana

Lowell, titled: "Why Not Say What Happened," in which Lowell describes being

sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's

M.O. of undressing and demanding a "massage."

c.      A 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not

afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on

no less than three occasions. [Pause] Out of five."[212]

d.      A January 2013 episode of 30 Rock where the character Jenna laments: "I

know how former lovers can have a hold over you long after they're gone. In some ways,

I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

e.      A 2013 Academy Awards ceremony where Seth MacFarlane, the creator

of *Family Guy*, announced the five nominees for best supporting actress and stated:

"Congratulations, you five ladies no longer have to pretend to be attracted to Harvey

Weinstein."[213]

531.    Ziff was aware of an article published by Defamer (a Gawker-owned website) on

April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[214]

The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting

sessions' at his office on Friday evenings when he can be alone, and that he greets women in his

---

[212] The excerpt of the *30 Rock* episode can be found at
https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[213] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*,
ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[214] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

bathrobe." Yet Robert Weinstein did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

532.    Ziff also knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[215]

533.    According to Robert Weinstein, he and the Board – which included Ziff – had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

534.    Ben Ammar admitted that he and the TWC Board (including Ziff) were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[216]  That knowledge of the police sting resulted in the Board's 2015 demand that Weinstein sign the Company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

535.    The Board relied on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had

---

[215] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[216] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board

that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit,

showing that her whole story was a sham, say the two directors."[217]  Yet neither the Board nor

Ziff conducted an independent investigation, nor requested to see the standard types of

documents that would be produced in such an investigation including correspondence, any

settlement agreements, and records of payments.

536.    While the Board did demand to see Weinstein's personnel file, Harvey's attorney,

David Boies, refused.[218]  The Board could have sued for access to the file, but decided not to

because it "could have been very damaging to the company."[219]

537.    Moreover, the Board's decision also motivated by the fact that Harvey Weinstein

"agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense

resulting from any incident, resolved or unresolved, disclosed in his personnel file," [220] thus

putting their personal interests over their duties as Directors.

538.    After the sting, and without requiring full access to all relevant information that

they knew existed, the Board decided to renew Harvey Weinstein's employment contract.

539.    Ziff was aware of a book published in 2016 by a producer named Barry Avrich

entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to

produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that,

---

[217] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[218] *Id.*

[219] *Id.*

[220] *Id.*

during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[221]

And Avrich hinted at other sexual improprieties in the book.[222]

540.    Yet, despite knowledge of the book and its substance in 2016, Ziff did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

541.    Ziff failed to take action because he was caught in the spiderweb of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.  Ziff also failed to take action because he put protection of his equity investment in TWC over his duties as a director.

### 8.    Director Jeff Sackman (September 21, 2010-October 6, 2015) knew or should have known that Harvey Weinstein was a serial sexual predator.

542.    Board Member Jeff Sackman knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. A Canadian film producer, Sackman regularly socialized with Weinstein and was caught in his spiderweb of social benefits and power.

543.    As a Board member of TWC from September 21, 2010 through October 6, 2015, Sackman was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

---

[221] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[222] *Id.* at 279.

544.     Sackman knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

        a.      witnessed Harvey Weinstein's physically and verbally-abusive behavior;

        b.      was aware that Weinstein was serially targeting women for sex;

        c.      saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

        d.      received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

        e.      discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

        f.      knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

        g.      as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

        h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

        i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

545.     As a Board member, Sackman had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.  In

fact, Sackman was on the compensation committee responsible for negotiating Weinstein's

employment contracts, and thus had a duty to know all relevant information that could impact

renewal or termination of Weinstein's employment agreement.

546.    Sackman was aware of references on red carpets, television shows, and

publications concerning Harvey Weinstein's sexual misconduct. By way of example, Sackman

was aware of:

      a.    A book published in 2010 by Robert Weinstein's former girlfriend, Ivana

Lowell, titled: "Why Not Say What Happened," in which Lowell describes being

sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's

M.O. of undressing and demanding a "massage."

      b.    A 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not

afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on

no less than three occasions. [Pause] Out of five."[223]

      c.    A January 2013 episode of 30 Rock where the character Jenna laments: "I

know how former lovers can have a hold over you long after they're gone. In some ways,

I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

      d.    A 2013 Academy Awards ceremony where Seth MacFarlane, the creator

of *Family Guy*, announced the five nominees for best supporting actress and stated:

---

[223] The excerpt of the *30 Rock* episode can be found at
https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

"Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[224]

547.    Sackman was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[225] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Sackman did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

548.    Sackman also knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[226]

---

[224] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[225] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

[226] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

549. According to Robert Weinstein, he and the Board – which included Sackman – had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

550. Ben Ammar admitted that he and the TWC Board (including Sackman) were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[227] That knowledge of the police sting resulted in the Board's 2015 demand that Weinstein sign the Company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

551. At this point in time, Sackman and Maerov – as the only members of the compensation committee – were involved in contentious negotiations for the termination or renewal of Harvey Weinstein's contract. Rather than stay on the Board and vote to terminate (or not renew) Harvey Weinstein's employment, Sackman resigned. He resigned because he knew he had been appointed to protect Harvey Weinstein, and his resignation did just that.

552. Sackman thus failed to conduct or cause to be conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

553. Sackman failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein

---

[227] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

appointed him as an "outside director" in order to protect Weinstein from termination or other

punitive measures resulting from his predatory sexual misconduct.

   **9.    Director Tim Sarnoff (June 25, 2013-October 6, 2017) knew or should have
          known that Harvey Weinstein was a serial sexual predator.**

   554.    Tim Sarnoff knew or should have known that Harvey Weinstein was regularly

sexually assaulting, battering, harassing and threatening women in the Class.

   555.    Sarnoff joined the company Technicolor in 2009 as President of Digital

Productions, and became Deputy CEO and President of Production Services, in 2014.

   556.    Technicolor was heavily involved with Miramax and TWC, providing post-

production effects and processing to films and media.[228] After Sarnoff came aboard at

Technicolor, TWC became exclusively reliant on Technicolor's post-production services.

   557.    In a TWC bankruptcy filing, Technicolor explained that TWC (and all of its

affiliates), through a series of agreements,[229] "have agreed to exclusively use Technicolor for

---

   [228] *See, e.g.,* https://www.technicolor.com/fr/news/technicolors-new-mediaffinity-service-provides-weinstein-company-fully-automated-digital (explaining Technicolor had worked with TWC for years and was providing a new service to TWC to digitally automate its library); Down and Dirty Pictures, at 200.

   [229] Limited Objection And Reservation Of Rights To Debtors' Motion For An Order (I) Approving Postpetition Financing, (II) Authorizing Use Of Cash Collateral, (III) Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, And (VI) Granting Related Relief, *In re: THE WEINSTEIN COMPANY HOLDINGS, LLC, et al.*, No. 18-10601 (MFW) (Bk. D. Del.) (Dkt. #208) (explaining that Technicolor and TWC entered The Restated Replication, Duplication, Packaging, Distribution and Returns Processing Agreement, dated as of September 2, 2005, as amended ("HES Agreement"); The Restated Film Laboratory Services Agreement dated as of July 2, 2010, as amended ("Film Agreement"); The Restated TCD Services Agreement dated as of July 2, 2010, as amended ("TCD Agreement"); The Technical Services Agreement dated as of July 2, 2010, as amended ("TS Agreement"); The Agreement and Amendment to Technicolor Agreements dated as of July 19, 2011 ("July 2011 Agreement"), and explaining that Technicolor and TWCH are parties to the Guarantee for the benefit of Technicolor HES, Inc., Technicolor CD, and Technicolor Michigan dated as of July 17, 2006, as amended (the "Technicolor Agreements Guarantee"); and That Guarantee for the benefit of Technicolor, Inc. dated as of July 2, 2010.

their post-production film and television services, certain distribution services, and home delivery solutions requirements, which services are integral to the transition of the Debtors' film and television projects into "finished products" for distribution and delivery. Following release of the Debtors' film and television productions, Technicolor serves as the exclusive party responsible for the replication, duplication, packaging, and distribution of the Debtors' film and television products into the hands of consumers (via mediums such as DVD, Blu-Ray, broadcast, and streaming services)."

558.    However, in or about 2012, TWC fell behind on its payments to Technicolor. After the parties worked out a repayment plan and agreed to certain liens on TWC assets, TWC agreed to add Sarnoff to TWC's Board as a Director in 2013. Sarnoff's purpose was to protect Technicolor's security interests, while also protecting Sarnoff's friend Harvey Weinstein.

559.    Sarnoff knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

      a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

      b.    was aware that Weinstein was serially targeting women for sex;

      c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

      d.    received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

      e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

      f.    knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.      as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

560.    As a Board member, Sarnoff had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

561.    Sarnoff was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example, Sarnoff was aware of a 2013 Academy Awards ceremony where Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[230]

562.    Sarnoff was also aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[231] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

---

[230] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[231] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

- 155 -

women in his bathrobe." Yet Sarnoff did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

563.    Sarnoff had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[232]

564.    Sarnoff also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

565.    The Board, including Sarnoff, relied on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham, say the two directors."[233] Yet neither the Board nor Sarnoff conducted an independent investigation, nor requested to see

---

[232] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[233] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

566.     While the Board could have sued for access to the file, Sarnoff and the Board decided not to because he knew it "could have been very damaging to the company."[234] Moreover, the Board's decision was motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [235] thus putting their personal interests over their duties as Directors.

567.     After the sting, the Board decided to renew Harvey Weinstein's employment contract.

568.     Sarnoff was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[236]

And Avrich hinted at other sexual improprieties in the book.[237]

---

[234] *Id.*

[235] *Id.*

[236] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[237] *Id.* at 279.

- 157 -

569.     Yet, despite knowledge of the book and its substance in 2016, Sarnoff did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

570.     Robert Weinstein also admitted that he and the Board (including Sarnoff) "begged" Harvey Weinstein to get help for years. In response to witnessing his brother engaging in verbal and physical abuse, Robert Weinstein explained: "I asked him to get help for many years. And that's the truth. He avoided getting the help. We begged him." [238]

571.     Sarnoff failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.   Sarnoff also failed to take action because he put protection of Technicolor's exclusivity agreements with TWC over his duties as a director.

## 10.     Director James Dolan (September 30, 2015 - June 20, 2016) knew or should have known that Harvey Weinstein was a serial sexual predator.

572.     Board Member James Dolan knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

573.     By 2010, producer Barry Avrich had completed filming a movie about Harvey Weinstein, based on dozens of interviews including people who shared "salacious" stories about Harvey's conduct. Harvey had cajoled, berated and threatened Avrich in an attempt to prevent the making of the movie, but Avrich could not be stopped in his desire to produce a film about Harvey Weinstein.

---

[238] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

574.    By September 2010, word had traveled in the industry that Avrich had a rough cut of the film about Harvey Weinstein ready for viewing. IFC Films, an influential New York-based distribution company asked for a screening. IFC Films is a subsidiary of AMC Networks, an entertainment company majority-owned and run by the Dolan family, including James Dolan.

575.    IFC Films expressed enthusiasm about the Harvey Weinstein film, and rushed a deal to buy the film from Avrich claiming it would release it through its own television and theater network. As Avrich recalled, "Neither I nor my lawyers stopped to ask, *Why the rush?* Hell, they even had me sign the contract on the hood of a stranger's Ferrari in front of Yorkville's Sassafraz restaurant." [239]

576.    Avrich then began the final editing on the film. However, when he had a final cut, IFC Films told Avrich that Harvey Weinstein objected and required changes to certain scenes, including cutting the scene where Avrich had portrayed Weinstein instructing an actor reshooting a sex scene: "You're going to hump her and hump her and hump her and hump her, and then you're going to flip her over and do her the other way." [240] Avrich was surprised that Harvey Weinstein would have any input or oversight at all on the film – until he realized IFC purchased the film at Weinstein's request in order to allow Harvey Weinstein to bury any hint at sexual abuse.

577.    Then, when the film *Unauthorized* debuted at the Toronto International Film Festival, IFC demanded Avrich make a list of changes required by Harvey Weinstein. Ultimately, the movie was significantly altered and buried – because James Dolan and his family

---

[239] Avrich, "Moguls Monsters and Madmen," at 287 (2016) (italics in original).

[240] *Id.* at 279.

was protecting Harvey Weinstein. Thus, James Dolan was well aware of Harvey Weinstein's reputation and his desire to hide and cover up any hint at his sexual misconduct.

578. Just before Harvey Weinstein's 2015 contract was renewed, several directors attempted to engineer a proxy fight. In order to engineer a majority of the Board who were his personal friends, Harvey Weinstein appointed James Dolan to the board, knowing Dolan would continue to protect him regardless of his conduct.

579. According to Harvey, Dolan was one of his and his brother's "best friends." And the other members of the Board considered Dolan to be a "Harvey Loyalist."

580. As a Board member, Dolan knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

     a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

     b.     was aware that Weinstein was serially targeting women for sex;

     c.     saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

     d.     received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

     e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

     f.     knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

     g.     as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey

or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

        h.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

        i.     knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

    581.    Despite his knowledge, Dolan voted to retain and/or approved the retention of Harvey Weinstein soon after joining the Board.

    582.    At the time he voted to retain him, Dolan was aware (or should have been aware given the extensive media reports) that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[241]  His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct.  However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

    583.    Neither the Board nor Dolan conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

    584.    When he joined the Board, Dolan also should have been aware of a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with

---

[241] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

Weinstein in his hotel room, which cited numerous incidents of Weinstein harassing or coercing women and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[242]

585.    Dolan was aware of the book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down when Dolan's family-run company IFC Films purchased it.[243]

586.    Yet, despite knowledge of the book and its substance in 2016, as well as his knowledge about Harvey Weinstein's sexual misconduct generally, Dolan did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

587.    In fact, James Dolan has admitted in a song he wrote that he "should've known" about Harvey Weinstein's "vile attacks" on women. Dolan stated in a television interview that Harvey Weinstein was on his mind when he wrote the song (and which he and his band JD & The Straight Shot have performed) titled "I should've known."[244]  Dolan wrote the song lyrics:

> We were friends
> We were friends
> Talked for hours without end
> About his latest story
> How to deal with fame and glory
> All the girls who adored him
> Catered to his every whim
> Nothing he could lose

---

[242] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[243] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied). *See also id.* at 279.

