**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOUISETTE GEISS, SARAH ANN
THOMAS (a/k/a SARAH ANN MASSE),
MELISSA THOMPSON, MELISSA
SAGEMILLER, NANNETTE MAY (f/k/a
NANNETTE KLATT), KATHERINE
KENDALL, ZOE BROCK, CAITLIN
DULANY, LARISSA GOMES, and JANE
DOE, individually and on behalf of all other
similarly situated,

     Plaintiffs,

   v.

THE WEINSTEIN COMPANY HOLDINGS,
LLC, MIRAMAX FILM NY, LLC, THE
WALT DISNEY COMPANY, DISNEY
ENTERPRISES, INC., BUENA VISTA
INTERNATIONAL, INC., HARVEY
WEINSTEIN, ROBERT WEINSTEIN, DIRK
ZIFF, TIM SARNOFF, MARC LASRY,
TARAK BEN AMMAR, LANCE MAEROV,
RICHARD KOENIGSBERG, PAUL TUDOR
JONES, JEFF SACKMAN, JAMES DOLAN,
MICHAEL EISNER, IRWIN REITER,
DAVID GLASSER, FRANK GIL, RICK
SCHWARTZ, FABRIZIO LOMBARDO,
MARK GILL, NANCY ASHBROOKE,
BARBARA SCHNEEWEISS, MIRAMAX
DOES 1-10, TALENT AGENCY DOES 1-
100, and JOHN DOES 1-50, inclusive

     Defendants.

17 Civ. 9554 (AKH) (BCM)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ............................................................................... 1

II. SUMMARY OF ALLEGATIONS ......................................................................... 5
    A.  Plaintiffs' Alleged Interactions with Harvey Weinstein ............................... 6
    B.  Allegations Concerning the Outside Directors ............................................. 8
    C.  Allegations Concerning Robert Weinstein .................................................. 10

III. STANDARD ON MOTION TO DISMISS ........................................................... 11

IV. THE STATUTES OF LIMITATIONS BAR THE VAST MAJORITY OF THE
    CLAIMS ............................................................................................................. 12
    A.  The Four-Year RICO Statute of Limitations Bars Counts V and VI ........... 13
    B.  The State-Law Allegations Fall Well Outside All Limitations Periods ......... 16
        1. The Negligent Supervision and Retention Claims Are Untimely (Counts III-IV) 17
        2. The Battery and Assault Claims Are Untimely (Counts VII-X) ........... 18
        3. The False Imprisonment Claims Are Untimely (Counts XI and XII) ............... 18
        4. The IIED Claims Are Untimely (Counts XIII and XIV) ........................ 19
        5. The NIED Claims Are Untimely (Counts XV and XVI) ...................... 20
        6. The Ratification Claims Are Untimely (Counts XVII and XVIII) ............ 20
    C.  Plaintiffs Cannot Meet Their Burden to Establish Tolling ........................... 20
        1. Equitable Estoppel Does Not Save Plaintiffs' Claims ........................... 21
        2. Duress Tolling Does Not Save Plaintiffs' Claims ................................. 24
        3. The Continuing Violations Doctrine Does Not Save Plaintiffs' Claims .............. 26

V.  PLAINTIFFS FAIL TO PLEAD A RICO VIOLATION (COUNT V) ............................. 28
    A.  Plaintiffs Fail to Adequately Plead Any RICO Predicate, Much Less a Pattern ......... 30
        1. Plaintiffs Fail to Plead Witness Tampering Against the Moving Defendants ....... 30
        2. Plaintiffs Fail to Plead Sex-Trafficking Against the Moving Defendants ........... 30
        3. Plaintiffs Fail to Plead Mail or Wire Fraud Against the Moving Defendants ....... 31
    B.  Plaintiffs Fail to Plead the Existence of a RICO Enterprise ........................ 34
    C.  Plaintiffs Fail to Plead Participation in the Operation of a RICO Enterprise ............. 36
    D.  Plaintiffs Have No RICO Standing ............................................................ 37
        1. Plaintiffs Fail to Plead a Cognizable Injury to Business or Property ............... 38
        2. Plaintiffs Fail to Plead Causation of Any Injury ................................. 40

VI. PLAINTIFFS FAIL TO PLEAD A RICO CONSPIRACY (COUNT VI) ...................... 42

VII. PLAINTIFFS FAIL TO PLEAD A SEX TRAFFICKING CLAIM (COUNT II) ............ 44
    A.  Geiss and Thomas Have No Cognizable Theory Under the 2003 TVPRA ............... 45
    B.  All Plaintiffs Fail to Plead the Elements of a TVPRA Violation ................. 46
        1. Plaintiffs Fail to Plead the "Participation" Element ............................. 47
        2. Plaintiffs Fail to Plead the "Benefits" Element ................................... 49
        3. Plaintiffs Fail to Plead the Required Scienter Regarding the "Venture" ............. 52

VIII. PLAINTIFFS FAIL TO PLEAD A NEGLIGENT SUPERVISION AND
      RETENTION CLAIM (COUNTS III-IV)..................................................................54
      A. Plaintiffs Fail to Plead That Any Duty of Care Was Owed to Plaintiffs....................55
      B. Plaintiffs Fail to Plead Proximate Causation of Any Injuries.......................................55
      C. Plaintiffs Fail to Plead the "Employee" Element Against Certain Defendants ...........56
      D. Plaintiffs Fail to Plead the Required Scienter Regarding "Propensity" .......................58
      E. Plaintiffs Fail to Plead the "Premises" Element...........................................................62

IX.   PLAINTIFFS FAIL TO PLEAD RATIFICATION (COUNTS XVII-XVIII).................63

X.    PLAINTIFFS FAIL TO PLEAD VICARIOUS LIABILITY (COUNTS VII-XVI).........66

XI.   ADDITIONAL ARGUMENTS OF DEFENDANT MIRAMAX FILM NY, LLC..........68
      A. The Statutes of Limitations Bar All Claims Against Miramax ....................................69
         1. Plaintiffs' Federal Claims Are Untimely by More than a Decade .......................69
         2. Plaintiffs' State-Law Claims Are Untimely by More than a Decade...................73
         3. Plaintiffs Cannot Meet Their Burden to Establish Tolling Against Miramax.......75
      B. Plaintiffs Have No Federal Claims Against Miramax ...................................................77
         1. Plaintiffs Still Have No RICO Standing...............................................................78
         2. Plaintiffs Still Fail to Define Miramax's Role in Any RICO Enterprise .............79
         3. Plaintiffs Still Fail to Plead the "Conduct" Element Against Miramax ...............81
         4. Plaintiffs Still Fail to Plead Miramax's Commission of a RICO Predicate .........82
         5. Plaintiffs Still Fail to Plead a RICO Conspiracy Claim .......................................85
      C. Plaintiffs Have No State-Law Claim Against Miramax ...............................................86
         1. Black Letter Law Defeats Plaintiffs' Vicarious Liability Claims. .......................86
         2. Plaintiffs Fail to Plead Negligence or Ratification Against Miramax..................87

XII.  ADDITIONAL ARGUMENTS OF THE DISNEY DEFENDANTS ...............................90
      A. All Claims Against the Disney Defendants Are Time-Barred ....................................91
         1. The Three-Year and One-Year Statutes of Limitations Applicable to Plaintiffs'
            Claims Have Run ..................................................................................................91
         2. Plaintiffs' Tolling Arguments Do Not Apply to the Disney Defendants.............92
            a. No Continuing Violation Is Alleged as to the Disney Defendants ..................93
            b. The Disney Defendants Are Not Alleged to Have Taken Any Steps to
               Prevent Plaintiffs from Bringing Suit..............................................................93
            c. Duress Does Not Apply Because Plaintiffs Do Not Allege That the Disney
               Defendants Made Any Threat ..........................................................................93
      B. All Claims Against the Disney Defendants Are Inadequately Pleaded ......................94
         1. Plaintiffs Do Not and Cannot Allege Any Facts That Plausibly Suggest That
            Harvey Weinstein Was an Employee or Agent of the Disney Defendants............95
         2. Plaintiffs Do Not and Cannot Allege Any Facts That Harvey Weinstein Acted
            Within the Scope of His Employment ..................................................................97
         3. Plaintiffs Do Not Allege Facts Supporting an Inference That the Disney
            Defendants Knew or Should Have Known of Inappropriate Conduct .................97
         4. Plaintiffs Do Not and Cannot Allege That Any of the Conduct at Issue Took
            Place on or with Any Disney Defendant's Property.............................................98

XIII. ADDITIONAL ARGUMENTS OF DEFENDANT THE WEINSTEIN
COMPANY HOLDINGS, LLC.....................................................................98
  A.  Plaintiffs' RICO Allegations Fail As to TWC ........................................98
      1. Plaintiffs Fail to Establish Predicate Acts ...........................................99
      2. Plaintiffs' Injuries Were Not Caused by TWC....................................99
  B.  Plaintiffs Geiss, Thomas and Thompson Fail to State a Claim Against TWC
      for Participating in a Commercial Sex Trafficking Venture .....................100
  C.  Geiss, Thomas, Thompson and Doe Fail to Plead Plausible Common Law
      Tort Claims Against TWC.......................................................................102
      1. The Near-Decade Old State Intentional Tort Claims Should Be Dismissed as a
         Matter of Law Against TWC Because They Are Time-Barred.........................102
      2. Plaintiffs Geiss, Thomas, Thompson, and Doe's Claims of Civil Battery,
         Assault, False Imprisonment, and Negligent and Intentional Infliction of
         Emotional Distress Against TWC Should Be Dismissed Because Plaintiffs Have
         Failed to Plead a Plausible Theory of Vicarious Liability...................103
      3. TWC Plaintiffs Pleaded No Facts Demonstrating That Liability May Be
         Extended to TWC Based on a Theory of *Respondeat Superior* .........................104
      4. Plaintiffs Have Pleaded No Facts Demonstrating That Liability May Be
         Extended to TWC Based on a Theory of Ratification. .......................................105
      5. The Claim of Negligent Infliction of Emotional Distress Against TWC Should
         Be Dismissed Because Plaintiffs Fail to Allege a Duty Owed ...........................105
      6. Plaintiffs Geiss, Thomas, Thompson and Doe Cannot Establish a Claim for
         Negligent Supervision. ............................................................................106

XIV. ADDITIONAL ARGUMENTS OF DEFENDANT ROBERT WEINSTEIN ...............106
  A.  Plaintiffs' Allegations Based on Robert Weinstein's Corporate Positions and
      Familial Relationship Provide No Support for Any of Plaintiffs' Claims .................107
  B.  Plaintiffs' Allegations Regarding Robert Weinstein's Purported Involvement
      in Settling Claims Against His Brother Do Not Adequately Plead Any
      Element of Any of Plaintiffs' Claims...........................................................109
  C.  Plaintiffs' Allegations That Robert Weinstein Had Knowledge of Harvey
      Weinstein's Sexual Assaults Are Insufficient...........................................112

XV. ADDITIONAL ARGUMENTS OF DEFENDANT JAMES DOLAN ..........................118
  A.  Mr. Dolan's Brief Tenure on the TWC Board Commenced Years After the
      Conduct of Weinstein Upon Which Plaintiffs' Claims Are Predicated and
      Thus Cannot Serve as a Basis for the Imposition of Liability Upon Him .................119
  B.  Plaintiffs Failed to Comply, as to Mr. Dolan, With the Specific Pleading
      Requirements Imposed by the Court at the September 12, 2018 Hearing.................121

XVI. ADDITIONAL ARGUMENTS OF FORMER OUTSIDE DIRECTOR
RICHARD KOENIGSBERG ......................................................................123

XVII. ADDITIONAL ARGUMENTS OF OUTSIDE DIRECTORS LANCE MAEROV
AND JEFF SACKMAN ...............................................................................128

XVIII. CONCLUSION..................................................................................129

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A. Terzi Prods., Inc. v. Theatrical Protective Union*,
   2 F. Supp. 2d 485 (S.D.N.Y. 1998)................................................................3, 63, 90

*Abdelhamid v. Altria Grp., Inc.*,
   515 F. Supp. 2d 384 (S.D.N.Y. 2007).........................................................19, 25, 67

*Adams v. Woods*,
   6 U.S. 336 (1805)..................................................................................................13

*Aerowest GmbH v. Freitag*,
   No. 15-CV-2894, 2016 U.S. Dist. LEXIS 84344 (E.D.N.Y. June 28, 2016) .........34

*Airlines Reporting Corp. v. Aero Voyagers, Inc.*,
   721 F. Supp. 579 (S.D.N.Y. 1989).......................................................................55

*Allen v. Antal*,
   No. 12 Civ. 8024(NSR), 2014 WL 2526977 (S.D.N.Y. Mar. 13, 2014), *aff'd*,
   665 F. App'x 9 (2d Cir. 2016) ..............................................................................18

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)................................................................................................42

*Arthur Andersen LLP v. United States*,
   544 U.S. 696 (2005)..........................................................................................30, 84

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................11, 12

*Attia v. Google LLC*,
   No. 17-cv-06037-BLF, 2018 WL 2971049 (N.D. Cal. June 13, 2018) ..................83

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) ..............................................................................50

*Azrielli v. Cohen Law Offices*,
   21 F.3d 512 (2d Cir. 1994)......................................................................................36

*Baisch v. Gallina*,
   346 F.3d 366 (2d Cir. 2003)........................................................................41, 43, 78

*Baiul v. William Morris Agency, LLC*,
   No. 13 CIV. 8683 KBF, 2014 WL 1804526 (S.D.N.Y. May 6, 2014), *aff'd*,
   601 F. App'x 58 (2d Cir. 2015) ........................................................13, 14, 15, 16

iv

*Baker v. Bank of Am., N.A.*,
No. 16 Civ. 488 (AKH), 2016 WL 9409022 (S.D.N.Y. Oct. 31, 2016) ................................20

*Baratta v. Kozlowski*,
464 N.Y.S.2d 803 (N.Y. App. Div. 1983) ...............................................................76

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................11

*Bell v. Morrison*,
26 U.S. 351 (1828) (Story, J.)..............................................................................12

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013)................................................................................56

*Bermudez v. City of New York*,
783 F. Supp. 2d 560 (S.D.N.Y. 2011) ...................................................................75

*Beter v. Murdoch*,
No. 17-CV-10247, 2018 U.S. Dist. LEXIS 107448 (S.D.N.Y. June 22, 2018) ......................34

*Bigio v. Coca-Cola Co.*,
675 F.3d 163 (2d Cir. 2012)...........................................................................63, 65

*Bistline v. Jeffs*,
No. 2:16-CV-788, 2017 WL 108039 (D. Utah Jan. 11, 2017) ....................................47

*Blanco v. AT&T Co.*,
90 N.Y.2d 757 (1997) ........................................................................................74

*Bliss v. Putnam Valley Cent. Sch. Dist.*,
No. 06-CV-15509, 2011 WL 1079944 (S.D.N.Y. Mar. 24, 2011).................................114

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide,*
*Inc.*,
369 F.3d 212 (2d Cir. 2004)...............................................................................124

*Board of Regents v. Tomanio*,
446 U.S. 478 (1980)...........................................................................................13

*Boyle v. United States*,
556 U.S. 938 (2009)......................................................................................35, 79

*Brautigam v. Rubin*,
55 F. Supp. 3d 499 (S.D.N.Y. 2014), *aff'd*, 618 F. App'x 723 (2d Cir. 2015)....................127

*Brewton v. City of N.Y.*,
550 F. Supp. 2d 355 (E.D.N.Y. 2008) ...................................................................68

v

*Butala v. Agishawala,*
    916 F. Supp. 314 (S.D.N.Y. 1996) .................................................... 13

*Cabrera v. New York City,*
    436 F. Supp. 2d 635 (S.D.N.Y. 2006) ................................................ 77

*Cabusao v. Lombardi,*
    No. 1:14CV74-HSO-RHW, 2015 U.S. Dist. LEXIS 185609 (S.D. Miss. Jan.
    30, 2015) ........................................................................................... 51

*Calder v. Planned Cmty. Living, Inc.,*
    No. 93-CV-8882, 1995 U.S. Dist. LEXIS 10773 (S.D.N.Y. Aug. 2, 1995) .......................... 58

*In re Cannavest Corp. Sec. Litig.,*
    307 F. Supp. 3d 222 (S.D.N.Y. 2018) ................................................ 57

*Chylinski v. Bank of Am.,*
    630 F. Supp. 2d 218 (D. Conn. 2009) ............................................... 108

*In re Citigroup ERISA Litig,*
    No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009), appeal
    docketed, No. 09-3804 (2d Cir. Sept. 9, 2009) ................................ 126

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
    187 F.3d 229 (2d Cir. 1999) .............................................................. 29

*Cohen v. S.A.C. Trading Corp.,*
    711 F.3d 353 (2d Cir. 2013) ................................................... 12, 29, 84

*Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.,*
    243 B.R. 620 (S.D.N.Y. 2000) ......................................................... 124

*Competitive Assocs., Inc. v. Laventhol Krekstein Horwath & Horwath,*
    478 F. Supp. 1328 (S.D.N.Y. 1979) ................................................. 126

*Conte v. Newsday, Inc.,*
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) ............................................... 37

*Corley v. Jahr,*
    No. 11-CV-9044, 2014 U.S. Dist. LEXIS 25489 (S.D.N.Y. Feb. 10, 2014) ......................... 57

*Crowley ex rel. Corning, Inc. Inv. Plan v. Corning, Inc.,*
    234 F. Supp. 2d 222 (W.D.N.Y. 2002) ............................................. 126

*Corrado v. New York Unified Court Sys.,*
    163 F. Supp. 3d 1 (E.D.N.Y. 2016), *aff'd*, 698 F. App'x 36 (2d Cir. 2017) .................... 26, 27

*Cort v. Marshall*'s *Dep't Store*,
No. 14-CV-7385, 2015 U.S. Dist. LEXIS 172611 (E.D.N.Y. Dec. 29, 2015) .......................59

*Coulter v. Morgan Stanley & Co., Inc.*,
753 F.3d 361 (2d Cir. 2014)................................................................................77

*Crawford v. Franklin Credit Mgmt.*,
758 F.3d 473 (2d Cir. 2014)................................................................................43

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013)................................................................................82

*D'Amico v. Christie*,
71 N.Y.2d 76 (1987) ...........................................................................................89

*D'Onofrio v. Mother of God with Eternal Life*,
60 Misc. 3d 910 (Sup. Ct. Westchester Cty. July 9, 2018)..............................25, 26

*Daventree Ltd. v. Republic of Azer.*,
349 F. Supp. 2d 736 (S.D.N.Y. 2004)................................................................63

*Davis v. N.J. Dep't of Corr.*,
10-cv-6439, 2011 U.S. Dist. LEXIS 130909 (D.N.J. Nov. 10, 2011) ...................27

*Davis v. Yeroushalmi*,
985 F. Supp. 2d 349 (E.D.N.Y. 2013) ...............................................................13

*Day v. Moscow*,
955 F.2d 807 (2d Cir. 1992).............................................................................25, 76

*De Santis v. City of New York*,
No. 10 CIV. 3508 JPO, 2014 WL 228659 (S.D.N.Y. Jan. 22, 2014)....................91

*DeFalco v. Bernas*,
244 F.3d 286 (2d Cir. 2001)..............................................................29, 31, 79, 99

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)................................................................................78

*Diamond v. Strassberg*,
751 F. Supp. 1152 (S.D.N.Y. 1990)....................................................................19

*In re Dig. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011).................................................................96

*Dilworth v. Goldberg*,
  No. 10-CV-2224, 2011 U.S. Dist. LEXIS 82392 (S.D.N.Y. July 28, 2011),
  report and recommendation adopted, 2011 U.S. Dist. LEXIS 112329
  (S.D.N.Y. Sept. 30, 2011) ...............................................................................61, 62

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
  822 F.2d 1242 (2d Cir. 1987) ....................................................................................32

*DLJ Mortg. Capital, Inc. v. Kontogiannis*,
  726 F. Supp. 2d 225 (E.D.N.Y. 2010) .......................................................................39

*Doe v. Alsaud*,
  12 F. Supp. 3d 674 (S.D.N.Y. 2014).................................................................. *passim*

*Doe v. City of New York*,
  No. 09-CV-9895, 2013 U.S. Dist. LEXIS 30010 (S.D.N.Y. Mar. 4, 2013) ...........58

*Doe v. Fed. Express Corp.*,
  571 F. Supp. 2d 330 (D. Conn. 2008), *aff'd* 345 Fed. App'x 670 (2d Cir.
  2009) ...........................................................................................................................88

*Doe v. Schneider*,
  667 F. Supp. 2d 524 (E.D. Pa. 2009) .........................................................................79

*Dooley v. Metro. Jewish Health Sys.*,
  No. 02-CV-4640, 2003 U.S. Dist. LEXIS 16520 (E.D.N.Y. Jul. 30, 2003)...........58

*AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*,
  361 F. Supp. 2d 312 (S.D.N.Y. 2005)........................................................................20

*Ehrens v. Lutheran Church*,
  385 F.3d 232 (2d Cir. 2004)............................................................................. *passim*

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014)........................................................................................75

*Empire State Towing & Recovery Ass'n v. Comm'r of Labor*,
  15 N.Y.3d 433 (2010) .................................................................................................57

*In re Enron Corp.*,
  379 B.R. 425 (S.D.N.Y. 2007)..................................................................................124

*Equinox Gallery Ltd. v. Dorfman*,
  306 F. Supp. 3d 560 (S.D.N.Y. 2018)..........................................................35, 79, 80

*In re F.C.C.*,
  208 F.3d 137 (2d Cir. 2000)......................................................................................124

*Feinberg v. Katz*,
No. 99 CIV. 45(CSH), 2002 WL 1751135 (S.D.N.Y. July 26, 2002) .................................109

*Feliberty v. Damon*,
527 N.E.2d 261 (N.Y. 1988) .................................................................................................96

*Fenner v. GM, LLC*,
298 F. Supp. 3d 1037 (E.D. Mich. 2018) ..............................................................................80

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
219 F. Supp. 2d 576 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004) ..........................124

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004) ........................................................................................ *passim*

*Flores-Figueroa v. United States*,
556 U.S. 646 (2009) ..............................................................................................................49

*Franzone v. Lask*,
No. 14 Civ. 3043 (GHW) (GWG), 2016 WL 4154276 (S.D.N.Y. Aug. 5,
2016) .....................................................................................................................................20

*Gabelli v. SEC*,
568 U.S. 442 (2013) ..............................................................................................................12

*Gallagher v. Dirs. Guild of Am., Inc.*,
144 A.D.2d 261 (N.Y. App. Div. 1988) ...............................................................................19

*Galper v. JP Morgan Chase Bank, N.A.*,
802 F.3d 437 (2d Cir. 2015) .................................................................................................94

*Gilson v. Metro. Opera*,
5 N.Y.3d 574 (2005) .............................................................................................................89

*Glick v. Berk & Michaels, P.C.*,
No. 90-CV-4230, 1991 U.S. Dist. LEXIS 10347 (S.D.N.Y. July 26, 1991) .........................22

*In re GM LLC Ignition Switch Litig.*,
No. 14-MD-2543, 2016 U.S. Dist. LEXIS 92499 (S.D.N.Y. July 15, 2016) .........................37

*Goldner v. Sullivan, Gough, Skipworth, Summers & Smith*,
482 N.Y.S.2d 606 (N.Y. App. Div. 1984) ...........................................................................91

*Gonzalez v. Hasty*,
802 F.3d 212 (2d Cir. 2015).............................................................................................24, 27

*Gonzalez v. Wright*,
665 F. Supp. 2d 334 (S.D.N.Y. 2009) ..................................................................................93

*Grant v. New York Times Co.*,
   No. 16-CV-03175 (PKC), 2017 WL 4119279 (S.D.N.Y. Sept. 14, 2017) ............................28

*Gray v. Schenectady City Sch. Dist.*,
   86 A.D.3d 771 (N.Y. App. Div. 2011) ................................................................................68

*Green v. Emmanuel African Methodist Episcopal Church*,
   278 A.D.2d 132 (N.Y. App. Div. 2000) ..............................................................................17

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ................................................................................81

*Hamm v. United States*,
   483 F.3d 135 (2d Cir. 2007) ..............................................................................................92

*Harris v. NYU Langone Med. Ctr.*,
   No. 12-CV-454, 2013 U.S. Dist. LEXIS 99328 (S.D.N.Y. July 9, 2013) ........................29, 30

*Hecht v. Commerce Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990) ................................................................................................28

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010) ..............................................................................................................41

*Hilow v. Rome City Sch. Dist.*,
   No. 6:14-cv-288, 2015 WL 893050 (N.D.N.Y. Mar. 2, 2015) .............................................77

*Hoatson v. N.Y. Archdiocese*,
   No. 05-CV-10467, 2007 U.S. Dist. LEXIS 9406 (S.D.N.Y. Feb. 8, 2007),
   *aff'd*, 280 F. App'x 88 (2d Cir. 2008) ................................................................................35

*Hollander v. Flash Dancers Topless Club*,
   340 F. Supp. 2d 453 (S.D.N.Y. 2004) ................................................................................78

*Holm v. C.M.P. Sheet Metal, Inc.*,
   89 A.D.2d 229 (N.Y. App. Div. 1982) ............................................................................89, 90

*Holmes v. SIPC*,
   503 U.S. 258 (1992) ..........................................................................................41, 78, 120

*In re Howard's Express, Inc.*,
   151 F. App'x 46 (2d Cir. 2005) ........................................................................................124

*Howell v. N.Y. Post Co.*,
   81 N.Y.2d 115 (1993) ........................................................................................................68

*In re Intel Corp. Derivative Litig.*,
   621 F. Supp. 2d 165 (D. Del. 2009) ..........................................................................127, 129

x

*J.E. v. Beth Israel Hosp.*,
295 A.D.2d 281 (N.Y. App. Div. 2002) ...............................................55

*Jaeger v. Cellco P'ship*,
936 F. Supp. 2d 87 (D. Conn. 2013), *aff'd*, 542 F. App'x 78 (2d Cir. 2013) ..........................77

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
610 F.3d 382 (7th Cir. 2010) ...............................................24

*Jerome M. Sobel & Co. v. Fleck*,
No. 03-CV-1041, 2003 U.S. Dist. LEXIS 21362 (S.D.N.Y. Dec. 1, 2003) ...............29, 30, 99

*In re Johnson & Johnson Derivative Litig.*,
865 F. Supp. 2d 545 (D.N.J. 2011) ...............................................127

*K.I. v. N.Y.C. Bd. of Educ.*,
683 N.Y.S.2d 228 (N.Y. App. Div. 1998) ...............................................67

*Kaczmarek v. Int'l Bus. Machs. Corp.*,
30 F. Supp. 2d 626 (S.D.N.Y. 1998) ...............................................37

*Katzman v. Victoria's Secret Catalogue*,
167 F.R.D. 649 (S.D.N.Y. 1996) ...............................................28, 33

*Khapesi v. City of New York*,
No. 13-Civ.-439, 2014 WL 2605342 (S.D.N.Y. June 10, 2014) ...........................114

*Khapesi v. City of New York*,
No. 13-CV-4391, 2014 U.S. Dist. LEXIS 79623 (S.D.N.Y. June 10, 2014) ..........................61

*Kim v. Kimm*,
884 F.3d 98 (2d Cir. 2018) ...............................................78, 82

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ...............................................23, 27

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012) ...............................................13, 16, 69, 70

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
No. 10-CV-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) ...............................51, 101

*Kovalchik v. City of New York*,
No. 09-CV-4546 (RA), 2014 U.S. Dist. LEXIS 132178 (S.D.N.Y. Sept. 18, 2014) ...............................................55

*Krystal G. v. Roman Catholic Diocese of Brooklyn*,
933 N.Y.S.2d 515 (N.Y. Sup. Ct. 2011) ...............................................58, 63

*Kunz v. New Netherlands Routes, Inc.*,
    64 A.D.3d 956 (N.Y. App. Div. 2009) ....................................................55, 68, 87

*Lawson v. Rubin*,
    No. 17-cv-6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr 29, 2018) ........................54, 102

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)........................................................................78, 85

*Lettis v. U.S. Postal Serv.*,
    39 F. Supp. 2d 181 (E.D.N.Y. 1998) .................................................................77

*Levy v. BASF Metals Ltd.*,
    No. 1:15-CV-7317-GHW, 2017 WL 2533501 (S.D.N.Y. June 9, 2017) ..................14, 15, 16

*Li Jun An v. Hui Zhang*,
    No. 13-CV-5064, 2013 U.S. Dist. LEXIS 174158 (S.D.N.Y. Dec. 6, 2013) ........................12

*Louis v. Perlitz*,
    No. 3:13-CV-1132, 2016 WL 1408076 (D. Conn. Apr. 8, 2016)..........................................46

*The Ltd., Inc. v. McCrory Corp.*,
    683 F. Supp. 387 (S.D.N.Y. 1988)......................................................................126

*Lundy v. Catholic Health Sys. of Long Island, Inc.*,
    711 F.3d 106 (2d Cir. 2013)........................................................................31, 33, 99

*Mack v. Parker Jewish Inst. For Health Care & Rehab.*,
    No. 14-1299, 2014 U.S. Dist. LEXIS 154577 (E.D.N.Y. Oct. 30, 2014)..............................42

*Mackin v. Auberger*,
    59 F. Supp. 3d 528 (W.D.N.Y. 2014) ....................................................39, 40, 42

*Major League Baseball Props., Inc. v. Price*,
    105 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................................79

*Manchester Equip. Co. v. Am. Way & Moving Co.*,
    60 F. Supp. 2d 3 (E.D.N.Y. 1999) .................................................................96

*Martin v. Curran*,
    303 N.Y. 276 (1951) ....................................................................................90

*Mary KK v. Jack LL*,
    203 A.D.2d 840 (N.Y. App. Div. 1994) ...............................................................87

*Maung Ng We v. Merrill Lynch & Co.*,
    No. 99 CIV. 9687(CSH), 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000)..............................108

*Maurillo v. Park Slope U-Haul*,
  194 A.D.2d 142 (N.Y. App. Div. 1993) ...............................................108

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008).............................................................120

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
  No. 91-CV-2923, 1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. Mar. 15, 1994) .........................30

*Merry Gentleman, LLC v. George & Leona Prods., Inc.*,
  76 F. Supp. 3d 756 (N.D. Ill. 2014) ......................................................45

*Meyer v. Holley*,
  537 U.S. 280 (2003).................................................................56, 108

*Miller v. Carpinello*,
  No. 06-CV-12940, 2007 U.S. Dist. LEXIS 86395 (S.D.N.Y. Nov. 20, 2007)............30, 36, 83

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
  737 F. Supp. 2d 137 (S.D.N.Y. 2010).....................................................85

*Monarch Ins. Co. v. Ins. Corp. of Ireland, Ltd.*,
  835 F.2d 32 (2d Cir. 1987)..............................................................90

*Morgan v. Cnty. of Nassau*,
  720 F. Supp. 2d 229 (E.D.N.Y. 2010) ...................................................105

*Mortise v. United States*,
  102 F.3d 693 (2d Cir. 1996)............................................................105

*Moss v. BMO Harris Bank, N.A.*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ...............................................35, 79, 80

*Moss v. Morgan Stanley, Inc.*,
  719 F.2d 5 (2d Cir. 1983) ...............................................................28

*Motorola Credit Corp. v. Uzan*,
  322 F.3d 130 (2d Cir. 2003)..............................................................39

*Murphy v. Guilford Mills*, *Inc.*,
  No. 02-CV-10105, 2005 U.S. Dist. LEXIS 7160 (S.D.N.Y. Apr. 22, 2005)................... *passim*

*N.X. v. Cabrini Med. Ctr.*,
  97 N.Y.2d 247 (2002) ...................................................................67

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*,
  165 F. Supp. 2d 514 (S.D.N.Y. 2001).....................................................85

*Nat'l Grp. for Commc'ns Ltd. v. Lucent Techs. Inc.*,
420 F. Supp. 2d 253 (S.D.N.Y. 2006)................................................................34

*Nat'l Railroad Passenger Corp. v. Morgan*,
536 U.S. 101 (2002).............................................................................................75

*Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)..................................................................................40

*Naughright v. Robbins*,
No. 10-CV-8451, 2014 U.S. Dist. LEXIS 148497 (S.D.N.Y. Oct. 16, 2014)..................57, 88

*Navin v. Wells Fargo Bank, N.A.*,
199 F. Supp. 3d 646 (D. Conn. 2016)...................................................................38

*Negron v. Cigna Health & Life Ins.*,
300 F. Supp. 3d 341 (D. Conn. 2018)...................................................................80

*New York v. United Parcel Serv., Inc.*,
2016 U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016)..............................16, 42

*Noble v. Weinstein*,
No. 17 Civ. 9260, 2018 WL 3863452 (S.D.N.Y. Aug. 13, 2018) .................. *passim*

*Norlin Corp. v. Rooney, Pace Inc.*,
744 F.2d 255 (2d Cir. 1984)................................................................................55

*Nuñag–Tanedo v. East Baton Rouge Parish Sch. Bd.*,
No. SACV 10-1172, 2011 WL 13153647 (C.D. Cal. May 12, 2011) ....................47

*O'Brien v. Spitzer*,
7 N.Y.3d 239 (2006)............................................................................................57

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
No. 12 Civ. 2837, 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012)............................50

*Order of R.R. Telegraphers v. Railway Express Agency*,
321 U.S. 342 (1944).....................................................................................12, 74

*Orix Fin. Servs., Inc. v. Cline*,
369 F. App'x 174 (2d Cir. 2010) .........................................................................93

*Overall v. Estate of Klotz*,
52 F.3d 398 (2d Cir. 1995)...................................................................23, 75, 93, 94

*Owino v. CoreCivic Inc.*,
Case No. 17-CV-1112, 2018 WL 2193644 (S.D. Cal. May 14, 2018)....................46

*P.F. v. Delta Air Lines, Inc.*,
No. 99-cv-4127, 2000 WL 1034623 (E.D.N.Y. June 20, 2000)............................................98

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002)......................................................................................................24

*PetEdge, Inc. v. Garg*,
234 F. Supp. 3d 477 (S.D.N.Y. 2017)...................................................................................109

*Pichardo v. N.Y.C. Dep't of Educ.*,
953 N.Y.S.2d 31 (N.Y. App. Div. 2012) ................................................................................91

*Precedo Capital Grp. Inc. v. Twitter Inc.*,
33 F. Supp. 3d 245 (S.D.N.Y. 2014).......................................................................................89

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ................................................................................................125

*Pulte Homes of N.Y., LLC v. Town of Carmel*,
No. 16 CV 8093, 2017 U.S. Dist. LEXIS 143290 (S.D.N.Y. Sept. 5, 2017) .........................27

*Ratha v. Patthana Seafood Co., Ltd.*,
No. 16-4271, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017)..................................................47

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)................................................................................................................38

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)..........................................................................................................36, 82

*Rich v. Fox News Network, LLC*,
322 F. Supp. 3d 487 (S.D.N.Y. 2018)....................................................................................62

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
30 F.3d 339 (2d Cir. 1994)................................................................................................26, 76

*RJR Nabisco, Inc. v. European Cmty.*,
136 S. Ct. 2090 (2016)............................................................................................................38

*Ross v. Mitsui Fudosan*,
2 F. Supp. 2d 522 (S.D.N.Y. 1998)..............................................................................62, 87, 97

*Rotella v. Wood*,
528 U.S. 549 (2000)..........................................................................................................13, 70

*Rothschild v. Title Guarantee & Trust Co.*,
204 N.Y. 458 (1912) ............................................................................................................105

*Russello v. United States*,
    464 U.S. 16 (1983)..................................................................................................28

*S. Ill. Laborers' & Emp'rs Health & Welfare Fund v. Pfizer Inc.*,
    No. 08-CV-5175, 2009 U.S. Dist. LEXIS 91414 (S.D.N.Y. Sept. 30, 2009).........................40

*Saldana v. Port Chester*,
    No. 09-CV-6268, 2010 U.S. Dist. LEXIS 142099 (S.D.N.Y. July 21, 2010) .......................55

*Salvatore v. KLM Royal Dutch Airlines*,
    No. 98-CV-2450, 1999 U.S. Dist. LEXIS 15551 (S.D.N.Y. Sept. 30, 1999).........................66

*Sandeep Rehal v. Harvey Weinstein et al.*,
    No. 18 CV 674 (S.D.N.Y.).......................................................................................116

*Santan-Morris v. N.Y. Univ. Med. Ctr.*,
    No. 96 Civ. 0621, 1996 U.S. Dist. LEXIS 18237 (S.D.N.Y. Dec. 9, 1996).........................77

*Scerba v. Allied Pilots Ass'n*,
    No. 13 CIV. 3694 LAK AJP, 2013 WL 6481583 (S.D.N.Y. Dec. 10, 2013),
    subsequently *aff'd*, 589 F. App'x 554 (2d Cir. 2014)..........................................124

*Schmidt v. Bishop*,
    779 F. Supp. 321 (S.D.N.Y. 1991).............................................................................76

*Schmidt v. Fleet Bank*,
    16 F. Supp. 2d 340 (S.D.N.Y. 1998)..........................................................................78

*Schwab v. Philip Morris USA, Inc.*,
    449 F. Supp 2d 992 (E.D.N.Y. 2006) ......................................................................120

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)...........................................................................................38, 78

*Sheila C. v. Povich*,
    11 A.D.3d 120 (N.Y. App. Div. 2004) ......................................................................68

*In re ShengdaTech, Inc. Sec. Litig.*,
    No. 11-CV-1918, 2014 U.S. Dist. LEXIS 112190 (S.D.N.Y. Aug. 12, 2014).......................57

*Shostack v. Diller*,
    No. 15 Civ. 2255 (GBD) (JLC), 2016 WL 958687 (S.D.N.Y. Mar. 8, 2016)................95, 108

*Shostack v. Diller*,
    No. 15-CV-2255, 2015 U.S. Dist. LEXIS 123777 (S.D.N.Y. Sept. 16, 2015),
    report and recommendation adopted, 2016 U.S. Dist. LEXIS 30354 (S.D.N.Y.
    Mar. 8, 2016)..........................................................................................56, 67, 108

*Sigmon v. Goldman Sachs Mortg. Co.*,
    539 B.R. 221 (S.D.N.Y. 2015) ........................................................................124

*Simcuski v. Saeli*,
    44 N.Y.2d 442 (1978) ...................................................................................23

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) ..............................................................85

*Smith v. Smith*,
    830 F.2d 11 (2d Cir. 1987).............................................................................24

