## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA THOMPSON, MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, and JANE DOE, individually and on behalf of all others similarly situated, | Case No. 17-cv-9554 (AKH) |
| Plaintiffs, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX FILM NY LLC, THE WALT DISNEY COMPANY, DISNEY ENTERPRISES, INC., BUENA VISTA INTERNATIONAL, INC., HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MICHAEL EISNER, IRWIN REITER, DAVID GLASSER, FRANK GIL, RICK SCHWARTZ, FABRIZIO LOMBARDO, MARK GILL, NANCY ASHBROOKE, MIRAMAX DOES 1-10, TALENT AGENCY DOES 1-100, and JOHN DOES 1-50, inclusive, | Hon. Alvin K. Hellerstein |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................................1

II.  FACT SUMMARY ............................................................................................................5

    A.  Harvey Weinstein used his power in the entertainment industry to sexually harass, manipulate, abuse, and assault women. .......................................................5

    B.  Plaintiffs have plausibly alleged that each defendant participated in setting up, covering up, or actively turning a blind eye to Weinstein's abuse. .................6

        1.  Miramax-Era Defendants .............................................................................6

            a.  The Walt Disney Company and Disney Enterprises, Inc. ...............6

            a.  Buena Vista International Inc. ........................................................7

            b.  Miramax Film NY LLC ................................................................8

            c.  Disney CEO Michael Eisner .........................................................9

            d.  Miramax Senior Vice President Rick Schwartz .............................9

            e.  Miramax Italy executive Fabrizio Lombardo ...............................10

            f.  Miramax Los Angeles President Mark Gill ..................................10

            g.  Miramax Vice President of Human Resources Nancy Ashbrooke ...................................................................................11

        2.  Defendants Who Worked During Both the Miramax- and TWC-Eras ............................................................................................................12

            a.  Miramax and TWC Co-Chairman Robert Weinstein ...................12

            b.  Miramax Vice President of Television and TWC Vice President of Production Barbara Schneeweiss ...............................14

         3.  TWC-Era Defendants .................................................................................14

            a.  The Weinstein Company Holdings LLC .......................................14

            b.  TWC Chief Operating Officer and President David Glasser .........16

            c.  TWC Vice President of Human Resources Frank Gil ...................16

            d.  TWC Director Lance Maerov ......................................................17

e.       TWC Director Tarak Ben Ammar ...................................................18

f.        TWC Director Richard Koenigsberg .............................................19

g.      TWC Director Dirk Ziff....................................................................20

h.      TWC Director Jeff Sackman.............................................................21

i.        TWC Director Tim Sarnoff..............................................................22

j.        TWC Director James Dolan..............................................................23

k.      TWC Director Paul Tudor Jones....................................................24

l.        TWC Director Marc Lasry.............................................................25

C.     Each Plaintiff was manipulated, assaulted, threatened, and blacklisted by Weinstein in his capacity as a Miramax or TWC executive.................................26

     1.       Nanette May (f/k/a Nanette Klatt) ..........................................26

     2.       Katherine Kendall ...................................................................27

     3.       Caitlin Dulany..........................................................................28

     4.       Zoe Brock..................................................................................30

     5.       Melissa Sagemiller ...................................................................32

     6.       Larissa Gomes...........................................................................33

     7.       Jane Doe....................................................................................34

     8.       Louisette Geiss..........................................................................37

     9.       Sarah Ann Thomas (a/k/a Sarah Ann Masse)...........................38

     10.     Melissa Thompson ...................................................................39

III.    PLAUSIBILITY IS A REASONABLE EXPECTATION THAT DISCOVERY WILL REVEAL EVIDENCE OF THE ALLEGED WRONGDOING ...........................42

IV.    PLAINTIFFS' CLAIMS ARE TIMELY .........................................................................47

A.     Plaintiff Geiss', Thomas' and Thompson's claims under the Trafficking Victims Protection Reauthorization Acts are timely. ...........................................47

     1.       Geiss' and Thomas' 2008 claims under the TVPRA are governed by the 10-year statute of limitations...........................................47

2.      Plaintiff Thompson's 2011 claims fall within the 10-year statute of limitations. ...................................................................................48

B.    Plaintiffs' RICO claims are timely because they could not discover that Harvey Weinstein blacklisted them until October 2017 at the earliest.................48

1.      Plaintiffs could not and did not discover that Weinstein caused their career damage until October 2017.....................................48

2.      An additional RICO injury, to Plaintiff Melissa Thompson's property, occurred in October 2017. .........................................51

C.    Plaintiff Jane Doe's tort claims, which arose at the time she was 16 years old, are and/or will be timely under the New York Child Victims Act. ................52

D.    Alternatively, equitable tolling principles toll the statute of limitations for Plaintiffs' RICO and state law claims....................................................53

1.      Equitable estoppel tolls the statutes of limitations for Plaintiff's negligent retention and supervision, ratification, and RICO claims. .........55

2.      The statutes of limitations for Plaintiffs' RICO and state law claims are tolled due to duress. ...................................................61

V.    PLAINTIFFS STATE PLAUSIBLE VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ................................................64

A.    The distinction between "perpetrators" and "passive beneficiaries" is a red herring at this stage. ...........................................................................64

1.      The 2008 sex trafficking claims of Plaintiffs Geiss and Thomas arise under perpetrator liability, which is defined to include the actor and "whoever *knowingly* benefits." ....................................64

2.      Plaintiff Melissa Thompson's 2011 sex trafficking claim arises under both perpetrator and passive beneficiary liability............................66

B.    Plaintiffs Geiss, Thomas, and Thompson allege plausible violations of the TVPRA. ...........................................................................66

1.      Plaintiffs adequately allege that the TWC Defendants participated in a venture that violated section 1591(a)(1). ............................66

2.      Plaintiffs adequately allege the "benefits" element. ................................67

3.      Plaintiffs adequately allege that the TWC Defendants knew or should have known they financially benefited from the sex-trafficking venture...................................................................68

VI.     PLAINTIFFS ALLEGE VALID NEGLIGENT SUPERVISION AND
        RETENTION CLAIMS (COUNTS III & IV) ................................................69

        A.      Corporate employees and officers owe a duty of care "to avoid creating
                the conditions that present an unreasonable risk of injury to third parties.".........69

        B.      Plaintiffs have alleged that Defendants breached their duty of care....................71

                1.      Plaintiffs have plausibly alleged employer-employee relationships
                        with the Defendants. ................................................................71

                2.      Plaintiffs plausibly allege that each Defendant knew or should
                        have known of Weinstein's propensity for sexual abuse and
                        assault......................................................................................72

                3.      Plaintiffs allege that the torts were committed on the employer's
                        premises or with its chattels.......................................................73

        C.      Plaintiffs allege that Defendants' negligent retention and supervision of
                Harvey Weinstein proximately caused their injuries. .............................74

VII.    PLAINTIFFS ALLEGE VALID RICO VIOLATIONS...................................74

        A.      Plaintiffs allege a valid RICO violation under section 1962(c). .............74

                1.      Plaintiffs adequately allege that the Weinstein Sexual Enterprise is
                        an associated-in-fact RICO enterprise. .....................................74

                        2.      The Outside Directors and other executives played some
                                part in directing the affairs of the Weinstein Sexual
                                Enterprise. .................................................................78

                3.      Defendants engaged in a pattern of racketeering.......................81

                        a.      Plaintiffs allege the predicate acts of sex trafficking. ...................81

                        b.      Plaintiffs allege the predicate acts of mail and wire fraud............84

                        c.      Plaintiffs allege the predicate acts of tampering with
                                victims and/or witnesses. ............................................88

                        d.      A closed-ended pattern of racketeering activity exists. ................90

                4.      Plaintiffs have alleged RICO injuries to their business or property
                        that were proximately caused by Defendants' RICO violations...............91

                        a.      Plaintiffs allege injuries to their business or property. .................92

                        b.      Plaintiffs adequately allege proximate causation..........................96

B.     Plaintiffs allege a valid RICO conspiracy claim (Count VI). ...............................97

VIII.   PLAINTIFFS ALLEGE VALID STATE LAW CLAIMS................................................98

A.     Plaintiffs state plausible claims for vicarious liability (Counts VII-XVI). ............98

B.     Plaintiffs allege valid ratification claims (Counts XVII-XVIII).........................101

IX.    CONCLUSION...............................................................................................................103

010717-11 1093440 V1

# TABLE OF AUTHORITIES

## CASES

*4 K & D Corp. v. Concierge Auctions, LLC,*
2 F. Supp. 3d 525 (S.D.N.Y. 2014)...................................................................86

*Aguilera v. Aegis Commc'ns Grp., LLC,*
72 F. Supp. 3d 975 (W.D. Mo. 2014) ...............................................................67

*AIU Ins. Co. v. Olmecs Med. Supply, Inc.,*
2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005) ...................................................79

*Aramony v. United Way of Am.,*
969 F. Supp. 226 (S.D.N.Y. 1997)....................................................................91

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010)...............................................................................45

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................42

*Astech-Marmon, Inc. v. Lenoci,*
349 F. Supp. 2d 265 (D. Conn. 2004)..........................................................93, 95

*Atlas Pile Driving Co. v. Di Con Fin. Co.,*
886 F.2d 986 (8th Cir. 1989) ...........................................................................4, 5

*Bais Yaakov of Spring Valley v. Educ. Testing Serv.,*
251 F. Supp. 3d 724 (S.D.N.Y. 2017)...............................................................46

*Baker v. Texas and Pac. Ry. Co.,*
359 U.S. 227 (1959)............................................................................................71

*Baiul v. William Morris Agency, LLC,*
2014 WL 1804526 (S.D.N.Y. May 6, 2014), *aff'd*, 601 F. App'x 58 (2d Cir.
2015) ...................................................................................................................51

*Bankers Tr. Co. v. Rhoades,*
859 F.2d 1096 (2d Cir. 1988).............................................................................48

*Bascuñán v. Elsaca,*
874 F.3d 806 (2d Cir. 2107)...............................................................................49

*In re Bausch & Lomb Secs. Litig.,*
941 F. Supp. 1352 (W.D.N.Y. 1996).................................................................80

*Boykin v. KeyCorp*,
521 F.3d 202 (2d Cir. 2008) .................................................................45, 46

*Boyle v. United States*,
556 U.S. 938 (2009) ................................................................75, 76, 77, 78

*Brown v. Burlington Indus., Inc.*,
378 S.E.2d 232 (N.C. Ct. App. 1989) ..............................................101

*Cabusao v. Lombardi*,
2015 U.S. Dist. LEXIS 185609 (S.D. Miss. Jan. 30, 2015) ....................68

*Camayo v. John Peroulis & Sons Sheep, Inc.*,
2013 WL 3927677 (D. Colo. July 30, 2013) ........................................48

*Canosa v. Ziff*,
2019 U.S. Dist. LEXIS 13263 (S.D.N.Y. Jan. 28, 2019) ............... *passim*

*In re Charles A. Field Delivery Serv., Inc.*,
488 N.E.2d 1223 (N.Y. 1985) ...............................................................71

*Childers v. N.Y. & Presbyterian Hosp.*,
36 F. Supp. 3d 292 (S.D.N.Y. 2014) ...............................................2, 55

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) ............................................................1, 42

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013) ....................................................49, 50, 51

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
235 F. Supp. 3d 1132 (E.D. Cal. 2017) ................................................84

*Conte v. Newsday, Inc.*,
703 F. Supp. 2d 126 (E.D.N.Y. 2010) .................................................81

*Cook v. City of Chicago*,
2008 WL 1883437 (N.D. Ill. 2008) ......................................................60

*Cordero-Hernandez v. Hernandez-Ballesteros*,
449 F.3d 240 (1st Cir. 2006) ................................................................86

*Cruz v. Maypa*,
773 F.3d 138 (4th Cir. 2014) ...............................................................47

*Cullen v. Margiotta*,
811 F.2d 698 (2d Cir. 1987) .................................................................61

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001) ..............................................................90

*Delaney v. Skyline Lodge,*
    642 N.E.2d 395 (Ohio Ct. App. 1994) ...........................................101

*Doe v. Alsaud,*
    12 F. Supp. 3d 674 (S.D.N.Y. 2014) ...............................................100

*Doe v. Bakersfield City Sch. Dist.,*
    136 Cal. App. 4th 556 (2006) .............................................................60

*Doe v. Schneider,*
    667 F. Supp. 2d 524 (E.D. Pa. 2009) .................................................93

*Dornberger v. Metro. Life Ins. Co.,*
    961 F. Supp. 506 (S.D.N.Y. 1997) .....................................................80

*Ehrens v. Lutheran Church,*
    385 F.3d 232 (2d. Cir. 2004) ..............................................................71

*First Capital Asset Mgmt. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004) ...............................................................79

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) .................................................................95

*Frankel v. Cole,*
    313 F. App'x 418 (2d Cir. 2009) .......................................................48

*GICC Capital Corp. v. Tech. Fin. Grp.,*
    67 F.3d 463 (2d Cir. 1995) .................................................................81

*In re GM LLC Ignition Switch Litig.,*
    2016 WL 3920353 (S.D.N.Y. July 15, 2016) ....................................81

*Grange Mut. Cas. Co. v. Mack,*
    2009 WL 1036092 (E.D. Ky. Apr. 17, 2009) ....................................93

*Gregory v. Garrett Corp.,*
    578 F. Supp. 871 (S.D.N.Y. 1983) ....................................................71

*Hallet v. Li & Fung, Ltd.,*
    1996 WL 487952 (S.D.N.Y. Aug. 27, 1996) ....................................80

*Headley v. Church of Scientology Int'l,*
    2009 U.S. Dist. LEXIS 131766 (C.D. Cal. Aug. 12, 2009) ...............48

*Holck v. Town of Hempstead*,
394 N.E.2d 281 (N.Y. 1979) ........................................................................100

*Hollander v. Flash Dancers Topless Club*,
340 F. Supp. 2d 453 (S.D.N.Y. 2004) ..............................................................92

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ...........................................................................75

*Int'l Telecomms. Satellite Org. v. Colino*,
1992 WL 93129 (D.D.C. Apr. 15, 1992) ..........................................................80

*Jacobson v. Cooper*,
882 F.2d 717 (2d Cir. 1989) ...........................................................................90

*JG v. Card*,
2009 WL 2986640 (S.D.N.Y. Sep. 17, 2009) ..................................................98

*John R. v. Oakland Unified Sch. Dist.*,
769 P.2d 948 (Cal. 1989) ...............................................................................60

*Johnson v. City of Shelby*,
135 S. Ct. 346 (2014) ....................................................................................66

*Kaczmarek v. IBM Corp.*,
30 F. Supp. 2d 626 (S.D.N.Y. 1998) ...............................................................81

*Keiler v. Harlequin Enterprises Ltd.*,
751 F.3d 64 (2d Cir. 2014) .......................................................................42, 43

*Kennington v. 226 Realty LLC*,
2013 NY Slip Op 32708(U) (N.Y. Sup. Ct. 2013) ...........................................101

*Kim v. Kimm*,
884 F.3d 98 (2d Cir. 2018) .............................................................................74

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ..........................................................................94

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) .................................................68

*Krystal G. v. Roman Catholic Diocese of Brooklyn*,
933 N.Y.S.2d 515 (N.Y. Sup. Ct. 2011) .....................................................70, 73

*L. Tarango Trucking v. Cty. of Contra Costa*,
181 F. Supp. 2d 1017 (N.D. Cal. 2001) .........................................................101

010717-11 1093440 V1

*Lama v. Malik*,
   192 F. Supp. 3d 313 (E.D.N.Y. 2016) ...................................................................47

*Levine v. Torino Jewelers, Ltd.*,
   2006 WL 709098 (S.D.N.Y. Mar. 22, 2006) ..........................................................81

*Liberty Ridge LLC v. Realtech Sys. Corp.*,
   173 F. Supp. 2d 129 (S.D.N.Y. 2001) ...................................................................65

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015) .................................................................................47

*Logan v. Zimmerman Brush Co.*,
   455 U.S. 422 (1982) .....................................................................................51, 96

*In re Lupron Mktg. & Sales Practices Litig.*,
   295 F. Supp. 2d 148 (D. Mass. 2003) ..............................................................76, 84

*Machen v. Childersburg Bancorporation, Inc.*,
   761 So. 2d 981 (Ala. 1999) ................................................................................101

*Mack v. Parker Jewish Inst. for Health Care & Rehab.*,
   2014 WL 5529746 (E.D.N.Y. Oct. 30, 2014) ........................................................97

*Mackin v. Auberger*,
   59 F. Supp. 3d 528 (W.D.N.Y. 2014) .............................................................92, 94

*Major League Baseball Props., Inc. v. Price*,
   105 F. Supp. 2d 46 (E.D.N.Y. 2000) ....................................................................93

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*,
   792 F.2d 341 (3d Cir. 1986), *aff'd*, 483 U.S. 143 (1987) .................................51, 96

*Matter of Mapp v. City of N.Y.*,
   2014 NY Slip Op 50492(U), 43 Misc. 3d 1204(A),
   990 N.Y.S.2d 438 (N.Y. Sup. Ct. 2014) ................................................................70

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir.1998) (per curiam) ................................................................48

*Metromedia Co. v. Fugazy*,
   983 F.2d 350 (2d Cir. 1992) .................................................................................90

*Miller v. Carpinello*,
   2007 WL 4207282 (S.D.N.Y. Nov. 20, 2007) ........................................................90

*Murillo v. Rite Stuff Foods, Inc.*,
   77 Cal. Rptr. 2d 12 (Cal. Ct. App. 1998) ............................................................101

010717-11 1093440 V1

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
   635 F. Supp. 2d 1170 (S.D. Cal. 2009) ...................................................................76

*New England Data Servs., Inc. v. Becher*,
   829 F.2d 286 (1st Cir. 1987) ...............................................................................86

*New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1998) ...............................................................................55

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
   2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ........................................................46

*Nigro v. Pickett*,
   39 A.D.3d 720 (N.Y. App. Div. 2007) ...................................................................61

*Noble v. Weinstein*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018) .........................................................66, 67, 84

*Oluoch v. Orina*,
   101 F. Supp. 3d 325 (S.D.N.Y. 2015) ...................................................................47

*Overall v. Klotz*,
   846 F. Supp. 297 (S.D.N.Y. 1994) ........................................................................61

*Padilla v. Yeshiva Univ.*,
   691 F. App'x 53 (2d Cir. 2017) ............................................................................46

*Pagan v. Pagan*,
   1992 NYLJ LEXIS 4742 (N.Y. Sup. Dec. 11, 1992) ...............................................64

*Parker v. Walker*,
   6 Cal. Rptr. 2d 908 (Cal. Ct. App. 1992) ...........................................................51, 96

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
   712 F.3d 705 (2d Cir. 2013) ..................................................................................4

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
   262 F.3d 260 (4th Cir. 2001) ...............................................................................93

*In re Pretium Res. Inc. Sec. Litig.*,
   256 F. Supp. 3d 459 (S.D.N.Y. 2017) ...................................................................86

*Pulinario v. Goord*,
   291 F. Supp. 2d 154 (E.D.N.Y. 2003) ...................................................................54

*Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*,
   295 F.R.D. 18 (E.D.N.Y. 2013) ..........................................................................103

*Ramos v. Jake Realty Co.*,
    21 A.D.3d 744 (N.Y. App. Div. 2005) .......................................................................98, 99

*RD Mgmt. Corp. v. Samuels*,
    2003 WL 21254076 (S.D.N.Y. May 29, 2003) ...............................................................75

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)...........................................................................................................79

*Rivera v. Puerto Rican Home Attendants Services, Inc.*,
    930 F. Supp. 124 (S.D.N.Y. 1996)............................................................................102, 103

*Riviello v. Waldron*,
    391 N.E.2d 1278 (N.Y. 1979)..........................................................................................98, 100

*Rizzo v. DF Land LLC*,
    2014 WL 12560779 (S.D.N.Y. June 10, 2014) ...............................................................45

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016).......................................................................................................49

*Roe v. Howard*,
    2018 U.S. Dist. LEXIS 1443 (E.D. Va. Jan. 3, 2018) ...................................................47

*Roitman v. N.Y.C. Transit Auth.*,
    704 F. Supp. 346 (E.D.N.Y. 1989) ..................................................................................92

*Rotella v. Wood*,
    528 U.S. 549 (2000)...........................................................................................................87

*Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*,
    33 A.D.3d 875 (N.Y. App. Div. 2006) .............................................................................70

*Saveria JFK, Inc. v. Flughafen Wien, AG*,
    2016 WL 11263673 (E.D.N.Y. May 3, 2016) ...............................................................55, 56

*Schmuck v. United States*,
    489 U.S. 705 (1989)...........................................................................................................84

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995).................................................................................................91

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)........................................................................................................74, 91

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*,
    19 A.D.3d 107 (N.Y. App. Div. 2005) ...........................................................................69, 70

*Shockley v. Vt. State Colls.*,
    793 F.2d 478 (2d Cir. 1986)............................................................................55

*Simcuski v. Saeli*,
    377 N.E.2d 713 (N.Y. 1978)..........................................................................60

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) .............................................................90

*Sky Med. Supply Inc. v. SCS Support Claims Servs.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) .............................................................79

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,
    277 F. Supp. 3d 521, 583 (S.D.N.Y. 2017)...................................................60

*Snowden v. Lexmark Int'l, Inc.*,
    237 F.3d 620 (6th Cir. 2001) .........................................................................83

*Spira v. Nick*,
    876 F. Supp. 553 (S.D.N.Y. 1995).................................................................84

*Stohlts v. Gilkinson*,
    867 A.2d 860 (Conn. App. Ct. 2005).............................................................101

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*,
    886 F. Supp. 1134 (S.D.N.Y. 1995)..........................................................94, 95

*Tsipouras v. W&M Props., Inc.*,
    9 F. Supp. 2d 365 (S.D.N.Y. 1998)................................................................94

*Twersky v. Yeshiva Univ.*,
    993 F. Supp. 2d 429 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014)..............55, 58, 59

*United States v. Allen*,
    155 F.3d 35 (2d Cir. 1998).............................................................................79

*United States v. Angiulo*,
    897 F.2d 1169 (1st Cir. 1990) ........................................................................5

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)...........................................................................84

*United States v. Blackmon*,
    839 F.2d 900 (2d Cir. 1988)...........................................................................98

*United States v. Campanale*,
    518 F.2d 352 (9th Cir. 1975) .........................................................................83

- xiii -

*United States v. Cook*,
  782 F.3d 983 (8th Cir. 2015) ......................................................................67

*United States v. Lee*,
  374 F.3d 637 (8th Cir. 2004) ......................................................................76

*United States v. Paris*,
  2007 WL 3124724 (D. Conn. Oct. 23, 2007) ...........................................82

*United States v. Portrait of Wally*,
  2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 11, 2002).............................65

*United States v. Ron Pair Enters.*,
  489 U.S. 235 (1989)....................................................................................84

*United States v. Turkette*,
  452 U.S. 576 (1981)........................................................................75, 77, 78

*United States v. Zemlyanski*,
  908 F.3d 1 (2d Cir. 2018) ...........................................................................98

*Velasquez v. 40 Cent. Park S. Inc.*,
  2008 NY Slip Op 32799(U) (N.Y. Sup. Ct. 2008) ..................................101

*Villoldo v. BNP Paribas S.A.*,
  648 F. App'x 53 (2d Cir. 2016) ...................................................................95

*Weyant v. Okst*,
  101 F.3d 845 (2d Cir. 1996)........................................................................66

*Williams v. Affinion Grp., LLC*,
  889 F.3d 116 (2d Cir. 2018)........................................................................84

*Wirig v. Kinney Shoe Corp.*,
  448 N.W.2d 526 (Minn. Ct. App. 1989), *aff'd in part & rev'd in part on other
  grounds*, 461 N.W.2d 374 (Minn. 1990) .................................................101

*Zimmerman v. Poly Prep Country Day School*,
  888 F. Supp. 2d 317 (E.D.N.Y. 2012) ..........................................56, 57, 59

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
  2017 WL 2829517 (S.D.N.Y. June 29, 2017) .....................................45, 46

*Zumpano v. Quinn*,
  849 N.E.2d 926 (N.Y. 2006)...........................................................58, 59, 60

## Statutes

18 U.S.C. § 1512..............................................................................................88

18 U.S.C. § 1512(a)(2), (b), (c), (d)................................................................89

18 U.S.C. § 1512(f)(1).......................................................................................90

18 U.S.C. § 1595(c)...........................................................................................48

18 U.S.C. § 1961(1)...........................................................................................81

18 U.S.C. § 1961(4)...........................................................................................75

18 U.S.C. § 1961(5)...........................................................................................81

18 U.S.C. § 1962(c)....................................................................................74, 78

18 U.S.C. § 1962(d)...........................................................................................97

18 U.S.C. § 1964(c)...........................................................................................74

18 U.S.C. § 3673(3)...........................................................................................88

28 U.S.C. § 1658(a)...........................................................................................47

## OTHER AUTHORITIES

"Statement from Governor Andrew M. Cuomo on Three-Way Agreement on the
    Child Victims Act," available at https://www.governor.ny.gov/news/
    statement-governor-andrew-m-cuomo-three-way-agreement-child-victims-act-
    which-slated-be-voted..........................................................................55

2 James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 9.03 (3d ed. 1999) ........87

Beverly Engel, L.M.F.T., "Why Don't Victims of Sexual Harassment Come
    Forward Sooner?", Psychology Today (Nov. 16, 2017), available at
    https://www.psychologytoday.com/us/blog/the-compassion-
    chronicles/201711/why-dont-victims-sexual-harassment-come-forward-sooner..................54

Blakey, "Time-Bars: Rico-Criminal and Civil Federal and State," 88 NOTRE
    DAME L. REV. 1581 (2013)..................................................................55

Fed. R. Civ. P. 9(b)....................................................................................85, 87

http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.................................44

https://definitions.uslegal.com/n/negligent-supervision/............................................70

https://thelawdictionary.org/chattel/......................................................................74

https://www.merriam-webster.com/dictionary/chattel................................................74

https://www.merriam-webster.com/dictionary/sex%20act ............................................84

https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies ........................43

https://www.nysenate.gov/legislation/bills/2019/s2440 ....................................52

https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal ....................................................................................43

https://www.vanityfair.com/hollywood/2018/01/harveys-concern-was-who-did-him-in-inside-harvey-weinstein-frantic-final-days ...................................44

Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003) .................................47

Rape, Abuse & Incest National Network, "Understanding Statutes of Limitations for Sex Crimes," available at https://www.rainn.org/articles/statutes-limitations-sex-crimes .........................................................................53

S. Rpt. 91-617, 91st Cong., 1st Sess. p. 158 (1969) .....................................83

Senate Bill S.2440, available at https://legislation.nysenate.gov/pdf/bills/2019/S2440 ........................................................................................52

U.S. Attorneys' Criminal Resource Manual, § 1729, available at https://www.justice.gov/usam/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or .........................................88

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221(2)(B), 122 Stat. 5044, 5067 .......................................47

# I.    INTRODUCTION

Plaintiffs' First Amended Complaint alleges facts *for each Defendant* demonstrating the plausibility of Plaintiffs' claims. Plaintiffs' allegations "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"[1] But proof of Plaintiffs' claims is not improbable. To the contrary, even though much relevant evidence is peculiarly within Defendants' knowledge, Plaintiffs' detailed allegations demonstrate the plausibility of their claims of sexual abuse and subsequent blacklisting that caused them to lose work and suffer other grievous harms.

