# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA THOMPSON, MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX FILM NY LLC, THE WALT DISNEY COMPANY, DISNEY ENTERPRISES, INC., BUENA VISTA INTERNATIONAL, INC., HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MICHAEL EISNER, IRWIN REITER, DAVID GLASSER, FRANK GIL, RICK SCHWARTZ, FABRIZIO LOMBARDO, MARK GILL, NANCY ASHBROOKE, MIRAMAX DOES 1-10, TALENT AGENCY DOES 1-100, and JOHN DOES 1-50, inclusive,<br><br>Defendants. | Case No. 17-cv-9554 (AKH)<br><br>Hon. Alvin K. Hellerstein |

---

## CORRECTED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANTS TARAK BEN AMMAR AND BARBARA SCHNEEWEISS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACT SUMMARY...............................................................................................1

     A.     Miramax Vice President of Television and TWC Vice President of
          Production Barbara Schneeweiss facilitated Weinstein's conduct and
          cover-up. ........................................................................................................2

     B.     TWC Director Tarak Ben Ammar exercised purposeful control over TWC..........3

III.   THIS COURT HAS PERSONAL JURISDICTION OVER TARAK BEN
      AMMAR, A DIRECTOR OF A NEW YORK-BASED CORPORATION......................5

     A.     Plaintiffs need only make a prima facie case of personal jurisdiction or,
          alternatively, are entitled to jurisdictional discovery................................................5

     B.     Plaintiffs have made a prima facie showing of personal jurisdiction over
          Defendant Ben Ammar under New York's long-arm statute. .................................6

          1.     This Court may exercise jurisdiction under New York's long-arm
               statute because Ben Ammar, directly or through TWC as his agent,
               transacted business related to Plaintiffs' claims in New York. ..................8

          2.     This Court may also exercise jurisdiction under New York's long-
               arm statute because Ben Ammar committed a tortious act in New
               York. ........................................................................................................12

          3.     Further, this Court may exercise personal jurisdiction over Ben
               Ammar because his activities outside New York caused injury
               within New York...................................................................................13

     C.     The exercise of personal jurisdiction over Ben Ammar comports with
          traditional notions of fair play and substantial justice. ..........................................15

           1.     The exercise of personal jurisdiction is reasonable. ..................................15

          2.     Plaintiffs' claims are related to Ben Ammar's contacts in New
               York. ........................................................................................................17

IV.    PLAINTIFFS STATE PLAUSIBLE VIOLATIONS OF THE TRAFFICKING
      VICTIMS PROTECTION REAUTHORIZATION ACT ................................................18

V.     PLAINTIFFS STATE PLAUSIBLE RICO CLAIMS.......................................................19

VI.    PLAINTIFFS ALLEGE PLAUSIBLE STATE LAW CLAIMS.......................................20

A.  Plaintiffs allege valid negligent supervision and retention claim against Ben Ammar. ...................................................................................20

    1.  Plaintiffs' claims may be pled in the alternative. .........................................20

    2.  Plaintiffs have alleged that Ben Ammar knew there was a high degree of risk that Weinstein would abuse women but nonetheless facilitated the circumstances in which abuse would occur. ......................20

    3.  Corporate documents cannot immunize Ben Ammar from liability to third parties. ............................................................................21

B.  Plaintiffs state plausible claims for vicarious liability and ratification as to Ben Ammar. ......................................................................23

C.  Plaintiffs state plausible claims against Schneeweiss for aiding and abetting Weinstein's tortious conduct. ...................................................23

VII.  PLAINTIFFS' CLAIMS ARE TIMELY .........................................................25

VIII.  CONCLUSION ...............................................................................26

010717-11 110679 V2

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnville v. Mimosa Cafe*,
No. 1:14-CV-518-GHW, 2014 U.S. Dist. LEXIS 94691 (S.D.N.Y. July 10,
2014) .................................................................................................................................21

*Beacon Enters., Inc. v. Menzies*,
715 F.2d 757 (2d Cir. 1983) ..............................................................................................5

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007) ..............................................................................................7

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ...........................................................................................................8

*Calder v. Jones*,
465 U.S. 783 (1984) ...........................................................................................................7

*Chaiken v. VV Publ'g Corp.*,
119 F.3d 1018 (2d Cir. 1997) ................................................................................. *passim*

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998) ..............................................................................7, 8, 15, 17

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010) ..............................................................................................7

*Cook v. City of Chicago*,
No. 06 C 5930, 2008 U.S. Dist. LEXIS 34131 (N.D. Ill. Apr. 25, 2008) ........................25

*Cosmetech Int'l, LLC v. Der Kwei Enter. & Co., Ltd.*,
943 F. Supp. 311 (S.D.N.Y. 1996) ....................................................................................5

*CutCo Indus., Inc. v. Naughton*,
806 F.2d 361 (2d Cir. 1986) ..............................................................................................8

*Doe v. Bakersfield City Sch. Dist.*,
39 Cal. Rptr. 3d 79 (Cal. Ct. App. 2006) ........................................................................25

*Goland v. Iglesias*,
No. 85 Civ. 9697 (SWK), 1988 U.S. Dist. LEXIS 3528 (S.D.N.Y. Apr. 21,
1988) .................................................................................................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ....................................................................................................7, 17

*Herbstein v. Bruetman*,
768 F. Supp. 79 (S.D.N.Y. 1991)...........................................................................5

*Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*,
600 F. Supp. 731 (E.D.N.Y. 1985) .........................................................................5

*IUE AFL-CIO Pension Fund v. Herrmann*,
9 F.3d 1049 (2d Cir. 1993).....................................................................................5

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
559 U.S. 573 (2010)..............................................................................................18

*John R. v. Oakland Unified Sch. Dist.*,
769 P.2d 948 (Cal. 1989) ......................................................................................25

*Karabu Corp. v. Gitner*,
16 F. Supp. 2d 319 (S.D.N.Y. 1998)...............................................................10, 11

*Kernan v. Kurz-Hastings, Inc.*,
175 F.3d 236 (2d Cir. 1999)..................................................................................14

*Kreutter v. McFadden Oil Corp.*,
522 N.E.2d 40 (N.Y. 1988)...................................................................................10

*Krystal G. v. Roman Catholic Diocese of Brooklyn*,
933 N.Y.S.2d 515 (N.Y. Sup. Ct. 2011) ..............................................................22

*LaMarca v. Pak-Mor Mfg. Co.*,
735 N.E.2d 883 (N.Y. 2000)................................................................................15

*Lebel v. Tello*,
707 N.Y.S.2d 426 (N.Y. App. Div. 2000) ...........................................................10

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*,
10 F. Supp. 2d 334 (S.D.N.Y. 1998).......................................................................8

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
173 F. Supp. 2d 129 (S.D.N.Y. 2001)...................................................................19

*Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*,
209 N.E.2d 68 (N.Y. 1965).....................................................................................8

*Mapp v. City of N.Y.*,
43 Misc. 3d 1204(A), 990 N.Y.S.2d 438, 2014 NY Slip Op 50492(U), (N.Y.
Sup. Ct. 2014) .......................................................................................................22

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996)................................................................................6, 15

*Nasso v. Seagal*,
    263 F. Supp. 2d 596 (E.D.N.Y. 2003) ...................................................................10

*Naughright v. Weiss*,
    826 F. Supp. 2d 676 (S.D.N.Y. 2011).....................................................................23

*Poe v. Leonard*,
    282 F.3d 123 (2d Cir. 2002)...................................................................................21