[244] https://www.si.com/nba/2018/08/09/james-dolan-i-shouldve-known-harvey-weinstein-song-audio

All he need to do was choose

I should've known
I should've known
I should've thrown myself across his tracks
Stopped him from these vile attacks
I should've known
We believed and didn't see
Through the lies he told us all
They led him to his endless fall
I should've known
I should've known

I should've known
I should've known

And what of the others
In some way all my brothers
Sitting on the very top
Could not hear the call to stop
Behind locked doors the eyes of men
Who take what don't belong to them
From those who seek the bright and starry
Are threatened with: you will be sorry

I should've known
I should've known
I should've thrown myself across his tracks
Stopped him from these vile attacks
I should've known
We believed and didn't see
Through the lies he told us all
They led him to his endless fall
I should've known
I should've known

I should've known
I should've known
I should've thrown myself across his tracks
Stopped him from these vile attacks
I should've known
We believed and didn't see
Through the lies he told us all
They led him to his endless fall
I should've known
I should've known

- 163 -

I should've known
I should've known

I should've known
I should've known

I should've known
I should've known

Audio of the song being performed by Dolan can be found at:

https://www.si.com/nba/2018/08/09/james-dolan-i-shouldve-known-harvey-weinstein-song-audio (last accessed September 23, 2018).

588.     Dolan failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

**11.     Director Paul Tudor Jones (October 20, 2015-October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

589.     Board Member Paul Tudor Jones knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

590.     Paul Tudor Jones was appointed to the TWC Board on or about October 20, 2015, the same day that Harvey Weinstein's 2015 Contract was signed.

591.     However, Jones was a friend of Weinstein for some time before the appointment. In fact, Weinstein served as a Director of the Robin Hood Foundation, which Jones had founded. They regularly attended the same galas, charitable events and other parties.

592.     At the time he was appointed to the TWC Board, Jones was aware that several Directors had attempted to engineer a proxy fight to oust Harvey Weinstein for his sexual

- 164 -

misconduct and financial improprieties.  Jones understood that he was being appointed to the TWC Board as a "Harvey Loyalist" to protect him regardless of his conduct and to ensure that the 2015 Contract was approved.

593.    As a Board member, Jones knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

        a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

        b.     was aware that Weinstein was serially targeting women for sex;

        c.     saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

        d.     received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

        e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

        f.     knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

        g.     as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

        h.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

     i.     knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

594.    At the time he was appointed to the TWC Board, Jones knew (or should have been aware given the extensive media reports) that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[245]  Yet Jones did not demand that the Board conduct an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

595.    When he joined the Board, Jones also should have been aware of a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room, which cited numerous incidents of Weinstein harassing or coercing women and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[246]

596.    Jones was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that,

---

[245] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[246] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[247]

And Avrich hinted at other sexual improprieties in the book.[248]

597.    Yet, despite knowledge of the book and its substance in 2016, Jones did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

598.    Even after the October 5, 2017 story published by The New York Times entitled "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades," Jones stayed loyal to Harvey – putting friendship and loyalty over duty.

599.    That evening, Jones attended a board meeting via conference call, during which the Board considered terminating Harvey. Despite Harvey's violations of the company's Code of Conduct (not to mention the illegality of sexual assault), Jones expressed doubts on the Board's ability to legally remove Harvey.[249]

600.    On October 6, 2017, four Board members issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "It's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation.

---

[247] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[248] *Id.* at 279.

[249] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

601.    Jones did not sign the October 6, 2017 release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul"

602.    On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to "'Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

603.    Jones resigned from the Board on October 7, 2017.

604.    After considerable backlash within his own company, Tudor Investments, Jones sent a memo on December 6, 2017 to employees attempting to explain why he supported Harvey Weinstein for so long. He admitted that: "… what I know now is that Harvey was a friend I believed too long and defended too long."[250]

605.    Jones failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

**12.    Director Marc Lasry (June 20, 2016 to October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

606.    Board Member Marc Lasry knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

---

[250] https://www.cnbc.com/2017/12/06/paul-tudor-jones-distances-himself-from-harvey-weinstein.html

607.   Lasry was a neighbor of Harvey Weinstein's in Westport, Connecticut. They and their families regularly socialized together, and Lasry and Weinstein attended the same galas, charitable events and other parties.

608.   Several women were assaulted during the course of family parties at Harvey Weinstein's home; accordingly, the fact that Lasry's family may have been present is not an immunizing factor.

609.   As a Board member, Lasry knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

      a.   witnessed Harvey Weinstein's physically and verbally-abusive behavior;

      b.   was aware that Weinstein was serially targeting women for sex;

      c.   saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

      d.   received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

      e.   discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

      f.   knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

      g.   as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

- 169 -

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

610.    At the time he was appointed to the TWC Board, Lasry knew (or should have been aware given the extensive media reports) that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[251]  Yet Lasry did not demand that the Board conduct an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

611.    Lasry was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down (and removed any disclosure of sexual improprieties along the way).[252]

612.    Yet, despite knowledge of the book and its substance in 2016, Lasry did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

613.    Lasry failed to take action because he was caught in the spiderweb of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein

---

[251] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[252] *Id.* at 279.

appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

### 13. TWC's President and Chief Operating Officer David Glasser (2008-February 16, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.

614. TWC's President and Chief Operating Officer from 2011 (and employee since 2008) until his termination in February 2018, David Glasser knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. Glasser's knowledge was based, in part, on his close working and personal relationship with Weinstein; he was known as Harvey Weinstein's and Robert Weinstein's "third brother," and served as Harvey Weinstein's right-hand man.[253]

615. As President and COO, Glasser was responsible for oversight of the human resources department at TWC. He thus knew or should have known of the numerous complaints of sexual misconduct and assault against Harvey Weinstein and their mishandling, including the fact that the department forwarded the complaints to Weinstein resulting in retaliation against the accusers.[254]

616. According to the New York Attorney General, Glasser received and knew of dozens of formal and informal complaints regarding Harvey Weinstein, including regarding sexual harassment and abuse by Harvey Weinstein.

617. Glasser was aware of information in Harvey Weinstein's personnel file that reflected complaints regarding sexual harassment and abuse by Harvey Weinstein.

---

[253] http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

[254] https://variety.com/2018/biz/news/david-glasser-weinstein-co-eric-schneiderman-1202695367/

618.    Glasser knew that Harvey Weinstein used funds from The Weinstein Company to pay for hotel rooms where women were lured by TWC employees under the pretense of official meetings, but were assaulted after the TWC employees were told to leave. Glasser knew that Harvey Weinstein used TWC employees to lure victims to Weinstein's office or hotel room or home to be assaulted.

619.    Glasser was aware of the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez, and the follow-up settlement with Gutierrez.

620.    Glasser also knew of Harvey Weinstein's conduct because he received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[255]

621.    Glasser admitted that he was aware of a 2009 incident between Harvey Weinstein and "a woman in publicity," the incident involving Emily Nestor, the Ambra Gutierrez incident leaked in 2015, and the 2015 memo from Lauren O'Connor.[256]  He also "always thought and

---

[255] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[256] https://deadline.com/2017/10/david-glasser-harvey-weinstein-bob-weinstein-the-weinstein-company-1202188171/

heard" Harvey Weinstein was unfaithful.[257] Yet he did not cause any of the incidents to be independently investigated.

622.    Instead, Glasser engaged in steps to cover up the behavior, including but not limited to sharing complaints directly with Harvey Weinstein, failing to document complaints, hiding complaints, and facilitating payments to victims.

**14.    TWC's Vice President of Human Resources Frank Gil (2007-October 9, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

623.    TWC's Senior Vice President of Human Resources from 2007 to October 9, 2017, Frank Gil knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

624.    Gil was responsible for the human resources department at TWC, where numerous complaints of sexual misconduct and assault against Harvey Weinstein were not properly handled.

625.    Gil implemented or ratified the practice of the human resources department of forwarding complaints about Weinstein's sexual misconduct to Weinstein, resulting in retaliation against the accusers.[258]

626.    Gil also authorized a bonus for former employee Sandeep Rehal for Rehal's procurement of erectile dysfunction drugs for Weinstein (which he used before assaulting various victims).

---

[257] https://deadline.com/2017/10/david-glasser-harvey-weinstein-bob-weinstein-the-weinstein-company-1202188171/

[258] https://variety.com/2018/biz/news/david-glasser-weinstein-co-eric-schneiderman-1202695367/

627.    According to one of Harvey Weinstein's TWC assistants from February 2013 to February 2015, Sandeep Rehal: "Harvey Weinstein's sexual abuse and conduct, and his use of the office, TWC and staff to enable it, was common knowledge in the office, to management, to his brother Robert Weinstein, and to Frank Gil."[259]

628.    During this period from 2013 to 2015, among other things, Rehal was required to clean Harvey Weinstein's semen off the couch in his TWC office "three or so times a week when Harvey Weinstein was in New York."[260] Rehal alleges that Frank Gil was aware of Weinstein's sexual acts in his TWC office.

629.    Gil received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[261]

630.    Gil also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.

631.    Moreover, Gil's knowledge is demonstrated by his actions to cover up evidence of Harvey Weinstein's assaults just before The New York Times published its exposé in 2017. On or about October 1, 2017, according to TWC, Gil entered the offices of TWC employees

---

[259] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. #1).

[260] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. #1).

[261] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

without their knowledge in order to take or destroy personnel files containing evidence of Harvey Weinstein's sexual abuse of women.

632.    In fact, Gil sought compensation from Harvey Weinstein (in the form of company funds) in exchange for providing confidential information from human resources files regarding complaints about Harvey to him.[262]

### 15.    Irwin Reiter, TWC's Executive Vice President for Accounting and Financial Reporting (October 21, 2005-2017), knew or should have known that Harvey Weinstein was a serial sexual predator.

633.    TWC's Executive Vice President for Accounting and Financial Reporting, Irwin Reiter, knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. Reiter was the Executive Vice President for Accounting and Financial Reporting at TWC from 2005 to at least 2017, and held the same position at Miramax from 1989-2005.[263]

634.    In his position as an accounting officer and because female employees had complained to him, Reiter knew that Harvey Weinstein used funds from The Weinstein Company to pay for hotel rooms where women were lured by TWC employees under the pretense of official meetings, but were assaulted after the TWC employees were told to leave.

635.    Based on years of complaints from employees, Reiter knew that Weinstein used TWC employees to lure victims to Weinstein's office or hotel room or home to be assaulted.

---

[262] Adam Ciralsky, NIGHT MARE on Greenwich Street, Vanity Fair (Hollywood 2018).

[263] https://www.linkedin.com/in/irwin-reiter-58828a4/ (last accessed September 19, 2018).

636.    Based on his position as an accounting officer, Reiter knew that Harvey Weinstein used company funds to pay for settlements with victims of sexual assault, abuse, and harassment.

637.    Reiter admitted in writing to a female employee of TWC that Weinstein's "mistreatment of women" was an ongoing problem.[264]

638.    Yet Reiter did not take any steps to report Weinstein's conduct to the authorities, but instead engaged in steps to cover up the behavior, including but facilitating payments to victims.

**16.    TWC Officer Barbara Schneeweiss (2005-2017) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

639.    TWC Officer Barbara Schneeweiss knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

640.    Just as she did at Miramax, Schneeweiss was regularly tasked at TWC with scheduling appointments with Weinstein's victims at hotels. She would meet the victims in the hotel restaurant or lobby where the victims understood the meeting would take place. Schneeweiss would then advise the women that Weinstein was running late or stuck on a telephone call, so the meeting had been moved to his hotel suite.

641.    Sometimes Schneeweiss would lead to the women up to Weinstein's hotel suite to give the meeting an air of legitimacy; sometimes, she would direct the victims to go up to his hotel suite, reassuring them that the meeting was for a legitimate purpose.

---

[264] Farrow, *supra* note 10.

642.    Schneeweiss would then leave the meeting, or ensure that the victim was left alone with Weinstein while the assault occurred.

643.    Schneeweiss was also used by Weinstein in an attempt to placate his victims after the assaults occurred. For example, Weinstein used Schneeweiss to correspond and meet with Melissa Thompson and several other victims (after the assaults occurred) under the guise they were going to be part of a new show called Women Inc. Weinstein also used Schneeweiss to contact Louisette Geiss the day after she was assaulted to invite her to travel on TWC's private plane.

644.    Schneeweiss has declared on various occasions that she was not aware that the victims were assaulted. However several Class members have publicly described seeing Schneeweiss after the assault occurred but Schneeweiss would purposefully not look them in the eyes.

645.    Moreover, Plaintiff Louisette Geiss confronted Schneeweiss on two occasions. First the day after the assault, when Schneeweiss called Geiss to invite her to travel on the TWC private plane, Geiss made clear that she would not ride alone with Weinstein and asked how many people would be on the plane. Schneeweiss assured her there would be at least 10 people on the plane (there were not). Then, in or about 2011, Geiss told Schneeweiss that Weinstein was totally inappropriate and a "bad" guy. Schneeweiss's only response was that Weinstein had never assaulted her.

646.    Despite her extensive knowledge, Schneeweiss failed to cause any independent investigations to be undertaking or take any actions to prevent or diminish the likelihood of further assaults – but rather continued to facilitate the assaults throughout her tenure at TWC.

- 177 -

I.    **The TWC Board's termination of Harvey Weinstein is too little, too late.**

647.    On October 5, 2017, The New York Times published the story entitled "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades."

648.    That same day, Harvey Weinstein issued a statement to the New York Times, which stated:

> I came of age in the 60's and 70's, when all the rules about behavior and workplaces were different. That was the culture then.
>
> I have since learned it's not an excuse, in the office - or out of it. To anyone.
>
> I realized some time ago that I needed to be a better person and my interactions with the people I work with have changed.
>
> I appreciate the way I've behaved with colleagues in the past has caused a lot of pain, and I sincerely apologize for it.
>
> Though I'm trying to do better, I know I have a long way to go. That is my commitment. My journey now will be to learn about myself and conquer my demons. Over the last year I've asked Lisa Bloom to tutor me and she's put together a team of people. I've brought on therapists and I plan to take a leave of absence from my company and to deal with this issue head on. I so respect all women and regret what happened. I hope that my actions will speak louder than words and that one day we will all be able to earn their trust and sit down together with Lisa to learn more. Jay Z wrote in 4:44 "I'm not the man I thought I was and I better be that man for my children." The same is true for me. I want a second chance in the community but I know I've got work to do to earn it. I have goals that are now priorities. Trust me, this isn't an overnight process. I've been trying to do this for 10 years and this is a wake-up call. I cannot be more remorseful about the people I hurt and I plan to do right by all of them.
>
> I am going to need a place to channel that anger so I've decided that I'm going to give the NRA my full attention. I hope Wayne LaPierre will enjoy his retirement party. I'm going to do it at the same place I had my Bar Mitzvah. I'm making a movie about our President, perhaps we can make it a joint retirement party. One year ago, I began organizing a $5 million foundation to give scholarships to women directors at USC. While this might seem coincidental, it has been in the works for a year. It will be named after my mom and I won't disappoint her.