*Snickles v. Gabryszak*,
    57 Misc. 3d 1206(A)(table), 2015 N.Y. Misc. LEXIS 5253 (Sup. Ct. Erie Cty.
    Oct. 28, 2015) ........................................................................................62, 114

*Snowden v. Lexmark Int'l, Inc.*,
    237 F.3d 620 (6th Cir. 2001) .........................................................................83

*Soward v. Deutsche Bank AG*,
    814 F. Supp. 2d 272 (S.D.N.Y. 2011)............................................................21

*Stadtman v. Cambere*,
    422 N.Y.S.2d 102 (N.Y. App. Div. 1979) .....................................................76

*Stamile v. Cnty. of Nassau*,
    No. 10-CV-2632, 2014 U.S. Dist. LEXIS 39320 (E.D.N.Y. Mar. 25, 2014)....59, 61

*Stordeur v. Computer Assocs. Int'l*,
    995 F. Supp. 94 (E.D.N.Y. 1998) ..................................................................24

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015).......................................................................38, 40

*Targum v. Citrin Cooperman & Co., LLP*,
    No. 12-CV-6909, 2013 U.S. Dist. LEXIS 164585 (S.D.N.Y. Nov. 19, 2013)....2, 28

*Teledyne Indus., Inc. v. Eon Corp.*,
    373 F. Supp. 191 (S.D.N.Y. 1974)...............................................................108

*Tomas v. Gillespie*,
    385 F. Supp. 2d 240 (S.D.N.Y. 2005)..............................................24, 25, 26

*Travis v. Park City Mun. Corp.*,
    565 F.3d 1252 (10th Cir. 2009) .....................................................................45

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*,
    886 F. Supp. 1134 (S.D.N.Y. 1995)..........................................................39, 41

*Tsipouras v. W&M Props., Inc.*,
  9 F. Supp. 2d 365 (S.D.N.Y. 1998)............................................................38, 39

*Twersky v. Yeshiva Univ.*,
  993 F. Supp. 2d 429 (S.D.N.Y. 2014)...................................................... *passim*

*Tymoshenko v. Firtash*,
  No. 11-CV-2794, 2015 U.S. Dist. LEXIS 125126 (S.D.N.Y. Sept. 18, 2015)......................33

*U.S. Fire Ins. Co. v. United Limousine Serv.*,
  303 F. Supp. 2d 432 (S.D.N.Y. 2004)............................................................81

*United States v. Afyare*,
  632 F. App'x 272 (2016) ........................................................ *passim*

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000)....................................................................33

*United States v. Diaz*,
  176 F.3d 52 (2d Cir. 1999)...............................................................81, 82

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999)............................................................32, 34, 99

*United States v. Persico*,
  832 F.2d 705 (2d Cir. 1987)....................................................................29

*United States v. Pierce*,
  224 F.3d 158 (2d Cir. 2000)...............................................................31, 34

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007)................................................................31, 34

*United States v. Turkette*,
  452 U.S. 576 (1981)............................................................................28

*United States v. Weintraub*,
  273 F.3d 139 (2d Cir. 2001)....................................................................49

*Universitas Educ., LLC v. T.D. Bank, N.A.*,
  No. 15-CV-5643 (SAS), 2015 WL 9304551 (S.D.N.Y. Dec. 21, 2015) ................................17

*Velez v. Sanchez*,
  693 F.3d 308 (2d Cir. 2012)...............................................................45, 83

*Walker v. Lorch*,
  No. 12 CIV. 9282 RWS, 2013 WL 3358013 (S.D.N.Y. July 2, 2013)............................22, 106

*Webb v. Goord*,
    340 F.3d 105 (2d Cir. 2003).....................................................................43

*In re: The Weinstein Co. Holdings, LLC, et al.*,
    Case No. 18-10601-MFW (Bankr. D. Del.).....................................124, 125

*The Weinstein Co. v. Smokewood Entm't Grp., LLC*,
    664 F. Supp. 332 (S.D.N.Y. 2009)............................................................45

*Westchester Cnty. Indep. Party v. Astorino*,
    137 F. Supp. 3d 586 (S.D.N.Y. 2015)............................................31, 38, 40

*WestRM-West Risk Mkts., Ltd. v. XL Reinsurance Am., Inc.*,
    No. 02 Civ. 7344 (MGC), 2006 U.S. Dist. LEXIS 48769 (S.D.N.Y. 2006) ......................120

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ......................................................................127

*Williams v. Affinion Grp. LLC*,
    889 F.3d 116 (2d Cir. 2018)....................................................................99

*Williams v. District of Columbia*,
    676 F. Supp. 329 (D.D.C. 1987) ..............................................................75

*Williams v. Dow Chem. Co.*,
    255 F. Supp. 2d 219 (S.D.N.Y. 2003) ......................................................38

*Wilson v. Danka Corp.*,
    No. 01 Civ. 10592(DAB), 2002 WL 31929120 (S.D.N.Y. Jan. 28, 2003)............................97

*Wood v. Carpenter*,
    101 U.S. 135 (1879)................................................................................12

*Woods v. CVS*,
    No. 13-CV-611, 2013 U.S. Dist. LEXIS 58764 (S.D.N.Y. Apr. 19, 2013)............................66

*World Wrestling Entm't., Inc. v. Jakks Pac., Inc.*,
    328 F. App'x 695 (2d Cir. 2009) .......................................................13, 39, 41

*Wultz v. Bank of China, Ltd.*,
    306 F.R.D. 112 (S.D.N.Y. 2013) ..............................................................73

*Zerilli-Edelglass v. N.Y.C. Transit Auth.*,
    333 F.3d 74 (2d Cir. 2003).......................................................................23

*Zimmerman v. Poly Prep Country Day Sch.*,
    888 F. Supp. 2d 317 (E.D.N.Y. 2012) ......................................................38

*Zumpano v. Quinn,*
   6 N.Y.3d 666 (2006) ...........................................................22, 23, 93

## STATUTES

Del. C.
   § 18-402 .........................................................................................55, 56
   § 18-407 .................................................................................................56

18 U.S.C.
   § 1341 ..................................................................................30, 83, 85
   § 1343 ..................................................................................30, 83, 85
   § 1512 .........................................................................................30, 83
   § 1512(a)(2) ...........................................................................................84
   § 1512(b)(2) ...........................................................................................30
   §§ 1581-1597 .........................................................................................44
   § 1591 ........................................................................................ *passim*
   § 1591(a) ....................................................................................102, 111
   § 1591(a)(2) .........................................................................................100
   § 1591(e)(3) .........................................................................................111
   § 1591(e)(5) .........................................................................................111
   § 1595 ........................................................................................ *passim*
   § 1961(1) ...........................................................................29, 31, 82
   § 1961(1)(B) ...........................................................................................83
   § 1962(c) .................................................................................... *passim*
   § 1962(d) .................................................................................... *passim*
   § 1964(c) ...........................................................................29, 42, 78

Ct. Gen. Stat. § 52-584 ...............................................................................17

New York City Human Rights Law (NYCHRL) .......................................116

RICO ................................................................................................ *passim*

Trafficking Victims Protection Reauthorization Act of 2003.............. *passim*

Trafficking Victims Protection Reauthorization Act of 2008......................45

William Wilberforce, Trafficking Victims Protection Reauthorization Act of
   2008, P.L. 110-457, 122 Stat. 5044 (Dec. 23, 2008) .............................45

# RULES

Fed. R. Civ. P.

    8................................................................................................................29

    9................................................................................................................29

    9(b)...................................................................................................... *passim*

    11..............................................................................................................125

    12(b)(6) ............................................................................1, 11, 124, 129

Fed. R. Evid. 201 ...................................................................................124

N.Y. C.P.L.R.

    § 202........................................................................................................17

    § 214........................................................................................................20

    § 214(5)..............................................................................................73, 91

    § 215(3).................................................................................................. *passim*

# TREATISES

CHATTEL, Black's Law Dictionary (8th ed. 2004) ............................................88, 89

Restatement (2d) of Torts (1965)...........................................................89, 120

Restatement (3d) of Agency (2006)...............................................................87

# OTHER AUTHORITIES

2008 Sundance Flyer, https://www.sundance.org/pdf/press-
releases/2008_SFF_PREMIERES_SPECTRUM_MIDNIGHT_NFOM.pdf.........................45

Dan B. Dobbs, The Law of Torts (****) .................................................120

http://www.vulture.com/201711 0/bob-weinstein-ex-assistant-he-knew-about-
harvey-decades-ago.html ......................................................................115

https://www.parliament.uk/documents/commons-committees/women-and-
equalities/Correspondence/Zelda-Perkins-SHW0058.pdf....................................110

Defendants The Weinstein Company Holdings, LLC, Miramax Film NY, LLC, The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc., Robert Weinstein, Dirk Ziff, Tim Sarnoff, Marc Lasry, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan and Michael Eisner (together the "moving Defendants" or the "Defendants")[1] respectfully submit this memorandum of law in support of their motion to dismiss with prejudice and without leave to re-plead the claims asserted against them in Plaintiffs' First Amended Class Action Complaint ("FAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.     PRELIMINARY STATEMENT

In their original complaint, Plaintiffs alleged that a wide-ranging and differently-situated set of defendants and others, termed the "Harvey Weinstein Sexual Enterprise," had violated RICO and a laundry list of state laws by virtue of their alleged connections to Harvey Weinstein's alleged conduct.  After the defendants moved to dismiss the complaint, the Court held a hearing on those motions, at which time it highlighted multiple times that in order to state causes of action against the various defendants, Plaintiffs have to plead as to each defendant the elements of each claim.[2]  Despite getting a second bite at the apple, Plaintiffs have again failed to do so, and the FAC should be dismissed with prejudice.

---

[1]     Harvey Weinstein, Tarak Ben Ammar, Frank Gil, Mark Gill, Nancy Ashbrooke, David Glasser, Barbara Schneeweiss, Rick Schwartz, and Fabrizio Lombardo are non-moving defendants.  Aside from Harvey Weinstein (who has moved for a stay), the response deadline for these non-moving defendants has not yet come due, because of their service dates.  In addition, Irwin Reiter, previously named as a defendant in the FAC, was recently voluntarily dismissed.

[2]     *See, e.g.*, Sept. 12, 2018 H'rg Tr. 16:14-19 (the Court told Plaintiffs they "have to plead that each defendant . . . knew that Harvey Weinstein was attempting to blacklist the plaintiffs, each of the plaintiffs until the statute of limitations period would be tolled"); *id.* 17:7-9 (Plaintiffs must "plead for each person separately that they knew of this continuing effort of Harvey Weinstein to blacklist the plaintiffs."); *id.*19:15-20 (Plaintiffs "need to prove that the person implicated knew about the conspiracy and consciously made it his own.  You would have

As an initial matter, the statutes of limitations on the vast majority of Plaintiffs' claims have long since passed.[3] *See infra*, Section IV. Plaintiffs bring claims based on alleged assaults that happened in some cases more than twenty-five years ago and in no case later than 2011. Because the relevant limitations periods have expired—a defect that cannot be cured through repleading—those claims should be dismissed with prejudice.

Further, Plaintiffs fail to state a claim for any of the causes of action they have brought against the Defendants. First, the FAC falls far short of satisfying the high burden necessary to allege a RICO claim. *See, e.g.*, *Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909, 2013 U.S. Dist. LEXIS 164585, at *18-19 (S.D.N.Y. Nov. 19, 2013) ("A plaintiff's burden is high when pleading RICO allegations."). Plaintiffs have failed to allege that each Defendant, through the commission of two or more predicate acts constituting a pattern of racketeering activity, participated in a RICO enterprise. Indeed, Plaintiffs have failed to establish that any of the Defendants has committed even a single predicate act. Plaintiffs have similarly failed to allege adequately the other elements of a RICO violation, so that claim must be dismissed.

Plaintiffs' claim for RICO conspiracy must similarly be dismissed, both because there is no adequately pled underlying RICO violation and because Plaintiffs have failed to allege the requisite "agreement." In fact, it is unclear how the over 100 named Defendants and other persons not named as Defendants, who worked for different companies at different (and often

---

to at least plead in good faith that each defendant knew of this effort by Harvey Weinstein and others whom he enlisted to silence the women and that they participated in some fashion in doing that."); *id.* 18:23-19:3 (Plaintiffs "need . . . to show that each defendant personally was aware of the continuing effort by Harvey Weinstein to intimidate them [*i.e.*, Plaintiffs]. . . . If you can't do that, I think that defendant has to be dismissed.").

[3]     As explained further *infra*, the statutes of limitations on three of Plaintiffs' claims pursuant to 18 U.S.C. § 1595 have not run, but only one Plaintiff alleges a violation occurring during the period in which the relevant statutory language was in effect.

non-overlapping) times and whose sole connection is that they knew Harvey Weinstein, could possibly have arrived at such an agreement.

Plaintiffs' sex trafficking claims in Count II fare no better. First, the version of the Trafficking Victims Protection Reauthorization Act in effect at the time of the relevant allegations by two Plaintiffs allows causes of action only against the perpetrator, and cannot support their claims for vicarious liability against the moving Defendants. *See* Trafficking Victims Protection Reauthorization Act of 2003 ("2003 TVPRA"), 108 P.L. 193, 117 Stat. 2875, 2878 (Dec. 19, 2003) (codified as amended at 18 U.S.C. § 1595(a)). In any event, all three of the Plaintiffs on this count fail to plead the requisite elements of a sex trafficking violation against Defendants, so that claim, too, must be dismissed.

The FAC also fails to state a claim for negligent supervision and retention. To plead that claim, Plaintiffs must plausibly allege: "(1) that the tortfeasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Plaintiffs do not and cannot plead all elements against any Defendant, and for many Defendants fail to plead even a single element.

For similar reasons, Plaintiffs' ratification claims must also be dismissed. To support such a claim, Plaintiffs must plead: (1) a principal-agent relationship; (2) the principal's full knowledge of the material facts concerning the allegedly binding transaction; and (3) acceptance by the principal of the benefits of the agent's acts. *See A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 492 (S.D.N.Y. 1998). As with their negligent supervision

and retention claims, Plaintiffs fail to allege the requisite elements against any Defendant, and cannot allege a single element against any individual Defendant.

Plaintiffs also attempt to impose vicarious liability on several Defendants for Harvey Weinstein's alleged actions. Setting aside the fact that the individual Defendants never employed Harvey Weinstein, it is well-established New York law that a person who engages in sexual misconduct does so for personal motives and not within the scope of his employment. *Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) ("No decision in New York has been cited to date in which the doctrine of *respondeat superior* was held to apply to sexual assault."). Indeed, Plaintiffs themselves recognize in the FAC that "Weinstein's [alleged] predatory behavior followed a pattern designed *for his personal gratification*." FAC at p. 28 (emphasis added). Accordingly, Plaintiffs cannot hold other Defendants liable for any such conduct.

For all these reasons, as more fully set forth herein, the FAC should be dismissed with prejudice and without leave to re-plead as against all the moving Defendants.

<p style="text-align:center">*       *       *</p>

In addition to the general arguments set forth below in support of the moving Defendants' motion to dismiss, many of the moving Defendants make additional arguments specific to them in further support of the motion.

Additional arguments specific to the Outside Directors are incorporated in the general sections of the brief (Sections II–X).

Additional arguments specific to defendant Miramax Film NY, LLC are found in Section XI (pages 68-90).

Additional arguments specific to defendants The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc. and Michael Eisner are found in Section XII (pages 90-98).

Additional arguments specific to defendant The Weinstein Company Holdings, LLC are found in Section XIII (pages 98-106).

Additional arguments specific to defendant Robert Weinstein are found in Section XIV (pages 106-118).

Additional arguments specific to defendant James Dolan are found in section XV (pages 118-123).

Additional arguments specific to defendant Richard Koenigsberg are found in Section XVI (pages 123-128).

Additional arguments specific to defendants Lance Maerov and Jeff Sackman are found in Section XVII (pages 128-129).

## II.  <u>SUMMARY OF ALLEGATIONS[4]</u>

Plaintiffs Louisette Geiss, Sarah Ann Thomas, Melissa Thompson, Melissa Sagemiller, Nannette May, Katherine Kendall, Zoe Brock, Caitlin Dulany, Larissa Gomes and Jane Doe allege that they were sexually assaulted by Defendant Harvey Weinstein at various times between 1993 and 2011.  FAC ¶¶ 93-301.  During that time, Harvey Weinstein was associated with Defendant Miramax Film NY, LLC ("Miramax")[5] (from the 1970s until 2005) and then later with The Weinstein Company ("TWC") (from 2005 until 2017).  *Id.* ¶¶ 61, 63, 656.

---

[4]  The FAC's allegations are taken as true for the purposes of this motion to dismiss only.

[5]  Miramax was purchased by Defendant The Walt Disney Company in 1993 and remained a subsidiary of The Walt Disney Company until 2010.  FAC ¶ 61.  For purposes of this motion, references to "Miramax" are to the Miramax entit(ies) existing at the time (against which plaintiffs make their allegations), and to Miramax Film NY, LLC (the defendant in this case), as

## A.        Plaintiffs' Alleged Interactions with Harvey Weinstein

Nannette Klatt alleges she was assaulted by Harvey Weinstein in his Miramax office in 1993 or 1994.  FAC ¶¶ 93-100.  Ms. Klatt alleges that "[h]er professional and personal interactions are . . .  limited by her fears generated by Weinstein's assault," which has led to the loss of opportunities at Miramax and TWC, as well as elsewhere.  *Id.* ¶ 101.

Katherine Kendall alleges that she was assaulted by Harvey Weinstein in 1993 after he met with her to discuss her career.  *Id.* ¶¶ 109-10.  Ms. Kendall allegedly experienced emotional distress and physical pain, along with shame, depression and a loss of self-worth because of the alleged assault.  *Id.* ¶ 113.  Ms. Kendall also alleges that she suffered additional distress and fear in 2017 after she was contacted by a person claiming to be a reporter from The Guardian and learned she was on a list of people being investigated by Harvey Weinstein.  *Id.* ¶¶ 116-24.

Caitlin Dulany alleges that Harvey Weinstein exposed himself to her in her apartment in 1996, and that he sexually assaulted her at the Cannes Film Festival two months later.  *Id.* ¶¶ 131, 137-40.  Ms. Dulany alleges that the assault caused her "severe anxiety and depression," and that she no longer sought roles that she would have pursued prior to the assault.  *Id.* ¶ 148.

Zoe Brock alleges that in 1998, she was assaulted by Harvey Weinstein in his hotel room at the Cannes Film Festival.  *Id.*  ¶¶ 156-59.  Ms. Brock alleges that after the assault she suffered from depression, a lack of self-confidence and a loss of reputation, which affected her ability to be a professional actor.  *Id.* ¶ 164.  She allegedly avoided travel to Hollywood for several years after the assault because she was afraid of Harvey Weinstein.  *Id.*

Melissa Sagemiller alleges that she was assaulted by Harvey Weinstein in his hotel room during the summer of 2000.  *Id.* ¶¶ 169-72.  Harvey Weinstein allegedly later prevented Ms.

---

the context may require.

Sagemiller from traveling on a commercial flight by holding her luggage hostage so she would travel on Harvey Weinstein's personal plane. *Id.* ¶ 175. Ms. Sagemiller alleges that she was concerned that Harvey Weinstein would hurt her career if she discussed what happened to her, and was frightened that Harvey Weinstein "wielded so much power that he could prevent her from traveling on public transportation." *Id.* ¶¶ 173, 176.

Larissa Gomes alleges that Harvey Weinstein assaulted her in his hotel room in 2000, and yelled at her threateningly when she tried to escape his grasp. *Id.* ¶¶ 189-96. Ms. Gomes alleges that Harvey Weinstein's assault caused her extreme distress. *Id.* ¶ 201. Because of the assault, Ms. Gomes alleges, she "never regained the momentum that she had before meeting Weinstein," her career was damaged, and she regularly felt fear and shame. *Id.* ¶ 202.

Jane Doe alleges that Harvey Weinstein threateningly demanded sex from her in September 2002, and that he thereafter assaulted her. *Id.* ¶¶ 207-12. From 2002 to 2008, Jane Doe alleges that Harvey Weinstein made sporadic contact with her, often under the guise of connecting Jane Doe with professional opportunities. *Id.* ¶¶ 215-29. In 2008, at his TWC office, Jane Doe alleges that Harvey Weinstein exposed himself in front of her during a meeting and began touching himself. *Id.* ¶ 232. These alleged assaults have caused Jane Doe to suffer from depression and anorexia, and also allegedly acted as a "barrier to her acting career." *Id.* ¶ 242.

Louisette Geiss alleges that in 2008, she was assaulted by Harvey Weinstein after meeting him in his hotel room to discuss a script. *Id.* ¶¶ 247-49. Weinstein purportedly told her that "he would 'greenlight' her script if she watched him masturbate." *Id.* ¶ 248. Ms. Geiss alleges her refusal of Harvey Weinstein's advances lost her a three-film deal and other opportunities at TWC. *Id.* ¶ 251. Moreover, Harvey Weinstein's assault allegedly caused Ms. Geiss deep distress. *Id.* ¶ 250.

Sarah Ann Thomas alleges that, after a month of interviewing to serve as a nanny to Harvey Weinstein's children in 2008, she interviewed with Harvey Weinstein at his house in Connecticut. *Id.* ¶ 256. Ms. Thomas was not given the job, allegedly because she rejected Harvey Weinstein's advance after Harvey Weinstein allegedly "grabbed Thomas and pulled her tight against his body." *Id.* ¶¶ 261, 263. The encounter, Ms. Thomas alleges, caused her "severe anxiety and emotional distress," and she often feels unsafe attending job interviews. *Id.* ¶ 264.

Melissa Thompson alleges that Harvey Weinstein raped her in a hotel room in 2011 during a business meeting, leaving her "in a state of shock and disbelief." *Id.* ¶¶ 293, 297. Ms. Thompson further alleges that in 2017 she was put in touch with Benjamin Brafman, who, she was told, was representing women in a planned lawsuit against Harvey Weinstein. *Id.* ¶ 305. After discussing legal strategy with an attorney who worked for Brafman, Ms. Thompson learned that Brafman actually represented Harvey Weinstein. *Id.* ¶¶ 307-08, 313. Ms. Thompson alleges that she was targeted for apparent investigation by the "Weinstein Sexual Enterprise," which caused her "significant additional distress and fear, as well as damage to her business and property." *Id.* ¶ 323.

## B. Allegations Concerning the Outside Directors

The FAC alleges that: (i) Defendant Dirk Ziff served on the TWC Board from October 2005 to April 30, 2009, and again from on or about 2011 through October 6, 2017; (ii) Defendant Tim Sarnoff served on the TWC Board from June 25, 2013 to October 6, 2017; (iii) Defendant Marc Lasry served on the TWC Board from on or about June 20, 2016 to October 6, 2017; (iv) Defendant Paul Tudor Jones served on the TWC Board from October 20, 2015 to October 7, 2017;[6] and (v) Defendant James Dolan served on the TWC Board from about September 30,

---

[6] Plaintiffs elsewhere admit, however, that Mr. Jones did not take his seat on the TWC Board until December 2015. ECF 1 ¶ 30.

2015 to June 20, 2016.  FAC ¶¶ 42-44, 48, 50.  Ziff, Sarnoff, Lasry, Jones and Dolan are referred to collectively herein as the "Outside Directors."[7]

This complaint, which has grown to 921 paragraphs, mentions each of the Outside Directors individually only a handful of times.  Relying almost entirely on conclusory allegations, Plaintiffs allege that each of the Outside Directors "knew or should have known that Harvey Weinstein was a serial sexual predator."  *Id.* ¶¶ 526-41 (Ziff); *id.* ¶¶ 554-71 (Sarnoff); *id.* ¶¶ 572-88 (Dolan); *id.* ¶¶ 589-605 (Jones); *id.* ¶¶ 606-13 (Lasry).  Specifically, Plaintiffs allege that the Outside Directors knew or should have known about Harvey Weinstein's alleged behavior because they "witnessed" abusive behavior by Harvey Weinstein (although Plaintiffs cannot identify any such instances), received complaints and a 2015 internal memorandum regarding Harvey Weinstein's behavior (although they cannot identify any specific complaints made to any Outside Director) and were aware of certain comments made in the media and payments made to women assaulted by Harvey Weinstein (although they do not allege how or when any Outside Director became aware of such comments or payments).  *Id.*  Moreover, Plaintiffs allege at various points that the Outside Directors either had access to Harvey Weinstein's personnel file or demanded to see the file but were refused such access by Harvey Weinstein's attorney.  *Compare, e.g.*, *id.* ¶ 528(h) *with* ¶ 536 (regarding Ziff).[8]

---

[7]    The entity for which these Defendants served as representatives—The Weinstein Company Holdings, LLC—is a Delaware limited liability company, not a corporation, and the limited liability company agreement for this company created a Board of Representatives rather than a Board of Directors.  We refer to these Defendants as "Outside Directors," rather than "Outside Representatives," because they are alleged to be "directors" by Plaintiffs.  As discussed below, the case law showing that Plaintiffs' allegations would be insufficient to state a claim as against a corporate director applies with even greater force in the context of claims against the board of a limited liability company.

[8]    Plaintiffs make identical or similar allegations with regard to the other Outside Directors.

The FAC also makes several allegations with regard to the "Board" generally, without identifying who was on the Board at the relevant times or which members of the Board knew of the relevant facts or engaged in the pertinent conduct. For example, it alleges that the Board approved Harvey Weinstein's 2005 employment contract and "hid behind the agreement claiming it couldn't do anything absent a conviction." *Id.* ¶ 423.[9] The FAC further asserts that certain provisions in Harvey Weinstein's employment contract "reflect[] TWC's knowledge that Weinstein had in the past engaged in, and therefore was more likely than not to engage in, sexual harassment and other misconduct[.]" *Id.* ¶ 429. But the FAC does not allege facts supporting the conclusion that any individual Outside Director knew of Harvey Weinstein's purported propensity to engage in sexual misconduct, or that any Outside Director influenced the drafting of Harvey Weinstein's employment agreement with such alleged knowledge in mind. Plaintiffs also allege the "Directors took affirmative actions to conceal their knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women[.]" *Id.* ¶ 679. Once again, however, Plaintiffs do not identify which directors took any such actions, what those actions were, when they were taken and what specific knowledge any Director attempted to conceal.

In sum, despite its attempt at new allegations against the Outside Directors, the FAC still fails to allege which Outside Directors supposedly knew what information (and does not allege any Outside Director knew anything about any Plaintiff), how they knew it or when they knew it.

## C. Allegations Concerning Robert Weinstein

Robert Weinstein is Harvey Weinstein's younger brother. The FAC alleges that, in the late 1970s, Harvey and Robert Weinstein started a small independent film company called

---

[9] The FAC does recognize, however, that none of the Outside Directors were members of the compensation committee of the Board, which was in charge of negotiations regarding Harvey Weinstein's 2015 contract renewal. *See* FAC ¶ 425 (alleging that Lance Maerov and Jeff Sackman comprised that committee).

Miramax, named after their parents, which became the most successful independent film studio in America, producing movies that achieved both critical attention and commercial success. FAC ¶ 60. In 1993, the Weinsteins sold Miramax to The Walt Disney Company. *Id.* ¶ 61. The Weinsteins left Miramax on September 30, 2005, to form their own production company, TWC, with several other media executives. *Id.* ¶ 63. The FAC alleges that Robert Weinstein was an officer and board chairman of Miramax, *id.* ¶ 41; *id.* at 97 (heading), and an officer and board co-chairman of TWC from October 2005 until July 13, 2018, where he ran Dimension Films, a separate TWC division, *id.* ¶¶ 41, 446-47, 830(h); *id.* at 1.

As with the Outside Directors, the FAC does not allege that Robert Weinstein had any involvement in Harvey Weinstein's alleged sexual misconduct against any Plaintiff or that he ever met, interacted with, or even knew of the existence of any Plaintiff. The vast majority of the FAC's allegations regarding Robert Weinstein are based on his membership on the TWC Board and are indistinguishable from the conclusory and otherwise insufficient allegations against the Outside Directors. *See, e.g.,* FAC ¶¶ 41, 351, 447-51, 458, 461-62, 465-72. The FAC does contain a limited number of allegations that are specific to Robert Weinstein, which are addressed in Section XIV below, and which do not effectively distinguish him from the Outside Directors or suffice to plead a claim against him. Accordingly, although the arguments set forth through Section X of this brief are presented on behalf of the Outside Directors, they apply with equal force to Robert Weinstein.

## III.   STANDARD ON MOTION TO DISMISS

To survive a Rule 12(b)(6) motion, a claim must have "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Pleadings that are no more than conclusions "are not entitled to the assumption of truth," nor are "naked assertion[s] devoid of further factual enhancement." *Id.* at 678-79 (internal quotation marks omitted).

Because the FAC alleges mail and wire fraud as RICO predicates, the FAC also must satisfy the heightened pleading requirements set forth by Federal Rule of Civil Procedure 9(b) in pleading those purported frauds. *Li Jun An v. Hui Zhang*, No. 13-CV-5064, 2013 U.S. Dist. LEXIS 174158, at *11 (S.D.N.Y. Dec. 6, 2013) ("To the extent that any predicate acts sound in fraud, the pleading of those acts must satisfy the particularity requirements of Rule 9(b)."). Rule 9(b) requires that allegations of fraud "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quotation omitted).

## IV.     THE STATUTES OF LIMITATIONS BAR THE VAST MAJORITY OF THE CLAIMS

Statutes of limitation are "vital to the welfare of society." *Gabelli v. SEC*, 568 U.S. 442, 449 (2013) (quoting *Wood v. Carpenter*, 101 U.S. 135, 139 (1879)). For centuries, they have served at least two critical purposes: (1) to prevent the prosecution of claims after "evidence has been lost, memories have faded, and witnesses have disappeared"; and (2) to preserve a defendant's "right to be free of stale claims"—a right that "in time comes to prevail over the [plaintiff's] right to prosecute them." *Order of R.R. Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 349 (1944) (Jackson, J.); *see also Bell v. Morrison*, 26 U.S. 351, 360 (1828)

(Story, J.); *Adams v. Woods*, 6 U.S. 336, 342 (1805) (Marshall, C.J.). In other words, "there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the fact-finding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious." *Board of Regents v. Tomanio*, 446 U.S. 478, 487 (1980).

Applying these principles, courts routinely dismiss untimely claims like the ones Plaintiffs have asserted at the pleading stage. *See, e.g.*, *Koch v. Christie*'s *Int'l PLC*, 699 F.3d 141, 153 (2d Cir. 2012); *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 452 (S.D.N.Y. 2014); *Davis v. Yeroushalmi*, 985 F. Supp. 2d 349, 362 (E.D.N.Y. 2013); *Butala v. Agishawala*, 916 F. Supp. 314, 320-21 (S.D.N.Y. 1996). And in this case, the same result—dismissal—is required for the moving Defendants.

### A. The Four-Year RICO Statute of Limitations Bars Counts V and VI

Plaintiffs' fifth and sixth causes of action for violation of 18 U.S.C. § 1962(c) (RICO) and 18 U.S.C. § 1962(d) (conspiracy to violate RICO) are time barred. The statute of limitations for a civil RICO claim is four years. *See Rotella v. Wood*, 528 U.S. 549, 552 (2000). The limitations period begins to run "when plaintiffs discover or should have discovered their RICO injury, not when they discover or should have discovered the underlying pattern of racketeering activity . . . ." *Baiul v. William Morris Agency, LLC*, No. 13 CIV. 8683 KBF, 2014 WL 1804526, at *6 (S.D.N.Y. May 6, 2014), *aff'd*, 601 F. App'x 58 (2d Cir. 2015) (emphasis added). Moreover, the statute of limitations "runs even where the full extent of the RICO scheme is not discovered until a later date." *Koch*, 699 F.3d at 153 (quoting *World Wrestling Entm't., Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009)).

Here, each individual Plaintiff alleges an injury stemming from alleged assaults by Harvey Weinstein that took place over seven years ago, and in some cases more than twenty

years ago.  Accordingly, even were the Court to find that Plaintiffs' alleged injuries were compensable under RICO (and they are not, *see infra* Section V.D.), and that Plaintiffs had otherwise stated a claim for relief under RICO (and they have not, *see infra* Section V) their RICO claims are barred by the four-year statute of limitations:

- Nannette Klatt alleges that Harvey Weinstein insisted that she show him her breasts during an audition in 1993 or 1994.  *See* FAC ¶ 98.  Because she would not engage with Harvey Weinstein, Ms. Klatt alleges, she "lost the part Weinstein offered, lost other opportunities at Miramax and TWC, and has lost other professional opportunities as the consequence of Weinstein's assault."  *Id.* ¶ 101.  Because Ms. Klatt was aware that she lost the part that was offered to her in 1993 or 1994, the limitations period began to run then, and her claim is time barred.  *See Baiul*, 2014 WL 1804526, at *6 (plaintiff was on notice of RICO claim when she received no payment for performances); *Levy v. BASF Metals Ltd.*, No. 1:15-CV-7317-GHW, 2017 WL 2533501, at *5 (S.D.N.Y. June 9, 2017).

- Katherine Kendall alleges that Harvey Weinstein assaulted her soon after they met to discuss Ms. Kendall's acting career in 1993.  FAC ¶¶ 102-15.  Ms. Kendall's allegations demonstrate that Ms. Kendall was acutely aware of any potential injury to her acting career soon after the alleged assault.  *Id.* ¶ 113 ("[a]fter the assault . . . she believed that if she were to disclose the assault, she would be blacklisted and blamed as a result of Weinstein's power in the industry"); *id.* ¶ 114 ("[s]he knew Weinstein could hurt her career").  Accordingly, Ms. Kendall discovered or should have discovered any purported injury more than twenty years ago, and the clock on her RICO claim has long since run.  *See Baiul*, 2014 WL 1804526 at *6 ("The law does not require that [the plaintiff] have understood all of the nuances of the various frauds she alleges, it merely requires that she have been aware that she did not receive the earnings generated from her various performances.").

- Caitlin Dulany alleges that Harvey Weinstein exposed himself to her at Ms. Dulany's apartment in 1996, then sexually assaulted her at the Cannes Film Festival several months later.  FAC ¶¶ 131, 139-40.  Ms. Dulany alleges that the day after the alleged assault at Cannes, "[s]he swore to herself that she would never speak of that night to anyone, ever" because "[s]he knew that if she reported him, Weinstein would destroy her life."  *Id.* ¶ 142.  Ms. Dulany was therefore aware of any possible RICO injury immediately after the 1996 assault.  The statute of limitations has run on her claim.  *See Baiul*, 2014 WL 1804526, at *6, *9.

- Zoe Brock alleges that Harvey Weinstein assaulted her at the Cannes Film Festival that was held from May 13-24, 1998.  FAC ¶¶ 152-64.  Ms. Brock alleges that because of "actions of Weinstein and his enablers, Brock was afraid to

audition for roles that required her to travel to Hollywood and avoided going there for several years [thereafter]. Weinstein and his Miramax colleagues significantly affected Brock's confidence and her ability to be a professional actor." *Id.* ¶ 164 (emphasis added). Accordingly, if Ms. Brock suffered any RICO injury, she was aware of it during the "several years" following 1998, triggering the limitations period long before 2013. *See Baiul*, 2014 WL 1804526 at *6; *Levy*, 2017 WL 2533501, at *5. Her claim is therefore time barred. *Baiul*, 2014 WL 1804526, at *9.

- Melissa Sagemiller alleges that Harvey Weinstein assaulted her in the summer of 2000. FAC ¶¶ 165-79. Ms. Sagemiller alleges that when she "disclosed the assault to her castmates, the implicit warning from others on the set was not to cause any trouble, because it would hurt her career to discuss what happened to her." *Id.* ¶ 173. Ms. Sagemiller does not allege any subsequent injury to her career. However, given her castmates' alleged "implicit warning" in or about the summer of 2000, Ms. Sagemiller knew or should have known of any possible harm to her career at that time, more than 15 years ago. *See Baiul*, 2014 WL 1804526, at *6. Her claim is similarly time barred. *Id.* at *9.

- Larissa Gomes also alleges that Harvey Weinstein assaulted her in 2000. Ms. Gomes alleges that Weinstein's alleged attack "damaged her career" because "[s]ince [the alleged assault], she has tried to avoid working with men, for fear of her safety" and that "[f]eelings of fear and shame have resurfaced regularly, which have negatively affected her personal and professional life." FAC ¶¶ 201-02. Ms. Gomes therefore knew or should have known about the alleged harm to her career in 2000, and the statute of limitations has long since run on her claim. *See Baiul*, 2014 WL 1804526, at *6, *9.

- Jane Doe alleges that Harvey Weinstein first assaulted her in or about September 2002. FAC ¶¶ 203-13. According to the FAC, Jane Doe spent the week after the September 2002 assault "worrying that she had destroyed her life by refusing Weinstein." *Id.* ¶ 214. She further alleges that during a 2006 trip to Los Angeles, a producer warned her "to be very careful, because Weinstein could crush people," and that she did not win a 2010 modeling job after Harvey Weinstein's wife was at the casting. *Id.* ¶¶ 226, 236. Finally, she alleges that her encounters with Harvey Weinstein over the years caused her "great stress and anxiety" because "[s]he understood that she would never get cast in a production unless she gave Weinstein sexual favors," and that Harvey Weinstein even told Jane Doe as early as 2002 (when she was sixteen) that "she could not be successful without engaging in unwanted sexual contact with him." *Id.* ¶ 239. Accordingly, Jane Doe was aware of any RICO injury (*i.e.*, any harm to her career) as early as 2002, and in any event no later than 2010. *See Baiul*, 2014 WL 1804526, at *6. The statute of limitations has run on her RICO claim. *Id.* at *9.

- The FAC also makes clear that Louisette Geiss was aware of any purported harm to her career in or around 2008 when she was allegedly assaulted by Harvey

Weinstein. FAC ¶¶ 243-53. Indeed, Ms. Geiss contends that the assault caused her to lose "a three-film deal and other opportunities at TWC" and to "leave the [entertainment] industry." *Id.* ¶ 251. Accordingly, Ms. Geiss was aware of (or at the very least should have been aware of) her alleged RICO injury much more than 4 years ago, and her claim is time barred. *See Baiul*, 2014 WL 1804526, at *6; *Levy*, 2017 WL 2533501, at *5 (dismissing RICO claim as time barred where "Plaintiff had actual notice of her injury almost seven years before filing the" complaint) (emphasis in original).

- Sarah Ann Thomas alleges that Harvey Weinstein sexually harassed her when she interviewed with him in 2008 to be his children's nanny, and that "a few days later," Harvey Weinstein's assistant informed her that she did not receive the nanny job. FAC ¶¶ 254-65. The statute of limitations for Ms. Thomas's RICO claim therefore began to run in 2008, and her claim is untimely. *See Baiul*, 2014 WL 1804526, at *9; *Levy*, 2017 WL 2533501, at *5.