*First, Plaintiffs' claims are timely*.

Since December 31, 2008, the statute of limitations under the Trafficking Victims Protection Reauthorization Act ("TVPRA") is ten years. While the statute of limitations was four years at the time Plaintiffs Louisette Geiss' and Sarah Ann Thomas' sex-trafficking claims arose in 2008, Congress amended the statute in 2008 to expand the limitations period. Courts universally apply the ten-year statute of limitations to live claims that arose before the amendment. Because their claims were live at the time of amendment, Geiss' and Thomas' claims are timely. Moreover, Melissa Thompson's TVPRA claim arose in 2011, and she filed suit in 2018. Accordingly, her claim is also timely.

Plaintiffs' RICO claims are also timely. The four-year statute of limitations is not triggered until Plaintiffs learned they were blacklisted, which caused career damage (the RICO injuries). Knowledge that an actress did not get a part is not equivalent to knowledge of RICO injury. When an actress is rejected for a part, she may be told she didn't have the right look, or

---

[1] *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

was too old or young, or too tall for her male counterpart. No Plaintiff was told she didn't get a particular part because Harvey Weinstein blacklisted her. Thus, the November 6, 2017 exposé by The New Yorker revealing Weinstein's "Army of Spies" was explosive news:



Within weeks of the publication, the original *Geiss* plaintiffs filed this class action. Further, Melissa Thompson's last RICO injury did not occur until she was "catfished" by Weinstein's former criminal counsel in October 2017. Thus, Plaintiffs' RICO claims are timely.

Further, Plaintiff Jane Doe's tort claims against the Miramax-era Defendants arising out of Weinstein's assault and harassment of her from 2002 to 2004 (prior to her 18th birthday) are timely under the New York Child Victims Act, passed by the state legislature this week.

Even if not timely, equitable estoppel tolls the statute of limitations for Plaintiffs' RICO and state law claims. "Whether a defendant should be estopped from asserting the statute of limitations as an affirmative defense 'is not a question of law, but rather a question of fact, which should be fully developed and determined [at] trial.'"[2] Moreover, the doctrine of duress tolls the statute of limitations for the RICO and state law claims. According to Defendant and The Weinstein Company ("TWC") Director Lance Maerov, once Harvey Weinstein was fired in

---

[2] *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 314 (S.D.N.Y. 2014) (*quoting Schirano v. Paggioli*, 99 A.D.2d 802, 472 N.Y.S.2d 391, 393-94 (N.Y. App. Div. 1984)).

October 2017, "the women he'd abused knew there was no way he could harm them professionally. Firing him was crucial to opening the floodgates."[3]

***Second, each Defendants' knowledge of Harvey Weinstein's pattern of abuse and cover-up—what they knew and when—is detailed***.

The date by which each defendant knew or should have known of Harvey Weinstein's propensity for abuse fits squarely within the pleading requirements for Plaintiffs' federal sex-trafficking claims, negligent retention and supervision claims, and description of their role in the RICO conspiracy. Plaintiffs allege facts supporting what each defendant knew and when, such as complaints of harassment and assault, payoffs to victims, retaliation for complaints, bonuses to employees who procured women and erectile dysfunction injections for Harvey Weinstein, the use of employees as honeypots to make victims feel comfortable, and depictions of Weinstein's abusive tendencies in the press. Plaintiffs even allege—using the Defendants' own words—what they knew or should have known, why they didn't speak up or stop the abuse, and what they gained from the cover-up.

***Third, Plaintiffs delineate the damage to their careers—i.e., the RICO injury***.

In Defendants' view, they will always be free to deny women roles for whatever reason they want—including blacklisting them for refusing to satisfy their sexual desires—with impunity. In essence, Defendants ask this Court to carve out an exception to RICO liability for claims that arise in Hollywood. Their argument conveys the utter disrespect Defendants have for Plaintiffs.

---

[3] ¶ 717. All references to "¶ __" are to the First Amended Class Action Complaint ("FAC") (Dkt. 140), filed October 31, 2018, unless otherwise indicated.

To address the Court's concern that Plaintiffs allege injury to property, Plaintiffs detail specific parts they did not receive, specific producers who blacklisted them, specific producers who were going to cast them but didn't (which Plaintiffs allege was due to Weinstein's interference), and a specific percentage decline in audition requests. Plaintiffs also detail how Weinstein erected a barrier to their careers, through his background interference, that they could not surmount—or discover—until late 2017. Finally, Plaintiffs allege in detail the team and methods Weinstein used to interfere with Plaintiffs' causes of action and enforce his code of silence.

> ***This combined brief addresses five briefs comprised of 155 pages and 98 subparts of legal argument***.

While this Court requested that Defendants file a single pleading and streamline their arguments, Defendants' main brief includes 76 separate argument headings that are designed to entice a review of individual facts in isolation.[4] The law is clear, however, that "no one fact in isolation demonstrates" the existence or damage caused by the sex-trafficking, abuse, and cover-up that spanned decades.[5] The First Amended Complaint must be read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."[6] "Rather, when

---

[4] This brief responds to the memoranda in support of (i) Defendants' Motion to Dismiss the First Amended Class Action Complaint (Dkt. 200), filed by The Weinstein Company Holdings, LLC, Miramax Film NY, LLC, The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc., Robert Weinstein, Dirk Ziff, Tim Sarnoff, Marc Lasry, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan and Michael Eisner; (ii) Defendant David Glasser's Motion to Dismiss (Dkt. 208); (iii) Mark Gill's Motion to Dismiss the First Amended Class Action Complaint (Dkt. 213); (iv) Defendant Nancy Ashbrooke's Motion to Dismiss (Dkt. 240); and (v) Harvey Weinstein's Motion to Dismiss the First Amended Complaint (Dkt. 242). Because of the volume and redundancy of the briefing, Plaintiffs have not cited each instance where a Defendant raised an issue. Any omission of citation is not a concession.

[5] *Atlas Pile Driving Co. v. Di Con Fin. Co.*, 886 F.2d 986, 991 (8th Cir. 1989).

[6] *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 732 (2d Cir. 2013) (citations omitted).

the facts are viewed in their entirety and inferences are made therefrom, a scheme [] emerges."[7]

Thus, Plaintiffs' allegations should not be viewed "piecemeal" but be considered "as a whole."[8]

When the FAC is viewed as a whole, as described below, Defendants' motions to dismiss should

be denied in their entirety.

## II.    FACT SUMMARY

**A.    Harvey Weinstein used his power in the entertainment industry to sexually harass, manipulate, abuse, and assault women.**

Harvey Weinstein was the most powerful movie executive in the world.[9] In the 1970s, he

and his brother Robert Weinstein co-founded Miramax, which they sold to (while continuing to

work for) Disney in 1993 for $80 million. In 2005, the brothers left Miramax to form The

Weinstein Company ("TWC"). Weinstein has produced and distributed countless critically

acclaimed films, including *Pulp Fiction*, *Good Will Hunting*, *Shakespeare in Love*, and Academy

Award Best Picture winner, *The English Patient*. As The New Yorker describes, "His movies

have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies,

he has been thanked more than almost anyone else in movie history, ranking just after Steven

Spielberg and right before God."[10]

Weinstein's *modus operandi* was to meet with women in his capacity as an executive at

Miramax and TWC under the guise of hiring them, collaborating with them, or otherwise helping

---

[7] *Atlas Pile Driving Co.*, 886 F.2d at 991.

[8] *United States v. Angiulo*, 897 F.2d 1169, 1180 (1st Cir. 1990) (*citing United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*) ("For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise.")).

[9] *See, e.g.*, ¶¶ 8-10, 65.

[10] ¶ 10.

their careers.[11] Once the women were isolated, Weinstein sexually harassed and assaulted his victims. He stripped down, sometimes wearing a robe or a towel, and sometimes wearing nothing at all. He regularly tried to force his victims to give him massages and oral sex. Weinstein tried to cajole his victims with quid pro quo offers for business deals. When that didn't work, he used force. His actions included flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape, and/or completed rape.[12]

**B.    Plaintiffs have plausibly alleged that each defendant participated in setting up, covering up, or actively turning a blind eye to Weinstein's abuse.**

Defendants' numerous variations on the argument that Plaintiffs have engaged in group pleading is contrary to the separate, detailed sections in the First Amended Complaint delineating each of their respective roles and knowledge.[13] A summary follows:

### 1.    Miramax-Era Defendants

#### a.    The Walt Disney Company and Disney Enterprises, Inc.[14]

*Background*. The Walt Disney Company entered into two employment agreements with Harvey Weinstein for the periods 1993-1995 and 1995-1999. Disney Enterprises, Inc. entered into an employment agreement with Weinstein from 1999 to 2005.

*Disney's role and knowledge*. According to Defendant Schneeweiss, The Walt Disney Company and subsequently Disney Enterprises (hereinafter collectively "Disney") paid Miramax's employees, controlled the budget for Miramax, approved (or vetoed) requests for

---

[11] ¶¶ 60-65.

[12] *See* ¶ 91(a)-(q).

[13] *See* FAC §§ IV(G)(1)-(9) (setting forth facts for each of the Disney, Miramax and Buena Vista defendants), IV(H)(1)-(16) (setting forth facts for each of the TWC Defendants, except Harvey Weinstein, who is referenced throughout the FAC).

[14] FAC § IV(G)(1). *See also* ¶¶ 36 (citing Amended Statement of Defence and Crossclaim of Barbara Schneeweiss, *Jane Doe v. Harvey Weinstein et al.*, No. CV-17-585459 (Ontario Sup. Ct. Justice)), 37.

increased film budgets from Miramax, audited Miramax's books, and reviewed, approved, and paid the business expenses of Miramax. Weinstein reported to Disney CEO Michael Eisner, who delegated supervision of Weinstein to a series of Disney employees. The Disney employees knew of Weinstein's pattern of abuse. Based on Disney's control of Miramax finances, Disney knew or should have known of the settlement payments to Weinstein's victims, including those made in 1998.

*Connection to Plaintiffs*.[15] Disney owned Miramax during the period that Plaintiffs Klatt, Brock, Kendall, Dulany, Gomes, Sagemiller, and Jane Doe were assaulted. Disney allegedly paid two of the defendants connected to setting up Plaintiffs for the assaults, including but not limited to Schwartz and Lombardo, who set up Brock in 1998, and Schneeweiss, who set up Sagemiller in 2000.

### a. Buena Vista International Inc. [16]

*Background*. Buena Vista was the international arm of Miramax and a subsidiary of Disney.

*Buena Vista's role and knowledge*. Buena Vista employed and paid the salary of defendant Fabrizio Lombardo, who regularly facilitated Weinstein's sexual abuse (he once described himself as Weinstein's "pimp") and was known to procure women for Weinstein (including Plaintiff Zoe Brock).

*Connection to Plaintiffs*. In addition to paying Lombardo, who set up Plaintiff Zoe Brock, on information and belief, Weinstein blacklisted Plaintiff Melissa Sagemiller from getting

---

[15] FAC § IV(D).

[16] ¶¶ 39, 178-179, 348.

a part in Buena Vista-produced and/or distributed movies *Pearl Harbor* (2001), *National Treasure* (2004), and *Sin City* (2005).

### b. Miramax Film NY LLC[17]

*Background*. Harvey Weinstein founded and was a co-chairman of Miramax until he left to found TWC in 2005.

*Miramax's role and knowledge*. Miramax officers and employees—including Robert Weinstein, Schneeweiss, Schwartz, Gill, and Lombardo—were well aware of Weinstein's pattern of sexual abuse. Inappropriate inside and outside the office, Weinstein attended meetings wearing nothing but a towel. Numerous victims complained to Miramax employees about Weinstein's sexual abuse, and nothing was done. Scott Rosenberg, a Miramax screenwriter from 1994 to the early 2000s, wrote a Facebook post admitting that "Everybody F***ing Knew," but turned a blind eye because Weinstein showered them with free trips, tickets, and other perks through Miramax.

*Connection to Plaintiffs*. Weinstein was Co-Chairman of Miramax during the period that Plaintiffs Klatt, Brock, Kendall, Dulany, Gomes, Sagemiller, and Jane Doe were assaulted. Miramax agents Schwartz, Lombardo, and Schneeweiss set up numerous victims to be assaulted, including Plaintiffs Zoe Brock and Melissa Sagemiller, and covered up the assaults after they happened.

Miramax continued to work with Weinstein and TWC after 2005, including during the time that (i) Weinstein continued to harass Jane Doe, and assaulted Louisette Geiss, Sarah Ann Thomas, and Melissa Thompson; and (2) while the blacklisting occurred up to and through 2017.

---

[17] FAC § IV(G)(1), (3)-(9). *See also* FAC § IV(D) and ¶¶ 6, 331.

### c. Disney CEO Michael Eisner[18]

*Background*. The CEO of Disney from 1993-2005, Michael Eisner made the decision to purchase Miramax, knowing of Harvey Weinstein's reputation.

*Eisner's role and knowledge*. Weinstein reported directly to Eisner. Eisner delegated oversight of Weinstein to a series of Disney executives. When the responsibility was passed to Bill Mechanic, Mechanic quickly identified that Miramax did not follow the law in their human resources policies. After Mechanic left Disney in 1994, Eisner assigned Joe Roth to oversee Miramax. Roth regularly "put[] out fires," including with respect to Weinstein's sexual harassment of women.

*Connection to Plaintiffs*. Eisner supervised Weinstein during the period that Plaintiffs Klatt, Brock, Kendall, Dulany, Gomes, Sagemiller, and Jane Doe were assaulted. Disney allegedly paid two of the defendants connected to setting up Plaintiffs for the assaults, including but not limited to Schwartz and Lombardo, who set up Brock in 1998, and Schneeweiss, who set up Sagemiller in 2000.

### d. Miramax Senior Vice President Rick Schwartz[19]

*Background*. Schwartz was a Senior Vice President at Miramax from 1999-2006.

*Role and knowledge*. Schwartz had direct knowledge of, and facilitated, Harvey's abuse of women. Schwartz was regularly tasked with luring victims to Weinstein's hotel suites. Sometimes Schwartz would lead the women up to Weinstein's hotel suite to give the meeting an air of legitimacy. Schwartz would then leave the meeting, or ensure that the victim was left alone

---

[18] FAC § IV(G)(2).

[19] FAC § IV(G)(7). *See also* FAC § IV(D)(4).

with Weinstein, while the assault occurred. Schwartz was also regularly tasked with taking care of the victims after the assaults occurred.

*Connection to Plaintiffs*. Schwartz helped set up Plaintiff Zoe Brock to be assaulted by Weinstein in 1998. After the assault of Brock, Schwartz apologized to Brock, gave her a card on which he wrote his name and phone number (which she still has), and admitted that Weinstein often sexually assaulted women.

### e.     Miramax Italy executive Fabrizio Lombardo[20]

*Background*. Lombardo was the head of Miramax Italy from 1999-2004.

*Role and knowledge*. Lombardo described himself as a "broker of personal relationships" for Weinstein. Lombardo regularly brought women to see Weinstein for "meetings" at international hotels, including the Hotel Eden in Rome and the Hotel du Cap in Cannes. Multiple women have identified Lomardo as the person who delivered them to Weinstein. Lombardo once described himself as Weinstein's "pimp." A Miramax employee reported that Lombardo was banned from the Hotel du Cap at one point because he "brought too many girls."

*Connection to Plaintiffs*. Lombardo facilitated Weinstein's attack on Zoe Brock in 1998.

### f.     Miramax Los Angeles President Mark Gill[21]

*Background*. Defendant Mark Gill joined Miramax in 1994 as head of marketing, based at its New York headquarters. Three years later, Gill relocated to Southern California and was named president of Miramax's Los Angeles office. He left Miramax in 2002.

*Role and knowledge*. Gill knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his positions at

---

[20] FAC § IV(G)(8). *See also* FAC § IV(D)(4).

[21] FAC § IV(G)(5).

Miramax. Gill told The New York Times that, behind the scenes at Miramax, Weinstein's treatment of women "was the biggest mess of all." Gill has admitted that Miramax's human resources division was so weak and ineffective at combatting Harvey Weinstein's mistreatment of women that female employees had to band together: "If a female executive was asked to go to a meeting solo, she and a colleague would generally double up" so as not to be alone with Harvey Weinstein. Gill's knowledge came from witnessing Weinstein's sexually inappropriate and harassing behavior. Gill also received direct complaints from women after assaults or harassment occurred. Gill discussed Harvey Weinstein's pattern of sexual harassment and assaults of women with other officers within Miramax, including Robert Weinstein.

*Connection to Plaintiffs*. Gill worked at Miramax during the period that Plaintiffs Klatt, Brock, Kendall, Dulany, Gomes, Sagemiller, and Jane Doe were assaulted. Gill continued to work and be associated with Weinstein, Miramax, and TWC after 2002, including during the time that (i) Weinstein continued to harass Jane Doe, and assaulted Louisette Geiss, Sarah Ann Thomas, and Melissa Thompson; and (2) while the blacklisting occurred up to and through 2017. For instance, TWC helped Gill with his struggling independent film venture, The Film Department, from 2007 to at least 2011. Moreover, Gill continued to support Weinstein, attending TWC-sponsored events like at the 2010 Cannes Film Festival.

### g. Miramax Vice President of Human Resources Nancy Ashbrooke[22]

*Background*. Ashbrooke was the Vice President of Human Resources at Miramax from 1991 to 2000.

*Role and knowledge*. As the Vice President of Human Resources for Miramax from 1991 to 2000, Ashbrooke had direct knowledge of complaints regarding Weinstein's sexual

---

[22] FAC § IV(G)(9).

misconduct and directly witnessed sexual harassment of women. Ashbrooke implemented or ratified the practice of the human resources department of forwarding complaints about Weinstein's sexual misconduct to Weinstein, resulting in retaliation against the accusers. By way of example only, Ashbrooke was aware that Weinstein "sexually assaulted and attempted to rape" a Miramax employee at the Venice Film Festival in 1998.

Ashbrooke was aware that Miramax entered a settlement agreement dated October 23, 1998, with the victim and Zelda Perkins, Weinstein's assistant who complained about the attempted rape. Ashbrooke was aware that the settlement agreement provided for a release of her as an officer of Miramax. Ashbrooke was aware that, under the settlement agreement, she was supposed to advise new employees about Miramax's human resources policies and the existence of three complaint handlers. She failed to do so, however. Ashbrooke was aware that Miramax was required to dismiss Weinstein if there were any further complaints (although it never did, despite additional subsequent complaints).

*Connection to Plaintiffs*. Ashbrooke worked at Miramax during the period that Plaintiffs Klatt, Brock, Kendall, Dulany, Gomes, and Sagemiller were assaulted.

### 2. Defendants Who Worked During Both the Miramax- and TWC-Eras

#### a. Miramax and TWC Co-Chairman Robert Weinstein[23]

*Background*. Robert Weinstein was the Co-Chairman and Director of TWC and Miramax.

*Knowledge and role*. Robert Weinstein's Miramax assistant, Kathy DeClesis, said that Harvey's harassment of women was an "open secret" at Miramax. Robert witnessed Harvey's physically and verbally abusive behavior and was aware that he serially targeted women. In or

---

[23] FAC § IV(G)(3), (H)(3).

about 1991, after being assaulted by Harvey Weinstein, Robert Weinstein's girlfriend (who was a VP of Miramax's book division) had a discussion with Robert Weinstein about the assault. In 1998, Robert paid 250,000 GBP of his own funds to settle two claims brought by Zelda Perkins (Harvey's former assistant) and another female Miramax UK employee against Miramax, himself, and Harvey. Harvey agreed to go to therapy to help with his sexual misconduct as part of the agreement (but never did).

At both Miramax and TWC, he received direct and indirect complaints from women and employees, and had access to Harvey's personnel file. Robert Weinstein was aware of references to Harvey's assaults in media and entertainment dating back to at least 2005. Robert claims that he "divorced" his brother in 2012, in part due to his sexual misconduct, but he did not take steps to terminate him from TWC or protect the class. Instead, he and the Board allegedly "begged" Harvey to get help.

By way of example of other specific complaints Robert Weinstein received: a former TWC employee, Sandeep Rehal, has alleged that Robert Weinstein knew she was charged with purchasing Harvey Weinstein's erectile dysfunction medication and cleaning up after his assaults. Robert also received complaints from Irwin Reiter, TWC and Miramax Executive Vice President for Accounting and Financial Reporting, about Harvey's mistreatment of women. He was aware of complaints made by Emily Nestor and Lauren O'Connor, and he was aware of the 2015 NYPD sting operation with Ambra Gutierrez. Robert Weinstein also knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Harvey's personnel file.

*Connection to Plaintiffs*. Robert Weinstein was aware of Harvey Weinstein's pattern of sexual abuse at the time each Plaintiff was assaulted and blacklisted.

- 13 -

### b. Miramax Vice President of Television and TWC Vice President of Production Barbara Schneeweiss[24]

*Background*. Schneeweiss was the Vice President of Production at TWC from 2005-2017 and Vice President of television at Miramax from 1996-2005.

*Role and knowledge*. Schneeweiss was regularly tasked with delivering women to Weinstein. In order to give Weinstein's "meetings" an air of legitimacy, she would attend the first few minutes before excusing herself and leaving the woman alone with Weinstein.

*Connection to Plaintiffs*. In 2000, Schneeweiss facilitated Weinstein's sexual assaults of Plaintiffs Larissa Gomes and Melissa Sagemiller. In 2008, Plaintiff Louisette Geiss complained to Schneeweiss about Weinstein's behavior, and Schneeweiss simply replied that he had never done anything like that to her. In 2008, Schneeweiss arranged a meeting with a modeling agency for Plaintiff Jane Doe and followed up with her about a job on *Project Runway* after Weinstein had exposed himself to Jane Doe in his TWC office. She also arranged for Plaintiff Melissa Thompson to do a screen test for a docu-series after she was raped by Weinstein in 2011.

### 3. TWC-Era Defendants

### a. The Weinstein Company Holdings LLC[25]

*Background*. Harvey Weinstein founded and was a co-chairman of TWC from 1995 to 2017.

*Role and knowledge*. Current and former employees reported that knowledge of Weinstein's misconduct was widespread, and that employees were required to facilitate Weinstein's liaisons with women and then cover them up. This included procuring Weinstein's erectile dysfunction shots, cleaning up after the assaults (which included semen on his office

---

[24] FAC § IV(G)(6), (H)(16). *See also* FAC §§ IV(D)(5), (6); IV(E); IV(F)(1), (3).

[25] FAC § IV(H)(1), (2).

couch), and forcing the women employees to act as "honeypots" to help lure victims to one-on-one meetings with Weinstein. One temporary employee, Emily Nester, complained about being sexually harassed by Weinstein, and Irwin Reiter responded to her with a message acknowledging that Weinstein's "mistreatment of women" was an ongoing problem. Former employee Lauren O'Connor wrote a memorandum complaining about Weinstein's sexual misconduct (which was shared with the Board of Directors), and the fact that she was required to deliver women to him.

While individual Board member knowledge is summarized below, TWC and its Board agreed to employment contracts with Weinstein that served to insulate him from recourse for sexual misconduct. His 2005 contract provided that he could be terminated only for a felony conviction involving moral turpitude or misuse of corporate funds (but he would be granted a cure period). His 2010 contract provided the same terms. Weinstein's 2015 TWC employment contract then required Weinstein to indemnify the company against claims made by women he had sexually abused. It also required Weinstein to pay liquidated damages to the company for each claim of a "code of conduct" violation ($250k for the first instance, $500k for the second, $750k for the third, and $1mm for each additional instance).

*Connection to Plaintiffs*. TWC existed during the periods Plaintiffs Jane Doe, Louisette Geiss, Sarah Ann Thomas, and Melissa Thompson were assaulted by Weinstein in his capacity as agent for TWC. Moreover, while at TWC, Weinstein blacklisted and targeted all Plaintiffs (even when the assaults pre-dated TWC).

### b. TWC Chief Operating Officer and President David Glasser[26]

*Background*. Glasser started at TWC in 2008, and he was the Chief Operating Officer and President of TWC from 2011 until February 2018.

*Role and knowledge*. Responsible for human resources at TWC, Glasser received dozens of sexual misconduct complaints about Weinstein. He knew that Weinstein used TWC funds to pay for hotel rooms where he sexually assaulted women. By way of example only, Glasser specifically knew about the incidents and reports involving Emily Nester (2014), Lauren O'Connor (2015), and Ambra Gutierrez (2015). He also took steps to cover up complaints from employees, including by sharing those complaints directly with Weinstein—knowing that those women would suffer retaliation.

*Connection to Plaintiffs*. David Glasser was an executive at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### c. TWC Vice President of Human Resources Frank Gil[27]

*Background*. Gil was the Vice President of HR at TWC from April 2007 to October 2017.