*Retail Software Servs., Inc. v. Lashlee*,
    854 F.2d 18 (2d Cir. 1988).....................................................................................10

*Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*,
    823 N.Y.S.2d 463 (N.Y. App. Div. 2006) ..............................................................22

*SEC v. Roor*,
    No. 99 Civ. 3372 (JSM), 1999 U.S. Dist. LEXIS 11527 (S.D.N.Y. July 28,
    1999) .......................................................................................................................16

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*,
    796 N.Y.S.2d 77 (N.Y. App. Div. 2005) ................................................................21

*In re Sumitomo Copper Litig.*,
    120 F. Supp. 2d 328 (S.D.N.Y. 2000)............................................................. *passim*

*Taibleson v. Nat'l Ctr. for Continuing Educ.*,
    740 N.Y.S.2d 772 (N.Y. Civ. Ct. 2002)....................................................................8

*Unique Indus. v. Sui & Sons Int'l Trading Corp.*,
    No. 05-CV-2744 (KMK), 2007 U.S. Dist. LEXIS 83725 (S.D.N.Y. Nov. 9,
    2007) .........................................................................................................................6

*United States v. Portrait of Wally*,
    No. 99 Civ. 9940 (MBM), 2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 11,
    2002) .......................................................................................................................19

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996)...................................................................................19

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196 (2d Cir. 2001).....................................................................................6

*Whitaker v. Fresno Telsat, Inc.*,
    87 F. Supp. 2d 227 (S.D.N.Y. 1999).......................................................................16

*Wilcock v. Equidev Capital L.L.C.*,
    No. 99 Civ. 10781 (DC), 1999 U.S. Dist. LEXIS 18898 (S.D.N.Y. Dec. 7,
    1999) .....................................................................................................................8, 9

- v -

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)............................................................................................8, 9

## Other Authorities

Fed. R. Civ. P. 8(d) ...........................................................................................20

https://definitions.uslegal.com/n/negligent-supervision/ .......................................12, 22

N.Y. C.P.L.R. 302(a) ................................................................................... *passim*

RESTATEMENT (SECOND) OF TORTS § 876(b) ...............................................................23

010717-11 110679 V2

## I.      INTRODUCTION

Isolating the allegations against a director (Tarak Ben Ammar) and an officer (Barbara Schneeweiss) of a New York-based corporation demonstrates the stark reality of the risks when officers and directors knowingly facilitate and protect a serial predator—here, Harvey Weinstein.

First, under New York's long-arm statute, the Court may exercise personal jurisdiction over Defendant Tarak Ben Ammar, a resident of France. Ben Ammar was placed on the TWC Board to protect a $45 million loan made by A-1 International Investments B.V. ("AII"), a company in which he was an investor. He attended meetings of the TWC Board and with Harvey Weinstein *in* New York on at least seven occasions. He attended TWC Board meetings telephonically on at least sixty occasions. Ben Ammar stood to derive economic benefit from the loan made in New York that he was protecting. Thus, Ben Ammar could certainly have foreseen being haled into court in New York for his actions.

Second, Plaintiffs' First Amended Complaint alleges facts for each of Ben Ammar and Barbara Schneeweiss demonstrating the plausibility of Plaintiffs' claims. Accordingly, for the reasons set forth in their original Opposition and below, Defendants' motions to dismiss should be denied.

## II.      FACT SUMMARY

Plaintiffs incorporate the Fact Summary from their Opposition to Defendants' Motions to Dismiss (Dkt. 243) as if fully set forth herein. A summary with respect to Ben Ammar and Schneeweiss follows:

**A.      Miramax Vice President of Television and TWC Vice President of Production Barbara Schneeweiss facilitated Weinstein's conduct and cover-up.[1]**

*Background*. Schneeweiss was the Vice President of Production at TWC from 2005–2017 and Vice President of television at Miramax from 1996–2005.

*Role and knowledge*. Schneeweiss was regularly tasked with delivering women to Weinstein. In order to give Weinstein's "meetings" an air of legitimacy, she would attend the first few minutes before excusing herself and leaving the woman alone with Weinstein. Then, after the assaults, she would handle the logistics to provide the payback and try to keep the victims from complaining.

*Connection to Plaintiffs*. Barbara Schneeweiss aided the assault of Plaintiff Melissa Sagemiller in 2000. In 2000, 24-year-old Sagemiller was filming Miramax's *Get Over It*. During filming, Schneeweiss (on information and belief) told her to go to Weinstein's hotel room. Sagemiller said that she was not comfortable, indicating that she would prefer meeting in her trailer instead. Schneeweiss told her not to worry, and it was "very important" for Weinstein to "discuss" the script with her. In his hotel room, dressed only in a robe, Weinstein demanded a massage, blocked Sagemiller from leaving until she touched him, and forcibly kissed her.

Schneeweiss aided in the sex trafficking of Jane Doe in 2008. In 2008, after being assaulted by Weinstein and years of grooming and manipulation, Jane Doe met Weinstein in his New York office to make a final attempt at becoming an actress. During the meeting, Weinstein told her she needed to become a model first, and described a model who was successful in exchange for sexual favors. Meanwhile, Christina Aguilera was performing on the TV in his office. Weinstein paused their conversation to look up at the TV, declaring: "Wow, I'd really like

---

[1] FAC § IV(G)(6), (H)(16). *See also* FAC §§ IV(D)(5), (6); IV(E); IV(F)(1), (3).

to fuck that pussy." He then unzipped his pants and began touching his penis. Jane Doe fled. Following the meeting, Schneeweiss handled the logistics for the "benefit" of hiring Jane Doe as a model on *Project Runway*, which was jointly produced by TWC and Miramax.

After Plaintiff Louisette Geiss was assaulted, Schneeweiss expressly misrepresented that she was not aware of Weinstein's pattern of abuse. Geiss ran into Weinstein at the 2008 Sundance Film Festival in Park City, Utah, while with Schneeweiss. After Weinstein assaulted her, Geiss met Schneeweiss for dinner, where she mentioned Weinstein's behavior. Schneeweiss denied knowledge, claiming: "He's never done anything to me"—as if Geiss was to blame.

Schneeweiss aided in the sex trafficking of Melissa Thompson in 2011. In September 2011, Thompson met Weinstein in his New York office to pitch a business opportunity. During the meeting, Weinstein harassed Thompson and subsequently raped her. In October 2011, Schneeweiss handled the logistics for the "benefit" of hiring Thompson for a TWC docu-series on women starting businesses in New York called Women Inc.

**B.     TWC Director Tarak Ben Ammar exercised purposeful control over TWC.[2]**

*Background*. Tarak Ben Ammar served as a Director of TWC from October 21, 2005, until July 13, 2018.

*Role and knowledge*. Ben Ammar witnessed Weinstein's physically and verbally abusive behavior, was aware that Weinstein serially targeted women, read and watched references to Weinstein's assaults in media and entertainment dating back to at least 2005, received direct and indirect complaints from women and employees, and had access to Weinstein's personnel file. Ben Ammar knew that TWC paid Boies Schiller to cover up Weinstein's pattern of assaults, and that Boies Schiller refused to show the Directors Weinstein's personnel file. Like the other

---

[2] FAC § IV(H)(1), (H)(5), (I). *See also* Declaration of Tarak Ben Ammar (Dkt. 256); Declaration of Elizabeth A. Fegan, filed concurrently herewith.