649.    That evening, all nine directors – including Harvey Weinstein, Robert Weinstein, Lance Maerov, Tarak Ben Ammar, Richard Koenigsberg, Paul Tudor Jones, Dirk Ziff, Marc Lasry, and Tim Sarnoff - met via conference call. During the telephone call, Harvey insisted that the stories were not true. He insisted that the telephone call did not count as an official board

meeting, and that the Board had no legal authority to remove him. Nonetheless, Harvey agreed to a temporary leave of absence.[265]

650.    During the call, Jones expressed doubts on the Board's ability to legally remove Harvey. Jones stated that terminating Harvey could be viewed by lenders as a "material event," triggering a debt default by TWC.[266]

651.    On October 6, 2017, Dirk Ziff, Marc Lasry, and Tim Sarnoff resigned as Board members.

652.    That evening, four Board members (Robert Weinstein, Ben Ammar, Maerov, and Koenigsberg) issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "It's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation.

653.    Jones did not sign the October 6, 2017 release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul".

654.    On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to "'Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

655.    Jones resigned from the Board on October 7, 2017.

656.    On Sunday, October 8, 2017, the Board met again, and voted to terminate Harvey.

---

[265] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[266] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

657.     Koenigsberg resigned on or about October 14, 2017.

**J.     The statutes of limitations are tolled by equitable estoppel, duress, and the continuing violations doctrine.**

658.     The power Weinstein wielded—and his ability to blacklist an entertainment industry participant for complaining about his predatory behavior—was so legendary that it was the rule in the entertainment industry that women needed to acquiesce to Weinstein to succeed. This rule was so widely accepted that male producers and actors laughingly voiced their expectations that Plaintiff and the Class had and would follow it to further their careers. For example, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, was onstage to announce the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[267]

659.     Defendants took affirmative steps to conceal their knowledge and facilitation of Weinstein's abuse from Class Members, therefore affirmatively misrepresenting to the Class that they did not have negligent retention, ratification, sex trafficking, and RICO claims.

660.     If women did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[268] This uniform response to those who challenged Weinstein's behavior, which was widely known throughout the industry, actually and reasonably placed Class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

---

[267] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[268] Farrow, *supra* note 10.

661.    Weinstein's pattern of abuse continued unabated until at least October 2017. Miramax, Disney, Eisner, Miramax Officers, TWC, TWC Officers, and TWC Directors continued to benefit from sex trafficking acts until 2017. Defendants' pattern of racketeering continued until at least October 2017, and Plaintiffs could not have discovered the racketeering activity until then.

662.    The statute of limitations was thus tolled at least until *The New York Times* published a powerful report revealing allegations of sexual harassment against Weinstein, which led to the resignation of four members of TWC's Board and to the firing of Weinstein.

663.    According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain.  Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally.  Firing him was crucial to opening the floodgates."[269]

**1.      The statutes of limitations for negligent retention and supervision, ratification, and RICO claims are tolled by equitable estoppel.**

664.    Negligence claims are subject to the general three-year statute of limitations for personal injury actions. The statute of limitations is tolled by the doctrine of equitable estoppel.

665.    Plaintiffs allege that Miramax, Miramax Officers, Disney, Eisner, TWC, TWC Officers, and TWC Directors ratified Harvey Weinstein's acts of assault, battery, and intentional and negligent infliction of emotional distress. The statute of limitations for intentional torts is one year, and for negligent infliction of emotional distress, it is three years. Plaintiffs' ratification claims are tolled by the doctrine of equitable estoppel.

---

[269] Tully, *supra* note 6.

666.    The statute of limitations for RICO is four years from the date the RICO injury is discovered. Plaintiffs have pled sufficient facts to show that they did not discover their RICO injuries until October 2017. But in the alternative, Plaintiffs' RICO claims are tolled by the doctrine of equitable estoppel.

667.    Equitable estoppel may toll the statute of limitations when the plaintiffs were induced by fraud, misrepresentations or deception to refrain from filing timely action, and the plaintiff's reliance on defendant's misrepresentations was reasonable.

668.    Plaintiffs have alleged that each Defendant had knowledge of Weinstein's pattern of abuse and efforts to control, threaten, silence, and blacklist his abuse victims.

669.    "Weinstein enforced a code of silence; employees of the Weinstein Company have contracts saying they will not criticize it or its leaders in a way that could harm its 'business reputation' or 'any employee's personal reputation,' a recent document shows."[270] All Defendants had knowledge of, and helped perpetuate and enforce, Weinstein's code of silence.

670.    Because of Defendants' affirmative actions to conceal Weinstein's pattern of abuse, and to help enforce this code of silence, Class Members had no knowledge of their negligent retention, ratification, or RICO claims against Defendants until The New York Times published its report in October 2017.

671.    Defendant Miramax took affirmative actions to hide its knowledge and facilitation of Weinstein's pattern of abusing, blacklisting, and silencing women from Class Members, thereby misrepresenting to Class Members that they had no claims against Miramax. For example, Miramax paid settlements to multiple women who were victims of Harvey Weinstein's abuse and harassment in order to silence them and induce them to release their claims. Moreover,

---

[270] Kantor & Twohey, *supra* note 1.

victims who complained to employees of Miramax were met with indifference, disbelief that they had mentioned the behavior, or advice to say nothing further. After the Weinstein brothers' departures in 2005, Miramax continued to have close business ties with Harvey Weinstein until at least 2017.

672.     Defendant Buena Vista took affirmative actions to hide its knowledge and facilitation of Weinstein's pattern of abusing, blacklisting, and silencing women from Class Members, thereby misrepresenting to Class Members that they had no claims against Buena Vista. For instance, Buena Vista paid the salary of Fabrizio Lombardo, who after the New Yorker and New York Times broke the stories of Weinstein's predatory conduct in October 2017, sent threatening text messages to at least one victim who he had procured for and was assaulted by Weinstein in the late 1990s.

673.     Defendant Disney took affirmative actions to hide its knowledge and facilitation of Weinstein's pattern of abusing, blacklisting, and silencing women from Class Members, thereby misrepresenting to the Class that they had no claims against Disney. For instance, as co-obligor of Miramax, Disney knew about, and facilitated, Miramax's payments to Harvey Weinstein's victims.

674.     Defendant TWC took affirmative actions to conceal its knowledge and facilitation of Weinstein's pattern of abusing, blacklisting, and silencing women from Class Members, thereby misrepresenting to Class Members that they had no claims against TWC.

675.     Employees of TWC signed contracts stating that they would not criticize the company or its leader in a way that could harm its "business reputation" or "any employee's personal reputation," thus requiring that they not speak about Weinstein's pattern of abusing, blacklisting, and silencing of women to the Class.

- 183 -

676.    When employees or others complained about Weinstein's sexual misconduct, TWC simply forwarded the complaints to Harvey Weinstein, knowing that Weinstein would take further steps to threaten or otherwise silence the complainants.

677.    TWC funds were used for payouts as part of settlement agreements with Weinstein's victims.  Those agreements, which contained non-disclosure provisions, were intended to make victims remain silent and release their claims against Weinstein and/or TWC.

678.    In 2016 (and before), TWC retained attorney David Boies, Kroll Associates, Inc. and Corporate Risk Holdings to cover up Harvey Weinstein's pattern of assault, and to suppress information by spying on, threatening, extorting, and otherwise silencing victims.

679.    TWC Directors took affirmative actions to conceal their knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to Class Members that they had no claims against TWC or its Directors.

680.    Tarak Ben Ammar, Dirk Ziff, Lance Maerov, Robert Weinstein, Tim Sarnoff, Richard Koenigsberg, James Dolan and Paul Tudor Jones knew or should have known, about NYPD's sting involving Harvey and Amber Battilana Gutierrez.  However, they did not require Harvey Weinstein to reaffirm the company's code of conduct, and they renewed his employment contract in 2015.

681.    Moreover, when the Board, including Tarak Ben Ammar, Dirk Ziff, Lance Maerov, Robert Weinstein, Tim Sarnoff, Richard Koenigsberg, James Dolan, and Paul Tudor Jones demanded to see Harvey's personnel file during the course of negotiating his 2015 contract, Harvey's lawyer David Boies refused. While the board could have sued for access to the file, they decided not to because they knew it "could have been very damaging to the

company" and because Harvey had agreed to hold TWC and Directors harmless for any liability resulting from "any incident, resolved or unresolved, disclosed in his personnel file." 271

682.    Defendant Robert Weinstein took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to the Class that they had no claims against Robert Weinstein, Miramax, or TWC. For example, Robert Weinstein paid settlements—using his personal funds— to several of Harvey Weinstein's victims in order to require them to stay silent and release their claims, including to former Miramax employee Zelda Perkins and another female Miramax employee in the UK.

683.    Defendant Irwin Reiter took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to Class Members that they had no claims against Reiter, Miramax, or TWC. For instance, Reiter handled and reviewed payments to Harvey Weinstein's victims out of Miramax and TWC funds. The payments were made to induce victims to stay silent and release their claims.

684.    Defendant David Glasser took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to the Class that they had no claims against Glasser or TWC. For instance, until 2017 Glasser oversaw the human resources department at TWC, which mishandled the numerous complaints about Weinstein's sexual misconduct, in part by failing to document them, hiding them, and forwarding them to Harvey Weinstein himself so that

---

271 http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

Weinstein could threaten and silence the complainant. Glasser also facilitated payments to victims in order to procure their silence and require them to release their claims.

685.     Defendant Frank Gil took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Gil or TWC. For instance, until 2017 Gil oversaw the human resources department at TWC, which mishandled the numerous complaints about Weinstein's sexual misconduct, in part by failing to document them, hiding them, and forwarding them to Harvey Weinstein himself so that Weinstein could threaten and silence the complainant. Gil sought compensation from Harvey Weinstein for providing him with confidential information from human resources files regarding the complaints. On or about October 1, 2017, Gil entered the offices of TWC employees in order to destroy personnel files containing evidence of Harvey's sexual abuse of women.

686.     Defendant Fabrizio Lombardo took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Lombardo or Buena Vista. For instance, when the New Yorker and New York Times broke the stories of Weinstein's predatory conduct in October 2017, Lombardo sent threatening text messages to at least one victim who he had procured for and was assaulted by Weinstein in the late 1990s.

687.     Defendant Barbara Schneeweiss took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Schneeweiss or TWC. For instance, Schneeweiss regularly delivered women for "meetings" and then left them to be assaulted by Weinstein, affirmatively representing to victims that she had no

knowledge of Weinstein's systematic abuse. She placated Weinstein's victims after their assaults in an attempt to prevent them from reporting Weinstein. For instance, Schneeweiss corresponded and met with Melissa Thompson and another victim (after the assaults occurred) under the guise they were going to be part of a new show called Women Inc. Schneeweiss responded to Louisette Geiss that Weinstein had never assaulted her, misrepresenting to Geiss the fact that she knew Weinstein had assaulted many others.

688.     Rick Schwartz took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Schwartz or Miramax. As Vice President of Miramax, Schwartz regularly delivered women to Weinstein, thus representing that he had no knowledge that Weinstein was a serial predator. He also attempted to placate women after they were assaulted in an attempt to prevent them from reporting Weinstein.

689.     Mark Gill took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Gill or TWC. For instance, Gill received direct complaints about Weinstein from victims, yet did nothing. Thus, Gill affirmatively represented to the Class that he had no knowledge of Weinstein's pattern of abuse.

690.     Nancy Ashbrook took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Ashbrook or Miramax. For instance, Ashbrooke was responsible for the human resources department at Miramax, where numerous complaints of sexual misconduct and assault against Harvey Weinstein were not properly handled. Ashbrooke was also aware that under the terms of a

- 187 -

settlement agreement, she was supposed to advise new employees about Miramax's human resources policies and the existence of three complaint handlers.[272]  She failed to do so.

691.    Brafman & Associates, participants in the Enterprise, made affirmative misrepresentations to Melissa Thompson in order to induce her to forebear her claims against Weinstein and TWC. When Thompson expressed concern about the statute of limitations, Alex Spiro, who was acting as Thompson's attorney at the time, told her that there were "loopholes" around it. Unbeknownst to Thompson, Spiro's firm, Brafman & Associates, was contemporaneously representing Harvey Weinstein.

## 2.    The statutes of limitations for Plaintiffs' RICO and infliction of emotional distress claims are tolled by duress.

692.    The statute of limitations for negligent infliction of emotional distress is three years, while the statute for intentional infliction of emotional distress is one.

693.    When duress is part of the cause of action alleged,' the statute of limitations is tolled until the duress has ended because the offensive conduct is regarded as a continuous wrong. Here, duress is an element of Plaintiffs' RICO claims and state law claims for infliction of emotional distress. Duress may toll the statute of limitations until the time when the plaintiff's compulsion through fear ceases.

694.    If women did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[273] It was widely understood that Weinstein threatened, blacklisted, and "crushed" women who complained about his abusive behavior. This uniform response to those who challenged Weinstein's behavior,

---

[272] *Id.*

[273] Farrow, *supra* note 8.

which was widely known throughout the industry, actually and reasonably placed Class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

695.   As a result, Plaintiffs did not sooner file infliction of emotional distress or RICO claims against Weinstein, TWC, TWC Officers, Miramax, Miramax Officers, or Disney because their will was overborn by the duress inflicted by Weinstein, whose actions were facilitated by his employers and the Enterprise.

   **a. Plaintiffs and the Class were compelled by fear of safety to forebear their claims against Weinstein and members of the Enterprise until at least 2017.**

696.   After she refused to show him her breasts, Weinstein chased Nannette Klatt into a dark stairway in the Miramax building and locked the door. Cold, frightened, and alone, she did not know how she would escape the building. She realized then that Weinstein was very dangerous. As a result, Klatt was compelled through fear for life and safety to forebear her claims related to Weinstein's conduct until October 2017.

697.   Zoe Brock told her agent that she never wanted to see Weinstein again after the night at the Hotel du Cap. But that evening, Weinstein lured an unknowing Brock, through her agent, to a private screening. There, Weinstein sat with his hand on the back of Brock's chair throughout the film. Brock knew that by arranging the screening and requiring her agent to deliver her there, Weinstein was demonstrating his level of control over the people around him. She thus refrained from bringing claims until October 2017 for fear of her life and safety.

698.   After he chased her around an apartment naked, Weinstein insisted on taking Katherine Kendall to her next location in a taxi. Kendall got out of the taxi and went into a bar, where she observed Weinstein waiting in the taxi, staring at her, for at least 20 minutes. Throughout the next three years, Weinstein called Kendall every few months, with a Miramax

assistant patching him through, to "make sure they were still friends." Kendall knew that

Weinstein was implying that there would be serious consequences if she complained about his

conduct. As a result, Kendall lived in abject fear of speaking out until October 2017, and she

refrained from doing so for fear of her life and safety. Shortly before then, in the summer of

2017, Kendall's fears materialized: an Intelligence Participant contacted her to ascertain whether

she was planning to go public with her story.

699.   Melissa Sagemiller declined to ride on Weinstein's private jet from the *Get Over

It* shooting location in Toronto. But when she arrived at the airport, she learned that Weinstein

had caused her bags to be removed from her commercial flight. She was then instructed by a

Miramax assistant to get on Weinstein's private jet. When she entered the jet, Weinstein said

"see Melissa, I always get what I want." Sagemiller then truly understood Weinstein's power,

and she knew that she must forebear any claims against him or seriously risk her personal safety.