- Melissa Thompson alleges that soon after Harvey Weinstein assaulted her in 2011 she confided in certain friends about the assault but "did not report it because she feared for her safety and career" and that she "knew that Weinstein could and would destroy her if she complained about his sexual misconduct." *See* FAC ¶ 298. Although Thompson also alleges that she suffered additional "damage to her business and property" (*i.e.*, her causes of action against Harvey Weinstein and others) in 2017 after she allegedly was targeted for "apparent investigation" by Weinstein associates, the clock began to run on her claim when she first became aware of the RICO injury, even if she was not aware of the full extent of the purported RICO scheme at that time. *See Koch*, 699 F.3d at 153.

Because Plaintiffs' RICO claims must be dismissed, their claims pursuant to 18 U.S.C.

§ 1962(d) (conspiracy to violate RICO) also fail. *See, e.g., New York v. United Parcel Serv., Inc.*, No. 15-cv-1136 (KBF), 2016 U.S. Dist. LEXIS 105038, at *4 (S.D.N.Y. Aug. 9, 2016)

("[A]ny claim under § 1962(d) based on conspiracy to violate the other subsections of section

1962 must fail if the substantive claims are themselves deficient.").

## B. The State-Law Allegations Fall Well Outside All Limitations Periods

The facts underlying all of Plaintiffs' state law claims relate to events that allegedly took

place at least seven years ago, and in some cases as many as 25 years ago. Plaintiffs Geiss,

Thomas, Thompson and Doe have brought multiple state law claims premised on underlying tort

claims against Harvey Weinstein. Because the applicable statutes of limitations have long since

expired for all but two of Plaintiffs' claims, those claims are time-barred and must be dismissed.[10]

In support of their claims, Ms. Geiss and Ms. Thomas each alleges a single, separate meeting with Harvey Weinstein in 2008 from which her claims arise. *See* FAC ¶¶ 243-53 (Geiss); *id.* ¶¶ 254-65 (Thomas). Ms. Thompson alleges that Harvey Weinstein raped her in 2011. *See id.* ¶¶ 266-97. Jane Doe alleges that Harvey Weinstein assaulted her in 2002, and that he sexually harassed her on and off until 2011. *See id.* ¶¶ 203-42.

### 1. The Negligent Supervision and Retention Claims Are Untimely (Counts III-IV)

New York applies a three-year statute of limitations to negligent supervision and retention claims, regardless of the nature of the underlying injury. *See Universitas Educ., LLC v. T.D. Bank, N.A.*, No. 15-CV-5643 (SAS), 2015 WL 9304551, at *3 (S.D.N.Y. Dec. 21, 2015) (footnotes omitted); *Green v. Emmanuel African Methodist Episcopal Church*, 278 A.D.2d 132, 132 (N.Y. App. Div. 2000). The limitations period "begins to run at the time and place of injury, 'even though the injured party may be ignorant of the existence of the wrong or injury.'" *Universitas Educ., LLC*, 2015 WL 9304551, at *3 (emphasis added). Accordingly, the statute of limitations ran on Ms. Doe's claim in 2005, on Ms. Geiss's and Ms. Thomas's claims in 2011, and on Ms. Thompson's claim in 2014.[11]

---

[10]     The statute of limitations for a civil claim under 18 U.S.C. § 1595 is ten years. Counts I and II of the FAC assert claims under that section against the Outside Directors on behalf of Ms. Geiss, Ms. Thomas and Ms. Thompson.

[11]     Even if Connecticut's statute of limitations were to apply to Ms. Thomas's claim via New York's borrowing statute, *see* N.Y. C.P.L.R. § 202, her claim would still be time barred under Connecticut's two-year statute of limitations. *See* Ct. Gen. Stat. § 52-584.

## 2. The Battery and Assault Claims Are Untimely (Counts VII-X)

Claims for assault and battery are subject to a one-year limitations period under New York law. *See* N.Y. C.P.L.R. § 215(3). Ms. Geiss, Ms. Thomas, Ms. Thompson and Jane Doe assert causes of action against the Outside Directors for civil battery and assault. Because even the most recent alleged conduct occurred in 2011, these claims are time barred.

## 3. The False Imprisonment Claims Are Untimely (Counts XI and XII)

The statute of limitations for a false imprisonment claim is also one year, running from the date when the plaintiff was released from custody. *See* N.Y. C.P.L.R. § 215(3); *see also Allen v. Antal*, No. 12 Civ. 8024(NSR), 2014 WL 2526977, at *5 (S.D.N.Y. Mar. 13, 2014), *aff'd*, 665 F. App'x 9 (2d Cir. 2016). As described in the FAC, to the extent Ms. Geiss, Ms. Thomas, Ms. Thompson and Jane Doe were detained by Harvey Weinstein, each was released immediately after her alleged assault in 2002, 2008 or 2011. *See* FAC ¶ 249 ("Fearing an imminent sexual assault, Geiss escaped Weinstein's grasp and fled, with Weinstein giving chase."); *id.* ¶ 262 ("Thomas left feeling upset, shaken, afraid and disrespected."); *id.* ¶ 297 ("[Ms. Thompson] tried to gather herself and left the room alone."); *id.* ¶ 213 ("As Weinstein finally let Jane Doe leave . . ."). Given these allegations, the latest possible date of a Plaintiff's release was in 2012 (Ms. Thompson), well over one year before Plaintiffs filed the Complaint. Moreover, because plaintiffs did not bring a false imprisonment claim in their original complaint (and more than one year passed between the filing of the original complaint and the filing of the FAC), the false imprisonment claim became untimely *during the course of this lawsuit*.[12]

---

[12] No tolling theory could possibly revive it. Plaintiffs allege that all statutes of limitations were tolled until the publication of an article in the New York Times on October 5, 2017. *See* FAC ¶¶ 11, 662. But Plaintiffs did not bring a false imprisonment claim until the filing of the FAC on October 31, 2018—more than a year after they admit tolling ceased, and outside the statute of limitations. *See* N.Y. C.P.L.R. § 215(3).

## 4. The IIED Claims Are Untimely (Counts XIII and XIV)

Like civil battery, assault and false imprisonment, IIED claims are subject to a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3); *see also Gallagher v. Dirs. Guild of Am., Inc.*, 144 A.D.2d 261, 262 (N.Y. App. Div. 1988) (explaining that one-year statute of limitations applies to intentional torts, including IIED). The statute of limitations for an IIED claim begins to run "from the time the cause of action accrued," *i.e.*, "when the shock or distress occurs." *Diamond v. Strassberg*, 751 F. Supp. 1152, 1154 (S.D.N.Y. 1990). Plaintiffs allege that their shock or distress occurred during the alleged assaults or immediately thereafter: for Ms. Geiss and Ms. Thomas in 2008,[13] in 2011 for Ms. Thompson, and 2002 for Ms. Doe.[14] *See* FAC ¶ 214 (Jane Doe "had spent the week [following the alleged assault] worrying that she had destroyed her life"); *id.* ¶ 250 ("Weinstein's assault deeply distressed Geiss"); *id.* ¶ 262 ("Thomas left [the 2008 meeting] feeling upset, shaken, afraid and disrespected"); *id.* ¶ 294 (during the alleged assault, "Thompson felt completely dissociated and ill"). The limitations period on these claims is therefore long passed. *See Diamond*, 751 F. Supp. at 1154; *Gallagher*, 144 A.D.2d at 262.

---

[13] Ms. Thompson's allegation that members of the so-called Weinstein Sexual Enterprise had deceived her into sharing information with attorneys representing Harvey Weinstein in 2017, FAC ¶¶ 298-323, does not render her IIED claim timely. First, it does not appear that Ms. Thompson's IIED claim is based on the alleged 2017 events. *See* FAC ¶¶ 886-93 (detailing IIED claim). Moreover, Ms. Thompson and the other Plaintiffs seek to hold the Outside Directors liable for their IIED claim on a theory of *respondeat superior*. *Id.* ¶ 893. "The key element of *respondeat superior* . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable." *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 398 (S.D.N.Y. 2007). Ms. Thompson's allegations in 2017 center on actions by attorneys whom she does not allege were employed by the Outside Directors (rather than Harvey Weinstein himself). Accordingly, Ms. Thompson's 2017 allegations have no bearing on the untimeliness of her IIED claim, which accrued in 2011.

[14] Ms. Doe also alleges that Harvey Weinstein sexually harassed her intermittently until 2011. FAC ¶¶ 203-42. Even if her claim accrued at the end of this period, it would still be barred by the one-year statute of limitations. *See Gallagher*, 144 A.D.2d at 262.

## 5. The NIED Claims Are Untimely (Counts XV and XVI)

NIED claims are subject to a three-year statute of limitations.  *See, e.g.*, *AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 317 (S.D.N.Y. 2005) (citing N.Y. C.P.L.R. § 214); *accord Franzone v. Lask*, No. 14 Civ. 3043 (GHW) (GWG), 2016 WL 4154276, at *9 (S.D.N.Y. Aug. 5, 2016).  Similar to IIED claims, the statute of limitations for NIED claims begins to run when the cause of action accrues, *i.e.*, on the date of the injury.  *See Baker v. Bank of Am., N.A.*, No. 16 Civ. 488 (AKH), 2016 WL 9409022, at *3 (S.D.N.Y. Oct. 31, 2016) (Hellerstein, J.).  For the same reasons described above, these causes of action are therefore untimely and should be dismissed.

## 6. The Ratification Claims Are Untimely (Counts XVII and XVIII)

Plaintiffs allege that Miramax, Miramax Officers, The Walt Disney Company, Disney Enterprises, Buena Vista International, Eisner, TWC, TWC Officers, and TWC Directors ratified Harvey Weinstein's acts of assault, battery, and intentional and negligent infliction of emotional distress.  As explained above, and as Plaintiffs acknowledge in the FAC, *see* FAC ¶¶ 665, the statute of limitations for intentional torts is one year, and for negligent infliction of emotional distress, it is three years.  Plaintiffs' claims arise from Harvey Weinstein's alleged tortious conduct between 2002 and September 2011, so any purported "ratification" of that conduct likewise would have occurred, at the latest, in or around September 2011.  Plaintiffs' ratification claims are therefore time barred and should be dismissed.

## C. Plaintiffs Cannot Meet Their Burden to Establish Tolling

Plaintiffs contend that the statutes of limitations applicable to their claims are tolled pursuant to the doctrines of equitable estoppel, duress and continuing violation.  *See* FAC ¶¶ 658-728.  Plaintiffs bear the burden, even at the pleading stage, of establishing tolling.  *See, e.g.*, *Twersky*, 993 F. Supp. 2d at 443. ("When the claims are prima facie barred by the statute of

limitations, the plaintiff must make sufficient factual allegations that each of the requirements of [tolling] is satisfied."); *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 278 (S.D.N.Y. 2011) ("[P]laintiff bears the burden of proving that a particular statute of limitation has been tolled.").

Plaintiffs cannot meet their burden here. Specifically, Plaintiffs contend that "[t]he power Weinstein wielded—and his ability to blacklist an entertainment industry participant for complaining about his predatory behavior—was so legendary that it was the rule in the entertainment industry that women needed to acquiesce to Weinstein to succeed." *Id.* ¶ 658. They also allege that the "Defendants" generally—but not the Outside Directors—"took affirmative steps to conceal their knowledge and facilitation of Weinstein's abuse from Class Members." *Id.* ¶ 659. Plaintiffs therefore assert that the "statute of limitations was thus tolled at least until" *The New York Times* reported the sexual harassment allegations against Harvey Weinstein and TWC fired Weinstein, when his "victims felt comfortable enough to complain." *Id.* ¶¶ 662-63. These allegations fail: the statute of limitations does not stand in abeyance until a plaintiff is "comfortable" filing suit, and Plaintiffs fail to identify any action taken by any Outside Director (or even any Director) that would trigger the application of these tolling doctrines. Indeed, at the September 12th hearing, the Court confirmed that, for the Court to apply equitable tolling under any of the theories Plaintiffs seek to invoke, they must allege that each defendant engaged in conduct giving rise to the application of that doctrine. *See* Sept. 12, 2018 H'rg Tr. 13:3. As further explicated below, Plaintiffs have ignored that directive.

### 1. Equitable Estoppel Does Not Save Plaintiffs' Claims

Under New York Law, equitable estoppel is an "'extraordinary remedy'" that "should be 'invoked sparingly and only under exceptional circumstances.'" *Twersky*, 993 F. Supp. 2d at 442 (dismissing as time barred claims related to alleged sexual abuse, including related claims for negligent supervision, and holding that equitable estoppel did not apply) (citations omitted);

*Walker v. Lorch*, No. 12 CIV. 9282 RWS, 2013 WL 3358013, at *5 (S.D.N.Y. July 2, 2013)

(same). Indeed, the New York Court of Appeals has held, in a case regarding supervisory

liability for alleged sexual assaults, that "equitable estoppel will apply 'where plaintiff was

induced by fraud, misrepresentations or deception to refrain from filing a timely action' . . . [and]

the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations."

*Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) (citations omitted). Accordingly, Plaintiffs must

meet the heightened pleading requirements of Rule 9(b). *Twersky*, 993 F. Supp. 2d at n.5.

Moreover, it is "fundamental to the application of equitable estoppel for plaintiffs to

establish that subsequent and specific actions by defendants somehow kept them from timely

bringing suit." *Zumpano*, 6 N.Y.3d at 674 (emphasis added); *see also Twersky*, 993 F. Supp. 2d

at 442 (noting that those actions "must be affirmative and specifically directed at preventing the

plaintiff from bringing suit."). "[E]quitable estoppel is only 'appropriate where the plaintiff is

prevented from filing an action within the applicable statute of limitations due to defendants'

misconduct toward the potential plaintiff, not a community at large.'" *Twersky*, 993 F. Supp. 2d

at 445 (citation omitted).

Despite having had an opportunity to re-plead, Plaintiffs do not, because they cannot,

allege any fraud, misrepresentation or deception by the Outside Directors that prevented

Plaintiffs from bringing their asserted claims years ago. Indeed, they do not identify any

statements—let alone misrepresentations—made by any Outside Director to any Plaintiff at all.[15]

Instead, Plaintiffs assert generally that the Outside Directors (as a group) "took affirmative

---

[15] It is insufficient to allege fraudulent statements or misrepresentations made by other defendants. *See Glick v. Berk & Michaels, P.C.*, No. 90-CV-4230, 1991 U.S. Dist. LEXIS 10347, at *29 (S.D.N.Y. July 26, 1991) ("Allegations that other defendants acted to deceive plaintiffs from filing suit do not plead fraudulent concealment against all defendants. That is because the doctrine of fraudulent concealment tolls the statute of limitations only as to those defendants who committed the concealment." (emphasis in original)).

actions to conceal their knowledge and facilitation of Weinstein's pattern" of abuse; that they "knew or should have known" about an NYPD sting involving Harvey Weinstein and "did not require . . . Weinstein to reaffirm the company's code of conduct"; and that they "could have sued for access to" Harvey Weinstein's personnel file but chose not to.  FAC ¶¶ 679-81. Plaintiffs' general allegations—which focus on the Outside Directors' inaction and boil down to an assertion that they should have discovered Harvey Weinstein's alleged abuses and then made that knowledge public—are exactly the type of allegations that courts have held are insufficient to warrant the application of equitable estoppel.  *See Twersky*, 993 F. Supp. 2d at 440 (rejecting argument that plaintiffs could not have brought their abuse claims against a school until an interview was published in which an administrator acknowledged the abuse); *Zumpano*, 6 N.Y.3d at 676 ("A wrongdoer is not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations.").

Plaintiffs cannot establish the elements of equitable estoppel for an additional reason: the FAC does not even address one of its two elements, which requires "reasonable diligence" on Plaintiffs' part.  *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997); *Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) ("[A] plaintiff invoking estoppel must show that he brought his action 'within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.'") (quoting *Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978)); *see also Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (requiring the plaintiff to have "acted with reasonable diligence during the time period she seeks to have tolled").

Plaintiffs must "plead [that] element of equitable estoppel with particularity."  *Twersky*, 993 F. Supp. 2d at 443 n.5.  But they do not plead it at all, because they did not act with reasonable diligence—to the contrary, the FAC makes clear that Plaintiffs consciously chose not

to bring their claims because they feared negative career consequences.  *See, e.g.*, FAC ¶¶ 113, 151, 200; *see also Stordeur v. Computer Assocs. Int'l*, 995 F. Supp. 94, 99 (E.D.N.Y. 1998) ("Neither does the statute of limitations toll because the plaintiff wishes to maintain the status quo, be it a job, a business relationship, or a marriage.").[16]  Nor can Plaintiffs' claims of "ongoing physical and emotional distress" give rise to tolling.  *See, e.g.*, FAC ¶¶ 24-30, 32.  It is settled law that the statute of limitations cannot be circumvented merely by alleging that the effects of a tortious act are lasting—especially where those effects are "traumatic emotional and psychiatric" impacts for which any proof lies literally (and exclusively) in the plaintiff's mind. *Smith v. Smith*, 830 F.2d 11, 13 (2d Cir. 1987); *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015) (finding "continuing effects" irrelevant in the context of the continuing violation doctrine).

Accordingly, the "extraordinary remedy" of equitable estoppel—which "should be invoked sparingly and only under exceptional circumstances"—has not been pleaded, and simply does not apply here.  *Twersky*, 993 F. Supp. 2d at 442.

## 2. Duress Tolling Does Not Save Plaintiffs' Claims

As Plaintiffs admit, duress may toll the statute of limitations "only where duress is part of the gravamen of a plaintiff's claim."  *Tomas v. Gillespie*, 385 F. Supp. 2d 240, 247 (S.D.N.Y. 2005); *accord* FAC ¶ 693.  Plaintiffs rely on duress to toll the limitations periods only on their NIED, IIED and RICO claims.  The doctrine, however, does not save these untimely claims.

---

[16]     *See* also *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010) ("[T]he Supreme Court has held that when an event occurs that tolls the statute of limitations [in a RICO case] . . . , even if the event is fraud by the defendant, the plaintiff cannot fold his hands, sit back, and do nothing until the defendant returns to good behavior."); *Pearl v. City of Long Beach*, 296 F.3d 76, 79, 85, 89 (2d Cir. 2002) (no equitable estoppel unless "it would have been impossible for a reasonably prudent person to learn about his or her cause of action" within the limitations period).

The limitations periods for Plaintiffs' IIED and NIED claims against the Outside Directors were not tolled under the doctrine of duress for two independent reasons: First, Plaintiffs' claims against the Outside Directors are based on a theory of vicarious liability. *See* FAC ¶ 893 (IIED); *id.* ¶ 909 (NIED). Such a claim is not, as a matter of law, based on an allegation of duress caused by the defendant, but rather on the existence of an employer/employee relationship between the defendant and the alleged tortfeasor. *See Abdelhamid*, 515 F. Supp. 2d at 398 ("The key element of *respondeat superior* . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable."). Because duress is not even an element—let alone the gravamen—of Plaintiffs' IIED or NIED claims against the Outside Directors, that doctrine cannot toll the limitations periods for those causes of action. *See Tomas*, 385 F. Supp. 2d at 247; *see also Day v. Moscow*, 955 F.2d 807, 813 (2d Cir. 1992) (declining to toll statute of limitations where duress was not an element of plaintiff's claim).

Second, Plaintiffs fail to identify any actions taken by the Outside Directors that could constitute duress. *See, e.g.*, *Tomas*, 385 F. Supp. 2d at 247 (duress did not toll statute of limitations because plaintiff "d[id] not show that defendants exercised dominion over either her mind or in any other manner deprived her of her freedom of will"); *D'Onofrio v. Mother of God with Eternal Life*, 60 Misc. 3d 910, 917 (N.Y. Sup. Ct. July 9, 2018) (duress did not toll statute of limitations because "plaintiff has failed to specify any particular acts by Fontana that would constitute duress such as would toll the limitations period"). Indeed, Plaintiffs do not identify a single interaction between any Plaintiff and any Outside Director. Given the total lack of communication between Plaintiffs and the Outside Directors alleged in the FAC, it is entirely implausible that those individuals caused Plaintiffs duress. Accordingly, the statutes of

limitations on Plaintiffs' IIED and NIED claims cannot be tolled as against the Outside

Directors. *See, e.g.*, *Tomas*, 385 F. Supp. 2d at 247; *D'Onofrio*, 60 Misc. 3d at 917.

The doctrine of duress similarly cannot save Plaintiffs' RICO claims. In a civil RICO

case, "an equitable tolling defense based on duress is available only when specific threats by the

defendant are used to prevent the plaintiff from commencing a lawsuit at an earlier time."

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 347 (2d Cir. 1994).

In other words, it is not enough that duress is an element of the cause of action. Indeed, "duress

inherent in [the] violation does not toll the statute of limitations" for RICO claims. *Id.* As

explained above, the FAC does not identify a single threat or even statement made by the

Outside Directors that prevented Plaintiffs from timely commencing a lawsuit, much less one

that continually did so over the years since their alleged injuries. Accordingly, duress does not

save Plaintiffs' untimely RICO claims against the Outside Directors. *Id.* at 347.

### 3. The Continuing Violations Doctrine Does Not Save Plaintiffs' Claims

Finally, the continuing violations doctrine is inapplicable to Plaintiffs' time-barred

claims. The doctrine, which arises often in the employment discrimination context, "'is heavily

disfavored in the Second Circuit and courts have been loath to apply it absent a showing of

compelling circumstances.'" *Corrado v. New York Unified Court Sys.*, 163 F. Supp. 3d 1, 20

(E.D.N.Y. 2016), *aff'd*, 698 F. App'x 36 (2d Cir. 2017) (citation omitted) (collecting cases). It

provides that when "'a plaintiff has experienced a continuous practice and policy of

discrimination . . . the commencement of the statute of limitations period may be delayed until

the last discriminatory act in furtherance of it.'" *Id.* (citations omitted). The doctrine does not

apply to discrete acts or "'merely because the claimant continues to feel the effects of a time-

barred discriminatory act.'" *Id.* (citations omitted).

Thus, as a threshold matter, this is not even the type of case in which the continuing violation doctrine can apply, because Plaintiffs' claims do not "by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment," as in a hostile workplace case where harassment "must be repeated or ongoing before it is adequately severe or pervasive to constitute a violation." *Gonzalez*, 802 F.3d at 220. Instead of a series of wrongs that "collectively constitute one unlawful [] practice," each claim here alleges a "discrete, unlawful act," to which the continuing violation doctrine is inapplicable. *Id.* (alterations in original); *see also Pulte Homes of N.Y., LLC v. Town of Carmel*, No. 16 CV 8093, 2017 U.S. Dist. LEXIS 143290, at *9 (S.D.N.Y. Sept. 5, 2017) (the doctrine applies to "unlawful conduct [that] takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred"). The very notion of reviving stale claims based on a theory of "continuing" violations is incompatible with RICO's "separate accrual rule." *See Klehr*, 521 U.S. at 181.[17]

Here, Plaintiffs' claims against the Outside Directors all arise from alleged discrete torts committed, not by the Outside Directors themselves, but rather by Harvey Weinstein. The continuing violations doctrine therefore does not apply. *See Corrado*, 163 F. Supp. 3d at 21 (holding that decisions underlying negligent supervision claims to initiate and dismiss sexual harassment investigation were discrete acts). To the extent that Plaintiffs seek to argue that after their alleged assaults they were unable to work or suffered other injuries, such allegations "amount to nothing more than an attempt to apply the continuing violation doctrine 'because [Plaintiff] continue[d] to feel the effects of a time-barred discriminatory act.'" *Id.* Further, to the

---

[17] Under that rule, a plaintiff "cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 181. Thus, even if Plaintiffs had been able to "identify a wrongful act committed within the limitations period by each defendant"—as they were required to do—the continuing violation doctrine would still be inapplicable here, as a matter of law. *See Davis v. N.J. Dep't of Corr.*, 10-cv-6439, 2011 U.S. Dist. LEXIS 130909, at *17 (D.N.J. Nov. 10, 2011).

extent Plaintiffs premise their continuing violations theory on alleged threats by Harvey Weinstein and the so-called Intelligence, Law Firm and Journalist Participants, that is insufficient to toll the limitations period as against the Outside Directors, who are not alleged to—and did not—have any involvement in such actions.

For all these reasons, each of the claims against the Outside Directors except for the sex trafficking causes of action should be dismissed as untimely. Further, because Plaintiffs' claims are time barred, the related class claims should be dismissed. *See Grant v. New York Times Co.*, No. 16-CV-03175 (PKC), 2017 WL 4119279, at *9 (S.D.N.Y. Sept. 14, 2017) ("Of course, plaintiffs may not pursue class claims based on any individual claim that has been dismissed.").

## V.   PLAINTIFFS FAIL TO PLEAD A RICO VIOLATION (COUNT V)

Plaintiffs fail to allege a RICO claim. This is no surprise since Congress enacted RICO as an "assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26 (1983); *see also United States v. Turkette*, 452 U.S. 576, 589 (1981). The statute has a narrow purpose with strict legal requirements, and is not designed as a catch-all "instrument against all unlawful acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). For this reason, it is well settled that "[a] plaintiff's burden is high when pleading RICO allegations." *Targum*, 2013 U.S. Dist. LEXIS 164585, at *18-19. "[C]ourts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Katzman v. Victoria*'s *Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (internal quotations marks omitted).

To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must plead "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). In addition, a

plaintiff must allege injury to his or her "business or property by reason of a violation of section 1962." *Id.* (quoting 18 U.S.C. § 1964(c)). Each of these elements "must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 305-06 (2d Cir. 2001). Plaintiffs have failed to meet this high burden.

RICO defines an exclusive list of predicate acts of racketeering. *See* 18 U.S.C. § 1961(1). "[T]o establish a violation of § 1962(c), plaintiffs must allege that each defendant committed at least two predicate acts of racketeering activity" and that these predicate acts occurred within a 10-year period. *Jerome M. Sobel & Co. v. Fleck*, No. 03-CV-1041, 2003 U.S. Dist. LEXIS 21362, at *18-19, *25-26 (S.D.N.Y. Dec. 1, 2003) (citing *DeFalco*, 244 F.3d at 306) (emphasis added); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co*., 187 F.3d 229, 242 (2d Cir. 1999). "[T]o comply with Rule 8, a complaint should offer specification as to the particular activities by any particular defendant" allegedly constituting a RICO predicate act. *See Harris v. NYU Langone Med. Ctr*., No. 12-CV-454, 2013 U.S. Dist. LEXIS 99328, at *26 (S.D.N.Y. July 9, 2013); *see also United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) (the focus of § 1962(c) "is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise"). And where the RICO predicates sound in fraud (as do Plaintiffs' mail and wire fraud allegations) the higher pleading standard of Rule 9 must be met, requiring Plaintiffs to "'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Cohen*, 711 F.3d at 359.

### A. Plaintiffs Fail to Adequately Plead Any RICO Predicate, Much Less a Pattern

As an initial matter, the FAC does not allege any conduct by specific Outside Directors that supposedly amounts to a RICO predicate act. That is insufficient as a matter of law, and the RICO claim should be dismissed for that reason alone. *See Harris*, 2013 U.S. Dist. LEXIS 99328, at *26; *Merrill Lynch, Pierce, Fenner & Smith v. Young*, No. 91-CV-2923, 1994 U.S. Dist. LEXIS 2929, at *48-49 (S.D.N.Y. Mar. 15, 1994) (dismissing a complaint where plaintiffs failed to "specify which defendant is alleged to have committed a particular predicate act").

#### 1. Plaintiffs Fail to Plead Witness Tampering Against the Moving Defendants

Although the FAC mentions three RICO predicates—sex trafficking in violation of 18 U.S.C. § 1591, witness tampering in violation of 18 U.S.C. § 1512, and mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343—Plaintiffs assert only sex trafficking and mail and wire fraud as to the Outside Directors,[18] and fail to allege the required elements for either of those crimes as to any individual Outside Director. Group pleading of RICO predicate acts does not suffice. *See Jerome M. Sobel & Co.*, 2003 U.S. Dist. LEXIS 21362, at *18-19 (RICO predicates must be alleged as to "each defendant").

#### 2. Plaintiffs Fail to Plead Sex-Trafficking Against the Moving Defendants

As discussed below, the FAC fails to allege the necessary elements of a commercial sex trafficking violation as to the Outside Directors. *See infra* Section VII. In fact, Plaintiffs do not

---

[18] Witness tampering appears to be alleged only against Harvey Weinstein. FAC ¶¶ 725(f), 805, 807. Nowhere does the FAC allege that any of the Outside Directors engaged in witness tampering. *See id.* ¶¶ 806-07. In any event, the FAC does not allege that any of the Outside Directors knew of or communicated with any of the Plaintiffs, let alone used "physical force or the threat of physical force" against any of them. 18 U.S.C. § 1512(b)(2). Nor does the FAC allege, as is required for the crime of witness tampering, any "type of nexus" between a wrongful act and an official proceeding, or that any official proceeding was even "foreseen." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005); *see also Miller v. Carpinello*, No. 06-CV-12940, 2007 U.S. Dist. LEXIS 86395, at *22 (S.D.N.Y. Nov. 20, 2007).

allege a RICO predicate for sex trafficking against the Outside Directors—only against Harvey Weinstein. Their theory is that Harvey Weinstein violated 18 U.S.C. § 1591, and that the Outside Directors are civilly liable derivatively for that violation under 18 U.S.C. § 1595. *See* FAC ¶¶ 754-55, 759. But 18 U.S.C. § 1595 is not a RICO predicate act, and Plaintiffs therefore bring no valid sex-trafficking predicate against the moving Defendants. *See* 18 U.S.C. § 1961(1) (providing exclusive list of RICO predicate acts). In any event, as detailed *infra*, the FAC's empty conclusion that "each of the Defendants knew or acted with reckless indifference to the fact that Harvey Weinstein was engaged in sex trafficking," FAC ¶ 800, is insufficient to allege the predicate act of commercial sex trafficking because Plaintiffs utterly fail to allege that each Outside Director acted in this way, or to plead the required elements for civil sex-trafficking liability against any moving Defendant. *See DeFalco*, 244 F.3d at 306 (each predicate act must be established as to "each defendant").

### 3. Plaintiffs Fail to Plead Mail or Wire Fraud Against the Moving Defendants

To establish a claim for mail or wire fraud, a plaintiff must allege "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks omitted); *see also Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 600 (S.D.N.Y. 2015). To establish the first element, the FAC must allege "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted). Notably, a scheme to defraud requires actual misrepresentation of material facts by each Defendant. *See Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (complaint "must adequately specify the

statements it claims were false or misleading, give particulars as to the respect in which [P]laintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements"). Moreover, it is "not sufficient that [the] defendant realizes that [a] scheme is fraudulent and that it has the capacity to cause harm to its victims." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Rather, Plaintiffs must "demonstrate that [each] defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to" each Plaintiff's property rights. *Id.* Finally, Plaintiffs must plead each of these elements with particularity for each Defendant. Fed. R. Civ. P. 9(b); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.")

The FAC fails to establish that the Outside Directors engaged in mail or wire fraud because it fails to allege with any specificity that any Outside Director participated in—or even knew about—a scheme to defraud Plaintiffs. The FAC purports to identify various mails and wires "sent as a result of Defendants' illegal scheme." *See* FAC ¶ 808. But despite an eleven-page list of alleged mails and wires purportedly involved in that scheme, *id.* ¶¶ 808(a)-821(s), the FAC only mentions the Outside Directors once, alleging that they (and other Defendants) were involved in sending wires and mails "to pay for lawyers and settlements arising out of Weinstein's sexual misconduct." *Id.* ¶ 808(b).[19] Putting aside the absence of any allegations of fraudulent intent or material misrepresentations by the Outside Directors (fatal omissions in

---

[19] It should come as no surprise that Plaintiffs have abandoned their prior argument that the Outside Directors' alleged involvement with Harvey Weinstein's 2015 employment contract was sufficient to allege their participation in a fraudulent scheme for purposes of mail and wire fraud. Indeed, the Court recognized as much at oral argument on the prior motion to dismiss. Sept. 12, 2018 H'rg Tr. 35:18-20 ("I don't see a mail or wire fraud because of this kind of activity on the part of the directors.").

themselves), this conclusory allegation is insufficient on its face. *See Tymoshenko v. Firtash*, No. 11-CV-2794, 2015 U.S. Dist. LEXIS 125126, at *12 (S.D.N.Y. Sept. 18, 2015) ("Where there are multiple defendants, a plaintiff must specify how each contributed to the fraud, rather than simply allege general participation in an overall fraudulent scheme."). Plaintiffs' one allegation that the Outside Directors used mails and wires fails to identify, for example: (1) which Defendants sent which mails and/or wires; (2) the specific recipient of any such mail or wire(s); and (3) the date or approximate date of any such transmissions. *See* FAC ¶ 808(b).[20] Moreover, the FAC fails to allege that any of these unidentified mails and/or wires contained any false or misleading statements, or were in furtherance of any scheme to defraud of which the Directors were a part. Indeed, the FAC contains no allegations suggesting that any of the Directors made any material misrepresentation, or even failed to disclose information that they were under a duty to disclose.[21] For this reason, too, the FAC does not adequately allege a scheme to defraud by the Outside Directors. *See Lundy*, 711 F.3d at 119.

Even if Plaintiffs had identified any misrepresentations by the Outside Directors (and they have not), their sole allegation that the Outside Directors even used mails and/or wires is insufficient to establish a scheme to defraud because the FAC does not allege facts showing that any of the Outside Directors "contemplated . . . harm to the property rights of the victim."

---

[20]    In proffering these vague allegations, often directed generally to "Defendants" as a group, *see, e.g.*, FAC ¶¶ 808-11 and never once mentioning any of the Outside Directors, Plaintiffs ignored entirely the Court's instruction at the September 12, 2018 hearing on the Motions to Dismiss the original Complaint that Plaintiffs "would have to prove the mail and wire fraud for each defendant," September 18, 2018 H'rg Tr. 19:10-11 (emphasis added), to which Plaintiffs' counsel responded, "Correct." *Id.* at 19:12. Despite Plaintiffs' awareness and acceptance of this pleading requirement, they made no effort in the FAC to comply with the Court's directive insofar as the Outside Directors are concerned.

[21]    *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) ("[A]n omission can violate the fraud statute only in the context of a duty to disclose . . . ."); *Katzman*, 167 F.R.D. at 656 (dismissing RICO claim; "[a]bsent the existence of any such duty to disclose, a mail fraud claim premised on a material omission must fail").

*Guadagna*, 183 F.3d at 129; *see also Shellef*, 507 F.3d at 107. "A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *Pierce*, 224 F.3d at 165. The FAC alleges no such property right, and its conclusory allegation otherwise is insufficient. *See* FAC ¶ 809 (use of mail and wires was "for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein"). Instead, the only allegations regarding mail and wire fraud that are arguably relevant to the Outside Directors suggest that the purpose of the alleged scheme (in which the Outside Directors did not participate) was "to deceive the public." *Id.* ¶ 812. But there is no property right belonging to "the public" that was impacted by this supposed scheme to deceive, nor could there be. *See Guadagna*, 183 F.3d at 129 (scheme must contemplate harm to property rights "of the victim," *i.e.*, Plaintiffs).

### B. Plaintiffs Fail to Plead the Existence of a RICO Enterprise

The RICO claim should also be dismissed because Plaintiffs did not plead a RICO enterprise. To plead a RICO enterprise, Plaintiffs must allege facts showing that each of the Defendants was a member of an enterprise that "share[d] a common purpose" and "work[ed] together to achieve their goal." *Aerowest GmbH v. Freitag*, No. 15-CV-2894, 2016 U.S. Dist. LEXIS 84344, at *7 (E.D.N.Y. June 28, 2016) (internal quotation marks omitted); *see also Nat'l Grp. for Commc'ns Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 271 (S.D.N.Y. 2006) (complaint must allege members of enterprise "were actually working with one another or associated together in a single ongoing organization or continuing unit where members worked together to accomplish a common purpose"); *Beter v. Murdoch*, No. 17-CV-10247, 2018 U.S. Dist. LEXIS 107448, at *17 (S.D.N.Y. June 22, 2018) ("Allegations of the RICO defendants' common purpose that are little more than a naked assertion devoid of further factual enhancement are insufficient.") (alteration and internal quotation marks omitted). In addition,

Plaintiffs must allege facts demonstrating that the "enterprise" was a "functioning unit," by providing sufficient allegations that specify the "relationships among those associated with the enterprise." *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 570 (S.D.N.Y. 2018) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009) (requiring such allegations)).

The FAC does none of this. To the contrary, the FAC alleges nothing more than that a laundry list of diverse groups of individuals, corporations, and firms—including Harvey Weinstein, Miramax, TWC, individual TWC directors, individual TWC officers and employees, Kroll, Black Cube, private investigators Palladino & Sutherland, David Boies, Boies Schiller & Flexner, various "casting directors and agencies, . . . directors, co-producers of Miramax and TWC, and other entertainment industry members and other unnamed co-conspirators"— comprise an association-in-fact for purposes of Plaintiffs' RICO claim. FAC ¶ 776. The FAC includes no allegations that these persons, groups, and companies even knew about each other, let alone worked together in furtherance of any shared goal. For this reason, Plaintiffs have failed to allege the existence of a RICO enterprise.

"Although a RICO enterprise need not have a formal hierarchy," a plaintiff must still provide the court with "solid information regarding the hierarchy, organization, and activities" of the alleged enterprise. *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 (E.D.N.Y. 2017) (quotation omitted). Here, other than allegations that certain entities attempted to prevent disclosure of accusations of Harvey Weinstein's misconduct, the FAC alleges no connection between, for example, TWC and Black Cube, or the Boies law firm and the Outside Directors. The FAC thus fails to allege any enterprise that "exist[s] and function[s] separately from the alleged illegal acts." *Hoatson v. N.Y. Archdiocese*, No. 05-CV-10467, 2007 U.S. Dist. LEXIS 9406, at *10 (S.D.N.Y. Feb. 8, 2007), *aff'd*, 280 F. App'x 88 (2d Cir. 2008). Accordingly, the

RICO claim must be dismissed. *See id.*(dismissing complaint where "wholly conclusory allegations . . . do[] not allege any facts that the defendants functioned 'as a continuing unit,' or were 'an entity separate and apart' from their alleged illegal activities . . . . The 'enterprise' . . . must exist and function separately from the alleged illegal acts, and Plaintiff has failed to assert that."); *Miller*, 2007 U.S. Dist. LEXIS 86395, at *23 (complaint failed to allege RICO enterprise where "Plaintiff . . . simply alleges that a group of union members committed some illegal acts").