*Role and knowledge*. Gil was directly responsible for the human resources department at TWC, where numerous complaints about Weinstein were mishandled. He authorized a bonus for Sandeep Rehal in exchange for her purchase of erectile dysfunction drugs for Weinstein, which he used in his assaults. Gil was aware of Weinstein's sex acts in the office. By way of example of complaints he received, in 2015 he received a memo from then-TWC employee Lauren

---

[26] FAC § IV(H)(13).

[27] FAC § IV(H)(14).

O'Connor complaining about Weinstein's sexual abuse of women, and he was aware of a sting operation stemming from Weinstein's assault of Ambra Gutierrez.

Moreover, he was involved in the cover-up of the abuse. According to The New York Times, Gil entered the TWC offices on or about October 1, 2017, to take or destroy personnel files containing evidence of Weinstein's sexual abuse of women.

*Connection to Plaintiffs*. Frank Gil was an executive at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### d.     TWC Director Lance Maerov[28]

*Background*. Lance Maerov served as a Director of TWC from October 21, 2005, until July 13, 2018.

*Role and knowledge*. Maerov witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Maerov has admitted that he knew about Weinstein's settlements to victims, but he claims that he assumed they were used to cover up consensual affairs. By way of example only, Maerov was aware of complaints made by Emily Nestor and Lauren O'Connor, and he has admitted that he was aware of the 2015 NYPD sting operation with Ambra Gutierrez. Maerov knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. Maerov was one of two members of the compensation committee during the 2015 contract negotiations with Weinstein, and he agreed to

---

[28] FAC § IV(H)(4).

renew Weinstein's 2015 contract (and previously his 2010 contract) despite his knowledge of Weinstein's sexual misconduct.[29]

Maerov's seat on the Board was due to his company WPP Investments' investment in TWC. He did not take action to terminate Weinstein in order to protect his investment. His decision to stay silent was also driven in part by Harvey Weinstein's threat to disclosed damaging personal information about him.

*Connection to Plaintiffs*. Maerov was a director at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### e.    TWC Director Tarak Ben Ammar[30]

*Background*. Tarak Ben Ammar served as a Director of TWC from October 21, 2005, until July 13, 2018.

*Role and knowledge*. Ben Ammar witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Ben Ammar knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. Like the other Directors, Ben Ammar was aware of the memorandum written by Lauren O'Connor, and he admitted that he was aware of the 2015 NYPD sting operation with Ambra Gutierrez.

---

[29] ¶¶ 475-493.

[30] FAC § IV(H)(5).

Attorney David Boies is quoted as saying to the Financial Times on October 24, 2017, "that Messrs Maerov and Ben Ammar did not know about Weinstein's settlements with women when they approved his 2015 contract … is simply false." Ben Ammar agreed to renew Weinstein's contracts in 2010 and 2015, despite his knowledge of Weinstein's sexual misconduct. Ben Ammar told Fortune magazine that Weinstein thought he was "untouchable" but that "for years Weinstein bullied and insulted employees, directors, and his brother, squandered outside investors' money, and ran TWC not to earn profits for outside investors, but as a personal fiefdom that bestowed celebrity and power."

*Connection to Plaintiffs*. Maerov was a director at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### f.     TWC Director Richard Koenigsberg[31]

*Background*. Richard Koenigsberg served as a Director of TWC from October 21, 2005 until October 14, 2017. As the only non-Weinstein who owned "W" shares of TWC, Koenigsberg had full control over all decisions involving running the studio. He was also Weinstein's longtime personal accountant (prior to TWC).

*Role and knowledge*. Koenigsberg knew or should have known about the Weinstein brothers' personal funds going to settlements with women, including Zelda Perkins in 1998. Koenigsberg witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Koenigsberg knew that

---

[31] FAC § IV(H)(6).

TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. By way of example of the types of complaints of which he was aware, Koenigsberg was aware of the memorandum written by Lauren O'Connor and the 2015 NYPD sting operation with Ambra Gutierrez. Koenigsberg agreed to renew Weinstein's contract in 2010 and 2015, despite his knowledge of Weinstein's sexual misconduct.

*Connection to Plaintiffs*. Koenigsberg was a director at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### g. TWC Director Dirk Ziff[32]

*Background*. Dirk Ziff served as a Director of TWC from October 2005 until April 30, 2009, and again from 2011 until October 6, 2017. The Wall Street Journal reported in 2009 that the Weinsteins did not pay back a $75mm bridge loan from Ziff Brothers Investments, and Ziff resigned from the Board in that year. But the loan was refinanced in 2012, and Ziff was back on the Board around 2011. Ziff was appointed to an "outside director" seat, and he knew that Weinstein appointed him to ensure that any votes to terminate him would be rejected.

*Role and knowledge*. Ziff witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Ziff knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. By way of example of

---

[32] FAC § IV(H)(7).

the types of complaints of which he was aware, Ziff was aware of the memorandum written by Lauren O'Connor and the 2015 NYPD sting operation with Ambra Gutierrez.

*Connection to Plaintiffs*. Koenigsberg was a director at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### h.    TWC Director Jeff Sackman[33]

*Background*. Jeff Sackman served as a Director of TWC from September 21, 2010, until October 6, 2015. Sackman was appointed to an "outside director" seat, and he knew that Weinstein appointed him to ensure that any votes to terminate him would be rejected.

*Role and knowledge*. Sackman witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Sackman knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. By way of example of the types of complaints of which he was aware, Sackman was aware of the memorandum written by Lauren O'Connor, and the 2015 NYPD sting operation with Ambra Gutierrez.

Sackman was on the compensation committee during the 2015 contract negotiation. Instead of staying on the Board and voting to terminate Weinstein, he resigned during the negotiation.

---

[33] FAC § IV(H)(8).

*Connection to Plaintiffs*. Sackman was a director at TWC during the time that Plaintiffs Jane Doe and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### i. TWC Director Tim Sarnoff[34]

*Background*. Tim Sarnoff served as a Director of TWC from June 25, 2013, until October 6, 2017. Sarnoff was Deputy CEO and President of Production at Technicolor. TWC exclusively used Technicolor for its post-production services. In 2012, TWC had fallen behind on payments to Technicolor, so it agreed to add Sarnoff to TWC's Board during negotiations for a repayment plan. Sarnoff's role was to protect Technicolor's security interests, which in turn meant protecting TWC from the upheaval that would have resulted from terminating Weinstein.

*Role and knowledge*. Sarnoff witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Sarnoff knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. Sarnoff should have been aware of the memorandum written by Lauren O'Connor, and he was aware of the 2015 NYPD sting operation with Ambra Gutierrez. Sarnoff agreed to renew Weinstein's contract in 2015, despite his knowledge of Weinstein's sexual misconduct.

*Connection to Plaintiffs*. Sarnoff was a director at TWC during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

---

[34] FAC § IV(H)(9).

### j. TWC Director James Dolan[35]

*Background*. James Dolan served as a Director of TWC from September 30, 2015, until June 20, 2016. Dolan was described as one of Weinstein's "best friends" and a "Harvey loyalist." He also took steps to cover up Weinstein's abuse in 2010.

*Knowledge and role*. James Dolan knew about Weinstein's misconduct by at least 2010. In 2010, IFC Films, a subsidiary of AMC Networks, a company majority-owned by the Dolan Family, purchased a movie that was produced by Barry Avrich about Weinstein. They purchased the film in order to significantly alter its content by hiding any hint of sexual impropriety and other salacious details.

Dolan also witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Dolan should have known that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. When he joined the Board, Dolan should have been aware of the memorandum written by Lauren O'Connor, and the 2015 NYPD sting operation with Ambra Gutierrez.

In 2018, Dolan admitted that he "should have known" about Weinstein's "vile attacks," publishing a song in specific reference to Weinstein's sexual misconduct.[36]

---

[35] FAC § IV(H)(10).

[36] ¶ 587.

*Connection to Plaintiffs*. Dolan's participation in the cover-up of Weinstein's behavior began in 2010—just before Thompson was assaulted. Dolan was also a director at TWC during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### k. TWC Director Paul Tudor Jones[37]

*Background*. Paul Tudor Jones served as a Director of TWC from October 20, 2015, until October 7, 2017. Weinstein was also a director of Jones's Robin Hood Foundation. Jones and Weinstein were friends—the two attended charitable events and galas together.

*Role and knowledge*. Jones knew that he was appointed to the Board as a "Harvey loyalist" to make sure the 2015 contract got approved, and he was aware that other directors had tried to arrange for Weinstein's ouster. Jones witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Jones knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. When Jones joined the Board, he should have been aware of complaints made, Lauren O'Connor's memorandum, and the 2015 NYPD sting operation with Ambra Gutierrez.

On October 7, 2017, after the media reported on Weinstein's sexual misconduct, Jones wrote an email to Weinstein, telling him "I love you" and to focus on a "comeback story."[38] Jones did not sign the October 6, 2017 statement from the Board calling for an independent

---

[37] FAC § IV(H)(11).

[38] ¶ 435.

investigation into Weinstein's misconduct. On December 6, 2017, Jones wrote an email to his own employees at Tudor Investments explaining that he had supported Weinstein for "too long."

***Connection to Plaintiffs***. Jones was a director at TWC during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

### l.　　TWC Director Marc Lasry[39]

***Background***. Marc Lasry served as a Director of TWC from June 20, 2016, until October 7, 2017. Lasry was Weinstein's neighbor in Westport, Connecticut. Their families socialized together, and they attended the same galas and charity events.

***Role and knowledge***. Lasry was appointed to an "outside director" seat, and he knew that Weinstein appointed him to ensure that any votes to terminate him would be rejected. Lasry witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. When he joined the Board, Lasry should have been aware of the 2015 NYPD sting operation with Ambra Gutierrez.

***Connection to Plaintiffs***. Lasry was a director at TWC during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

---

[39] FAC § IV(H)(12).

**C.**     **Each Plaintiff was manipulated, assaulted, threatened, and blacklisted by Weinstein in his capacity as a Miramax or TWC executive.**

    **1.**     **Nanette May (f/k/a Nanette Klatt)**[40]

*The manipulation*. In about 1993, Nannette Klatt attended an audition in Weinstein's Miramax office. After she read from a script Weinstein provided, Weinstein appeared very pleased, told her she was "exactly what I am looking for," and that she had gotten the part.

*The assault*. Weinstein then told her he just needed "one more thing from you." He asked her to disrobe and explained that he needed to see her breasts, repeatedly stating, "it's just your breasts," "take your dress down," and "you are going to need to expose them." Klatt was terrified. When Klatt refused, Weinstein angrily told her that he could "make" her or "break" her, and that she would "never work in this town again."

*The threats and intimidation*. Belligerent and ranting, he told her, "without me, you will never work again." Weinstein corralled her to a side door that led into a pitch-black stairwell and locked her in. Scared and upset, she panicked, walking up and down flights of stairs, banging on doors and yelling on each landing that she was locked in, all the while not knowing whether Weinstein would return and assault her further. Klatt feared for her safety and life. Finally, a maintenance worker let her out.

*The emotional damage*. This assault was profoundly disturbing and life-changing for Klatt. As a result, she has changed how she conducts her life, pursues her career, takes meetings, and interacts with men both personally and professionally. She limits interactions that are one-on-one, even though those meetings are necessary to connect and bond with both professional

---

[40] FAC § IV(D)(1), ¶¶ 93-101.

colleagues and personal acquaintances. Her professional and personal interactions are limited by fears generated by Weinstein's assault.

**The damage to career—*i.e., RICO injury***. Weinstein and Miramax did not hire Klatt for the movie for which she was told she was perfect.

2. **Katherine Kendall**[41]

**The manipulation**. In 1993, 23-year-old Kendall attended a meeting with Weinstein in his Miramax office scheduled by his agent. He gave her scripts for the Miramax movies *Beautiful Girls* and *Things To Do In Denver When You're Dead*, told her she was a great fit, offered her parts in those movies, and welcomed her to "the Miramax family." The meeting was professional, with open doors to his office and female Miramax employees present. After taking her to a movie (under the pretense that it would be a "screening" where he would introduce her to industry participants), Kendall told him she was going to take the subway home. Weinstein said he had to pick up something from his nearby apartment and then would walk her to the subway.

**The assault**. Weinstein went to the bathroom and returned wearing a robe. He repeatedly requested a massage, but Kendall refused. He told her "everyone does it," asking why Kendall was making "a big deal" out of the situation. Kendall refused and was visibly upset. He then went back to the bathroom and returned naked. He stood between her and the door, informing her that her refusal to provide sexual services had "insulted" him. Weinstein chased her around the apartment, demanding that she kiss him, touch him, and allow him to see her breasts. He barred Kendall in the apartment, placing her in imminent fear for her life and safety.

---

[41] FAC § IV(D)(2), ¶¶ 102-124.

***The threats and intimidation***. Weinstein finally allowed her to leave. Weinstein took her to a taxi but physically forced his way into the taxi with her. For that reason, Kendall claimed she was meeting her boyfriend at a bar. After dropping her at the bar, Weinstein remained in the taxi for approximately 20 minutes, watching her movements in the bar. Weinstein called Kendall several times after the assault to "make sure" they were friends. Each time he attempted to contact her, Kendall became upset.

***The emotional and physical distress***. After the assault, Kendall experienced both emotional distress and physical pain, along with shame, depression, and a loss of self-worth. At various times since the assault, she has had to leave the entertainment industry completely in an effort to address her post-traumatic stress and emotional trauma.

***The career damage—i.e., RICO injury***. Weinstein and Miramax did not cast Kendall in the movies *Beautiful Girl* and *Things To Do In Denver When You're Dead*—even though Weinstein told her that he had parts for her in those movies and she was expressly welcomed into the "Miramax family." In 2017, Kendall was targeted by spies whose purpose was to gather information concerning her assault for the purpose of harming her causes of action and/or preventing her from filing suit.

### 3. Caitlin Dulany[42]

***The manipulation***. After 23-year-old Caitlin Dulany met Harvey Weinstein at Miramax in 1996, Weinstein's assistant called Dulany to invite her to a screening of a Miramax movie. There, he was professional and introduced her to industry participants. He invited her to several other professional events, including an industry party and a meeting with a talent manager. Each

---

[42] FAC § IV(D)(3), ¶¶ 125-151.

encounter was professional, with Weinstein telling Dulany that he wanted to help her with her career.

After Weinstein's assistant invited Dulany to dinner, Weinstein arrived to pick her up. Dulany let him into her apartment. Dulany excused herself to use the bathroom. When she came out, Weinstein lay naked in her bed. He stood up. She rushed past him into the living area and said: "Harvey put your clothes back on." He then got dressed and left the apartment. Dulany told herself that it must have been a misunderstanding.

Two months later, Dulany attended the Cannes Film Festival to promote her most recent film, *Rescuing Desire*. There, she ran into Weinstein. He acted like nothing had happened and invited her to an industry gathering, where he acted professionally. Several days later, Weinstein's assistant invited her to a Miramax film premiere, followed by a benefit dinner.

***The assault***. After the dinner, Weinstein's assistant told Dulany that there was a car waiting outside to take her to the after-party at Hotel du Cap. When she arrived in the hotel room, there was no party—just Weinstein, who imprisoned her and sexually assaulted her. Weinstein undressed her and performed oral sex on her without her consent. Then Weinstein began to masturbate. When he ejaculated, Dulany felt a wave of nausea run through her body.

***The duress and emotional distress***. Dulany knew that if she reported him, Weinstein would destroy her life. Weinstein's assault traumatized her. She has experienced debilitating anxiety, depression, and exhaustion. The assault has negatively impacted her relationships. Since the assault, Dulany has experienced a pervasive feeling that she would rather be dead.

***The career damage—i.e., RICO injury***. After the assaults, Dulany auditioned for several productions with Miramax producer Scott Rosenberg, who told others she "was great." On

information and belief, Dulany was not cast in those productions because Harvey Weinstein interfered and told Rosenberg not to cast Dulany.

### 4. Zoe Brock[43]

*The manipulation*. In 1998, 24-year-old Zoe Brock attended the Cannes Film Festival with her agent for her modeling career. They stayed on a yacht in the bay. One evening, Brock and her friends attended a dinner at the Hotel Barrière Le Majestic with her agent and Defendants Weinstein, Schwartz, and Lombardo. Later that night, Weinstein, Schwartz, and Lombardo separated Brock from her group; they said her friends would meet them at Hótel du Cap Eden-Roc for a drink. When they arrived at Weinstein's hotel room, Brock's friends were absent and Lombardo made excuses to leave. After Brock asked Schwartz to contact her friends, Schwartz said he would go see whether they were having trouble getting up to the room.

*The assault*. Weinstein then left the room, came back naked, and demanded a massage. While Brock refused, Weinstein physically maneuvered her into his bedroom. She was terrified that Weinstein was going to rape her, and she feared for her life. Brock escaped and locked herself in the bathroom. Weinstein banged on the bathroom door, demanding that Brock come out. Convinced that he would rape her, Brock refused. Eventually, after Brock started yelling, Weinstein promised to put his clothes on. When Brock emerged from the bathroom, Weinstein was in a bathrobe. Weinstein promised to make it up to her and told her he would have Schwartz take her into town. Weinstein then got dressed, contacted Schwartz to return, and the three of them took a car back to the harbor. During the car ride, Weinstein repeatedly told Zoe how much he wanted to help her with her career. Weinstein told her she was special, amazing, and a star.

---

[43] FAC § IV(D)(4), ¶¶ 152-164.

***The duress and intimidation***. When they arrived at the harbor, there was no way for Brock to return to the yacht. Weinstein offered her his penthouse suite at Hotel Barrière Le Majestic, which he claimed to keep for "emergencies." During check-in, Schwartz apologized for Weinstein's behavior, admitting that it had happened before. When Brock arrived at the room, she triple-locked the door and called an actor staying at the hotel to tell him what happened. The actor warned Brock not to go to sleep because Weinstein would be back. The next morning, Brock took the first-available water taxi back to the yacht, narrowly avoiding another encounter with Weinstein, who returned to intercept her.

Brock told her agent that she never wanted to see Weinstein again. Shockingly, that very night—and without disclosing that Weinstein would be present—Brock's agent took her and a group to a private film screening. As the lights dimmed, Weinstein entered the cinema and sat directly behind Brock. To intimidate her, Weinstein kept his hand on Brock's chair the entire movie. Throughout the movie, Brock was nauseous and shaking, fearful of being assaulted.

***The emotional distress***. After Weinstein assaulted her, Brock suffered from depression, a lack of self-confidence, and a loss of reputation. Because of the actions of Weinstein and his enablers, Brock was afraid to audition for roles that required her to travel to Hollywood and avoided going there for several years. Weinstein and his Miramax colleagues significantly affected Brock's confidence and her ability to be a professional actor.

***The career damage—i.e., RICO injury***. Brock did not receive any work from Weinstein or Miramax, even after telling that her he was going to "make her a star."

5.    **Melissa Sagemiller**[44]

*The manipulation*. In 2000, 24-year-old Sagemiller was filming Miramax's *Get Over It*. Right after shooting started, with an invitation from Weinstein's female assistant, Sagemiller attended lunch with Weinstein. Subsequently, a female assistant (on information and belief, Barbara Schneeweiss) told her to go to Weinstein's hotel room. Sagemiller said that she was not comfortable, requesting to meet and indicating that she would prefer meeting in her trailer instead. The assistant told her not to worry, and it was "very important" for Weinstein to "discuss" the script with her.

*The assault*. When Sagemiller arrived, Weinstein answered the door in his robe. Weinstein asked for a massage and demanded a kiss. She refused. Weinstein said he would not allow her to leave until she kissed and touched him. He blocked the door, placing Sagemiller in fear of assault. Weinstein told her that other famous actresses gave sexual favors, and he asked: "Don't you want your career to be more than just this little teen film?" Weinstein prevented Sagemiller from leaving, until he forcibly kissed her.

*The threats and intimidation*. Sagemiller avoided him for the rest of the shoot. At the wrap party, Weinstein insisted that she travel back to the United States on his private plane. She refused and instructed her agent not to allow the cancellation of her commercial flight reservation. The next day at the airport, after checking her bags, she was told to report to security. On the security phone, Weinstein's assistant informed her that Weinstein had directed her bags be delivered to his plane. With her personal effects held hostage, Sagemiller was forced to travel on Weinstein's plane. When she arrived at his plane, Weinstein said: "See, Melissa, you can't say no to me. I always get what I want."

---

[44] FAC § IV(D)(5).

***The emotional distress***. The fact that Weinstein wielded so much power that he could prevent her from traveling on public transportation, over her objections, frightened Sagemiller.

***The career damage—i.e., RICO injury***. Sagemiller auditioned for *40 Days and 40 Nights*, a Miramax movie. Sagemiller's manager, Christian Donatelli, told her that the producer had "made it known" throughout Hollywood that he did not like her and would not cast her. On information and belief, Weinstein fed the producer negative information about Sagemiller. Sagemiller later auditioned for a movie called *Sin City* produced by Buena Vista. On information and belief, Sagemiller did not get the part because Weinstein told the producer not to cast her. On information and belief, Weinstein also blacklisted Sagemiller from the movies *Pearl Harbor* (Buena Vista) and *National Treasure* (Disney and Buena Vista).

**6.  Larissa Gomes[45]**

***The manipulation***. An ensemble dancer and actor on the set of *Get Over It* in 2000, Gomes was invited to meet with Weinstein at the Sutton Place Hotel for a morning meeting. When Gomes arrived, she called his penthouse room and suggested they meet in a nearby bistro. He refused. Gomes then called her agent because she was not comfortable going to the hotel room. After Gomes' agent and a colleague called Weinstein, Weinstein agreed to have his head of casting present for the meeting. Weinstein told Gomes she would read for three upcoming films to be shot in Toronto. He said he needed local talent and that she was a perfect fit. Weinstein also arranged for her to perform background vocals on a soundtrack.

***The assault***. Shortly thereafter, Weinstein set up an evening meeting in his hotel room. Gomes felt comfortable because the prior meeting was professional. Weinstein gave her a stack of scripts and told her she would read for *Serendipity* and *40 Days and 40 Nights* because she'd

---

[45] FAC § IV(D)(6).

be "perfect." Weinstein then intimated he had needs to be taken care of. Gomes panicked. Weinstein laid down on the bed and claimed to have a headache. Frightened, Gomes offered to find some Advil. Weinstein demanded she lay down, give him a massage, and show him her breasts. Shocked, Gomes tried to gather her things. Weinstein followed her, used his bulk to lean over her, and massaged her shoulders. Nauseated, she tried to pull away but Weinstein held on. Weinstein forcefully pushed his hands toward her breasts. In fear of assault, Gomes wrenched herself away from Weinstein's reach. Weinstein yelled at Gomes, and named actresses who would give sexual favors. Weinstein blocked her from leaving. After catching and forcibly kissing her, Weinstein released his hand from the door. Gomes ran out of the room distraught.

*The emotional distress*. Gomes knew Weinstein would destroy her if she complained about his sexual misconduct. Gomes could not shake the extreme physical and emotional distress she felt. Since then, she has tried to avoid working with men, for fear of her safety. Feelings of fear and shame have resurfaced regularly, negatively affecting her personal and professional life.

*The career damage—i.e., RICO injury*. Gomes was not included on Miramax's roster of go-to talent in Toronto as Weinstein had promised, and she did not get cast in even one of the eight films per year that Weinstein represented Miramax filmed in Canada annually.

### 7. Jane Doe[46]

*The manipulation, harassment, and assaults*. In September 2002, 16-year-old Jane Doe (from Poland) was attending an event with her modeling agency in Manhattan when she met Harvey Weinstein. Three days later, Weinstein called Jane Doe and said he would pick her up with his driver for a business lunch. Instead, the driver dropped them at Weinstein's apartment. Once alone, Weinstein wasted no time in aggressively demanding sex. He told Jane Doe that if

---

[46] FAC § IV(E).

she wanted to be an actress, then she would have to be comfortable losing her inhibitions and getting naked. He told her to take off her clothes. She refused. He then took off his pants and firmly held Jane Doe while forcing her to touch and massage his penis. Jane Doe protested, screamed, and tried to leave. Weinstein returned Jane Doe's shouting with anger.

After their first encounter, Jane Doe endured nearly a decade of sexual harassment and emotional abuse at his hands. Over the course of a decade, he or his assistant called and texted her every two weeks, and even tried to break into her hotel rooms. He used each opportunity to make sure that she understood that he was the only person who could help her become an actress. He repeatedly chastised Jane Doe for being "unavailable" for his sexual demands.

Wanting to avoid his wrath, and still wanting to become an actor, Jane Doe became well versed in the art of letting Weinstein down gently. She knew from her experience and warnings from others that he was powerful and dangerous.

Over the years, he provided her with opportunities, including as an extra on the *Nanny Diaries* (2004), an acting school recommendation from Kelly Carmichael, TWC's Senior Vice President of Production (2006), and a meeting with an agent at William Morris (2006). Each time, he said she would have to be "very good to him" and the frequency of his contacts increased. Jane Doe took the opportunities, but refused to give him sexual favors in return. Weinstein continued his efforts to keep Jane Doe under his control. He constantly reminded her how much he had done for her, always emphasizing that he was the only person who could help her become an actor.

In 2008, at age 23, Jane Doe returned to New York to make a final attempt at becoming an actress. Weinstein suggested that they meet at his TWC office. In the meeting, Weinstein said that he would help her become an actress eventually, but that she would have to go back to

modeling first. He told her about a model who was successful in exchange for sexual favors. Meanwhile, Christina Aguilera was performing on the TV in his office. Weinstein paused their conversation to look up at the TV, declaring: "Wow, I'd really like to fuck that pussy." He then unzipped his pants and began touching his penis. Jane Doe first froze, and then fled the office.

Weinstein later called Jane Doe to hire her as a model on *Project Runway*, which was jointly produced by TWC and Miramax. Barbara Schneeweiss handled the logistics.

In 2011, after several more years of harassment, Weinstein reached out to her upon hearing that she was dating a well-known actor. He repeatedly asked her on the call "what she was doing" with him. Exhausted from the years of abuse and harassment, Jane Doe declined his invitation to meet, and did not see him again after 2011.