Directors, Ben Ammar was aware of the memorandum written by Lauren O'Connor, and he admitted that he was aware of the 2015 NYPD sting operation with Ambra Gutierrez.

Attorney David Boies is quoted as saying to the Financial Times on October 24, 2017, "that Messrs Maerov and Ben Ammar did not know about Weinstein's settlements with women when they approved his 2015 contract . . . is simply false." Ben Ammar agreed to renew Weinstein's contracts in 2010 and 2015, despite his knowledge of Weinstein's sexual misconduct. Ben Ammar told Fortune magazine that Weinstein thought he was "untouchable" but that "for years Weinstein bullied and insulted employees, directors, and his brother, squandered outside investors' money, and ran TWC not to earn profits for outside investors, but as a personal fiefdom that bestowed celebrity and power."

***Purposeful Connection to New York.*** As reflected in Ben Ammar's Declaration and the Fegan Declaration, Ben Ammar was purposefully connected to New York on TWC business:

- Ben Ammar owns the Netherlands company Holland Coordinator & Service Company B.V., the owner of A-1 International Investments B.V. ("AII"), which was an investor in TWC;[3]

- AII appointed Ben Ammar to the TWC Board;[4]

- Ben Ammar was a director of TWC from October 2005 to July 13, 2018;[5]

- Ben Ammar appeared in New York to conduct TWC business during the periods October 24–28, 2005, June 16–18, 2007, June 2–5, 2008, June 22–25, 2009, March 13–15, 2013, March 23–25, 2015, and October 25, 2017;[6]

- Ben Ammar appeared in New York from May 7–10, 2006, to screen the movie *Hannibal Rising*, and again in New York from January 31–February 1, 2007, for

---

[3] Ben Ammar Decl. ¶ 7. *See also* Fegan Decl., Corrected Ex. 5, at Schedule 1, p.3.

[4] *Id.* ¶ 12.

[5] *Id.* ¶ 2.

[6] Ben Ammar Decl. ¶¶ 14, 16, 17, 22.

- 4 -

the movie's premiere.[7] The Weinstein Company owned the distribution rights to all media for *Hannibal Rising* in the United States;[8]

- He attended TWC Board meetings via telephone 60 times between 2005 and 2018;[9]

- In the TWC bankruptcy proceedings, Ben Ammar submitted a proof claim, individually, claiming that TWC owes him no less than $232,982 as of December 31, 2018, and asserting, *inter alia*, "common law rights of indemnity, contribution and/or reimbursement" for certain fees and costs.[10]

**Connection to Plaintiffs**. Ben Ammar was a director at TWC during the time that Plaintiffs Jane Doe, Geiss, Thomas, and Thompson were harassed or assaulted, and during the time that all Plaintiffs were blacklisted or targeted by Weinstein.

## III.   THIS COURT HAS PERSONAL JURISDICTION OVER TARAK BEN AMMAR, A DIRECTOR OF A NEW YORK-BASED CORPORATION

### A.   Plaintiffs need only make a prima facie case of personal jurisdiction or, alternatively, are entitled to jurisdictional discovery.

On a Rule 12(b)(2) motion to dismiss, this Court must construe all pleadings and affidavits in the light most favorable to Plaintiffs and resolve all doubts in Plaintiffs' favor.[11] To withstand a Rule 12(b)(2) motion to dismiss, a plaintiff need only make out a prima facie case of personal jurisdiction.[12] The court must determine the issue of personal jurisdiction separately for each claim asserted in the complaint.[13]

---

[7] *Id.* ¶ 21.

[8] Fegan Decl. ¶ 4; Ex. 3.

[9] Ben Ammar Decl. ¶¶ 18-20, 24-26.

[10] Ex. 4.

[11] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 335 (S.D.N.Y. 2000) (citations omitted). *See also IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993); *Herbstein v. Bruetman*, 768 F. Supp. 79, 81 (S.D.N.Y. 1991).

[12] *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 768 (2d Cir. 1983).

[13] *See Cosmetech Int'l, LLC v. Der Kwei Enter. & Co., Ltd.*, 943 F. Supp. 311, 317 (S.D.N.Y. 1996); *Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*, 600 F. Supp. 731, 734 (E.D.N.Y. 1985).

In the event the Court cannot find on the allegations and pre-discovery declarations that it can exercise personal jurisdiction, this Court should grant Plaintiffs leave to conduct jurisdictional discovery. Courts regularly decline to rule on jurisdictional issues until Plaintiffs have the opportunity to conduct discovery on the jurisdictional issue.[14] This is particularly true where Plaintiffs have made a threshold showing that their position on jurisdiction is not frivolous,[15] as Plaintiffs do below.

**B.      Plaintiffs have made a prima facie showing of personal jurisdiction over Defendant Ben Ammar under New York's long-arm statute.**

Because Ben Ammar was served in France, personal jurisdiction must be decided in reference to New York law. In diversity or federal question cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits.[16] This determination involves a two-step analysis.[17] In New York, the Court must first determine whether personal jurisdiction is appropriate pursuant to the State's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a). The second step is an evaluation of whether the Court's exercise of personal

---

[14] *Unique Indus. v. Sui & Sons Int'l Trading Corp.*, No. 05-CV-2744 (KMK), 2007 U.S. Dist. LEXIS 83725, at *23–24 (S.D.N.Y. Nov. 9, 2007) ("However, mindful of Plaintiff's request for jurisdictional discovery, the Court need not, and therefore will not, resolve the sufficiency of the single sale of goods to Plaintiff's representative as a basis for personal jurisdiction at this time. *See Alicea v. Lasar Mfg. Co.*, No. 91-CV-3929 (JFK), 1992 U.S. Dist. LEXIS 13027, [] at *1 (S.D.N.Y. Aug. 31, 1992) (declining to rule on jurisdictional motion to dismiss pending jurisdictional discovery).").

[15] *Id.* at *24–25 ("Even if a plaintiff has not made out a prima facie showing for personal jurisdiction, 'the Court has discretion to order further discovery on the jurisdictional issue, provided that the plaintiff makes a threshold showing of jurisdiction and establishes that its position is not frivolous.'") (quoting *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547–48 (S.D.N.Y. 1994)). *See also id.* (citing *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("It is within a district court's discretion to determine whether a plaintiff is entitled to conduct jurisdictional discovery and to 'devise the procedures to ferret out the facts pertinent to jurisdiction.'") (citation omitted)).

[16] *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997)).

[17] *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

jurisdiction comports with the Fifth Amendment Due Process Clause of the United States Constitution.[18]

Plaintiffs do not assert that the Court has general jurisdiction pursuant to Section 301. Rather, this Court has specific jurisdiction over Ben Ammar pursuant to New York's long-arm statute, C.P.L.R. § 302(a), which provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he . . . (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .[19]

"In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"[20] "To establish the minimum contacts necessary to justify 'specific' jurisdiction, the [plaintiffs] first must show that their claim arises out of or relates to [defendant's] contacts with [the state]."[21] Plaintiffs must also show that Defendant

---

[18] *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007); *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 334.

[19] N.Y. C.P.L.R. 302(a) (McKinney).

[20] *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). *See also Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (quoting same).

[21] *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1027–28 (2d Cir. 1997). *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Chew*, 143 F.3d at 28 (quoting *Chaiken*, 119 F.3d at 1027).