700.   Caitlin Dulany knew, from spending time with Weinstein and observing the

people around him, that he had the power to destroy lives. Not only that, but Weinstein had

falsely imprisoned and sexually assaulted her at the Hotel du Cap in France. She was deeply

afraid of him, and she knew that she would be risking her life and safety if she told anyone about

the assault.

701.   As a young aspiring actress, Larissa Gomes learned from her peers that Weinstein

destroyed people who spoke out against him, and that he would do the same to her if she

complained about her sexual assault in Toronto. Therefore, she was compelled by fear for her

life and safety until June 2018 to refrain from bringing her claims.

702.   While he was naked in the hot tub, Weinstein grabbed Louisette Geiss's arm and

then chased her as she fled his hotel room at the Sundance Film Festival. During the course of

their prior conversation, Weinstein informed Geiss that he had the power to unilaterally greenlight her scripts (implying, on the other hand, that he had the power to bury them). When Geiss told Barbara Schneeweiss that Weinstein had been inappropriate, Schneeweiss simply replied that he had never done anything like that to her. Thereafter, Geiss was overborn by fear for her life and safety to remain silent about Weinstein's sexual misconduct.

703.    Weinstein purposely instilled fear in Sarah Ann Thomas when he summoned her to his home, where the two were alone but for his small children, and then interviewed her and forcibly embraced her in his underwear. TWC personnel had arranged the meeting. As a result, Thomas was compelled by fear for her life and safety to refrain from reporting Weinstein's abusive behavior.

704.    Melissa Thompson learned of Weinstein's reputation for ruining the lives of those who spoke out against him. Therefore, she was overborn by fear for her life and safety from filing claims against defendants for Weinstein's rape until 2018. Earlier, in 2017, a friend in whom she had confided suggested she contact a lawyer at Brafman & Associates. After attorney Alex Spiro consulted her, took her video evidence, and assured her that he would represent her and that there were "loopholes" around her statute of limitations, Thompson learned that Brafman & Associates were actually Weinstein's criminal defense lawyers. This turn of events confirmed to Thompson that her fear had been justified; Weinstein did indeed have a network of people working to destroy the victims who talked.

705.    After he sexually assaulted Jane Doe when she was 16 years old, he continued to subject her to emotional abuse and sexual assault and harassment for the next decade. The abuse included an attempt to forcibly enter her hotel room in New York City. Jane Doe spent years trying to placate Weinstein, having experienced his bullying behavior and been informed by

others that he would crush people. Jane Doe was compelled by fear for her life and safety to forebear her claims until today.

706.   Asia Argento, an Italian film actress and director, said that she did not speak out until 2017, after Weinstein had "forcibly performed oral sex on her" years before, "because she feared that Weinstein would 'crush' her. 'I know he has crushed a lot of people before… That's why this story—in my case, it's twenty years old, some of them are older—has never come out.'"[274]

707.   Four actresses, including Mira Sorvino and Rosanna Arquette, told *The New Yorker* that "they suspected that, after they rejected Weinstein's advances or complained about them to company representatives, that Weinstein had them removed from projects or dissuaded people from hiring them."[275] Multiple sources told the same reporter that "Weinstein frequently bragged about planting items in media outlets about those who spoke against him; these sources feared similar retribution."[276]

708.   Weinstein and his companies worked to blacklist women who had refused his sexual advances. In or about 1998, Mira Sorvino and Ashley Judd had been chosen to star in the *Lord of the Rings*, when the franchise was still under the umbrella of Miramax. Peter Jackson, the film's director, confirmed that Miramax stepped in and told him that Judd and Sorvino were "a nightmare to work with and we should avoid them at all costs."[277]

---

[274] *Id.*

[275] Farrow, *supra* note 8.

[276] *Id.*

[277] Nardine Saad, *Peter Jackson says Weinsteins blacklisted Ashley Judd, Mira Sorvino; Harvey Weinstein disagrees*, LOS ANGELES TIMES (Dec. 15, 2017), http://www.latimes.com/

709.   Several sources "pointed to Gutierrez's case: after she went to the police, negative items discussing her sexual history and impugning her credibility began rapidly appearing in New York gossip pages. (In the taped conversation, part of which *The New Yorker* posted online, Weinstein asks Gutierrez to join him for "five minutes," and warns, "Don't ruin your friendship with me for five minutes.")[278]

710.   Women who spoke to *The New Yorker* on condition of anonymity "were too afraid to allow [the author] to use their names, but their stories are uncannily similar to these allegations. One woman who worked with Weinstein, explained her reluctance to be identified. 'He drags your name through the mud, and he'll come after you hard with his legal team.'"[279]

711.   Mira Sorvino, who rejected Weinstein's advances and complained about his harassment to Miramax, "felt that saying no to Weinstein and reporting the harassment had ultimately hurt her career." She told a reporter from *The New Yorker*, "I definitely felt iced out and that my rejection of Harvey had something to do with it."[280]

712.   After Gwyneth Paltrow was harassed, she complained to her then-boyfriend Brad Pitt, who confronted Weinstein, who subsequently called and berated Paltrow for disclosing what happened. Paltrow feared she would be fired from the Miramax film *Emma* if she complained further.[281]

---

entertainment/la-et-entertainment-news-updates-peter-jackson-ashley-judd-mira-sorvino-weinstein-1513362464-htmlstory.html.

[278] Farrow, *supra* note 8.

[279] *Id*.

[280] *Id*.

[281] Kantor & Abrams, *supra* note 13.

713.    After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told to refrain from saying anything further, so as not to endanger the release of the Miramax films in which she appeared.[282]

714.    Darryl Hannah felt immediate repercussions from turning down Weinstein's advances and sexual demands. A Miramax plane on a film tour left without her, her plane and hotel reservations were cancelled, and her hair and make-up artist was let go.[283]  Hannah was not about to let Weinstein's actions go, however—she complained to her manager, a producer on the film, and her director, Quentin Tarantino, who has since admitted that he did nothing.[284] Nonetheless, Hannah not only was not believed but also, consistent with the objectives of the Weinstein Sexual Enterprise, was "berated, criticized, and blamed."[285]

715.    The type of emotional and physical abuse Weinstein used to command silence from his victims and to cover up his assaults has been studied by psychologists. John Gottman and Neil Jacobsen, psychologists and authors of *When Men Batter Women* (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from systematic abuse at the hands of a partner. The four factors that determine emotional violence, Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage.  Each of these factors can be found in Weinstein's abuse of Plaintiffs and the Class.

---

[282] *Id*.

[283] Farrow, *supra* note 8.

[284] *Id.*

[285] *Id.*

716.     Shortly before *The New York Times* and *The New Yorker* finally revealed the decades-long pattern of harassment, Weinstein and his legal team began calling Class members and threatening them for talking. They also threatened to sue *The New York Times* and other media outlets.[286]

717.     According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain.  Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally.  Firing him was crucial to opening the floodgates."[287]

**3.      The statutes of limitations for Plaintiffs' RICO and state law tort claims are tolled by the continuing violations doctrine.**

718.     The statute of limitations for RICO is four years from the date that the RICO injury is discovered. Plaintiffs have pled sufficient facts to show that they did not discovery their RICO injuries until 2017. But in the alternative, Plaintiffs' RICO claims are tolled by the continuing violations doctrine.

719.     The statute of limitations for assault, battery, false imprisonment, and intentional infliction of emotional distress is one year, and it is three years for negligent retention, supervision, and infliction of emotional distress. Each claim is tolled by the continuing violations doctrine.

> **a.      Plaintiffs' intentional tort claims against Harvey Weinstein, TWC, TWC Officers and Directors, and Miramax are subject to the continuing violations doctrine, as are Plaintiffs' negligent retention**

---

[286] Farrow, *supra* note 8.

[287] Tully, *supra* note 6.

**and supervision claims against TWC and TWC Officers and Directors.**

720.   Plaintiffs have pled facts to show that Weinstein's pattern of sexually abusing, blacklisting, threatening, and silencing women continued unabated until at least December 2017.

721.   As a result, Defendants Disney, Eisner's, Miramax, Miramax Officers, TWC, TWC Officers, and TWC Directors' ratification of Weinstein's abuse, threats, and efforts to silence and blacklist Class Members continued until at least October 2017.

722.   Miramax and TWC continued to engage in a close and consistent business relationship after the Weinstein brothers left Miramax in 2005. Knowing about, and benefitting from, Harvey's abuse, threats, and efforts to silence and blacklist Class Members, Miramax co-produced scores of movies and television shows throughout the time period. And Miramax entered into a production and distribution deal with TWC in 2013 to make sequels of Miramax titles. Thus Miramax's ratification of Weinstein's abuse, threats, and efforts to silence and blacklist Class Members continued until at least October 2017.

723.   Defendant TWC, TWC Officers, and TWC Directors' negligent retention of Harvey Weinstein continued until October 2017.

        **b.**    **RICO claims against all Defendants are subject to the continuing violations doctrine.**

724.   Shortly before *The New York Times* and *The New Yorker* finally revealed the decades-long pattern of harassment, Weinstein and his legal team began calling Class Members, threatening them for talking. They also threatened to sue *The New York Times* and other media outlets.[288]

---

[288] Farrow, *supra* note 8.

725.    Defendants' pattern of racketeering began in the early 1990s and continued until at least 2017. By way of example only:

    a.    Plaintiffs allege specific acts of mail and wire fraud by Miramax and Weinstein in 1993, Miramax, Buena Vista, and Weinstein in 1998, and Miramax, Disney, and Weinstein in 2000 and 2004;

    b.    Plaintiffs allege specific acts of mail and wire fraud by TWC, Weinstein, and TWC officers that occurred in 2008, 2010, 2011, and 2015;

    c.    Plaintiffs allege specific acts of mail and wire fraud between the Law Firms and Intelligence Participants in 2015, 2016, and 2017;

    d.    Plaintiffs allege specific acts of mail and wire fraud between the Law Firms, Intelligence, Film Participants, Journalist Participants, and Weinstein in 2015, 2016 and 2017;

    e.    Plaintiffs allege that Defendants engaged in specific acts of sex trafficking in 1993, 1996, 1998 2000, 2002, 2004, 2006, 2008, 2010, and 2011;

    f.    Plaintiffs allege specific acts of witness tampering by Harvey Weinstein throughout the relevant periods.

726.    The type of emotional and physical abuse Weinstein used to command silence from his victims and cover up his assaults has been studied by psychologists. Psychologists John Gottman and Neil Jacobsen, authors of *When Men Batter Women* (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from systematic abuse at the hands of a partner. The four factors that determine emotional violence,

Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage.  Each of these factors can be found in Weinstein's abuse of Plaintiffs and the Class.

727.    The statute of limitations was thus tolled at least until *The New York Times* published a powerful report revealing allegations of sexual harassment against Weinstein, which led to the resignation of four members of TWC's Board and to the firing of Weinstein.

728.    According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain.  Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally.  Firing him was crucial to opening the floodgates."[289]

## V.    CLASS ALLEGATIONS

729.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of themselves and the following "Nationwide Class":

> All women who met with Harvey Weinstein in person (i) to audition for or to discuss involvement in a project to be produced or distributed by either The Weinstein Company Holdings, LLC or its affiliates ("TWC"), or, prior to September 30, 2005, Miramax Film Corp. or its predecessors ("Miramax"), or (ii) in a meeting or event facilitated, hosted, or underwritten by TWC or, prior to September 30, 2005, Miramax.

730.    In addition, Plaintiffs Melissa Sagemiller, Nannette Klatt, Katherine Kendall, Zoe Brock, Caitlin Dulany, Larissa Gomes, and Jane Doe, assert certain state law claims on behalf of the "Miramax Subclass," defined as:

> All women who met with Harvey Weinstein in person, before September 30, 2005, (i) to audition for or to discuss involvement in a project to be produced or distributed by Miramax or (ii) in a meeting or event facilitated, hosted, or underwritten by Miramax.

---

[289] Tully, *supra* note 7.

731.     Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe also assert certain state law claims on behalf of the "TWC Subclass," defined as:

> All women who met with Harvey Weinstein in person (i) to audition for or to discuss involvement in a project to be produced or distributed by The Weinstein Company Holdings, LLC or its affiliates, or (ii) in a meeting or event facilitated, hosted, or underwritten by The Weinstein Company Holdings, LLC or its affiliates.

The Nationwide Class, Miramax Subclass, and TWC Subclass are hereinafter referred to as the "Classes."

732.     The Classes consist of dozens, if not hundreds, of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Classes and the identities of the individual members are ascertainable through records maintained by Weinstein, the Defendants, and members of the Weinstein Sexual Enterprise. For example, one former employee of Miramax and TWC told *The New Yorker* that "she was asked to keep track of the women, who, in keeping with a practice established by Weinstein's assistants, were all filed under the same label in her phone: F.O.H., which stood for 'Friend of Harvey.'"[290]

733.     The claims of Plaintiffs are typical of the Class and the respective Subclasses. The claims of the Plaintiffs and the Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

734.     There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

---

[290] Farrow, *supra* note 10.

735.    Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

a.    Whether the Defendants knew or should have known of Harvey Weinstein's pattern of and propensity for sexual harassment, misconduct and assault;

b.    The date by which the Defendants knew or should have known of Harvey Weinstein's pattern of and propensity for sexual harassment, misconduct and assault;

c.    Whether Harvey Weinstein engaged in sex trafficking;

d.    Whether Defendants knew or should have known TWC was a venture engaged in sex trafficking;

e.    Whether Defendants engaged in a scheme with the Intelligence Participants, Law Firm Participants, Journalist Participants and others to use false pretenses to tamper with victims and witnesses of Weinstein's sexual misconduct in order to prevent the publication, prosecution, or reporting of Weinstein's sexual misconduct, and to destroy evidence.

f.    Whether Defendants violated RICO, 18 U.S.C. § 1962.

g.    Whether Defendants violated RICO, 18 U.S.C. § 1512.

h.    Whether Weinstein engaged in a pattern and practice of sexual harassment, assault, and battery.

i.    Whether Weinstein's pattern and practice of sexual harassment, assault, and battery was committed within the scope of his employment at Disney, Miramax or TWC.

j.      Whether TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers facilitated Weinstein's pattern and practice of sexual harassment, assault, and battery.

k.      Whether TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers ratified Weinstein's pattern and practice of sexual harassment, assault, and battery.

l.      Whether TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers engaged in conduct designed to suppress complaints or reports regarding Weinstein's conduct.

m.      Whether TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers negligently retained or supervised Weinstein.

n.      Whether Disney, Miramax and/or TWC are responsible for Weinstein's conduct under the doctrine of *respondeat superior*.

736.    Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers' legal responsibility for Weinstein's actions, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

737.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and have the financial resources to do so.

Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Classes.

## VI.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1591, 1595 (SEX TRAFFICKING)
### (PLAINTIFFS GEISS, THOMAS AND THOMPSON VERSUS HARVEY WEINSTEIN)

738.    Plaintiffs Geiss, Thomas, and Thompson incorporate by reference all preceding paragraphs, as if fully set forth herein.  Plaintiffs assert Count I on behalf of the TWC Subclass.