### C. Plaintiffs Fail to Plead Participation in the Operation of a RICO Enterprise

Separate from the FAC's failure to plead a RICO enterprise, the claims against the Outside Directors also fail because the FAC does not allege that any of those individuals participated in the operation or management of an enterprise. "[O]ne is liable under RICO only if he participated in the operation or management of the enterprise itself." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) (internal quotation marks omitted). Simply "establishing the presence of an enterprise is not enough. Plaintiffs must also allege that [D]efendants 'conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 175-76 (2d Cir. 2004) (quoting 18 U.S.C. § 1962(c)); *see also Reves v. Ernst & Young*, 507 U.S. 170, 536-37 (1993).

But just as the Outside Directors did not engage in any of the underlying predicate acts (which is fatal to any RICO claim against them), the FAC fails to articulate any theory of how the Outside Directors allegedly participated in the operation or management of the purported enterprise (because they did not). Tellingly, the FAC's own allegations highlight this deficiency: although it conclusorily alleges that the "Weinstein Participants[22] . . . assigned each member of

[22] The FAC does not say who belongs to this group.

the enterprise a task or tasks to fulfill the common purpose of profitability from Weinstein," FAC ¶ 780, the paragraphs that follow make no mention of any Outside Director, see *id.* ¶¶ 781-89. And the Outside Directors' participation in the legitimate business affairs of the TWC Board does not constitute participation in any alleged RICO enterprise's criminal affairs. *See In re GM LLC Ignition Switch Litig.*, No. 14-MD-2543, 2016 U.S. Dist. LEXIS 92499, at *135-37 (S.D.N.Y. July 15, 2016) (collecting cases); *Kaczmarek v. Int'l Bus. Machs. Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) ("To the extent plaintiffs allege that the enterprise also included third party manufacturers, dealers, and resellers, plaintiffs have failed to distinguish this association of entities from the typical and ordinary participants who act separately for the purpose of distributing any product."). The RICO claims against the Outside Directors must fail for these reasons too. *See Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 135-36 (E.D.N.Y. 2010) (plaintiffs failed to allege participation in an enterprise where they "fail[ed] to articulate how these various entities and individuals exerted control over the enterprise's affairs").[23]

### D. Plaintiffs Have No RICO Standing

Putting aside the fact that the FAC fails to plead the elements of a RICO claim, Plaintiffs lack standing to bring such a claim. "In order to bring a suit under RICO, each plaintiff must allege injury to his or her business or property caused 'by reason of the substantive RICO

---

[23]      Although the foregoing is dispositive of the issue, it bears mention that, in respect of the allegation in the FAC that complaints of alleged abuse had been made to the TWC Board, *e.g.*, FAC ¶¶ 495, 510, 528, 544, 559, 580, 593, 609, the Court confirmed at the September 12th hearing that Plaintiffs cannot assert a viable RICO enterprise claim against Outside Directors who were not members the Board at the time of the alleged complaints. *See* September 12, 2018 H'rg Tr. 42: 4-7 ("You have to have an allegation by these identifiable plaintiffs. . . . I don't think you can have a cause of action against people who weren't on the board at the time.")   A number of the Outside Directors—*i.e.*, Dolan, Jones, Lasry, and Sarnoff—did not join the TWC Board until 2013 or later, years after the TWC Plaintiffs allege they were assaulted, which was in 2002 (Doe), 2008 (Geiss, Thomas, and Doe), and 2011 (Thompson), providing an additional independent basis for the dismissal of the RICO claims against those defendants.

violation.'" *Astorino*, 137 F. Supp. 3d at 612 (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 91 (2d Cir. 2015)); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("[T]he plaintiff only has standing if . . . he has been injured in his business or property by the conduct constituting the violation.").  In determining whether a plaintiff has suffered a RICO injury, the court must engage in a two-step analysis:  (1) identify "the property interest that is protected by RICO, as alleged by plaintiffs," and (2) determine "whether the injury to that interest was caused by the RICO violation."  *Sykes*, 780 F.3d at 91.

### 1. Plaintiffs Fail to Plead a Cognizable Injury to Business or Property

Plaintiffs' alleged harms are not RICO injuries; in fact, they are precisely the type of physical, emotional, and personal injuries that courts routinely reject in the RICO context.  "RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries."  *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225 (S.D.N.Y. 2003).[24]  RICO likewise does not provide redress for the "economic consequences of personal injuries."  *Navin v. Wells Fargo Bank, N.A.*, 199 F. Supp. 3d 646, 657 (D. Conn. 2016); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 329-30 (E.D.N.Y. 2012) (collecting cases).  Simply put, RICO is not a valid vehicle for a claim seeking compensation for the physical and emotional harms Plaintiffs allege.  *See* FAC ¶ 101 (Ms. Klatt's "professional and personal interactions are . . .  limited by her fears generated by Weinstein's assault"); *id.* ¶¶ 113-15, 124 (Ms. Kendall "experienced both emotional distress and physical pain"); *id.* ¶¶ 143, 146-50 (Ms. Dulany experienced "severe anxiety and depression"); *id.* ¶¶ 163-64 (Ms. Brock

---

[24]     *See* also *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2108 (2016) (Congress "cabin[ed] RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries"); *Tsipouras v. W&M Props., Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) ("[I]njury to character, business reputation, and/or intentional infliction of emotional distress are not actionable under civil RICO."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("The phrase 'business or property' . . . exclude[s] personal injuries suffered.").

"suffered from depression, a lack of self-confidence and a loss of reputation"); *id.* ¶¶ 176 (Ms. Sagemiller was frightened); *id.* ¶¶ 199, 201-02 (Ms. Gomes has suffered trauma); *id.* ¶¶ 227, 235-39, 242 (Doe suffered "guilt, shame and anxiety" and "depression and anorexia," and she was not cast in a fashion show after seeing Harvey Weinstein's wife at the casting and feeling "anguish and guilt"); *id.* ¶ 250 (Ms. Geiss "experienced fear, helplessness, anger and depression"), 261-62, 264 (Ms. Thomas "felt upset, shaken, afraid and disrespected"), 294, 297 (Ms. Thompson felt "nauseous and distressed").

Plaintiffs' claims also fail because their alleged RICO damages are speculative and unprovable. *See World Wrestling Entm't.*, 530 F. Supp. 2d at 520; *see also DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (a "cause of action does not accrue under RICO until the amount of damages becomes *clear and definite.*") (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)) (emphasis in original). Plaintiffs allege that they lost out on future acting roles or other potential future business opportunities. *See* FAC ¶¶ 101, 115, 144, 164, 177-78, 202, 236, 251, 263. The loss of roles or other opportunities in the entertainment industry, however, is a loss too speculative to be redressed under RICO. *See Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995) ("a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable"); *see also Tsipouras*, 9 F. Supp. 2d at 368. Indeed, courts in this Circuit have held that a "loss of career" is too "speculative and indefinite," and the "loss of Plaintiff's reputation and resulting inability to gain future employment are personal injuries [that] are not compensable under RICO." *Mackin v. Auberger*, 59 F. Supp. 3d 528, 558 (W.D.N.Y. 2014).

In fact, at the September 12, 2018 hearing, the Court—citing the Second Circuit decision in *Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)—admonished that RICO injury allegations predicated on "mere expectation" or alleged "injuries that are indefinite and unprovable" will not suffice. Sept. 12, 2018 H'rg Tr. 28:18-22. In making these observations, the Court noted that Plaintiffs "have to bring [themselves] under that rule. It is a pretty high standard. It is a pretty high bar." *Id.* 29:3-4. Plaintiffs' vague allegations of their alleged loss of certain job opportunities resulting from Harvey Weinstein's alleged interference—most of which fail even to identify any specific job opportunity allegedly lost by any of the Plaintiffs, *see*, *e.g.*, FAC ¶ 25 (alleging that Plaintiff "Brock was injured in her property or livelihood as a result of Weinstein's actions; Weinstein did not give her any work after telling her he was going to 'make her a star' and be her 'Rock of Gibraltar'")—are manifestly predicated on a "mere expectation" and are insufficient to adequately support Plaintiffs' allegations of the critical "RICO injury" element of their asserted RICO claim. *See Mackin*, 59 F. Supp. 3d at 558. Because Plaintiffs' claimed damages are too speculative, their RICO claims must be dismissed.

## 2. Plaintiffs Fail to Plead Causation of Any Injury

The FAC also fails to allege that Plaintiffs' purported injuries were caused by conduct of the Outside Directors that amounted to a RICO violation. RICO requires that each Plaintiff "allege injury to his or her business or property caused 'by reason of the substantive RICO violation.'" *Astorino*, 137 F. Supp. 3d at 612 (quoting *Sykes*, 780 F.3d at 91) (emphasis added); *see also S. Ill. Laborers' & Emp'rs Health & Welfare Fund v. Pfizer Inc.*, No. 08-CV-5175, 2009 U.S. Dist. LEXIS 91414, at *24 (S.D.N.Y. Sept. 30, 2009) (dismissing complaint where plaintiffs failed to plead that their injuries were caused by defendants' alleged RICO violations). Whatever injuries Plaintiffs may have suffered were not caused by a RICO violation committed

by one of the Outside Directors, and the FAC does not allege otherwise. According to the FAC, Plaintiffs' injuries stem from Harvey Weinstein's alleged assaults, and/or from his alleged interference with their being cast in roles, and/or from the activities of the Law Firm, Intelligence, Film and Journalist Participants, thereafter—not from any conduct of the Outside Directors. *See* FAC ¶¶ 830(a)-(j). Because the FAC does not plead that the Outside Directors engaged in any predicate acts or engaged in a RICO enterprise, or that any conduct of theirs caused injury to Plaintiffs, the FAC fails to plead the requisite causation for RICO standing.

More fundamentally, the kinds of injuries Plaintiffs allege here simply cannot fulfill the causation prong—which, as this Court noted at the hearing on the motions to dismiss the original complaint, sets a "high standard." *See* Sept. 12, 2018 H'rg Tr. at 28:16-29:4. Plaintiffs cannot meet that standard, which requires (1) that the alleged RICO injury was "proximately caused by a pattern of racketeering activity . . . or by individual RICO predicate acts" and (2) that the injury was directly and foreseeably caused by the alleged RICO violations. *Baisch v. Gallina*, 346 F.3d 366, 373-74 (2d Cir. 2003). Neither requirement can be met where a plaintiff seeks "speculative losses or where the amount of damages is unprovable." *World Wrestling Entm't.*, 530 F. Supp. at 520-21 (quoting *Trs. of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech. Inc.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995)), *aff'd* 328 F. App'x 695 (2d Cir. 2009); *see also Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) ("A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient.") (quoting *Holmes v. SIPC*, 503 U.S. 258, 271, 274 (1992)).

But those are exactly the kinds of speculative, contingent, unprovable injuries that Plaintiffs purport to claim here. Lacking any specific lost contract for film-industry employment, Plaintiffs ask this Court to reconstruct Hollywood careers that might have been—a

causal inquiry of impenetrable complexity.  To determine causation, it would be necessary to assess each plaintiff's career prospects (itself an impossible exercise turning on subjective evaluations of the aesthetics, vocal abilities, acting abilities, and marketability of each plaintiff) against a decade or more of Hollywood history, making arbitrary assumptions about which projects would have been available, which actresses would have been cast in them, how much those actresses would have negotiated and recouped for their work in those projects, and how their careers would have accelerated and developed as a result.  Nothing could be more speculative—which is why courts have recognized that "loss of career" is too indefinite an injury to satisfy RICO's standing requirements.  *See, e.g.*, *Mackin*, 59 F. Supp. 3d at 558; *see also Mack v. Parker Jewish Inst. For Health Care & Rehab.*, No. 14-1299, 2014 U.S. Dist. LEXIS 154577, at 13-14 (E.D.N.Y. Oct. 30, 2014) (allegations that the plaintiff "has not been able to find employment reflective of her level of education and experience" are insufficient under RICO).

Plainly, this is a case in which Plaintiffs' alleged business injuries could have been caused by "any number of reasons unconnected to the" RICO allegations.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).  A career in Hollywood is too ephemeral, its prospects for success too contingent and uncertain, to serve as a standalone "business or property" that can be lost "by reason of a violation" of RICO.  18 U.S.C. § 1964(c).  Plaintiffs do not have standing.

## VI.    PLAINTIFFS FAIL TO PLEAD A RICO CONSPIRACY (COUNT VI)

The FAC also fails to allege a conspiracy by the moving Defendants to violate RICO under 18 U.S.C. § 1962(d).  As an initial matter, the FAC does not plead a substantive RICO violation and, accordingly, its conspiracy claim must fail.  *See Satinwood*, 385 F.3d at 182 (RICO conspiracy claim properly dismissed where "Plaintiffs did not adequately allege a substantive violation of RICO"); *United Parcel Serv., Inc.*, No. 15-CV-1136, 2016 U.S. Dist. LEXIS 105038, at *13 ("[A]ny claim under § 1962(d) based on conspiracy to violate the other

subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.") (internal quotation marks omitted).

Plaintiffs' RICO conspiracy claim against the Outside Directors also is deficient because the FAC does not allege that any of them "agreed with at least one other entity to commit a substantive RICO offense." *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 487 (2d Cir. 2014). Where, as here, Plaintiffs cannot allege that a "meeting of the minds occurred among any or all of the defendants," the FAC's RICO "conspiracy allegation must . . . fail." *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). The FAC asserts claims against 25 named defendants, as well as 160 Doe defendants. Plaintiffs do not allege that the Outside Directors had any interactions with most of the other defendants at all, let alone that they had some "meeting of the minds" with any of them regarding Harvey Weinstein's alleged misconduct.

In fact, at the September 12th hearing, the Court confirmed that to allege a viable RICO conspiracy claim Plaintiffs would "need to prove that the person implicated [*i.e.*, a particular Defendant] knew about the conspiracy and consciously made it his own. You would have to at least plead in good faith that each defendant knew of this effort by Harvey Weinstein and others whom he enlisted to silence the women and that they participated in some fashion in doing that." Sept. 12, 2018 H'rg Tr. 19:15-20. The Court further confirmed that mere knowledge of the alleged conspiracy does not suffice; rather, noting that it was a "tall order," *id.* 21:11-12, the Court observed that "you have to make yourself part of the conspiracy. You have to adopt it. You have to make it your own project," *id.* 21:1-8. *See also Baisch*, 346 F.3d at 376-77 (RICO conspiracy requires "[intent] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.").

Plaintiffs have not alleged and cannot allege that the Outside Directors "adopted" a RICO conspiracy or that they made any statements or engaged in any conduct evincing an "agreement" with another supposed "conspirator." Rather, the FAC merely alleges, in "copy and paste" fashion as to each separate Outside Director, facts suggesting that, at most, the Outside Directors supposedly knew (or should have known) that Harvey Weinstein had engaged in certain sexual misconduct. Even if that were true (which it is not), such knowledge—unaccompanied by any allegation that each Outside Director made himself part of the conspiracy, adopted it and made it his own project, Sept. 12, 2018 H'rg Tr. 21:1-8—simply does not give rise to a RICO conspiracy. Accordingly, Plaintiffs' RICO conspiracy claim against the Outside Directors fails and must be dismissed.

## VII.   **PLAINTIFFS FAIL TO PLEAD A SEX TRAFFICKING CLAIM (COUNT II)**

In Count II, Plaintiffs Geiss, Thomas, and Thompson seek civil remedies from all of the TWC Defendants under the beneficiary liability provision of the Trafficking Victims Protection Reauthorization Act (the "TVPRA").[25] Under that provision, "a victim of a violation of" 18 U.S.C. §§ 1581-1597 may bring a claim against a person who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged" in a violation of federal human-trafficking laws. 18 U.S.C. § 1595(a).

Plaintiffs' claims here meet neither the elements nor the purposes of the TVPRA's beneficiary liability statute. As an initial matter, Plaintiffs Geiss and Thomas are flatly foreclosed from seeking relief under 18 U.S.C. § 1595, because their allegations predate the effective date of the relevant statutory provisions. And in any event, all Plaintiffs fail to plead

---

[25]   Plaintiffs name "TWC, the TWC Directors and the TWC Officers" as the Count II defendants. *See* FAC ¶¶ 755-758. The arguments in this section are made on behalf of the TWC Directors—not including Harvey Weinstein—and not on behalf of TWC or the TWC Officers (as defined in the FAC at p. 1).

the elements—the knowing receipt of benefits that derive from the defendant's participation in a

known sex-trafficking venture—that are necessary prerequisites to liability. Each of these

pleading defects is an independent ground for dismissal of Count II, and individually and

collectively, are incurable. Accordingly, the moving Defendants seek dismissal with prejudice.[26]

### A. Geiss and Thomas Have No Cognizable Theory Under the 2003 TVPRA

Plaintiffs Geiss and Thomas both base their claims on allegations of encounters with

Harvey Weinstein in 2008, *see* FAC ¶¶ 243-265, before the relevant provisions of the TVPRA

went into effect on December 23, 2008. Their claims are thus governed by the TVPRA as it

existed prior to the amendments, which forecloses Plaintiffs Geiss and Thomas's theory of

liability. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) ("Nothing in the language

of the TVPRA or its legislative history indicates that Congress intended retroactive

application").[27]

Here, timing matters because the 2008 TVPRA amendments expanded the substantive

scope of the statute's private cause of action. The 2003 version of 18 U.S.C. § 1595(a) was

critically different—and far more limited—than today's operative version. It provided in full:

---

[26]    Plaintiffs fail to plead a sex trafficking claim and accordingly, as explained *infra*,
Plaintiffs' RICO claim based on the alleged predicate act of sex trafficking also fails.

[27]    The "amendment creating [the TVPRA's] civil cause of action" was enacted in 2003.
*See Velez*, 693 F.3d at 324. The 2003 version of that civil remedy was not revised until
December 23, 2008, when Congress amended 18 U.S.C. § 1595(a). *See* William Wilberforce,
Trafficking Victims Protection Reauthorization Act of 2008, P.L. 110-457, 122 Stat. 5044, 5067
(Dec. 23, 2008). Plaintiff Geiss alleges that she met with Harvey Weinstein during the Sundance
Film Festival in 2008. *See* FAC ¶¶ 243-244. But the 2008 Sundance Film Festival occurred in
January (as it does every year). *See, e.g.*, *Merry Gentleman, LLC v. George & Leona Prods.,
Inc.*, 76 F. Supp. 3d 756, 759 (N.D. Ill. 2014); *see also Travis v. Park City Mun. Corp.*, 565 F.3d
1252, 1255 (10th Cir. 2009); *The Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp.
332, 336 (S.D.N.Y. 2009); *see also* 2008 Sundance Flyer, https://www.sundance.org/pdf/press-
releases/2008_SFF_PREMIERES_SPECTRUM_MIDNIGHT_NFOM.pdf. Plaintiff Thomas
alleges that she interviewed to serve as a nanny to Harvey Weinstein's children in 2008 after
"one month of . . . interviews" (which, of course, could not have occurred in the last week of
2008). *See* FAC ¶ 256.

> (a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against *the perpetrator* in an appropriate district court of the United States and may recover damages and reasonable attorneys fees [sic].

Trafficking Victims Protection Reauthorization Act of 2003 ("2003 TVPRA"), 108 P.L. 193, 117 Stat. 2875, 2878 (Dec. 19, 2003) (codified as amended at 18 U.S.C. § 1595(a)) (emphasis added). This statutory language makes clear that only "the perpetrator" of the trafficking offense can be civilly liable under the 2003 TVPRA.

Plaintiffs do not allege that the TWC Directors are the perpetrators of sex trafficking. Rather, they allege that Harvey Weinstein is the perpetrator. *See* FAC ¶¶ 754-755. Plaintiffs Geiss and Thomas therefore have no claim under the 2003 version of the TVPRA, as their theory of liability depends on the retroactive application of a statutory amendment that postdates their allegations. Courts have rejected claims under 18 U.S.C. § 1595 due to that exact flaw. *See Owino v. CoreCivic Inc.*, No. 17-CV-1112, 2018 WL 2193644, at *13 n.7 (S.D. Cal. May 14, 2018) ("Plaintiffs' TVPA cause of action . . . was not available until December 23, 2008."); *St. Louis v. Perlitz*, No. 3:13-CV-1132, 2016 WL 1408076, at *3 (D. Conn. Apr. 8, 2016) ("Because the amended version of § 1595 has the effect of increasing defendants' liability for past conduct, it cannot be applied retroactively in the absence of a clear statement from Congress, which the statute lacks."). Accordingly, the Court can and should dismiss the claims of Plaintiffs Geiss and Thomas for these reasons independently—and with prejudice.

**B.     All Plaintiffs Fail to Plead the Elements of a TVPRA Violation**

In addition, all Plaintiffs' claims under Count II should be dismissed because they fail to plead the elements of 18 U.S.C. § 1595(a) against the TWC Directors. These elements require that the defendant knowingly (1) participated in a sex-trafficking venture; (2) benefited from their participation in that venture; and "(3) knew or should have known [the venture] was

engaged in violation of the TVPRA." *Nuñag–Tanedo v. East Baton Rouge Parish Sch. Bd.*, No. SACV 10-1172, 2011 WL 13153647, at *3 (C.D. Cal. May 12, 2011); *see also Noble v. Weinstein*, No. 17 Civ. 9260, 2018 WL 3863452, at *13 (S.D.N.Y. Aug. 13, 2018). The FAC fails to plead even a single element.

### 1. Plaintiffs Fail to Plead the "Participation" Element

"[P]articipation in a venture" requires that "a defendant actually participate and commit some 'overt act' that furthers the sex trafficking aspect of the venture." *Afyare*, 632 F. App'x at 286. Without that limitation on its sweep, the statute "would create 'a vehicle to ensnare conduct that the statute never contemplated.'" *Id.* (quotations omitted). Following that approach in a recent case, Judge Sweet held that liability against Robert Weinstein "cannot be established by association alone," and therefore, a plaintiff "must allege specific conduct that furthered the sex trafficking venture." *Noble*, 2018 WL 3863452, at *13 (dismissing TVPRA participation claim against Robert Weinstein). Neither can liability be premised on the mere "receipt of a passive benefit" of an alleged sex trafficking venture. *See also Ratha v. Patthana Seafood Co., Ltd.*, No. 16-4271, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (citing *Bistline v. Jeffs*, No. 2:16-CV-788, 2017 WL 108039, at *10 (D. Utah Jan. 11, 2017)). The FAC fails this standard.

The FAC does not (and cannot) plead that the Outside Directors participated in a sex trafficking venture. First, Plaintiffs do not allege that the TWC Directors took part in acts of sex trafficking committed by Harvey Weinstein. Rather, their theory of liability rests on the TWC Directors' alleged failure to do enough to investigate and thwart such acts. Thus, they allege that the TWC Directors failed to "conduct an independent investigation or cause TWC or the Board to conduct an investigation" into reports of Harvey Weinstein's misconduct. *See* FAC ¶¶ 472, 493, 408, 524, 540, 552, 569, 586, 597, 612. Similarly, Plaintiffs fault the TWC Directors for failing to "sue[] for access" to Harvey Weinstein's personnel file after his personal attorney

refused to produce it. *See id.* ¶¶ 469, 486, 520, 536, 566, 681. In essence, the FAC alleges that the TWC Directors "acquiesce[d] and permit[ted] Harvey Weinstein to continue business as usual" rather than "oust" him from TWC. *See id.* ¶¶ 490, 491.

But a "defendant's 'mere negative acquiescence'" is not enough, and there is no liability for those who merely "turn a blind eye" to sex trafficking, even if they benefit from it. *Afyare*, 632 F. App'x at 286 (quotations omitted). It is therefore "irrelevant" whether the TWC Directors are professionally or socially associated with a sex trafficker. *Id.* at 286 (finding it irrelevant whether a defendant "frequented a restaurant with [traffickers] or carpooled with them"). What matters is whether the defendant "engaged in some aspect of the sex trafficking along with his" co-workers. *Id*; *see also Noble*, 2018 WL 3863452, at *13 ("In other words, some participation in the sex trafficking act itself must be shown.").

The FAC contains no such allegations against the moving Defendants.[28] In fact, although the FAC does allege that certain employees and officers "help[ed] procure . . . potential victims" for Harvey Weinstein, none of those allegations concerns the Outside Directors. *See, e.g.*, FAC ¶¶ 12(b), 12(e), 58, 153, 326, 348, 402 (alleging acts of procurement by Barbara Schneeweiss and Fabrizio Lombardo, without the TWC Directors' knowledge). And none of the Count II

---

[28] Indeed, this Court has already instructed Plaintiffs on this point. At the September 12, 2018 hearing on the motions to dismiss the original complaint, the Court noted that the TWC Directors did not act wrongfully in deciding not to terminate Harvey Weinstein. *See* Sept. 12, 2018 H'rg Tr. at 40:3-7 ("THE COURT: They . . . wrote the letter, and the letter resulted in a contract, and the contract had a clause about a fine and a sanction. But the directors decided that they did not want to terminate. I can't see how that is a wrongful act."). In response to that guidance from the Court, Plaintiffs' counsel proposed to amend the complaint with allegations that Harvey Weinstein sent personnel to "procure women for him" promising auditions, but "[k]nowing they weren't delivering those women for a part." *See id.* 40:3-22. Finding that the Plaintiffs would have a "good argument" against "[a]nybody who did that[,]" the Court instructed Plaintiffs "to name people" who engaged in that conduct, noting that they had "to be specific" about the procurers' identities. *See id.* 40:23-41:13. Plaintiffs then committed to amend the complaint to "connect[] each [director] to a particular act." *See id.* 42:4-10.

Plaintiffs in this case were "procured" by any defendant: Plaintiffs specifically pled that Geiss and Thompson "bumped into" Harvey Weinstein at restaurants through chance encounters, and that Thomas was placed into contact with Harvey Weinstein by her nanny agency. *See id.* ¶¶ 243, 267, 254. Thus, Plaintiffs have not pleaded (and cannot plead) the "participation" element of beneficiary liability—which mandates dismissal of their claim against the TWC Directors.

### 2. Plaintiffs Fail to Plead the "Benefits" Element

Plaintiffs also fail to plead the "benefits" element of TVPRA liability—namely, that the TWC Directors "knowingly benefit[ed] . . . from participation" in a sex-trafficking venture. *See* 18 U.S.C. § 1595(a). Under settled law, the "knowing" *mens rea* for this element requires not only that a defendant knowingly received benefits, but also that the defendant understood the connection between those benefits and the defendant's participation in a trafficking venture. *See, e.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element.").[29] The FAC's allegations do not meet that standard.

As a preliminary matter, the FAC does not identify any cognizable benefits arising from Harvey Weinstein's alleged sexual misconduct that flowed to the Outside Directors. While the FAC alleges the Outside Directors received "social benefits and power within the film industry," it concedes that the TWC Directors did not receive "paychecks, bonuses" or other financial incentives. *See* FAC ¶ 756; *see also id.* ¶¶ 525, 541, 542, 571, 588, 605, 613. This is fatal to Plaintiffs' claims, as liability "cannot be established by association alone." The TVPRA's purpose is to compensate victims for the value of their forced labor, not to transform mere social

---

[29]     *See* also *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001) ("Courts have applied a canon of statutory interpretation to read criminal statutes that are silent or ambiguous as to the required standard of mens rea, to demand knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent.").

relationships into sources of tort liability. *See Noble*, 2018 WL 3863452, at *13; *see also Afyare*, 632 F. App'x at 286 (liability must not "ensnare conduct that the statute never contemplated") (quotation omitted).

But even assuming that "the receipt of perks and social status," *id.* ¶ 757, can qualify as a "benefit" for purpose of the sex-trafficking statute—a proposition for which the TWC Directors have found no supporting case law—Plaintiffs' allegations remain wholly insufficient. Aside from passing references to "tables at the Oscars," "Emmy parties," and other unidentified "glamorous events," *id.* ¶ 7, the FAC does not identify any specific "social benefits" received by any TWC Director. The FAC makes no attempt to tie those "tables at the Oscars" to any alleged sexual misconduct. Nor can it. Those "social benefits" certainly did not derive from the acts of misconduct alleged against Harvey Weinstein. Nor does the FAC allege that the TWC Directors actually attended any of those "glamorous events," or that any TWC Director attended them because of Harvey Weinstein.[30] Plaintiffs' speculative allegations are therefore a conclusory (and deficient) exercise in group pleading. *See, e.g.*, *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal for conclusory group pleading); *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 Civ. 2837, 2012 WL 6082387, at *6-7 (S.D.N.Y. Dec. 3, 2012) (dismissal for failure to distinguishing defendants' conduct).

Plaintiffs also allege, in purely conclusory terms, that the TWC Directors "ensured that Harvey Weinstein continued to produce movies, ensuring that TWC continued to make money[.]"[31] FAC ¶ 756. But there is no logical connection between the sexual conduct alleged

---

[30]    Plaintiffs allege only that for three TWC Directors—Ziff, Sarnoff, and Dolan—Harvey Weinstein "would throw [their] way invites . . . to the Oscars and other Hollywood events." FAC ¶¶ 42, 43, 50.

[31]    Aside from conclusory allegations of "investments" in TWC by TWC Directors Ziff and Maerov, Plaintiffs do not even attempt to distinguish between the receipt of "benefits" by TWC

in the FAC—occurring solely for Harvey Weinstein's personal gratification, and not for the benefit nor in the interest of the TWC Directors—and TWC's ability to make money. The sole connection even attempted by the FAC is that once Harvey Weinstein left the company, it would "spiral[] into bankruptcy." *Id.* ¶ 758. That theory (equating "benefit" with "avoiding self-harm") stretches the statutory language too far, and at bottom, simply repackages Plaintiffs' argument that the TWC Directors should have terminated Harvey Weinstein, which this Court has already rejected. *See* Sept. 12, 2018 H'rg Tr. 40:3-7. The extremity of Plaintiffs' position here demonstrates why that argument was, and remains, incurably flawed.

Put simply, the FAC does not and cannot allege what is required under the TVPRA: a "causal relationship between the sex act" and the benefit purportedly received by the defendant. *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013); *see also Cabusao v. Lombardi*, No. 1:14CV74-HSO-RHW, 2015 U.S. Dist. LEXIS 185609, at *10 (S.D. Miss. Jan. 30, 2015) (plaintiff must allege facts showing how defendants "knowingly benefited from any alleged violation of the human trafficking laws") (emphasis added).

More fundamentally, Plaintiffs' theory fails to tie any alleged benefit to the Outside Directors' knowledge. Plaintiffs plead no facts suggesting that the TWC Directors affirmatively knew that any benefits they received were the fruits of any alleged participation in a trafficking venture. Indeed, there are no allegations that the TWC Directors even knew of the specific incidents that Plaintiffs Geiss, Thomas, and Thompson allege occurred in their private encounters with Harvey Weinstein. *See* FAC ¶¶ 252-253 (Geiss), 257, 262, 265 (Thomas), 282-284, 298 (Thompson). As in *Noble*, "[w]hat is missing here are factual allegations that link [the

---

as a company and the receipt of "benefits" by its directors as individuals. *See* FAC ¶¶ 491, 541.

TWC Directors'] actions to Harvey [Weinstein]'s . . . conduct toward" these particular Plaintiffs. *See* 2018 WL 3863452, at *33.

Accordingly, the FAC does not plead that the TWC Directors "knowingly benefit[ed] . . . from participation" in a sex-trafficking venture. *See* 18 U.S.C. § 1595(a). The FAC's failure to plead the "benefits" element mandates dismissal of Count II against the TWC Directors.

### 3. Plaintiffs Fail to Plead the Required Scienter Regarding the "Venture"

Finally, Plaintiffs fail to plead the required scienter for beneficiary liability—*i.e.*, that the TWC Directors participated in "a venture which [they] knew or should have known has engaged in an act in violation of" the sex-trafficking statutes. *See* 18 U.S.C. § 1595(a).

Plaintiffs fail to plead this element because the "venture" that gives rise to liability— defined expansively in the FAC as the "Weinstein Sexual Enterprise"—consists almost entirely of dealings between Harvey Weinstein and third parties of which the TWC Directors had neither actual nor constructive knowledge. Plaintiffs define the "Weinstein Sexual Enterprise" to include five principal constituents: (1) the "Defendants"; (2) the "Intelligence Participants"; (3) the "Law Firm Participants"; (4) the "Journalist Participants"; and (5) the "Film Participants." *See* FAC ¶¶ 756, 776, 779. Each of those "participants" includes various sub-parts: the "defendants" include all of their "employees and agents"; the "Intelligence Participants" include Black Cube, two Kroll entities, Palladino & Sutherland, and other unnamed investigators; the "Law Firm Participants" include David Boies, Boies Schiller Flexner LLP, Brafman & Associates, P.C., and "several big [but unnamed] law firms"; the "Journalist Participants" include "an unnamed freelance reporter" and various personnel from American Media, Inc. (publisher of the *National Enquirer*); and the "Film Participants" include the William Morris talent agency and Creative Arts Agency, among others. *Id.* ¶ 776. Thus, even excluding

defendants from this sprawling list, the "Weinstein Sexual Enterprise" is composed of more than a dozen distinct parts and sub-parts—by Plaintiffs' own definition.

In any event, the FAC fails to plead that the TWC Directors "knew or should have known" about this "venture." There is no allegation that the TWC Directors had any contact with or knowledge of any of the "Intelligence Participants," the "Journalist Participants," or the "Film Participants." As for the "Law Firm Participants," Plaintiffs' sole allegation is that the TWC Directors "knew that TWC paid Boies Schiller . . . and knew or should have known the purposes of those payments was to cover up Harvey's pattern of assault." *See* FAC ¶¶ 351(h); 476(g); 495(h); 510(i); 528(i); 544(i); 559(i); 580(i); 593(i); 609(i).[32] But the FAC offers no factual basis for the conclusion that the TWC Directors knew the acts in which David Boies— whom the FAC identifies as "Harvey's lawyer," *id.* ¶ 681—was engaged. In fact, the only allegation in the FAC that touches on the TWC Directors' contact with any of the "Law Firm Participants" is the refusal of David Boies to provide the TWC Directors with information about Harvey Weinstein. *See id.*

It defies reason that the refusal of a corporate executive's personal lawyer to divulge his client's personnel file is sufficient to establish a board's knowledge—or even constructive knowledge—of that executive's operation of a sex-trafficking enterprise. In sum, Plaintiffs offer no link between the TWC Directors and the alleged "Weinstein Sexual Enterprise."

Moreover, to adequately allege this element, the FAC would have to sufficiently allege knowledge on the part of the TWC Directors that the alleged venture used means of "force, fraud

---

[32] The FAC also alleges that Robert Weinstein "knew that TWC paid . . . Kroll . . . and should have known the purpose was to cover up Harvey's pattern of assault." FAC ¶ 351(h). But the FAC does not offer any factual allegations—at all—alleging Robert Weinstein's basis for knowing about or interacting with Kroll, and Plaintiffs' single conclusory allegation regarding his knowledge is therefore insufficient.

or coercion" to cause women to engage in "commercial sex acts."  The FAC contains no such

allegations.  The FAC's conclusory allegation that the TWC Directors knew or should have

known "that Harvey Weinstein was a serial sexual predator," *see generally* FAC ¶¶ 446-613, is

patently insufficient with respect to the TWC Directors.  Here, as in other cases that have

dismissed defectively pled sex trafficking claims under the TVPRA:

> The amended complaint, like the original complaint, does not allege that
> [the Directors] was present for any of the alleged assaults, was told about
> them before or after they occurred, or knew that any of the plaintiffs were
> afraid of [Harvey Weinstein]; nor does it allege anything similar, which
> might show knowledge or reckless disregard.

*Lawson v. Rubin*, No. 17-cv-6404 (BMC), 2018 WL 2012869, at *12 (E.D.N.Y. Apr 29, 2018);

*see also Noble*, 2018 WL 3863452, at *14.

The TVPRA does not impose liability for knowledge regarding an individual's pattern of

sexual harassment, predation, or other misconduct.  It creates liability for knowingly

participating in a sex-trafficking venture.  The FAC fails to allege such knowledge.

## VIII.   PLAINTIFFS FAIL TO PLEAD A NEGLIGENT SUPERVISION AND RETENTION CLAIM (COUNTS III-IV)

To state a claim for negligent supervision and retention, a plaintiff must plead the

standard elements of negligence and "(1) that the tortfeasor and the defendant were in an

employee-employer relationship; (2) that the employer knew or should have known of the

employee's propensity for the conduct which caused the injury prior to the injury's occurrence;

(3) that the tort was committed on the employer's premises or with the employer's chattels."

*Ehrens*, 385 F.3d at 235.  The FAC does not adequately plead any of these elements, much less

all of them.

## A. Plaintiffs Fail to Plead That Any Duty of Care Was Owed to Plaintiffs

As a threshold matter, all negligence-based claims must be premised on a breach of duty owed to a plaintiff that is the proximate cause of plaintiff's injuries. *Kovalchik v. City of New York*, No. 09-CV-4546 (RA), 2014 U.S. Dist. LEXIS 132178, at *25 (S.D.N.Y. Sept. 18, 2014). But the Outside Directors do not owe the Plaintiffs any duty. A corporation's Board of Directors owes a duty of care to the company and its owners, not to third parties. *See Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984); *Kunz v. New Netherlands Routes, Inc.*, 64 A.D.3d 956, 957 (N.Y. App. Div. 2009) (finding that no duty to "protect the public" from "offensive conduct," including sexual assault, has been recognized on the part of officers and directors of a corporation). Under Delaware law, the Outside Directors' duties of management are further limited to those expressly provided in the limited liability company agreement. *See* Del. C. § 18-402. And an officer or director's failure to perform a duty owed to a company does not make the director personally liable to third parties. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 585 (S.D.N.Y. 1989) (dismissing negligence claim against officers and directors for alleged failure to supervise company's employees who harmed third party).

## B. Plaintiffs Fail to Plead Proximate Causation of Any Injuries

Likewise, the FAC contains no well-pled allegations that the Outside Directors proximately caused Plaintiffs' alleged injuries. *See Saldana v. Port Chester*, No. 09-CV-6268, 2010 U.S. Dist. LEXIS 142099, at *14 (S.D.N.Y. July 21, 2010) (a negligent supervision claim must allege that "the employer's negligence [is] the proximate cause of the plaintiff's injuries"); *see also J.E. v. Beth Israel Hosp.*, 295 A.D.2d 281, 284 (N.Y. App. Div. 2002) (dismissing negligence claim where there was no evidence that plaintiff's injuries were caused by defendant-hospital rather than by the sexual misconduct of a third party).