*The emotional distress*. Weinstein's ongoing emotional abuse, and the guilt, shame, and anxiety that flowed from the 2002 incident—when she was 16 and alone with Harvey Weinstein—took a toll on Jane Doe. She understood that she would never get cast in a production unless she gave Weinstein sexual favors. In addition to acting as a barrier to her acting career, her encounter with Weinstein—her first sexual encounter—was deeply traumatizing. And the ensuing abuse, harassment, and manipulation has had compounding negative effects on her mental health. To this day, she suffers from depression and anorexia, and has found it difficult to maintain healthy relationships with men.

*The career damage—i.e., RICO injury*. Weinstein told Jane Doe, starting when she was 16 years old, that she could not be successful without engaging in unwanted sexual contact with him; he was the sole gatekeeper to the industry, and she would have to give him sexual favors in exchange for becoming an actor. Because Jane Doe was unwilling to give Weinstein the sexual

favors he demanded, Weinstein never gave her the extent of the work he promised her and made sure others didn't either.

## 8.    Louisette Geiss[47]

*The manipulation*. Geiss ran into Weinstein at the 2008 Sundance Film Festival in Park City, Utah, while with Barbara Schneeweiss. Weinstein invited Geiss to a TWC movie premiere. After the movie, Weinstein inquired about Geiss' music company, the script she was pitching at the festival, and her acting career. Weinstein asked Geiss to meet in the lobby of The Stein Eriksen Lodge. When the lobby bar was closing, Weinstein suggested that they go to his office.

Because Geiss had heard rumors about Weinstein, she was skeptical, but the reason for attending Sundance was to secure a deal for her script. She decided to bluntly express her concerns and asked Weinstein to shake her hand—in front of security cameras in the hotel lobby —and agree that he would not touch her during the meeting. He agreed. In Weinstein's office, Weinstein and Geiss had a professional conversation for approximately 30 minutes, in which Weinstein expressed enthusiasm about both her script, music, and roles she could play as an actress. Then, Weinstein excused himself to go to the bathroom.

*The assault*. Weinstein emerged from the bathroom in an open bathrobe, naked underneath. He informed Geiss that he would listen to the remainder of her pitch from the hot tub. He then disrobed, entered into the hot tub, began to masturbate, and told her to keep talking. Distressed, Geiss tried to leave. Weinstein quickly climbed out of the hot tub and grabbed her arm while his other hand was touching his penis. He pulled her to his bathroom, insisting she watch him masturbate and he would "greenlight" her script in return. Geiss repeatedly said no. Continuing to hold on to her arm, Weinstein told Geiss not to be "stupid," as he would give her a

---

[47] FAC § IV(F)(1).

three-film deal. Weinstein grabbed both of her arms forcefully and kissed her. Fearing sexual assault, Geiss escaped Weinstein's grasp and fled, with Weinstein giving chase.

*The duress and emotional distress*. After the assault, Geiss met Schneeweiss for dinner, where she mentioned Weinstein's behavior. Schneeweiss responded: "He's never done anything to me," but did not deny that Weinstein was inappropriate with other women. On information and belief, Weinstein directed Schneeweiss to contact Geiss so that she would not speak to the press; Schneeweiss connected with Geiss via LinkedIn in May 2017.

Weinstein's assault deeply distressed Geiss. She experienced fear, helplessness, anger and depression, and she sought professional help.

*The career damage—i.e., the RICO injury*. Geiss lost both the three-film deal and other opportunities at TWC. Ultimately, Geiss' professional career in the entertainment industry was damaged, causing her to leave the industry.

### 9. Sarah Ann Thomas (a/k/a Sarah Ann Masse)[48]

*The manipulation*. In 2008, Sarah Ann Thomas was working as a nanny to support herself as she pursued an acting career in New York. After her agency told her of an open position as a nanny for Weinstein's children, two female TWC assistants interviewed Thomas via telephone and in person. They inquired several times whether she could work for Weinstein while pursuing her acting career without it becoming a conflict. Thomas was clear that she did not use her nanny work as an opportunity to try to advance her acting career.

After one month, one of the assistants scheduled an interview with Weinstein at his Connecticut home. Weinstein conducted the interview in his boxer shorts and an undershirt. During the interview, two of Weinstein's children ran into the room. Weinstein screamed at them

---

[48] FAC § IV(F)(2).

to leave, which was odd given that parents typically want children to meet a potential nanny. Thomas was frightened. Eventually, leaning forward and wiggling his eyebrows as if leering at her, Weinstein asked whether she would "flirt" with his friends to "get ahead." At the conclusion of the interview, Weinstein grabbed Thomas and pulled her tight against his body. The hug was uncomfortably close and lasted too long. She did not know how to get out of his embrace. Weinstein then told Thomas that he loved her. Thomas felt unsafe and sexualized. She was afraid he would assault her. Thomas left feeling upset, shaken, and afraid.

*The emotional distress*. Since then, Thomas has experienced severe anxiety and emotional distress, as well as physical symptoms. Now, she often does not feel safe to attend interviews and auditions alone, and requires her husband to accompany her.

*The career damage—i.e., RICO injury*. Thomas did not receive the job as Weinstein's nanny. Thomas also was told in December 2017 that she was blacklisted as a result of her accusations against Weinstein and has since seen an 86% drop in auditions.

### 10.   Melissa Thompson[49]

*The manipulation*. A recent MBA graduate, Thompson met with Weinstein on September 29, 2011, to pitch an enterprise video platform in his TWC office. When she arrived, she turned on the video recording on her computer to use a live-feed demonstration (and has a video of their encounter). Weinstein locked his office door as he walked in. He deflected her handshake and ran his hands from her upper back around to her lower back. Over the course of the pitch, Weinstein tried to flirt and touch Thompson, running his hands on her back and thighs and reaching under her dress. Each time, she tried to deflect and redirect his attention to the business pitch she was making. Thompson felt cornered, as if she had to play along to not blow

---

[49] FAC § IV(F)(3).

the pitch. Thompson continued her pitch, focusing on the technology's capabilities and the cost of the options. She tried to keep the pitch business-like, not returning Weinstein's caresses and keeping her elbows on the table. During the pitch, Weinstein called TWC's President of Marketing, said he wanted him to meet Thompson and to make a deal. He asked her to meet them for a drink at Tribeca Grand Hotel at 5:30 p.m. After Thompson set up in the hotel restaurant, Weinstein arrived and told Thompson to follow him. He took her to a room on the third floor that turned out to be his hotel room.

*The assault*. Attempting to set a professional tone for the meeting, Thompson opened her laptop on the coffee table directly in front of the door. Weinstein sat behind her on the couch and began rubbing her shoulders. Thompson kept trying to shift away from him, but Weinstein used his strength to maintain contact and continued to massage her shoulders. Thompson excused herself to use the bathroom, trying to figure out how to leave. When Thompson came out, Weinstein had no pants on. Weinstein demanded she join him in the shower. She declined. He then reached behind her dress and pulled the zipper down. Thompson tried to pull the zipper back up. As she did so, Weinstein lowered himself to his knees and tried to take her stockings off. As he pushed one leg of her stockings down, she tried to pull the other one up. His hands were everywhere and she could not get out of his grasp or keep up with deflecting him. He maneuvered Thompson into the bedroom, took off his shirt and laid face down on the bed. Weinstein told her to give him a shoulder massage. She told herself that if she could leave after the massage, she would be relatively unscathed.

When she sat on the bed, he flipped over onto his back and aggressively tried to undress her. He pulled her dress up, exposing her underwear, despite her attempts to keep herself covered. Weinstein then started to masturbate, demanded that she "come here," and pushed her

head between his legs, in an attempt to force her to fellate him. Thompson refused. Weinstein

grabbed her, using brute force to push her flat on the bed on her stomach as he pulled her dress

up and moved her underwear to the side. Thompson was fighting back, but could not out-muscle

him. Weinstein held Thompson down and raped her. He then masturbated in the shower where

Thompson could see him while she gathered her things to leave.

*The emotional distress*. Covered in hives, Thompson couldn't think straight or breathe.

Thompson was completely unnerved, panic-stricken, and in a state of shock and disbelief.

Thompson felt nauseous and distressed. Thompson felt dirty and ashamed. Moments of the

assault that just occurred flashed in her mind—something that would continue for years to come.

*Tampering with a victim—i.e., the RICO injury*. Thompson confided shortly thereafter

to her then-friend, Ambassador Paolo Zampolli, who told her that these things happen in

business and she would need to deal with it. She knew that Weinstein could and would destroy

her if she complained. On October 8, 2017, just days after The New York Times story broke

uncovering Weinstein's pattern of assaults, Thompson received the first of several emails from

Zampolli, insisting she call him ASAP. On October 12, 2017, Thompson recorded her call with

Zampolli. Zampolli told her that several other victims were going to be represented by Benjamin

Brafman in a class action lawsuit against Weinstein. Thompson agreed that Zampolli could put

her in touch with Brafman's firm. Thompson proceeded, via telephone, text and email, to share

the evidence of her assault with a Brafman associate and discuss legal strategy. The associate

even told Thompson there were "loopholes" for the statute of limitations.

On November 8, 2017, Weinstein publicly announced that he had hired Brafman to

represent him in his criminal case. Upset, Thompson confirmed with Zampolli that Brafman told

him that he was representing victims of Weinstein. Thompson then texted Brafman's associate, who advised her for the first time that he no longer worked there.

Thompson immediately felt ill and fearful. She had shared important evidence against Weinstein with the very law firm that represented Weinstein—unbeknownst to her. That law firm had informed her that she did not need to worry about the statute of limitations and lulled her into a sense of security regarding her claims. All of her fears—the very reasons she did not come forward immediately after she was assaulted—had been realized. Weinstein had used his network to show her just how far his reach stretched into her own circle.

## III. PLAUSIBILITY IS A REASONABLE EXPECTATION THAT DISCOVERY WILL REVEAL EVIDENCE OF THE ALLEGED WRONGDOING

The Second Circuit recently explained that to "survive a motion to dismiss, a complaint need only provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[50] Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[51] Moreover, for "[a]ppellants to 'nudge[ ] their claims across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"[52] As the Second Circuit stated in *Keiler v. Harlequin Enterprises Ltd.*:

> We underscore that *Twombly* does not impose a probability requirement at the pleading stage. *See Arista Records LLC*, 604 F.3d at 120 (citing *Twombly*, 550 U.S. at 556[]). It simply requires factual allegations sufficient to raise a reasonable expectation that discovery is likely to generate evidence of liability. *See id.* For

---

[50] *Citizens United*, 882 F.3d at 380 (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013).

[51] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[52] *Citizens United*, 882 F.3d at 380 (quoting *Twombly*, 550 U.S. at 570).

these reasons, we conclude that the fourth claim should not have been dismissed.[53]

The Second Circuit's guidance is directly applicable here, given the ample public disclosures of the evidence that will be available to Plaintiffs during discovery:

- Lists of victims provided to spies for targeting, including a list on which Plaintiff Kendall's name reportedly appears (and on which other Plaintiffs will plausibly appear);[54]

- Recordings of communications between the spies and the victims (which Plaintiff Kendall believes will include a recording of contacts with her);[55]

- A list of 100+ victims provided by Harvey Weinstein to TWC in the bankruptcy proceedings in order to obtain their communications (Plaintiffs do not know if they are on this list);[56]

- Thousands of pages of emails between Weinstein and the victims;[57]

- Emails between Weinstein and his former criminal lawyer, whose firm also purported to contemporaneously represent Plaintiff Melissa Thompson while it took her evidence of assault;[58]

- The "dirt file" on victims that was sent to reporters from a public relations person retained by Weinstein's criminal lawyers;[59]

---

[53] 751 F.3d 64, 71 (2d Cir. 2014).

[54] ¶¶ 120-123. *See also* https://www.theguardian.com/film/2017/nov/18/harvey-weinstein-secret-hitlist-sex-scandal.

[55] ¶¶ 116-124. *See generally* https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[56] Order Authorizing the Protocol for Production of Documents in Response to Harvey Weinstein's Motion Compelling Discovery Under Rule 2004 of the Federal Rules of Bankruptcy Procedure, *In re: The Weinstein Co. Holdings LLC, et al.*, No. 18-10601 (MFW) (Bankr. D. Del. June 5, 2018) (Dkt. 976).

[57] *Id.*; Attorney's Reply Affirmation at 2, 4, 32, *The People of the State of New York v. Harvey Weinstein*, Ind. No. 2335/18 (N.Y. Sup. Nov. 29, 2018).

[58] ¶¶ 305-321.

[59] *See* Declaration of Elizabeth Fegan in Support of Objection of Class Plaintiffs to Harvey Weinstein's Motion for an Order Permitting Use of Documents Produced Under 2004 Order, *In re: The Weinstein Co. Holdings, LLC, et al.*, No. 18-10601 (MFW) (Bankr. D. Del. Jan. 2, 2019) (Dkt. 1911).

- Lists maintained by Weinstein's assistants, called "Friends of Harvey" or "HW friends," detailing his victims;[60]

- Documentation of complaints by victims to Miramax and TWC management;[61]

- Documentation of complaints shared with TWC Board Members;[62]

- Phone records reflecting the phone calls and text messages Weinstein (or his agents) sent to victims (including Plaintiffs) before and after their assaults;[63]

- Expense reports, credit card statements, budgets and other financial reporting reflecting corporate payments for erectile dysfunction shots, hotel rooms, and other chattels used by Weinstein;[64]

- Bonus payments to employees who procured erectile dysfunction shots and cleaned up after the assaults;[65]

- Emails between and among TWC Board Members regarding the retention of Harvey Weinstein despite their knowledge of sexual abuse and the purpose of insulating him from termination so long as Weinstein paid a penalty for each assault;[66]

- Weinstein's personnel file;[67]

- Personnel files of employees who had complained about Weinstein;[68] and

---

[60] Verified Petition ¶ 70, *The People of the State of New York v. The Weinstein Co.*, LLC, et al. (N.Y. Sup. Feb. 11, 2018) ("NYAG Petition"); Compl. ¶ 31, *Rehal v. Weinstein, et al.*, Ind. No. 151738/2018 (N.Y. Sup. Oct. 4, 2018) ("Rehal Compl."); https://www.vanityfair.com/hollywood/2018/01/harveys-concern-was-who-did-him-in-inside-harvey-weinstein-frantic-final-days.

[61] *See, e.g.*, ¶¶ 333-335.

[62] *See, e.g.*, ¶¶ 443, 445.

[63] *See, e.g.*, ¶¶ 105, 116, 175, 215, 217, 224, 307, 320, 411.

[64] ¶¶ 79-81, 442, 626. *See also* NYAG Petition, ¶¶ 72, 82; Rehal Compl. ¶¶ 26, 27.

[65] ¶¶ 442, 626; NYAG Petition ¶¶ 45, 81.

[66] ¶¶ 423-430. *See also* http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

[67] https://www.vanityfair.com/hollywood/2018/01/harveys-concern-was-who-did-him-in-inside-harvey-weinstein-frantic-final-days (describing how portions of Weinstein's personnel file and the files of employees who had complained about Weinstein may have been taken in the days before The New York Times broke its story on Weinstein's misconduct).

[68] ¶ 631; https://www.vanityfair.com/hollywood/2018/01/harveys-concern-was-who-did-him-in-inside-harvey-weinstein-frantic-final-days.

- 44 -

- Emails between Weinstein and individual members of the TWC Board, including Maerov, in which Weinstein threatened to publicly release embarrassing details from their past if they did not renew his employment contract.[69]

Given the plethora of evidence that exists (but to which Plaintiffs do not yet have access), "[a]llegations made upon information and belief satisfy the pleading requirements, especially in the case that 'the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.'"[70] As this Court explained in *Zuma Press, Inc. v. Getty Images (US), Inc.*, "Where relevant information is exclusively in the possession of the defendant, as is the case here, a plaintiff may allege facts on information and belief, and need not plead more specific facts that are unavailable to the plaintiff as a result of the defendant's own conduct."[71] "To hold otherwise would enable [the defendant] to convert the sheer magnitude of its alleged [wrongdoing] into a shield from liability."[72]

Nor should the need to plead "on information and belief" that Weinstein and his co-conspirators blacklisted them be fatal to Plaintiffs' claims. Instructive is *Boykin v. KeyCorp*, in which the Second Circuit reversed a district court's dismissal of a race and sex discrimination claim.[73] Criticizing the district court's rejection of the plaintiff's pleading of facts on "information and belief," then-Judge Sotomayor explained that:

---

[69] *See, e.g.*, ¶ 490.

[70] *Rizzo v. DF Land LLC*, 2014 WL 12560779, at *1 (S.D.N.Y. June 10, 2014) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations omitted)). *See Arista Records, LLC*, 604 F.3d at 120 ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.") (internal quotations and citations omitted).

[71] 2017 WL 2829517, at *3 (S.D.N.Y. June 29, 2017) (quoting *Arista Records, LLC*, 604 F.3d at 120).

[72] *Id.*

[73] 521 F.3d 202 (2d Cir. 2008).

- 45 -

[B]oth *Twombly* and *Erickson* explicitly disavow that Rule 8(a) requires any plaintiff--let alone a *pro se* plaintiff--to plead "specific facts." *Twombly*, 127 S. Ct. at 1973-74; *Erickson*, 127 S. Ct. at 2200. Moreover, as Boykin correctly observes, the names and records, if any, of persons who were not members of the protected classes and were more favorably treated in the loan application process is information particularly within KeyBank's knowledge and control. Pleading on the basis of information and belief is generally appropriate under such circumstances. … Indeed, even in the context of Federal Rule of Civil Procedure 9's more stringent pleading requirements for pleading "special matters," we have held that "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."[74]

District courts frequently apply *Boykin* in denying motions to dismiss when relevant information is peculiarly within the control of the defendants.[75] Here, other than the fact of assault, *all* of the information is in Defendants' control. Nonetheless, Plaintiffs have pleaded detailed facts regarding the scope and breadth of the conspiracy. That is enough.

Finally, allegations of retaliation need only be supported by facts that give rise to an inference that retaliation occurred. As the Second Circuit recently explained, "a plaintiff alleging retaliation or discrimination does not need to state a *prima facie* case to survive a motion to dismiss so long as they plausibly allege facts that give rise to an inference of retaliation or discrimination."[76] Thus, the allegations in a "complaint need not give plausible support to the

---

[74] *Id.* at 215 (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)).

[75] *See, e.g.*, *Zuma Press*; *Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, 251 F. Supp. 3d 724, 746 (S.D.N.Y. 2017) ("With respect to Plaintiff's allegations regarding Defendant's involvement in the transmission of the fax, that information is 'peculiarly within the possession and control of ... [D]efendant,' and therefore pleading on the basis of information and belief is permissible.") (quoting *Arista Records*, 604 F.3d at 120); *Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016) ("At this stage, without discovery, it is to be expected that Plaintiffs would have limited knowledge of the extent to which Defendant has used their trade secrets. Accordingly, the Court finds that Plaintiffs have sufficiently alleged the second element of their misappropriation of trade secrets claim – that Defendant used their trade secrets in developing a feature for its own app.").

[76] *Padilla v. Yeshiva Univ.*, 691 F. App'x 53, 54 (2d Cir. 2017) (citing *Boykin*, 521 F.3d at 212).

ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a *minimal* inference of discriminatory motivation."[77] As reflected below, Plaintiffs satisfy this standard here.

## IV.   PLAINTIFFS' CLAIMS ARE TIMELY

**A.   Plaintiff Geiss', Thomas' and Thompson's claims under the Trafficking Victims Protection Reauthorization Acts are timely.**

### 1.   Geiss' and Thomas' 2008 claims under the TVPRA are governed by the 10-year statute of limitations.

At the time of the alleged violations as to Geiss and Thomas, the Trafficking Victims Protection Reauthorization Act ("TVPRA") was governed by a four-year statute of limitations.[78] In 2008, however, Congress amended the TVPRA to include a ten-year statute of limitations.[79] At the time of the amendment, neither Geiss' nor Thomas' claims were time-barred. For TVPRA claims that were not time-barred on the effective date of the 2008 amendment, courts consistently hold that the plaintiffs are entitled to the full benefit of the amended 10-year statute of limitations.[80] Accordingly, Geiss' and Thomas' TVPRA claims (Counts I and II) are timely.

---

[77] *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis added).

[78] *See* Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003) (establishing a private right of action but not a statute of limitations); 28 U.S.C. § 1658(a) (2012) ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues.").

[79] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 221(2)(B), 122 Stat. 5044, 5067 (codified at 18 U.S.C. § 1595(c)).

[80] *Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014) (rejecting defendants' argument that application of the amended statute of limitations under the TVPRA would be impermissibly retroactive). *See also Roe v. Howard*, 2018 U.S. Dist. LEXIS 1443, at *4 (E.D. Va. Jan. 3, 2018) (same); *Lama v. Malik*, 192 F. Supp. 3d 313, 323 (E.D.N.Y. 2016) (denying motion for summary judgment; because plaintiff's claims were "still alive at the time the amended statute of limitations was enacted, it does not impair any parties' rights to apply it retroactively, since it does not revive stale or expired claims"); *Oluoch v. Orina*, 101 F. Supp. 3d 325, 331 (S.D.N.Y. 2015) (denying motion to dismiss TVPRA claims, explaining: "In 2007, defendant could not expect to face liability for her conduct beyond 2011, when the four-year statute of limitations period expired. However, plaintiff's claims were still valid, still 'alive,' a year later when Congress expanded the statute of limitations for human trafficking claims to ten years. Holding defendant to this increased limitations period risks no retrospective effect because it does nothing to expand the legal

- 47 -

### 2. Plaintiff Thompson's 2011 claims fall within the 10-year statute of limitations.

The violations of the TVPRA as to Melissa Thompson occurred in 2011. Accordingly, her claims in Counts I and II fit squarely within the ten-year statute of limitations.[81]

## B. Plaintiffs' RICO claims are timely because they could not discover that Harvey Weinstein blacklisted them until October 2017 at the earliest.

### 1. Plaintiffs could not and did not discover that Weinstein caused their career damage until October 2017.

While a four-year limitations period applies to RICO,[82] the Second Circuit recognizes:

> [C]ongress tied the right to sue for damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property' from the violation. Consequently, a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury.[83]

RICO thus requires discovery of the "injury and the injurer" to trigger the statute. Plaintiffs alleged that they could not have discovered and did not discover that Weinstein's network of professional spies had targeted them (which is the whole point of hiring "spies") until October 2017 at the earliest—well within the limitations period.

---

consequences defendant already faced in 2008. Since the claims were still alive in 2008, there is no impermissible retroactivity in applying the extended statute of limitations Congress adopted that year."); *Headley v. Church of Scientology Int'l*, 2009 U.S. Dist. LEXIS 131766, at *19 (C.D. Cal. Aug. 12, 2009) (same); *Camayo v. John Peroulis & Sons Sheep, Inc.*, 2013 WL 3927677, at *2 (D. Colo. July 30, 2013) (same).

[81] 18 U.S.C. § 1595(c).

[82] *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988). *See also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998) (per curiam) ("The limitations period begins to run when the plaintiff discovers or should have discovered the RICO injury."); *Frankel v. Cole*, 313 F. App'x 418, 420 (2d Cir. 2009) ("Because the RICO statute requires a showing of 'injury', 18 U.S.C. § 1964(c), and the injury discovery rule calculates accrual from the discovery of that *injury*, accrual of a civil RICO claim is delayed until the plaintiff is aware, or should have been aware, of the injury.") (quoting *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 777 (5th Cir. 2000)).

[83] *Bankers Tr. Co.*, 859 F.2d at 1103 (internal citations omitted).

Defendants argue that the date on which each Plaintiff was sexually assaulted triggered the four-year statute of limitations for RICO. But rape and assault do not result in RICO injury.[84] The RICO injury is the career damage inflicted by Weinstein's practice of blacklisting.

The focus of the inquiry is thus on the date that Plaintiffs should have discovered their RICO injuries—i.e., the damage to their careers. But the issue is not whether a Plaintiff knows that she did not get a part or a business deal. The issue is whether she knew that she was blacklisted. By way of example, when an actress is rejected for a part, she may be told that she didn't have the right look, or was too old or young, or too tall for her male counterpart. *But Plaintiffs allege that none were told that they didn't get a particular part because Harvey Weinstein blacklisted her after she was assaulted.* It is only after Weinstein's practice of blacklisting his victims was revealed by investigative reporters in October 2017 that Plaintiffs became aware of the fraud that plausibly impacted their careers.

The Second Circuit has given clear guidance that "the limitations period does not begin to run until [the plaintiff has] actual or inquiry notice of the injury."[85] The Second Circuit's analysis in *Cohen* is instructive. In *Cohen,* the plaintiff wife and defendant husband divorced in 1989; during the divorce, the husband represented that a substantial investment was worthless. In 1991, she accused him of fraud and moved for additional support. During those proceedings, the ex-husband again represented that the investment was worthless and they settled.[86]

---

[84] *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2108 (2016) (Congress limited "RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries"); *Bascuñán v. Elsaca*, 874 F.3d 806, 817 (2d Cir. 2107) ("A plaintiff bringing a civil RICO claim must allege an injury to his 'business or property'; he cannot, for example, recover for 'personal injuries.'") (footnotes omitted). For this reason, the statute of limitations analysis should be separate for the RICO and tort claims.

[85] *Cohen*, 711 F.3d at 361 (quoting *In re Merrill Lynch*, 154 F.3d at 60).

[86] *Id.* at 362.

More than fifteen years later, the wife read a newspaper article that disclosed a related fraud. Two years after that, she "chanced upon" a lawsuit disclosing the significant value her husband actually received from the supposedly worthless investment.[87] Finally, twenty years after the divorce, she sued her ex-husband for RICO violations, fraud, breach of fiduciary duty, and unjust enrichment. The district court dismissed the claims based on the statute of limitations.[88]

The Second Circuit reversed the decision that the RICO and tort claims were time-barred. The Second Circuit explained the flaws in the district court's reasoning. First, mere suspicions and distrust do not trigger a duty to investigate.[89] Second, a suspicion that triggers a duty to inquire does not mean that the investigation will reveal the facts: "it does not follow that reasonable diligence will in all circumstances result in discovery of" the underlying facts.[90]

The Second Circuit's reasoning in *Cohen* is directly applicable here. A plaintiff's knowledge that she did not get a part does not by itself start the running of the limitations period.[91] In fact, even if she had distrusted Weinstein, a plaintiff's duty to investigate would not

---

[87] *Id.* at 363.