"purposefully availed" himself of the privilege of doing business in New York and "could foresee being 'haled into court' there."[22]

> **1.    This Court may exercise jurisdiction under New York's long-arm statute because Ben Ammar, directly or through TWC as his agent, transacted business related to Plaintiffs' claims in New York.**

Section 302(a)(1) of New York's long-arm statute provides in relevant part that a court may exercise jurisdiction over a non-domiciliary who "transacts any business within the state."[23] A non-domiciliary defendant transacts business within the state when he "purposefully avails himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws."[24] "***Proof of one transaction in New York is sufficient to invoke jurisdiction***, even though the defendant never enters New York, so long as the defendant's activities in New York were purposeful and there is a substantial relationship between the transaction and the claim asserted."[25]

Here, AII's investment in TWC entitled AII to appoint Ben Ammar to the TWC Board.[26] Ben Ammar traveled to New York and attended TWC Board meetings, meetings for TWC-

---

[22] *Chaiken*, 119 F.3d at 1027–28. *See also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Chew*, 143 F.3d at 28 (quoting *Chaiken*, 119 F.3d at 1027).

[23] N.Y. C.P.L.R. § 302(a)(1) (McKinney).

[24] *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (quotation marks and citations omitted); *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 10 F. Supp. 2d 334, 339 (S.D.N.Y. 1998).

[25] *Wilcock v. Equidev Capital L.L.C.*, No. 99 Civ. 10781 (DC), 1999 U.S. Dist. LEXIS 18898, at *3–4 (S.D.N.Y. Dec. 7, 1999) (quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)); *see Levisohn*, 10 F. Supp. 2d at 339; *see Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 209 N.E.2d 68, 75 (N.Y. 1965) (holding that "the statutory test may be satisfied" by "a single transaction in New York" and that the transaction may consist of "purposeful acts performed by the appellant in this State in relation to the contract" other than consummation even if those acts are taken "preliminary or subsequent to . . . execution"); *Taibleson v. Nat'l Ctr. for Continuing Educ.*, 740 N.Y.S.2d 772, 775–76 (N.Y. Civ. Ct. 2002) (C.P.L.R. 302 is a "'single act statute' and one transaction in New York is sufficient to support jurisdiction") (citing *Kreutter*, 522 N.E.2d at 43).

[26] Ben Ammar Decl. ¶ 12.

related business, and meetings with Harvey Weinstein in person, including during October 24–28, 2005, January 16–18, 2007, June 2–5, 2008, June 22–25, 2009, March 13–15, 2013, March 23–25, 2015, and October 25, 2017.[27] He also attended 60 TWC Board meetings taking place in New York via telephone between 2005 and 2018.[28] Further, Ben Ammar traveled to New York on two occasions in connection with the screening and premiere of the movie *Hannibal Rising*,[29] for which TWC owned the distribution rights.[30]

Finally, Ben Ammar has filed a proof of claim in the TWC bankruptcy seeking monies purportedly owed.[31] In addition to the allegations of the First Amended Complaint, these facts establish Ben Ammar's conduct and connection to New York such that he could reasonably anticipate being haled into court here.

Ben Ammar's contacts (and the occurrence of events) in New York was hardly fortuitous.[32] His attendance at meetings in New York, in person and by telephone, was purposeful and specific to TWC. Plaintiffs have expressly alleged that Ben Ammar took actions for the purposeful effect of retaining Harvey Weinstein, supervising Weinstein, protecting Weinstein, and availing himself of the benefits Weinstein showered on him. Courts have held even just one visit to transact relevant business suffices.[33] Additionally, Ben Ammar admits to

---

[27] Ben Ammar Decl. ¶¶ 14, 16–17, 22.

[28] *Id.* ¶¶ 19–20, 23–26.

[29] *Id.* ¶ 21.

[30] Fegan Decl. ¶ 4.

[31] Fegan Decl. ¶ 5; Ex. 4.

[32] *See World-Wide Volkswagen Corp.*, 444 U.S. at 286 (due process cause prohibits exercise of personal jurisdiction by Oklahoma's long-arm statute over New York corporation in products liability action arising out of automobile accident in Oklahoma involving vehicle sold in New York to New York residents).

[33] *Wilcock*, 1999 U.S. Dist. LEXIS 18898, at *4–5 (defendant's admission that he attended one meeting in New York sufficient to establish minimum contacts).

more than five dozen phone calls with the TWC Board concerning TWC business—which, by definition, involved oversight of Weinstein.

These transactions support the exercise of jurisdiction over Ben Ammar with respect to all of those claims with which they bear a "substantial relationship."[34] They bear a substantial relationship with all of the claims for oversight or ratification of, or complicity in, Harvey Weinstein's actions. Further, they bear the requisite relationship to the facts Ben Ammar "knew or should have known" giving rise to liability under the federal sex trafficking statute and the common law claim for negligent retention and supervision.[35] Accordingly, this Court may exercise personal jurisdiction under Section 302(a)(1) of New York's long-arm statute.

Section 302(a) also provides that a court may exercise personal jurisdiction over a non-domiciliary defendant who meets certain requirements "through an agent."[36] "[T]he fiduciary shield rule is not available to defeat jurisdiction under the New York long-arm statute[.]"[37] Thus, "an out-of-state corporate officer who has not personally transacted business in New York, can still be subject to personal jurisdiction under § 302(a)(1) of New York's long-arm statute, if it can be shown that the corporation transacted business in New York as the officer's agent."[38]

Plaintiffs need not establish a formal agency relationship between the defendant and his agent.[39] Plaintiffs need only allege that the agent engaged in purposeful activities in this state in

---

[34] *Kreutter*, 522 N.E.2d at 43.

[35] *See, e.g.*, *Lebel v. Tello*, 707 N.Y.S.2d 426, 427 (N.Y. App. Div. 2000) ("Although [C.P.L.R. 302(a)(1)] is typically invoked in cases involving contractual liability, it also has application in tort actions."). *See also Nasso v. Seagal*, 263 F. Supp. 2d 596, 613 (E.D.N.Y. 2003) (same).

[36] N.Y. C.P.L.R. 302(a) (McKinney).

[37] *Kreutter*, 522 N.E.2d at 47.

[38] *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (Sotomayor, J.) (citing *Kreutter*, 522 N.E.2d at 44); *see also Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988).

[39] *Karabu Corp.*, 16 F. Supp. 2d at 323; *Kreutter*, 522 N.E.2d at 44.

relation to the "transaction for the benefit of and with the knowledge and consent of the defendants and that they exercised some control over [the agent] in the matter."[40]

In order to establish that TWC served as Ben Ammar's agent in New York, Plaintiffs must show that (1) TWC engaged in purposeful activities in New York (2) for the benefit of and with the knowledge and consent of Ben Ammar, and (3) Ben Ammar exercised some control over the corporation in that transaction.[41]

First, there can be no dispute that TWC engaged in purposeful activities in New York by producing movies and television shows, as well as by employing Weinstein in New York.

Second, Ben Ammar "knew of, consented to, and benefitted from these transactions." Ben Ammar knew of and consented to Weinstein's continued role as Chairman, because he first and foremost was on the Board to protect AII's and his personal investment.[42] Ben Ammar claims that he did not derive financial gain from TWC, but it is clear that AII's $45 million loan was intended to be the basis of gain. Moreover, Ben Ammar's Quinta Communications and TWC jointly produced and distributed films—also intended to be the basis of gains.[43] Ben Ammar also benefitted from the racketeering and cover-up activities, because they were meant to cause silence among victims in order to protect the TWC veneer. The fact that the veneer lost its shine is of no matter; Ben Ammar was on the Board and directed TWC to take actions to protect Harvey Weinstein.