739.    In violation of 18 U.S.C. § 1591, Harvey Weinstein knowingly, in or affecting interstate or foreign commerce, recruited, enticed, or solicited Plaintiffs knowing that means of force, threats of force, fraud, or coercion (or a combination thereof) would be used to cause each Plaintiff to engage in any sex act on account of which anything of value would be given to or received by any person.

740.    The statute of limitations for violations of the sex trafficking statute is 10 years. 15 U.S.C. § 1595.  Each of the Plaintiffs who bring this count were affected within the 10 years prior to filing suit.

741.    Harvey Weinstein's actions knowingly affected interstate or foreign commerce:

a.    With respect to  Geiss, in 2008, Weinstein traveled for his business to Sundance Film Festival in Park City, Utah where he promised a three-picture deal to  Geiss;

b.    With respect to  Thomas, in 2008, Weinstein caused his TWC assistants to entice Thomas to travel to his home in Connecticut with the promise of a position as his children's nanny;

c.    With respect to Thompson, in 2011, Weinstein promised her a business deal in which her company's technology platform would integrate a live video feed filmed in New York, for an event associated with a film that was distributed throughout the United States. Similarly, Weinstein promised her a business deal, in which her

company's technology platform would integrate a live video feed filmed in Los Angeles, for an event associated with a film that was distributed throughout the United States. For both deals promised, Thompson's technology was to distribute the live broadcasts internationally, on behalf of The Weinstein Company, via an Internet web protocol and Facebook's application programming interface.

742.   Harvey Weinstein recruited, enticed, or solicited by any means each of the

Plaintiffs:

a.   With respect to Geiss, Weinstein invited her to meet with him in the office adjacent to his hotel room at the film festival to discuss her music company, the script she was pitching at the festival, and her career. The opportunity to meet with the producer about her script was a chance of a lifetime. Because Geiss had heard rumors about Weinstein, she was skeptical, but the reason for attending Sundance was to secure a deal for her script. She decided to bluntly express her concerns and asked Weinstein to shake her hand – *in front of security cameras in the hotel lobby* – and agree that he would not touch her during the meeting. He agreed.  Because she had secured his agreement in what she believed to be a recorded event, she took the rare opportunity to meet with him.

b.   With respect to Thomas, Weinstein's TWC assistants interviewed her several times for the position of Weinstein's nanny. After multiple interviews, they told her she would be perfect for the job, and that Weinstein wanted to meet with her at his home in Connecticut.  Thomas was concerned about traveling from New York to Connecticut to meet with Weinstein alone. However, his TWC assistant assured Thomas that she would accompany her. The night before the interview, the assistant called Thomas to let her know that she would not be accompanying her to the meeting. Nonetheless, the assistant assured Thomas that she should still proceed with the interview.  The opportunity to work for the producer was a significant opportunity for Thomas, and given that she had passed through multiple interviews with his assistants, the job opportunity seemed realistic.

c.   With respect to Thompson, she was not aware of Weinstein's reputation because she was not in the film

industry. She was working in the technology industry.
Accordingly, while she had researched Weinstein's
business deals, she was not aware that she would be
physically at risk if she met with him.   Weinstein and his
assistants set up a meeting for Thompson at the TWC office
in New York for the purpose of her pitching her company's
technology for use in the online promotion of TWC films
and related events.  The opportunity to pitch a startup's
technology to one of the most successful producers in
Hollywood was a significant opportunity for Thompson.

743.    Weinstein knew that he would use fraud, physical force or coercion (as he had

done many times before with other actresses, directors, producers, employees, and other persons

pitching business deals) on each of the Plaintiffs and Class Members for a sexual encounter.

744.    Weinstein was well aware that a role in one of his projects, or the chance to work

for him directly, or his agreement to produce a script a woman had written, or an engagement of

a new technology to promote his films was of significant commercial value to each of the

Plaintiffs, and used this value, or the prospective use of his influence on each Plaintiff's behalf,

to recruit and entice Geiss, Thomas and Thompson to private locations, including his hotel room,

home and office, where he would perform sex acts.

745.    Weinstein's role in one of his projects, or the chance to work for him directly, or

his agreement to produce a script a woman had written, or an engagement of a new technology to

promote his films was successful in enticing Plaintiffs to his hotel room, home or office. Each of

the Plaintiffs felt compelled to attend the meetings – and to comply with Weinstein's acts toward

her up to and until he used forceful restraint to prevent her from refusing further – because of the

benefits she would receive from his power and influence in the industry.

746.    Weinstein knew that the promise to listen to her pitch a script and a three-picture

deal or the use of his influence on her behalf would entice Geiss into his hotel room, and knew

that once she was there, he was in a position to force the sexual activity he desired. Weinstein

used physical force to restrain Geiss to perform the sexual act. Weinstein physically grabbed her arm and held it, preventing her escape while he masturbated.

747.    Weinstein knew that the promise to work for him directly would entice Thomas into his home, and knew that once she was there, he was in a position to force the sexual activity he desired. Weinstein grabbed Thomas and held her with both arms against him so that she could physically feel his genitals.

748.    Weinstein knew that the promise to use the technology she was pitching to promote TWC films would entice Thompson into his office and hotel meeting, and knew that once she was there, he was in a position to force the sexual activity he desired. Weinstein used brute force to push Thompson's head to his genitals in an attempt to make her fellate him and ultimately threw her down on the bed and held her there while he raped her.

749.    Weinstein had no intention of following through with promise of a three-script deal for Geiss or the job for Thomas.  Instead, he used this ploy as a fraudulent means of obtaining sexual gratification.

750.    Weinstein used brute force to obtain sexual gratification from Thompson.

751.    By virtue of these violations of 18 U.S.C. § 1591, 1595, Harvey Weinstein is liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees.

### COUNT II

### VIOLATION OF 18 U.S.C. § 1591, 1595 (PARTICIPATION IN A VENTURE ENGAGED IN SEX TRAFFICKING) (PLAINTIFFS GEISS, THOMAS AND THOMPSON VERSUS TWC, THE TWC DIRECTORS AND TWC OFFICERS)

752.    Plaintiffs Geiss, Thomas and Thompson incorporate by reference all preceding paragraphs, as if fully set forth herein.  Plaintiffs assert Count II on behalf of the TWC Subclass.

753.    18 U.S.C. § 1595 provides in pertinent part that an individual who is a victim of sex trafficking under 18 U.S.C. § 1591 may bring a civil action against "any person whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or ***should have known*** has engaged in an act in violation of this chapter."

754.    ***First***, as set forth above and in Count I, Harvey Weinstein engaged in acts in violation of 18 U.S.C. § 1591.

755.    ***Second***, as set forth above, each of TWC, the TWC Directors and the TWC Officers knew or should have known that Harvey Weinstein was engaging in acts that constitute sex trafficking in violation of 18 U.S.C. § 1591, and was using TWC funds and employees to facilitate those acts.

756.    Each of TWC, the TWC Directors, and the TWC Officers benefitted financially from their participation in the cover-up and venture because it ensured that Harvey Weinstein continued to produce movies, ensuring that TWC continued to make money or receive financing, the TWC Directors' investments (direct or through their respective companies) continued to make money, the Directors and Officers continued to receive the social benefits and power within the film industry, and the TWC Officers continued to receive their paychecks, bonuses and other incentives.

757.    Each of TWC, the TWC Directors and the TWC Officers also benefitted through the receipt of perks and social status.  As Maerov and Ben Ammar explained: "'Weinstein traded on those friendships, on his social currency,' says Maerov. 'He spun a kind of spiderweb,' says Ben Ammar. 'He had three tables at the Oscars, he had Emmy parties, he hosted bankers, investors and politicians at glamorous events. He could be so charming. He was Mr. Charming

and Mr. Bully all in one. Lots of prominent people, including TWC directors, got caught in the spiderweb.'"[291]

758.    Once Weinstein's wrongdoing was publicized, TWC quickly spiraled into bankruptcy. The TWC Directors and Officers knew that they had to participate in the TWC Sexual Enterprise and cover up Harvey Weinstein's wrongdoing – or the collapse of TWC and their fortunes in it would have occurred much earlier.

759.    18 U.S.C. § 1595 does not require that the benefactors of the venture knew or should have known of the specific victim that is bringing the suit. Rather, it is sufficient that the Defendants knew or should have known that Weinstein had engaged in acts that constituted a violation of 18 U.S.C. § 1591.

760.    The statute of limitations for violations of the sex trafficking statute is 10 years. 15 U.S.C. § 1595.  Each of the Plaintiffs who bring this count were affected within the 10 years prior to filing suit.

761.    By virtue of these violations of 18 U.S.C. § 1591, 1595, Defendants are liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees.

## COUNT III

### NEGLIGENT SUPERVISION AND RETENTION
### (KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX OFFICERS)

762.    Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the

---

[291] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

preceding paragraphs as if fully set forth herein, and bring Count III on behalf of the Miramax Subclass.

763.    At all times material prior to September 30, 2005, Disney and Miramax jointly employed Weinstein and other employees who performed services for Miramax, and Weinstein was an executive and/or director of Miramax who reported directly to Eisner.

764.    Weinstein was unfit or incompetent to work directly with Class members and posed a particular risk of sexually harassing and assaulting them.

765.    Miramax, Walt Disney, Disney Enterprises, Buena Vista International, Michael Eisner and Miramax Officers knew or should have known not only that Weinstein was unfit or incompetent to work directly with women and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiff and the Class.

766.    Weinstein's unfitness and particular risk to Class members and women in the entertainment industry harmed Plaintiffs and the Class.

767.    The negligence of Miramax, Walt Disney, Disney Enterprises, Buena Vista International, Michael Eisner and Miramax Officers in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiffs and the Class, who are entitled to damages.

### COUNT IV

### NEGLIGENT SUPERVISION AND RETENTION
### (GEISS, THOMAS, THOMPSON, AND JANE DOE VERSUS TWC, TWC'S DIRECTORS, AND TWC'S OFFICERS)

768.    Plaintiff Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and brings Count IV on behalf of the TWC Subclass.

769.    At all times material from September 30, 2005, to October 2017, TWC employed Weinstein and Weinstein was an executive and/or director of TWC.

770.     Weinstein was unfit or incompetent to work directly with Class members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them.

771.     TWC, TWC's Directors and Officers knew or should have known not only that Weinstein was unfit or incompetent to work directly with Class members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiffs and the Class.

772.     Weinstein's unfitness and particular risk to women in the entertainment industry harmed Plaintiffs and the Class.

773.     The negligence of TWC, its Directors, and its Officers in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiffs and the Class, causing substantial damages.

## COUNT V

### VIOLATION OF 18 U.S.C. § 1962(C)
### (ALL PLAINTIFFS VERSUS MIRAMAX, MIRAMAX OFFICERS, TWC, TWC DIRECTORS, TWC OFFICERS)

774.     Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.  Plaintiffs assert Count V on behalf of the Nationwide Class.

**1.     The association in fact.**

775.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

776.     The Weinstein Sexual Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Defendants, including their employees and agents; (ii) the Intelligence Participants, defined as third parties Kroll Associates, Inc. and Corporate

Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence; B.C. Strategy U.K. Ltd.

("Black Cube"), a company composed of a "select group of veterans from the Israeli elite

intelligence units that specializes in tailored solutions to complex business and litigation

challenges"[292]; Jack Palladino and Sara Ness of Palladino & Sutherland; and other investigators

whose identities are currently unknown; (iv) the Law Firm Participants, including but not limited

to David Boies and Boies Schiller Flexner LLP (first hired by Harvey and Robert Weinstein in

2005);several big law firms which purportedly reviewed and approved of Black Cube's

duplicitous tactics; and Brafman & Associates, P.C.; (v) the Journalist Participants, including an

unnamed freelance reporter, along with reporters from and the chief content officer (Dylan

Howard) for American Media Inc., which publishes the *National Enquirer*; (v) the Film

Participants, which included casting directors and agencies, including Creative Arts Agency,

William Morris, and other agency does, directors, co-producers of Miramax and TWC, and other

entertainment industry members and other unnamed co-conspirators.

777.    The Defendant "persons" are distinct from the Weinstein Sexual Enterprise.

778.    The Weinstein Sexual Enterprise was closed-ended, occurring over a substantial

period of time.

## 2.    The common purpose.

779.    The Weinstein Sexual Enterprise falls within the meaning of 18 U.S.C. § 1961(4)

and consists of a group of "persons" associated together for the common purpose of:

(1) associating with Harvey Weinstein in order to profit from his success and that of the studios

he was associated with, while associating for the common purpose of (a) sex trafficking and/or

benefitting from a venture that engages in sex trafficking; (b) facilitating Harvey Weinstein's

---

[292] *See* www.blackcube.com (last accessed Nov. 7, 2017).

common practice of using his position of power to assault women; (c) harassing, threatening, extorting, and misleading Weinstein's victims and the media to prevent the reporting, disclosure, or prosecution of his sexual misconduct; and (d) destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report (or prosecute) his sexual offenses.

### 3.    The roles of the participants.

780.    The Weinstein Participants determined who the members of the Weinstein Sexual Enterprise would, and assigned each member of the enterprise a task or tasks to, fulfill the common purpose of profitability from Weinstein.

781.    Miramax and TWC had a business relationship after the Weinstein brothers left Miramax in 2005. For example, Miramax and TWC co-produced Project Runway, and worked together to produce and distribute multiple films including but not limited to: *Proof* (2005), *Derailed* (2005), *The Brothers Grimm* (2005), *Scary Movie 4* (2006), *Breaking and Entering* (2006), *Scream 4* (2011), *Sin City: A Dame to Kill For* (2014), and *Bad Santa 2* (2016). Models on Project Runway and actresses associated with one or more of these films was the subject of sexual harassment or misconduct by Harvey Weinstein.

782.    In 2013, Miramax and TWC entered into a production and distribution deal that gave TWC rights to co-produce sequels to Miramax titles.[293] In a joint announcement, Miramax

---

[293] David McNary, *Weinsteins Reunite with Miramax in Production, Distribution Deal*, VARIETY (Dec. 16, 2013), http://variety.com/2013/film/news/weinsteins-reunite-with-miramax-in-production-distribution-deal-1200962849/

and TWC said they would make films and TV shows based on Miramax's library of more than 700 films that include *Shakespeare in Love*, *Good Will Hunting*, and *The English Patient*.[294]

783.    Thus, throughout the Class Period, the Complicit Producers—TWC and Miramax—each allowed Weinstein to conduct business at their offices and on television and movie sets under their control, were aware of his misconduct and agreed to conceal it so that they could continue to benefit from their lucrative collaborations with Weinstein.

784.    When they joined the Weinstein Sexual Enterprise, the Intelligence Participants targeted dozens of Class members and reporters, using false names and identities to gather information from them regarding Weinstein's sexual offenses, illegally recording conversations, and compiling psychological profiles that focused on the Class members' personal or sexual histories that could be used to extort those individuals' silence. The Intelligence Participants also destroyed or concealed evidence, including but not limited to documents and recordings.