As to Dolan, Jones, Lasry, and Sarnoff in particular, they could not have either owed the TWC Plaintiffs a duty of care or caused their injuries for the simple reason that none of them were members of the TWC Board until 2013 or later, after the TWC Plaintiffs allege they were assaulted, which was in 2002 (Doe), 2008 (Geiss, Thomas, and Doe), and 2011 (Thompson). For these reasons alone, the FAC plainly fails to satisfy the standard elements of negligence necessary to adequately allege a claim of negligent supervision and retention, and the claim must be dismissed (as to those defendants) on that basis alone.

## C.    Plaintiffs Fail to Plead the "Employee" Element Against Certain Defendants

The FAC does not even attempt to allege an employer-employee relationship between the Outside Director defendants and Harvey Weinstein.  In fact—and to the contrary—it specifically alleges that Harvey Weinstein was employed by TWC, not by members of TWC's board.  *See* FAC ¶ 769 (alleging that "at all times material from September 30, 2005, to October 2017, TWC employed Weinstein").  The flaw cannot be fixed:  it is well-settled that employees are employed by the company, not by members of the board.  *See Shostack v. Diller*, No. 15-CV-2255, 2015 U.S. Dist. LEXIS 123777, at *12-13 (S.D.N.Y. Sept. 16, 2015) (it is "well-established that . . . 'it is the corporation, not its owner or officer, who is the principal or employer'") (quoting *Meyer v. Holley*, 537 U.S. 280, 286 (2003)), report and recommendation adopted, 2016 U.S. Dist. LEXIS 30354 (S.D.N.Y. Mar. 8, 2016); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 490-91 (3d Cir. 2013) (holding that board members did not employ the company's tortfeasor-employee and dismissing negligent supervision claim against board members).  And here, the relationship between the Outside Directors and Harvey Weinstein's employment is even further attenuated because, unlike the board of directors of a corporation, the board of a limited liability company has only the authority delegated to them as permitted by law.  *See* Del. C. §§ 18-402, 18-407. Here, the FAC is devoid of any allegation regarding any such delegation of authority.

Ultimately an employer-employee relationship depends on the employer exercising control over the employee's conduct. *O'Brien v. Spitzer*, 7 N.Y.3d 239, 242 (2006) (holding that an employer-employee relationship requires that the employer exercise "substantial control" over the "results produced" and the "means used" to create the results); *Empire State Towing & Recovery Ass'n v. Comm'r of Labor*, 15 N.Y.3d 433, 437 (2010) (finding no employer-employee relationship because the defendant did not exercise control over the alleged employee). And none of the Outside Directors controlled Harvey Weinstein's actions in running TWC. This should come as no surprise. Courts have recognized that outside directors are rarely "involved in the everyday business" of the company. *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918, 2014 U.S. Dist. LEXIS 112190, at *27 (S.D.N.Y. Aug. 12, 2014); *see also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 242 (S.D.N.Y. 2018). Moreover, an individual's "general supervisory power" over an alleged employee is inadequate to create an employer-employee relationship. *Murphy v. Guilford Mills, Inc.*, No. 02-CV-10105, 2005 U.S. Dist. LEXIS 7160, at *14-16 (S.D.N.Y. Apr. 22, 2005). The FAC does not (and cannot) allege that the Outside Directors had sufficient control over Harvey Weinstein to establish that they employed him for purposes of a claim of negligent supervision and retention.

Without an alleged employer-employee relationship between the Outside Directors and Harvey Weinstein, Plaintiffs' negligent supervision and retention claims cannot survive. *See Ehrens*, 385 F.3d at 235; *see also Corley v. Jahr*, No. 11-CV-9044, 2014 U.S. Dist. LEXIS 25489, at *33 (S.D.N.Y. Feb. 10, 2014) ("A claim for negligent supervision under New York law is limited to cases where an employer-employee relationship exists."); *Naughright v. Robbins*, No. 10-CV-8451, 2014 U.S. Dist. LEXIS 148497, at *18-19 (S.D.N.Y. Oct. 16, 2014)

(dismissing claim for negligent supervision where the plaintiff did not plead that the tortfeasor was employed by defendant, and collecting similar cases).[33]

### D. Plaintiffs Fail to Plead the Required Scienter Regarding "Propensity"

In a superficial attempt to add "individualized" allegations about each defendant's knowledge of Harvey Weinstein's misconduct, the FAC now contains separate headings for each defendant. But this is mere window-dressing: the addition of separate headings does not make up for the continued absence of factually-supported claims. An employer may be liable for negligent supervision and retention only if he or she had knowledge of "specific prior acts or allegations" before the tort is committed. *Alsaud*, 12 F. Supp. 3d at 680; *see also Doe v. City of New York*, No. 09-CV-9895, 2013 U.S. Dist. LEXIS 30010, at *17-18 (S.D.N.Y. Mar. 4, 2013) (granting motion to dismiss where plaintiff did not plausibly allege that the defendant knew or should have known of its employee's propensity for rape). Moreover, the employer must be aware of the precise nature of the relevant conduct; "general, unrelated or lesser allegations of prior wrongdoing are insufficient." *Alsaud*, 12 F. Supp. 3d at 681. Even setting aside that the Outside Directors were not Harvey Weinstein's employers, the FAC, like the original complaint, fails to identify any "specific prior acts or allegations" of which the Outside Directors had knowledge, so the FAC's negligent supervision claim fails as against them.

---

[33] The few New York cases in which the court did not require an employer-employee relationship for a negligent supervision and retention claim are inapposite outliers. *Calder v. Planned Cmty. Living, Inc.*, No. 93-CV-8882, 1995 U.S. Dist. LEXIS 10773, at *28 (S.D.N.Y. Aug. 2, 1995) and *Dooley v. Metro. Jewish Health Sys.*, No. 02-CV-4640, 2003 U.S. Dist. LEXIS 16520, at *33-34 (E.D.N.Y. Jul. 30, 2003) did not address the employee-employer element of a negligent supervision claim. *Krystal G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515, 522-23 (N.Y. Sup. Ct. 2011) found that an employer-employee relationship was not required where one employee was charged with negligent supervision of another subordinate employee. Here, the FAC does not plead that Harvey Weinstein, the Chief Executive Officer and Co-Chairman of the TWC Board, was subordinate to the Outside Directors or that they were co-employees. In any event, none of *Calder*, *Dooley*, or *Krystal G.* have been followed by any other court on this issue.

To the extent the FAC makes any allegations at all about the Outside Directors' knowledge of Harvey Weinstein's misconduct, those allegations are conclusory and speculative. For example, it alleges that TWC's directors "knew of many complaints against Weinstein," FAC ¶ 12, "knew of Weinstein's pattern and practice of predatory sexual conduct toward women," *id.* ¶¶ 42, 43, 44, 48, 50, and knew Harvey Weinstein "posed a particular risk of sexually harassing and assaulting" women in the entertainment industry, *id.* ¶ 771. The FAC's impermissible reliance on conclusory allegations is best demonstrated by the fact that it repeats the same nine, virtually identical, allegations against each of the Outside Directors. Among others, these allegations include that they "witnessed Harvey Weinstein's physically and verbally-abusive behavior," "[were] aware that Weinstein was serially targeting women for sex," "knew of payments by TWC to settle claims," and "discussed with other TWC Board members…complaints about Harvey Weinstein's sexual misconduct[.]" *Id.* ¶¶ 528, 544, 559, 580, 593, 609. The fact that these general allegations are cut and pasted, without even an effort to identify how they apply to individual directors, is evidence of what they lack: they do not specify when any of the Outside Directors witnessed Harvey Weinstein's abusive behavior, when they allegedly acquired knowledge of Harvey Weinstein's conduct or alleged settlement payments by TWC, what they were told or when, and where alleged discussions of complaints took place and who participated. Again, these empty allegations are insufficient to state a negligent supervision claim. *See Cort v. Marshall*'s *Dep't Store*, No. 14-CV-7385, 2015 U.S. Dist. LEXIS 172611, at *13 (E.D.N.Y. Dec. 29, 2015) ("A conclusory allegation is not enough to state a claim for negligent hiring, retention, supervision, or training."); *Stamile v. Cnty. of Nassau*, No. 10-CV-2632, 2014 U.S. Dist. LEXIS 39320, at *26-28 (E.D.N.Y. Mar. 25, 2014)

(holding that plaintiff's conclusory allegations that defendant had actual or constructive knowledge of the tortfeasor's propensity for sexual abuse cannot withstand a motion to dismiss).

Even the allegations with more factual details—which are also repeated for multiple Defendants—are impermissibly conclusory because they assume the individual defendant's knowledge of an incident without any factual support. The FAC claims that certain publicly-available forms of media alluding to Harvey Weinstein's alleged conduct put the Outside Directors on notice of Harvey Weinstein's propensity for sexual misconduct.[34] But, there are no details in the FAC about whether (much less when) any individual director learned of these alleged statements or reports, how they became aware, and what they knew. The FAC cannot proceed without such details, and is particularly inappropriate to the extent that it simply assumes the Outside Directors—some of whom were not even on the board at the time—would have been aware of particular reports there is no evidence that they read.

In any case, the allegations described above are irrelevant to the FAC's negligent supervision claim because they concern events that took place after Plaintiffs were allegedly assaulted. According to the FAC, the Outside Directors allegedly learned of Harvey Weinstein's propensity for sexual misconduct from media references and allegations made after 2012, while the assaults themselves are alleged to have occurred in 2008 and 2011.[35] FAC ¶¶ 232, 247, 261,

---

[34]    Specifically, it points to references of Harvey Weinstein on the television show *30 Rock* in 2012 and 2013 and at the 2013 Academy Awards, a 2015 Gawker article, and a book published by Barry Avrich in 2016. FAC ¶¶ 530, 531, 539, 561, 562, 568, 585, 596, 611. The FAC also alleges that the Outside Directors knew or were aware through media reports that Ambra Battilana Gutierrez accused Harvey Weinstein of groping her in 2015. FAC ¶¶ 534, 564, 582, 594, 610. Finally, the FAC claims that Dolan, Jones, Sarnoff, and Ziff should have been aware of a 2015 memorandum by a then-TWC employee, which allegedly cited instances of Harvey Weinstein harassing women. FAC ¶¶ 532, 563, 584, 596.

[35]    The FAC alleges that Ziff was aware of a statement made by Courtney Love in 2005 advising actresses to not attend private parties in the Four Seasons with Harvey Weinstein and a book published in 2010 by Robert Weinstein's former girlfriend, Ivana Lowell, in which she

293.  Even assuming the allegations about the Outside Directors' knowledge are true—and the

FAC provides no support for this assumption—they are irrelevant because they do not show (or

even allege) that the Outside Directors had knowledge of a related act or allegation before the

underlying torts were committed.  *Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) (dismissing

a negligent supervision claim for failure to allege the defendant's knowledge of a prior act or

allegation of sexual misconduct).  The FAC does not and cannot allege facts purporting to show

the Outside Directors' knowledge of specific prior acts committed by Harvey Weinstein similar

to the assaults alleged by Plaintiffs.

Finally, any particular defendant's alleged awareness of Harvey Weinstein's sexual

misconduct is irrelevant to any other defendant's awareness of Harvey Weinstein's sexual

misconduct, as it is well-established that the knowledge of one defendant cannot be imputed to

another.  *See Khapesi v. City of New York*, No. 13-CV-4391, 2014 U.S. Dist. LEXIS 79623, at

\*22-29, 34-35 (S.D.N.Y. June 10, 2014) (dismissing negligent supervision claim arising out of

alleged sexual abuse of a prison inmate notwithstanding allegations that other employees knew

or suspected abuse); *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 U.S. Dist. LEXIS 82392, at

\*86-88 (S.D.N.Y. July 28, 2011) (allegations that certain defendants knew about prior

misconduct insufficient to sustain a negligent supervision claim against another defendant),

---

alleges that Harvey Weinstein "chased" her around his office desk and, while at her apartment
one night, asked her for a back massage.  FAC ¶ 530, 450–51.  The FAC contains no facts
supporting the bald assertion that Ziff knew of Love's statement or Lowell's book.  In addition,
while Love's statement allegedly was made before Plaintiffs were allegedly assaulted, it was
much too vague to make Harvey Weinstein's alleged sexual assaults foreseeable.  Similarly,
Harvey Weinstein's conduct as described in Lowell's book is inappropriate, but would not put a
defendant on notice that Harvey Weinstein would allegedly assault and rape Thompson in 2011.
*See Alsaud*, 12 F. Supp. 3d at 680-81 (finding that "general, unrelated or lesser allegations of
prior wrongdoing are insufficient" to put an employer on notice of a tortfeasor's propensity to
engage in the conduct causing plaintiff's injury); *Stamile*, 2014 U.S. Dist. LEXIS 39320, at \*24-
25 ("Many cases discussing this standard appear to require actual knowledge of the [underlying]
practices, rather than simple knowledge of inappropriate behavior.").

report and recommendation adopted, 2011 U.S. Dist. LEXIS 112329 (S.D.N.Y. Sept. 30, 2011); *Snickles v. Gabryszak*, 57 Misc. 3d 1206(A) (table), 2015 N.Y. Misc. LEXIS 5253, at *7 (N.Y. Sup. Ct. Oct. 28, 2015) (finding allegation that one defendant knew of sexual harasser's conduct because of plaintiff's complaint to another defendant was insufficient to plead knowledge).

For all of these reasons, the negligent supervision and retention claim must be dismissed against the Outside Directors because the FAC fails to assert any factually-supported claims that they individually knew or should have known of similar acts by Harvey Weinstein before Plaintiffs allegedly were assaulted.

### E. Plaintiffs Fail to Plead the "Premises" Element

The FAC's negligent supervision claim also fails because it does not allege that the underlying torts occurred on the Outside Directors' premises or with their property. Rather, the alleged assaults against Plaintiffs took place in Harvey Weinstein's hotel rooms in Utah and New York, FAC ¶¶ 244, 247, 284, his Connecticut home, FAC ¶¶ 256, 261, and TWC's office building, FAC ¶¶ 232, 268. The FAC does not—and cannot—allege that the Outside Directors owned, controlled, or paid for any of those locations, and the negligent supervision claim must accordingly be dismissed. *See Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487, 504 (S.D.N.Y. 2018) (dismissing negligent supervision claim where plaintiff did not allege "credible facts showing that [alleged employees] committed tortious conduct on, or using, [defendant's] property"); *Alsaud*, 12 F. Supp. at 676, 684 (dismissing negligent supervision claim where sexual misconduct occurred at a hotel, notwithstanding that the tortfeasor engaged in business at the hotel); *Ross v. Mitsui Fudosan*, 2 F. Supp. 2d 522, 533 (S.D.N.Y. 1998) (finding employer not liable for sexual misconduct that occurred off-premises at an apartment and a restaurant).[36]

---

[36]     As explained above, it is a required element of a negligent supervision claim that the underlying tort occurred on or with the defendant's property. *See Ehrens*, 385 F.3d at 235-36.

## IX. **PLAINTIFFS FAIL TO PLEAD RATIFICATION (COUNTS XVII-XVIII)**

To plead ratification, a plaintiff must allege (1) a principal-agent relationship; (2) the principal's full knowledge of the material facts concerning the allegedly binding transaction; and (3) acceptance by the principal of the benefits of the agent's acts. *See A. Terzi Prods.*, 2 F. Supp. 2d at 492 (collecting cases). It is well settled that "ratification requires not only knowledge of the material facts, but also an intention to ratify another's actions." *Murphy*, 2005 U.S. Dist. LEXIS 7160, at *22-26. Further, a plaintiff must specifically allege that "the underlying tortious conduct was done or professedly done on the principal's account." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 n.12 (2d Cir. 2012). Plaintiffs have not adequately alleged any of these elements.

Plaintiffs' claim for ratification against the Outside Directors fails as a matter of law and should be dismissed. First, Plaintiffs fail to adequately allege a principal-agent relationship between Harvey Weinstein and the Outside Directors. Plaintiffs' conclusory allegation that "there was an actual or assumed agency relationship between . . . Weinstein and TWC's Board of Directors," FAC ¶ 918, without more, falls short of the requisite pleading standard. *See, e.g.*, *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 763 (S.D.N.Y. 2004) (no ratification where complaint "failed to allege facts sufficient for the existence of an agency relationship"). Plaintiffs do not and cannot allege how Harvey Weinstein could have had an agency relationship with the Outside Directors, when the Outside Directors were not entrusted by the limited liability operating agreement with responsibility for managing TWC. Furthermore, the FAC does not

---

Nevertheless, one New York Supreme Court decision allowed a negligent supervision claim to go forward even though this element was not satisfied. *See Krystal, G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515 (Sup. Ct. Kings Cnty. 2011). No court has followed *Krystal G.* on that issue, and a Southern District of New York case, applying New York law, found that *Krystal G.* is "an outlier on this issue, and the vast weight of authority establishes a premises element to negligent supervision and retention claims." *Alsaud*, 12 F. Supp. 3d at 684.

contain a single allegation that Harvey Weinstein at any time held himself out as an agent of any of the Outside Directors or that Plaintiffs believed that he was acting as their agent or vice versa.

Second, Plaintiffs' ratification claims fail because the allegations in the FAC are insufficient to show that that the Outside Directors knew of (let alone had "full knowledge" of) Harvey Weinstein's alleged tortious conduct. "Agency law requires that, in order to ratify an agent's act, the principal must have 'full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Murphy*, 2005 U.S. Dist. LEXIS 7160, at *23 (finding no ratification where there was no evidence that defendants had knowledge of the material facts).

Here, Plaintiffs fail adequately to allege that the Outside Directors had "full knowledge" of Harvey Weinstein's alleged tortious acts prior to the release of the October 5, 2017 *New York Times* article. In the initial complaint, Plaintiffs made various conclusory assertions as to the knowledge of the Outside Directors. As explained *supra*, in the FAC, Plaintiffs largely rehash the same conclusory assertions and allege that the Outside Directors were aware of certain comments made in the media, purportedly had access to a 2015 internal TWC memorandum, and could have sued for access to Harvey Weinstein's personnel file—but chose not to. *See* FAC ¶¶ 528-41 (Ziff); *id.* ¶¶ 559-71 (Sarnoff); *id.* ¶¶ 580-86 (Dolan); *id.* ¶¶ 593-97 (Jones); 609-13 (Lasry). That Plaintiffs in the FAC have done nothing more than essentially break out the same conclusory allegations as to each Outside Director (and pile on even more conclusory and, in many circumstances, irrelevant allegations) does not render them sufficiently particularized to withstand a motion to dismiss.[37] Indeed, Plaintiffs still do not allege that any of the Outside

---

[37] This pleading failure is especially glaring in light of the Court's directive during the previous motion to dismiss conference that "you have to plead that each defendant . . . knew that Harvey Weinstein was attempting to blacklist the plaintiffs, each of the plaintiffs[.]" Sept. 12,

Directors had "full knowledge" (or any knowledge) of any alleged assaults on Plaintiffs, so it is unclear how the Outside Directors could have ratified such assaults. *See Murphy*, 2005 U.S. Dist. LEXIS 7160, at *23 ("[R]atification requires not only knowledge of the material facts, but also an intention to ratify another's actions."); *see also* Sept. 12, 2018 H'rg Tr. 42:4-5 ("You have to have an allegation by these identifiable plaintiffs."). Plaintiffs' assertions remain just the type of conclusory allegations that fail to state a ratification claim.

Third, Plaintiffs' ratification claim fails because Plaintiffs do not allege that any of Weinstein's alleged tortious conduct was done for any of the Outside Directors' benefit. It is well settled that to state a claim for ratification, a plaintiff must specifically allege that "the underlying tortious conduct was done or professedly done on the principal's account." *Bigio*, 675 F.3d at 176 n.12. New York law is clear that "sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context[.]" *Alsaud*, 12 F. Supp. 3d at 677 (citation omitted). Here, Plaintiffs do not—and cannot—plausibly allege that Weinstein's sexual misconduct was done on the Outside Directors' behalf. Indeed, it is hard to imagine what the Outside Directors could have stood to gain from such alleged misconduct.

Finally, any actions purportedly taken by the Outside Directors in their role on TWC's board would have been taken in their capacity as board members, not in their individual capacity. Just as a board member is not personally responsible for a corporation's or limited liability company's contract simply because he or she approved the contract, the Outside Directors could not be held personally liable for ratification based upon acts that they took in their capacity as board members.

---

2018 H'rg Tr. 17:14-18.

## X.   PLAINTIFFS FAIL TO PLEAD VICARIOUS LIABILITY (COUNTS VII-XVI)

The FAC purports to state claims on the theory that various Defendants can be held vicariously liable for Harvey Weinstein's alleged battery, assault, false imprisonment, and intentional and negligent infliction of emotional distress.  FAC ¶¶ 848–53, 861–65, 873–77, 887–93, 903–09.  But under the doctrine of *respondeat superior*, an employer can be held liable for an employee's tortious conduct only where that conduct was "undertaken within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests." *Alsaud*, 12 F. Supp. 3d at 677.  The FAC does not pass this test.

First, the FAC's vicarious liability theory fails because it is well-established law that sexual misconduct does not fall within the scope of employment, even when committed within the employment context.  *Woods v. CVS*, No. 13-CV-611, 2013 U.S. Dist. LEXIS 58764, at *7 (S.D.N.Y. Apr. 19, 2013) ("New York courts have consistently held that 'sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, *even when committed within the employment context*.'") (emphasis in original) (quoting *Salvatore v. KLM Royal Dutch Airlines*, No. 98-CV-2450, 1999 U.S. Dist. LEXIS 15551, at *12 (S.D.N.Y. Sept. 30, 1999); *Alsaud*, 12 F. Supp. 3d at 677 ("No decision in New York has been cited to date in which the doctrine of *respondeat superior* was held to apply to sexual assault.").  Each of the torts for which the FAC seeks to hold the Defendants vicariously liable are centered on Harvey Weinstein's alleged sexual flashing, assault, or rape.  *See e.g.*, FAC ¶¶ 232, 247, 249, 261, 275, 293.  All are outside the scope of Harvey Weinstein's employment and cannot form the basis of a vicarious liability claim.

Indeed, it is inconceivable that Harvey Weinstein's sexual misconduct furthered any of the Outside Directors' interests.  In an unsuccessful effort to avoid this result, the FAC attempts to fit Harvey Weinstein's acts into the scope of TWC's business by alleging that Weinstein's

"grooming of women in the entertainment industry to work with TWC" was connected to his sexual misconduct.  FAC ¶¶ 851, 863, 875, 891, 907.  Even if that were true and even if Harvey Weinstein intended to further TWC's interests by meeting with or "grooming" the TWC Plaintiffs, absolutely no business purpose—and certainly no business purpose of the Outside Directors—would have induced Harvey Weinstein's sexual misconduct.  *See N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 250-52 (2002) (declining to find hospital vicariously liable as a matter of law for surgical resident's sexual assault of patient, despite plaintiff's argument that the assault was a purported medical examination within the resident's duties, because the assault "in no way advanced the business of the hospital").  Harvey Weinstein's alleged sexual assaults were committed for wholly personal motives and clearly departed from the tasks TWC authorized Harvey Weinstein to perform for its benefit.

Second, as explained above, the Outside Directors cannot be vicariously liable for Harvey Weinstein's sexual misconduct because they did not employ him.  *See supra*, Section VIII.C.  A defendant is not vicariously liable for tortious conduct unless he or she employed the tortfeasor.  *See Abdelhamid*, 515 F. Supp. 2d at 398 ("The key element of *respondeat superior* . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable."); *K.I. v. N.Y.C. Bd. of Educ.*, 683 N.Y.S.2d 228, 230 (N.Y. App. Div. 1998) ("*Respondeat superior* cannot exist without a present employer-employee relationship.").

The Outside Directors' positions as TWC board members do not cure this deficiency.  Officers and directors are not, merely by virtue of their office, vicariously liable for tortious conduct—they must have participated in, authorized, or directed it.  *See Shostack*, 2015 U.S. Dist. LEXIS 123777, at *13 (dismissing complaint against individual officers where there were no facts demonstrating that they participated in, or were aware of, the complained-of conduct).

Here, there are no allegations that the Outside Directors participated in or directed Harvey Weinstein's sexual misconduct. Rather, the FAC offers only a conclusory allegation that "all acts or omissions alleged . . . were ratified" by TWC and its directors and officers. FAC ¶ 919. Again, the allegation is insufficient. In particular, Dolan, Jones, Lasry, and Sarnoff could not have participated in or "ratified" Harvey Weinstein's tortious conduct for the simple reason that they were not directors at the time the alleged conduct occurred.

For all of these reasons, the tort claims against the Outside Directors premised on vicarious liability cannot be sustained.[38]

## XI.   ADDITIONAL ARGUMENTS OF DEFENDANT MIRAMAX FILM NY, LLC

Plaintiffs' FAC only confirms what has been clear from the inception of this litigation: Miramax cannot be held liable under any factual or legal theory. That is principally true because Miramax and Harvey Weinstein have had no connection for more than twelve years—which, by

---

[38]   The intentional and negligent infliction of emotional distress (IIED and NIED) claims must be dismissed as against the Outside Directors for the following additional reasons. The elements of an IIED claim are "rigorous, and difficult to satisfy" and require a plaintiff to allege that each defendant engaged in "extreme and outrageous conduct." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121–22 (1993). While the FAC's claims are incredibly serious, it fails to assert that the conduct of the Outside Directors—as opposed to Harvey Weinstein—was extreme and outrageous. Indeed, it alleges that "Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress." FAC ¶ 887. Thus, the IIED claim must be dismissed against the Outside Directors. *Kunz*, 64 A.D.3d at 958 (dismissing an IIED claim against a director-defendant whose "comments and actions" after the plaintiff revealed that she was sexually assaulted by a fellow director were not extreme and outrageous); *Gray v. Schenectady City Sch. Dist.*, 86 A.D.3d 771, 773 (N.Y. App. Div. 2011) ("mere inaction after receiving complaints about [the alleged harasser] . . . cannot be considered the type of extreme and outrageous conduct" necessary to sustain an IIED claim). In addition, IIED claims are routinely dismissed as duplicative of traditional tort claims like assault and battery, which the FAC also alleges here. *See e.g.*, *Brewton v. City of N.Y.*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) ("state courts and federal district courts applying New York law have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory"). As for the NIED claim, all negligence claims must be premised on the breach of a duty owed to the plaintiff. *See Sheila C. v. Povich*, 11 A.D.3d 120, 130 (N.Y. App. Div. 2004). As explained above, the Outside Directors did not owe any duty to the Plaintiffs. *See supra* Section VIII.A.

any measure, places all of Plaintiffs' claims well outside any applicable statute of limitations. But it is also true because none of Plaintiffs' claims is properly pleaded against Miramax. Plaintiffs' RICO claims are riddled with incurable defects, and must be dismissed for lack of standing, and failure to plead the essential "enterprise," "conduct," and "pattern" elements. Plaintiffs' state-law tort claims—which depend entirely on Miramax's employment of Harvey Weinstein more than a decade ago—do not allege sufficient facts to state a claim against Miramax, and are barred by well-established principles limiting *respondeat superior* liability.

The Court already advised Plaintiffs of these and other defects at the September 12, 2018 hearing on the prior motions to dismiss. Despite their promises, Plaintiffs have not cured these fatal defects. The Court instructed Plaintiffs to plead a RICO injury within the statute-of-limitations period. Plaintiffs have not done so. The Court instructed Plaintiffs to revise their RICO allegations to establish standing, and that Defendants (including Miramax) had committed qualifying RICO predicates—which the Court specifically found lacking in the original complaint. Again, Plaintiffs have not done so. Their allegations remain conclusory, speculative, and irremediably inconsistent with the legal requirements in the Second Circuit.

Plaintiffs could not fulfill their promises because the defects in their claims against Miramax are incurable. Plaintiffs' failure to cure these issues—previously briefed and argued— show that any further amendment would be futile. Miramax should be dismissed with prejudice.

**A.    The Statutes of Limitations Bar All Claims Against Miramax**

**1. Plaintiffs' Federal Claims Are Untimely by More than a Decade**

Plaintiffs' RICO claims are untimely. Those claims "are subject to a four-year statute of limitations," which "accrues upon the discovery of the injury alone." *Koch*, 699 F.3d at 148, 150. Miramax has had no agency relationship with Harvey Weinstein since 2005, *see* FAC ¶¶ 63, 912, and the only post-2005 allegations concerning Miramax at all are that "Miramax and

TWC co-produced Project Runway," co-produced and distributed eight films, and "entered into a production and distribution deal that gave TWC rights to co-produce sequels to Miramax titles," *id.* at ¶¶ 781-782. Manifestly, Plaintiffs have not and cannot plead any wrongful act or injury attributable to Miramax in the four-year period before this suit was filed.

Plaintiffs attempt to evade this straightforward conclusion by redefining their RICO injury as "lost employment and employment opportunities" that they "could not have discovered" until "at least October 2017," when allegations regarding Harvey Weinstein's "blacklist" were reported in the media. *See id.* ¶¶ 829, 661-663. Tellingly, the FAC pleads this theory as triggering the limitations period once Plaintiffs "discovered the racketeering," *id.* ¶ 61—but not once Plaintiffs discovered their injury.

That theory fails as a matter of law: "the injury alone" is the trigger. *Koch*, 699 F.3d at 150; *see also Rotella*, 528 U.S. at 555 ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."). As the Supreme Court explained in *Rotella*, once the plaintiff knows "that he has been hurt and who has inflicted the injury," the period of limitations for RICO claims begins to run. 528 U.S. at 556. *See generally supra* Section IV.A.

Plaintiffs' theory that their RICO claims were not triggered until 2017 is not only legally flawed, but also factually deficient. At the September 12, 2018 hearing on the motions to dismiss the original complaint, the Court instructed Plaintiffs as follows:

> THE COURT: You are saying that their cause of action was not necessarily the predatory act . . . It was the continued inability to get parts that continued up to and through the four-year period before the filing of the complaint?
>
> MS. FEGAN: That's exactly right, your Honor.
>
> THE COURT: That is something that needs to be shown.

Sept. 12, 2018 H'rg Tr. 12:8-15.

The FAC does not cure that defect identified by the Court, despite Plaintiffs' express promise to do so.  *See id.* 10:1-21. In the four-year period before this suit was filed (*i.e.*, from December 2013 to December 2017), the FAC alleges that Miramax worked on the production and distribution of two movies (*Sin City: A Dame to Kill For* and *Bad Santa 2*) and one television show (*Project Runway*).  *See* FAC ¶ 781.  But there is no allegation in the FAC—none—that any Plaintiff sought work in connection with that show or those two movies, or any Miramax project after Harvey Weinstein's departure from Miramax.  *Compare id.* ¶ 781 *with id.* ¶ 830(a)-(j).[39]  Thus, even if the FAC's allegations of "lost employment opportunities" due to a Hollywood blacklist were a valid RICO injury (they are not, *see supra* Section V.D.), the FAC itself makes clear that each of these Plaintiffs had notice of that alleged injury long before December 2013—making the four-year statute of limitations a conclusive bar.

Specifically, the FAC alleges that Plaintiffs Klatt, Kendall, Dulany, Brock, Sagemiller, Gomes, and Doe suffered RICO injury by not being cast as actresses.  *See* FAC ¶ 830(d)-(j).  Of those seven Plaintiffs, only two identify any specific Miramax projects in which they did not receive roles.  For Plaintiff Kendall, those films (*Things to Do in Denver When You're Dead* and *Beautiful Girls*) were released in theaters in 1995 and 1996.  *See id.* ¶ 830(g); Exh. A to FAC (ECF No. 140-1) at p. 7.  As for Plaintiff Sagemiller, the sole Miramax project she identifies—*40 Days and 40 Nights*—was released in theaters in 2002.  *See* FAC ¶ 830(h); Exh. A to FAC (ECF No. 140-1) at p. 13.  Plainly, both Plaintiffs knew of their alleged injury (*i.e.*, that they had not been cast in those films) well over a decade before filing suit in this case.

---

[39]  The FAC's only other mention of Miramax in the four-year period preceding the filing of this case is the allegation that "[i]n 2013, Miramax and TWC entered into a production and distribution deal that gave TWC rights to co-produce sequels to Miramax titles."  *See* FAC ¶ 782.  But the FAC does not allege that any such sequels were ever even made, much less that any Plaintiff in this case sought employment in connection with those nonexistent films.

The same is true for the other five Miramax Plaintiffs. Plaintiff Brock does not allege that she ever sought work in connection with any Miramax project—either before or after the alleged assault by Harvey Weinstein in France in 1998. *See* FAC ¶¶ 152, 164. Plaintiff Klatt alleges that she auditioned for only one Miramax role "[i]n 1993 or 1994," but she knew by the end of the audition that she "lost the part" because she rebuffed Harvey Weinstein. *See id.* ¶¶ 93, 101. Similarly, Plaintiff Gomes alleges that Harvey Weinstein asked her to audition for three roles in Canada in 2000, but that "shortly thereafter," she realized "that his interest in her talent had not been genuine, and that she would never be part of the Miramax talent pool." *See id.* ¶¶ 180, 185, 187, 199. Plaintiff Doe alleges that Harvey Weinstein failed to "help her secure a part in the ensemble cast of a movie," but admits that she knew of that failure either in 2008 (when Harvey Weinstein rejected her "one final attempt at becoming an actress" and instead steered her into modeling) or in 2011 (when she ceased contact with Harvey Weinstein). *See id.* ¶¶ 830(i), 229-230, 238. Finally, Plaintiff Dulany alleges that Harvey Weinstein assaulted her in France in 1996, but that "[f]our months after the assault[,]" she decided not to pursue roles in independent films (at Miramax or otherwise) because she did not want to be "in Weinstein's world" and "convinced herself that she would rather work in television." *See id.* ¶¶ 125, 145.[40]

Thus, on the face of the FAC, every Plaintiff in this case either never auditioned for a Miramax role or knew well over a decade ago (or much longer) that they had not been cast. Plaintiffs' RICO claims are therefore time-barred. Every alleged RICO injury was known to each of the Plaintiffs more than a decade before this case was filed. Moreover, they have

---

[40] Dulany alleges that "on information and belief, [she] was not cast" in some unidentified movies "because Harvey Weinstein interfered and told [producer Scott] Rosenberg not to cast [her]." FAC ¶ 144. Because Dulany admits that she left the movie industry within four months of the 1996 incident in France, she was aware of her alleged RICO injury—failure to be cast in the Scott Rosenberg films—no later than 1997. *See id.* ¶ 145.

pleaded no facts remotely suggesting they suffered a "continued inability to get parts that continued up to and through the four-year period before the filing of the complaint"—as this Court previously required them to do. *See* Sept. 12, 2018 H'rg Tr. 12:8-15.

### 2. Plaintiffs' State-Law Claims Are Untimely by More than a Decade

Plaintiffs' state-law claims against Miramax are likewise untimely. All of those claims are premised on theories of derivative liability. They rest entirely on Harvey Weinstein's status—long ago—as a Miramax employee. *See* FAC ¶¶ 844, 857, 869, 883, 899 (Counts VII, IX, XI, XIII, and XV alleging "[Harvey] Weinstein's conduct was committed within the scope of his employment at . . . Miramax"). But as the FAC repeatedly concedes, that employment ended more than twelve years before this case was filed. "The Weinstein brothers left Miramax on September 30, 2005," *id.* ¶ 63, and Plaintiffs filed suit in this Court on December 6, 2017.

The twelve-year gap between Harvey Weinstein's departure from Miramax and the filing of this case is simply unbridgeable. As Plaintiffs concede, the longest state-law statute of limitations applicable here is three years. *See* FAC ¶ 665 ("The statute of limitations for intentional torts is one year, and for negligent infliction of emotional distress, it is three years"); *see also* N.Y. C.P.L.R. §§ 214(5) and 215(3).[41] In other words, even if Harvey Weinstein had committed an intentional tort on his last day of work for Miramax (which the FAC does not allege), no state-law claim could have survived against his former employer beyond September 30, 2008 at the latest, which is more than nine years before Plaintiffs brought this case.

---

[41]     Miramax does not concede that New York law governs Plaintiffs' state-law claims. However, under New York's "borrowing statute," a claim "is untimely if it is barred under the law of either New York or the state where the injury occurred." *Wultz v. Bank of China, Ltd.*, 306 F.R.D. 112, 114 (S.D.N.Y. 2013). Because Plaintiffs' claims are patently untimely under New York law, no further choice-of-law analysis is necessary on the applicable statutes of limitations at this time.

Accordingly, there is no possibility that any Plaintiff could have a timely claim that depends on Miramax's long-past employment of Harvey Weinstein—and certainly the named Plaintiffs in this case fall far short of the mark. Only seven of the ten named Plaintiffs assert state-law claims against Miramax.[42] Of those seven, four do not even allege torts occurring in this century. *See* FAC ¶¶ 93, 102, 125, and 152 (Klatt, Kendall, Dulany, and Brock alleging intentional torts by Harvey Weinstein between "1993 or 1994" and 1998). The other three Plaintiffs allege that Harvey Weinstein assaulted them in 2000 and in 2002. *Id.* at ¶¶ 165, 180 (Sagemiller and Gomes); ¶¶ 203-220 (Doe).[43] Simply put, the accrual of the most recent state-law claim predates this suit by fifteen years: five times the longest statute of limitations.

Personal injury statutes of limitations are short for a reason: "[t]he effect of the perpetration of the torts involved in these actions is known promptly to the person injured." N.Y. C.P.L.R. § 215(3) (Advisory Committee Notes). While those persons sleep on their rights, the evidence "deteriorate[s] through passage of time." *Blanco v. AT&T Co.*, 90 N.Y.2d 757, 773 (1997); *Order of R. Telegraphers*, 321 U.S. at 349. Those concerns are at their apex here, when the claims of assault and other torts depend mainly on personal memories of percipient witnesses—memories that a company, by definition, cannot have.[44] The prejudice to Miramax in defending decades-old claims is incurable. The statutes of limitations must be enforced.

---

[42] Plaintiffs Geiss, Thomas, and Thompson bring no state-law claims against Miramax because their allegations date from 2008-2011, by which time Harvey Weinstein was no longer a Miramax employee.

[43] Plaintiff Doe alleges that Harvey Weinstein assaulted her in his Soho apartment in 2002. *See* FAC ¶¶ 207-12. Although the FAC alleges that Harvey Weinstein continued to contact Doe in subsequent years, it contains no comparable allegation of any tortious assault, battery, false imprisonment, or other intentional tort over that period. Nor does the FAC contain any allegation that Miramax knew about the encounters that Doe and the other Plaintiffs allege against Harvey Weinstein.