[88] *Id.*

[89] *Id.* at 363 ("The fact that she distrusted her former husband and thought he might be lying is not an objective fact that supports a duty to investigate.").

[90] *Id.* at 362-63 ("First, the court appears to have assumed that because Patricia had suspicions in 1991 and did not find the Lurie payment, it follows that her investigation at the time was less than reasonable. There is no basis in the record for that conclusion. … [I]t does not follow that she was chargeable with an awareness of any and all monies Steven may have received and concealed, regardless of whether a reasonable investigation based on what she knew would have revealed it. The district court had no basis on the record before it to conclude that the investigation that Patricia made in 1991 was not reasonable.") (citations omitted).

[91] For example, Defendants argue: "Because Ms. Klatt was aware that she lost the part that was offered to her in 1993 or 1994, the limitations period began to run then, and her claim is time barred." Def. Mem. at 13.

be triggered under *Cohen*. And, Plaintiffs expressly allege that they could not have discovered the blacklisting scheme until October 2017. Accordingly, their RICO claim was timely filed.

Defendants rely on an inapposite case, *Baiul v. William Morris Agency, LLC*, in which the plaintiff alleged that the defendants stole millions of dollars she earned for performances and endorsements.[92] The district court dismissed a RICO claim as time-barred because "a person of ordinary intelligence would have been on inquiry notice to further investigate potential fraud as of 2000 … when defendants had failed to pay Baiul more [than] *$57 million* between 1993 and 1997."[93] Here, discovery of the fraud was not nearly so easy as looking at financial statements for a production. Plaintiffs expressly allege that they could not have discovered the lengths to which Weinstein went to blacklist them. And, as soon as they did learn he was plausibly behind their damaged careers, they filed suit within months. Their RICO claims are timely.

### 2. An additional RICO injury, to Plaintiff Melissa Thompson's property, occurred in October 2017.

In addition to damaging their careers, Weinstein and his co-conspirators targeted his victims' potential causes of action, including Melissa Thompson's. A cause of action is a property right.[94] The interference by Weinstein's former criminal counsel with Thompson's

---

[92] 2014 WL 1804526 (S.D.N.Y. May 6, 2014), *aff'd*, 601 F. App'x 58 (2d Cir. 2015).

[93] *Id.* at *7.

[94] *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 353-54 (3d Cir. 1986) ("The district court dismissed the RICO claims … because, it held, interference with a lawsuit did not constitute an injury to 'business or property' within the meaning of RICO. We believe, especially in light of the Supreme Court's intervening decision in *Sedima*, that this constituted reversible error. … A cause of action, of course, is a form of 'property[.]'"), *aff'd*, 483 U.S. 143 (1987). *See also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause"); *Parker v. Walker*, 6 Cal. Rptr. 2d 908, 912 (Cal. Ct. App. 1992) ("A cause of action to recover money in damages, as well as money recovered in damages, is a … form of personal property.").

evidence and causes of action occurred in October 2017—and is documented in emails, text messages, and phone call recordings. Accordingly, her RICO claim is timely.

**C.** **Plaintiff Jane Doe's tort claims, which arose at the time she was 16 years old, are and/or will be timely under the New York Child Victims Act.**

On Monday, January 30, 2019, the New York state legislature passed the Child Victims Act.[95] Governor Andrew Cuomo announced that he will sign the bill.[96]

In pertinent part, the Act adds section 214-g to the civil practice law and rules.[97] Section 214-g states in relevant part:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary …, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, … which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

In 2002, at the time Harvey Weinstein first assaulted her, Jane Doe was 16. Under the Act, all of Jane Doe's state law tort claims arising before her 18th birthday (May 4, 2004) are

---

[95] https://www.nysenate.gov/legislation/bills/2019/s2440 (last accessed Jan. 30, 2019).

[96] "Statement from Governor Andrew M. Cuomo on Three-Way Agreement on the Child Victims Act," available at https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-three-way-agreement-child-victims-act-which-slated-be-voted (last accessed Jan. 29, 2019).

[97] *See* Senate Bill S.2440, section 3, available at https://legislation.nysenate.gov/pdf/bills/2019/S2440 (last visited Jan. 30, 2019). Section 3 also states: "Dismissal of a previous action, ordered before the effective date of this section, on grounds that such previous action was time barred, and/or for failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action pursuant to this section."

- 52 -

timely against Defendants Harvey Weinstein, Robert Weinstein, Disney, Eisner, Miramax, Gill, Ashbrook, Schwarz, and Lombardo.[98]

Jane Doe alleges that Harvey Weinstein's acts "constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age."[99] Of particular importance, the Child Victims Act does *not* require criminal charges; instead, it applies to "conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age." And equally important, the Act applies to "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of" such conduct. Therefore, none of Plaintiff Jane Doe's state law claims against the Miramax-era Defendants are time-barred.

**D.    Alternatively, equitable tolling principles toll the statute of limitations for Plaintiffs' RICO and state law claims.**

Defendants assert that statutes of limitations play two important roles. First, they prevent the prosecution of claims after memories have faded.[100] However,

> [i]n recent years, evidence that does not erode over time is often available, such as DNA, audio or video recordings, emails, texts, and other digital communication. These newer forms of evidence play an important role in investigating and prosecuting crimes of sexual violence.[101]

---

[98] Counts III (negligent retention and supervision), VII (civil battery), IX (assault), XI (false imprisonment), XIII (intentional infliction of emotional distress), XV (negligent infliction of emotional distress), XVII (ratification).

[99] *See id.* In *People of the State of New York v. Harvey Weinstein*, No. 2018NY023971 (N.Y. Sup. Ct.), Weinstein has been indicted on two counts of predatory sexual assault under New York Penal Law ("P.L.") § 130.15(2), one count of criminal sexual act in the first degree under P.L. § 130.5(1), one count of rape in the first degree under P.L. § 130.35(1), and one count of rape in the third degree under P.L. § 130.25(1).

[100] Def. Br. at 12.

[101] Rape, Abuse & Incest National Network, "Understanding Statutes of Limitations for Sex Crimes," available at https://www.rainn.org/articles/statutes-limitations-sex-crimes.

- 53 -

Plaintiffs—and Harvey Weinstein—have pled various forms of evidence exist, including video

recordings, audio recordings, emails, texts, and other documentation.[102] Accordingly, the fear of

"fading memories" is inapplicable.

Second, Defendants assert that statutes of limitations prevent Plaintiffs from "upset[ting]

settled expectations that a substantive claim will be barred."[103] Here, however, Plaintiff has pled

that Weinstein and his co-conspirators had little expectation that even sex abuse claims that

occurred 25 years ago were settled. Weinstein and others on his behalf retained ex-Israeli spies to

track down a history of victims to try and quash their voices as recently as late 2017.[104]

Clearly, the only role Defendants would have the statutes of limitations play is a bar to

meritorious claims without regard to equitable tolling doctrines that recognize the physical,

emotional, and psychological effects of sexual violence, which cause a victim's delay in

reporting.[105] Defendants would also have this Court ignore the lengths to which Weinstein went

---

[102] ¶¶ 105, 116, 175, 215, 217, 224, 268, 303, 307, 320, 411, 704, & n.28.

[103] Def. Br. at 13 (quotation and citation omitted).

[104] ¶ 821(i)-(l), (o)-(q).

[105] Beverly Engel, L.M.F.T., "Why Don't Victims of Sexual Harassment Come Forward Sooner?", Psychology Today (Nov. 16, 2017), available at https://www.psychologytoday.com/us/blog/the-compassion-chronicles/201711/why-dont-victims-sexual-harassment-come-forward-sooner. *See also Pulinario v. Goord*, 291 F. Supp. 2d 154, 163 (E.D.N.Y. 2003) ("Rape is an under-reported crime. *See, e.g.*, Rennison, Rape and Sexual Assault: Reporting to Police and Medical Attention 1992-2000 at 1 (Selected Findings, Bureau of Justice Statistics, August 2002) (approximately two-thirds of rapes are not reported to the police). Studies have shown that rape victims do not report rape, or delay in reporting, because of fear of mistreatment by police and hospital personnel, lack of support by family and friends, fear of rapist retaliation, and feelings of guilt and shame. *See* Pamela A. Wilk, Comment, Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution, 33 Am. U.L. Rev. 417, 424 n.54 (1984); *People v. Liberta*, 64 N.Y.2d 152, 166 n.8[] (1984) ('the stigma and other difficulties associated with a woman reporting a rape and pressing charges probably deter most attempts to fabricate an incident; rape remains a grossly under-reported crime'), *cert denied*, 471 U.S. 1020[] (1985).").

—using former Israeli spies—to ensure women were not believed, and were besmirched and forced to stay quiet.

"Whether a defendant should be estopped from asserting the statute of limitations as an affirmative defense 'is not a question of law, but rather a question of fact, which should be fully developed and determined [at] trial.'"[106] "These are fact-based doctrines and, at this stage of the litigation, all factual and legal ambiguities must be resolved in plaintiffs' favor."[107] As set forth below, Defendants' harsh application of the statutes of limitations should be rejected.

### 1. Equitable estoppel tolls the statutes of limitations for Plaintiff's negligent retention and supervision, ratification, and RICO claims.

"The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense."[108] It would be unjust where "a plaintiff is 'induced by fraud, misrepresentations or deception to refrain from filing a timely action.'"[109]

Analyzing facts analogous to those here, the court in *Saveria* denied a motion to dismiss a RICO claim, finding that equitable estoppel tolled the statute of limitations. In *Saveria*, the Indian-born, Austrian-citizen plaintiff alleged that Austrian officials undertook a secret, ethnic-smear campaign to undermine his business prospects in New York.[110] Dubbed the "Dirty

---

[106] *Childers*, 36 F. Supp. 3d at 314 (quoting *Schirano*, 99 A.D.2d at 804). *See also Shockley v. Vt. State Colls.*, 793 F.2d 478, 485 (2d Cir. 1986) (whether a defendant should "be equitably estopped from relying on the statute of limitations[] was a question of fact to be decided by the factfinder at trial").

[107] *Saveria JFK, Inc. v. Flughafen Wien, AG*, 2016 WL 11263673, at *9 (E.D.N.Y. May 3, 2016).

[108] *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).

[109] *Id.* at 442 (citation omitted). *See also* Blakey, "Time-Bars: Rico-Criminal and Civil Federal and State," 88 Notre Dame L. Rev. 1581, 1740 (2013); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1998) ("[T]he … doctrine is to prevent a defendant from … committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.") (citation omitted).

[110] *Saveria JFK, Inc.*, 2016 WL 11263673, at *2.

Laundry Affair" by defendants, they secretly conspired to destroy plaintiff and his business by (i) hiring an Austrian attorney to spread defamatory allegations against him within the New York business community; (ii) wiretapping the cell phones of plaintiff and his family; and (iii) hiring a private detective to spy on them. As a result, plaintiff lost significant business opportunities, which "support[ed] the application of tolling or estoppel."[111]

Just as in *Saveria*, Plaintiffs allege that Defendants (i) hired journalists to spread lies about them; (ii) hired spies to pose as legitimate media personnel to extricate and destroy their evidence against Defendants; (iii) hired lawyers to both facilitate the spy campaign and to directly deceive Plaintiffs that they were working for victims when in fact they were working for Weinstein.[112] These allegations justify application of tolling.

Also instructive is the court's decision in *Zimmerman v. Poly Prep Country Day School*,[113] in which the court applied estoppel to allow state law claims to proceed to discovery. In *Zimmerman*, ten plaintiffs who were sexually abused by their football coach from 1966 to 1991 filed an amended complaint in 2009, naming the school, two headmasters, and trustees for RICO, Title IX, and state law violations.[114] The court found that equitable estoppel had been adequately pled and was a question of fact.[115]

Several facts were critical to the *Zimmerman* decision. First, the court found allegations that defendants took affirmative steps to hide their knowledge of the abuse was a "game

---

[111] *Id.* at *9.

[112] Defendants' surveillance, blacklisting, and reputation-besmirching activities have been so widely reported since late 2017 that they are colloquially referred to as "Black Cubing," referring to the spies hired by Boies Schiller to target Plaintiffs and the Class.

[113] 888 F. Supp. 2d 317 (E.D.N.Y. 2012).

[114] *Id.* at 323.

[115] *Id.* at 326, 338, 341.

changer."[116] Second, plaintiffs alleged that they had justifiably relied on the school's

representations that it was unaware of the coach's misconduct, and therefore their claims against

the school "could not possibly have been independently uncovered."[117]

The court explained how the defendants' actions affirmatively misled the plaintiffs

concerning the basis for a negligent retention and supervision claim:

> Central to plaintiffs' claims in the present case are their allegations
> that Poly Prep engaged in an affirmative course of conduct during
> the period of limitations to deceive the plaintiffs into believing that
> they had no claim against Poly Prep because the school had no
> knowledge of [the coach's] wrongdoing after [the victim's] parents
> complained that their thirteen-year-old son had told them that [the
> coach] had sexually abused him…. [The coach] was consistently
> portrayed to the plaintiffs as a reputable and esteemed football
> coach throughout the limitations period (1966-1991). While that
> deceitful conduct could not have plausibly altered plaintiffs'
> knowledge to the contrary, it might plausibly have led them to
> falsely believe that Poly Prep was unaware of [the coach's]
> misconduct and could not be liable for negligent retention
> or supervision.[118]

The court concluded that, although plaintiffs' estoppel claim faced "several hurdles," it survived

the motion to dismiss.[119] The court then "allowed limited discovery to allow plaintiffs to

investigate whether they have a basis to equitably estop Poly Prep from asserting a statute of

limitations defense."[120]

---

[116] *Id.* at 339-40 ("A review of [New York cases], however, reveals that in each the court recognized that affirmative misrepresentations or deceitful conduct designed to keep a potential plaintiff from gaining knowledge of an essential element of a viable cause of action for a claim of negligent retention or supervision by an employer of a sexual-predator employee would be a game-changer.").

[117] *Id.* at 341.

[118] *Id.* at 340 (footnote omitted).

[119] *Id.*

[120] *Id.* at 327.

Analogous to *Zimmerman*, Plaintiffs allege that all defendants knew of Harvey Weinstein's abusive conduct and took affirmative steps to prevent victims from 1) ***learning of the defendants' knowledge***; or 2) mounting any claims against Harvey Weinstein or his employers. Thus, dismissal is not warranted at this stage.

Here, Defendants held Harvey Weinstein out as a genius—he was the face of their production companies. Like the coach who "was consistently portrayed to the plaintiffs as a reputable and esteemed football coach," Weinstein was portrayed by Defendants as the face of their company and the most successful producer in the business.

Moreover, Plaintiffs could not have known of Defendants' knowledge of Weinstein's abusive behavior because of, *inter alia*: (i) the enforcement of a written and oral Code of Silence on TWC and Miramax employees; (ii) TWC's and Miramax's payments to abuse victims to ensure they stayed quiet; (iii) Miramax and TWC employees' responses to complaints by victims that they should stay quiet; (iv) Disney assigned a top executive to supervise Weinstein and to cover-up problems with actresses as they arose; (v) Buena Vista employee Fabrizio Lombardo sent threatening text messages to ensure silence; (vi) TWC (as approved and implemented by Glasser, Gil, and Robert Weinstein) forwarded victim and witness complaints to Harvey Weinstein, knowing Weinstein would take steps to threaten or silence the complainants; and (vi) TWC retained David Boies, Esq., Kroll Associates, Inc. and Corporate Risk Holdings to cover up Harvey Weinstein's pattern of assault.

Defendants claim two cases, *Zumpano v. Quinn*[121] and *Twersky v. Yeshiva University*,[122] are dispositive here. However, both focused on the lack of a duty "to make a public confession

---

[121] 849 N.E.2d 926 (N.Y. 2006).

[122] 993 F. Supp. 2d 429 (S.D.N.Y. 2014).

… to get the benefit of a statute of limitations."[123] In other words, "passive concealment" is not sufficient to estop application of the statute of limitations.

In *Zumpano*, plaintiffs alleged that bishops and the diocese were aware that priests had abused children, yet "fail[e]d to investigate and report the conduct to law enforcement authorities."[124] The court held that the lack of affirmative steps to silence victims was not fraudulent concealment, which "means employment of artifice, plan[ing] to prevent inquiry or escape investigation and mislead or hinder acquirement of information disclosing a right of action."[125] Here, on the other hand, Plaintiffs have asserted, *ad nauseum*, multiple allegations of affirmative steps to silence victims and witnesses.

Similarly, in *Twersky*, plaintiffs alleged that a boarding school knew several teachers and administrators sexually abused students in decades past. Rejecting the application of equitable estoppel to toll the limitations periods, the court explained: "passive concealment falls short of the sort of specific and affirmative misrepresentation required to trigger an equitable estoppel defense."[126] Considering the closest set of facts—but still short of Black Cubing, the *Twersky* court rejected plaintiffs' allegations that they reported their abuse to school administrators, who failed to take action.[127] Here, in contrast, Plaintiffs do not allege passive concealment.

Rather, Defendants hired lawyers and spies, pushed women into NDAs, blacklisted victims, and intimidated journalists and others who threatened to blow the whistle. Defendants' actions here went far beyond "passive concealment" to active participation in the Weinstein

---

[123] *Zumpano*, 849 N.E.2d at 930.

[124] *Id.* at 928.

[125] *Zimmerman*, 888 F. Supp. 2d at 339 (quoting *Doe v. Roman Catholic Archbishop*, 264 Mich. App. 632, 643 (2004)).

[126] *Twersky*, 993 F. Supp. 2d at 444.

[127] *Id.* at 448.

010717-11 1093440 V1

Sexual Enterprise's efforts to suppress victims' claims, using threats, intimidation, and extortion. Accordingly, unlike the institutions in *Twerksy* and *Zumpano* that turned a blind eye to bad behavior and dismissed victim's allegations, the Defendants here built an elaborate system to illegally procure victims' and witnesses' silence. [128]

Recently, in *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, a court in this District found that the statute of limitations for plaintiff's RICO claims was tolled because "defendants' alleged collusion and manipulation by its very nature was concealed from the public, which prevented plaintiffs from having notice of their claims until at earliest December of 2012."[129] This result should be equally easy to reach here, given the highly secretive nature of the Black Cubing campaign. Accordingly, the statutes of limitations should be equitably tolled for the federal and state law claims.

Finally, a plaintiff invoking estoppel must bring her action within a "reasonable time after the facts giving rise to the estoppel have ceased to be operational."[130] Having learned in October

---

[128] Contrary to the Directors' arguments, Plaintiffs need not show that every individual Defendant made separate threats because that would be inconsistent with the basis for the doctrine. *See, e.g.*, *John R. v. Oakland Unified Sch. Dist.*, 769 P.2d 948, 951 (Cal. 1989) (denying school district's motion to dismiss claims arising out of teacher's molestation of student because the district did not threaten the student separately, stating: "Although the teacher's alleged threats in this case were no doubt motivated largely by self-interest, rather than to prevent John from filing a claim against the district, it would clearly be inconsistent with the equitable underpinnings of the estoppel doctrine to permit the district to benefit to plaintiffs' detriment by such threats."); *Doe v. Bakersfield City Sch. Dist.*, 136 Cal. App. 4th 556, 572 (2006) (plaintiff' exposure to ongoing threats from school district employee "reflect[s] that plaintiff acted within a reasonable time to pursue his claim against the District after the deterrent effect of the threats ceased"); *Cook v. City of Chicago*, 2008 WL 1883437, at * 2 (N.D. Ill. 2008) (although plaintiff must allege affirmative acts by the city for the city to be estopped from asserting statute of limitations as a defense, the allegation that officers' and investigators' threats were part of the city's "code of silence" was enough to toll plaintiff's statute of limitations).

[129] 277 F. Supp. 3d 521, 583 (S.D.N.Y. 2017).

[130] *Simcuski v. Saeli*, 377 N.E.2d 713, 717 (N.Y. 1978) (discussing fraud, misrepresentation, and deception as grounds for estoppel).

2017 of Defendants' years-long practice of Black Cubing, Plaintiffs swung into action, filing suit in just a few months' time. Accordingly, the statutes of limitations are tolled.

> ### 2.  The statutes of limitations for Plaintiffs' RICO and state law claims are tolled due to duress.

The statute of limitations for Plaintiffs' RICO and state law claims are also tolled based on the doctrine of duress. "'[W]hen duress is part of the cause of action alleged,' the statute of limitations is tolled until the duress has ended 'because the offensive conduct is regarded as a continuous wrong.'"[131] The Second Circuit has instructed that the "fact-specific nature of the duress contention" is one that should be addressed at summary judgment or trial.[132]

In *Cullen*, the Second Circuit found that the doctrine of duress applied, in part, to toll the statute of limitations where plaintiffs alleged extortion (a violation of the Hobbs Act) as a RICO predicate act.[133] Like in *Cullen*, Plaintiffs have alleged the RICO predicate act of witness or victim tampering (18 U.S.C. § 1512), in that certain Defendants used the threat of physical force in order to cause the victim not to report the assaults to a law enforcement officer. Plaintiffs further allege the predicate act of sex trafficking (18 U.S.C. §§ 1590, 1591), which includes the use of force, fraud, or coercion to accomplish or attempt to accomplish the sex trafficking. Thus, duress is clearly an element of Plaintiffs' RICO claims, and tolling applies.

Moreover, Plaintiffs allege intentional infliction of emotional distress, in which the duress they were placed under certainly played a role.[134] Weinstein's power to destroy lives and

---

[131] *Cullen v. Margiotta*, 811 F.2d 698, 722 (2d Cir. 1987) (quoting *Baratta v. Kozlowski*, 94 A.D.2d 454, 458-59 (N.Y. App. Div. 1983)).

[132] *Id.* at 724.

[133] *Id.* at 722.

[134] *See, e.g.*, *Nigro v. Pickett*, 39 A.D.3d 720, 721-22 (N.Y. App. Div. 2007). *See also Overall v. Klotz*, 846 F. Supp. 297, 300 n.2 (S.D.N.Y. 1994) (stating, in an action to recover for intentional infliction of emotional distress: "Duress, defined under New York law as 'actual or threatened violence or restraint contrary to law,' tolls the running of a statute of limitations only if the alleged duress is 'an element of the

careers was widely known throughout the industry. Almost every woman who has come forward has said that she did not do so sooner because she was afraid of him.[135] Indeed, just days before The New York Times first reported on his pattern of sexual abuse, Weinstein and his legal team telephoned class members and threatened them for talking.[136]

Plaintiffs allege that Weinstein used emotional and physical abuse and industry and economic power to command silence:

- After she refused to show him her breasts, Weinstein chased Nannette Klatt into a dark stairway in the Miramax building and locked the door. Cold, frightened, and alone, she did not know how she would escape the building. She realized then that Weinstein was very dangerous. As a result, Klatt feared for life and safety.[137]

- Zoe Brock told her agent that she never wanted to see Weinstein again after the night at the Hotel du Cap. But that evening, Weinstein lured an unknowing Brock, through her agent, to a private screening. There, Weinstein sat with his hand on the back of Brock's chair throughout the film. Brock knew that by arranging the screening and requiring her agent to deliver her there, Weinstein was demonstrating his level of control over the people around him. She thus feared for her life and safety.[138]

- After he chased her around an apartment naked, Weinstein insisted on taking Katherine Kendall to her next location in a taxi. Kendall got out of the taxi and went into a bar, where she observed Weinstein waiting in the taxi, staring at her, for at least 20 minutes. Throughout the next three years, Weinstein called Kendall every few months, with a Miramax assistant patching him through, to "make sure they were still friends." Kendall knew that Weinstein was implying that there would be serious consequences if she complained about his conduct. Moreover, in the summer of 2017, an Intelligence Participant contacted her to ascertain whether she was planning to go public with her story. As a result, Kendall lived in abject fear of speaking out.[139]

---

cause of action asserted.' The Court will assume that this requirement is satisfied here.") (citations omitted).

[135] ¶¶ 694, 696-717.

[136] ¶ 716.

[137] ¶ 696.

[138] ¶ 697.

[139] ¶ 698.

- Melissa Sagemiller declined to ride on Weinstein's private jet from the *Get Over It* shooting location in Toronto. But when she arrived at the airport, she learned that Weinstein had caused her bags to be removed from her commercial flight. She was then instructed by a Miramax assistant to get on Weinstein's private jet. When she entered the jet, Weinstein said "see Melissa, I always get what I want." Sagemiller then truly understood Weinstein's power, and she knew that she must forebear any claims against him or seriously risk her personal safety.[140]

- Caitlin Dulany knew, from spending time with Weinstein and observing the people around him, that he had the power to destroy lives. Not only that, but Weinstein had falsely imprisoned and sexually assaulted her at the Hotel du Cap in France. She was deeply afraid of him, and she knew that she would be risking her life and safety if she told anyone about the assault.[141]

- As a young aspiring actress, Larissa Gomes learned from her peers that Weinstein destroyed people who spoke out against him, and that he would do the same to her if she complained about her sexual assault in Toronto. Therefore, she was compelled by fear for her life and safety to refrain from bringing her claims.[142]

- While he was naked in the hot tub, Weinstein grabbed Louisette Geiss' arm and then chased her as she fled his hotel room at the Sundance Film Festival. During the course of their prior conversation, Weinstein informed Geiss that he had the power to unilaterally greenlight her scripts (implying, on the other hand, that he had the power to bury them). When Geiss told Barbara Schneeweiss that Weinstein had been inappropriate, Schneeweiss simply replied that he had never done anything like that to her. Thereafter, Geiss was overborn by fear for her life and safety to remain silent about Weinstein's sexual misconduct.[143]

- Weinstein purposely instilled fear in Sarah Ann Thomas when he summoned her to his home, where the two were alone but for his small children, and then interviewed her and forcibly embraced her in his underwear. He also demonstrated his rage during the meeting. As a result, Thomas feared for her life and safety.[144]

- Melissa Thompson learned of Weinstein's reputation for ruining the lives of those who spoke out against him. And when she did try to speak to a lawyer, she was referred to Benjamin Brafman, who she was told was going to represent a class of victims. In fact, while representing Harvey Weinstein, Brafman's firm consulted with Thompson, took her video evidence, assured her that they would represent

---

[140] ¶ 699.