Finally, Ben Ammar "exercised some control over" TWC.[44] Ben Ammar participated in and approved of the continued employment of Weinstein, despite Ben Ammar's knowledge of

---

[40] *Karabu Corp.*, 16 F. Supp. 2d at 323 (quoting *Kreutter*, 522 N.E.2d at 44).

[41] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 335–37.

[42] Ben Ammar Decl. ¶¶ 7, 12; Fegan Decl. ¶ 2.

[43] *See, e.g.*, Ex. 4.

[44] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 335–37.

Weinstein's predatory actions.[45] Accordingly, for purposes of this pre-discovery stage, Plaintiffs

sufficiently allege that TWC was Ben Ammar's agent under New York's long-arm statute.

> **2.  This Court may also exercise jurisdiction under New York's long-arm statute because Ben Ammar committed a tortious act in New York.**

This Court may exercise personal jurisdiction over Ben Ammar pursuant to C.P.L.R.

302(a)(2) if, in person or through TWC, he committed a tortious act in New York.[46] This

subsection requires Defendant's physical presence in New York.

Ben Ammar has admitted that he attended meetings of the TWC Board of Directors in

New York. He also admits to meetings with Harvey Weinstein and Robert Weinstein in New

York. Plaintiff has alleged that Ben Ammar committed the tort of "negligent supervision and

retention."[47] Given that he has admitted that he engaged in activities that are at the heart of

supervising Harvey Weinstein while in New York, this Court may exercise personal jurisdiction

over Ben Ammar pursuant to C.P.L.R. 302(a)(2).

Analogous is the court's decision in *Goland v. Iglesias*,[48] which arose out of the failed

venture to produce music recordings by the popular singer Julio Iglesias. A citizen of Spain,

Iglesias moved to dismiss for lack of personal jurisdiction. While the court declined to find

personal jurisdiction under Section 301 of the New York long-arm statute, the court held that it

was premature to dismiss Iglesias under Section 302. The court explained:

> There is evidence that Iglesias met on two occasions with the plaintiff in New York to discuss their relationship. If he made misrepresentations at those meetings, he committed a tort within the state. [Citations omitted.] If material terms of their alleged contract

---

[45] FAC § IV(H)(1), (H)(5), (I).

[46] N.Y. C.P.L.R. 302(a)(2) (McKinney).

[47] https://definitions.uslegal.com/n/negligent-supervision/ (citing RESTATEMENT (SECOND) OF AGENCY § 213) (last accessed Feb. 26, 2019).

[48] *Goland v. Iglesias*, No. 85 Civ. 9697 (SWK), 1988 U.S. Dist. LEXIS 3528, at *11–12 (S.D.N.Y. Apr. 21, 1988).

were agreed upon at those meetings, whether they were partially
social in nature or not, he transacted business within the state.
C.P.L.R. § 302(a)(1); *Round One Products, Inc. v. Greg Page
Enterprises, Inc.*, 566 F. Supp. 934, 937-38 (E.D.N.Y. 1982) (two
partially social dinner meetings held when defendant was
"fortuitously" in New York formed basis for jurisdiction as "links"
in a "chain of business meetings"); *American Contract Designers,
Inc. v. Cliffside, Inc.*, 458 F. Supp. 735, 738-39 (S.D.N.Y. 1978)
(two similar visits by high level officers). Because it does not appear
that these meetings were entirely "casual visits" and "passing the
time of day," . . . [citations omitted]. Iglesias['] motion to dismiss
for lack of personal jurisdiction is denied without prejudice.[49]

The same analysis applies here. Ben Ammar's meetings with TWC and Harvey Weinstein were

not "casual visits," nor was he "passing the time of day." Ben Ammar was conducting TWC

business and supervising Weinstein—in person during at least seven trips to New York and

during at least 60 telephonic board meetings.[50] That is enough at this stage.

### 3. Further, this Court may exercise personal jurisdiction over Ben Ammar because his activities outside New York caused injury within New York.

This Court may assert personal jurisdiction over Ben Ammar pursuant to C.P.L.R.

302(a)(3)(ii) if, in person or through TWC, he committed "a tortious act without the state causing

injury to person or property within the state . . . if he . . . expects or should reasonably expect the

act to have consequences in the state and derives substantial revenue from interstate or

international commerce."[51] As reflected in the case law:

The conferral of jurisdiction under this provision rests on five
elements: First, that defendant committed a tortious act outside the
state; second, that the cause of action arises from that act; third, that
the act caused injury to a person or property within the State; fourth,
that defendant expected or should reasonably have expected the act

---

[49] *Id.*

[50] Ben Ammar Decl.

[51] N.Y. C.P.L.R. 302(a)(3)(ii) (McKinney).

to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.[52]

Each of these elements is satisfied here.

First, Plaintiffs allege that Ben Ammar committed the tortious act of negligent retention and supervision (as well as ratification) outside the state. Ben Ammar admits that he participated in more than 60 official calls for the purpose of overseeing TWC.

Second, Plaintiffs Louisette Geiss, Jane Doe, Sarah Anne Masse, and Melissa Thompson allege that their sex trafficking and sexual abuse claims arise from the negligent retention and supervision of Weinstein, as do all Plaintiffs' racketeering claims.

Third, Plaintiffs Jane Doe and Thompson allege that the negligent retention and supervision caused injury to their person and property within the State of New York, and all Plaintiffs allege career damage that occurred or had an impact in New York.[53]

Fourth, Ben Ammar expected or should reasonably have expected the act to have consequences in the State. "The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one."[54] Here, there is overwhelming evidence of investments in TWC, attendance at Board meetings in New York, telephonic attendance at more than 60 Board meetings, and Ben Ammar's declaration that

---

[52] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 341 (quoting *LaMarca v. Pak-Mor Mfg. Co.*, 735 N.E.2d 883, 886 (N.Y. 2000)).

[53] All of the Plaintiffs' career damage claims also gave rise to injury in New York given that is the state from which TWC blacklisted their careers and converted Thompson's attorney-client privileged communications.

[54] *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999) (quoting *Allen v. Auto Specialties Mfg. Co.*, 357 N.Y.S.2d 547, 550 (N.Y. App. Div. 1974)); *id.* (holding that an agreement to sell products in the United States, among other places, "was sufficient in and of itself to support a finding of foreseeability . . . coupled with a purposeful act for purposes of § 302(a)(3)(ii)" (alteration in original) (quotation marks and citation omitted)).

- 14 -

he is owed money by TWC (in his Proof of Claim). Objectively, his entanglements demonstrate that he could expect to be haled into court in New York.

Fifth, Ben Ammar derived substantial revenue from interstate or international commerce. C.P.L.R. 302(a)(3)(ii) does not require Plaintiffs to allege that Defendants regularly engaged in business in New York.[55] Rather, Plaintiffs need only show that Ben Ammar's operations were far from local in character (in France) but instead international in scope.[56] Ben Ammar admits his operations are international in scope in his declaration.[57] Accordingly this Court may exercise jurisdiction under New York's long-arm statute.

**C.    The exercise of personal jurisdiction over Ben Ammar comports with traditional notions of fair play and substantial justice.**

This Court must also consider "whether the assertion of jurisdiction 'comports with "traditional notions of fair play and substantial justice"—that is, whether it is reasonable under the circumstances of a particular case.'"[58]

**1.    The exercise of personal jurisdiction is reasonable.**

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"[59] "Whether it is 'reasonable' to exercise jurisdiction in a

---

[55] *LaMarca*, 735 N.E.2d at 886.