785.    The Film Participants, such as the talent ageny C.A.A.,delivered victims to Harvey Weinstein, enforced a Code of Silence on his victims, collected names of Class members and reporters with information concerning Weinstein's sexual offenses and placed calls to the Class members and reporters to intimidate them and prevent them from reporting Weinstein's sexual misconduct.

786.    All of the participants reported on their activities to Harvey or Robert Weinstein.

787.    The Law Firm Participants provided cover and shield to the Weinstein Participants by contracting with the Intelligence Participants on behalf of the Weinstein Participants and permitting the Weinstein Participants to protect evidence of Weinstein's

---

[294] *Weinstein brothers reunite with Miramax film studio they started*, REUTERS (Dec. 16, 2013), https://www.reuters.com/article/us-miramax-weinsteins/weinstein-brothers-reunite-with-miramax-film-studio-they-started-idUSBRE9BF1A320131216

misconduct under the guise of the attorney-client privilege or the doctrine of attorney work product when that was not the case. The Law Firm Participants also approved the Intelligence Participants' "operational methodologies," which were illegal.

788.    Certain Law Firm Participants, including Brafman, targeted Class members and deceived them into believing that they intended to represent the Class members and a class of victims.Under that deception, the Law Firm Participants gathered information from the Class members regarding Weinstein's sexual offenses, as well as other information that could then be used against the Class members or to extort those individuals' silence.

789.    The Journalist Participants also gathered information from Weinstein's victims regarding Weinstein's sexual offenses under the pretense of writing a story, illegally recorded conversations, and compiled profiles that focused on their personal or sexual histories that could be used to extort those individuals' silence.

### 4.    Pattern of racketeering and predicate acts.

790.    The Defendants have conducted and participated in the affairs of the Weinstein Sexual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes (i) multiple instances of obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18 U.S.C. §§ 1590 and 1591 as described above, (ii) multiple instances of tampering with a victim in violation of 18 U.S.C. § 1512, and (iii) multiple instances of mail and wire fraud as described throughout and below.

### a.    Predicate acts of sex trafficking.

791.    In violation of 18 U.S.C. § 1591, Harvey Weinstein knowingly (and with the help, knowledge or reckless indifference of Miramax, Miramax Officers, TWC, TWC Directors, and TWC Officers), in or affecting interstate or foreign commerce, recruited, enticed, or solicited

Plaintiffs knowing that means of force, threats of force, fraud, or coercion (or a combination thereof) would be used to cause each Plaintiff to engage in any sex act on account of which anything of value would be given to or received by any person.

792.    Harvey Weinstein's actions knowingly affected interstate or foreign commerce:

a.    With respect to Klatt, Weinstein invited her to audition in his office from which he distributed films nationwide and internationally;

b.    With respect to Kendall, Weinstein took her to a screening of a film being distributed nationwide as a prelude to the assault, and hired Black Cube operatives to target her;

c.    With respect to Dulany, Weinstein took her to several screenings and a premiere, and traveled to the Cannes Film Festival where he assaulted her;

d.    With respect to Brock, Weinstein traveled to the Cannes Film Festival where he assaulted her;

e.    With respect to Sagemiller, Weinstein traveled to Toronto, Canada where filming of a production in which Sagemiller was casted was ongoing;

f.    With respect to Gomes, Weinstein traveled to Toronto, Canada where filming of a production in which Gomes was casted was ongoing;

g.    With respect to Jane Doe, Weinstein traveled and promised her parts nationwide, causing others within the entertainment industry to meet with her under the guise of providing her work or representation;

h.    With respect to Geiss, Weinstein traveled to Sundance Film Festival in Park City, Utah where he promised a three-picture deal to Geiss;

i.      With respect to Thomas, Weinstein caused his TWC assistants to entice Thomas to travel to his home in Connecticut with the promise of a position as his children's nanny;

j.      With respect to Thompson, in 2011, Weinstein promised her business deals for her company to facilitate international distribution of content related to two films that were distributed throughout the United States.

793.    With the help, knowledge or reckless indifference of Miramax, Miramax Officers, TWC, TWC Directors, and TWC Officers, Harvey Weinstein recruited, enticed, or solicited by any means each of the Plaintiffs:

a.      With respect to Geiss, Weinstein invited her to meet with him in the office adjacent to his hotel room at the film festival to discuss her music company, the script she was pitching at the festival, and her career. The opportunity to meet with the producer about her script was a chance of a lifetime. Because Geiss had heard rumors about Weinstein, she was skeptical, but the reason for attending Sundance was to secure a deal for her script. She decided to bluntly express her concerns and asked Weinstein to shake her hand – *in front of security cameras in the hotel lobby* – and agree that he would not touch her during the meeting. He agreed.  Because she had secured his agreement in what she believed to be a recorded event, she took the rare opportunity to meet with him.

b.      With respect to Thomas, Weinstein's TWC assistants interviewed her several times for the position of Weinstein's nanny. After multiple interviews, they told her she would be perfect for the job, and that Weinstein wanted to meet with her at his home in Connecticut. Thomas was concerned about traveling from New York to Connecticut to meet with Weinstein alone. However, his TWC assistant assured Thomas

that she would accompany her. The night before the interview, the assistant called Thomas to let her know that she would not be accompanying her to the meeting. Nonetheless, the assistant assured Thomas that she should still proceed with the interview.  The opportunity to work for the producer was a significant opportunity for Thomas, and given that she had passed through multiple interviews with his assistants, the job opportunity seemed realistic.

       c.     With respect to Thompson, she was not aware of Weinstein's reputation because she was not in the film industry. She was working in the technology industry. Accordingly, while she had researched Weinstein's business deals, she was not aware that she would be physically at risk if she met with him.   Weinstein and his assistants set up a meeting for Thompson at the TWC office in New York for the purpose of her pitching her company's technology for use in the online promotion of TWC films.  The opportunity to pitch a fledgling technology to one of the most successful producers in Hollywood was a significant opportunity for Thompson.

       d.     With respect to Gomes, she met Weinstein while working as an ensemble dancer on the set of Get Over It—a film that he produced. He told her that he found her impressive and would like to schedule a meeting. When Gomes arrived at Weinstein's hotel, Weinstein's assistant told her to go to his room, but she felt uncomfortable and called her agent. When her agent called Weinstein to express misgivings about Gomes meeting with him in a hotel room, Weinstein berated the agent. Gomes then proceeded to Weinstein's hotel room, and several other Miramax employees were present for their meeting. There, Weinstein told Gomes that he shot eight films per year in Toronto and needed reliable local talent. Because their first meeting had been professional, Gomes felt

comfortable meeting with Weinstein a second time in his hotel room for this incredible opportunity to be on his roster of go-to talent in Toronto.

  e. With respect to Brock, Weinstein, Lombardo, and Schwartz took her to the Hotel du Cap under the false promise of a party that her friends—also the people she was staying with on the yacht—would join in a separate car. Once at the hotel, Lombardo and Schwartz knowingly left Brock in the hotel room alone with Weinstein, with Schwartz saying that he was going to make sure that Brock's friends could get up to the room. Brock went to the hotel—and stayed in the room alone with Weinstein—because she believed that her friends were on their way.

  f. With respect to Klatt, she was told that Weinstein had seen her, and that he wanted to meet with her in his Miramax office because he required someone with her "look" for a movie he was casting. Klatt agreed because she wanted the opportunity to be cast in a Miramax movie. When she arrived, Weinstein asked her to read from a script.

  g. With respect to Kendall, her agent arranged for her to meet with Weinstein at the Miramax offices. To Kendall, their meeting seemed successful—Weinstein said that she was a great fit, gave her two specific scripts to read and told her she would be those two movies, welcomed her to the "Miramax family," and invited her to attend a film screening later that day. He said that he would introduce her to other people at the screening. Kendall thought it sounded like a great opportunity. She agreed to go.

  h. With respect to Sagemiller, while filming the Miramax-produced film Get Over It, Weinstein's assistant told her that Weinstein needed to see her in his hotel room. Sagemiller requested that they meet elsewhere, but the assistant told her not to worry, that the meeting would be short, and that it was "very important" that she attend so that

Weinstein could "discuss" the script with her. With those assurances, Sagemiller felt that she had no choice but to attend the meeting with the producer of her film.

        i.       With respect to Jane Doe, Weinstein invited the 16-year-old aspiring actress to lunch to discuss her future. She had not been told that he was going to take her to his Soho apartment. Throughout the next nine years—and after he sexually assaulted her at age 16—Weinstein abused and manipulated Jane Doe. He constantly told her that he would help her become an actress, and that he was the only person who could do so. In 2008, Jane Doe had returned to New York to make one final attempt at acting. Weinstein invited her to meet with him at the TWC offices because he might have some ideas. Jane Doe agreed because she was eager for help.

        j.       With respect to Dulany, she thought that Weinstein wanted to help her with her career—he demonstrated as much by introducing her to industry professionals and setting up a meeting for her with a high-powered manager. Even when he propositioned her inappropriately (and naked) in her apartment, he obliged her when she told him to leave. When Weinstein invited Dulany to a film premiere and benefit dinner during the Cannes Film Festival, because he still held the keys to careers in the entertainment industry, she felt obligated to attend. After dinner, Dulany was told that there was an after party at the Hotel du Cap, and that a car would take her there. Dulany thought that she would have a chance to talk to other diner attendees at the after party. She also thought that attending the party would benefit her career and appease Weinstein, so she got in the car.

794.    Weinstein knew that he would use fraud, physical force or coercion (as he had done many times before with other actresses, directors, producers, employees, and other persons pitching business deals) on each of the Plaintiffs and Class Members for a sexual encounter.

795.    Weinstein was well aware that a role in one of his projects, or the chance to work for him directly, or his agreement to produce a script a woman had written, or an engagement of a new technology to promote his films was of significant commercial value to each of the Plaintiffs, and used this value, or the prospective use of his influence on each Plaintiff's behalf, to recruit and entice each Plaintiff to private locations, including his hotel room, home and office, where he would perform sex acts.

796.    Weinstein's role in one of his projects, or the chance to work for him directly, or his agreement to produce a script a woman had written, or an engagement of a new technology to promote his films was successful in enticing Plaintiffs to his hotel room, home or office. Each of the Plaintiffs felt compelled to attend the meetings – and to comply with Weinstein's acts toward her up to and until he used forceful restraint to prevent her from refusing further – because of the benefits she would receive from his power and influence in the industry.

797.    Weinstein knew that the promise to listen to her pitch or the use of his influence on her behalf would entice each Plaintiff into a private meeting, and knew that once she was there, he was in a position to force the sexual activity he desired. Weinstein used physical force to restrain or attempt to restrain each Plaintiff to perform sexual acts.

798.    Weinstein had no intention of following through with promises of commercial rewards.  Instead, he used this ploy as a fraudulent means of obtaining sexual gratification.

799.    Weinstein also engaged in multiple other instances of sex trafficking of class members as alleged *supra,* each instance of which constitutes a predicate act.

800.    As reflected throughout the Complaint and incorporated herein by reference, each of the Defendants knew or acted with reckless indifference to the fact that Weinstein was engaged in sex trafficking.

801.    Moreover, the Film Participants, including C.A.A. and William Morris, engaged in or knew the Defendants engaged in sex trafficking (and also failed to report and/or blacklisted actresses who did report).  At least eight agents at C.A.A. were told that Harvey Weinstein had harassed, menaced or assaulted female clients, but agents continued to arrange private meetings for its female clients with Weinstein.  C.A.A. and William Morris represented many of the actresses who they sent to meetings with Weinstein at his hotel suites, including the Peninsula Hotel in Beverly Hills, Calif.

802.    Assault victim and actress Mira Kirshner reported Harvey Weinstein to her C.A.A. agent, after the agent had set up a meeting for her with Harvey Weinstein at his hotel, but the agent did not report Harvey Weinstein and led Kirshner to conclude she had to drop the matter because C.A.A. had too much to lose in the way of clients and projects in which Weinstein was involved.  Gwyneth Paltrow reported Weinstein's sexual misconduct to her C.A.A. agent, who failed to take any action.  Since the reports on Harvey Weinstein were published in October 2017, C.A.A. issued an apology "to any person the agency let down for not meeting the high expectations we place on ourselves."

803.    In 2005, C.A.A. reportedly imposed a ban on Courtney Love after her statement on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll

get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [295]

804.    In 2016 or 2017, C.A.A. attempted – at Harvey Weinstein's demand – to stop C.A.A. client Ronan Farrow from publishing the disclosure of Weinstein's sexual misconduct in The New Yorker.

### 5.    Predicate acts of tampering with a victim.

805.    Next, certain Defendants tampered with one or more victims in violation of 18 U.S.C. § 1512, each instance of which constitutes a predicate act.

806.    18 U.S.C. § 1512, entitled "Tampering with a witness, *victim*, or an informant," provides in pertinent part:

> (2)  Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—
>
> *        *        *
>
> (C)  hinder, delay, or prevent the communication to a law enforcement officer … information relating to the commission or possible commission of a Federal offense …;
>
> shall be punished ….

(emphasis supplied).

807.    Here, Weinstein used the threat of physical force with the intent to hinder, delay or prevent, *inter alia*:

a.        Zoe Brock from communicating with a law enforcement officer

concerning the assault in Cannes, France, including by working with her agent and causing

---

[295] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

Miramax, its Officers and employees to set up and pay for the theater at which the threats occurred;

b.      Melissa Sagemiller from communicating with a law enforcement officer concerning the assault in Toronto, Canada, including by causing Miramax and its employees to cause her luggage to be removed from a commercial airline and moved to Weinstein's private plane;

c.      Nannette Klatt from communicating with a law enforcement officer concerning the assault in New York, New York.

**6.      Predicate acts of mail and wire fraud.**

808.    The Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a.      Contracts between Weinstein and the Law Firms and Intelligence Participants;

b.      Wires and mails by Harvey and Robert Weinstein, Koenigsberg, Miramax, Miramax Officer, Koenigsberg (before he was a TWC Director), TWC, TWC Directors, and the TWC Officers to pay for lawyers and settlements arising out of Weinstein's sexual misconduct;

c.      Wires and mails between the Law Firms and the Intelligence Participants on the subject of Weinstein's sexual activities, his victims, and concealing his acts of sexual misconduct;

d.      Payments to the Law Firm Participants and Intelligence Participants to perform their roles in concealing Weinstein's sexual misconduct;

e.       Emails from the Law Firm Participants to lawyers retained by Class members to encourage confidentiality in connection with accusations of sexual misconduct by Weinstein;

f.       Emails, texts, and telephone calls from the Law Firm Participants to Class members in connection with inquiries or meetings designed to elicit information from Class members using deception;

g.       Emails from the Intelligence Participants to Class members in connection with inquiries or meetings designed to elicit information from Class members using deception;

h.       Use of the wires by the Intelligence Participants to construct false identities and websites to deceive Class members and journalists.