[44] As courts have noted, extending the one-year limitations period for assault and battery and false imprisonment claims makes it "impossible for [a defendant] to obtain evidence for use"

### 3. Plaintiffs Cannot Meet Their Burden to Establish Tolling Against Miramax

Recognizing their claims are barred by the statutes of limitations, Plaintiffs cite three tolling doctrines—equitable estoppel, duress, and continuing violations—in an effort to keep their decades-old claims in court.  *See* FAC ¶¶ 664-728.  Plaintiffs bear the burden to establish tolling, even at the pleading stage, *see supra* Section IV.C., but cannot meet that burden here.

As an initial matter, all of Plaintiffs' tolling theories have a common, critical flaw:  there is no allegation that Miramax engaged in any wrongful act after Harvey Weinstein's departure from Miramax in 2005.  That failure is fatal.  Each tolling doctrine required Plaintiffs to plead misconduct by Miramax in the four-year (or less) period before the filing of this suit.[45]

Plaintiffs do not plead any misconduct by Miramax—no misrepresentations, no use or threats of force, and no violation of any plaintiff's rights—in the twelve-year period from 2005-2017.[46]  In fact, Plaintiffs make only two post-2005 allegations of any kind regarding Miramax: that it co-produced films and television shows with TWC, and that it entered into a production and distribution deal giving TWC the rights to make "sequels to Miramax titles" (which Plaintiffs do not even allege were actually made).  *See* FAC ¶ 722.[47]

---

in its defense.  *Williams v. District of Columbia*, 676 F. Supp. 329, 332 (D.D.C. 1987).

[45]    Equitable tolling requires a showing that "the defendant's conduct caused [the plaintiff] to delay bringing his lawsuit," through a "definite misrepresentation of fact."  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014).  Duress tolling similarly requires "threats or force by the defendant," and that "*tortious conduct itself must continue*" for the entirety of the tolling period.  *Overall*, 52 F.3d at 404-05 (emphasis in original).  And the continuing violations doctrine requires that "at least one" alleged violation "falls within the" statute of limitations period.  *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y. 2011) (quoting *id.*).

[46]    The most recent allegation of any misconduct by Miramax is the FAC's wholly conclusory allegation of "mail and wire fraud" in 2004.  *See* FAC ¶ 725(a).

[47]    Plaintiffs allege that Miramax and TWC co-produced "scores of movies and television shows," but aside from that conclusory allegation, identifies only eight films and one television

None of those allegations amounts to wrongful conduct; and none has anything to do with the named Plaintiffs and the reasons they delayed bringing suit. As a result, all statutes of limitations continued to run (and were not tolled) during that twelve-year timeframe, barring all of Plaintiffs' claims. On this issue alone—which the Court instructed Plaintiffs to cure— Plaintiffs' tolling argument should be rejected and Miramax should be dismissed from this case. *See* Sept. 12, 2018 H'rg Tr. 18:23-19:3 ("THE COURT: I think you need, Ms. Fegan, to show that each defendant personally was aware of the continuing effort by Harvey Weinstein to intimidate [the Plaintiffs] . . . . If you can't do that, I think that defendant has to be dismissed.").

Plaintiffs' tolling theories also fail for additional and independent reasons. Equitable estoppel does not apply here, as explained in *supra* Section IV.C.1.

Nor can Plaintiffs establish that the doctrine of duress applies to Miramax here. The requirements for duress tolling are narrow and particular. For RICO claims, Plaintiffs must show that "specific threats by the defendant [were] used to prevent the plaintiff[s] from commencing a lawsuit at an earlier time." *Riverwoods*, 30 F.3d at 347. Plaintiffs cannot meet this standard— the FAC contains no allegation of any threat made specifically by Miramax (certainly not between 2005 and 2017). As for Plaintiffs' state-law claims, duress tolling is available "only if duress against the plaintiff is an element of the cause of action asserted." *Day*, 955 F.2d at 813; *Riverwoods*, 30 F.3d at 347.[48] None of Plaintiffs' claims against Miramax includes duress as an element. Accordingly, duress tolling does not save any of Plaintiffs' claims.

---

show. *Compare* FAC ¶ 722 *with* ¶¶ 781-782.

[48] This requirement "has been applied strictly; courts confronted by facts which might suggest to the layman that 'duress' is present have routinely refused to apply the doctrine." *Schmidt v. Bishop*, 779 F. Supp. 321, 331 (S.D.N.Y. 1991); *see also Baratta v. Kozlowski*, 464 N.Y.S.2d 803, 806-07 (N.Y. App. Div. 1983) (no duress tolling despite death threat); *Stadtman v. Cambere*, 422 N.Y.S.2d 102, 103 (N.Y. App. Div. 1979) (no duress tolling despite threats of physical violence and loss of employment).

Nor can Plaintiffs establish that the continuing violation doctrine—which "is disfavored in [the Second] Circuit and will be applied only upon a showing of compelling circumstances"— applies here. *Cabrera v. New York City*, 436 F. Supp. 2d 635, 642 (S.D.N.Y. 2006). As for Plaintiffs' federal-law claims, "[t]he continuing violation doctrine does not apply under RICO." *Hilow v. Rome City Sch. Dist.*, No. 6:14-cv-288, 2015 WL 893050, at *9 n.8 (N.D.N.Y. Mar. 2, 2015); *see generally supra* Section IV.C.3. As for Plaintiffs' state-law claims, courts have expressly held that intentional tort claims "accrue immediately upon the occurrence of the tortious act and thus," categorically, "are not appropriate for the continuing violation exception." *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 204 (E.D.N.Y. 1998).[49]

In sum, each of Plaintiffs' claims against Miramax is time-barred. No legal theories nor pleaded facts support tolling of the statute of limitations—certainly not for the vast period Plaintiffs require. The FAC's failure (for the second time and with clear Court direction) to plead facts sufficient to bring Miramax within the limitations period shows that Plaintiffs cannot cure the defects identified in Miramax's prior motion to dismiss. Accordingly, Plaintiffs' claims should be dismissed again—and this time—with prejudice. *See, e.g.*, *Coulter v. Morgan Stanley & Co., Inc.*, 753 F.3d 361, 368 (2d Cir. 2014).

### B. Plaintiffs Have No Federal Claims Against Miramax

Plaintiffs bring only two federal-law claims against Miramax—alleging a violation of RICO and a RICO conspiracy under 18 U.S.C. § 1962(c) and (d). *See, e.g.*, FAC ¶ 16. The first of these "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

---

[49]    *See id.* at 204 (holding the continuing violation doctrine does not apply to assault and battery claims); *Santan-Morris v. N.Y. Univ. Med. Ctr.*, No. 96 Civ. 0621, 1996 U.S. Dist. LEXIS 18237, at *12 (S.D.N.Y. Dec. 9, 1996) (same, for IIED claim); *Jaeger v. Cellco P'ship*, 936 F. Supp. 2d 87, 100 n.10 (D. Conn. 2013), *aff'd*, 542 F. App'x 78 (2d Cir. 2013) (same, for NIED claim).

activity." *Sedima*, 473 U.S. at 496; *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *id.*).

In addition to these four elements, Plaintiffs must also establish RICO "standing," which requires

(5) an injury to the plaintiff's "business or property" that (6) is caused "by the conduct

constituting the [RICO] violation." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir.

2006). Plaintiffs' RICO conspiracy claim requires all of these elements as well, plus an

additional showing "that each defendant knowingly agreed to participate in [a RICO]

conspiracy." *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 354 (S.D.N.Y. 1998).

Plaintiffs cannot allege—and in some respects do not even try to allege—these elements

against Miramax. Plaintiffs have no RICO standing. They fail to allege a RICO enterprise and

do not even try to allege that Miramax "conducted" the alleged enterprise's affairs. They

similarly fail to allege that Miramax committed any of the predicate acts that RICO requires.

Miramax's prior motion to dismiss raised all of these issues. The FAC has not cured (and plainly

cannot cure) these defects in its RICO claims, which should be dismissed.

### 1. Plaintiffs Still Have No RICO Standing

As an initial matter, Plaintiffs still cannot establish that they have RICO standing—a

requirement that ensures the right plaintiff is suing the right defendant for the relevant conduct.

*See Holmes*, 503 U.S. at 274 (standing inquiry excludes those who are "not proper plaintiffs").

Standing required Plaintiffs to "plead, at a minimum . . . 'injury to [their] business or property,'"

and "'causation of the injury by the defendant's violation.'" *Baisch*, 346 F.3d at 372 (quoting

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120-24 (2d Cir. 2003)).

It is black letter law that personal injury is insufficient to confer RICO standing; the

statute requires injury to the plaintiff's "business or property." *See* 18 U.S.C. § 1964(c);

*Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 458-59 (S.D.N.Y. 2004)

(collecting cases). The FAC does not pass that test. Its animating theory is that emotional

injuries caused by Harvey Weinstein negatively affected Plaintiffs' careers.[50]  That is not enough.  Allegations of "mental distress and physical injuries that negatively affected" a future career in the performing arts are insufficient to establish RICO injury.  *See Doe v. Schneider*, 667 F. Supp. 2d 524, 534 (E.D. Pa. 2009) (dismissing ballet performer's RICO claim arising from allegations of sexual abuse).  If the bar were that minimal, any personal injury could be artfully pleaded as a RICO injury.  That is not the law.  RICO does not "provide a federal cause of action and treble damages for personal injuries."  *Major League Baseball Props., Inc. v. Price*, 105 F. Supp. 2d 46, 49 (E.D.N.Y. 2000) (quotation omitted).

Nor can Plaintiffs establish the causation prong of standing, for the reasons set forth *supra* Section V.D.2.  Plaintiffs therefore lack standing for their federal claims against Miramax.

### 2. Plaintiffs Still Fail to Define Miramax's Role in Any RICO Enterprise

Allegations of a RICO enterprise must include, at a minimum, some description of the enterprise's structure and each defendant's position within that structure, and an account of the enterprise's fraudulent common purpose (which must be distinct from the underlying RICO predicates alleged).  *See, e.g.*, *BMO Harris Bank*, 258 F. Supp. 3d at 301; *Satinwood*, 385 F.3d at 174.  Plaintiffs must establish these requirements against "each *individual* defendant."  *DeFalco*, 244 F.3d at 306 (emphasis added).  Nonetheless, they wholly fail to plead them against Miramax.

"Although a RICO enterprise need not have a formal hierarchy," a plaintiff must still provide the court with "solid information regarding the hierarchy, organization, and activities" of the alleged enterprise.  *BMO Harris Bank*, 258 F. Supp. 3d at 301 (quotation omitted).  Absent allegations that detail the "relationships among those associated with the enterprise," no RICO claim can exist.  *Equinox*, 306 F. Supp. 3d at 570 (quoting *Boyle*, 556 U.S. at 946).  The FAC's

---

[50]    *See, e.g.*, FAC ¶ 101 ("[Klatt's] professional and personal interactions are thus limited by her fears generated by [Harvey] Weinstein's assault"); *see also id.* ¶¶ 115, 148, 164, 202.

sole allegation against Miramax is that "Miramax and TWC had a business relationship after the Weinstein brothers left Miramax in 2005." *See* FAC ¶¶ 781-782. That is not enough. The mere allegation of "close business relationships" is "insufficient to state a RICO claim." *BMO Harris Bank*, 258 F. Supp. 3d at 301; *see also Fenner v. GM, LLC*, 298 F. Supp. 3d 1037, 1080 (E.D. Mich. 2018) (noting "widespread consensus among courts that such routine business relationships are insufficient to impose RICO liability") (quotation omitted).

Plaintiffs also fail to plead—as they must—that Miramax shared in the alleged enterprise's illicit purpose. *See Equinox*, 306 F. Supp. 3d at 570. Plaintiffs define that "common purpose" by reference to two categories of acts: (1) "associating with Harvey Weinstein in order to profit from his success and that of the studios he was associated with," and (2) committing various predicate acts of sex trafficking and assault. *See* FAC ¶ 779. The first of those purposes—sharing in the profits of a Hollywood producer—is not a fraudulent purpose, and is therefore not cognizable under Second Circuit law. *See, e.g.*, *Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 366 (D. Conn. 2018) ("The Second Circuit requires that the members of an association must 'share a common purpose to engage in a particular fraudulent course of conduct[.]'") (quotations omitted). The second—the commission of underlying RICO predicates such as sex trafficking—is also not cognizable, because Plaintiffs must offer a purpose that is "separate and distinct from the alleged predicate racketeering acts themselves," which is "a requirement in this Circuit." *Satinwood*, 385 F.3d at 174.

Moreover, the "purpose" of the FAC's alleged enterprise is not even a common one. The acts alleged against Harvey Weinstein did not in any sense serve any "enterprise" involving Miramax—only his own personal gratification. When a defendant commits offenses for his

"own affairs or purposes, as opposed to the affairs or purposes of [the] common 'enterprise,'" there is no RICO claim. *Gross v. Waywell*, 628 F. Supp. 2d 475, 498 (S.D.N.Y. 2009).

Accordingly, the FAC fails to plead RICO's "enterprise" element—and on these grounds, Miramax must be dismissed.

### 3. Plaintiffs Still Fail to Plead the "Conduct" Element Against Miramax

RICO's "conduct" element is governed by "an extremely rigorous test" which requires allegations that Miramax was "allow[ed] . . . to direct the affairs of the enterprise" and did in fact do so. *U.S. Fire Ins. Co. v. United Limousine Serv.*, 303 F. Supp. 2d 432, 451-52 (S.D.N.Y. 2004) (quotation omitted). Passive involvement is not enough: "[t]here is a substantial difference" between "involvement" and "control." *Id.* (quotation omitted). Even the "taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise" are not enough. *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (quotation omitted).

The FAC does not meet these requirements. It alleges—at most—that "TWC and Miramax . . . each allowed [Harvey] Weinstein to conduct business at their offices and on television and movie sets under their control" and "agreed to conceal [his misconduct] so that they could continue to benefit from their lucrative collaborations with [Harvey] Weinstein." *See* FAC ¶ 783. These wholly conclusory allegations (yet another example of impermissible group pleading) still do not satisfy the "conduct" element.[51] There is a tremendous difference between directing the affairs of a criminal enterprise and allowing the alleged leader of that enterprise to "conduct [legitimate] business at [one's] offices." *Id.*; *see also Diaz*, 176 F.3d at 92. The same is true for Plaintiffs' (completely unsupported) allegation that Miramax and TWC "agreed to

---

[51] *See e.g.*, *Gross*, 628 F. Supp. 2d at 495 ("[L]umping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually, as required.").

conceal" Harvey Weinstein's misconduct. *See* FAC ¶ 783. Plaintiffs have not even pled that concealment was "necessary" or "helpful" to an enterprise (or that it even occurred). But even if they had, it would not be enough. *See Diaz*, 176 F.3d at 92.

The "conduct" element of a RICO claim requires active "participat[ion] in the operation or management of the enterprise itself," in furtherance of a criminal goal—a RICO claim cannot subsist on guilt by association. *Reves*, 507 U.S. at 183. But guilt by association is the core of Plaintiffs' theory. *See* FAC ¶ 781 (alleging that Miramax participated in a RICO enterprise by having "a business relationship" with the company Harvey Weinstein later formed). The law requires much more. *See Reves*, 507 U.S. at 183. The FAC falls far short of the *Reves* standard. It wholly fails to plead any conduct suggesting that Miramax managed the enterprise itself or that Miramax actively participated in the enterprise by taking any act in furtherance of a criminal goal.

That failure is incurable. As Plaintiffs concede, since 2005, the only connections of any kind between Miramax and any party in this case are legitimate business activities. *See* FAC ¶¶ 781-782 (alleging that Miramax co-produced and/or distributed one television show and a limited number of films with TWC). And in the pre-2005 period, Plaintiffs cannot establish RICO participation against Miramax *as a matter of law*: it is well-settled that a company cannot violate RICO by participating in an enterprise that consists solely of the company, its employees, and/or its agents. *E.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) ("[A] corporate person cannot violate the statute by corrupting itself."). Miramax must be dismissed.

### 4. Plaintiffs Still Fail to Plead Miramax's Commission of a RICO Predicate

Last, Plaintiffs fail to plead RICO's "pattern" element against Miramax, which requires "'at least two acts of racketeering activity' within a ten-year period." *Kim*, 884 F.3d at 103; *see also* 18 U.S.C. § 1961(1) (defining RICO predicates). Plaintiffs allege three predicate acts in

support of their RICO claims: (1) sex trafficking under 15 U.S.C. § 1591; (2) witness tampering under 18 U.S.C. § 1512; and (3) mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. *See* FAC ¶ 790. None of those predicate acts applies against Miramax.

Plaintiffs cannot plead a sex-trafficking predicate against Miramax. Sex-trafficking did not become a RICO predicate until December 19, 2003, through an act of Congress, and has no retroactive application. *See Velez*, 693 F.3d at 324-25; Trafficking Victims Protection Reauthorization Act of 2003 ("2003 TVPRA"), 108 P.L. 193, 117 Stat. 2875, 2879 (Dec. 19, 2003) (codified as amended at 18 U.S.C. § 1961(1)(B)). Plaintiffs whose allegations predate the 2003 TVPRA have no claim against Miramax. *Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620, 624-25 (6th Cir. 2001); *accord Attia v. Google LLC*, No. 17-cv-06037-BLF, 2018 WL 2971049, at *9-10 (N.D. Cal. June 13, 2018). The only Plaintiffs who allege any act of sex-trafficking after the 2003 TVPRA went into effect are Plaintiffs Geiss, Thomas, and Thompson. *See* FAC ¶ 793. Tellingly, those Plaintiffs do not bring a freestanding claim for violation of the sex-trafficking statute against Miramax (as opposed to a RICO predicate) because their allegations have nothing to do with Miramax. *See generally id.* ¶¶ 752-761. Accordingly, Plaintiffs cannot allege a sex-trafficking predicate against Miramax under 18 U.S.C. §§ 1591 and 1595.

Plaintiffs' witness-tampering predicate fares no better. This Court already ruled, at the September 12, 2018 hearing, that "witness tampering is out." Sept. 12, 2018 H'rg Tr. 33:24-25. The Court based that ruling on the plain terms of the relevant statute (and the cases applying it), which require any act of witness tampering to take place in connection with "an official proceeding." *See* 18 U.S.C. § 1512; *see also* FAC ¶ 806 (citing *id.*); *Miller*, 2007 U.S. Dist. LEXIS 86395, at *22 (dismissing RICO claim where plaintiff did "not allege that any official proceeding was pending at the time" of the alleged tampering). As the Supreme Court has made

clear, while an official proceeding need not necessarily "be pending" at the exact moment of a witness-tampering offense, some "type of nexus" between the wrongful act and an official proceeding is required: at a minimum, a proceeding must be "foreseen." *Arthur Andersen*, 544 U.S. at 707-08. The FAC does not remotely touch on that requirement, *see* FAC ¶¶ 805-807, and thus fails to cure the defect that the Court identified in the prior complaint.[52]

That leaves Plaintiffs' allegations of mail and wire fraud, and they too are deficient. *See* FAC ¶¶ 808-820. Plaintiffs must plead these fraud predicates "with particularity." *See supra* Section III. Plaintiffs do not meet that standard. Of the scant allegations against Miramax, almost none are "representations" of any kind—let alone knowingly false and fraudulent ones. *See, e.g.*, FAC ¶¶ 813(c) (alleging Miramax "pa[id] for the car . . . to take Kendall to a private screening"); 815(a) (alleging "Miramax and Weinstein . . . pa[id] for the hotel room where Harvey Weinstein assaulted Zoe Brock"). Making payments for hotel rooms, cars, or theater rentals is not fraud. Indeed, the only allegations in the FAC that could possibly constitute "representations"—because they are the only communications of any kind alleged against Miramax—are Plaintiffs' assertions that "Miramax and TWC employees used the mails and wires to contact Plaintiffs . . . to schedule meetings with Weinstein under the guise they were business meetings, when in fact, they were for the purpose of sex trafficking." *See* FAC ¶ 812(a); *see also id.* ¶¶ 813(a), 815(d). These allegations, however, utterly fail the pleading standard. They do not identify the "time, place, speaker, and content of the alleged misrepresentations," nor do they plead any facts suggesting that the speaker knew that the purpose of each meeting was not genuine. *Cohen*, 711 F.3d at 359. Plaintiffs "may not 'base

---

[52] Plaintiffs' witness-tampering claim also fails to plead any facts suggesting Miramax "use[d] physical force or the threat of physical force against any person," which is also required by the statute. *See* 18 U.S.C. § 1512(a)(2).

claims of fraud on speculation and conclusory allegations.'" *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010) (quoting *Lerner*, 459 F.3d at 290-291).

Apart from the pleading standard, Plaintiffs' fraud claims fail for an additional reason: they completely fail to allege the second element of the predicate, *i.e.*, a cognizable "object of the scheme." *See supra* Section V.A.3. The federal fraud statutes do not create criminal liability for deception, concealment, or general untruths; they reach only schemes "for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. §§ 1341, 1343 (emphasis added). The FAC contains no allegations to that effect.

Plaintiffs cannot prove a single RICO predicate against Miramax—and *a fortiori*, cannot plead a *pattern* of racketeering. For this reason as well, their RICO claims must be dismissed.

### 5. Plaintiffs Still Fail to Plead a RICO Conspiracy Claim

Plaintiffs' failure to state a RICO claim against Miramax means they have no claim against Miramax for a RICO conspiracy. *See, e.g.*, *Satinwood*, 385 F.3d at 182 (conspiracy claim fails when complaint does "not adequately allege a substantive violation of RICO").

In addition, a RICO conspiracy claim requires allegations that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise[.]" *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 540 (S.D.N.Y. 2001). And as the Court explained at the September 12, 2018 hearing on the motions to dismiss the original complaint, Plaintiffs must also allege "a continuity" of any conspiracy following Harvey Weinstein's departure from Miramax in 2005. *See* Sept. 12, 2018 H'rg Tr. 45:24-46:17. The FAC contains no allegation of any agreement by Miramax to commit any RICO predicates, and Plaintiffs' RICO conspiracy claim is nothing "more than a conclusory add-on at the end of [the] complaint." *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 230 (E.D.N.Y. 2014) (quotation omitted).

Accordingly, Plaintiffs' RICO conspiracy claim against Miramax must also be dismissed.

## C. Plaintiffs Have No State-Law Claim Against Miramax

Plaintiffs bring seven state-law claims against Miramax. Five of those claims allege torts committed by Harvey Weinstein—for civil battery, assault, false imprisonment, and intentional and negligent infliction of emotional distress—for which Plaintiffs seek to hold Miramax vicariously liable as Harvey Weinstein's former employer. *See* FAC ¶¶ 844, 857, 869, 883, 899 (Counts VII, IX, XI, XIII, and XV alleging "[Harvey] Weinstein's conduct was committed within the scope of his employment at . . . Miramax"). Counts III and XVII plead tort claims directly against Miramax, Disney, and others on theories of "negligent supervision and retention" of Harvey Weinstein as an employee, and "ratification" of "[a]ll" of his "acts or omissions." *See* FAC ¶¶ 765, 913.

Plaintiffs' claims for vicarious liability fails under black letter principles that set limits on *respondeat superior*, and Plaintiffs' direct claims against Miramax (Counts III and XVII) fail to plead the necessary elements of a cause of action. All claims therefore should be dismissed.[53]

### 1. Black Letter Law Defeats Plaintiffs' Vicarious Liability Claims.

Fundamental limits on the tort-law doctrine of *respondeat superior* defeat all of Plaintiffs' claims that rest on allegations of wrongful conduct by Harvey Weinstein allegedly "committed within the scope of his employment at . . . Miramax." *See* FAC ¶¶ 844, 857, 869, 883, 899 (Counts VII, IX, XI, XIII, and XV). It is axiomatic that an employee's act is not within the scope of his employment—and an employer such as Miramax is not liable for that act—

---

[53] Miramax does not concede that New York law applies to every claim, but Plaintiffs frame and argue their state-law claims under the law of New York, *see* FAC ¶¶ 664-665, and because those claims plainly cannot meet the standards required by that body of law, a more detailed choice-of-law analysis is unnecessary for purposes of this motion.

"when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (3d) of Agency § 7.07(2) (2006).

Plaintiffs' tort claims cannot overcome that legal barrier. The entire theory of their case is that Harvey Weinstein engaged in "predatory behavior . . . for his personal gratification"—not conduct that was intended to, or did, serve any purpose for Miramax. *See* FAC § IV.C. The doctrine of *respondeat superior* does not extend to that conduct, which is why courts routinely dismiss employers from lawsuits alleging tortious sexual assaults by their employees. *See, e.g.*, *Alsaud*, 12 F. Supp. 3d at 677 ("No decision in New York has been cited to date in which the doctrine of *respondeat superior* was held to apply to sexual assault.").[54] This Court should not stray from that that unbroken line of cases. It should dismiss Plaintiffs' vicarious liability claims against Miramax with prejudice.

## 2. Plaintiffs Fail to Plead Negligence or Ratification Against Miramax

Counts III and XVII plead claims for negligent supervision and retention and ratification. But the FAC does not plead the elements of negligent supervision and retention—and ratification is not a claim at all, but a legal theory for which Plaintiffs do not plead sufficient facts.

A claim for negligent supervision and retention requires Plaintiffs to plead that "the tort was committed on [Miramax's] premises or with its chattels." *Alsaud*, 12 F. Supp. 3d at 680; *Ehrens*, 385 F.3d at 236. The FAC does not meet this requirement. All but one of the Plaintiffs

---

[54]     *See also Ross*, 2 F. Supp. 2d at 531 ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."); *see also Kunz*, 64 A.D.3d at 958 ("[A]n act of sexual assault by an employee is a clear departure from the scope of employment, committed solely for personal reasons, and unrelated to the furtherance of the employer's business."); *Mary KK v. Jack LL*, 203 A.D.2d 840, 841 (N.Y. App. Div. 1994) (teacher's sexual assault of student on school property during school hours was "clearly outside the scope of teacher's employment as they were wholly personal in nature and certainly not done in the furtherance of the District's business").

allege that they were assaulted by Harvey Weinstein in his personal apartment or hotel room—

not on Miramax's premises. *See* FAC ¶¶ 136, 139, 154, 169, 183 (Plaintiffs Dulany, Brock,

Sagemiller, and Gomes alleging assault in Harvey Weinstein's hotel rooms in France and

Canada); *see also id.* ¶¶ 108, 206 (Plaintiffs Kendall and Doe alleging assault in Harvey

Weinstein's apartment). These Plaintiffs have no claim against Miramax. *Alsaud*, 12 F. Supp.

3d at 681, 684 (dismissal based on allegation of assault at tortfeasor's hotel); *Naughright*, 2014

U.S. Dist. LEXIS 148497, at *19 (allegation of assault at tortfeasor's home; claim dismissed).[55]

   Plaintiffs also do not plead that any tort was committed with Miramax's "chattels." The

term "chattels" refers to movable property, and "a physical object [] capable of manual delivery."

*Doe v. Fed. Express Corp.*, 571 F. Supp. 2d 330, 333 (D. Conn. 2008) (quoting CHATTEL,

Black's Law Dictionary (8th ed. 2004)), *aff'd* 345 Fed. App'x 670 (2d Cir. 2009). "Further,

decisional law indicates that an employer has a duty stemming from an employee's use of its

chattel only where that use is directly involved in the harm or injury to plaintiff"—thus, a

company vehicle that "only provided a means of travel to the place of injury" does not qualify,

nor does the use of a company's "goodwill, telephone[,]" or other resources, even when an

employee leverages those assets to commit acts of "sexual abuse." *Id.* Nor can an employer be

liable for its employee's use of its chattel unless it was "entrusted to him as [a] servant;" in other

words, "the use of the master's chattels . . . wholly for the servant's own purposes . . . do[es] not

---

[55]   As for Plaintiff Klatt, she alleges that "[i]n 1993 or 1994," Harvey Weinstein insisted on
seeing her breasts after an audition in Harvey Weinstein's private office, which Plaintiff does not
allege was committed on Miramax's premises, but in a separate part of "a building also occupied
by Miramax." *See* FAC ¶¶ 93, 95, 98. The FAC thus fails to allege that *Miramax* exercised
control over the premises in question. The FAC also fails to plead, as it must, "a single prior act
or allegation of sexual misconduct" before Klatt's 1993 allegations that put Miramax on notice
of a propensity toward the misconduct at issue. *Alsaud*, 12 F. Supp. 3d at 680 ("New York
courts have held in sexual misconduct cases that an employer is only liable for negligent
supervision or retention if it is aware of specific prior acts or allegations against the employee.").

subject the master to liability[.]"  Restatement of Torts (2d) § 317 cmt b (1965); *see also*

*D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987) (citing *id.*).

The FAC does not address any of these requirements.  Plaintiffs identify no chattel—no tangible, movable property—that was directly involved in any assault, and that was specifically entrusted to Harvey Weinstein in his role as a Miramax employee.  Accordingly, they have no claim for negligent supervision and retention against Miramax.  Count III must be dismissed.[56]

Plaintiffs' final claim, for ratification, fails at every level.  As an initial matter, ratification is not even a claim for relief; it is a theory of vicarious liability under which a principal can be bound to an agent's acts.  That theory requires Plaintiffs to establish at least three points that the FAC does not even plead.

First, Plaintiffs must show that the tortious acts alleged against Harvey Weinstein were performed for the benefit of Miramax and within the scope of Harvey Weinstein's agency for Miramax.  *See, e.g.*, *Precedo Capital Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 257-58 (S.D.N.Y. 2014) (dismissing complaint because "the intent to ratify an act 'must be clearly established and may not be inferred from doubtful or equivocal acts of language'") (quotation omitted); *Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 232 (N.Y. App. Div. 1982) ("The law is clear that only an act done on another's behalf may be ratified.").  Plaintiffs do not and cannot meet this requirement. They allege acts performed for Harvey Weinstein's "personal gratification," not for Miramax.  *See* FAC § IV.C.

---

[56]    In addition, Plaintiffs cannot make out a claim for negligence without demonstrating that "the defendant owed a legally recognized duty to the plaintiff."  *Gilson v. Metro. Opera*, 5 N.Y.3d 574, 576-77 (2005).  As explained *supra* Section VIII.A., there are no allegations in the FAC sufficient to give rise to any tort duty owed by any Defendant—and certainly not Miramax—to any of the Plaintiffs.

Second, "[r]atification requires acceptance by the principal of the benefits of an agent's acts," but Plaintiffs do not allege that Harvey Weinstein's acts of assault benefited Miramax at all. *Monarch Ins. Co. v. Ins. Corp. of Ireland, Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987). For this reason as well, Plaintiffs cannot establish ratification.

Finally, "[u]nder basic agency principles, ratification of another's actions requires 'full knowledge [of] . . . the specific acts in question.'" *A. Terzi Prods.*, 2 F. Supp. 2d at 492 (quoting *Martin v. Curran*, 303 N.Y. 276, 282 (1951)); *see also Holm*, 89 A.D.2d at 233 (requiring "full knowledge of the material facts relating to the transaction"). This is a "stringent" requirement for ratification; "plaintiffs need to allege" that "each and every one" of the Miramax decision makers with authority to ratify Harvey Weinstein's conduct had "full knowledge" of the relevant tortious acts. The FAC is utterly devoid of those allegations, and completely fails to show that the principals of Miramax had any knowledge—let alone "full knowledge"—of Plaintiffs' allegations of their incidents of assault by Harvey Weinstein. Accordingly, Plaintiffs' ratification theory fails, and Count XVII should be dismissed.

## XII. ADDITIONAL ARGUMENTS OF THE DISNEY DEFENDANTS

Defendants The Walt Disney Company ("TWDC"), Disney Enterprises, Inc. ("DEI") (together with TWDC, "Disney"), Buena Vista International, Inc. ("Buena Vista") and Michael Eisner (all together, the "Disney Defendants") respectfully set forth in this section arguments specific to them in support of their motion to dismiss Plaintiffs' FAC. The Disney Defendants incorporate by reference the general arguments made in other sections of the joint brief in support of their motion to dismiss.

The Disney Defendants played no role in the acts alleged in the FAC. Harvey Weinstein was never employed by a Disney Defendant. None of the alleged misconduct is alleged to have taken place on or with Disney property. No Disney Defendant is alleged to have been a member

of any RICO conspiracy or sex trafficking venture.  And there is no allegation that any Disney

Defendant took any action to prevent any Plaintiff from asserting her claims.  Thus, for reasons

unique to the Disney Defendants, the claims asserted against them are untimely and inadequately

pleaded.

## A.    All Claims Against the Disney Defendants Are Time-Barred

### 1. The Three-Year and One-Year Statutes of Limitations Applicable to Plaintiffs' Claims Have Run

Plaintiffs' claims against the Disney Defendants for negligent supervision and retention

(FAC Count III) and negligent infliction of emotional distress (FAC Count XV) are subject to

three-year statutes of limitations.  N.Y. C.P.L.R. § 214(5).  The three-year period begins to run

on the "date of the last alleged underlying act."  *Pichardo v. N.Y.C. Dep't of Educ.*, 953

N.Y.S.2d 31, 32 (N.Y. App. Div. 2012).  Plaintiffs' claims against the Disney Defendants for

intentional torts—FAC Counts VII (civil battery), IX (assault), XI (false imprisonment) and XIII

(intentional infliction of emotional distress)—are subject to one-year statutes of limitations.

N.Y. C.P.L.R. § 215(3); *Goldner v. Sullivan, Gough, Skipworth, Summers & Smith*, 482

N.Y.S.2d 606, 608 (N.Y. App. Div. 1984).  The statutes of limitations for intentional torts also

begin to run upon "the last actionable act."  *De Santis v. City of New York*, No. 10 CIV. 3508

JPO, 2014 WL 228659, at *4 (S.D.N.Y. Jan. 22, 2014).[57]

Here, the last act relevant to the Disney Defendants could not have occurred later than

September 2005, when Harvey Weinstein left Miramax, a subsidiary of TWDC from 1993 to

2010, to form The Weinstein Company—an entity with no corporate connection to the Disney

---

[57]    Plaintiffs also plead a separate count for "ratification" against the Disney Defendants for acts occurring prior to September 30, 2005 (FAC Count XVII).  Plaintiffs allege that the statute of limitations for ratification is one year for an underlying intentional tort and three years for an underlying negligence claim.  FAC ¶ 665.

Defendants.  FAC ¶¶ 34, 63.  At that point, any alleged connection between the Disney Defendants and Harvey Weinstein came to an end.  Thus, even for the latest possible conduct in any way relevant to the Disney Defendants, the applicable statutes of limitations expired either in 2006 (for the intentional tort claims) or 2008 (for the negligence claims), a decade or more before Plaintiffs brought this suit.

Plaintiffs conclusorily assert that the Disney Defendants "ratifi[ed]" Harvey Weinstein's conduct until 2017.  FAC ¶ 721.  But they fail to assert facts indicating anything of the sort, let alone that any ratification took place after September 2005.  *See Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) (ratification requires an "indication that the [principal] sanctioned [the agent's] wrongful conduct or [an] attempted . . . cover-up of his improper activities").  Rather, the facts that are alleged foreclose any argument that claims are timely.  For example, Plaintiffs allege that Mr. Eisner left TWDC in 2005.  FAC ¶ 37.  As such, he could not possibly have ratified any alleged conduct within the limitations period.  Likewise, Plaintiffs concede that Harvey Weinstein left Miramax in 2005, FAC ¶ 63, severing any purported connection between him and the Disney Defendants, and foreclosing any possibility that the Disney Defendants could have ratified his conduct.  Lastly, and tellingly, in the section of the FAC seeking relief from the Disney Defendants for ratification, Plaintiffs reference only "acts prior to September 30, 2005." FAC ¶¶ 910-15.  (To be clear, Plaintiffs do not allege sufficient facts prior to 2005 to establish any ratification by the Disney Defendants, either.)

### 2. Plaintiffs' Tolling Arguments Do Not Apply to the Disney Defendants

The FAC raises three purported bases for tolling:  the continuing violations doctrine, equitable estoppel and duress.  None can apply to the Disney Defendants.

### a. No Continuing Violation Is Alleged as to the Disney Defendants

Unlike all other defendants, Plaintiffs specifically exclude the Disney Defendants from both the alleged RICO conspiracy and any alleged sex trafficking venture. FAC ¶¶ 738-61, 774-839. As a result, allegations of a "pattern of racketeering" or continued "benefit[s] from sex trafficking acts" do not pertain to the Disney Defendants, and claims against the Disney Defendants cannot be tolled based on them. FAC ¶ 661. Likewise, Plaintiffs explicitly exclude the Disney Defendants from their continuing violations tolling allegations. FAC ¶¶ 718-728. Allegations about others cannot toll claims against the Disney Defendants. *See Gonzalez v. Wright*, 665 F. Supp. 2d 334, 350 (S.D.N.Y. 2009) ("[I]n order for the continuing violation doctrine to apply, plaintiff needed to show that *those specific individuals* committed at least one wrongful act within the statutory time period." (emphasis added)).

### b. The Disney Defendants Are Not Alleged to Have Taken Any Steps to Prevent Plaintiffs from Bringing Suit

In the absence of plausible allegations "that subsequent and specific actions by [the Disney Defendants] somehow kept [Plaintiffs] from timely bringing suit," equitable estoppel cannot apply. *Zumpano*, 6 N.Y.3d at 674 (citation omitted). Here, the Disney Defendants took no steps to prevent Plaintiffs from bringing suit, and Plaintiffs do not allege otherwise. Plaintiffs cannot invoke equitable estoppel as to the Disney Defendants based on actions by others because "equitable estoppel cannot be applied based on extrapolation from evidence pertaining to other defendants." *Orix Fin. Servs., Inc. v. Cline*, 369 F. App'x 174, 177 (2d Cir. 2010).

### c. Duress Does Not Apply Because Plaintiffs Do Not Allege That the Disney Defendants Made Any Threat

Duress can toll a statute of limitations only when the plaintiff was prevented from bringing suit because of "threats or force *by the defendant*." *Overall*, 52 F.3d at 404 (emphasis added). Here, because there are no allegations of threat or force *by the Disney Defendants*,

duress tolling does not apply to them; indeed, Plaintiffs do not even mention the Disney Defendants in the section of the FAC discussing duress.  FAC ¶¶ 696-717.