[141] ¶ 700.

[142] ¶ 701.

[143] ¶ 702.

[144] ¶ 703.

her, and advised her there were "loopholes" around the statute of limitations. When Thompson learned that Brafman & Associates was actually Weinstein's criminal defense lawyers, her fear was justified; Weinstein did indeed have a network of people working to destroy the victims who talked.[145]

- After Weinstein sexually assaulted Jane Doe when she was 16 years old, he continued to subject her to emotional abuse and sexual assault and harassment for the next decade. The abuse included an attempt to forcibly enter her hotel room in New York City. Jane Doe spent years trying to placate Weinstein, having experienced his bullying behavior and been informed by others that he would crush people. Jane Doe feared for her life and safety.[146]

Because of these threats, and the continuing nature of Weinstein's actions, duress also tolls the statute of limitations for Plaintiffs' other state law claims.[147]

## V.  PLAINTIFFS STATE PLAUSIBLE VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

**A.  The distinction between "perpetrators" and "passive beneficiaries" is a red herring at this stage.**

  **1.  The 2008 sex trafficking claims of Plaintiffs Geiss and Thomas arise under perpetrator liability, which is defined to include the actor and "whoever *knowingly* benefits."**

Contrary to Defendants' argument,[148] Section 1591 of the Trafficking Victims Protection Reauthorization Act of 2005 (prior to the 2008 amendment effective December 31, 2008) defined two categories of "perpetrators":

  (a) Whoever knowingly—

  (1) in or affecting interstate commerce, recruits, entices, harbors, transports, provides, or obtains by any means a person; or

  (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

---

[145] ¶ 704.

[146] ¶ 705.

[147] *Pagan v. Pagan*, 1992 NYLJ LEXIS 4742 (N.Y. Sup. Dec. 11, 1992) (denying motion to dismiss sexual abuse claims, permitting discovery on the question of duress).

[148] Def. Br. at 45-46.

- 64 -

> knowing that force, fraud, or coercion described in subsection (c)(2) will
> be used to cause the person to engage in a commercial sex act, or that the
> person has not attained the age of 18 years and will be caused to engage in
> a commercial sex act, shall be punished as provided in subsection (b).

Thus, prior to December 31, 2008, the TVPRA's reach did not extend to persons who "should have known," but—in addition to the main actor—extended to persons who **knowingly benefitted** from a venture **knowing that force, fraud, or coercion** would be used to cause a person to engage in a commercial sex act.[149] In other words, in 2008, the TVPRA extended to active participants.

For those two classes of active perpetrators, section 1595(a) provided (prior to December 31, 2008): "An individual who is a victim of a violation of section … 1591 of this chapter may bring a civil action against the perpetrator …." Plainly, anyone who violated section 1591 was a perpetrator, whether under subsection (1) or subsection (2).

Here, Geiss and Thomas have alleged Harvey Weinstein is the perpetrator within the definition of subsection (1). And, they have alleged that the following Defendants **knowingly benefitted** in the venture **knowing that force, fraud, or coercion** would be used to cause a person to engage in a commercial sex act in 2008 within the definition of subsection (2): TWC, Robert Weinstein, Dirk Ziff, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, David Glasser, Frank Gil, and Barbara Schneeweiss.[150] Because the question of knowledge is for the trier of fact and not for Rule 12(b)(6),[151] the motion to dismiss Counts I and II should be denied.

---

[149] 18 U.S.C § 1591(a)(2).

[150] ¶¶ 41, 42, 45, 46, 47, 51, 53, 58. *See also* FAC § IV(H)(1)-(7), (13), (14), (16).

[151] *United States v. Portrait of Wally*, 2002 U.S. Dist. LEXIS 6445, at *81 (S.D.N.Y. Apr. 11, 2002) (under the National Stolen Property Act, "[w]hether or not Dr. Leopold actually had the knowledge is a question of fact for trial"); *Liberty Ridge LLC v. Realtech Sys. Corp.*, 173 F. Supp. 2d 129, 136 (S.D.N.Y. 2001) (denying Rule 12(b)(6) motion, where under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), "The question of Plaintiffs' knowledge of Defendants' alleged fraud, and when this knowledge

## 2. Plaintiff Melissa Thompson's 2011 sex trafficking claim arises under both perpetrator and passive beneficiary liability.

The 2008 amendment to section 1595 added a third category of perpetrator referred to as a passive beneficiary—i.e., where "that person knew or ***should have known***" that the sex-trafficking venture violated section 1591.[152] Assaulted in 2011, Melissa Thompson has thus stated a claim against Harvey Weinstein under section 1591(a)(1), and against the TWC Defendants as knowing participants under section 1591(a)(2) or alternatively as passive beneficiaries who "should have known" under section 1595.[153]

## B. Plaintiffs Geiss, Thomas, and Thompson allege plausible violations of the TVPRA.

### 1. Plaintiffs adequately allege that the TWC Defendants participated in a venture that violated section 1591(a)(1).

In erroneously arguing that Plaintiffs fail to allege participation in a venture under section 1595,[154] the TWC Defendants rely on *Noble v. Weinstein*,[155] which is readily distinguishable. In *Noble*, the court sustained claims for sex-trafficking against Harvey Weinstein but dismissed a claim against his brother, Robert, because the complaint "'does not allege that [defendant] was

---

arose, is clearly a question of fact."); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (for Eighth Amendment claim, "the state of the defendant's knowledge is normally a question of fact to be determined after trial").

[152] Whether Plaintiffs specifically allege a claim against TWC Defendants as "perpetrators" is irrelevant, so long as the factual allegations support the claim (which they do, as shown in the following subsection). *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules … do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

[153] As of 2011, the TWC Defendants included Harvey Weinstein, Robert Weinstein, Lance Maerov, Tarak Ben Ammar, Richard Koenigsberg, Dirk Ziff, Jeff Sackman, David Glasser, Frank Gil, and Barbara Schneeweiss.

[154] Def. Br. at 47-49.

[155] 335 F. Supp. 3d 504 (S.D.N.Y. 2018).

- 66 -

present for any of the alleged assaults, was told about them before or after they occurred ... nor does it allege anything similar, which might show knowledge or reckless disregard.'"[156]

In contrast, as summarized *supra*, Plaintiffs here allege one or more of the following facts as to each of the TWC Defendants:

- Defendants helped Harvey Weinstein set up for the assaults, or were told that TWC employees were helping him set up for assaults;

- Defendants received complaints from women who were assaulted or knew about the assaults;

- Defendants paid, approved, or knew of settlement payments to women who were assaulted;

- Defendants participated in the cover-up of the assaults, threatened to retaliate against victims, or spoliated evidence related to the assaults; and

- Defendants have admitted that they knew of the assaults, asked Weinstein about the assaults, and chose to nonetheless take Weinstein's word over the word of the victims and witnesses.

Plaintiffs thus adequately allege participation under Fed. R. Civ. P. 8(a).

### 2. Plaintiffs adequately allege the "benefits" element.

Contrary to Defendants' contention,[157] Plaintiffs adequately allege under sections 1591 and 1592 that the TWC Defendants benefited "financially or by receiving anything of value" from the alleged sex trafficking. As the Eighth Circuit has explained, the "phrase 'anything of value' is extremely broad."[158] And at the pleading stage, Plaintiffs need not allege "the source or amount of the benefit, how and when the alleged benefit was conferred upon [defendant] or how [defendant] knew it received the alleged benefit."[159]

---

[156] *Id.* at 524 (quoting *Lawson v. Rubin*, 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018)).

[157] Def. Br. at 49-52.

[158] *United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015).

[159] *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 980 (W.D. Mo. 2014).

Plaintiffs plausibly allege that Defendants turned a blind eye to the abuse because they wanted to continue to benefit from the power, prestige, and perks Weinstein gave them in Hollywood. Plaintiffs allege that Defendants purposefully ignored the abuse because they knew the revelation of Weinstein as a predator could cause the downfall of the company, and they benefitted through the continued protection of their investments and loans. And, Plaintiffs allege that Defendants benefitted through continued employment or retention by protecting Weinstein as he demanded. These extensive allegations (including admissions by Defendants) are hardly conclusory.[160]

### 3. Plaintiffs adequately allege that the TWC Defendants knew or should have known they financially benefited from the sex-trafficking venture.

Finally, the TWC Defendants' argument that Plaintiffs do not allege that Defendants knew or should have known they benefited financially from the alleged sexual trafficking flies in the face of the detailed allegations.[161] Plaintiffs plausibly allege that Defendants have admitted they benefitted. Two of the longest-running TWC Directors explained that the Directors let Weinstein get away with the sexual abuse for so long *because of the benefits they received.* Defendant Tarak Ben Ammar said that the TWC Directors "all had close social ties to the famous producer," which (according to Maerov) Weinstein used to "trade[] on those

---

[160] Cases cited by Defendants are inapposite. *See Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013) ("The fact that sexual abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds is simply not sufficient to establish a violation of 18 U.S.C. § 1591."); *Cabusao v. Lombardi*, 2015 U.S. Dist. LEXIS 185609, at *10 (S.D. Miss. Jan. 30, 2015) ("The Amended Complaint only contains conclusory allegations that 'Defendants knowingly benefitted financially.' This mere recitation of the elements of the cause of action under the statute is insufficient to state a claim.").

[161] Def. Br. at 52-54.

friendships." Ben Ammar explained that the "TWC Directors[] got caught in a spiderweb" of Oscar tables, Emmy parties, and glamorous events.[162]

Moreover, while they knew of complaints by abuse victims, Maerov admitted that the TWC Defendants did not fight for access to additional documentation (which they knew existed), because they didn't want to damage the company.[163] Yet, rooting out abuse does not damage a company. It could, however, hurt their individual investments and employment if Weinstein retaliated—which is exactly what they feared. Accordingly, they benefitted by protecting his sex-trafficking venture. The court in *Canosa v. Ziff*, which is "one of several pending in this District in which plaintiffs have brought claims against" Harvey Weinstein and others,[164] recently denied the TWC defendants' motion to dismiss a claim under the TVPRA.[165] Similarly, the TWC Defendants' motion to dismiss Plaintiffs' TVPRA claim here should be denied.

## VI. PLAINTIFFS ALLEGE VALID NEGLIGENT SUPERVISION AND RETENTION CLAIMS (COUNTS III & IV)

### A. Corporate employees and officers owe a duty of care "to avoid creating the conditions that present an unreasonable risk of injury to third parties."

Defendants' assertion that corporate officers and directors do not owe a duty to third parties, like Plaintiffs, is contrary to basic tenets of tort and negligence law.[166] First, a corporate officer can be held personally liable for his tortious conduct under New York law.[167] "The

---

[162] ¶¶ 6, 7, 525, 541, 542, 553, 571, 587, 588, 605, 613, 757.

[163] ¶ 486.

[164] *Canosa v. Ziff*, 2019 U.S. Dist. LEXIS 13263, at *2 (S.D.N.Y. Jan. 28, 2019).

[165] *Id.* at *58-64.

[166] Def. Br. at 55.

[167] *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 110 (N.Y. App. Div. 2005) (citing *W. Joseph McPhillips Inc. v. Ellis*, 278 A.D.2d 682, 684 (N.Y. App. Div. 2000)).

particular tort committed is of little significance."[168] Thus, because negligent retention and supervision is a tort,[169] corporate officers and directors can be held liable.

Second, in contrast to Defendants' arguments, Plaintiffs need not plead an independent duty owed to them by the officers and directors. Rather, under New York law:

> Both corporate employees and officers of the corporation owe a duty of care as individuals apart from any duty owed by the corporation. This obligation includes a duty to refrain from causing injury to others **and to avoid creating the conditions that present an unreasonable risk of injury to third parties**.[170]

A negligent retention and supervision claim "does not require the existence of any particular relationship" between the plaintiff and defendants.[171] In fact, New York law "unequivocally" holds "that a corporate officer or agent may be found liable for negligently supervising a third party that was responsible for the plaintiff's injury, even if that corporate officer was acting in his or her official capacity."[172] Delaware law does not provide an independent shield for corporate officers or directors.[173]

---

[168] *Id.* at 80.

[169] https://definitions.uslegal.com/n/negligent-supervision/ (citing RESTATEMENT (SECOND) OF AGENCY § 213) (last accessed Jan. 31, 2019).

[170] *Matter of Mapp v. City of N.Y.*, 2014 NY Slip Op 50492(U), ¶ 3, 43 Misc. 3d 1204(A), 1204A, 990 N.Y.S.2d 438 (N.Y. Sup. Ct. 2014) (emphasis added).

[171] *Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*, 33 A.D.3d 875, 879 (N.Y. App. Div. 2006) (citing *Rodriguez v. United Transp. Co.*, 246 A.D.2d 178, 180 (N.Y. App. Div. 1998)). *See also id.* at 879 ("Rather, the defendant is responsible for the harm its negligently hired employee causes to any third party.").

[172] *Krystal G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515, 525 (N.Y. Sup. Ct. 2011) (citing *Bellinzoni v. Seland*, 128 A.D.2d 580, 580-81 (N.Y. App. Div. 1987)).

[173] Defendants cite Del. C. § 18-402, which speaks only to the vestiture of management of an LLC among its members by agreement, and does not shield corporate officers and directors from liability to third parties. In fact, 6 Del. C. § 18-1101 provides that an LLC operating agreement may limit the duties or liabilities of the members or managers as to those who are parties to the agreement; it does not permit a corporation to shield its management from third party claims for negligent retention and supervision.

**B.      Plaintiffs have alleged that Defendants breached their duty of care.**

Negligent supervision and retention claims require plaintiffs to plead (i) an employer-employee relationship; (ii) the employer knew or should have known of the employees' propensity for the offensive conduct prior to the injury; and (iii) the tort was committed on the employer's premises or with its chattels.[174]

**1.      Plaintiffs have plausibly alleged employer-employee relationships with the Defendants.**

First, neither Miramax nor TWC dispute that they were employers of Weinstein. Second, federal and state courts agree that whether an employer-employee relationship exists is a question of fact.[175]

Disney's dispute that it was an employer of Weinstein would impermissibly require this Court to draw inferences in Disney's favor. Here, Plaintiffs allege that Disney purchased Miramax, Disney was a co-employer and signatory on three of Weinstein's employment contracts, Weinstein reported to Disney President Michael Eisner, and Eisner assigned a series of Disney executives to supervise Weinstein.[176]

---

[174] *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d. Cir. 2004).

[175] *See Baker v. Texas and Pac. Ry. Co.*, 359 U.S. 227, 228 (1959) ("We think it perfectly plain that the question [of whether an employment relationship existed for purposes of the Federal Employers' Liability Act], like that of fault or of causation under the Act, contains factual elements such as to make it one for the jury under appropriate instructions as to the various relevant factors under law. … Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury.") (citations omitted); *Gregory v. Garrett Corp.*, 578 F. Supp. 871, 888-89 (S.D.N.Y. 1983) ("The problem with this argument in the context of a motion for summary judgment is that it requires the Court to find as a matter of law that TG was the employer of the crew members; yet, such a finding is one of fact, which should be left to the jury."); *In re Charles A. Field Delivery Serv., Inc.*, 488 N.E.2d 1223, 1227 (N.Y. 1985) ("Whether an employer-employee relationship exists is a question of fact, to be decided on the basis of evidence from which it can be found that the alleged employer 'exercises control over the results produced … or the means used to achieve the results.'") (citations omitted).

[176] FAC § IV(G)(2).

Certain Directors have renamed themselves as "Outside Directors" seeking to have this Court make findings (contrary to the Complaint) that they weren't involved in the everyday business of the company—and therefore weren't employers.[177] However, Plaintiffs have alleged that each of these Directors was appointed to the Board for the purpose of protecting Weinstein from termination for his sexual abuse. And they did so. Plaintiffs also allege they exercised control over Weinstein's employment contracts, and the manner in which he was supervised. Finally, as reflected above, New York law recognizes corporate officer liability for negligent retention and supervision claims.

### 2. Plaintiffs plausibly allege that each Defendant knew or should have known of Weinstein's propensity for sexual abuse and assault.

Plaintiffs have alleged facts showing Miramax knew of Weinstein's behavior in the 1990s, given that Weinstein used Miramax offices, funds, and personnel to assault women.

As for TWC and the Directors,[178] current and former executives and assistants at TWC have described a pattern of professional meetings that resulted in sexual advances on young women.[179] Knowledge of Weinstein's behavior went all the way up to the Directors. TWC Directors documented penalties in Weinstein's employment agreements due to his propensity for abuse.[180] Moreover, Weinstein's lawyer confirmed that the Directors knew of settlements with

---

[177] Def. Br. at 56-57.

[178] The claim for negligent retention is only subject to Rule 8's pleading standards and not Rule 9(b).

[179] ¶¶ 85-88.

[180] The Directors' attempts to have this Court draw inferences in their favor concerning the employment agreements' terms is impermissible. Moreover, Plaintiffs have alleged that TWC's entire board negotiated and approved Harvey Weinstein's contracts at each juncture. Thus, this case is not about nonfeasance merely based on a director's position, but based on malfeasance and active participation.

victims during contract negotiations.[181] And the Directors have admitted they knew or should have known.[182]

Against this backdrop, the Directors' argument that they didn't supervise him is ludicrous.[183] Plaintiffs allege that the Directors had the means through the employment agreements to control Weinstein and created clear-cut exceptions permitting Weinstein's assaults so long as he avoided a felony conviction.[184] The fact that the Directors deliberately chose to give sexual assaults a free pass does not absolve them.

### 3. Plaintiffs allege that the torts were committed on the employer's premises or with its chattels.

Third, Plaintiffs allege that the torts were committed on either Miramax's or TWC's premises (offices and company-funded hotel rooms) or with their personnel and chattels (employees who set up the meetings, use of company-funded cars and planes, and erectile dysfunction injections bought by TWC employees who received bonuses for doing so).[185] Defendants' argument that TWC did not exercise control over the hotel rooms is a question of fact, given that TWC employees scheduled and attended business meetings in the hotel rooms and Weinstein used TWC as his piggybank. And, even if hotel rooms are not considered premises, erectile dysfunction medication paid for by TWC, picked up by a TWC employee, and for which a TWC employee received a bonus, qualifies as TWC's chattel.[186]

---

[181] ¶ 489.

[182] *See, e.g.*, ¶¶ 369, 454, 456, 474, 480, 489, 504, 534, 550, 587, 604.

[183] An employer relationship is not required under New York law. *Krystal G.*, 933 N.Y.S.2d at 522.

[184] ¶¶ 423, 427.

[185] At this stage, Plaintiffs have not alleged that any of the tortious conduct occurred on the personal properties owned by the Outside Directors, but reserve the right to do so after discovery.

[186] *See* Merriam-Webster Unabridged ("chattel" is defined as "an item of tangible movable or immovable property except real estate and things (such as buildings) connected with real property"),

- 73 -

C.   **Plaintiffs allege that Defendants' negligent retention and supervision of Harvey Weinstein proximately caused their injuries.**

To demonstrate proximate causation, Plaintiffs need to show assault which resulted in personal injury. First, each Plaintiff has expressly alleged assault by Harvey Weinstein that caused her physical and emotional injury. Second, after discovery and at trial, Plaintiffs will establish the date by which each Defendant knew or should have known of Weinstein's abusive behavior for purposes of demonstrating proximate cause. Nonetheless, in the Complaint, Plaintiffs allege facts demonstrating each Defendant's knowledge and the basis therefor. Accordingly, Defendants' motion should be denied.

## VII.   PLAINTIFFS ALLEGE VALID RICO VIOLATIONS

A.   **Plaintiffs allege a valid RICO violation under section 1962(c).**

RICO prohibits a person associated with an "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity" and provides a private right of action for treble damages to any person "injured in his business or property by reason of a violation."[187] The elements of a section 1962(c) RICO violation are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[188] In addition, Plaintiffs must allege that they have "been injured in [their] business or property by the conduct constituting the violation."[189]

1.   **Plaintiffs adequately allege that the Weinstein Sexual Enterprise is an associated-in-fact RICO enterprise.**

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact

---

available at https://www.merriam-webster.com/dictionary/chattel; Black's Law Dictionary (Free 2d ed.) (defines "chattel" as "an article of personal property"), available at https://thelawdictionary.org/chattel/.

[187] 18 U.S.C. §§ 1962(c), 1964(c).

[188] *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018).

[189] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

- 74 -

although not a legal entity."[190] In *United States v. Turkette*, the Supreme Court described an

association-in-fact RICO enterprise as "a group of persons associated together for a common

purpose of engaging in a course of conduct."[191] Such an enterprise is proved "by evidence of an

ongoing organization, formal or informal, and by evidence that the various associates function as

a continuing unit."[192]

In *Boyle*, the Supreme Court rejected the notion that such an enterprise must have any

particular organizational structure:

> Such a group need not have a hierarchical structure or a "chain of
> command"; decisions may be made on an ad hoc basis and by any
> number of methods--by majority vote, consensus, a show of
> strength, etc. Members of the group need not have fixed roles;
> different members may perform different roles at different times.
> The group need not have a name, regular meetings, dues,
> established rules and regulations, disciplinary procedures, or
> induction or initiation ceremonies.[193]

Under *Boyle*, an alleged association-in-fact enterprise requires only three structural features:

"[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity

sufficient to permit these associates to pursue the enterprise's purpose."[194] "Courts in this Circuit

construe the enterprise element of RICO liberally."[195]

---

[190] 18 U.S.C. § 1961(4).

[191] 452 U.S. 576, 583 (1981).

[192] *Id.*

[193] *Boyle v. United States*, 556 U.S. 938, 948 (2009); *accord In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010) ("[A]fter *Boyle*, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity.").

[194] *Boyle*, 556 U.S. at 946.

[195] *RD Mgmt. Corp. v. Samuels*, 2003 WL 21254076, at *5 (S.D.N.Y. May 29, 2003) (citing *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) ("the language and the history suggest that Congress sought to define that term as broadly as possible") (construing 18 U.S.C. § 1961(4))).

To demonstrate that a RICO enterprise exists, Plaintiffs must show "*a common purpose that animates the individuals associated with it.*"[196] "'Common purpose' does not mean commonality of motive, it means coordinated activity in pursuit of a common objective."[197] Here, Plaintiffs allege that the Weinstein Sexual Enterprise had two purposes, one legal and one illegal. The legal purpose was to produce and promote movies and entertainment. The illegal purpose of the enterprise was to procure women for Weinstein's assaults and to cover up his pattern of sexual harassment and assault through intimidation, threats, payoffs, and deception, and to silence victims through duress, induced agreements and threats. And Defendants gained money, power, and prestige by covering up his conduct and allowing him to continue to bully Hollywood in the name of ensuring continued profits.

Defendants assert, without any explanation as to why it purportedly matters, that "the FAC alleges no connection between, for example, TWC and Black Cube, or the Boies law firm and the Outside Directors."[198] But it is clear that "all members of the enterprise need not be directly working with all other members of that enterprise."[199] And despite Defendants' conclusory argument to the contrary, Plaintiffs clearly allege contacts between and among members of the enterprise, including but not limited to between Disney, Weinstein, Miramax, Buena Vista, and their officers; between Weinstein, TWC, and the Directors; between Weinstein,

---

[196] *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004) (emphasis added). *See also Boyle*, 556 U.S. at 946 ("That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, *i.e.*, a 'venture,' 'undertaking,' or 'project.' Webster's Third New International Dictionary 757 (1976). The concept of 'associat[ion]' requires both interpersonal relationships and a common interest.").

[197] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173 (D. Mass. 2003) (citing *Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir. 1995)).

[198] Def. Br. at 35.

[199] *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009) (citing *United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988)).

TWC, and Miramax;[200] and between Weinstein, TWC and Black Cube, the Law Firm

Participants, and other non-defendant participants. Accordingly, Plaintiffs have plausibly alleged

relationships among those associated with the enterprise.

Defendants also erroneously contend without substantiation that Plaintiffs fail to allege

the enterprise's hierarchy or that the enterprise is a continuing unit,[201] even though the Supreme

Court rejected the necessity of such facts in *Turkette* and again in *Boyle*. The Supreme Court

explained that a RICO enterprise need not have "a structural hierarchy," "a chain of command,"

or "regular meetings regarding enterprise affairs."[202] The Court noted that "a group that does

nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may

fall squarely within the statute's reach."[203] Plaintiffs have alleged what the Supreme Court

requires: a continuing unit that functions with a common purpose.

Finally, again without explanation, Defendants incorrectly argue that Plaintiffs have not

alleged that the enterprise is separate and apart from the illegal acts.[204] That argument is legally

and factually incorrect. *First*, the Supreme Court has never imposed such a requirement. In

*Turkette*, the Supreme Court explained that an enterprise "is proved by evidence of an ongoing

---

[200] Moreover, Miramax continued to have a close relationship with Harvey Weinstein and TWC after the Weinstein brothers left Miramax in 2005. ¶ 781. For example, Miramax and TWC co-produced *Project Runway*, and worked together to produce and distribute multiple films including but not limited to: *Proof* (2005), *Derailed* (2005), *The Brothers Grimm* (2005), *Scary Movie 4* (2006), *Breaking and Entering* (2006), *Scream 4* (2011), *Sin City: A Dame to Kill For* (2014), and *Bad Santa 2* (2016). *Id.* And in 2013, Miramax and TWC entered into a production and distribution deal in 2013 that gave TWC rights to co-produce sequels to Miramax titles. ¶ 782. In a joint announcement, Miramax and TWC said they would make films and TV shows based on Miramax's library of more than 700 films that include *Shakespeare in Love*, *Good Will Hunting*, and *The English Patient*. *Id.*

[201] *Id.*

[202] *Boyle*, 556 U.S. at 948.