[56] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 338–42 ("The New York Court of Appeals explained that the fifth element narrows the long-arm reach to preclude the exercise of jurisdiction over non-domiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of local character.") (quotation marks omitted) (citing *Ingraham v. Carroll*, 687 N.E.2d 1293, 1296 (N.Y. 1997); *LaMarca*, 735 N.E.2d at 886).

[57] Ben Ammar Decl. ¶¶ 7, 12, 21. *See also generally* Fegan Decl.

[58] *Chaiken*, 119 F.3d at 1027 (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568); *see also Chew*, 143 F.3d at 28.

[59] *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at 477).

particular case depends on '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) [and] the plaintiff's interest in obtaining convenient and effective relief[.]'"[60]

First, Ben Ammar has "offered no evidence to support an argument that this general burden [of litigating in a foreign forum] presents any particular hardship to" him.[61] In fact, he regularly travels to the United States, for both business and vacation.[62] The burden should not be considered onerous given that Ben Ammar should have known that acting as a director for a New York-based corporation, and traveling to New York to exercise his duties, would have consequences in New York.[63]

Moreover, New York has an interest in adjudicating the case, as reflected by the fact that criminal charges were brought by the Manhattan District Attorney against Harvey Weinstein and civil charges were brought by the New York Attorney General against TWC. In fact, the New York Attorney General's lawsuit "alleges Company Executives and Board repeatedly failed to protect employees from then-CEO Harvey Weinstein's unrelenting sexual harassment, intimidation, and discrimination."[64]

---

[60] *Chaiken*, 119 F.3d at 1028 (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568). The fourth factor (the interstate judicial system's interest in obtaining the most efficient resolution of the controversy) and fifth factor (the shared interest of the states in furthering substantive social policies) "are not significant in deciding this issue of jurisdiction over a foreign national." *SEC v. Roor*, No. 99 Civ. 3372 (JSM), 1999 U.S. Dist. LEXIS 11527, at *4 (S.D.N.Y. July 28, 1999) (Martin, J.).

[61] *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 343 (alteration in original) (quoting *SEC v. Euro Sec. Fund*, No. 98 Civ. 7347 (DLC), 1999 U.S. Dist. LEXIS 1537, at *11 (S.D.N.Y. Feb. 17, 1999)).

[62] *See generally* Ben Ammar Decl.

[63] *See Whitaker v. Fresno Telsat, Inc.*, 87 F. Supp. 2d 227, 233 n.6 (S.D.N.Y. 1999) (Scheindlin, J.) (noting that "this burden may be less onerous if one considers that [the defendant] could have and should have reasonably foreseen that its actions would have consequences in New York").

[64] *See* Ex. 7, Press Release, "A.G. Schneiderman Files Civil Rights Lawsuit Against The Weinstein Companies, Harvey Weinstein, and Robert Weinstein" (Feb. 11, 2018), available at https://ag.ny.gov/ press-release/ag-schneiderman-files-civil-rights-lawsuit-against-weinstein-companies-harvey.

Finally, Plaintiffs have an interest in obtaining convenient and effective relief, which they believe is best served by prosecuting this matter in the state in which Miramax and TWC operated. Thus, this Court's exercise of personal jurisdiction over Ben Ammar is reasonable.

   **2.      Plaintiffs' claims are related to Ben Ammar's contacts in New York.**

Plaintiffs must also show that their claims arose out of or relate to Ben Ammar's contacts with New York to establish minimum contacts necessary to justify specific jurisdiction.[65] The "relatedness test is but a part of a general inquiry which is designed to determine whether the exercise of personal jurisdiction in a particular case does or does not offend 'traditional notions of fair play and substantial justice.'"[66]

> Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. *See Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321–22 (2d Cir. 1964). Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.[67]

Ben Ammar made ongoing and purposeful contact with New York to oversee TWC and Harvey Weinstein as a director—attending nearly 70 Board meetings in person in New York or by phone. Plaintiffs' claims arise out of Ben Ammar's New York contacts, all of which relate directly to the supervision of Harvey Weinstein and his actions. Thus, this Court may assert personal jurisdiction over Ben Ammar without offending traditional notions of fair play and substantial justice.

---

[65] *Chew*, 143 F.3d at 28; *Chaiken*, 119 F.3d at 1027; *see also Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414.

[66] *Chew*, 143 F.3d at 29 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

[67] *Id.* (footnote omitted).

## IV.    PLAINTIFFS STATE PLAUSIBLE VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

Plaintiffs incorporate Section V of their original Opposition as if fully set forth herein, and only respond to new arguments to avoid duplication.

Schneeweiss claims that Plaintiffs fail to allege she benefitted from the sex-trafficking venture or that she knew or should have known "the venture was in violation of the applicable sex-trafficking statute."[68] First, Plaintiffs allege Schneeweiss benefitted from continued employment under Weinstein and the power and benefits it brought her.[69] Second, the Supreme Court has "long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'"[70] Here, Plaintiffs have alleged that Schneeweiss knew she was delivering Plaintiffs (and other victims) to Weinstein to be assaulted—and knowingly handled the logistics of the benefits provided in exchange for the

---

[68] Schneeweiss Br. at 4.

[69] *See* Ex. 8 ¶ 14, Endorsement filed in *Jane Doe v. Harvey Weinstein, et al.*, No. CV-17-585459, 2018 ONSC 1126 (Feb. 16, 2018) (denying Schneeweiss' motion to dismiss or strike, explaining: "In my view, the Impugned Pleadings set out material facts that are relevant to the Claim. Doe pleads that Weinstein had a well-developed method for targeting young actresses and luring them into situations that provided him the opportunity to harass and assault them. Doe further argues that Weinstein was able to continue his practice because he was facilitated and supported by others who wished to profit from him or advance their careers. Thus the pleading that Schneeweiss continued to work for Weinstein for many years after the assaults is relevant to the claim that Schneeweiss knew of Weinstein's activities and yet continued her employment with him. It is also relevant to the claim that Schneeweiss's facilitation of the sexual assaults was undertaken with a view to subsequent career advancement. Similarly, the claim that Schneeweiss's conduct conformed to an established practice involving other Weinstein assistants is material to the claim that Schneeweiss was aware of Weinstein's established practices and conduct.").

[70] *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581–82 (2010) (quoting *Barlow v. United States*, 32 U.S. 404, 411 (1833)); *see also id.* ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system.") (quoting *Cheek v. United States*, 498 U.S. 192, 199 (1991)).

assaults afterward.[71] Ultimately, the question of knowledge is for the trier of fact and not for

Rule 12(b)(6).[72] Plaintiffs have thus stated a claim against Schneeweiss under the TVPRA.

## V.     PLAINTIFFS STATE PLAUSIBLE RICO CLAIMS

Plaintiffs incorporate Section VII of their original Opposition as if fully set forth herein,

and only respond to new arguments to avoid duplication.