809.    The Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

810.    The Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

811.    The Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the scheme.

812.    The mail and wire transmissions described herein were made in furtherance of the Defendants' scheme and common course of conduct to deceive the public about Weinstein's sexual activities, and include but are not limited to the following which occurred throughout the Class Period:

a.       Miramax and TWC employees used the mails and wires to contact Plaintiffs and Class Members to schedule meetings

with Weinstein under the guise they were business meetings, when in fact, they were for the purpose of sex trafficking;

b. Miramax and TWC employees created and maintained official lists of Harvey's targets and their contact information, which the employees would use to contact the targets and victims via telephone and email.

813. The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples in 1993:

a. Miramax employees communicated via telephone with Katherine Kendall's agent to schedule a meeting with Weinstein at the Miramax office;

b. Weinstein's assistant from Miramax contacted Kendall to arrange for a car to pick her up to take her to a private screening;

c. Miramax caused money to be exchanged via the wires to pay for the car that was arranged to take Kendall to a private screening with Weinstein;

d. After Kendall was assaulted, Weinstein called her several times via telephone in an attempt to threaten her and cause her duress and to keep her from reporting the assault.

814. The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include numerous examples throughout the existence of Miramax and TWC.  Non-exhaustive  examples follow.

815. The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples in 1998:

a.       Around the time of the Cannes Film Festival, Miramax and Weinstein caused money to be exchanged via the wires for the payment to the Hótel du Cap Eden-Roc to pay for the hotel room where Harvey Weinstein assaulted Zoe Brock;

b.       Miramax and Weinstein caused money to be exchanged via the wires to pay for the hotel room at Hotel Barrière Le Majestic where Defendant Schwartz housed Brock after the assault in an attempt to keep the assault from the authorities;

c.       Miramax and Weinstein caused money to be exchanged via the wires to pay for a private screening at the theater where Brock was threatened by Weinstein the day after the assault;

d.       Weinstein or Miramax employees at his direction contacted Brock's agent via telephone to cause Brock to bring Brock to the private screening despite her request that she never be required to see Weinstein again;

e.       Weinstein's assistant contacted Dulany via telephone to invite her to a screening of a Miramax movie attended by Miramax employees;

f.       Weinstein's assistant contacted Dulany and, separately, a high-powered manager via telephone to cause the manager to attend a meeting with him and Dulany;

g.       While at the Cannes Film Festival, Miramax employees caused money to be exchanged via the wires for a car which picked up Dulany – supposedly to attend an industry party (but in fact to deliver Dulany to Weinstein's hotel);

h.       While at the Cannes Film Festival, Miramax caused money to be exchanged via the wires for the hotel room where Weinstein assaulted Dulany;

010717-11 1076419 V1

816.    The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples in 2000:

a.    While filming Get Over It in Toronto, Canada, Weinstein's female assistant telephoned Sagemiller to invite her to lunch with Weinstein;

b.    Another Weinstein assistant telephoned Sagemiller, telling her to go to Weinstein's hotel room;

c.    Miramax paid via the wires for the hotel room in Toronto, Canada where Weinstein stayed and assaulted Sagemiller;

d.    The day after the wrap party, Weinstein's assistant telephoned the airport and caused the airport to page Sagemiller, who spoke to the assistant via telephone;

e.    Weinstein's assistant also contacted the airline via telephone and caused Sagemiller's luggage to be transferred to Weinstein's plane;

f.    Miramax caused money to be exchanged via the wires to use, refuel and staff the private airplane where Weinstein caused Sagemiller fear and duress;

g.    While filming on the set of Get Over It in Toronto, Canada, Weinstein's assistant scheduled a meeting via telephone for Gomes to meet with Weinstein at the Sutton Place Hotel in Toronto, Canada;

h.    When Gomes arrived at the meeting place, Gomes contacted her agent because she did not want to meet in Weinstein's hotel room; Weinstein spoke on the telephone with Gomes' agent (and a second agent) to complain when Gomes expressed reluctance about attending a meeting in his hotel room;

      i.     Miramax caused money to be exchanged via the wires for the hotel room where Weinstein assaulted Gomes.

817.    The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples <u>in 2008</u>:

      a.     TWC caused money to be exchanged via the wires to pay for the hotel room where Weinstein assaulted Geiss during the Sundance Film Festival, in Park City, Utah;

      b.     TWC female employees contacted Thomas via the telephone and email several times to interview her for Weinstein, as well as to schedule an interview with Thomas at Weinstein's home;

      c.     Weinstein's female assistant emailed Thomas to let her know that she could not accompany Thomas to the meeting.

818.    The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples <u>in 2011</u>:

      a.     Weinstein and his assistants exchanged emails with Thompson to schedule meetings with her at TWC's offices;

      b.     TWC caused money to be exchanged via the wires to pay for the hotel room at the Tribeca Grand Hotel where Weinstein raped Thompson.

819.    The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples <u>in 2015</u>:

     a.     TWC and/or Weinstein retained Kroll / K2 to obtain and destroy evidence of assaults by Weinstein;

     b.     TWC caused money to be exchanged via the wires to pay K2 to obtain and destroy evidence of assault by Weinstein;

     c.     Weinstein communicated via telephone and email with K2 to further the destruction of evidence.

     d.     After Ambra Battilana Gutierrez, an Italian model, accused Weinstein of sexually assaulting her, Weinstein communicated via email and telephone with K2 and Gutierrez's lawyers to require her to surrender all her personal devices to Kroll so that evidence of a conversation in which Weinstein admitted to groping her could be deleted.[296]

820.     The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples in 2016:

     a.     Weinstein directed via telephone and email the Law Firm Participant Boies Schiller to retain Intelligence Participant Black Cube to investigate which Class members were providing information to reporters or third parties about their assaults, to gather intelligence to prevent the reporting or publication of the accusations, and to secretly record Class members' conversations.[297]

     b.     Boies Schiller and Black Cube communicated via telephone, email and/or U.S. mail and signed a contract to help the Weinstein Sexual Enterprise.

---

[296] *Id.*

[297] Farrow, *supra* note 4.

        c.      on or about October 28, 2016, at Weinstein's direction, Boies Schiller wired Black Cube a payment of $100,000.[298]

        d.      TWC caused money to be exchanged via the wires to pay Boies Schiller.

821.     The mail and wire transmissions made in furtherance of the scheme and common course of conduct to deceive Plaintiffs, the Class and the public about Weinstein's sexual activities include the following examples in 2017:

        a.      immediately after the first story broke of Weinstein's assaults, Thompson received emails, texts and phone calls from Zampolli, who  would turn out to be part of the enterprise who shared her evidence with Weinstein's defense team;

        b.      Zampolli and Thompson talked via the telephone, during which Zampolli told Thompson that all of Weinstein's victims were going to be presented by Benjamin Brafman and she should contact him;

        c.      Zampolli sent an email introducing Thompson and Alex Spiro, an attorney then working for Brafman;

        d.      over the course of multiple telephone conversations, texts, and emails (to and from Spiro's email address at aspiro@braflaw.com) in the next few days, Spiro purported to interview Thompson for the purpose of analyzing her claim against Weinstein.

        e.      in texts and emails, Thompson expressed concern that her case had passed the statute of limitations. In response, Spiro indicated that there were "loopholes" for that;

        f.      in an exchange of texts, Thompson inquired of Spiro whether he was still interested in representing her. He responded, in writing: "Correct stick with me."

---

[298] *Id.*

g.      upon hearing the news that Brafman represented Weinstein, Thompson spoke with Zampolli via telephone, who reaffirmed that Brafman told him he was representing Weinstein's victims;

h.      At 9:26 p.m. on November 8, 2017, Thompson texted Spiro, inquiring of the apparent connection with Weinstein "through Brafman" to which he responded he no longer worked there nor represented anyone involved.

i.      Boies Schiller and Black Cube communicated via telephone, email and/or U.S. mail and signed another contract dated July 11,  2017, to "provide intelligence which will help the Client's [Weinstein's] efforts to completely stop the publication of a new negative article in a leading NY newspaper" and to "obtain additional content of a book which currently being written and includes harmful negative information on and about the Client," who allegedly is identified as Weinstein in multiple documents obtained by *The New Yorker*.[299]   The contract between Boies Schiller and Black Cube included a description of the duplicitous tactics to be used to accomplish the objectives of the Weinstein Sexual Enterprise.[300]   Black Cube agreed to provide "a dedicated team of expert intelligence officers that will operate in the USA and any other necessary country," including a project manager, intelligence analysts, linguists, and "Avatar Operators" specifically hired to create fake identities on social media, along with "operations experts with extensive experience in social engineering." The agency also said that it would provide "a full time agent by the name of 'Anna' (hereinafter 'the Agent'), who will be based in New York and Los Angeles as per the Client's instructions and who will be available full time to assist the Client and his attorneys for the next four months."  Black Cube also agreed

---

[299] *Id.*

[300] *Id.*

to hire "an investigative journalist, as per the Client request," who would be required to conduct ten interviews a month for four months and be paid forty thousand dollars. Black Cube agreed to "promptly report to the Client the results of such interviews by the Journalist."[301]

      j.      In May 2017, Rose McGowan received an e-mail from a literary agency introducing her to a woman who identified herself as Diana Filip, the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. In reality, Filip was an employee of Black Cube, which had developed the fictional Reuben Capital Partners. According to *The New Yorker*, "Diana Filip" was an alias for a former officer in the Israeli Defense Forces who originally hailed from Eastern Europe.[302]

      k.      Using false pretenses, Filip set up via email and met with McGowan on at least four occasions, including at the Peninsula Hotel in Beverly Hills, in hotel bars in Los Angeles and New York, and on the Venice boardwalk.  Filip repeatedly told McGowan that she wanted to make a significant investment in McGowan's production company. The purpose of these meetings, which were secretly recorded via wire by Intelligence Participant Black Cube, was to extract information regarding Weinstein and to prevent the publication of McGowan's book and/or the reporting of accusations against Weinstein.[303]

      l.      Black Cube used information extracted from McGowan regarding McGowan's reporting of the rape to a reporter at *The New Yorker* to contact the reporter via telephone and email in an attempt to prevent the publication of the accusation.[304]

---

[301] *Id.*

[302] *Id.*

[303] *Id.*

[304] *Id.*

m.      In 2016, Black Cube's Filip used a second alias, "Anna," to contact via telephone and/or email and to meet twice with Ben Wallace, suggesting she had an allegation against Weinstein. However, Anna never shared information, but instead pushed the reporter for information about what he knew and who he was talking to.  During their second meeting, Anna requested that they sit close together, leading Wallace to suspect that she was secretly recording their conversation via wire. [305]

n.      Filip also allegedly used her alias to email Jodi Kantor, a reporter for *The New York Times*, regarding a story about Weinstein. [306]

o.      Black Cube also retained a freelance journalist to further the objectives of the Weinstein Sexual Enterprise, providing the journalist with contact information for victims, journalists, and Weinstein's business rivals. The freelancer conducted interviews to be used by the Weinstein Sexual Enterprise and provided summaries of those interviews to Black Cube, which then sent the summaries to one or more Law Firm Participants, including Boies Schiller via email.[307]

p.      In January 2017, the freelance journalist called McGowan and secretly recorded their lengthy conversation.

q.      In 2017, the freelance journalist also contacted Kendall via telephone, as well as other Class members (including actress Annabella Sciorra and, on information and belief, Katherine Kendall), Ben Wallace, Ronan Farrow (*The New Yorker*) in furtherance of the objectives of the enterprise. [308]

---

[305] *Id.*

[306] *Id.*

[307] *Id.*

[308] *Id.*

r.      Weinstein also enlisted Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*, to have his reporters obtain information that would discredit McGowan.  Howard obtained secret recordings of those in-person and telephonic interviews from his reporters via wire and shared them with Weinstein via email, including on December 7, 2016 and December 8, 2016 to be used to discredit victims of Weinstein's sexual offenses.[309]

s.      E-mails obtained by *The New Yorker* also purportedly show that Dan Karson, the chairman of Kroll America's Investigations and Disputes practice, contacted Weinstein at his personal e-mail address with information intended to discredit Class members.[310]

### 7.      Affected interstate commerce.

822.      The Weinstein Sexual Enterprise engaged in and affected interstate commerce, because, *inter alia*, Weinstein, TWC, and Miramax contracted with multinational corporations not only for movie and television productions but also for the investigation, slander, blacklisting, and blackmail of Weinstein's victims.

### 8.      Operation and management.

823.      Defendants each exerted some measure of control over the Weinstein Sexual Enterprise, and Defendants participated in the operation or management of the affairs of the Weinstein Sexual Enterprise.

824.      Within the Weinstein Sexual Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Weinstein Sexual

---

[309] *Id.*

[310] *Id.*

Enterprise used this common communication network for the purpose of enabling Weinstein's sexual activities.

825.    Each participant in the Weinstein Sexual Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities. Through the Weinstein Sexual Enterprise, the Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

826.    To achieve their common goals, the Defendants hid from the general public the unlawfulness of Weinstein's conduct, and suppressed and/or ignored warnings from third parties about his conduct.

827.    Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to hide and conceal Weinstein's conduct.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

828.    The pattern of racketeering activity alleged herein and Weinstein are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Weinstein Sexual Enterprise.

**9.      RICO injury.**

829.    Plaintiffs have been injured in their property and business by reason of these violations.  Defendants interfered with Plaintiffs' current and prospective contractual relations, because Plaintiffs lost employment and employment opportunities, as well contracts and contractual opportunities, as a result of Weinstein's conduct.

830.    Each of the Plaintiffs suffered injury to property as a result of the racketeering activity, including but not limited to as follows:

    a.    As to Geiss, Weinstein and TWC failed to purchase her script and failed to give her the three-picture deal Weinstein promised;

    b.    Thomas did not receive the job as Weinstein's nanny; Thomas also was told in December 2017 that she was blacklisted as a result of her accusations against Weinstein and has since seen an 86% drop in auditions;

    c.    Weinstein did not produce the TV show in which he cast Thompson, and for which she filmed a pilot. Moreover, Plaintiff Thompson's and other Class members' causes of action against Weinstein were likely also injured, in that Weinstein caused them to share not only their evidence but to strategize with his defense team under the guise they were representing victims against Weinstein;

    d.    Gomes was not included on Miramax's roster of go-to talent in Toronto as Weinstein had promised, and thus did not get cast in even one of the eight films per year Weinstein represented Miramax filmed in Canada annually;

    e.    Brock did not receive any work from Weinstein or Miramax, even after telling her he was going to "make her a star" and be her "Rock of Gibraltar."

    f.    Weinstein and Miramax did not hire Klatt for the movie for which she was told she was perfect;

    g.    Weinstein and Miramax did not cast Kendall in the movies Beautiful Girl and Things to Do In Denver When You're Dead – even though Weinstein gave her the scripts and told her he had parts for her in those movies, and even after she was expressly welcomed into the "Miramax family." In 2017 Kendall was targeted by spies whose

- 235 -

purpose was to gather information concerning her assault for the purpose of harming her causes of action and/or preventing her from filing suit;

h.      Sagemiller did not get a part in the movies "40 Days and 40 Nights" (produced by Miramax) or "Sin City" (produced by Dimension Films, which was run by Robert Weinstein, and distributed by Buena Vista), even though she had successful auditions for both movies. On information and belief, Sagemiller did not get the part in Sin City because Weinstein intervened and told Rodriguez not to cast her. On information and belief, Sagemiller did not get the part in 40 Days and 40 Nights because the casting director followed Weinstein's direction not to cast her. On information and belief, Weinstein's interventions to ensure Sagemiller was blacklisted also resulted in her not getting parts in the movies "Pearl Harbor" (distributed by Buena Vista) and "National Treasure" (produced by Disney and distributed by Buena Vista).

i.      Weinstein told Jane Doe he would help her secure a part in the ensemble cast of a movie, but he never did despite years of acting as the gatekeeper to the industry;

j.      Dulany was not cast in several films for which she auditioned that were being produced by Miramax's Scott Rosenberg, who was told, on information and belief, by Weinstein to not cast Dulany despite Weinstein's promises to her and despite Rosenberg's statements that Dulany was "really good."