Plaintiffs do allege elsewhere in the FAC that Buena Vista paid the salary of a Miramax employee, Fabrizio Lombardo, from 1999 to 2004.  Plaintiffs also allege that Lombardo "sent threatening text messages" to a woman in 2017.  FAC ¶ 672.  Those allegations are insufficient to invoke duress tolling as to Buena Vista for two reasons.  First, the statute of limitations had expired nearly a decade before Mr. Lombardo allegedly sent the text messages.  Duress cannot resurrect claims that already were time-barred.  *See Overall*, 52 F.3d at 404 ("New York law requires that a plaintiff be subjected to a 'continuous wrong' for duress tolling to be appropriate." (citation omitted)).  Second, any purported connection between Mr. Lombardo and Buena Vista ended thirteen years before the alleged messages.  FAC ¶ 55.  As a result, his actions cannot be attributed to Buena Vista and are irrelevant to the statute of limitations analysis for any Disney Defendant.  *See Overall*, 52 F.3d at 404.

### B.    All Claims Against the Disney Defendants Are Inadequately Pleaded

All but one of Plaintiffs' claims against the Disney Defendants are premised on the doctrines of *respondeat superior*, FAC ¶¶ 846, 853, 859, 865, 871, 877, and ratification, FAC ¶ 915.[58]  "Under New York law, the doctrine of *respondeat superior* renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment."  *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446 n.7 (2d Cir. 2015) (internal quotation and citation omitted).  "[T]o ratify an agent's act, the principal must have 'full knowledge of the material facts relating to the transaction' . . . ."  *Murphy*, 2005 U.S. Dist. LEXIS 7160, at *22-23 (citation omitted).

---

[58]    FAC Counts VII (civil battery), IX (assault), XI (false imprisonment), XIII (IIED), XV (NIED) and XVII (ratification).

Plaintiffs' other claim is that the Disney Defendants are directly liable for negligent supervision and retention (FAC Count III). "To state a claim for negligent supervision or retention under New York law . . . a plaintiff must show (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens*, 385 F.3d at 235 (internal quotations and citations omitted).

Plaintiffs have not pled any of those elements against the Disney Defendants. Harvey Weinstein was not an employee or agent of the Disney Defendants. Nor was Harvey Weinstein's alleged misconduct within the scope of his employment to any company. Further, Plaintiffs do not and cannot plausibly allege that the Disney Defendants knew or should have known about Harvey Weinstein's alleged misconduct, or that such conduct occurred on the Disney Defendants' property or with their chattels. Each claim should be dismissed.

## 1. Plaintiffs Do Not and Cannot Allege Any Facts That Plausibly Suggest That Harvey Weinstein Was an Employee or Agent of the Disney Defendants

Plaintiffs make no plausible allegation that Harvey Weinstein was an employee or agent of Michael Eisner. Nor could they. Mr. Eisner, in his individual capacity, is not a "principal" or "employer" for these purposes because "the corporation, not its owner or officer, . . . is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *Shostack v. Diller*, No. 15 Civ. 2255 (GBD) (JLC), 2016 WL 958687, at *3 (S.D.N.Y. Mar. 8, 2016) (citations omitted) (dismissing tort claims against defendants named in their individual capacities). Likewise, Buena Vista is not alleged to have had an employment relationship with Harvey Weinstein, FAC ¶¶ 39, 348, 672, and Plaintiffs plead no facts to

support their conclusory assertions that Harvey Weinstein served as Buena Vista's or Disney's "agent," FAC ¶¶ 911-12.

Plaintiffs make passing references to an employment relationship between Disney and Harvey Weinstein, but their allegations are conclusory and insufficient. FAC ¶¶ 36, 38. Employer status depends on "control [of] the manner in which work is performed." *Feliberty v. Damon*, 527 N.E.2d 261, 263-64 (N.Y. 1988). Plaintiffs make no allegations that Disney controlled the manner in which Harvey Weinstein worked. On the contrary, the FAC is clear that the Disney Defendants did not control Harvey Weinstein. For example, Plaintiffs emphasize that it was important to Harvey Weinstein that he be employed by Miramax, not Disney, and that he and his brother only agreed to Disney's acquisition of Miramax because it "ensure[d] that they would remain at the head of their company," FAC ¶ 61, where Harvey Weinstein wielded "unfettered power in the movie and television industry," FAC ¶ 84.

To the extent Plaintiffs seek to attribute an employment relationship with Harvey Weinstein to Disney through his employment at Miramax, FAC ¶ 40, their efforts also fail. Miramax operated as a TWDC subsidiary and a separate corporate entity. FAC ¶ 34. "New York courts are 'reluctant' to disregard corporate form and will do so only if the form has been used to achieve fraud or the parent exercises such extreme dominion and control over the subsidiary as to render the corporate form a sham." *Manchester Equip. Co. v. Am. Way & Moving Co.*, 60 F. Supp. 2d 3, 6 (E.D.N.Y. 1999). Plaintiffs make no attempt to "pierce the corporate veil" between Miramax and Disney, and, regardless, could not meet such a demanding standard. *See In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011) (dismissing claims because "the corporation's separate identity is generally respected, and the proponent of disregarding a corporation's separate identity bears a heavy burden").

### 2. Plaintiffs Do Not and Cannot Allege Any Facts That Harvey Weinstein Acted Within the Scope of His Employment

Even if a Disney Defendant had employed Harvey Weinstein, his "sexual misconduct and related tortious behavior . . . d[id] not further [the Disney Defendant's] business" and, therefore, is not considered "within the scope of [Harvey Weinstein's] employment" to the Disney Defendant, as would be necessary to hold it vicariously liable under the doctrine of *respondeat superior*. *Wilson v. Danka Corp.*, No. 01 Civ. 10592(DAB), 2002 WL 31929120, at *4 (S.D.N.Y. Jan. 28, 2003) (internal quotations and citations omitted). Indeed, "[n]o decision in New York has been cited to date in which the doctrine of *respondeat superior* was held to apply to sexual assault." *Alsaud*, 12 F. Supp. 3d at 677.

### 3. Plaintiffs Do Not Allege Facts Supporting an Inference That the Disney Defendants Knew or Should Have Known of Inappropriate Conduct

Plaintiffs have not alleged specific facts that plausibly suggest that the Disney Defendants knew or should have known about Harvey Weinstein's alleged misconduct to support their claims for negligent supervision and retention and ratification. *Alsaud*, 12 F. Supp. 3d. at 682; *Murphy*, 2005 U.S. Dist. LEXIS 7160, at *22-23. Plaintiffs only make conclusory statements about the Disney Defendants. *See, e.g.*, FAC ¶¶ 346-48. Not once does the FAC link any specific alleged misconduct with any Disney Defendant's knowledge. Plaintiffs do not allege that any Disney Defendant arranged or participated in meetings with potential victims, made statements indicating awareness of misconduct, or did anything else to support an inference that the Disney Defendant was aware of Harvey Weinstein's alleged misconduct. *See Alsaud*, 12 F. Supp. 3d. at 680 ("The absence in the FAC of factual allegations concerning [Defendant's] . . . knowledge is fatal to Plaintiff's negligence claim and warrants dismissal."); *Murphy*, 2005 U.S. Dist. LEXIS 7160, at *22-24. Conclusory statements merely reciting the elements of the cause of action do not suffice. *See id.*; *Ross*, 2 F. Supp. 2d at 532-33.

### 4. Plaintiffs Do Not and Cannot Allege That Any of the Conduct at Issue Took Place on or with Any Disney Defendant's Property

Also lacking are allegations that Harvey Weinstein's misconduct occurred on any Disney Defendant's property or with its chattels. Plaintiffs claim that Harvey Weinstein committed acts "at locations paid for by Disney," FAC ¶¶ 844, 857, 869, 883, 899, but even if a Disney Defendant paid for Harvey Weinstein's hotel room, "hotel accommodations cannot be considered the [Disney Defendant's] 'premises' or 'equipment' as support for a claim of negligence against [the Disney Defendant] for the assault." *P.F. v. Delta Air Lines, Inc.*, No. 99-cv-4127, 2000 WL 1034623, at *13 (E.D.N.Y. June 20, 2000); *see also Alsaud*, 12 F. Supp. 3d at 681.

### XIII. ADDITIONAL ARGUMENTS OF DEFENDANT THE WEINSTEIN COMPANY HOLDINGS, LLC

#### A. Plaintiffs' RICO Allegations Fail As to TWC

As set forth more fully in *supra* Section V, Plaintiffs' FAC fails to state a RICO claim as to TWC[59] and should be dismissed in its entirety for its failure to properly plead the seven necessary elements.[60]

---

[59] The claims against TWC are: Violation of 18 U.S.C. § 1591, 1595, Participation in a Venture Engaged in Sex Trafficking (Count Two); Negligent Supervision and Retention (Count Four); Violation of RICO, 18 U.S.C. § 1962(c) (Count Five); Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) (Count Six); Civil Battery, (Count Eight); Assault (Count Ten); False Imprisonment (Count Twelve); Intentional Infliction of Emotional Distress (Count Fourteen); Negligent Infliction of Emotional Distress (Count Sixteen); and Ratification (Count Eighteen).

[60] Pursuant to the Court's direction that Defendants file a single, joint brief, TWC joins the MTD to the extent it addresses the legal sufficiency of the claims asserted against TWC. Although the MTD takes the allegations as true for purposes of the motion (as it must), TWC's joinder should not be construed, and is not intended, as an admission or assertion by TWC concerning the conduct of any other Defendant or as a waiver of any claims TWC may have. TWC has entered into a stipulation in its Chapter 11 cases to confer standing on the Official Committee of Unsecured Creditors (the "Committee") to investigate, prosecute and settle certain such claims. TWC reserves all rights concerning those claims on its own behalf and for its estate, the Committee, and any of TWC's successors and/or assigns.

## 1. Plaintiffs Fail to Establish Predicate Acts

Plaintiffs assert TWC engaged only in the predicate acts of mail and wire fraud, and sex trafficking.  FAC, Count V.  As set forth *supra* Section V.A., Plaintiffs fail to plausibly allege that TWC knew, intended, or participated in a scheme to defraud Plaintiffs.  Nor do they plausibly allege that TWC used mails or wires in an effort to harm the property rights of the victims.  *See Guadagna*, 184 F.3d at 129.  They likewise fail to satisfy the pleading requirements with respect to the predicate act of wire fraud, which must be pled with particularity under Fed. R Civ. P. 9(b).  *See Williams v. Affinion Grp. LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  For example, although they identify a few specific instances of use of mail or wires by "TWC" for the purpose of payment of Weinstein's hotel rooms, or to schedule meetings or interviews with alleged victims as part of the "Weinstein Sexual Enterprise," FAC ¶¶ 817-818, they fail to allege what is false or misleading about these routine transmissions so as to constitute mail and wire fraud.  *See Lundy*, 711 F.3d at 119.

As to the predicate act of commercial sex trafficking, Plaintiffs baldly assert that "each of the defendants knew or acted with reckless indifference to the fact that Weinstein was engaged in sex trafficking."  FAC ¶ 800.  This conclusory allegation fails to sufficiently allege how TWC knew or acted with reckless indifference with respect to Weinstein's alleged improper conduct. *See DeFalco*, 244 F.3d at 306 (stating that "each predicate act must be established for each defendant.").  Group pleading of RICO predicate acts does not suffice.  *See Jerome M. Sobel & Co.*, 2003 WL 22839799, at *6 (RICO predicates must be alleged as to "each defendant").

## 2. Plaintiffs' Injuries Were Not Caused by TWC

As set forth in the MTD, Plaintiffs' injuries are not redressable under RICO. Moreover, whatever alleged injuries Plaintiffs may have suffered were not caused by a RICO violation, and the FAC does not allege otherwise.  The injuries Plaintiffs claim to have suffered stem from the

conduct of Harvey Weinstein both with respect to alleged sexual abuse and with respect to alleged " loss of business opportunity," the latter considered too speculative to be actionable. Neither measure of damages, however, can be attributed to TWC and thus the FAC fails to plead the requisite element of causation as to TWC.

### B. Plaintiffs Geiss, Thomas and Thompson Fail to State a Claim Against TWC for Participating in a Commercial Sex Trafficking Venture

The FAC fails to contain a single, well-pleaded allegation satisfying any of the three elements of a sex trafficking participation claim—that TWC (i) knowingly benefited financially or by receiving anything of value, (ii) from participation in commercial sex trafficking venture, (iii) while knowing (or recklessly disregarding) that means of force, fraud or coercion would be used to cause the trafficked individual to engage in a commercial act. 18 U.S.C. § 1591(a)(2).

First, Plaintiff's participation claim fails against TWC because the FAC does not sufficiently allege that TWC acted in furtherance of the alleged venture. *See Afyare*, 632 F. App'x 272, 282 (6th Cir. 2016) (holding that a claim under § 1591(a)(2) requires proof "that the defendant actually participated in a sex-trafficking venture"). The FAC impermissibly groups together "TWC, the TWC Directors and the TWC Officers" and contains nothing more than conclusory allegations regarding TWC's conduct. FAC ¶¶ 755-757.

The only allegations relating to TWC's purported participation are that TWC's employees planned and facilitated meetings with women that were allegedly victimized by Harvey Weinstein. FAC ¶¶ 439-445. These barebones allegations are strikingly similar to those rejected by the Southern District in *Noble*, 2018 WL 3863452, at *13-14 (Sweet, J.) ("Without participation, there can be no violation of Section 1591(a)(2). . . . What is required here, and what is missing, are factual allegations of participation . . . that render a violation of 1591(a)(2) by [–] plausible on its face."). Therefore, factual allegations of participation are required, and

some participation by TWC in the sex trafficking act must be shown.[61]  Plaintiffs' own

allegations make clear that TWC did not arrange for Plaintiffs to meet with Harvey Weinstein,

those meetings occurred independent of any action on the part of TWC.  FAC ¶¶ 243, 267.

Thus, the participation element cannot be met.

Plaintiff's participation claim against TWC also is deficient because the FAC fails to

plausibly allege that TWC benefited financially or in any other way, let alone knowingly

benefited, from Harvey Weinstein's alleged sex trafficking venture.  Plaintiffs instead allege that

TWC "financially benefited" from Harvey Weinstein's being able to produce movies and secure

financing so as to pay TWC officers, and benefited through perks and social status.  FAC ¶¶ 756-

757.  But allegations that TWC benefited from Harvey Weinstein's legitimate business success

are strikingly different than the receipt of benefits from TWC's purported participation in an

alleged sex trafficking venture.  Indeed, to adequately plead a § 1591 claim, Plaintiffs must

allege a "causal relationship between the sex act" and the benefit purportedly received by the

defendant.  *Kolbek*, 2013 WL 6816174, at * 16.  The FAC contains no such well-pleaded

allegations.

Finally, Plaintiffs' claim should be dismissed because it fails to make any non-conclusory

allegations that TWC had knowledge that Harvey Weinstein used means of force, fraud, or

coercion to cause Plaintiffs to engage in a commercial sex act known to TWC.  The FAC offers

that TWC and its directors and officers knew (or recklessly disregarded) that Weinstein was a

---

[61]     Allegations that Robert Weinstein "facilitated" Harvey Weinstein's alleged sex
trafficking venture by paying for his foreign travel, or otherwise facilitating such meetings was
deficient in *Noble*.  2018 WL 3863452, at *13-14; *see also Alsaud*, 12 F. Supp. 3d at 679
(finding insufficient "conclusory allegations" that "employer's business involved facilitating
rape").

"serial sexual predator." *See generally* FAC ¶¶ 446-613. However, this is quite different than a knowing involvement in a purported sex trafficking venture which victimized Plaintiffs.

Even if there was a venture, a "defendant's mere membership in the venture is insufficient if he is ignorant of the venture's sex trafficking activities (and the means and methods thereof)." *Afyare*, 632 F. App'x at 285; *see also Noble*, 2018 WL 3863452(RWS), at *14 (finding there were "insufficient facts in [plaintiff's] [] complaint to suggest" that [R.] Weinstein "knew of Harvey's scheme in violation of 18 U.S.C. § 1591(a)"); *Lawson*, 2018 WL 2012869, at *12 (dismissing RICO claims because plaintiff failed to plead underlying sex trafficking predicate act under the TVPA where the complaint did not allege any facts demonstrating defendant's knowledge or reckless disregard of the fact that "force, fraud or coercion would cause plaintiff to engage in commercial sex acts"). Plaintiffs' failure to link TWC's knowledge of Harvey Weinstein's conduct as to these Plaintiffs suffers from the same infirmity and, therefore, must be dismissed.

### C. Geiss, Thomas, Thompson and Doe Fail to Plead Plausible Common Law Tort Claims Against TWC

Plaintiffs Geiss, Thomas, Thompson and Doe ("TWC Plaintiffs") also assert individual state law claims against TWC for intentional torts, which all must be dismissed.

#### 1. The Near-Decade Old State Intentional Tort Claims Should Be Dismissed as a Matter of Law Against TWC Because They Are Time-Barred

As established in the MTD, all of the TWC Plaintiffs' intentional tort[62] claims against TWC are subject to a one-year statute of limitations pursuant to C.P.L.R. § 215(3), and are therefore time barred. Geiss's state law claims all stem from one alleged incident with Harvey Weinstein that allegedly occurred in 2008 at a hotel in Park City. FAC ¶¶ 243-253. Likewise,

---

[62]     The "Intentional Torts" against TWC are Battery (Count VIII), Assault (Count X), False Imprisonment (Count XII), and Intentional Infliction of Emotional Distress (Count XIV).

Thomas's state law claims all stem from one alleged incident with Harvey Weinstein that allegedly occurred in 2008 at Harvey Weinstein's Connecticut home. *Id.* ¶¶ 254-265.[63] Thompsons' experience with Harvey Weinstein allegedly occurred in 2011. *Id.* ¶¶ 266-299. Jane Doe's experience allegedly occurred between 2002 and 2011, during a period of time in which Harvey Weinstein worked for Miramax, not TWC. *Id.* ¶¶ 203-242. Acknowledging their claims are time-barred, TWC Plaintiffs allege the statutes of limitations have been tolled by equitable estoppel and the continuing violation doctrine. FAC ¶¶ 658-728. Plaintiffs have been aware of the alleged conduct on which they base their claims, and knew the identity of Harvey Weinstein, knew that TWC employed Harvey Weinstein, and point to no misrepresentation by any Defendant TWC. Because, as set forth in the MTD, none of the statutes of limitations for these claims is more than three years and the TWC Plaintiffs have failed to plead an adequate basis for tolling of these statutes, these claims are all time-barred and should be dismissed.

### 2. Plaintiffs Geiss, Thomas, Thompson, and Doe's Claims of Civil Battery, Assault, False Imprisonment, and Negligent and Intentional Infliction of Emotional Distress Against TWC Should Be Dismissed Because Plaintiffs Have Failed to Plead a Plausible Theory of Vicarious Liability

The individual claims of civil battery, assault, false imprisonment, and negligent and intentional infliction of emotional distress against TWC are all based on conduct allegedly committed by Harvey Weinstein. The TWC Plaintiffs seek to hold TWC vicariously liable for this alleged conduct based on the theories of *respondeat superior* and ratification, but they have failed to plead facts demonstrating a plausible claim of vicarious liability under either theory.

---

[63] Thomas alleges that in December 2017, she was "informed" that several casting directors complained about Thomas's public declaration that "she will not audition for roles for productions in which known predators are involved." FAC ¶ 265. This allegation is irrelevant to the statute of limitations as it applies to TWC because it does not involve any conduct or action by TWC.

### 3. TWC Plaintiffs Pleaded No Facts Demonstrating That Liability May Be Extended to TWC Based on a Theory of *Respondeat Superior*

Here, the TWC Plaintiffs fail to plead facts demonstrating that Harvey Weinstein's alleged tortious conduct arose out of anything other than purely personal motives or how it furthered TWC's business interests in any way. As an initial matter, Plaintiffs do not allege that TWC sought or encouraged Harvey Weinstein to engage in tortious conduct toward Plaintiffs. Nor do they allege that it was part of his job duties to harass or assault aspiring actresses. It defies logic to suggest that Harvey Weinstein somehow served TWC's interests by advancing his own prurient interests or that TWC's business plan was to lure women into meetings with Harvey Weinstein so that he could assault them. It is a ludicrous proposition that cannot survive the plausibility requirements of *Twombly* and *Iqbal*. Because Plaintiffs have failed to allege how TWC benefited from or participated in any alleged conduct, it is evident that Harvey Weinstein's alleged conduct was fueled purely by personal motives and was outside the scope of his employment.

This argument is even more compelling with respect to Thomas's claims against TWC. As Thomas alleges, her interaction with Harvey Weinstein occurred in the context of an interview in Harvey Weinstein's private home for a personal nanny position; it did not relate in any way to a potential film role or a job with TWC. FAC ¶¶ 254-265. Indeed, Thomas admits that she did not seek to use her nanny work as an opportunity to advance her acting career. *Id.* ¶ 255. To the extent that Thomas alleges that she coordinated with Harvey Weinstein's TWC assistants when interviewing for the nanny position, that is not enough either, as Weinstein's assistants held lower-level positions, and there are no allegations that TWC was aware that Harvey Weinstein was using his assistants to assist with his personal hiring of a nanny.

### 4. Plaintiffs Have Pleaded No Facts Demonstrating That Liability May Be Extended to TWC Based on a Theory of Ratification.

Plaintiffs' purported claims of ratification have also failed to plead any viable facts demonstrating that TWC has somehow "ratified" the alleged conduct of Harvey Weinstein that would thereby render TWC liable for his acts.  Ratification is not an independent cause of action, but rather a contractual doctrine by which an otherwise voidable or invalid contract is confirmed and thereby made valid.  *See Rothschild v. Title Guarantee & Trust Co.*, 204 N.Y. 458 (1912) (noting that ratification is an act of recognition or adoption of a contract or transaction causing one to be equitably estopped from impeaching it, although it was originally void or voidable).  Indeed, Plaintiffs appear to recognize that ratification is not an independent cause of action, as they admit in the FAC that via their ratification claims, they seek to hold TWC responsible for Harvey Weinstein's alleged acts of assault, battery, and intentional or negligent infliction of emotional distress.  FAC ¶ 921.  Accordingly, the ratification claims against TWC should be dismissed.

### 5. The Claim of Negligent Infliction of Emotional Distress Against TWC Should Be Dismissed Because Plaintiffs Fail to Allege a Duty Owed

A fundamental element of any negligence claim, including Plaintiffs' claims of negligent infliction of emotional distress, is that the alleged tortfeasor owed a duty to the plaintiff.  *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  Importantly, here, Plaintiffs pleaded no viable facts that TWC owed a specific duty to these Plaintiffs, and therefore their negligent infliction of emotional distress claims against TWC should fail.  *See Morgan v. Cnty. of Nassau*, 720 F. Supp. 2d 229, 242-43 (E.D.N.Y. 2010) (dismissing negligent infliction of emotional distress claim where plaintiff pleaded no facts that the defendant owed a special duty to her).

### 6. Plaintiffs Geiss, Thomas, Thompson and Doe Cannot Establish a Claim for Negligent Supervision[64]

To state a claim for negligent retention or supervision, a plaintiff must allege, in addition to the elements of standard negligence, that: "(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens*, 385 F.3d at 235 (citations omitted). The negligent retention and supervision claim against TWC should also be dismissed because as Plaintiffs admit, the alleged incidents giving rise to their claims either did not occur on TWC's premises, nor do they allege that the incidents involved TWC's chattels.[65]

For all the foregoing reasons, Defendant TWC respectfully requests dismissal of the FAC against TWC in its entirety, and that the Court grant such other relief it deems appropriate.

## XIV.  ADDITIONAL ARGUMENTS OF DEFENDANT ROBERT WEINSTEIN

The vast majority of the FAC's claims and allegations against Robert Weinstein arise from his service on the TWC Board of Directors and are the same as those made against the other Board members. Accordingly, virtually all of the arguments made above apply with equal force to Robert Weinstein, and compel the same result as to him:  dismissal.[66] The limited

---

[64]     Negligent supervision and retention claims are subject to a three-year statute of limitations. *See, e.g.*, *Walker*, 2013 WL 3358013, at *4 (negligent supervision and retention).

[65]     Plaintiff Jane Doe alleges that her 2008 meeting with Harvey Weinstein was at the TWC offices on Greenwich Street, New York, New York, after business hours.  FAC ¶ 230.  Given that this alleged occurrence is nearly ten-years old is time-barred under the three-year statute of limitations, it does not change the Court's analysis.

[66]     This includes:  (i) the expiration of the relevant limitations periods, including the absence of any alleged act or statement by Robert Weinstein that would provide a basis for tolling the relevant periods as to him (Section IV); (ii) the FAC's inability to plead a RICO claim given, among other deficiencies, its lack of well-pled allegations that Robert Weinstein committed any

allegations in the FAC that raise issues specific to Robert Weinstein are addressed below and do not merit a different result.

## A. Plaintiffs' Allegations Based on Robert Weinstein's Corporate Positions and Familial Relationship Provide No Support for Any of Plaintiffs' Claims

First, the FAC attempts to bolster its efforts to pin liability on Robert Weinstein with a series of oft-repeated allegations regarding his familial relationship with Harvey Weinstein, who is his older brother, and his role in the creation and operation of Miramax and TWC. Specifically, the FAC alleges that, along with his brother, Robert Weinstein formed Miramax in 1979, FAC ¶¶ 60, 350, sold that company to The Walt Disney Company in 1993, *id.* ¶¶ 61, 340, and then left Miramax in 2005 to form TWC, *id.* ¶¶ 63, 446. Additionally, the FAC alleges that Robert Weinstein was an officer and board chairman of Miramax, *id.* ¶ 41, p. 97 (heading), and an officer and board co-chairman of TWC, *id.* ¶ 41, 446-47, p. 1.[67] But none of these status-based allegations can remedy the fatal pleading deficiencies identified above.

---

predicate acts or participated in a RICO enterprise (Section V); (iii) the FAC's failure to adequately allege that Robert Weinstein was part of any conspiracy to violate RICO (Section VI); (iv) the FAC's failure to plead even a single element of a TVPA claim, including that Robert Weinstein participated in a sex trafficking venture, benefited from his participation in that venture, or had knowledge that a sex trafficking venture existed (Section VII); (v) the FAC's failure to plead the elements of a claim for negligent supervision and retention, including that Robert Weinstein was Harvey Weinstein's employer, that he knew of Harvey Weinstein's propensity for assault before the alleged assaults against Plaintiffs occurred, or that the assaults were committed on Robert Weinstein's premises or with his chattels (Section VIII); (vi) the FAC's failure to plead a ratification claim, given that it does not adequately allege a principal-agent relationship between Robert Weinstein and Harvey Weinstein, full knowledge on the part of Robert Weinstein, or his acceptance of any "benefits" from Harvey Weinstein's alleged torts (Section IX); and (vii) the FAC's inability to impose vicarious liability on Robert Weinstein, given, among other pleading deficiencies, the absence of allegations that that Harvey Weinstein was Robert Weinstein's employee or agent (Section X).

[67] Specifically, Robert Weinstein ran Dimension Films, FAC ¶ 830(h), a separate division of TWC that produced films in different genres than those produced by Harvey Weinstein, as detailed in several articles the FAC relies on in support of its allegations against Robert Weinstein. *Id.* ¶ 455 & n. 157 (citing *Hollywood Reporter* article); *id.* ¶ 468 n.166 (citing *Fortune* article).

As an initial matter, none of these allegations can satisfy the pleading requirement common to each of the common law claims asserted against Robert Weinstein in the FAC—that Harvey Weinstein engaged in his alleged tortious acts while employed by Robert Weinstein or acting as his agent.  As the Supreme Court has made clear, as a general rule, "it is the corporation, not its owner or officer, who is the principal or employer" for purposes of imputing tort liability.  *Meyer*, 537 U.S. at 286.  Absent sufficient allegations that Harvey Weinstein was acting under Robert Weinstein's direction and control and on Robert Weinstein's behalf—and there are no such allegations in the FAC—no employment or agency relationship can be inferred giving rise to tort liability on the part of Robert Weinstein.  *See, e.g.*, *Maung Ng We v. Merrill Lynch & Co.*, No. 99 CIV. 9687(CSH), 2000 WL 1159835, at *4, *9 (S.D.N.Y. Aug. 15, 2000); *see also Meyer*, 537 U.S. at 286.

Indeed, courts routinely refuse to impute vicarious liability to an officer, founder, or owner of the tortfeasor's corporate employer.  *See, e.g.*, *Shostack*, 2015 U.S. Dist. LEXIS 123777, at *13 (dismissing vicarious liability claim and noting that "'[i]t is now well settled that an officer or director is not, merely by virtue of his office, liable for the tortious acts of the corporation.  He must direct, authorize, or in some meaningful sense participate actively in the assertedly wrongful conduct.'") (quoting *Teledyne Indus., Inc. v. Eon Corp.*, 373 F. Supp. 191, 196 (S.D.N.Y. 1974)), report and recommendation adopted, 2016 WL 958687 (S.D.N.Y. Mar. 8, 2016).  They also reject attempts to hold individual officers liable for negligent supervision.  *See Chylinski v. Bank of Am.*, 630 F. Supp. 2d 218, 222 (D. Conn. 2009) (dismissing negligent supervision claim brought against a corporate manager, as opposed to the corporation itself).

Nor is Robert Weinstein's status as Harvey Weinstein's brother a sufficient basis to hold him liable as a principal or employer for Harvey Weinstein's alleged torts.  *See, e.g.*, *Maurillo v.*

*Park Slope U-Haul*, 194 A.D.2d 142, 146 (N.Y. App. Div. 1993) ("Under most circumstances, intrafamilial activity will not give rise to an agency relationship.").

The FAC's status-based allegations likewise lend no support to the federal claims asserted against Robert Weinstein under the civil RICO statute and the TVPA. Such allegations cannot substitute for what is lacking from the FAC here: well-pled factual allegations that Robert Weinstein knowingly participated in a sex trafficking venture or a scheme to defraud. *See, e.g.*, *Noble*, 2018 WL 3863452, at *13 (TVPA "liability . . . cannot be established by association alone"); *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493-94 (S.D.N.Y. 2017) (dismissing fraud allegations against CEO and rejecting theory that CEO was liable "because he was a senior officer of TPC and, thus, must bear some personal liability for the acts of the company through his subordinates"); *Feinberg v. Katz*, No. 99 CIV. 45(CSH), 2002 WL 1751135, at *15 (S.D.N.Y. July 26, 2002) (dismissing RICO claims despite allegations that defendant-father co-owned and jointly ran business with his son, as neither "legitimate proximity" nor "the closeness of the filial relationship" could reasonably suggest father's complicity in son's malfeasance").[68]

### B. Plaintiffs' Allegations Regarding Robert Weinstein's Purported Involvement in Settling Claims Against His Brother Do Not Adequately Plead Any Element of Any of Plaintiffs' Claims

Plaintiffs also allege that "[d]uring his time at Miramax, Robert Weinstein paid—using his personal funds—several of Harvey Weinstein's victims to stay silent and release their

---

[68] Apparently relying on nothing more than Robert Weinstein's corporate position, the FAC alleges, in wholly conclusory terms, that "[a]ll of the [purported enterprise] participants reported to Harvey or Robert Weinstein," FAC ¶ 786, and that Robert Weinstein "knew that TWC paid Boies Schiller, Kroll and other enterprise participants and should have known the purpose was to cover up Harvey's pattern of assault." *Id.* ¶ 351(h). There is not a single well-pleaded allegation of fact in the FAC to support either of these bald assertions, which are precisely the type of conclusory allegations that cannot sustain Plaintiffs' pleading burden.

claims," and that he was aware that Miramax funds also were used to pay his brother's alleged victims.  FAC ¶ 352.  Specifically, the FAC alleges that Robert Weinstein paid £250,000 to settle claims asserted against Harvey Weinstein in 1998 by Zelda Perkins, who was Harvey Weinstein's former assistant, and another unidentified Miramax employee who worked in the U.K.  *Id.* ¶ 357-68.[69]

What the FAC does not—and cannot—allege is that Robert Weinstein had any involvement in the alleged misconduct that led to those settlements or that he knew of the nature of the complaints against his brother.  In fact, the FAC acknowledges that Robert Weinstein has said that he understood that the two women's claims had nothing to do with alleged sexual assault.  *Id.* ¶ 360.  Plaintiffs allege that cannot be true because Robert Weinstein supposedly was a "part[y] to the settlement agreements."  *Id.*  But that allegation is belied by the very document on which Plaintiffs rely—excerpts from Ms. Perkins' settlement agreement published on a U.K. Parliament website—which contain no indication whatsoever that Robert Weinstein was a party to the agreement and, in fact, are initialed solely by Harvey Weinstein and Ms. Perkins.[70] Moreover, the FAC does not even describe the nature of Harvey Weinstein's alleged mistreatment of Ms. Perkins or allege that she was sexually assaulted, let alone plausibly allege that Robert Weinstein had knowledge of the nature of his brother's alleged misconduct.

---

[69]     The allegations about the 1998 settlement payments are the only non-conclusory allegations to be found in the FAC relating to Robert Weinstein's purported role in settling claims against Harvey Weinstein.  Plaintiffs' bald assertions that Robert Weinstein knew of and authorized other, unspecified settlements are unsupported by any factual allegations and thus entitled to no weight.

[70]     *See* https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf.  Furthermore, although the FAC attempts to draw an inference of wrongdoing or knowledge on the part of Robert Weinstein because he obtained a release as part of the settlement, FAC ¶¶ 357, 362(b), the excerpts of the agreement upon which Plaintiffs rely show that all of Miramax's officers, directors, shareholders, agents and employees were included among the agreement's definition of "Released Parties."

The FAC's allegations regarding these 1998 settlement payments are woefully insufficient to adequately plead any of Plaintiffs' claims against Robert Weinstein. First, the TVPA was not enacted until 2000, after the alleged settlements, and does not apply retroactively. *See supra* Section VII.A. As such, the FAC's allegations regarding these settlements cannot satisfy Plaintiffs' burden to plead that Robert Weinstein participated in any commercial sex trafficking venture, as required by the TVPA, let alone had anything to do with Harvey Weinstein's alleged sex acts against Plaintiffs Geiss, Thomas and Thompson in 2008 and 2011. Nor do these allegations assist Plaintiffs in pleading the element of knowledge required to sustain a TVPA claim, as they do not, on their face, allege that Robert Weinstein knew or believed that any sex trafficking "venture" involving two or more perpetrators existed or that the two complainants claimed that Harvey Weinstein had used "force, fraud or coercion" to cause them to engage in a "commercial sex act." *See* 18 U.S.C. §§ 1591(a), 1591(e)(3), (6).

In *Noble v. Weinstein*, Judge Sweet considered—and rejected—claims under the TVPA asserted against Robert Weinstein by one of Harvey Weinstein's alleged victims. The plaintiff in *Noble* relied on the same allegations regarding Robert Weinstein's role in paying the 1998 settlements. *See* 2018 WL 3863452 at *13. Nevertheless, Judge Sweet dismissed the claims against Robert Weinstein, holding that the plaintiff had not adequately alleged that he participated in, or knew about, Harvey Weinstein's alleged wrongdoing. *Id.* at *12-15. The same result is compelled here.[71]

Given the foregoing, Plaintiffs cannot rely on any alleged violation of the TVPA as a RICO predicate act. Nor do the FAC's settlement allegations come close to adequately alleging

---

[71] Like the complaint in *Noble*, the FAC alleges, in wholly conclusory fashion, that Robert Weinstein "knew of and approved [Harvey] Weinstein's use of corporate funds to perpetuate [his] assaults and silence his victims." FAC ¶ 12(h). No facts are pled in the FAC to support this allegation, and it is just as insufficient here as it was in *Noble*.

the second RICO predicate act Plaintiffs assert against Robert Weinstein—mail/wire fraud. Even if Plaintiffs had adequately alleged any specific use of the mails/wires by Robert Weinstein (and they have not), not one allegation in the FAC remotely suggests he made any affirmative misrepresentation in connection with these settlement payments (let alone one directed at any Plaintiff here), or that he owed any duty to disclose whatever he may have known to any Plaintiff or the public at large. *See supra* Section V.A.3.

Finally, the FAC's allegations regarding these settlement payments cannot remedy the pleading deficiencies in Plaintiffs' common law claims. Nothing about his alleged role in those settlements suggests that Robert Weinstein was Harvey Weinstein's principal or employer, which Plaintiffs must adequately allege to state their common law claims against him. *See supra* Section VIII.C. Moreover, the FAC's settlement allegations are insufficient to plead that Robert Weinstein knew or should have known about Harvey Weinstein's pattern of sexual assault for purposes of Plaintiffs' negligent supervision claims, which require adequate allegations that he was made aware of "*specific* prior acts or allegations against" Harvey Weinstein; "general, unrelated or lesser allegations of prior wrongdoing are insufficient." *Alsaud*, 12 F. Supp. 3d at 680-81 (emphasis added). As discussed above, the FAC does not sufficiently allege that Robert Weinstein had any knowledge about the specific misconduct that led to the settlements.[72]

### C. Plaintiffs' Allegations That Robert Weinstein Had Knowledge of Harvey Weinstein's Sexual Assaults Are Insufficient

Of the remaining allegations in the FAC even arguably particular to Robert Weinstein, the overwhelming majority of them are aimed at establishing his purported knowledge of Harvey

---

[72] Despite involving the use of Robert Weinstein's personal funds, the FAC's settlement allegations also are irrelevant with respect to the premises-or-chattels element of Plaintiffs' negligent supervision claims, liability for which requires that the defendant's property be used in commission of a tort against the plaintiff. *See supra* Section VIII.E.

Weinstein's proclivity for sexual assault. But none of these allegations are sufficient to adequately plead that fact, as they all consist either of mere conclusory allegations or allegations that, on their face, do not allege that Robert Weinstein had knowledge that Harvey Weinstein was assaulting Plaintiffs or other women.

The FAC's allegations that charge Robert Weinstein with knowing that Harvey Weinstein assaulted women are all rendered in entirely conclusory terms. *See, e.g.*, FAC ¶ 41 (alleging that Robert Weinstein "has known of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women"), *id.* ¶ 351(g) (alleging that Robert Weinstein "knew of and authorized Miramax and TWC to make payments to settle claims by women who were sexually assaulted by [Harvey] Weinstein"), *id.* ¶ 353 (alleging that Robert Weinstein "knew that Harvey Weinstein's pattern of assault was a problem"), *id.* ¶¶ 351(e), 449 (alleging that Robert Weinstein "received" and was "aware of" complaints by women "who were sexually assaulted" or "abused"). These allegations are presented without any supporting factual allegations, such as facts alleging when or how Robert Weinstein "received" or became "aware" of sexual assault complaints, who the complainants were, or the specific nature of their allegations.[73]

The FAC's conclusory allegations that Miramax officers Irwin Reiter and Mark Gill both "discussed Harvey Weinstein's pattern if [sic] sexual harassment and assaults of women with other officers within Miramax, including Robert Weinstein," *id.* ¶¶ 372, 380, are similarly deficient given that the FAC contains not a single factual allegation to support those claims.