[203] *Id.*

[204] Def. Br. at 35-36.

organization, formal or informal, and by evidence that the various associates function as a continuing unit," and that a pattern of racketeering activity is "proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise."[205] The Court then explained that "[w]hile the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other."[206] Thus, the Court did *not* hold that proof of an enterprise must be separate from proof of racketeering acts.[207] *Second*, Plaintiffs allege that the enterprise is an ongoing organization, and that not all aspects of that organization constitute illegal acts, such as the co-production of the popular television show *Project Runway* by TWC and Miramax.

### 2. The Outside Directors and other executives played some part in directing the affairs of the Weinstein Sexual Enterprise.

Defendants erroneously assert that "the FAC fails to articulate any theory of how the Outside Directors allegedly participated in the operation or management of the purported enterprise (because they did not)."[208] A RICO plaintiff must allege that each defendant "conduct[ed] or participate[d] directly or indirectly, in the conduct of such enterprise's affairs."[209] The Supreme Court has held that "RICO liability is not limited to those with primary

---

[205] 452 U.S. at 583.

[206] *Id.*

[207] *See also Boyle*, 556 U.S. at 947 ("As we explained in *Turkette*, the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' 452 U.S. at 583. On the other hand, if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.' *Ibid.*").

[208] Def. Br. at 36. Defendants do *not* assert that the FAC fails to allege the participation of any other Defendant in the enterprise.

[209] 18 U.S.C. § 1962(c).

responsibility for the enterprise's affairs" but that "*some* part in directing the enterprise's affairs is required."[210] The Court stated that "we disagree with the suggestion of the Court of Appeals for the District of Columbia Circuit that § 1962(c) requires '*significant control* over or within an enterprise.'"[211] Thus, in the Second Circuit, "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, [] especially at the pleading stage.'"[212] And "where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question."[213]

Under those standards, Plaintiffs adequately allege participation by the Outside Directors in the enterprise. Plaintiffs allege that all of the Directors, including the Outside Directors, negotiated and agreed to increasingly protective employment agreements with Harvey Weinstein from 2005 through 2015 *in direct response to his history of assault*.[214] While the Outside Directors have publicly disclaimed knowledge of all of the assaults, David Boies—Harvey's lawyer—made clear that the Directors knew that settlements to female victims had been paid.[215] By 2015, the Directors had explicitly agreed that Weinstein could not be fired unless he was *convicted* of a felony involving moral turpitude—and just as explicitly agreed that settlements of

---

[210] *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

[211] *Id.* at 179 n.4.

[212] *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (internal citations omitted). *See also United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) (holding the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact).

[213] *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005). *See also id.* at *9 ("Given the early stage of the proceedings, plaintiff[] may not yet have had the opportunity to fully understand the nature of the roles of each category of defendant with regard to their respective management or operation capacity."); *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 225 (E.D.N.Y. 2014) (finding that "plaintiff has alleged enough to withstand a motion to dismiss on this issue, and '[a]ny future doubts involving moving defendants' relative level of participation should be resolved on summary judgment'") (citation omitted).

[214] ¶¶ 423-438.

[215] ¶ 489.

civil matters would result in little more than a slap on the wrist.[216] This type of set-up encouraged Harvey Weinstein (and the enterprise) to ensure that victims never reported Weinstein and/or were discredited if they did. Plaintiffs allege that this type of provision in an employment agreement is unique and reflects the Directors' knowledge and participation in the enterprise and agreement to participate in the scheme.[217] Indeed, participating in the cover-up of crimes (part of the scheme to defraud) by the Directors is sufficient to survive a motion to dismiss.[218] The

---

[216] ¶¶ 423-438.

[217] Robert Weinstein's argument that he cannot be held liable merely based on his familial relationship ignores the allegations that he participated as an officer and director at both Miramax and TWC. *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 529-30 (S.D.N.Y. 1997) ("The same reasoning holds true for those individual Defendants who sat on MetLife's Board of Directors. Plaintiff alleges that these Defendants sat on various committees, including the Audit and Legal and Social Responsibility Committees. This creates an inference that these Defendants were aware of the illegality of MetLife's alleged conduct, especially in light of facts such as the arrest of a MetLife agent in Switzerland and the British investigation, events which must have put MetLife on notice of the possible illegality of its insurance sales.") (internal citations omitted) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (holding that plaintiff satisfied Rule 9(b) where facts gave rise to strong inference that individuals, as directors of corporation, were aware of import restrictions which were not disclosed to plaintiff); *Hallet v. Li & Fung, Ltd.*, 1996 WL 487952, at *4 (S.D.N.Y. Aug. 27, 1996) (holding that plaintiff satisfied Rule 9(b) as to individual director where director sat on board committees and had access to financial information, thus creating strong inference that director was aware of misrepresentations); *In re Bausch & Lomb Secs. Litig.*, 941 F. Supp. 1352, 1361-62 (W.D.N.Y. 1996) (holding that plaintiff satisfied Rule 9(b) as to individual officers where corporation received information about declining distributorship sales, thus creating strong inference that officers were aware of scheme to hide corporation's declining growth)).

[218] *Int'l Telecomms. Satellite Org. v. Colino*, 1992 WL 93129, at *18 (D.D.C. Apr. 15, 1992) ("Whether or not the above uses of the interstate mail and wires were essential to the execution of a fraudulent scheme is immaterial here because, clearly, all of the uses were at the very least, either (i) made to promote a fraudulent scheme, (ii) related to the acceptance of the proceeds of a fraudulent scheme, or (iii) facilitated the concealment of a fraudulent scheme. As such, they were all incidental to an essential part of a fraudulent scheme and this is all the plaintiff needs to prove to establish a violation of the mail and wire fraud statutes.").

Second Circuit has described the "operation or management" test as "a relatively low hurdle for plaintiffs to clear, especially at the pleading stage,"[219] which Plaintiffs clear here.[220]

### 3. Defendants engaged in a pattern of racketeering.

Plaintiffs must demonstrate a "pattern of racketeering activity," with at least two acts of racketeering activity within ten years.[221] The minimum two acts must be "related" and "either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)."[222]

As set forth below, Plaintiffs have alleged the predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), sex trafficking (18 U.S.C. §§ 1590, 1591), and victim and witness tampering (18 U.S.C. § 1512).

### a. Plaintiffs allege the predicate acts of sex trafficking.

As discussed above, Plaintiffs allege multiple instances of obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18

---

[219] *Levine v. Torino Jewelers, Ltd.*, 2006 WL 709098, at *6 (S.D.N.Y. Mar. 22, 2006) (denying directors' motion to dismiss, finding that allegation that defendants were each "officers, directors, and/or shareholders" in the RICO enterprise sufficient to show they participated in the operation or management).

[220] The three cases cited by Defendants for the proposition that participation is not shown by legitimate acts of business, *see* Def. Br. at 37, are inapposite, because Plaintiffs here allege *illegitimate* acts. *See In re GM LLC Ignition Switch Litig.*, 2016 WL 3920353, at *15 (S.D.N.Y. July 15, 2016) ("the only 'common purpose' plausibly alleged here is the processing and settlement of New GM claims in the ordinary course of business"); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 136 (E.D.N.Y. 2010) ("any alleged benefits to these defendants are vague and disconnected to the alleged enterprise, and, thus, the complaint fails to articulate in a plausible manner how the defendants participated in the operation and management of the enterprise"); *Kaczmarek v. IBM Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) ("plaintiffs have failed to distinguish this association of entities from the typical and ordinary participants who act separately for the purpose of distributing any product").

[221] *See* 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1).

[222] *GICC Capital Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 466 (2d Cir. 1995) (internal quotations omitted).

U.S.C. §§ 1590, 1591, committed by the Miramax-era Defendants and TWC Defendants. Plaintiffs have alleged the elements of (i) recruiting, enticing, transporting, providing, and obtaining victims; (ii) the use of force, fraud, or coercion to accomplish or attempt to accomplish the sex trafficking; (iii) the sex trafficking affected interstate or foreign commerce (e.g., Miramax filming in Canada and promoting at film festivals in Cannes and TWC promoting at film festivals in Utah); and (iv) the sexual assaults were commercial in that Weinstein either linked the sex acts to quid pro quo for the victims, or the corporate defendants paid the employees to procure Weinstein's victims.[223]

The predicate acts of sex trafficking as to Geiss, Thomas, and Thompson which implicate TWC and the TWC Defendants are set forth in section V, *supra.* For the Disney and Miramax Defendants, by way of example only, the following predicate acts of sex trafficking are alleged in the First Amended Complaint:

- In 1996, a Miramax assistant set up Dulany to meet Weinstein at the Cannes Film Festival, and caused her to be transported to a hotel where she was assaulted by Weinstein;[224]

- In 1998, Miramax employees (including Lombardo and Schwartz) transported Plaintiff Zoe Brock to Harvey Weinstein's hotel room at the Cannes Film Festival in France, where they left her alone and Weinstein attempted to assault her;[225]

- In 2000, during filming of the Miramax film *Get Over It* in Toronto, Canada, Miramax employee Schneeweiss deceived Plaintiff Melissa Sagemiller into attending a meeting in Weinstein's hotel room (over her objections), telling her the meeting was to the discuss the script. In fact, Weinstein attempted to sexually assault her;[226] and

---

[223] *See generally United States v. Paris*, 2007 WL 3124724 (D. Conn. Oct. 23, 2007) (discussing the elements of sex trafficking violations). Weinstein argues that Plaintiffs have not alleged that money changed hands. In fact, Plaintiffs allege that Miramax and TWC paid employees to lure women to non-consensual sexual encounters with Harvey Weinstein.

[224] FAC § IV(D)(3).

[225] FAC § IV(D)(4).

[226] FAC § IV(D)(5).

- In 2000, also on the set of the Miramax film *Get Over It* in Toronto, Canada, Miramax employees deceived Plaintiff Larissa Gomes into attending a meeting in Weinstein's hotel room where Weinstein assaulted her.[227]

Defendants oversimplify *Snowden v. Lexmark Int'l, Inc.*,[228] suggesting that sex trafficking as to Plaintiffs assaulted before 2003 do not qualify as predicate acts (because Congress did not include it as a predicate offense until 2003).[229] But even under *Snowden*, Plaintiffs need only allege one act of racketeering after the amendment's effective date to avoid implicating the prohibition against *ex post facto* laws[230]—a scenario Congress explicitly addressed.[231] Unsurprisingly, the government has successfully prosecuted criminals under RICO based on predicate acts committed *prior to its existence*.[232] Given that, here, Plaintiffs plead several predicate acts occurring after the amendment in 2003, Defendants' arguments regarding retroactivity must fail.

Weinstein claims that none of Plaintiffs' allegations of attempted rape, masturbation, groping, and non-consensual touching amount to a "sex act" in violation of the statute. However, the statute (18 U.S.C. § 1512) does not define "sex act." Thus, "[t]he plain meaning of legislation

---

[227] FAC § IV(D)(6).

[228] 237 F.3d 620, 624 (6th Cir. 2001).

[229] Def. Br. at 83.

[230] *See* 237 F.3d at 624 ("In this case, Mr. Snowden's infringing activity before July 2, 1996—the effective date of the Anticounterfeiting Consumer Protection Act—cannot serve as a predicate act unless he *also* infringed *after* July 2, 1996. This he did not do.") (emphasis in original).

[231] S. Rpt. 91-617, 91st Cong., 1st Sess. p. 158 (1969) ("One act in the pattern must be engaged in after the effective date of the legislation. This avoids the prohibition against ex post facto laws, and bills of attainder. Anyone who has engaged in the prohibited activities before the effective date of the legislation is on prior notice that only one further act may trigger the increased penalties and new remedies of this chapter.").

[232] *See, e.g.*, *United States v. Campanale*, 518 F.2d 352, 365 (9th Cir. 1975) ("[A]ppellants were not convicted … for acts committed prior to October 15, 1970; rather they were convicted for having performed post-October 15, 1970, acts in furtherance of their continued racketeering conspiracy after being put on notice that these subsequent acts would combine with prior racketeering acts to produce the racketeering pattern against which this section is directed.").

should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"[233] The plain meaning of "sex act" encompasses far more than sexual intercourse, including any "act performed with another for sexual gratification."[234] Weinstein's argument has been rejected in another court in this district, where the court found that "sex act" included Weinstein's acts of "forcibly rubbing her vagina" and forcing the victim to "masturbate him."[235] The same result should apply here.

### b. Plaintiffs allege the predicate acts of mail and wire fraud.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires."[236] A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching."[237] The Second Circuit has recently reaffirmed that "the mail or wire communications themselves need not contain a false statement."[238] "The use of the mails (or the wires) need not be essential to the scheme to defraud, *or even done by a defendant*, so long as the mailing is a closely related and reasonably foreseeable incident of the scheme."[239]

---

[233] *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

[234] https://www.merriam-webster.com/dictionary/sex%20act (last accessed Jan. 31, 2019). Nonetheless, the *Dulany* Complaint specifically alleges that Weinstein sexually penetrated Thompson.

[235] *Noble*, 335 F. Supp. 3d at 523.

[236] *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).

[237] *Autuori*, 212 F.3d at 115 (citing *McNally v. United States*, 483 U.S. 350, 358 (1987)).

[238] *Williams*, 889 F.3d at 125 (citations omitted). *See also Schmuck v. United States*, 489 U.S. 705 (1989) (holding "innocent" mailings sufficient for purposes of mail fraud statute); *Spira v. Nick*, 876 F. Supp. 553, 558-59 (S.D.N.Y. 1995) (same). Plaintiffs need only allege a scheme to defraud, and "that defendants committed at least two of the statutorily enumerated predicate acts." *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017).

[239] *In re Lupron*, 295 F. Supp. 2d at 165 (emphasis added) (citations omitted). *See also Schmuck*, 489 U.S. at 710-11 (declaring that the mails had to be used in connection with the fraud but their use "need

Here, the scheme to defraud is clearly pled. The Weinstein Sexual Enterprise initially used Defendants to deceive women into meeting with Weinstein under the guise of business, when in fact the purpose was to sate Weinstein's sexual appetite.[240] The Weinstein Sexual Enterprise then used Defendants and their employees, spies, the media and lawyers to deceive Weinstein's victims, to blacklist victims, as well as to turn over or share their evidence of assault under the guise that it would be used to expose Weinstein's wrongdoing (in the media) or to prosecute a claim against Weinstein (in a civil action). The material misrepresentations were made in writing via email and texts, and in telephone calls (several of which were made across state lines)—each holds out the sender as someone who is sympathetic to and willing to help the victims, when they were actually working for Weinstein. In fact, the Weinstein Sexual Enterprise used the victims' evidence of assault against Plaintiffs and the class to blacklist them and publish false stories about them. Members of the enterprise also destroyed evidence. The scheme to defraud is clearly pled separate from the predicate acts of mail and wire fraud.[241]

Moreover, Plaintiffs satisfy Rule 9(b) with respect to mail and wire fraud.[242] "[U]nder Rule 9 the [RICO] pleader is required to go beyond a showing of fraud and state the time, place

---

not be an essential element of the scheme" and could be merely "incident[al] to an essential part of the scheme" or "a step in [the] plot" (citations omitted).

[240] Indeed, Harvey Weinstein has admitted use of the wires to communicate with class members in recent filings. *See* Motion for Entry of an Order Compelling Limited Discovery Under Rule 2004 of the Federal Bankruptcy Procedure and Reply (Dkt. 729) at 2, 10, *In re Weinstein Co. Holdings, LLC, et al.*, No. 18-10601 (Bankr. D. Del.) (Weinstein seeking his "electronically stored information" at TWC, consisting of "his own email communications where he was the sender/recipient," including "hundreds of thousands of emails, texts and pieces of personal correspondence").

[241] In contrast to Plaintiffs' detailed allegations of mail and wire fraud, the plaintiff in *Canosa* made only conclusory, insufficient allegations of mail and wire fraud. *See Canosa*, 2019 U.S. Dist. LEXIS 13263, at *69-70 ("[Plaintiff's] elliptical pleadings in support of claims of mail and wire fraud are manifestly inadequate. The [amended complaint] does not articulate a coherent theory of fraud. And despite the references above, the [amended complaint] does not otherwise refer anywhere to law firms, intelligence participants, or complicit producers.").

[242] Fed. R. Civ. P. 9(b).

and content of the alleged mail and wire communications perpetrating that fraud."[243] "However,

the particularity requirement is not a mechanical formula demanding exacting precision but must

instead be applied in view of its express purposes and the facts of each case."[244]

Examples of the mail and wire fraud include:

- Mails and wires were used by Weinstein, his Miramax assistant, and Miramax's accounting department to: (i) speak with Brock's agent after her assault to set up the private screening at which Weinstein threatened Brock; (ii) rent and pay for the theater and private screening at which Weinstein threatened Brock; and (iii) schedule and pay for the private plane on which Sagemiller was forced to fly after her assault (and to contact Sagemiller at the airport to redirect her);[245]

- Mails and wires were likely used by Miramax and Weinstein to remove women from projects or dissuade other people from hiring the women;[246]

- Mails and wires were likely used by Miramax to (i) discuss complaints of sexual assault and harassment against Weinstein as they occurred; and (ii) negotiate non-disclosure agreements to conceal Weinstein's assaults after they occurred;[247]

- Wires were used by a "fake" journalist hired by unidentified members of the enterprise in the summer of 2017 to contact Miramax-era victim Katherine Kendall, who was also on the Black Cube list, as well as other Intelligence Participants targeting victims;[248]

- Wires were used by Ambassador Paolo Zampolli (telephone across state lines) and Alex Spiro, Esq. (telephone calls, emails, and text messages across state lines) to contact proposed plaintiff Melissa Thompson (a TWC-era victim) in October 2017 to entice her to retain Spiro at Benjamin Brafman's firm to prosecute her

---

[243] *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (internal quotations and citations omitted). *See also New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud. This degree of specificity is no more nor less than we have required in general fraud and securities fraud cases.").

[244] *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 538 (S.D.N.Y. 2014). *See also In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 475 (S.D.N.Y. 2017) (a "plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based") (citation omitted).

[245] ¶¶ 163, 175.

[246] *E.g.*, ¶¶ 179, 265, 658.

[247] ¶¶ 330-336, 358-359.

[248] ¶¶ 116-123, 820-821.

claims and then to share her evidence against Weinstein (when in fact Brafman was Weinstein's lawyer);[249]

- Mails and wires were used by TWC's Board of Directors (who live in New York, Connecticut, California, New Jersey, Florida, Canada, and Europe) to (i) discuss and edit Weinstein's employment contracts, which specifically incorporated clauses to address Weinstein's sexual assaults; (ii) negotiate Weinstein's employment contracts with him; (iii) correspond with TWC and Weinstein's lawyer concerning Weinstein's personnel file and the lawyer's withholding of the file from the Board; (iv) correspond about and discuss each complaint against Weinstein as it occurred; (v) negotiate post-assault non-disclosure agreements with Weinstein's victims; and (vi) discuss, negotiate, and/or approve employment contracts with TWC employees precluding the employees from criticizing the company or its leaders;[250] and

- Mails and wires were used between Weinstein, his lawyers and the Intelligence Participants to retain, pay, and discuss the findings of the Intelligence Participants.[251]

As further detailed in the Complaint, Plaintiffs have included extensive details to inject precision or some measure of substantiation into their allegations of mail and wire fraud.[252] To the extent more is needed, the Supreme Court has recognized that Rule 9(b) can be relaxed for a RICO claim where the necessary evidence is likely to come through discovery.[253]

---

[249] ¶¶ 302-320.

[250] ¶¶ 423-428, 441-445, 459, 464, 466-470, 473-474, 476, 480, 483-484, 486-488, 495, 502-506, 510, 512-514, 517-522, 528, 532-538, 544, 548-551, 559, 563-567, 570, 580-584, 593-595, 609-610. Any argument that Plaintiffs have not identified a specific communication as to a specific person ignores the reality that they hold the emails and evidence of calls in their possession. *Rotella v. Wood*, 528 U.S. 549, 560 (2000) (citing *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1050-51 (7th Cir. 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim)). Moreover, requisite scienter or knowledge is subject to Rule 8. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

[251] ¶¶ 787, 808, 820-821.

[252] 2 James Wm. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 9.03[1][b], at 9-18 (3d ed. 1999) ("Plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.").

[253] *Rotella*, 528 U.S. at 560 (citing *Corley*, 142 F.3d at 1050-51 (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim)).

Plaintiffs also allege the predicate acts of tampering with a witness or victim.[254] Plaintiffs allege that certain Defendants used the threat of physical force to cause the victim not to report the assaults to a law enforcement officer.[255] To allege a predicate act of witness tampering, however, it is sufficient that the harassing conduct be "intended to badger, disturb or pester,"[256] like the conduct directed at Kendall.[257] Moreover, the conduct need not be directed at the plaintiff, if the conduct is directed at a third party with the intent to intimidate the plaintiff.[258]

By way of example only, the following predicate acts of tampering with a victim are alleged:

*For Defendants Disney, Miramax, and Harvey Weinstein:*

- The night after assaulting and attempting to assault Plaintiff Zoe Brock in Cannes, France, Weinstein and Miramax rented out a theater (unbeknownst to Brock) for a private screening for Brock's group. After the lights dimmed, Weinstein entered the theater, sat right behind Brock and kept his hand on Brock's chair to intimidate her into silence;[259]

---

[254] 18 U.S.C. § 1512.

[255] Law enforcement officer is defined as "public servant authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, or prosecution of an offense." 18 U.S.C. § 3673(3). Plaintiffs have not alleged, at this stage, predicate acts of witness tampering against the Directors, but do not concede that they were ignorant of the witness tampering that occurred and reserve the right to amend. *See* Def. Br. at 30.

[256] U.S. Attorneys' Criminal Resource Manual, § 1729, available at https://www.justice.gov/usam/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or (last accessed Jan. 31, 2019). Defendants' position that the procurement of silence through "settlement agreements" is not witness tampering ignores (1) the threats to the women that preceded any alleged settlements; and (2) that those settlements were intended to hide illegal conduct. Whether settlement agreements constitute witness tampering is a question of fact.

[257] FAC § IV(D)(2).

[258] U.S. Attorneys' Criminal Resource Manual, § 1729, available at https://www.justice.gov/usam/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or (last accessed Jan. 31, 2019).

[259] FAC § IV(D)(4).

- At the end of shooting the Miramax movie in Toronto and after having been assaulted, Sagemiller declined Weinstein's invitation to travel back to the United States on his private plane. Nonetheless, Weinstein's assistant tracked Sagemiller down at the airport and told her that her bags had been removed from the commercial airline. After Sagemiller was forced to board Weinstein's plane, Weinstein directly threatened and intimidated her into silence;[260] and

- After attempting to assault Klatt at Miramax's offices, Weinstein locked her in a pitch-black stairwell to prevent her from going to the authorities and intimidate her into silence.[261]

### For Weinstein, Miramax, and TWC:

- After assaulting Jane Doe, Weinstein harassed and stalked her—even trying to break into her hotel room.[262]

### For Weinstein and TWC:

- In 2017, Weinstein's criminal defense firm interfered with Thompson, gaining access to her evidence of assault and causing her significant fear when she learned they were representing Weinstein.[263]

Defendants' argument that Plaintiffs' allegations of victim tampering are inadequate should be rejected. First, nothing in section 1512 requires Plaintiffs to identify a specific "federal proceeding" in order to prosecute a case of tampering. Indeed, such a requirement would eviscerate section 1512, a major portion of which is aimed at tampering that is intended to prevent complaints to a law enforcement officer.[264] Similarly, the argument that Weinstein would need to be aware that he was the subject of a federal investigation to fall within the statute would undermine the provision that "an official proceeding need not be pending or about to be

---

[260] FAC § IV(D)(5).

[261] FAC § IV(D)(1).

[262] FAC § IV(E).

[263] FAC § IV(F)(3).

[264] *See, e.g.*, 18 U.S.C. § 1512(a)(2), (b), (c), (d).

instituted at the time of the offense."[265] Here, the very gravamen of this claim is that the RICO enterprise's purpose was to prevent Plaintiffs, the class, and others from reporting Harvey Weinstein's criminal conduct, which constituted a federal crime of, *inter alia*, sex trafficking pursuant to 18 U.S.C. § 1590.[266]

### d. A closed-ended pattern of racketeering activity exists.

Closed-ended continuity can be shown through past criminal conduct extending over a substantial period of time. The Second Circuit has found closed-ended continuity to exist with predicate acts occurring over as little as two years.[267] Courts have denied motions to dismiss where there are a number of victims and separate incidents, even where the time period is less than two years.[268] Here, Plaintiffs allege predicate acts occurring from at least 1993 to October 2017, and thus satisfy closed-ended continuity.

---

[265] 18 U.S.C. § 1512(f)(1). For this reason, to the extent that it states that a federal proceeding must be pending for a tampering charge to stand, *Miller v. Carpinello*, 2007 WL 4207282, at *7 & n.6 (S.D.N.Y. Nov. 20, 2007), is simply incorrect.

[266] In contrast to Plaintiffs' detailed allegations of witness tampering, Canosa made only the conclusory allegation that "all defendants were aware of, ratified and condoned said threats that were ever received from any other victim." *Canosa*, 2019 U.S. Dist. LEXIS 13263, at *69 (quoting amended complaint).

[267] *Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992). *See also Jacobson v. Cooper*, 882 F.2d 717 (2d Cir. 1989) (concluding that predicate acts occurring from approximately 1980 to 1988 satisfied the continuity requirement").

[268] *See, e.g.*, *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (17 months). *See also id.* ("While Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity."); *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) ("Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.").

010717-11 1093440 V1

### 4. Plaintiffs have alleged RICO injuries to their business or property that were proximately caused by Defendants' RICO violations.

Defendants erroneously argue that Plaintiffs have no RICO standing.[269] Under 18 U.S.C. § 1964(c), a RICO plaintiff has standing where "he has been injured in his business or property by the conduct constituting the violation."[270] Plaintiffs allege that they were injured in their business or property because the RICO scheme: (i) blacklisted them, causing damage to their business of being actors; and (ii) impeded and injured their legal claims against Harvey Weinstein. Injury to a plaintiff's business is a RICO injury when the purpose of the RICO scheme is to prevent plaintiffs from getting jobs or work in their profession.[271] In other words, where the damage is directly and proximately caused by the RICO scheme, it is a RICO injury. Here, Plaintiffs expressly allege that they lost work as a direct and intended result of the RICO violations.[272]

---

[269] Def. Br. at 78-85.