Contrary to Schneeweiss' argument,[73] Plaintiffs specifically allege that Schneeweiss

engaged in at least two predicate acts, including multiple instances of obtaining a victim for the

purpose of committing or attempting to commit aggravated sexual abuse in violation of 18

U.S.C. §§ 1590, 1591. By way of example only, the following predicate acts of sex trafficking as

to Schneeweiss are alleged in the First Amended Complaint:[74]

- In 2000, during filming of the Miramax film *Get Over It* in Toronto, Canada, Miramax employee Schneeweiss deceived Plaintiff Melissa Sagemiller into attending a meeting in Weinstein's hotel room (over her objections), telling her the meeting was to the discuss the script. In fact, Weinstein attempted to sexually assault her;[75]

- In 2008, after she was again harassed by Weinstein in his New York office, Schneeweiss handled the logistics for the "benefit" of hiring Jane Doe as a model on *Project Runway*, which was jointly produced by TWC and Miramax; and

---

[71] *See e.g.*, FAC ¶¶ 639-646.

[72] *United States v. Portrait of Wally*, No. 99 Civ. 9940 (MBM), 2002 U.S. Dist. LEXIS 6445, at *81 (S.D.N.Y. Apr. 11, 2002) (under the National Stolen Property Act, "[w]hether or not Dr. Leopold actually had the knowledge is a question of fact for trial"); *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 136 (S.D.N.Y. 2001) (denying Rule 12(b)(6) motion where, under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), "The question of Plaintiffs' knowledge of Defendants' alleged fraud, and when this knowledge arose, is clearly a question of fact."); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (for Eighth Amendment claim, "the state of the defendant's knowledge is normally a question of fact to be determined after trial").

[73] Schneeweiss Br. at 4.

[74] Plaintiffs contend that discovery will likely unveil multiple additional predicate acts conducted by Schneeweiss, including mail and wire fraud and tampering with a victim, although just two predicate acts are necessary to be pled.

[75] FAC § IV(D)(5).

- 19 -

- In the fall of 2011, after Weinstein raped Melissa Thompson in New York. Schneeweiss handled the logistics for the "benefit" of hiring Thompson for a TWC docu-series on women starting businesses in New York called Women Inc.

Accordingly, Schneeweiss' motion should be denied.

## VI.   PLAINTIFFS ALLEGE PLAUSIBLE STATE LAW CLAIMS

Plaintiffs incorporate Sections VI and VIII of their original Opposition as if fully set forth herein, and only respond to new arguments to avoid duplication.

### A.   Plaintiffs allege valid negligent supervision and retention claim against Ben Ammar.

#### 1.   Plaintiffs' claims may be pled in the alternative.

First, Plaintiffs have pled in the alternative that Ben Ammar is liable either for (i) negligent retention and supervision; or (ii) under the doctrine of *respondeat superior*.[76]

Accordingly, Plaintiffs may proceed on both claims at this stage.[77]

#### 2.   Plaintiffs have alleged that Ben Ammar knew there was a high degree of risk that Weinstein would abuse women but nonetheless facilitated the circumstances in which abuse would occur.

Even assuming that Ben Ammar's claim that Plaintiffs must allege "gross negligence" as to the Directors to sustain Plaintiffs' claims for negligent supervision is correct, Plaintiffs have done so. The Second Circuit explains: "We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct . . . where the defendant has reason to

---

[76] FAC ¶¶ 735(m)–(n) ("m. Whether TWC, TWC's Directors or Officers, Disney, Eisner, Miramax or the Miramax Officers negligently retained or supervised Weinstein. n. Whether Disney, Miramax and/or TWC are responsible for Weinstein's conduct under the doctrine of *respondeat superior*."). *See* FAC ¶¶ 846 ("Holding Disney, Eisner, Miramax, and Miramax Officers liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of Disney or Miramax."), 859 (same), 871 (same), 885 (same), 901 (same). *See also* FAC ¶¶ 853 ("Holding TWC, TWC Directors, and TWC Officers liable furthers the policy goals of respondeat superior, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC."), 865 (same), 877 (same), 893 (same), 909 (same).

[77] Fed. R. Civ. P. 8(d).

know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'"[78] Here, Plaintiffs have alleged that Ben Ammar knew that there was a high degree of risk that Weinstein would engage in sexual abuse of women he lured under the guise of business to meetings—and deliberately failed to prevent Weinstein from continuing. In fact, the Directors countenanced such acts—profiting off of them through, *inter alia*, Weinstein's 2015 employment agreement.

Ben Ammar also attempts to apply a standard applicable when a court entertains a motion to strike a request for punitive damages.[79] Nonetheless, when all inferences are drawn in Plaintiffs' favor, these facts "imply a criminal indifference to civil obligations."[80]

### 3. Corporate documents cannot immunize Ben Ammar from liability to third parties.

Expanding upon an argument made by other TWC Directors, Ben Ammar in effect asserts that TWC corporate documents must explicitly identify the protection of third-party women as a responsibility for liability to arise. He cites to no case that so holds, because it is directly contrary to basic tenets of tort and negligence law.[81] A corporate officer can be held personally liable for his tortious conduct under New York law.[82] "The particular tort committed

---

[78] *Poe v. Leonard*, 282 F.3d 123, 140 n.14 (2d Cir. 2002) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)).

[79] Ben Ammar Br. at 24.

[80] *Barnville v. Mimosa Cafe*, No. 1:14-CV-518-GHW, 2014 U.S. Dist. LEXIS 94691, at *9 (S.D.N.Y. July 10, 2014) (quoting *Henderson v. UPS*, 675 N.Y.S.2d 715, 716 (N.Y. App. Div. 1998)).

[81] Ben Ammar Br. at 25–27.

[82] *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 79–80 (N.Y. App. Div. 2005) (citing *W. Joseph McPhillips Inc. v. Ellis*, 717 N.Y.S.2d 743, 745 (N.Y. App. Div. 2000)).

- 21 -

is of little significance."[83] Thus, because negligent retention and supervision is a tort,[84] corporate officers and directors can be held liable.

This duty is not created by corporate formation documents, as Ben Ammar contends. The duty owed to Plaintiffs by the officers and directors arises under New York law:

> Both corporate employees and officers of the corporation owe a duty of care as individuals apart from any duty owed by the corporation. This obligation includes a duty to refrain from causing injury to others **and to avoid creating the conditions that present an unreasonable risk of injury to third parties**.[85]

A negligent retention and supervision claim "does not require the existence of any particular relationship" between the plaintiff and defendants.[86] In fact, New York law "unequivocally" holds "that a corporate officer or agent may be found liable for negligently supervising a third party that was responsible for the plaintiff's injury, even if that corporate officer was acting in his or her official capacity."[87] Delaware law does not provide an independent shield for corporate officers or directors.[88] Accordingly, Ben Ammar's argument that he did not owe a duty to Plaintiffs should be rejected.

---

[83] *Id.* at 80.

[84] https://definitions.uslegal.com/n/negligent-supervision/ (citing RESTATEMENT (SECOND) OF AGENCY § 213) (last accessed Feb. 26, 2019).

[85] *Mapp v. City of N.Y.*, 43 Misc. 3d 1204(A), 990 N.Y.S.2d 438, 2014 NY Slip Op 50492(U), ¶ 3, (N.Y. Sup. Ct. 2014) (emphasis added).

[86] *Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*, 823 N.Y.S.2d 463, 467 (N.Y. App. Div. 2006) (citing *Rodriguez v. United Transp. Co.*, 677 N.Y.S.2d 130, 132 (N.Y. App. Div. 1998)); *see also id.* ("Rather, the defendant is responsible for the harm its negligently hired employee causes to any third party.").

[87] *Krystal G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515, 525 (N.Y. Sup. Ct. 2011) (citing *Bellinzoni v. Seland*, 512 N.Y.S.2d 846, 847 (N.Y. App. Div. 1987)).