831.    Had members of the Weinstein Sexual Enterprise not been complicit and had they revealed instead of concealed Weinstein's predatory behavior, Plaintiffs and members of the Class would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

832.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT VI**

**VIOLATION OF 18 U.S.C. § 1962(D) BY
CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)
(ALL PLAINTIFFS VERSUS MIRAMAX, MIRAMAX OFFICERS, TWC, TWC
OFFICERS, TWC DIRECTORS)**

833.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein. Plaintiffs bring this Count VI on behalf of the Nationwide Class.

834.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

835.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

836.    As demonstrated in detail above, Defendants' co-conspirators, including, but not limited to, the Weinstein Participants, the Intelligence Participants, the Law Firm Participants, the Film Participants, and the Journalist Participants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of tampering with a victim or witness in violation of 18 U.S.C. § 1512.

837.    The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of

- 237 -

racketeering activity.  At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the Weinstein Sexual Enterprise and intended to participate in it.

838.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

839.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT VII

### CIVIL BATTERY
### (MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS DISNEY, MICHAEL EISNER, MIRAMAX, MIRAMAX OFFICERS)

840.    Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count VII on behalf of the Miramax Subclass.

841.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

    a.    Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

    b.    Demanding or threatening sexual contact.

842.   Weinstein did commit an unwanted contact with Plaintiffs and the Class members' person or property in a harmful or offensive manner, including but not limited to causing sexual contact between Weinstein and each Class member.

843.   Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm to each Class member.

844.   Weinstein's conduct was committed within the scope of his employment at Disney and Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, inter alia, the use of Disney and Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Disney and Miramax.

845.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Disney's and Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

846.   Holding Disney, Eisner, Miramax, and Miramax Officers liable  furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were  not employees of Disney or Miramax.

## COUNT VIII

## CIVIL BATTERY
## (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON, AND JANE DOE VERSUS TWC, TWC DIRECTORS AND TWC OFFICERS)

847.    Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count VIII against TWC Board Members and Weinstein on behalf of the TWC Subclass.

848.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

        a.    Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

        b.    Demanding or threatening sexual contact.

849.    Weinstein did commit an unwanted contact with Plaintiffs and the Class members' person or property in a harmful or offensive manner, including, but not limited to, causing sexual contact between Weinstein and each Class member.

850.    Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class member.

851.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

- 240 -

852.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

853.     Holding TWC, TWC Directors, and TWC Officers liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

**COUNT IX**

**ASSAULT**
**(MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS DISNEY, MICHAEL EISNER, MIRAMAX, MIRAMAX OFFICERS)**

854.     Plaintiffs Melissa Sagemiller, Nannette Klatt, Katherine Kendall, Zoe Brock, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count IX against Disney, Eisner, Miramax, and Miramax Officers on behalf of the Miramax Subclass.

855.     Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiff and the Class members. He did so by, *inter alia*:

a.     Isolating Plaintiffs and the Class members in closed quarters and dismissing any bystanders;

b.     Demanding or threatening sexual contact;

c.     Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.      Threatening harm to the careers and reputations of Plaintiffs and the Class members if they did not participate in such conduct.

856.    Weinstein's actions did, in fact, cause Plaintiffs and the Class members to fear imminent harmful or offensive contact by Weinstein.

857.    Weinstein's conduct was committed within the scope of his employment at Disney and Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Disney and Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Disney and Miramax.

858.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Disney's and Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

859.    Holding Disney, Eisner, Miramax, and Miramax Officers liable  advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were  not employees of Disney or Miramax.

## COUNT X

### ASSAULT
### (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

860.   Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count X against Weinstein and TWC Board Members on behalf of the TWC Subclass.

861.   Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiffs and the Class members. He did so by, *inter alia*:

a.   Isolating Plaintiffs and the Class members in closed quarters and dismissing any bystanders;

b.   Demanding or threatening sexual contact;

c.   Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.   Threatening harm to the careers and reputations of Plaintiffs and the Class members if they did not participate in such conduct.

862.   Weinstein's actions did, in fact, cause Plaintiffs and the Class members to fear imminent harmful or offensive contact by Weinstein.

863.   Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC

employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

864.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

865.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT XI

### FALSE IMPRISONMENT
**(KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX OFFICERS)**

866.    Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XI on behalf of the Miramax Subclass.

867.     Plaintiffs and Class members were willfully detained by Weinstein, without their consent, while he battered, assaulted and attempted to assault them.

868.    Weinstein willfully detained Plaintiffs and Class Members through physical force and/or through intimidation. In many instances, Weinstein used such intimidation that Plaintiffs and Class Members stopped resisting rather than risk injury or death.

869. Weinstein's conduct was committed within the scope of his employment at Disney and Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Disney and Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Disney and Miramax.

870. Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Disney's and Miramax's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

871. Holding Disney and Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of Disney or Miramax.

## COUNT XII

### FALSE IMPRISONMENT
### (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON, AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

872. Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count XII on behalf of the TWC Subclass.

873. Plaintiffs and Class members were willfully detained by Weinstein, without their consent, while he battered, assaulted and attempted to assault them.

- 245 -

874.    Weinstein willfully detained Plaintiffs and Class Members through physical force and/or through intimidation. In many instances, Weinstein used such intimidation that Plaintiffs and Class Members stopped resisting rather than risk injury or death.

875.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

876.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

877.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT XIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX OFFICERS)

878.     Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XIII on behalf of the Miramax Subclass.

879.     Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

880.     Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

881.     Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

882.     Weinstein's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure. In fact, Robert Weinstein admitted that: "My brother has caused unconscionable suffering."[311]

---

[311] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

883.     Weinstein's conduct was committed within the scope of his employment at Disney and Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Disney and Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Disney and Miramax.

884.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Disney's and Miramax's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

885.     Holding Disney, Eisner, Miramax, and Miramax Officers liable  advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were  not employees of Disney or Miramax.

## COUNT XIV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON, AND JANE
### DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

886.     Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count XIV on behalf of the TWC Subclass.

887.     Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff and the Class members.

888.    Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

889.    Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

890.    Weinstein's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure. In fact, Robert Weinstein admitted that: "My brother has caused unconscionable suffering."[312]

891.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

892.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the

---

[312] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

893.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

### COUNT XV

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, MICHAEL EISNER AND MIRAMAX OFFICERS)**

894.    Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XV on behalf of the Miramax Subclass.

895.    Weinstein's conduct negligently caused emotional distress to Plaintiffs and the Class members.

896.    Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

897.    Plaintiffs and the Class members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

898.    Plaintiffs and the Class members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

899.    Weinstein's conduct was committed within the scope of his employment at Disney and Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the

entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter

those women.  Each act of battery of a Class member lured with the prospect of being cast in a

Miramax production or to meet or work with Miramax and Weinstein was foreseeable given,

inter alia, the use of Disney and Miramaxemployees to lure the victims and the commission of

the acts on Miramax property or at locations paid for by Disney and Miramax.

900.     Weinstein's conduct is not so unusual or startling that it would seem unfair to

include the loss resulting from it among other costs of Disney's and Miramax's business.

Assaults in the context of the "casting couch" are exactly why Class members and other female

members of the entertainment industry would expect production companies to take extra

precautions to ensure that they are protected from abuse by a powerful executive.

901.     Holding Disney, Eisner, Miramax, and Miramax Officers liable  advances the

policy goals of *respondeat superior*, including the prevention of future injuries and assurance of

compensation to victims, given that Plaintiffs and the Class members do not have separate

remedies under Title VII because they were  not employees of Disney or Miramax.

## COUNT XVI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

902.     Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe

restate and incorporates herein by reference the preceding paragraphs as if fully set forth herein,

and brings this Count XVI on behalf of the TWC Subclass.

903.     Weinstein's conduct negligently caused emotional distress to Plaintiffs and the

Class members.

904.     Weinstein could reasonably foresee that his action would have caused emotional

distress to Plaintiffs and the Class members.

905.    Plaintiffs and the Class members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

906.    Plaintiffs and the Class members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

907.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

908.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

909.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT XVII

### RATIFICATION
**(KATHERINE KENDALL, ZOE BROCK, MELISSA SAGEMILLER, NANNETTE KLATT, CAITLIN DULANY, LARISSA GOMES, AND JANE DOE VERSUS MIRAMAX, WALT DISNEY, DISNEY ENTERPRISES, BUENA VISTA INTERNATIONAL, EISNER AND MIRAMAX OFFICERS)**

910.    Plaintiffs Katherine Kendall, Zoe Brock, Melissa Sagemiller, Nannette Klatt, Caitlin Dulany, Larissa Gomes, and Jane Doe restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XVII on behalf of the Miramax Subclass.

911.    Weinstein was an agent, director, and employee of Disney and Miramax prior to September 30, 2005.

912.    At the time of the acts prior to September 30, 2005, there was an actual or assumed agency relationship between Weinstein and Miramax, as well as between Disney and Weinstein, Eisner and Weinstein, and Miramax Officers and Weinstein.

913.    All acts or omissions alleged for the period before September 30, 2005, were ratified by Disney, Eisner, Miramax and Miramax Officers. Disney, Eisner, Miramax and Miramax Officers had investigated or knew of the acts and omissions of Weinstein, and Disney's and Miramax's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, Disney's and Miramax's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for Disney and Miramax.

914.    Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on Disney and Miramax business.

915.     Disney, Eisner, Miramax and Miramax Officers are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

### COUNT XVIII

### RATIFICATION
### (LOUISETTE GEISS, SARAH ANN THOMAS, MELISSA THOMPSON AND JANE DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

916.     Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, and Jane Doe restate and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XVIII on behalf of the TWC Subclass.

917.     Weinstein was an agent, director, and employee of TWC until October 2017.

918.     At the time of the acts alleged herein, there was an actual or assumed agency relationship between Weinstein and TWC, as well as between Weinstein and TWC's Board of Directors, and Weinstein and TWC's Officers.

919.     All acts or omissions alleged herein after September 30, 2005, were ratified by TWC, and its Directors and Officers. TWC, and its Directors and Officers, had investigated or knew of the acts and omissions of Weinstein, and TWC's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, TWC's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for TWC.

920.     Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on TWC business.

921.     TWC, its Directors, and its Officers are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

A.      Certify the Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages, name Plaintiffs as representative of the Class and the respective Subclasses, and appoint their lawyers as Class Counsel;

B.      Enter judgment against Harvey Weinstein on Counts I and III-XVI on liability in favor of the respective Plaintiffs and the Classes;

C.      Enter judgment against Robert Weinstein on Counts II-XVIII on liability in favor of the respective Plaintiffs and the Classes;

D.      Enter judgment against The Weinstein Company Holdings, LLC on Counts II, IV, VIII, X, XII, XIV, XVI and XVIII on liability in favor of the TWC Plaintiffs and the TWC Subclass, and on Count V on liability in favor of all Plaintiffs and the Nationwide Class;

E.      Enter judgment against Miramax Film NY LLC on Counts III, VII, IX, XI, XIII, XV, and XVII on liability in favor of the Miramax Plaintiffs and Miramax Subclass, and on Count V on liability in favor of all Plaintiffs and the Nationwide Class;

F.      Enter judgment against The Walt Disney Company on Counts III, VII, IX, XI, XIII,  XV, and XVII on liability in favor of the Miramax Plaintiffs and Miramax Subclass;

G.      Enter judgment against Disney Enterprises, Inc. on Counts III, VII, IX, XI, XIII, XV, and XVII on liability in favor of the Miramax Plaintiffs and Miramax Subclass;

H.      Enter judgment against Buena Vista International, Inc. on Counts III, VII, IX, XI, XIII,  XV, and XVII on liability in favor of the Miramax Plaintiffs and Miramax Subclass;

I.      Enter judgment against Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, and James Dolan on

- 255 -

Counts II, IV, VIII, X, XII, XIV, XVI and XVIII on liability in favor of the TWC Plaintiffs and

the TWC Subclass, and on Count V on liability in favor of all Plaintiffs and the Nationwide

Class;

J.     Enter judgment against Michael Eisner, Rick Schwartz, Fabrizio Lombardo, Mark

Gill, Nancy Ashbrooke, Irwin Reiter, and Barbara Schneeweiss on Counts III, VII, IX, XI, XIII,

XV, and XVII on liability in favor of the Miramax Plaintiffs and Miramax Subclass;

K.     Enter judgment against Rick Schwartz, Fabrizio Lombardo, Mark Gill, Nancy

Ashbrooke, Irwin Reiter, and Barbara Schneeweiss on Count V on liability in favor of all

Plaintiffs and the Nationwide Class;

L.     Enter judgment against Irwin Reiter, David Glasser, Frank Gil, and Barbara

Schneeweiss on Counts II, IV, VIII, X, XII, XIV, XVI and XVIII on liability in favor of the

TWC Plaintiffs and the TWC Subclass, and on Count V on liability in favor of all Plaintiffs and

the Nationwide Class;

M.     In individual damage proceedings and prove-ups, award Plaintiffs and the Class

members damages for pain and suffering, and compensatory and punitive damages against each

of the Defendants in accordance with the judgments;

N.     Award Plaintiffs' counsel attorneys' fees and costs, and grant Plaintiffs service

awards as class representatives; and

O.     Grant such other and further relief as this Court deems appropriate.


DATED: October 31, 2018              HAGENS BERMAN SOBOL SHAPIRO LLP

                                     By /s/ Elizabeth A. Fegan
                                        Elizabeth A. Fegan
                                     Emily Brown
                                     HAGENS BERMAN SOBOL SHAPIRO LLP

455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
*beth@hbsslaw.com*
*emilyb@hbsslaw.com*

Steve W. Berman
Shelby Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
*steve@hbsslaw.com*
*shelby@hbsslaw.com*

Jason Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
*jasonz@hbsslaw.com*

010717-11 1076419 V1