Equally insufficient are the FAC's attempts to imply that because other Miramax or TWC employees were allegedly aware of complaints about Harvey Weinstein's misconduct, Robert

---

[73] Although Plaintiffs present them as if they are specific to Robert Weinstein, these allegations are, in fact, entirely redundant of conclusory allegations made against the Outside Directors. *See, e.g.*, FAC ¶¶ 42-50, 476(d),(f).

Weinstein must have known about them too.  *See, e.g.*, *id.* ¶¶ 447, 463-64.  Courts routinely dismiss claims where the complaint merely alleges that employees reported the tortfeasor's misconduct to managers other than the defendant, but alleges no facts showing anyone informed the defendant himself.  *See, e.g.*, *Snickles*, 57 Misc. 3d 1206(A)(table), 2015 WL 13617330, at *3 ("allegations that [defendant] knew of [sexual harasser]'s actions because [plaintiff] complained to [another defendant]" not sufficient to plead knowledge); *Khapesi v. City of New York*, No. 13-Civ.-439, 2014 WL 2605342, at *7-11 (S.D.N.Y. June 10, 2014); *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06-CV-15509, 2011 WL 1079944, at *9-10 (S.D.N.Y. Mar. 24, 2011).[74]

In the handful of instances where the FAC does plead with any degree of specificity that Robert Weinstein learned of allegations against Harvey Weinstein, the allegations in question did not involve sexual assault at all.  For example:

> Plaintiffs allege that Kathy DeClesis, Robert Weinstein's former assistant during the 1990s, told a media outlet in October 2017 that she "personally handed Robert Weinstein a demand letter" from lawyers of a "young female employee [who had] quit abruptly after an 'encounter' with Harvey Weinstein, ... telling [Robert]. Weinstein, 'Your brother is a pig.'"  FAC ¶ 356.

The FAC does not, however, allege what the "encounter" was that purportedly led the employee to quit, or that it involved a sexual assault, or that the nature of the alleged encounter was set forth in the letter that Ms. DeClesis claims to have given to Robert Weinstein.  Nor could Ms. DeClesis' alleged comment—that Harvey Weinstein was a "pig"—have put Robert

---

[74]     The lone employee complaint that Plaintiffs do allege Robert Weinstein actually "received" was the memorandum written in 2015 by then-TWC employee Lauren O'Connor, FAC ¶ 466—an allegation that also is made against every other director who was on TWC's board at the time.  *Id.* ¶¶ 483, 502, 518, 534, 548, 563, 582.  As set forth *supra*, Section VIII.D, the O'Connor complaint is irrelevant to Plaintiffs' negligent supervision claim, which requires Robert Weinstein to have had the requisite knowledge prior to their alleged assaults.

Weinstein on notice that his brother was committing sexual assaults such as those at issue here. Indeed, the article on which the FAC relies for these allegations suggests the incident Ms. DeClesis described did not involve sexual assault: "Kathy DeClesis says her former boss should have known his brother was sexually harassing actresses and female employees."[75]

> Plaintiffs allege that in the 1990s, when Robert Weinstein "started dating [then-Miramax employee] Ivana Lowell," he "asked [her] if she had slept with his brother, and she responded 'no, but not for want of him aggressively trying, and all the other women...,' at which point [Robert Weinstein] cut her off and said: 'No, I don't want to know.'" FAC ¶ 354.

At most, this allegation suggests that Robert Weinstein learned that Harvey Weinstein had "aggressively" pursued a number of women, and that Robert Weinstein preferred not to hear about his brother's (unsuccessful) attempts to have sexual relations with his new girlfriend. This allegation plainly provides no plausible support for the FAC's assertion that Robert Weinstein knew his brother was raping or sexually assaulting women.

> Plaintiffs allege that Robert Weinstein must have been aware of statements made by Ms. Lowell in a book she published in 2010, which described one such incident, in 1991, where Harvey Weinstein allegedly chased her around a room, and which referred to "Harvey's reputation as a womanizer" and tales of his "trying to seduce every young actress in town." FAC ¶¶ 450-54.

Here again, even if Robert Weinstein had read the statements in Ms. Lowell's book, at most he would have learned that his brother was a womanizer who was attempting to seduce young women—not raping or assaulting them.

> Plaintiffs allege that Sandeep Rehal, one of Harvey Weinstein's former assistants, has filed a complaint alleging that Harvey's Weinstein's misconduct "was common knowledge in the office, to management, to his

---

[75] http://www.vulture.com/201711 0/bob-weinstein-ex-assistant-he-knew-about-harvey-decades-ago.html. Ms. DeClesis' additional statement to the press that Harvey Weinstein's harassment "wasn't a secret to the inner circle" at Miramax, FAC ¶ 355, suffers from the same flaw. Further, this article does not quote Ms. DeClesis as saying that this "inner circle" included Robert Weinstein, despite the FAC's disingenuous implication to the contrary.

brother Robert Weinstein, and to Frank Gil," and that "Rehal alleges that Robert Weinstein was aware of [Harvey] Weinstein's sexual acts in his TWC office." FAC ¶¶ 459-60.

Plaintiffs, however, have simply mischaracterized Ms. Rehal's complaint. Contrary to the FAC's implication, the "common knowledge" allegation in Ms. Rehal's complaint was not made on the basis of her personal knowledge, but only "[u]pon information and belief" and press reports. FAC ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (ECF No. 1). And no allegation that Robert Weinstein was aware of sexual acts in Harvey Weinstein's office appears anywhere in Ms. Rehal's complaint, which does not allege that Ms. Rehal ever spoke with or interacted with Robert Weinstein in any way. Even more importantly, Ms. Rehal's complaint is not about sexual assault at all, but only alleges violations of provisions of the New York City Human Rights Law ("NYCHRL") relating to sexual discrimination and harassment and does not assert any of the causes of action asserted in the FAC.[76]

Equally unavailing are the FAC's allegations that Robert Weinstein has "admitted" knowing that his brother was "targeting" women for sex. FAC ¶¶ 351(c), 456. As set forth in the FAC, what Robert Weinstein is alleged to have "admitted" is that Harvey Weinstein was "philandering" and was "going out there cheating in a pervasive way." *Id.* ¶ 456. Far from pleading Robert Weinstein's knowledge of sexual assault, these allegations affirmatively contradict the FAC's conclusory claims of such knowledge by showing that Robert Weinstein believed that Harvey Weinstein's encounters with women were consensual.

Finally, the FAC relies on a series of allegations that Robert Weinstein "witnessed his brother[]" exhibiting behavior that was "physically and verbally abusive." FAC ¶ 351(a); *see*

---

[76]     Robert Weinstein has moved to dismiss the NYCHRL claims brought against him in Ms. Rehal's action, which is now pending in New York State Supreme Court. The motion to dismiss is *sub judice*.

*also id.* ¶¶ 454, 473, 474.  But despite Plaintiffs' allegation that Robert Weinstein "witnessed" Harvey Weinstein being physically abusive, the FAC does not contain a single allegation of fact describing any such incident.  Instead, the FAC alleges that Robert Weinstein attended internal Miramax meetings at which Harvey Weinstein "was wearing only a bathrobe or underwear." FAC ¶ 351(b).  Such allegations, even taken as true, could not possibly be sufficient to charge Robert Weinstein with knowledge of any pattern of sexual assault by Harvey Weinstein.

The FAC's "verbal abuse" allegations are likewise of no moment.  These include Robert Weinstein's statements that "Harvey was a bully" who "treated people like sh*t," that employees had gone into Robert Weinstein's office "crying . . . 'Your brother said this, that and the other,'" and that Robert Weinstein grew tired of Harvey Weinstein's negative "attitude toward everyone."  FAC ¶¶ 369, 454-55.  Once again, these allegations are—on their face—plainly insufficient to adequately plead that Robert Weinstein knew about Harvey Weinstein's pattern of sexual assault, which is what Plaintiffs must allege to support their claims against him.[77]

In short, the FAC's litany of knowledge allegations at most pleads that Robert Weinstein was aware that his brother engaged in boorish and morally offensive behavior.  They do not give rise to any plausible inference that Robert Weinstein knew that his brother was committing rape or sexual assault.  Plaintiffs therefore have failed to plead the element of knowledge needed to support their claims against Robert Weinstein.  And in any event, Plaintiffs have failed to plead the other elements needed to state a claim against Robert Weinstein, such as, *inter alia*, participation in or knowing receipt of a benefit from a sex trafficking venture (Count II), fraudulent conduct and the existence of a RICO enterprise or RICO injury (Counts V and VI),

---

[77]     Plaintiffs' apparent attempt to plead Robert Weinstein's knowledge by quoting him "admitting" that "[his] brother has caused unconscionable suffering," FAC ¶¶ 882, 890, is patently absurd.  Robert Weinstein made that statement after The New York Times' expose about Harvey Weinstein's misconduct and has no bearing on Plaintiffs' claims.

and an employer-employee or agency relationship for their negligent supervision, ratification and vicarious liability claims (Counts III to IV and VII to XVII).  All of the claims asserted against him should be dismissed with prejudice.

## XV.   ADDITIONAL ARGUMENTS OF DEFENDANT JAMES DOLAN

James Dolan—who briefly served as an "Outside Director" of TWC in late 2015/early 2016—submits these additional arguments as a supplement to the consolidated Motion to Dismiss Plaintiffs' FAC (the "Consolidated Motion") filed in accordance with the Court's directive at the September 12, 2018 hearing on defendants' Motion to Dismiss Plaintiffs' initial Complaint.  Sept 12, 2018 H'rg Tr. 4:25-5:3.  Mindful of the Court's admonition at the hearing, Mr. Dolan will not repeat or expand upon the compelling arguments for dismissal advanced in the Consolidated Motion.  Rather, Mr. Dolan highlights in this Addendum certain significant, albeit focused, issues that compel the dismissal of Plaintiffs' claims against him, independent of the broader arguments advanced in the Consolidated Motion.

There can be no denial of the seriousness of the allegations that Plaintiffs have lodged against Harvey Weinstein ("Weinstein"), the former Co-Chairman of TWC, or of the significant harm that they aver they suffered as a result.  Nor can one ignore the widespread and explosive publicity that these allegations have generated, on a worldwide basis.

However, neither the seriousness of Weinstein's alleged conduct nor the visibility surrounding these matters can serve as a surrogate for essential pleading requirements or as a basis to foist upon Mr. Dolan liability where, as a matter of law and fact, none exists.  As discussed below, Plaintiffs' own allegations in the FAC—and, of equal or perhaps even greater importance, the glaring omissions in that pleading—utterly fail to state a cognizable claim against him.  As such, the FAC—which, despite its ostensible "heft," scope and length, ultimately is revealed principally as a "claim in search of defendants" (in addition to Weinstein)

upon whom liability for his conduct might be imposed—should be dismissed as to Mr. Dolan, with prejudice and without leave to (once again) re-plead.

## A. Mr. Dolan's Brief Tenure on the TWC Board Commenced Years After the Conduct of Weinstein Upon Which Plaintiffs' Claims Are Predicated and Thus Cannot Serve as a Basis for the Imposition of Liability Upon Him

The FAC alleges that Mr. Dolan served on the TWC Board, as an independent outside director, from September 30, 2015 until June 20, 2016. FAC ¶ 50. The FAC also confirms that the alleged assaults and related conduct of Weinstein upon which Plaintiffs' claims are predicated occurred during the period commencing in the early 1990s and ending in 2011, *i.e.*, the latest of these acts occurred some four years before Mr. Dolan even began his brief tenure on TWC's Board.[78] As such, the FAC is replete with references to and allegations concerning events that occurred years, if not decades before Mr. Dolan was appointed a TWC director. *See, e.g.*, FAC ¶¶ 89(a)-(j); 90(c) and (d); 91(a), (d), (p), (q); 93-101; 102-124; 125-151; 152-164; 165-179; 180-202; 203-242; 243-253; 254-265; 266-323. However, as a matter of fact, law, logic and metaphysics, there is simply no theory by which an individual who did not assume the role upon which the claims against him are predicated until years after the operative events underlying those claims can be held liable thereon.

It is of course an essential element of any cause of action—whether one sounding in negligence; an intentional tort based on assaultive conduct; or a statutory cause of action such as RICO—that the plaintiff suffered cognizable injury as the result of some act or omission of the putative defendant. Whether characterized under the rubric "proximate cause," "but for causation," "precipitating cause," or some other legal formulation, a plaintiff is required to allege

---

[78]    Nanette Klatt – 1993-1994; Katherine Kendall – 1993; Caitlin Dulany – 1996; Zoe Brock – 1998; Melissa Sagemiller – 2000; Larissa Gomes – 2000; Jane Doe – 2002-2011; Louisette Geiss – 2008; Sarah Ann Thomas (Masse) – 2008; and Melissa Thompson – 2011.

that her claimed injuries were the "result" of some affirmative act or omission of the defendant. *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) ("To fulfill the [civil RICO] requirement that the injury occur 'by reason of' a defendant's action, a plaintiff must show that 'the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well.'") (quoting *Holmes*, 503 U.S. at 268); *WestRM-West Risk Mkts., Ltd. v. XL Reinsurance Am., Inc.*, No. 02 Civ. 7344 (MGC), 2006 U.S. Dist. LEXIS 48769, at *37 (S.D.N.Y. 2006) ("Causation is one of the standard elements of negligence.") (quoting Restatement (Second) of Torts § 281). For reasons that are self-evident, the law simply does not impose liability on an individual whose conduct did not cause the harm of which a plaintiff complains. *See Schwab v. Philip Morris USA, Inc.*, 449 F. Supp 2d 992, 1043 (E.D.N.Y. 2006) ("Factual causation is a requirement of every tort. It is commonsensical: if a defendant's action cannot be linked to a harm suffered by plaintiff, he cannot be held liable for it.") (citing Dan B. Dobbs, The Law of Torts § 166 (cause in fact requirement)). The syllogism, though perhaps simple, is nonetheless fundamental, and requires the dismissal of the claims asserted against Mr. Dolan: (1) Mr. Dolan did not join TWC's Board until 2015 (and left shortly thereafter in 2016) and, as such, did not assume, until that date, any possible role upon which Plaintiffs might attempt to impose liability on him for Weinstein's alleged misconduct; (2) every one of the inappropriate assaultive and related acts of Weinstein underlying Plaintiffs' claims occurred years, if not decades prior to the date on which Mr. Dolan commenced his role as a TWC outside director; and, as such, (3) there is simply no manner through which Mr. Dolan's post-facto role as a director could have prevented, facilitated, or otherwise contributed to Weinstein's alleged misconduct.

One need look no further than Plaintiffs' negligent retention and supervision claim against TWC and its erstwhile officers and directors (Count IV) to underscore the point. Whatever "facts" Plaintiffs have, or even (without basis) could have, alleged against Mr. Dolan in support of that claim, stemming from his brief tenure as a Board member, could not have "caused"—in any, even a tortured, sense of that word—conduct, no matter how reprehensible, that occurred years before. Even if it is assumed—albeit contrary to fact and notwithstanding Plaintiffs' failure to allege it—that Mr. Dolan abdicated every one of the most fundamental responsibilities attendant to his position as a Board member in late 2015 and early 2016, there is simply no way that any such alleged defalcations could have contributed to Weinstein's alleged inappropriate conduct towards the Plaintiffs years earlier. Conversely, even if Mr. Dolan had undertaken Herculean efforts in 2015-2016 to address in the most urgent and dramatic way Weinstein's alleged conduct, that fact similarly would not have prevented the events that Plaintiffs allege occurred years, if not decades, before. In light of the foregoing, there is no cognizable basis upon which Plaintiffs can allege (and, despite its massive 257-page length, the FAC does not allege) any act or omission of Mr. Dolan that can be said to have been even a contributing factor to, let alone "caused," the harm that Plaintiffs aver they suffered as a result of Weinstein's interactions with them. That unassailable conclusion requires dismissal of all of the claims asserted against Mr. Dolan, without further analysis.

**B.** **Plaintiffs Failed to Comply, as to Mr. Dolan, With the Specific Pleading Requirements Imposed by the Court at the September 12, 2018 Hearing**

As a concomitant to the foregoing, Plaintiffs utterly failed to satisfy the pleading requirements that the Court imposed upon them at the September 12, 2018 hearing, providing yet further grounds for the dismissal of the claims asserted against Mr. Dolan:

- While the Court specifically required that Plaintiffs' allegations regarding their equitable tolling defense would have to be made "as to each individual

defendant," Sept. 12, 2018 H'rg Tr. 13:1-2, the FAC does not contain any factual allegations against Mr. Dolan in ostensible support of that defense.

- Although the Court required Plaintiffs to allege that "each [defendant] separately . . . knew of [the] continuing effort of Harvey Weinstein to blacklist the plaintiffs," Sept. 12, 2018 H'rg Tr. 17:7-9, Plaintiffs have not offered any such allegations against Mr. Dolan.

- Plaintiffs similarly failed to proffer any factual allegations against Mr. Dolan to comply with the Court's specific requirement, in the context of Plaintiffs' RICO conspiracy claim, that Plaintiffs "need to prove that the person implicated [*i.e.*, a particular defendant] knew about the conspiracy and consciously made it his own"; that "you have to make yourself part of the conspiracy. You have to adopt it. You have to make it your own project." Sept. 12, 2018 H'rg Tr. 19:15-17; 21:1-3.

- Plaintiffs also ignored the Court's admonition at the hearing that "you would have to prove the mail and wire fraud for each defendant," Sept. 12, 2018 H'rg Tr. 19:10-11—to which Plaintiffs' counsel responded "Correct," *id.* 19:12—and fail to allege any specific use of the mail or describe a single email or other internet or wire transmission by Mr. Dolan.

- The Court emphasized at the hearing that it would find insufficient collective references in the FAC to the outside directors as a group, admonishing that "She has to be specific. She can't say outside directors. She has to be specific." Sept. 12, 2018 H'rg Tr. 41:12-13. Yet notwithstanding this specific directive, the operative allegations upon which Plaintiffs rely in attempting to impose liability on Mr. Dolan are not directed to him individually, but reference the "TWC Directors" or the "Defendants" collectively.[79] *See, e.g.*, FAC ¶¶ 659, 661, 669, 721, 823, 829.

---

[79]     Other than alleging in wholly conclusory fashion that Mr. Dolan "knew or should have known" of Harvey Weinstein's misconduct, FAC ¶ 572—an allegation that, standing alone, of course does not support the imposition of liability on Mr. Dolan—Plaintiffs have utterly failed to shoulder their pleading burden with respect to Mr. Dolan. In fact, in a desperate attempt to manufacture a basis for liability, Plaintiffs allege that a song Mr. Dolan wrote, entitled "I should've known," somehow constitutes an admission by Mr. Dolan that he "should have known" about Weinstein's misconduct. As an initial matter, although Plaintiffs misleadingly aver in the FAC that Mr. Dolan "stated in a television interview that Harvey Weinstein was on his mind when he wrote the song," in fact, Mr. Dolan repeatedly stressed during that interview that the song was "not just about" Weinstein, but also "others" who engaged in misconduct towards women. Not only does Mr. Dolan's song thus not constitute a commentary—much less any sort of legal admission—concerning Mr. Dolan's state of mind vis-à-vis Weinstein alone, but a plain reading of the lyrics of that song (which Plaintiffs recite in the FAC in their entirety, FAC ¶ 587) in fact compels the conclusion that Mr. Dolan lacked either actual or constructive knowledge of Weinstein's misconduct and would have tried to stop it if he had, *i.e.*, Mr. Dolan

Despite being afforded the opportunity by the Court to save their deficient claims from dismissal, Plaintiffs chose instead to ignore the Court's specific pleading instructions (in sub silentio acknowledgement that there simply are no facts to support their claims against Mr. Dolan) and, as they have thus failed to cure the dispositive deficiencies in their original pleading, their present claims asserted against Mr. Dolan in the FAC should be dismissed.

## XVI. ADDITIONAL ARGUMENTS OF FORMER OUTSIDE DIRECTOR RICHARD KOENIGSBERG

Defendant Richard Koenigsberg ("Mr. Koenigsberg"), a former outside director of TWC from October 21, 2005 through on or about October 14, 2017, *see* FAC ¶ 47, respectfully submits that the FAC should be dismissed with prejudice as against him for the same reasons that it should be dismissed with prejudice as against each of the other outside directors. The claims and allegations in the FAC against Mr. Koenigsberg are virtually identical to the claims and allegations against each of the other outside directors. *See generally supra* Section II.B.; *compare* FAC ¶¶ 509-10, 513-524 (Koenigsberg) *with id.* ¶¶ 475-76, 478, 481-84, 486-87, 492-93 (Maerov); *id.* ¶¶ 494-95, 497-505, 507-508 (Ben Ammar); *id.* ¶¶ 526, 528-541 (Ziff); *id.* ¶¶ 542-550, 552-53 (Sackman); *id.* ¶¶ 554, 559-571 (Sarnoff); *id.* ¶¶ 572, 580-86, 588 (Dolan); *id.* ¶¶ 589, 593-97, 605 (Jones); *id.* ¶¶ 606, 609-13 (Lasry). In fact, the FAC makes only two unique—but nevertheless wholly conclusory and factually implausible—allegations against

---

wished he had learned of the misconduct of Weinstein and others so he could have "thrown myself across [their] tracks; stopped [them] from these vile attacks," but that he, like many others, "believed and didn't see through the lies [Weinstein and others] told us all." *Id.* Stated perhaps more succinctly, Mr. Dolan, plainly disgusted by Weinstein and others who allegedly mistreated women, laments in his song his lack of any contemporaneous knowledge of—and thus any ability to stop or prevent—that conduct, hardly an admission Mr. Dolan knowingly enabled or facilitated Weinstein's misconduct during the short time that Mr. Dolan served on the TWC Board.

Mr. Koenigsberg. Neither of these bare bones allegations, however, is sufficient to withstand dismissal of the claims against Mr. Koenigsberg.

First, the FAC alleges that Koenigsberg was "the only other Director, besides the Weinstein brothers, who owned 'W' shares" and that the "'W' shareholders had full control over all decisions involved in running the studio under the TWC operating agreement." FAC ¶ 511; *see also id.* ¶¶ 510(g), 525. The Court need not accept this allegation as true because it contradicts facts properly subject to judicial notice.[80] Plaintiffs' allegation is squarely refuted by TWC's Voluntary Petition for Bankruptcy ("Voluntary Petition"),[81] which identifies Harvey Weinstein and Robert Weinstein as the only owners of Class "W" shares. *See In re: The Weinstein Co. Holdings, LLC, et al.*, Case No. 18-10601-MFW (Bankr. D. Del.), ECF Dkt. No. 1

---

[80] The Court may consider on a motion to dismiss public records such as filings in other courts under Federal Rule of Evidence 201. *See, e.g.*, *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc*., 369 F.3d 212, 217 (2d Cir. 2004) (noting that the court "may also look to public records, including complaints filed in state court, in deciding a motion to dismiss"); *Scerba v. Allied Pilots Ass'n*, No. 13 CIV. 3694 LAK AJP, 2013 WL 6481583, at *2 n. 2 (S.D.N.Y. Dec. 10, 2013) ("In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case sub judice.") (internal quotation marks and citation omitted), subsequently *aff'd*, 589 F. App'x 554 (2d Cir. 2014); *In re Enron Corp.*, 379 B.R. 425, 431 n. 18 (S.D.N.Y. 2007) ("Judicial notice of public records such as court filings, is clearly appropriate.").

[81] TWC filed the Voluntary Petition on March 19, 2018 in the case captioned, *In re: The Weinstein Co. Holdings, LLC, et al.*, Case No. 18-10601-MFW (Bankr. D. Del.), currently pending in the Delaware Bankruptcy Court. The Second Circuit and district courts within this circuit have repeatedly taken judicial notice of documents, such as the Voluntary Petition, publicly filed in pending bankruptcy proceedings. *See, e.g.*, *In re Howard*'s *Express, Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of bankruptcy docket); *In re F.C.C.*, 208 F.3d 137, 138 (2d Cir. 2000) (taking judicial notice of material filed in bankruptcy court); *Sigmon v. Goldman Sachs Mortg. Co*., 539 B.R. 221, 225 (S.D.N.Y. 2015) (taking judicial notice of "documentation produced in the underlying bankruptcy proceeding"); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc*., 219 F. Supp. 2d 576, 584 (S.D.N.Y. 2002) (taking judicial notice of "[r]ecords on the bankruptcy court's electronic filing system" in deciding Rule 12(b)(6) motion), *aff'd*, 385 F.3d 159 (2d Cir. 2004); *Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*, 243 B.R. 620, 622 n. 2 (S.D.N.Y. 2000) (taking judicial notice of bankruptcy filings and court orders).

at p. 30.  Indeed, the Voluntary Petition shows that Mr. Koenigsberg did not own Class A-1 shares, Class A-2 shares, Class B shares or any other shares of TWC, *see id.* pp. 26-30, and Plaintiffs lack a good-faith basis under Rule 11 of the Federal Rules of Civil Procedure to allege otherwise.  Indeed, Mr. Koenigsberg was merely a representative on the Board of Representatives (not an owner of Class "W" shares or any other shares of TWC), and, therefore, did not have control over decisions involved in running the studio under the TWC operating agreement.  As such, the Court must not credit Plaintiffs' bad faith allegation to the contrary.[82]

Second, the FAC alleges that Mr. Koenigsberg was "Harvey and Robert Weinstein's long-term personal accountant" and "was thus aware or should have been aware of the settlements with Harvey Weinstein's victims that were paid out of Harvey Weinstein and Robert Weinstein's personal funds, including but not limited to the 1998 settlement with Zelda Perkins and her colleague, in which Robert Weinstein paid £250,000 from his personal funds." FAC ¶ 512; *see also id.* ¶¶ 47, 510(f), 808(b).  The fact that Mr. Koenigsberg was Harvey and Robert Weinstein's personal accountant, however, can hardly be a basis for adequately alleging that Mr. Koenigsberg had knowledge of alleged settlements with Harvey Weinstein's alleged victims or Harvey Weinstein's alleged misconduct.  Courts have soundly rejected attempts to infer knowledge based on the position of a defendant.  *See, e.g., Pugh v. Tribune Co.*, 521 F.3d

---

[82]  Even if Mr. Koenigsberg were a Class "W" shareholder with management control (which he was not), this allegation would nevertheless be insufficient to establish that Mr. Koenigsberg participated in the operation or management of a RICO enterprise (Count V) because his participation in the legitimate business affairs of TWC and/or the TWC Board does not constitute participation in any alleged RICO enterprise's criminal affairs.  *See supra* Section II.C.  It would likewise be insufficient to establish, *inter alia*, that Mr. Koenigsberg participated in a sex trafficking venture (Count II), *see supra* Section VII, that Mr. Koenigsberg employed Harvey Weinstein (Counts III and IV), *see supra* Section VIII, that there was a principal-agent relationship between Harvey Weinstein and Mr. Koenigsberg (Counts XVII and XVIII), *see supra* Section IX, or that Mr. Koenigsberg is vicariously liable for Harvey Weinstein's alleged battery, assault, false imprisonment, and intentional and negligent infliction of emotional distress (Counts VII, VIII, IX, X, XI, XII, XIII XIV, XV, XVI), *see generally supra* Section X.

686, 700-01 (7th Cir. 2008) (allegations that "defendants, by virtue of their positions alone . . . .

should have known specific facts about a company is generally insufficient to state a claim . . .

."); *In re Citigroup ERISA Litig*, No. 07 Civ. 9790, 2009 WL 2762708, at *25 (S.D.N.Y. Aug.

31, 2009), appeal docketed, No. 09-3804 (2d Cir. Sept. 9, 2009) (holding that conclusory

allegations that members of the Administration Committee, the named plan fiduciary, had

knowledge of Citigroup's subprime exposure because of their responsibilities as fiduciaries is no

more than a "naked assertion"); *Crowley ex rel. Corning, Inc. Inv. Plan v. Corning, Inc.*, 234 F.

Supp. 2d 222, 230 (W.D.N.Y. 2002) ("[P]laintiff makes no allegation that Committee members

themselves 'had any actual knowledge of any misinformation or that they participated in the

dissemination of information they knew or should have known was misleading . . . .'")

(citations omitted).

Moreover, even if "by virtue of his position" were a sufficient basis to infer knowledge

(which it is not), here, there is absolutely nothing about Mr. Koenigsberg's alleged position as

Harvey and Robert Weinstein's "personal accountant" that even suggests that he would have had

access to the pertinent information. *See, e.g.*, *The Ltd., Inc. v. McCrory Corp.*, 683 F. Supp. 387,

394 (S.D.N.Y. 1988) (explaining that accountant's "knowledge cannot be inferred solely from

the fact that it was Lerner's auditor"); *Competitive Assocs., Inc. v. Laventhol Krekstein Horwath

& Horwath*, 478 F. Supp. 1328, 1333 (S.D.N.Y. 1979) ("There is no evidence that

the accountants had any knowledge of the forgery of the Science Systems appraisal, or the bribe

involved in procuring the International Computer Products appraisal.").  Plaintiffs fail to allege

how Mr. Koenigsberg's work as Harvey and Robert Weinstein's personal accountant would lead

him to have knowledge about alleged settlements with Harvey Weinstein's alleged victims.

Indeed, allegations such as these are exactly the type of unsubstantiated conclusory allegations that must be rejected post-Iqbal and Twombly.

Finally, an allegation that Mr. Koenigsberg was aware of alleged settlements with Harvey Weinstein's alleged victims does not establish knowledge of Harvey Weinstein's alleged misconduct. *See, e.g.*, *White v. Panic*, 783 A.2d 543, 552-53 (Del. 2001) (knowledge of multiple settlements is not the same thing as knowledge of wrongdoing); *see also Brautigam v. Rubin*, 55 F. Supp. 3d 499, 507 (S.D.N.Y. 2014) (holding that "an allegation that the board was aware of these settlements when they were executed suggests nothing about what it knew at the time of the alleged misconduct"), *aff'd*, 618 F. App'x 723 (2d Cir. 2015); *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 552 (D.N.J. 2011) (rejecting "red flag" allegations, including qui tam complaints and regulatory settlements, that failed to "point to any specific board members, or suggest how any of the directors knew that J&J was engaging in illicit conduct at that time"); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 174-75 (D. Del. 2009) (knowledge of regulatory investigations failed to establish knowledge of underlying corporate misconduct). Notably, the FAC does not allege that, in any of these alleged settlements, Mr. Koenigsberg was charged with knowledge of Harvey Weinstein's underlying alleged misconduct.

In sum, the FAC does not (and cannot in good faith) allege that Mr. Koenigsberg was a Class "W" shareholder who had control over TWC's operations or that he knew or should have known of Harvey Weinstein's alleged misconduct. Plaintiffs' allegations unique to Mr. Koenigsberg are no more than naked assertions that cannot withstand scrutiny, and should now be rejected. Accordingly, all of the arguments set forth by the other outside directors are equally applicable to Mr. Koenigsberg and the FAC should be dismissed with prejudice as

against him for all of the same reasons set forth above and below by them as well as for the additional reasons set forth in this section.

## XVII. <u>ADDITIONAL ARGUMENTS OF OUTSIDE DIRECTORS LANCE MAEROV AND JEFF SACKMAN</u>

Messrs. Maerov and Sackman were outside directors of TWC. Mr. Maerov allegedly served as a non-voting Board observer from 2005 to March 2013, and as an outside director from March 2013 to July 2018. FAC ¶ 46. Mr. Sackman was a director from September 2010 to October 2015. FAC ¶¶ 49, 544(g). The FAC does not allege that either Mr. Maerov or Mr. Sackman was an employee of TWC, or that they had any direct interest in TWC. It is axiomatic that Messrs. Maerov and Sackman cannot be held responsible for actions that allegedly occurred before they became members of the TWC Board.

The FAC cites a Fortune article to give the erroneous impression that Mr. Maerov had heard complaints regarding Harvey Weinstein's sexual assaults, alleging that "for years prior to the 2015 Gutierrez allegations, [Mr. Maerov] had heard from TWC employees about complaints against Weinstein." FAC ¶ 46.[83] The allegation that Mr. Maerov had heard complaints about Harvey Weinstein's sexual assaults "for years prior to the 2015 Gutierrez allegations" is pulled by Plaintiffs from thin air. What the article actually states is that "Mr. Maerov says that the Gutierrez bombshell aside, he'd been hearing anonymously from employees about complaints from both male and female employees." *See* Dkt. No. 88-1. In purporting to paraphrase that statement, Plaintiffs disingenuously insert the phrase "for years." Further, while their allegation is designed to give the impression that Mr. Maerov had heard complaints regarding Harvey Weinstein's sexual assaults, on a plain reading of the article, it is replete with references to

---

[83]     The Fortune article at issue was previously submitted to the Court on March 22, 2018 as Dkt. No. 88-1.

complaints Mr. Maerov had heard regarding Harvey Weinstein that did not involve sexual assault: (i) not "show[ing] respect for the people around him," (ii) "squander[ing] outside investors' money," (iii) being "Mr. Bully," (iv) "mismanag[ing] the company," (v) "misusing company funds," (vi) "making gifts with company money," and (vii) using company "personnel for his personal projects." *Id.* The Fortune article does not support Plaintiffs' allegations that Mr. Maerov "knew of [Harvey] Weinstein's pattern and practice of predatory sexual conduct toward women." FAC ¶ 46 (emphasis added).[84]

\* \* \*

For all of the reasons and arguments set forth and detailed above by the other outside directors, all of which are equally applicable to Messrs. Maerov and Sackman, Messrs. Maerov and Sackman respectfully request that the FAC be dismissed as against them in its entirety, with prejudice, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

## XVIII. CONCLUSION

For the reasons discussed above, the Court should dismiss the FAC as against the moving Defendants in its entirety, with prejudice, and without leave to re-plead.

---

[84] The FAC suggests, in pure conclusory fashion, that Mr. Maerov was motivated to overlook Harvey Weinstein's alleged sexual misconduct because an affiliate of Mr. Maerov's employer held a small stake in TWC. *See* FAC ¶¶ 46, 491. Even putting aside this sheer speculation, the FAC utterly fails to allege that Mr. Maerov had knowledge of Harvey Weinstein's alleged misconduct.

Dated: December 17, 2018          Respectfully submitted,

By:    /s/ Marvin S. Putnam
         Marvin S. Putnam
         (marvin.putnam@lw.com)
         Laura R. Washington (*pro hac vice*)
         (laura.washington@lw.com)
         LATHAM & WATKINS LLP
         10250 Constellation Blvd., Suite 1100
         Los Angeles, California 90067
         Telephone: (424) 653-5588
         Fax: (424) 653-5501

         *Attorneys for Defendants Tim Sarnoff and*
         *Miramax Film NY, LLC*

Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions:

By:    /s/ James V. Masella, III
         James V. Masella, III (jmasella@pbwt.com)
         Melissa Ginsberg (mginsberg@pbwt.com)
         PATTERSON BELKNAP WEBB &
         TYLER LLP
         1133 Avenue of the Americas
         New York, New York 10036
         Telephone: (212) 336-2000
         Fax: (212) 336-2222

         *Attorneys for Defendant Paul Tudor Jones*

By:    /s/ Brad S. Karp
         Brad S. Karp (bkarp@paulweiss.com)
         Roberto Finzi (rfinzi@paulweiss.com)
         Sara F. Nichols (snichols@paulweiss.com)
         PAUL, WEISS, RIFKIND, WHARTON &
         GARRISON LLP
         1285 Avenue of the Americas
         New York, New York 10019
         Telephone: (212) 373-3000
         Fax: (212) 757-3990

         *Attorneys for Defendant Marc Lasry*

By:     /s/ Lawrence S. Spiegel
Lawrence S. Spiegel
(lawrence.spiegel@skadden.com)
Abigail E. Davis
(abigail.sheehan@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Defendant Dirk Ziff*


By:     /s/ John J. Rosenberg
John J. Rosenberg
(jrosenberg@rglawpc.com)
Brett T. Perala
(bperala@rglawpc.com)
ROSENBERG & GIGER P.C.
250 Park Avenue
12th Floor
New York, NY  10177
Telephone: (646) 494-5000
Fax: (646) 595-0590

*Attorneys for Defendant James Dolan*


By:     /s/ Gerald L. Maatman
Gerald L. Maatman, Jr.
(gmaatman@seyfarth.com)
Karen Y. Bitar
(kbitar@seyfarth.com)
Lisa L. Savadjian
(LSavadjian@seyfarth.com)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5500
Fax: (212) 218-5526

*Attorneys for The Weinstein Company
Holdings, LLC*

By:      /s/ Evan R. Chesler
         Evan R. Chesler
         (echesler@cravath.com)
         J. Wesley Earnhardt
         (wearnhardt@cravath.com)
         CRAVATH, SWAINE & MOORE LLP
         825 Eighth Avenue
         New York, New York 10019
         Telephone: (212) 474-1000
         Fax: (212) 474-3700

         *Attorneys for Defendants The Walt Disney
         Company, Disney Enterprises, Inc., Buena
         Vista International, Inc. and Michael Eisner*

By:      /s/ Barry A. Bohrer
         Barry A. Bohrer
         (barry.bohrer@srz.com)
         Gary Stein
         (gary.stein@srz.com)
         Brian T. Kohn
         (brian.kohn@srz.com)
         SCHULTE ROTH & ZABEL LLP
         919 Third Avenue
         New York, New York 10022
         Telephone: (212) 756-2000
         Fax: (212) 593-5955

         *Attorneys for Defendant Robert Weinstein*

By:      /s/ Israel David
         Israel David
         (israel.david@friedfrank.com)
         James D. Wareham
         (james.wareham@friedfrank.com)
         Anne S. Aufhauser
         (anne.aufhauser@friedfrank.com)
         FRIED, FRANK, HARRIS, SHRIVER &
         JACOBSON LLP
         One New York Plaza
         New York, New York 10004
         Telephone: (212) 859-8218
         Fax: (212) 859-4000

         *Attorneys for Defendants Lance Maerov and
         Jeff Sackman*

By:     /s/ John C. Scalzo
        John C. Scalzo
        (jscalzo@reedsmith.com)
        Jonathan P. Gordon
        (jonathan.gordon@reedsmith.com)
        REED SMITH LLP
        599 Lexington Avenue
        New York, New York 10022
        Telephone: (212) 521-5400
        Fax: (212) 521-5450

        *Attorneys for Defendant Richard
        Koenigsberg*