[270] *Sedima*, 473 U.S. at 496.

[271] *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262, 264 (2d Cir. 1995) (affirming verdict for plaintiff on RICO claim and damages of $100,000 in "injury to reputation and/or loss of goodwill," explaining "[o]ne objective of the unlawful conduct was to create multiple sources for rumors concerning the supposed dangers of Securitron locks. … [T]he jury could conclude that there was a deliberate effort to use both independent entities to give a spurious validity to the rumors."). *See also Aramony v. United Way of Am.*, 969 F. Supp. 226, 233 (S.D.N.Y. 1997) (explaining that: "The plaintiff in *Securitron* succeeded because the underlying predicate acts included deliberate and fraudulent misrepresentations designed to malign the plaintiff's reputation in the marketplace as a lock manufacturer. The damage contemplated by the predicate acts was reputational injury to the plaintiff, thus fulfilling the proximate cause requirement of *Holmes*.") (citation omitted).

[272] In contrast, Canosa alleged that she continued to receive work, albeit under threats by Weinstein. *See Canosa*, 2019 U.S. Dist. LEXIS 13263, at *67 ("[The amended complaint] does not anywhere describe any actual harm to her career. Quite the contrary, the [amended complaint] alleges that Weinstein used his promotion of her career as an opportunity to abuse her. ('Harvey Weinstein advanced plaintiff's career and provided plaintiff with jobs and production opportunities, and plaintiff was working on said jobs producing several film projects with Harvey Weinstein and was assaulted and forcibly sexually assaulted against her will several times under the guise of production work.')" (quoting amended complaint)).

### a.    Plaintiffs allege injuries to their business or property.

While Plaintiffs seek physical and emotional distress damages with respect to their sex trafficking and tort claims, those damages do not form the basis of their injuries under RICO. Their damages under RICO were caused by being blacklisted, which resulted in significant damage to their careers.

Defendants' citation to *Hollander v. Flash Dancers Topless Club* for the proposition that personal injuries can never constitute RICO injury is a red herring.[273] *Hollander* held that a plaintiff lacks standing where the "injuries are caused not by the RICO violations themselves, but by the exposure of those acts, or where plaintiff seeks to recover for injuries caused by his refusal to aid and abet the violations."[274] The *Hollander* court dismissed plaintiff's allegation of RICO injury because he "was not a target of the Scheme," nor was the scheme intended "to cause harm to plaintiff's reputation and goodwill or business."[275]

The allegations here stand in stark contrast. Plaintiffs were injured by the secret scheme to blacklist them from working in their chosen acting profession. That is the essence of a RICO injury. Not only were the class members the explicit targets of the scheme—the scheme itself was explicitly intended to harm them in their professions. So the additional cases cited by

---

[273] Def. Br. at 78-79 (citing *Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 459-60 (S.D.N.Y. 2004)).

[274] *Hollander*, 340 F. Supp. 2d at 459-60.

[275] *Id*. at 462. The Directors cite cases where the purpose of the RICO scheme was not aimed at ruining the plaintiffs' job prospects and thus are inapposite. *See, e.g.*, *Roitman v. N.Y.C. Transit Auth.*, 704 F. Supp. 346 (E.D.N.Y. 1989) (RICO claim dismissed against police officer who arrested an offender who sexually assaulted a woman on the train where the offender claimed he might not be able to get a teaching job with the "sex offender" label); *Mackin v. Auberger*, 59 F. Supp. 3d 528, 558 (W.D.N.Y. 2014) (rejecting RICO injury as "the loss of Plaintiff's reputation and resulting inability to gain future employment" where plaintiff police officer was let go due to misconduct on the job, including the destruction of evidence, and there was no evidence that the RICO scheme was designed to prevent the police officer from gaining future employment).

Defendants[276] are inapposite, because the alleged RICO wrongs in those cases were not intended to cause loss of business, and any loss of business or property was purely derivative of personal injuries or was not an injury to any business at all.[277]

For the same reasons, Defendants' argument that RICO "does not provide redress for the 'economic consequences of personal injuries'" is a red herring.[278] Plaintiffs expressly allege that Defendants directly and intentionally blacklisted them from obtaining employment in their business of acting. Plaintiffs do *not* claim injuries to business that are solely derivative of personal injuries. To put it bluntly, Weinstein sexually assaulted them, and Defendants independently blacklisted them from obtaining employment, in violation of RICO. The fact that Weinstein sexually assaulted them does not immunize Defendants from their misconduct in thereafter blacklisting Plaintiffs.

Defendants also wrongly claim that Plaintiffs' injuries to their business and property are "speculative and unprovable."[279] In fact, "courts do not require a civil RICO plaintiff to quantify the exact amount of her injury in order to allege such injury."[280] It suffices to allege the fact of

---

[276] Def. Br. at 79.

[277] *See Doe v. Schneider*, 667 F. Supp. 2d 524, 534 (E.D. Pa. 2009) ("Here, Count VII of the Amended Complaint does not include any allegations of business or property injury, but the complaint generally alleges that Doe's physical injuries caused a diminishment of his income and earning potential."); *Major League Baseball Props., Inc. v. Price*, 105 F. Supp. 2d 46 (E.D.N.Y. 2000) (consumer purchaser of trading cards did not suffer injury to business or property).

[278] Def. Br. at 38 (quoting *Williams v. Dow Chem. Co.*, 255 F. Supp. 219, 225 (S.D.N.Y. 2003)).

[279] *Id.* at 39.

[280] *Grange Mut. Cas. Co. v. Mack*, 2009 WL 1036092, at *6 (E.D. Ky. Apr. 17, 2009). *See also Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) (noting that it "has not held that quantifiable damages are a necessary precondition to RICO liability; instead, this Circuit has formulated the requirement in terms of the necessity of proving some damages, not a specific amount"); *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 271 (D. Conn. 2004) ("Although it is axiomatic that a plaintiff must plead concrete damages, Fed. R. Civ. P. 12(b)(6) does not require a complaint to plead the amount of damages with mathematical precision.").

injury, as Plaintiffs have done here.[281] "Whether experts will be able to measure the [damages] remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative."[282]

Outrageously, Defendants contend that the "loss of roles or other opportunities in the entertainment industry, however, is a loss too speculative to be redressed under RICO."[283] In Defendants' view, they will *always* be free to deny women roles for whatever reason they want—including blacklisting them for refusing to satisfy Defendant's sexual desires—with impunity. The cases cited by Defendants do not support such a demeaning legal argument. For example, Defendants cite *Trustees of the Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical*,[284] where the court held that "plaintiffs have alleged a non-speculative loss; they simply cannot ascertain the precise amount of that loss at this time because information is peculiarly within defendants' knowledge." Similarly here, Plaintiffs allege a non-speculative loss of business but simply cannot obtain crucial information that is peculiarly within Defendants' knowledge.[285]

Finally, Defendants incorrectly claim that Plaintiffs' RICO claim must be dismissed because "most" of their allegations "fail even to identify any specific job opportunity allegedly

---

[281] ¶¶ 829, 838.

[282] *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000).

[283] Def. Br. at 39.

[284] 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995).

[285] The other cases cited by Defendants similarly do not support their argument. *See Tsipouras v. W&M Props., Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) ("Tsipouras's conclusory allegations that he suffered 'economic injury as a direct result of the certain predicate acts,' … 'boil down' to his claim that he was injured because defendants *promised* him a bonus, which falls far short of the requisite interest necessary to sustain a civil RICO claim") (citation omitted); *Mackin*, 59 F. Supp. 3d at 558 ("The alleged injures regarding Greece's loss of over $900,000 and the hiring of Gary Pignato are not viable injuries recoverable by Plaintiff under the RICO statute, since they are injuries to third parties and do not involve an injury to Plaintiff's business or property.").

- 94 -

lost by any of the Plaintiffs."[286] First, Plaintiffs do allege specific job opportunities from which

they were blacklisted where they know.[287] Second, Defendants utterly fail to acknowledge, let

alone explain away, the undeniable fact that *Defendants* control the information necessary to

make such proof. Plaintiffs "should have the opportunity to discover evidence showing that"

their careers were damaged and they would have "reaped profits if Defendants had not

subverted" their ability to participate in the industry.[288]

Plaintiffs have alleged facts demonstrating that such damage is plausible. As one court

explained in denying a motion to dismiss a RICO claim in response to an argument that damages

were speculative:

> [Dismissal] would ignore not only how Defendants corrupted the
> City bidding process, but also the Second Circuit's admonition that
> courts should avoid applying a "mechanical test detached from the
> policy considerations … at play in [a civil RICO] case." Thus, the
> court declines to reward the Defendants for their allegedly illegal
> conduct by immunizing them from civil RICO liability.[289]

Likewise, Defendants here should not be rewarded at the pleading stage simply because their

allegedly wrongful acts were done in secret.[290]

---

[286] Def. Br. at 38.

[287] ¶ 830(a)-(j).

[288] *Astech-Marmon*, 349 F. Supp. 2d at 271. *See also Trs. of the Plumbers & Pipefitters Nat'l Pension Fund*, 886 F. Supp. at 1146 ("[P]laintiffs have alleged a non-speculative loss; they simply cannot ascertain the precise amount of that loss at this time because information is peculiarly within defendants' knowledge.").

[289] *Astech-Marmon*, 349 F. Supp. 2d at 271 (citation omitted).

[290] Two cases discussed at oral argument are inapposite. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("we reject FNB's novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined"); *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016) ("The hope of collecting upon a judgment if one's suit proves successful is precisely the sort of mere expectation that is too speculative to constitute a property right[.]"). In contrast to those cases, Plaintiffs here allege concrete injury to business and property but will seek discovery of facts peculiarly within Defendants' knowledge to further substantiate their losses.

Finally, Plaintiffs allege that Defendants purposefully obstructed justice, destroyed evidence, and manipulated and deceived them to make statements to be used against them. In other words, one purpose of the Weinstein Sexual Enterprise was to injure Plaintiffs' causes of action against Defendants, including for damage to their careers. A cause of action is a property right,[291] the damage to which gives rise to RICO injury.[292] Dismissal should be denied.

### b. Plaintiffs adequately allege proximate causation.

Defendants also erroneously claim that the FAC "fails to allege that Plaintiffs' purported injuries were caused by conduct of the Outside Directors that amounted to a RICO violation."[293] Once again, Defendants take the outrageous and demeaning position that the very nature of Hollywood prevents them from being found liable. Specifically, Defendants state, "Plainly, this is a case in which Plaintiffs' alleged business injuries could have been caused by 'any number of reasons unconnected to the' RICO allegations. A career in Hollywood is too ephemeral, its prospects for success too contingent and uncertain, to serve as a standalone 'business or property' that can be lost 'by reason of a violation' of RICO. 18 U.S.C. § 1964(c)."[294] In short, Defendants claim that Plaintiffs should be prevented from conducting discovery to determine

---

[291] *Parker v. Walker*, 6 Cal. Rptr. 2d 908, 912 (Cal. Ct. App. 1992) ("A cause of action to recover money in damages, as well as money recovered in damages, is a … form of personal property."). *See also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause").

[292] *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 354 (3d Cir. 1986) ("The district court dismissed the RICO claims predicated on the alleged obstructions of justice … because, it held, interference with a lawsuit did not constitute an injury to 'business or property' within the meaning of RICO. We believe, especially in light of the Supreme Court's intervening decision in Sedima, that this constituted reversible error. … A cause of action, of course, is a form of 'property[.]'"), *aff'd*, 483 U.S. 143 (1987).

[293] Def. Br. at 40. Defendants do *not* argue that Plaintiffs fail to allege that other Defendants proximately caused Plaintiffs' RICO injuries.

[294] *Id.* at 42.

*why* they were denied roles and *whether* it was because Defendants closed ranks around Harvey Weinstein to protect him and to line their pockets.

The bankruptcy of Defendants' argument is shown by their reliance on *Mack v. Parker Jewish Inst. for Health Care & Rehab.*[295] In *Mack*, the defendants reported the plaintiff pharmacist to the licensing board for diversion of drugs. Although the plaintiff claimed she was innocent, she did not allege that the defendants had taken affirmative steps to blacklist her from employment nor cause other employers not to hire her. Rather, she alleged that she was "slandered, libeled, and defamed," suffered "immense pain and suffering," and was "unable to seek employment that reflects her level of professional achievement and standing within her field, or to further her career due to the damage done to her reputation by defendants."[296] Dismissing her RICO claim, the court held: "While Plaintiff argues that her injuries involve more than just damage to her reputation, she fails to cite to any specific injury to her business or her property."[297] Unlike the *Mack* plaintiff, here Plaintiffs allege that Defendants did take affirmative steps to blacklist them and interfere with their careers, with the full extent of those affirmative steps to be obtained in discovery.

**B.      Plaintiffs allege a valid RICO conspiracy claim (Count VI).**

Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962]."[298] A RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme; (b) of the defendant's knowing

---

[295] *Id.* (citing *Mack v. Parker Jewish Inst. for Health Care & Rehab.*, 2014 WL 5529746 (E.D.N.Y. Oct. 30, 2014)).

[296] *Mack*, 2014 WL 5529746, at *6.

[297] *Id.*

[298] 18 U.S.C. § 1962(d).

engagement in the scheme with the intent that its overall goals be effectuated; and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering.[299] Plaintiffs here have alleged facts demonstrating that each Defendant knowingly agreed to join the conspiracy and involved itself (or himself) in the commission of at least two predicate acts. Accordingly, the motions to dismiss should be denied.[300]

## VIII. PLAINTIFFS ALLEGE VALID STATE LAW CLAIMS

### A. Plaintiffs state plausible claims for vicarious liability (Counts VII-XVI).

An employer can be vicariously liable for conduct within the scope of employment,[301] including physical assault.[302] And the "employer need not have foreseen the precise act or

---

[299] *United States v. Zemlyanski*, 908 F.3d 1, 11 (2d Cir. 2018). *See id*. ("RICO conspiracy does not require proof that a defendant knowingly agreed to facilitate a specific crime (e.g., mail fraud). So long as the defendant knowingly agreed to facilitate the general criminal objective of a jointly undertaken [racketeering] scheme, the government need not prove that he or she knowingly agreed to facilitate any specific predicate act. Similarly, unlike basic conspiracy, RICO conspiracy does not require proof that the defendant intended that specific criminal acts be accomplished. Instead, it suffices to show that he intended that the broad goals of the racketeering scheme be realized, along with evidence that some (or any) members of the conspiracy intended that specific criminal acts be accomplished.") (internal quotations and citation omitted).

[300] *See generally* Def. Br. at 42-43. The Directors reassert that they cannot be liable for acts prior to joining the Board (or, as Plaintiffs allege, joining the conspiracy). *But see United States v. Blackmon*, 839 F.2d 900, 908 (2d Cir. 1988) ("a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy") (citation omitted).

[301] *JG v. Card*, 2009 WL 2986640, at *11 (S.D.N.Y. Sep. 17, 2009).

[302] *Ramos v. Jake Realty Co.*, 21 A.D.3d 744 (N.Y. App. Div. 2005) (reversing summary judgment for the employer where a fact question existed as to whether a building superintendent acted within the scope of his employment when he physically assaulted a tenant). *See also Riviello v. Waldron*, 391 N.E.2d 1278, 1282 (N.Y. 1979) (in action against a tavern where an employee poked a patron's eye out with a pocket knife, court held that the employer could have foreseen the event, noting "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment").

manner of the injury as long as the general type of conduct may have been reasonably

expected."[303] The doctrine applies depending upon:

> The connection between the time, place and occasion for the act;
> the history of the relationship between employer and employee as
> spelled out in actual practice; whether the act is one commonly
> done by such an employee; the extent of departure from normal
> methods of performance; and whether the specific act was one that
> the employer could reasonably have anticipated.[304]

Application of these factors supports denial of the motions to dismiss here.

First, Miramax and TWC knew of the time, place, and occasion for many of the sexual

assaults, having specifically set the logistics up and/or covered up after. Plaintiffs have

unquestionably alleged facts showing the assaults were "commonly done by" Weinstein; they

were not a departure from his normal method of performance.[305]

Moreover, Defendants ignore the exception to the rule for vicarious liability: even if the

misconduct was not within the scope of employment, vicarious liability can be imposed for

intentional torts that are reasonably foreseeable and a natural incident of employment.[306]

Weinstein's assaults were reasonably foreseeable by Disney, Miramax, and TWC, and their

respective officers and directors—with TWC's Board going so far as to account for future

assaults in Weinstein's employment contracts. Moreover, the assaults were "incident of his

---

[303] *Ramos*, 21 A.D.3d at 745 (quoting *Riviello*, 391 N.E.2d at 1282).

[304] *Id.* (quoting *Riviello*, 391 N.E.2d at 1282).

[305] These allegations distinguish *Canosa*, in which the court held that the plaintiff did not adequately allege vicarious ability. Indeed, it does not appear that the plaintiff even responded to the motion to dismiss those claims. *See Canosa*, 2019 U.S. Dist. LEXIS 13263, at *34 ("[Defendants] argue that the [amended complaint] inadequately pleads their vicarious liability. … The Court assumes Canosa responds with the theories of aider and abettor and ratification liability outlined above. The Court agrees with these defendants that the [amended complaint] fails to plead a viable theory of vicarious liability against them[.]"). As discussed in the following section of this Opposition, Plaintiffs here—unlike in *Canosa*— adequately allege ratification.

[306] *Id.*

employment" with Miramax's and TWC's direct participation. This highly unusual (and sickening) fact pattern—where the employer sets the scene for the tortious conduct and covers it up after—does not exist in any of the cases cited by Defendants. Because the question whether conduct is "an incident of employment" is one of fact,[307] the motions to dismiss as to vicarious liability for the state law claims should be denied.

Defendants rely on *Doe v. Alsaud*, in which a woman sued the employer of her rapist, who was a member of a Saudi prince's entourage.[308] She alleged the employee's duties involved luring women to the prince.[309] The *Alsaud* court held that the plaintiff had not established a sufficient nexus between those duties (luring women for the prince) and the employee's own sexual misconduct (raping the plaintiff).[310] This case could not be more different. Plaintiffs pled that Miramax and TWC employees had the responsibility to lure the women victims to Weinstein to be assaulted (and not that they separately sexually assaulted the women). Thus, his conduct was within the scope of employment, and the motions should be denied.[311]

---

[307] *Riviello*, 391 N.E.2d at 1281 ("Thus formulated, the rule may appear deceptively simple but, because it depends largely on the facts and circumstances peculiar to each case, it is more simply said than applied. … [T]he question is ordinarily one for the jury.") (citations omitted). *See also Holck v. Town of Hempstead*, 394 N.E.2d 281 (N.Y. 1979) ("Whether claimant's noontime recreational activity was an incident of employment so as to arise out of and in the course of employment is a question of fact.").

[308] *Doe v. Alsaud*, 12 F. Supp. 3d 674, 676 (S.D.N.Y. 2014).

[309] *Id.*

[310] *Id.* at 678.

[311] These allegations distinguish *Canosa*, in which the court dismissed a claim for negligent supervision. *See Canosa*, 2019 U.S. Dist. LEXIS 13263, at *36-41.

## B. Plaintiffs allege valid ratification claims (Counts XVII-XVIII).

Under the doctrine of ratification, a defendant who deliberately allows illegal conduct to continue when he can stop it is liable for ratifying the conduct.[312] Plaintiffs allege that each Defendant knowingly ratified Weinstein's practice of assaulting women under the guise of business in Miramax's and TWC's names.[313] As reflected in the Restatement (Second) on Torts, ratification is hardly limited to contract law.[314] Thus, courts have found that an employer's ongoing tolerance of sexual harassment logically amounts to ratification.[315] To that end, New York courts regularly deny motions to dismiss claims that a corporate defendant ratified the sexual harassment of the plaintiff.[316]

First, Plaintiffs allege that every meeting—in his office, hotel, or at industry parties—was taken by Weinstein in his role as an officer of (or using the employees and chattels of) Miramax

---

[312] *L. Tarango Trucking v. Cty. of Contra Costa*, 181 F. Supp. 2d 1017, 1032 (N.D. Cal. 2001) (citing *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir. 1984)).

[313] *See* FAC, Counts XVII (Ratification versus Miramax, Walt Disney, Disney Enterprises, Buena Vista International, Eisner, and Miramax Officers), XVIII (Ratification versus TWC, TWC Directors, and TWC Officers).

[314] *See, e.g.*, *Stohlts v. Gilkinson*, 867 A.2d 860, 874 (Conn. App. Ct. 2005) ("Punitive damages can properly be awarded against a master or other principal because of an act by an agent if … the principal or a managerial agent of the principal ratified or approved the act." (quoting 4 RESTATEMENT (SECOND) TORTS, § 909 (1979)).

[315] *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 984-86 (Ala. 1999) (employer ratifies acts of sexual harassment if it expressly adopts misconduct or implicitly approves it); *Murillo v. Rite Stuff Foods, Inc.*, 77 Cal. Rptr. 2d 12, 24 (Cal. Ct. App. 1998) (principal is liable when it ratifies an originally unauthorized tort); *Delaney v. Skyline Lodge*, 642 N.E.2d 395, 402 (Ohio Ct. App. 1994) (employer potentially liable for punitive damages for ratifying acts of sexual harassment); *Wirig v. Kinney Shoe Corp.*, 448 N.W.2d 526, 534 (Minn. Ct. App. 1989), *aff'd in part & rev'd in part on other grounds*, 461 N.W.2d 374 (Minn. 1990) (employer may ratify or approve acts of employee by failing to discharge or reprimand agent for sexual harassment); *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 236 (N.C. Ct. App. 1989) (jury may find ratification of sexual misconduct from any act or omission by employer which tends to show intention to ratify unauthorized acts).

[316] *See, e.g.*, *Velasquez v. 40 Cent. Park S. Inc.*, 2008 NY Slip Op 32799(U), ¶ 4 (N.Y. Sup. Ct. 2008) (denying motion to dismiss of corporate defendant who plaintiff alleged ratified sexual harassment); *Kennington v. 226 Realty LLC*, 2013 NY Slip Op 32708(U), ¶ 7 (N.Y. Sup. Ct. 2013) (denying motion to dismiss complaint that the corporate hotel ratified the employee's sexual harassment of plaintiff).

- 101 -

or TWC. Second, Plaintiffs allege that Miramax employees and TWC employees set up those meetings knowing the female invitees would be assaulted, purposefully acted as procurers of women, knowingly lulled women into a false sense of security, supplied Weinstein with his erectile dysfunction injections, cleaned up and covered up the assaults after they occurred, and paid for Weinstein's hotel rooms knowing that he used them to set up meetings under the companies' names and then to assault the female attendees. Furthermore, with full knowledge of Weinstein's sexual misconduct, TWC and the TWC Directors continued to offer him contracts with increasing levels of job security—including protections from being terminated for sexual assault *absent a felony conviction*—year after year. These are hardly "bare assertions," as Defendants contend.[317]

Instructive is the court's analysis in *Rivera v. Puerto Rican Home Attendants Services, Inc.*[318] In *Rivera*, plaintiff alleged sexual harassment, assault, battery, and retaliation claims by a supervisor and owner of the company. The court denied the motion to dismiss, in part finding that plaintiff's internal complaints about the "high level, supervisory positions … may establish knowledge or ratification of the alleged conduct on the part of the employer."[319] The court also denied the motion, explaining that ratification may occur where the offensive conduct was "open

---

[317] These allegations distinguish *Canosa*. First, Canosa did not respond to the defendants' arguments to dismiss the ratification claims. *See Canosa*, 2019 U.S. Dist. LEXIS 13263, at *32 ("The TWC Companies move to dismiss the [amended complaint's] ratification claim against them because, they contend, it applies only to contract, not tort claims, and because, on the facts pled, the TWC Companies had insufficient knowledge of Weinstein's actions. Canosa does not appear to respond to these arguments." (citation omitted)). Second, Canosa did not allege, as Plaintiffs do here, Defendants' knowing participation in, and benefit from, Weinstein's sexual assaults. *See id.* at *33 ("The [amended complaint] does not plead any non-conclusory facts that make out that [ratification] standard.").

[318] 930 F. Supp. 124 (S.D.N.Y. 1996).

[319] *Id.* at 133 n.9.

and notorious."[320] Given that witnesses had seen the sexual harassment and the complaint asserted that "everyone in the office observed it from time to time," the court denied the motion to dismiss the defendant corporation which "may be blind to the reality of the workplace only at its peril."[321] The same analysis applies here.

Further, the Directors' argument that Weinstein was not their agent is a question of fact.[322] And, their argument that they lacked knowledge is contradicted by the Complaint, including the direct quotes from Weinstein's lawyer.[323]

Defendants also insist that they cannot imagine what they gained from Weinstein's conduct—or their participation in it. This line of argument ignores all they did gain—money, power, and prestige—by covering up Weinstein's conduct and allowing him to bully and assault Hollywood. Accordingly, the motion to dismiss should be denied.

## IX. CONCLUSION

Plaintiffs respectfully request that Defendants' motions to dismiss be denied. Alternatively, Plaintiffs request leave to conduct discovery and a subsequent opportunity to amend the complaint.

---

[320] *Id.* at 131 (citing *McKenney v. New York City Off-Track Betting Corp.*, 903 F. Supp. 619, 621 (S.D.N.Y 1995) ("open and notorious" sexually based verbal abuse may be chargeable to employer)).

[321] *Id.*

[322] *Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*, 295 F.R.D. 18, 26 (E.D.N.Y. 2013) ("Whether an agency relationship exists is a question of fact.") (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 385-86 (2d Cir. 1994)).

[323] ¶ 556.

DATED: January 31, 2019

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
*beth@hbsslaw.com*

Steve W. Berman
Craig Spiegel
Shelby Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
*steve@hbsslaw.com*
*craig@hbsslaw.com*
*shelby@hbsslaw.com*

Jason Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
*jasonz@hbsslaw.com*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2019, I electronically transmitted the foregoing

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will

transmit a Notice of Electronic Filing to all ECF registrants.

Dated: January 31, 2019

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan

010717-11 1093440 V1