[88] Like in the Defendants' original brief, Ben Ammar cites 6 Del. C. § 18-402, which speaks only to the vestiture of management of an LLC among its members by agreement, and does not shield corporate officers and directors from liability to third parties. Ben Ammar Br. at 26. In fact, 6 Del. C. § 18-1101 provides that an LLC operating agreement may limit the duties or liabilities of the members or managers as to those who are parties to the agreement; it does not permit a corporation to shield its management from third party claims for negligent retention and supervision.

**B.      Plaintiffs state plausible claims for vicarious liability and ratification as to Ben Ammar.**

In response to Ben Ammar's arguments at pages 28–30, Plaintiffs incorporate Section VIII of their original Opposition as if fully set forth herein. And, as reflected above, corporate documents cannot immunize corporate officers from third-party liability.

**C.      Plaintiffs state plausible claims against Schneeweiss for aiding and abetting Weinstein's tortious conduct.**

Plaintiffs concede that Schneeweiss was not Weinstein's employer or principal.[89] However, she acted both as his agent and aided and abetted his tortious conduct. Plaintiffs thus request that the Court deny her motion to dismiss or grant leave to amend on this narrow basis.

The RESTATEMENT (SECOND) OF TORTS provides that, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."[90] New York specifically recognizes a cause of action for aiding and abetting tortious conduct, such as assault and battery. The elements of aiding and abetting are: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's knowing and substantial assistance in the principal violation."[91] Plaintiffs have alleged facts demonstrating that each of these elements is satisfied.

First, Weinstein engaged in multiple wrongful acts of assault and battery producing injuries to each of the Plaintiffs. Second, Schneeweiss was aware of her role of delivering

---

[89] *See* Schneeweiss Br. at 5.

[90] RESTATEMENT (SECOND) OF TORTS § 876(b).

[91] *Naughright v. Weiss*, 826 F. Supp. 2d 676, 691–92 (S.D.N.Y. 2011) (quoting *Scollo v. Nunez*, 16 Misc. 3d 1118(A), 847 N.Y.S.2d 899, 2007 N.Y. Slip Op. 51469[U] (N.Y. Sup. Ct. 2007)).

victims to Weinstein to be assaulted, as well as her participation in the cover-up. Third, Schneeweiss knew and nonetheless provided substantial assistance in the principal violations: for example, when Plaintiff Melissa Sagemiller expressly resisted visiting Weinstein's hotel room, Schneeweiss forced her to go.[92]

Based on nearly identical facts, the Superior Court of Justice in Ontario denied a motion to dismiss Schneeweiss. In *Jane Doe v. Harvey Weinstein et al.*,[93] Schneeweiss invited actress Jane Doe to a breakfast meeting with Weinstein. Schneeweiss took her to Weinstein's hotel room because he was allegedly busy. After Weinstein asked Schneeweiss to leave, Weinstein assaulted Jane Doe. Then, Schneeweiss took Jane Doe back to Weinstein for an apology, and Weinstein assaulted her again.[94]

Applying a standard similar to Rule 8,[95] the Ontario Superior Court of Justice held:

> In my view, there is no ambiguity in the Claim. Doe is claiming, inter alia, that Schneeweiss was an active and knowing facilitator of Weinstein's sexual assaults against Doe; that she made specific representations to Doe about the nature and purpose of Doe's meetings with Weinstein knowing that these representations were false; alternatively, that she knew or ought to have known that Weinstein posed a serious risk of harm to Doe and, rather than warning her of this risk, actively facilitated the circumstances that permitted the assaults to take place. Doe's Claim is framed both in negligence as well as for the intentional infliction of mental injury.[96]

---

[92] FAC § III(A)(5).

[93] Ex. 8.

[94] *Id.* ¶ 4.

[95] *Id.* ¶ 7 ("Rule 25.06(1) of the Rules of Civil Procedure . . . provides that every pleading must contain a concise statement of the material facts in which a party relies[.] The purposes of pleadings are to: (a) define clearly and precisely the questions and controversy between the litigants; (b) give fair notice of the precise case which is required to be met; and (c) assist the Court in its investigations of the truth of the allegations made.") (citation omitted).

[96] *Id.* ¶ 8.

Declining to dismiss Schneeweiss' claim, the court held that the claims were pled with "great[] specificity," and "the basis for the allegation that Schneeweiss knew of Weinstein's propensity to assault women is clearly identified."[97] The same result should apply here. Accordingly, the motion to dismiss the state law claims as to Schneeweiss should be denied.

## VII.   PLAINTIFFS' CLAIMS ARE TIMELY

Plaintiffs incorporate Section IV of their original Opposition as if fully set forth herein, and only respond to new arguments to avoid duplication.

Schneeweiss claims that she individually took no actions that would toll the statute of limitations. However, Plaintiffs' allegations supporting tolling are extensive. Plaintiffs need not show that Schneeweiss made separate threats because that would be inconsistent with the basis for the doctrine of tolling:

> Although [Weinstein's and his spies] alleged threats in this case were no doubt motivated largely by self-interest, rather than to prevent [Plaintiffs] from filing a claim against [Schneeweiss], it would clearly be inconsistent with the equitable underpinnings of the estoppel doctrine to permit [Schneeweiss] to benefit to plaintiffs' detriment by such threats.[98]

Accordingly, Schneeweiss' motion to dismiss should be denied.

---

[97] *Id.* ¶ 12.

[98] *John R. v. Oakland Unified Sch. Dist.*, 769 P.2d 948, 951 (Cal. 1989) (denying school district's motion to dismiss claims arising out of teacher's molestation of student because the district did not threaten the student separately, stating: "Although the teacher's alleged threats in this case were no doubt motivated largely by self-interest, rather than to prevent John from filing a claim against the district, it would clearly be inconsistent with the equitable underpinnings of the estoppel doctrine to permit the district to benefit to plaintiffs' detriment by such threats."); *Doe v. Bakersfield City Sch. Dist.*, 39 Cal. Rptr. 3d 79, 91 (Cal. Ct. App. 2006) (plaintiff' exposure to ongoing threats from school district employee "reflect[s] that plaintiff acted within a reasonable time to pursue his claim against the District after the deterrent effect of the threats ceased"); *Cook v. City of Chicago*, No. 06 C 5930, 2008 U.S. Dist. LEXIS 34131, at *6–8 (N.D. Ill. Apr. 25, 2008) (although plaintiff must allege affirmative acts by the city for the city to be estopped from asserting statute of limitations as a defense, the allegation that officers' and investigators' threats were part of the city's "code of silence" was enough to toll plaintiff's statute of limitations).

## VIII.   CONCLUSION

Plaintiffs respectfully request that Defendants' motions to dismiss be denied.

Alternatively, Plaintiffs request leave to conduct discovery and a subsequent opportunity to

amend the complaint.

Dated: March 1, 2019                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Elizabeth A. Fegan*
    Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
*beth@hbsslaw.com*

Steve W. Berman
Craig Spiegel
Shelby Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
*steve@hbsslaw.com*
*craig@hbsslaw.com*
*shelby@hbsslaw.com*

Jason Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
*jasonz@hbsslaw.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2019, I electronically transmitted the foregoing

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will

transmit a Notice of Electronic Filing to all ECF registrants.

Dated: March 4, 2019              */s/ Elizabeth A. Fegan*
                                      Elizabeth A. Fegan