```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LOUISETTE GEISS, et al.,

 4                  Plaintiffs,

 5            v.                         17 CV 9554 (AKH)

 6   THE WEINSTEIN COMPANY HOLDINGS
     LLC, et al.,
 7                                       Oral Argument

                    Defendants.
 8
     ------------------------------x
 9
                                         New York, N.Y.
10                                       March 13, 2019
                                         11:00 a.m.
11
     Before:
12
            HON. ALVIN K. HELLERSTEIN
13
                                         District Judge
14

15

16

17            APPEARANCES

18
     HAGENS BERMAN SOBOL SHAPIRO LLP
19        Attorneys for Plaintiffs
     BY:  ELIZABETH A. FEGAN
20
     SEYFARTH SHAW LLP
21        Attorneys for Defendant Weinstein Company
     BY:  KAREN BITAR
22
     LATHAM & WATKINS LLP
23        Attorneys for Defendants Miramax and Sarnoff
     BY:  MARVIN S. PUTNAM
24

25
```

                    APPEARANCES (Continued)

LEWIS BRISBOIS
        Attorneys for Defendant Harvey Weinstein
BY:  ELIOR SHILOH

SCHULTE ROTH & ZABEL LLP
        Attorneys for Defendant Robert Weinstein
BY:  BRIAN T. KOHN

PATTERSON BELKNAP WEBB & TYLER LLP
        Attorneys for Defendants Lasry, Jones, and Dolan
BY:  JAMES V. MASELLA, III

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
        Attorneys for Defendants Maerov and Sackman
BY:  ISRAEL DAVID

REED SMITH LLP
        Attorneys for Defendant Koenigsberg
BY:  JOHN C. SCALZO

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
        Attorneys for Defendants Ziff and Dolan
BY:  ABIGAIL E. DAVIS
        LAWRENCE S. SPIEGEL

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
        Attorneys for Defendant Lasry
BY:  DANIEL STONE

PILLSBURY WINTHROP SHAW PITTMAN LLP
        Attorneys for Defendant Ammar
BY:  MATTHEW D. STOCKWELL

SERPE + RYAN
        Attorneys for Defendant Mark Gill
BY:  SILVIA L. SERPE

HOGUET NEWMAN REGAL & KENNEY
        Attorneys for Defendant Ashbrooke
BY:  HELENE R. HJECHTKOPF

SCHLAM STONE & DONAL LLP
        Attorneys for Defendant Glasser
BY:  RICHARD H. DOLAN

ROSOFF SCHIFFRES & BARTA
        Attorneys for Defendant Schneeweiss

```
 1                    (Case called)

 2                    THE DEPUTY CLERK:  Counsel, please state your

 3       appearances for the record.

 4                    MS. FEGAN:  Good morning, your Honor.  Elizabeth Fegan

 5       for plaintiffs.

 6                    MR. SHILOH:  Elior Shiloh on behalf of Harvey

 7       Weinstein from the law firm of Lewis Brisbois.

 8                    THE COURT:  And you represent?

 9                    MR. SHILOH:  Harvey Weinstein.

10                    THE COURT:  Let me do this in a different way.

11                    Who represents Robert Weinstein?

12                    MR. KOHN:  Good morning, your Honor.  Brian Kohn from

13       Schulte, Roth & Zabel.

14                    THE COURT:  Who represents David Glasser?

15                    MR. DOLAN:  Good morning, your Honor.  Richard Dolan,

16       Schlam Stone & Dolan.

17                    THE COURT:  How are you, Mr. Dolan?

18                    MR. DOLAN:  Good, Judge.

19                    THE COURT:  Barbara Schneeweiss.

20                    MR. BARTA:  Good morning, your Honor.  Robert Barta.

21                    THE COURT:  Did I force you to come?

22                    MR. BARTA:  You did not force me to come, your Honor.

23       I love coming to New York.

24                    THE COURT:  What about your wife's 60th?

25                    MR. BARTA:  We managed it.  Thank you, your Honor.  We
```

 1  made it here about ten minutes ago.  So all is good.  Thank

 2  you.

 3          THE COURT:  Richard Koenigsberg.

 4          MR. SCALZO:  Good morning, your Honor.  John Scalzo of

 5  Reed Smith.

 6          THE COURT:  No Jonathan Gordon?

 7          MR. SCALZO:  John Scalzo of Reed Smith.

 8          THE COURT:  Walt Disney?

 9          MR. EARNHARDT:  Good morning, your Honor.  Wes

10  Earnhardt Hart from Cravath, Swaine for Walt Disney.

11          THE COURT:  Mark Glasser.

12          MR. STONE:  Good morning, your Honor.  Daniel Stone

13  from Paul, Weiss, Rifkind, Wharton & Garrison.

14          THE COURT:  Nancy Ashbrooke.

15          MS. HECHTKOPF:  Good morning, your Honor.  Helene

16  Hechtkopf, Hoguet Newman Regal & Kenney.

17          THE COURT:  Miramax and Tim Sarnoff.

18          MR. PUTNAM:  Marvin Putnam, your Honor, of Latham &

19  Watkins.

20          THE COURT:  Thank you.

21          Mark Gill.

22          MS. SERPE:  Silvia Serpe from Serpe + Ryan, LLP.

23          THE COURT:  Why aren't you at the table?

24          MS. SERPE:  I will gladly come to the table,

25  your Honor.

 1                THE COURT:  There's a seat there.

 2                MS. SERPE:  Sure.

 3                THE COURT:  Paul Tudor Jones.

 4                MR. MASELLA:  Good morning, your Honor.  James Masella

 5     from Patterson Belknap Webb & Tyler.

 6                MR. CRUZ:  Good morning, your Honor.  Alejandro Cruz

 7     from Patterson Belknap Webb & Tyler.

 8                THE COURT:  Who will be arguing between the two of

 9     you?

10                MR. MASELLA:  I will be, your Honor.  James Masella.

11     My apologies.

12                THE COURT:  Lance Maerov and Jeff Sackman.

13                MR. DAVID:  Good morning, your Honor.  Israel David

14     with Fried, Frank.

15                THE COURT:  Dirk Ziff.

16                MR. SPIEGEL:  Good morning your Honor.  Lawrence

17     Spiegel with Skadden, Arps.

18                MS. DAVIS:  And Abigail Davis, also with Skadden,

19     Arps.

20                THE COURT:  You can go to the jury box.

21                The Weinstein Company.

22                MS. BITAR:  Good morning, your Honor.  Karen Bitar,

23     Seyfarth Shaw.

24                THE COURT:  Did I miss anyone?

25                MR. ROSENBERG:  The party I'd just assume not be

1    invited to, your Honor.  John Rosenberg for James Dolan.

2          THE COURT:  You can go to the jury box too if you

3    want, Mr. Dolan.

4          MR. STOCKWELL:  Your Honor, Matthew Stockwell from

5    Pillsbury Winthrop for Mr. Ben Ammar.

6          THE COURT:  Did you sign in?

7          MR. STOCKWELL:  I did, your Honor.

8          THE COURT:  Who's your client?

9          MR. STOCKWELL:  Mr. Ben Ammar.

10          THE COURT:  Did you say Ben Ammar?

11          MR. ROSENBERG:  Yes, your Honor.

12          THE COURT:  What's your name?

13          MR. STOCKWELL:  Matthew Stockwell.

14          THE COURT:  You can go in the jury box if you like.

15          Have I missed anyone?

16          Okay.  I'd like to discuss the Trafficking Victims

17    Protection Act first.  I'll deal with the motion by Harvey

18    Weinstein first.

19          You can turn that podium around.

20          MR. SHILOH:  Yes, your Honor.  Good morning,

21    your Honor.

22          In addressing the Sex Trafficking Act alleged by the

23    plaintiffs, the critical element of a commercial sex act is not

24    alleged.  Assault is alleged.  Battery is alleged.  However, a

25    commercial sex act is not.

1          There is no exchange of value.  Now, I've read

2    Judge Sweet's opinion with respect to how he translates what is

3    exactly commercial value.  And on page 8 of his decision, he

4    attributes value to the fact that just meeting Harvey Weinstein

5    is value in and of itself because it would essentially possibly

6    propel this person's career or ability to obtain a contract,

7    and that is the value.

8          However, respectfully, there is a danger in applying

9    the definition to commercial value that is applied by

10   His Honor, Judge Sweet.  The best example that I can provide

11   your Honor with is this, if I'm a third-year law student and I

12   attend a networking event that my law school is hosting and at

13   that networking event I meet the managing partner of the most

14   prestigious New York City law firm and, after speaking with

15   this partner, he invites me back to his office to essentially

16   discuss further possible employment and advancement in my

17   career, and unbeknownst to me, this partner has other

18   intentions.  I make my way to this partner's office that

19   evening after the event, and a sexual act takes place.

20          THE COURT:  How has he enticed you?

21          MR. SHILOH:  He has enticed me with the promise of

22   possible employment.

23          Now, that is an assault, plain and simple.  However,

24   according to Judge Sweet's definition --

25          THE COURT:  I'm looking at (a)(1).

1          MR. SHILOH:  (a)(1) in the complaint, your Honor?

2          THE COURT:  No.  Title 18, 1591(a)(1):  "Whoever

3    knowingly in or affecting commerce recruits, entices, harbors,

4    transports, provides, obtains, advertises, maintains,

5    patronizes, or solicits by any means a person or" -- and then

6    it goes on to two:  "Knowing that means of force or threats of

7    force or fraud or coercion will be used to cause the person to

8    engage in a commercial sex act."

9          Isn't that sufficient?

10         MR. SHILOH:  No, it's not, your Honor.  They have not

11   alleged any commercial value being exchanged.

12         THE COURT:  There's nothing in commercial value.  They

13   say commercial sex act, but 1591(a)(1) does not speak of

14   benefits.

15         MR. SHILOH:  Respectfully, your Honor, the commercial

16   sex act is defined by Section 1591(e)(3) as "any sex act on

17   account of which anything of value is given to or received by

18   any person."

19         THE COURT:  Anything of value is these people are

20   coming up because they want jobs.  They want favor.  They're in

21   the business, and they want Harvey Weinstein's endorsement for

22   hiring or something else of value.

23         MR. SHILOH:  I don't disagree with what you're telling

24   me, your Honor.  However, that's an assault.  It's not

25   sex-trafficking under the statute and the legislative history

1    surrounding the purpose of sex trafficking.

2              THE COURT:  Sex trafficking can include assaults, but

3    this is an allegation that Mr. Weinstein enticed a woman to

4    come to his hotel room, and instead of discussing a project or

5    a job or something of like nature, forced her to engage in a

6    sex act.

7              MR. SHILOH:  Well, your Honor, there is no value being

8    exchanged.  I understand what you're telling me, but a

9    necessary component is value.  The only value being attributed

10   is the definition provided by His Honor, Judge Sweet.

11             And he's simply incorrect because, frankly, we're then

12   placing a higher standard on anybody who is rich, famous,

13   important.  And if they were to commit similar allegations,

14   according to Judge Sweet, it's sex trafficking.

15             I argue that it's simply assault and not sex

16   trafficking under the statute.

17             THE COURT:  Ms. Fegan.  You can stay where you are.

18             MS. FEGAN:  Yes, your Honor.  Quite simply, we have

19   three plaintiffs that have brought claims under the Sex

20   Trafficking Act.  Each of them were enticed by Mr. Weinstein to

21   come meet with him specifically for the job or for the contract

22   he was offering.

23             Melissa Thompson met with him --

24             THE COURT:  Answer the point that's made that there

25   needs to be something of value.

1              MS. FEGAN:  There was something of value.

2    Ms. Thompson's company signed a contract with him as a result

3    of that meeting.

4              THE COURT:  Isn't that value?

5              MS. FEGAN:  That's absolutely value, and it's

6    commercial value, your Honor.  Ms. Geiss was promised a

7    three-picture deal, and Ms. Thomas met with him because she was

8    specifically interviewing to be his nanny.  None of those did

9    they meet him at a party or follow him to his room.  Each of

10   those they were specifically asked to meet with him for a

11   contract, a job, or a deal.

12             THE COURT:  Mr. Shiloh, that's not value?

13             MR. SHILOH:  It is not, your Honor.  Let me expound.

14             THE COURT:  So those are not value?

15             MR. SHILOH:  Your Honor, they still have not alleged

16   that.  It's not alleged in the complaint.  There is no

17   commercial exchange of value set forth.

18             The example given with respect to the nanny, the nanny

19   went to Mr. Weinstein's home.  He opens the door.  He's in a

20   T-shirt and boxers.  She meets with him.  There are kids

21   walking around.  He tells the kids to go to the other room.  He

22   interviews her.  And according to her, he hugs her very

23   forcefully according to the allegations.

24             Is that sex trafficking?  I don't think so,

25   your Honor.

 1          THE COURT:  There are a number of different incidents.

 2   I don't think it's necessary at this point to isolate them.

 3   I'll take the issue under advisement, but I believe that there

 4   is an exchange of value.  It's not money.  It's not a typical

 5   prostitution deal, but it does seem to fit the statute.

 6          MR. SHILOH:  Respectfully, your Honor, if I may just

 7   add a few more points.

 8          There are three incidents that are alleged, three

 9   plaintiffs, not all the plaintiffs.  And it's critical that

10   this Court review the allegations relating to all three because

11   by labeling this conduct as "sex trafficking," we're opening

12   the door that any time anybody who is rich or famous has a

13   meeting with somebody and a sexual act takes place, we're going

14   to now label it "sex trafficking."  I don't believe that's the

15   intent of the statute, and especially the legislative history

16   doesn't support that.

17          THE COURT:  I don't know what the parade of horribles

18   comes to in this situation.  I'm not sure that there's the

19   danger you speak.  I think I understand the issue.

20          MR. SHILOH:  Your Honor, I would simply ask this Court

21   to look at the cases cited to by Judge Sweet in support of his

22   reasoning.  Those cases involve kidnapping, prostitution,

23   selling people into slavery.  Those are not the allegations

24   that are conveyed here.  Thank you, your Honor.

25          THE COURT:  Thank you.

1          Let me deal with The Weinstein Company.

2          MS. BITAR:  Karen Bitar, your Honor.  Good morning.

3          THE COURT:  Good morning.

4          MS. BITAR:  Your Honor, I did not realize I would be

5    addressing the Court.  I was going to rely on the main brief.

6          THE COURT:  Here's your big chance.

7          MS. BITAR:  Okay.  I will cede most of my time to

8    whoever is going to advance the arguments in the main brief.

9    I will make my comments with respect to TWC.

10          THE COURT:  That's all I want you to do is TWC.

11          MS. BITAR:  Right.  Your Honor, as to these three

12    plaintiffs, there is no evidence that TWC procured anything

13    relating to the three of them.  The complaint reads that they

14    were introduced to Mr. Weinstein, Harvey Weinstein, either

15    through happenstance or through an employment firm, an

16    employment agency.

17          Even if we accept as true that with respect to the

18    company arranging for meetings for some of these women to meet

19    with Mr. Weinstein in various places across the world or

20    securing a plane ticket or things of that nature, we don't

21    believe that that rises to the level of constituting conduct in

22    furtherance of a sex trafficking venture.

23          Also, your Honor, with respect to TWC sustaining a

24    benefit as a result of Mr. Weinstein's conduct, we would argue

25    that the fact that Mr. Weinstein, again, Harvey Weinstein,

1   remained employed at TWC and was able to continue to grow the

2   company and create economic value for the company and cache for

3   the company, which, yes, ultimately inured to the benefit of

4   the company, is the kind of benefit that constitutes receiving

5   a benefit under the sex trafficking statute with respect to

6   TWC.

7           We submit that Mr. Weinstein benefited -- withdrawn --

8   that the company benefited from Mr. Weinstein's legitimate

9   business interests.

10          Lastly, your Honor, I don't believe there is

11  sufficient evidence that The Weinstein Company was aware that

12  Mr. Weinstein was engaging in fraud and coercion in connection

13  with his actions with respect to Plaintiffs Geiss, Thomas, and

14  Thompson.

15          THE COURT:  Is there respondeat superior liability

16  under the Sex Trafficking Act?

17          MS. BITAR:  I don't believe so, your Honor, because I

18  believe that conduct is not the type of conduct for which

19  respondeat superior applies.

20          THE COURT:  Let's say the commercial sex was not

21  within the property of The Weinstein Company and for the

22  purpose of interviewing people for roles or considering ideas

23  for motion pictures, activities that are well within the

24  employment relationship, why wouldn't that be respondeat

25  superior liability?

 1            MS. BITAR:  First of all, your Honor, I don't believe

 2    that as to these plaintiffs, they were on TWC's chattel.  So I

 3    don't believe that would apply here.

 4            THE COURT:  That it was what?

 5            MS. BITAR:  That it was on TWC's premises.

 6            THE COURT:  They were or were not?

 7            MS. BITAR:  They were not, your Honor.

 8            THE COURT:  I know Judge Engelmayer makes that point,

 9    but it seems to me like a company like The Weinstein Company,

10    which is really selling services, that the services can be sold

11    anywhere the company's officials go.  So whether it's a hotel

12    room in Manhattan or a Universal property lot in Los Angeles,

13    it seems to me it really doesn't make much difference.

14            He's there to hire people, and one can argue that

15    hiring talent that is complicit in the demand for sex may not

16    be the best talent.  It's not a decision made on the merits.

17    So it may be argued that what Weinstein did was not within the

18    best interests of the company, but nevertheless, he was doing

19    it for the company.

20            Let me see what Ms. Fegan says.

21            MS. FEGAN:  Your Honor, I agree with you.  Here we

22    have a situation where in fact one of the plaintiffs was --

23            THE COURT:  Is there respondeat superior liability?

24            MS. FEGAN:  Your Honor, the liability for purposes of

25    the sex trafficking statute inures if the defendant knew or

1   should have known.

2          THE COURT:  So there's no respondeat superior

3   liability.  There has to be complicity on the part of the

4   company.

5          MS. FEGAN:  Or should have known, your Honor.  What we

6   have here is TWC employees specifically setting up these

7   meetings, buying his erectile dysfunction medication, making

8   sure that he's not bothered when these women are put in the

9   rooms with him, paying for his hotel rooms, and in effect

10  having meetings with them in the hotel rooms, setting up the

11  meeting through two different assistants with him so that Sara

12  Ann would go to his home.

13         THE COURT:  That wasn't the business of the company.

14  The business of the company was not making it easy for Harvey

15  Weinstein to have sex.  The business of the company was to make

16  very good movies.

17         MS. FEGAN:  You're absolutely right, your Honor.  So

18  the standard under the statute is not whether they benefited

19  from the sex act itself.  It's whether they benefited from the

20  venture.  And the venture here overall, absolutely.  The

21  Weinstein Company was trying to make movies.

22         THE COURT:  One could say that there was no benefit to

23  the company.  All the acts talk about were because of the

24  demands of a very strong person who had an important role in

25  the company and who could fire people if he didn't do what he

1  wanted them to do.  But I don't see where the company benefits.

2      MS. FEGAN:  Your Honor, if we look at the statute,

3  what it says.  It says two different things:  First, did the

4  person entice the individual, who is the victim, knowing and

5  using fraud, enticing them with the idea that they would get a

6  movie role.

7      And did the company know in this instance that

8  Mr. Weinstein was doing that?  Did they know or should it have

9  known that he was using his power and prestige to lure these

10  women under the guise that they were going to get a deal but

11  really knowing that he was going to assault them?  That is the

12  case here, your Honor.

13      THE COURT:  It is whoever knowingly entices.  The

14  company did not entice.

15      MS. FEGAN:  That's right.  So it's under number two.

16  It's whether they received anything of value.

17      THE COURT:  You can't say they received anything of

18  value.

19      MS. FEGAN:  From the venture, not from the sex act,

20  from the venture which has engaged in an act knowing that --

21      THE COURT:  Harvey Weinstein did use sexual favors as

22  a means of choosing people.  It's not in the interest of the

23  company.  It's the company's decision on the merits.

24      MS. FEGAN:  Your Honor, it was in the interest of the

25  company to protect him.  It was in the interest of the company

1    to allow him to continue to do that because they didn't want to

2    come down on him and let happen exactly what happened.

3           THE COURT:  I'll take that under advisement, but I

4    think the words "knowingly entices" precludes liability of the

5    company.

6           MS. FEGAN:  But there's an "or," your Honor.

7           THE COURT:  And the fact that the company knew that

8    Harvey Weinstein was enticing I don't think creates liability.

9    But I'll look through it more.

10          MS. FEGAN:  There is an "or" between those sections

11   that I think is important because it does provide separate

12   liability for people who participate.

13          THE COURT:  Look where the "or" is.

14          MS. FEGAN:  Correct.

15          THE COURT:  Whoever knowingly applies to both

16   subparagraphs one and two.  And knowing that.

17          MS. FEGAN:  There was also a 2008 amendment,

18   your Honor.  The 2008 amendment in Section 1595 added the

19   phrase that liability can inure to a person that knew or

20   "should have known."  So that 2008 amendment is important to

21   Ms. Thompson's claim which arose in 2011.

22          THE COURT:  I think there are protections in the law

23   for people who just knew.  There has to be knowing assistance.

24   It's an aiding and abetting claim essentially.  Aiding and

25   abetting requires more, but I have your arguments.  Thank you.

1          MS. FEGAN:  Thank you, your Honor.

2          MS. BITAR:  Thank you, your Honor.

3          MR. SHILOH:  Your Honor, may I respond to some points

4    raised by some of your questions, as well as some statements

5    made by Ms. Fegan?

6          THE COURT:  No.

7          I'd like to discuss the case for Robert Weinstein.

8    Robert Weinstein is represented by Mr. Kohn.

9          MR. KOHN:  Good morning, your Honor.

10         Specifically about the sex trafficking acts?

11         THE COURT:  Yes.

12         MR. KOHN:  There have been three motions to dismiss

13   filed in different cases with respect to allegations very

14   similar to the claims here against Mr. Weinstein, my client,

15   Robert Weinstein.

16         Two judges have already dismissed, Judge Engelmayer in

17   the Canosa case, Judge Sweet in the Noble case.  There was a

18   third case pending in federal court in California after we

19   filed our motion to dismiss.  The plaintiff elected to dismiss

20   Mr. Weinstein, Robert Weinstein, from the case.

21         As the Sixth Circuit held in the Afyare case, the

22   defendant has to be engaged knowingly in some aspect of

23   trafficking.  That's the case that Judge Sweet relied on in

24   finding there can be no guilt by association for Robert

25   Weinstein and that the plaintiff has to allege adequately that

 1   he engaged affirmatively in some aspect of the trafficking.

 2          THE COURT:  This is the same discussion I just had

 3   with Ms. Fegan.

 4          MR. KOHN:  Effectively, yes, your Honor.

 5          THE COURT:  What do you say to that, Ms. Fegan?

 6          MS. FEGAN:  Your Honor, I would say that if you look

 7   at our allegations, Mr. Weinstein, Robert Weinstein,

 8   specifically authorized a bonus for an employee that bought

 9   erectile dysfunction medication that would be delivered to the

10   hotel room --

11          THE COURT:  Not because he delivered medicine.

12          MS. FEGAN:  I'm sorry?

13          THE COURT:  Not because he delivered medicine.

14          MS. FEGAN:  No, but he knew it was happening.  He

15   allowed the employees to facilitate it, he approved of it, and

16   in fact, he gave bonuses for it.  That is far more than

17   being --

18          THE COURT:  He gave bonuses for that activity or for

19   overall activity in the company?

20          MS. FEGAN:  Bonuses for getting his erectile

21   dysfunction medication and making sure it was in Harvey

22   Weinstein's hotel room.

23          THE COURT:  For that activity?

24          MS. FEGAN:  Yes, your Honor.  For assaulting the

25   women.  That's what Mr. Weinstein used the erectile dysfunction

 1    medication for, in part at least.  So, your Honor, I think

 2    based on the allegations, this is not passive.

 3              THE COURT:  Wait.  I want to hear what Mr. Kohn says.

 4              MR. KOHN:  I'm not sure if this is being referred to

 5    Harvey Weinstein or Robert Weinstein.

 6              THE COURT:  Robert Weinstein.

 7              MR. KOHN:  Robert Weinstein is not alleged to have

 8    paid a bonus to Ms. Rehal for getting erectile dysfunction

 9    drugs for Harvey Weinstein.

10              MS. FEGAN:  It is alleged that he approved The

11    Weinstein Company to pay the bonus, your Honor.

12              THE COURT:  As a director of the company.

13              MS. FEGAN:  That's correct.

14              Is there a resolution to that effect?

15              MR. KOHN:  That is not knowingly participating in some

16    aspect of sex trafficking.  If the board approved bonuses

17    generally, there is no allegation that a bonus was approved

18    specifically to purchase erectile dysfunction drugs.

19              THE COURT:  Ms. Fegan alleges that.

20              MR. KOHN:  Not in the complaint.

21              MS. FEGAN:  We do, your Honor.

22              THE COURT:  She alleges it.

23              MR. KOHN:  The complaint actually alleges that Robert

24    Weinstein was aware of the sex acts in The Weinstein Company

25    offices and that my client, Mr. Weinstein, received a complaint

 1    from Ms. Rehal about having to purchase erectile dysfunction

 2    shots.  That's what the opposition brief says.  That's not pled

 3    in the complaint here.  In fact, it's not even pled in

 4    Ms. Rehal's complaint.

 5         THE COURT:  I'm missing what you're saying.  Can you

 6    say it a little more clearly.

 7         MR. KOHN:  Yes.  In the opposition, plaintiffs argue

 8    that Ms. Rehal alleged in her complaint that my client received

 9    a complaint from her that she had to purchase these erectile

10    dysfunction drugs.

11         But that's not pled either in the plaintiff's

12    complaint here.  Nor is it actually pled in Ms. Rehal's

13    complaint.  The opposition is just embellishing the allegations

14    that are in the actual complaint.

15         THE COURT:  It's kind of bizarre to give a bonus just

16    because some employee goes to the drugstore and buys a drug and

17    gives it to Mr. Weinstein, Harvey Weinstein.

18         And it's kind of hard to extend liability to Robert

19    Weinstein because as a director he didn't clamp down on this or

20    vote to clamp down on this or vote to fire Harvey Weinstein.  I

21    don't think that makes out liability under the act, but I'll

22    look into this further.

23         MR. KOHN:  Thank you, your Honor.

24         THE COURT:  Other directors.  Who wants to speak?

25         MR. PUTNAM:  I will, your Honor, very briefly.Marvin

1    Putnam.  I represent Tim Sarnoff, as well as Miramax.  For this

2    I'm talking about Tim Sarnoff.

3            I want to make something very clear in case it's not

4    in the papers.  I believe it is, but since it hasn't come up

5    today, I want to bring it up, which is in their opposition,

6    plaintiffs make clear that there are certain outside directors

7    that they are absolutely not going against in terms of sex

8    trafficking despite the complaint.  Those would be my client,

9    Tim Sarnoff; Mr. Dolan, Mr. Tudor Jones; Mr. Lasry.

10           THE COURT:  Is that true, Ms. Fegan?

11           MS. FEGAN:  That is correct, your Honor.

12           THE COURT:  So you won your point.

13           MR. PUTNAM:  Now, I'd like to now go to the other

14   directors if I may, unless someone else would rather do that.

15           THE COURT:  So you're speaking for all the other

16   directors?

17           MR. PUTNAM:  Apparently I am.

18           This complaint is a complaint that goes after about

19   150 different people and entities.  And it's all about

20   association, did you have an association with Harvey Weinstein

21   and thereby there is some kind of guilt.  And sex trafficking

22   is the perfect example of this.  Let me explain why.

23           It's the perfect example because what it does is

24   plaintiffs attempt to conflate everything.  It's the type of

25   group pleading that's not allowed, but it's also the type of

1    complaint where they say something as to one entity or one

2    person generally and then conflate it as to everyone else.

3         So, for example, here, in terms of the sex

4    trafficking, there are two different sex trafficking statutes

5    at issue as to these three plaintiffs.  So first off, which was

6    not done here, they have to be broken down that way.

7         As to two of them, you have to do the 2003 statute.

8    As to the second, you have to do the 2008.  Why that's so

9    important here, your Honor -- I just want to be clear -- is

10    because as to the first one, it goes directly to the arguments

11    you're making, your Honor, about a perpetrator.

12         There they talk explicitly about going after a

13    perpetrator.  To be clear on that, your Honor, it requires

14    actual knowledge within 2003.  So if you look at that one as to

15    two of the plaintiffs -- to be clear as to who they are.  I

16    want to make sure I get them right.  One second.  Geiss and

17    Thompson.  Thomas is as to the later 2008.  Do I have that

18    wrong?

19         MS. FEGAN:  Yes.

20         MR. PUTNAM:  Thank you.  Is it Thomas and Thompson

21    together?

22         MS. FEGAN:  Yes.

23         MR. PUTNAM:  So you have two of the three as to this.

24    It's important to look at that, your Honor, because as of 2003,

25    it requires actual knowledge, different than 2008.  There is no

1   allegation of actual knowledge here, your Honor.  If you look

2   at it, that's why it talks about participation in the venture.

3          Plaintiffs' counsel just tried to note that

4   participation in the venture can just be a broader venture such

5   as the making of great movies.  No.  The case law is clear, and

6   I quote:  "Participation in a venture requires that the

7   defendant actually participate and commit some overt act that

8   furthers the sex trafficking aspect of the venture," and that's

9   what Ayfare means which is in the briefing.

10         Now, that's but one example of the cases that you

11  have.  It's not a respondeat superior.  So it really goes to

12  all the other defendants who are not perpetrators in that

13  instance, your Honor.  There's just one other small note in

14  that, and then I'll jump off.  When it comes to this idea --

15         THE COURT:  Slow your speech.

16         MR. PUTNAM:  Sorry.  I always do that.  Sorry.

17         Is that the benefit under the statute that they talk

18  about isn't this benefit of, you know, you get to go to great

19  parties or you can go to the Oscars or something like that.

20         When they talk about benefit under the statute, the

21  benefit is the value of the forced labor, and that's clear

22  throughout.  You can look at the case law.  If that's the

23  benefit that they're looking at, forced labor, if that's what

24  he was trying to get the money for --

25         THE COURT:  I don't think that's the issue.

1          Do you really think that's the issue, that the women

2     were not paid for their time?

3          MR. PUTNAM:  Are you asking me?

4          THE COURT:  You, Mr. Putnam.

5          MR. PUTNAM:  Under the statute, that's what it is,

6     your Honor.  Yes.

7          THE COURT:  How do you read the statute to come to

8     that?

9          MR. PUTNAM:  It's from the case law, your Honor, and

10    we have a whole section in the brief about this.

11         THE COURT:  The problem with reading from case law on

12    this subject is that cases are specific to the facts.  And you

13    have facts like that in those cases, but this is a different

14    kind of case.

15         The value is not the time of committing a sex act.  It

16    was not stealing services.  It was enticing people to have sex

17    with Harvey Weinstein through fraud in the hope of getting

18    better parts.

19         MR. PUTNAM:  And then he didn't have it with these

20    three.  Look at Ayfare again.

21         THE COURT:  It didn't happen, but they wanted it.

22    That's why they were there.  They didn't go to Harvey Weinstein

23    because they admired his sexual capabilities and they were

24    hungry for sex.  They went because they wanted jobs.  They

25    wanted his word.  They wanted to work with him.  He was the

1   most successful movie producer in Hollywood.  The value was the

2   byproduct of this.

3           MR. PUTNAM:  Who would that byproduct be here?

4           THE COURT:  The trouble with the analogy is that there

5   was no value that came to Harvey Weinstein from this.  He was

6   misusing people.  He was manipulating people, but I can't see

7   where he got a financial benefit.

8           MR. PUTNAM:  Again, remember, your Honor.

9           THE COURT:  The 2003 statute doesn't require it.

10           MR. PUTNAM:  It doesn't, your Honor.

11           THE COURT:  It does not.

12           MR. PUTNAM:  If you look at Flores and the related

13   cases, what they make clear is that you can't have too broad an

14   interpretation of what constitutes a benefit.  As to the

15   director, what's required is affirmative knowledge of the link

16   between the benefits and their alleged participation in sex

17   trafficking.

18           THE COURT:  Yes.

19           MR. PUTNAM:  That does not exist here.

20           THE COURT:  What do you say to that, Ms. Fegan?

21           MS. FEGAN:  Your Honor, I think we are putting a break

22   in the link that doesn't exist.  These women met with him

23   because they thought that he was going to offer them parts in

24   movies or deals or contracts, and he offered that to them.

25           To now say that the defendants had to have gotten

1   value from the sex act as opposed to the very thing that these

2   women went to his room for or to his office for, which was the

3   contract and the deal, is putting two different standards on

4   it.

5           THE COURT:  So what are you saying?  That Harvey

6   Weinstein produced benefit for the company by limiting the jobs

7   he would give out to those who would have sex with him?

8           MS. FEGAN:  Potentially --

9           THE COURT:  That doesn't strike me as giving value to

10  the company.

11          MS. FEGAN:  Can we focus on Ms. Thompson.

12  Ms. Thompson did get a contract for her company.

13          THE COURT:  It's almost like he couldn't get an

14  actress, but those people who were enamored with Weinstein's

15  sexual prowess were going to get a job.  That's not right.

16          MS. FEGAN:  Actually, your Honor if we could focus on

17  Ms. Thompson.  Ms. Thompson got the contract for her company,

18  and then he raped her.

19          THE COURT:  The companies, to the extent they knew or

20  didn't know indulged Harvey.  They indulged his appetites.  He

21  was a very powerful man, and no one was willing to stand up to

22  him.  But while he was successful, he was impossible to deal

23  with.  But to say that the company or the directors got benefit

24  out of it a stretch.

25          MS. FEGAN:  Your Honor, I respectfully disagree.  If

1  the company knew that they were bringing in prostitutes, if the

2  company knew that they were bringing in people from other

3  countries and selling them, the Court would not be looking at

4  this as being passive.

5          THE COURT:  That's not what happened here.

6          MS. FEGAN:  But what did happen, your Honor, is that

7  they knew that he was using his contracts, his ability to make

8  deals, to rape women.  In fact, the company did benefit from

9  the contract that Ms. Thompson's company got.  It promoted

10 several movies.  They made money on it.  She was involved in

11 that.  She actually -- there was commercial value and the

12 company benefited.

13         THE COURT:  She was hired because she had sex with

14 Harvey Weinstein.

15         MS. FEGAN:  No.  She got the contract, and then he

16 raped her after.  He told her to come to the next meeting after

17 she had gotten the contract.  She believed it was to sign the

18 contract, and in fact, he raped her.  So she did not go there

19 and then first have sex --

20         THE COURT:  So he didn't entice her.

21         MS. FEGAN:  He did entice her.  He enticed her because

22 he said, we're going to go sign this contract.  So he said,

23 you've got the deal.  He made a call, and she believed she was

24 going to sign the contract, and we've alleged that, your Honor.

25         THE COURT:  I just can't see the benefit to the

1    company or to these other directors to this.

2          MS. FEGAN:  Your Honor, the directors knew.  They kept

3    him in power.  In fact, once it finally came out --

4          THE COURT:  I will concede that specifically on this

5    complaint and with regard to a motion to dismiss that the

6    company knew that Weinstein was engaging in sex, and they knew

7    that it was unwanted sex, and they kept him on.

8          Whether that makes the company a violator of the sex

9    trafficking laws is another question.

10          MS. FEGAN:  Understood, your Honor.

11          THE COURT:  Certainly the directors who don't have an

12    employment relationship with Harvey Weinstein but who have a

13    relationship with the company itself and can approve or

14    disprove contracts takes one step further removed.

15          MS. FEGAN:  Except under negligent retention and

16    supervision, your Honor.

17          THE COURT:  Before we move to RICO, I need to have a

18    short recess.

19          MS. FEGAN:  Thank you, your Honor.

20          MR. BARTA:  Your Honor, can I be heard on Schneeweiss

21    with respect to the sex trafficking crime?

22          THE COURT:  Yes.  After the recess.  You'll be first.

23          (Recess)

24          MR. BARTA:  Robert Barta on behalf of Barbara

25    Schneeweiss.

1          THE COURT:  Go ahead.

2          MR. BARTA:  Thank you, your Honor.  I'll be brief.

3    I'm not going to repeat what was previously stated by counsel.

4          THE COURT:  You need to be louder.

5          MR. BARTA:  I just want to address the specifics or

6    lack of specifics as to my client in particular.

7          THE COURT:  She's there because she got hotel rooms.

8    She diverted meetings from the company offices to hotel rooms.

9    She in effect enabled.

10         MR. BARTA:  She was an assistant.  She did her job.

11   She was there --

12         THE COURT:  Okay.  That's the argument, the allegation

13   of knowing assistants --

14         MR. BARTA:  There is no allegation of knowledge.

15   That's the issue.  Their pleadings have no allegation of

16   knowledge.  What they have is they say she knew or should have

17   known.  And the only factual allegation --

18         THE COURT:  That's knowledge.

19         MR. BARTA:  I have it here, your Honor.  The only

20   factual allegation they say is that she didn't look at someone

21   in the eye.

22         THE COURT:  I'll look at this again, but the

23   interesting question to me is whether an employee of Harvey

24   Weinstein told to do certain things which enabled him to

25   function for the company and to indulge himself in private sex

1    causes the employee to be complicit in what Harvey Weinstein

2    did.

3              MR. BARTA:  Under the Act, you have to have more.  You

4    also have to have a commercial benefit to that employee.

5              THE COURT:  This was her job.

6              MR. BARTA:  There is no commercial benefit pled.

7              THE COURT:  That's a commercial benefit, to keep her

8    job.

9              MR. BARTA:  It's not pled.  I'm dealing with what

10   the --

11             THE COURT:  That's not how I understand the pleadings.

12   I don't have to have an absolutely perfect pleading.  This is

13   not demurrer practice.  It's implicit in the pleadings, if not

14   explicit, that Ms. Schneeweiss knew that she furthered his

15   acts.

16             And my question is that since she did it as an

17   employee of the company acting in her job following the

18   directions of her boss, which was Harvey Weinstein, whether she

19   can be liable under the Act.

20             MR. BARTA:  Your Honor, I believe there was an

21   argument earlier about expanding this Act.  And if you are to

22   keep her in this lawsuit on the basis of what is alleged that

23   she did which is simply to do her job to set up appointments,

24   it was understood and recognized that Weinstein -- he carried

25   out his appointments and legitimate appointments.

1          THE COURT:  It's an aiding and abetting issue really

2     Ms. Fegan.  Aiding and abetting requires not only a knowing

3     assistance, but there must also be a mindset almost to the

4     point of sharing the purposes of the perpetrator.

5          MS. FEGAN:  Your Honor, there are two different

6     standards.  One is knowing, and second post 2008 is should have

7     known.  With respect to Ms. Schneeweiss, we have specifically

8     alleged --

9          THE COURT:  I'm granting that she should have known.

10          MS. FEGAN:  Correct, your Honor.

11          THE COURT:  I'm granting you that.  It's a motion to

12     dismiss, not a motion for summary judgment.

13          MS. FEGAN:  Thank you, your Honor.

14          THE COURT:  How can you attach liability to an

15     employee who is not getting any personal benefit out of this?

16     She's doing the job because she's got a powerful boss who wants

17     to do terrible things and she has no choice in it.

18          MS. FEGAN:  Your Honor, there were employees at the

19     company that were only there for a couple years and left.

20     Ms. Schneeweiss was at Miramax.  She was there.  She was the

21     vice-president of television, and she followed Mr. Weinstein to

22     The Weinstein Company and was vice-president of production.

23     She got a promotion.

24          She had a choice, and she stayed with him for 21

25     years, your Honor.  She had a choice, and she made a choice.

1   She knew what she was doing.  In fact, when several of our

2   plaintiffs complained to her that they didn't want to meet

3   privately with him, she assured them that they would be okay

4   knowing that they wouldn't be.

5        So, your Honor, Ms. Schneeweiss is not a passive

6   employee.  We haven't sued 150 people.  We haven't sued

7   employees that got caught up for a year or two and perhaps are

8   victims themselves.

9        She was a 21-year participant in what Mr. Weinstein

10   did, at least for the period that the Victims Protection Act

11   provides for private liability for the last ten years.  She

12   should stay in the case, your Honor.

13        MR. BARTA:  Your Honor, what we're hearing is

14   argument.  Those statements are not alleged in the complaint.

15        THE COURT:  That is her argument but fairly derived

16   from the allegations in the complaint.  I'm not going to

17   dismiss the complaint for deficiencies at this point.

18        MR. BARTA:  I understand that.  The question though is

19   does an employee who goes into an entertainment organization

20   who has the expectation of rising within the ranks because most

21   young people who start at talent agencies, production

22   companies, studios have an expectation that they're going to

23   grow with that company.

24        So the fact that they indeed fulfilled that

25   expectation of growing with the company and rise through the

1   ranks of a very large organization and during the course of

2   that they follow the instructions of their employer, can they

3   now be held liable for an aiding and abetting because that

4   employer has engaged in unlawful conduct?

5         I would think not.  I think that's extending exposure

6   and liability to a whole cadre of people who will have a

7   floodgate of litigation that will arise from that.  Thank you,

8   your Honor.

9         THE COURT:  Thank you.  Let's do RICO.

10        MR. SHILOH:  Your Honor, may I be heard further on the

11  sex trafficking point?

12        THE COURT:  Who do you represent?

13        MR. SHILOH:  Harvey Weinstein.

14        THE COURT:  No.  We already did that.

15        Is there any director who wishes to be heard on the

16  Victims Protection Act on the trafficking law?

17        All right.  Let's do RICO.

18        Let me ask you, Ms. Fegan.  How do you get an injury

19  to business of property?

20        MS. FEGAN:  Your Honor, we have specifically alleged

21  here, by way of example, that one plaintiff was told in

22  December of 2017 that she was blacklisted for complaining about

23  Harvey Weinstein.  In fact, we allege that she has seen an

24  86 percent drop in auditions as a result of being blacklisted.

25        We have alleged that another plaintiff didn't get the

1    parts in Beautiful Girl and Things to Do in Denver When You're

2    Dead, even though she was told she had parts, because she was

3    blacklisted.

4        Your Honor, these women could not have known at the

5    time they didn't get the parts.  We allege other movies also,

6    specific movies by name, specific distributors, specific

7    producers.

8        At the time these women didn't get parts, they could

9    have been told they were not tall enough, they were not pretty

10    enough, any number of things.  What they were not told and what

11    they could not have discovered until the fall of 2017 was that

12    the reason that they didn't get these very specific parts was

13    because Harvey Weinstein had interfered and blacklisted them

14    for not going along with his sexual assaults.

15        THE COURT:  You say that he blacklisted.

16        Does that mean any more than he decided he would not

17    hire them?

18        MS. FEGAN:  It does.  In these particular instances,

19    it means that these women were told by producers and directors

20    that they had the part.  They were perfect.  And then he came

21    in and interfered with that, and he basically came in and said,

22    no.  You can't hire her.  Do not hire her, and she didn't get

23    the part.

24        THE COURT:  What is the basis of your allegation?

25        MS. FEGAN:  It depends on the person, your Honor.  In

1    several of these we have listed a particular producer like

2    Miramax's Scott Rosenberg who had told Delaney, Ms. Delaney,

3    that she was going to get a part.

4              THE COURT:  That's Weinstein's company; right?

5              MS. FEGAN:  That's correct.  Scott Rosenberg was a

6    producer that would freelance or come in and do work for them.

7              THE COURT:  Yes, but if Harvey Weinstein came and

8    said, I don't want you to hire this woman, that doesn't mean

9    she's blacklisted.  It means Harvey Weinstein won't hire her.

10             MS. FEGAN:  Your Honor, we allege that these are

11   producers that aren't employees per se.  They come in and do

12   coproductions.  So what we have is Buena Vista.  We have

13   Dimension Films.  We have Miramax.

14             Different producers or directors come in or casting

15   directors, outside companies.  And he would go in and say, no.

16   Don't cast these people.  So, your Honor, that is blacklisting.

17   You can't do that and interfere with somebody's career.

18             That career damage is quintessential RICO injury,

19   your Honor.  In fact, there are several cases that talk about

20   where the purpose of the RICO scheme, the coverup, the

21   blacklisting or the black cubing was to injure the person's

22   career.  That in the Second Circuit is RICO damage and RICO

23   injury.

24             THE COURT:  Your pleading though is that the women

25   suffered terrible emotional injury from having been forced to

1  do things with Harvey Weinstein that had economic consequences

2  in their ability to get jobs.  An economic consequence is

3  personal injuries and not actionable under RICO.

4         MS. FEGAN:  Your Honor, for purposes of RICO injury,

5  I'd ask the Court look at paragraph 829 of our complaint.  That

6  is under the RICO count cause of action.  Specifically there,

7  we allege a paragraph for each individual plaintiff and the

8  particular parts where we have them.

9         THE COURT:  Let me get them.

10         MS. FEGAN:  Sure.  It starts on 234, your Honor, it

11  starts and goes on to 235 and 236.

12         So there is a emotional distress damage, your Honor,

13  for the assaults.  We are not seeking recovery for that under

14  RICO.  Under RICO, we are seeking recovery for career damage

15  caused by Mr. Weinstein.

16         While the lawsuit does include emotional distress

17  damages, your Honor, in this particular cause of action, we're

18  not seeking emotional distress damages.

19         THE COURT:  Say that again.

20         MS. FEGAN:  While the lawsuit generally with respect

21  to the tort claims and the sex trafficking claims seeks

22  emotional distress damages, we are not seeking emotional

23  distress damages under the RICO cause of action.

24         THE COURT:  Mr. Shiloh, do you want to respond?

25         MR. SHILOH:  Yes, your Honor.  Your Honor, I'm just

1    only going to address --

2          THE COURT:  I appreciate that you don't rely on the

3    briefs for the purposes of shortening your arguments.  If I

4    wanted to read the briefs for the point I'm deciding, I

5    wouldn't need oral argument.  I have oral argument now.  Make

6    your point.

7          MR. SHILOH:  The point is that when we were first here

8    on a motion to dismiss, you provided a how-to guide on how to

9    plead a RICO claim.  You went step-by-step in court to

10   Ms. Fegan about what needed to be in the complaint.

11         Well, the second complaint was filed.  I've reviewed

12   it.  It does not comply with the instructions that you provided

13   to counsel.  All of the alleged injuries are speculative, and

14   speculative damages are not considered damages under RICO.

15   There are personal injury damages.

16         THE COURT:  Give me an illustration of what is

17   speculative.

18         MR. SHILOH:  Yes, your Honor.  Paragraph 830f.,

19   Weinstein and Miramax did not hire Klatt for the movie for

20   which she was told she was perfect."

21         I'm told a lot of things.  That doesn't guarantee that

22   I'm given what I'm told.

23         THE COURT:  The problem, Mr. Shiloh, is that you have

24   now a motion under Rule 12(b).  I have to accept the

25   allegations that are plausibly alleged, and this is plausibly

1    alleged.

2          This whole subset A to J may not stand up and aren't

3    enough to state a claim if they are an injury to business or

4    property.  It's clear from the cases that you don't need money

5    or actually property.  Intangibles satisfy the law.  You can

6    have an intangible that is an injury to business or property.

7          MR. SHILOH:  Your Honor, I still don't believe they've

8    properly pled under the pleading standard.  They don't identify

9    any lost contracts.  Rather, they insist they would have had

10   successful film careers but for the alleged conduct.

11         THE COURT:  Mr. Shiloh, it's a complaint, not a bill

12   of particulars.  It's not actionable for a motion on that

13   grounds.

14         What else do you have?

15         MR. SHILOH:  What else I have is simply that they

16   don't properly plead damages.

17         Are we specifically focusing on the injury portion of

18   the RICO claim, your Honor?  I have a lot else to offer, but I

19   want to know what you'd like.

20         THE COURT:  Starting with injury to business or

21   property.

22         Does anyone else have anything to contribute on the

23   injury to business or property?

24         Okay.  Make another point.

25         MR. PUTNAM:  Your Honor, to business, I do, your

Honor, if I may.

THE COURT:  Yes.

MR. PUTNAM:  Marvin Putnam, your Honor.

I'm going to address directly some questions that you posited, your Honor, both last time and today because I think they go together quite well.

The first is this idea of injury.  Last time you made very clear that economic consequences of personal injury are not actionable under RICO.

THE COURT:  Yes.  They fixed that up.

MR. PUTNAM:  Let me see if they did fix that up, your Honor.  If you look at the paragraph you just noted which was paragraph 829 and you go through those and you compare that, compare it to the complaint, what you will note is in every instance except for the one where they say blackmail in 2017 -- so it's not listed in 2017 -- every one of those predates the time period we're talking about and are barred by the statute of limitations.

THE COURT:  We're just doing injury to business or property.

MR. PUTNAM:  Yes, your Honor.  What I want to note is what's important -- well, okay.

THE COURT:  I'll give you a chance on statute of limitations.

MR. PUTNAM:  If I may then, your Honor.  The other

1    point of this was just noted by plaintiffs' counsel which is

2    the idea she said it's the scheme.  I think that's a hundred

3    percent correct.  It's about the scheme.

4          Here the issue for scheme is racketeering, knowledge

5    of racketeering activity, which is what blacklisting is.  It is

6    not an injury.  The injury is the actual injury, and that is

7    what you have to have notice of.

8          I just want to remind the Court of what we talked

9    about last time.  The scheme is racketeering.  You don't have

10   to have notice of racketeering.

11         THE COURT:  You can take that up at the next subject,

12   Mr. Putnam.

13         MR. PUTNAM:  All right.

14         THE COURT:  Thank you, Mr. Putnam.  You need a

15   racketeering act.  Blacklisting is not included in a

16   racketeering act.

17         MS. FEGAN:  Your Honor, there are three types of

18   predicate acts that we've alleged here.  There is the sex

19   trafficking, there's mail and wire fraud, and there's tampering

20   with a victim.

21         Ultimately, your Honor, the entire scheme to defraud

22   that's set forth was to cover up the original sexual assaults

23   for the original sex trafficking, your Honor.

24         THE COURT:  What does that have to do with emotional

25   injury?  The injury to business or property has to flow from

```
1    the pattern of racketeering activity.

2             MS. FEGAN:  That's right, your Honor.  So the pattern

3    of racketeering and the mail and wire fraud that was used to

4    implement this was to interfere with the women's business

5    expectations with real interests here where they were told that

6    they were going to get particular parts or particular deals.

7    And he interfered with those, and he used others to help

8    interfere with those.

9             So what we've alleged by way of example with respect

10   to Ms. Thompson, in 2017 --

11            THE COURT:  Sex trafficking is not one of the examples

12   of racketeering activities.

13            MS. FEGAN:  It is, your Honor.  It is both alleged,

14   and it is a recognized predicate act under RICO.

15            THE COURT:  Sorry.  You're right.  But that causes the

16   emotional injury, a direct result of the sexual trafficking.

17            MS. FEGAN:  It does, your Honor.

18            THE COURT:  It's emotional injury.  The blacklisting

19   is something different from the sex act.  That's punishment.

20            MS. FEGAN:  Your Honor, the injury under RICO does not

21   have to be sex trafficking career damage.  There has to be a

22   relationship.  Obviously there has to be a causation.

23            That relationship under Second Circuit law is --

24   courts have discussed this because all courts recognize that

25   the sex trafficking itself is going to have emotional distress
```

J2DYGEIC

1    damages.  The question is did it impact these women's ability

2    to earn a living.

3              THE COURT:  That won't be good.  The impact of

4    emotional injuries on business or property is not such.

5              MS. FEGAN:  You're right, your Honor.  What we have

6    here is Mr. Weinstein and others specifically interfering to

7    take away career movies, to take away deals, to take away

8    promises, to take away parts that they were told that they got

9    and then taking those away from them.

10             THE COURT:  That's not trafficking.

11             MS. FEGAN:  I understand, your Honor.  What the case

12   law talks about is what happens after the trafficking, does the

13   scheme continue to ensure that the women are hurt monetarily,

14   and that is what happened here, your Honor.

15             THE COURT:  It's a distraction.

16             MS. FEGAN:  Your Honor, I think a review of the case

17   law shows that courts struggle with this because sex

18   trafficking and injury to property sound like two different

19   things, and where courts have come out is if the scheme

20   continues such that the women lose business, lose contracts

21   like they have here, that that would constitute injury under

22   RICO that is recognized.

23             Congress didn't intend for RICO -- for predicate acts

24   which it has defined to be compensable under RICO to preclude

25   the injury to property when that sex trafficking comes in to

 1    make sure that their life is ruined by taking away specific

 2    deals or movies.

 3            THE COURT:  Thank you.

 4            MS. FEGAN:  Thank you.

 5            THE COURT:  Any other defendants on any aspect of

 6    RICO?

 7            MR. PUTNAM:  On predicate acts, your Honor?

 8            THE COURT:  Anything in RICO.

 9            MR. PUTNAM:  Yes.

10            Marvin Putnam, your Honor.

11            A couple things.  I first want to go through the idea

12    of the three predicate acts because, again, there are very

13    different claims as to different defendants, and it's very

14    important not to group them all together as is consistently

15    being done because when you actually break them apart, they are

16    very different claims.

17            So first of all, as to the sex trafficking claim which

18    is one of the three predicate acts alleged, that became an

19    issue on December 19, 2003.  It was resolved.  It has no effect

20    going backwards.

21            As a result, as to Miramax --

22            THE COURT:  That's statute of limitations.

23            MR. PUTNAM:  Exactly.  I don't think that is just

24    statute of limitations, your Honor.  It's whether there is a

25    predicate act.  There can't be a predicate act in this instance

 1   since you have to have two under RICO if it literally isn't the

 2   effect.

 3           Do you see what I mean, your Honor?

 4           THE COURT:  No.  I'm missing it.

 5           MR. PUTNAM:  Three predicate acts are alleged:  Sex

 6   trafficking, witness tampering, and the third is -- I'm sorry.

 7   I have to remember.

 8           THE COURT:  Mail and wire fraud.

 9           MR. PUTNAM:  Thank you.  As to the sex trafficking,

10   they've alleged, as we noted five minutes ago, that sex

11   trafficking is not relevant as to Tim Sarnoff and a number of

12   outside directors in terms of the latter period.

13           That was admitted five minutes ago.  So it can't be a

14   predicate act of sex trafficking as to them.  As to Miramax,

15   there cannot be a predicate act of sex trafficking because it

16   did not become a part of the RICO statute under December 19,

17   2003.

18           THE COURT:  What is not?

19           MR. PUTNAM:  Trafficking did not become a predicate

20   act under RICO until that date.

21           THE COURT:  2003?

22           MR. PUTNAM:  Exactly.  As to 2003.  So as to Miramax,

23   all the plaintiffs' claim all the supposed acts are prior to

24   that date.  So as a result, sex trafficking cannot be a

25   predicate act as to Tim Sarnoff or the other outside directors

1  because that was admitted earlier.

2          They did not have that.  That's the footnote we talked

3  about five minutes ago.  You cannot have a predicate act as to

4  Miramax because it wasn't part of the RICO statute at that

5  time.  So that predicate act has to be out.

6          THE COURT:  What do you say to that, Ms. Fegan?

7          MS. FEGAN:  Your Honor, with respect to Miramax

8  specifically, there is specific case law that talks about

9  whether you can take a predicate act that's added and apply it

10  backwards.

11          And as long as there is one predicate act after the

12  time that it is implemented, it can also roll backwards, and it

13  does not violate the ex post facto laws.

14          THE COURT:  Which act is timely?

15          MS. FEGAN:  As long as there is one timely

16  racketeering act, you can also look back to old acts that might

17  not have been racketeering at the time.

18          THE COURT:  It's a pattern.  So that's the way you get

19  around the statute.

20          MS. FEGAN:  That's correct, your Honor, with respect

21  to Miramax.

22          MR. PUTNAM:  If the Court would look at the briefing

23  on Snowden which they're relying on to see how it does not in

24  fact rely on it.

25          THE COURT:  Tell me about it.

1          MR. PUTNAM:  I'm trying to remember.  I'll look real

2     quickly if you'll let me, your Honor.

3          If you look at the case they rely on, that's looking

4     at the original, going back to the original RICO statute.  So

5     if you look at that, it doesn't apply to the statute that's

6     actually in play here.  So it absolutely does not apply here.

7          So this idea of relating back, and moreover, in terms

8     of Miramax, there actually, your Honor, is no later RICO act

9     they talk about in terms of Miramax within the sex trafficking.

10    So it does not relate back, the way it was noted.

11         May I continue to the two other predicate acts?

12         THE COURT:  Yes.

13         MR. PUTNAM:  In terms of the two other predicate acts,

14    in terms of Miramax, for witness tampering, your Honor, you had

15    indicated at the last hearing that you thought witness

16    tampering was out because of the idea that there was no

17    official proceeding, and I think that remains true here.

18         They have not alleged any official proceeding for

19    witness tampering.  There is no potential witness to tamper

20    with.  That's true for I believe everyone involved here, but

21    it's certainly true for Miramax, as well as Sarnoff and the

22    outside directors.

23         I'd go further in terms of the relevance of that for

24    the outside directors which is the idea that also -- there was

25    an idea that all they say about tampering with witnesses,

1    your Honor, is they talk about this idea of Black Cube and this

2    spy network.  They did not do anything to show that the outside

3    directors had anything to do with that.

4          As you also noted last time, Your Honor, you indicated

5    that if you're going to have a predicate act, you're going to

6    have to specifically indicate as to each of the defendants, and

7    thereby each of the outside directors, how they participated in

8    some way.  There is nothing as to witness tampering that goes

9    to any of that.

10          THE COURT:  There was an association, and the

11   enterprise is defined as the Harvey Weinstein sexual

12   enterprise, some name like that.  It could become an enterprise

13   if there is some commonality of purpose or some commonality of

14   membership and a continuous program.  I think for our purposes,

15   that may be satisfied.

16          So if one is associated with the enterprise, the

17   pattern of racketeering activity can be performed by any member

18   of the association.  There is enterprise liability potentially

19   to business or property by each and all the members who are

20   associated with the enterprise.  So I don't know that I accept

21   what you're saying.

22          MR. PUTNAM:  But, your Honor, here is the thing about

23   enterprise which is true throughout all of the case law.  If we

24   go to the idea of enterprise, there has to be a connection

25   between each of the entities and what the enterprise ostensibly

1   is.  Here --

2           THE COURT:  You know how it's defined.  It's a strange

3   definition, but it's defined in terms of Harvey Weinstein's

4   sexual proclivities, the organization that was created to

5   support --

6           MR. PUTNAM:  To support his sexual activities.

7           THE COURT:  Yes.

8           MR. PUTNAM:  Your Honor, if you go back and look as to

9   the outside directors, there is no connection made in the

10  complaint anywhere as to the outside directors and the

11  furtherance --

12          THE COURT:  The argument is that they're not

13  associated with the enterprise.

14          MR. PUTNAM:  Exactly.  With the enterprise as

15  indicated.  You can't just say generally all these entities are

16  part of the enterprise and then not specifically argue as to

17  how each is connected to another entity within the furtherance

18  of that enterprise.

19          THE COURT:  What's your argument, Ms. Fegan?

20          MS. FEGAN:  Your Honor, we do specifically allege how

21  each of the directors is connected, if that's where we're

22  focusing.  In our complaint, we did not replead.  We provided a

23  specific section for each individual director, as well as a

24  separate section about what the board did collectively.  But

25  with respect to knowledge and participation, we specifically

1    pled it.

2          We've also, with respect to the directors,

3    specifically talked about mail and wire fraud.  And what we've

4    done here, I list all of the paragraph numbers in footnote 250

5    of our brief, but we specifically show all the different

6    kinds -- and there are dozens -- of allegations about how the

7    mails and wires were used to ensure that he stayed in power, to

8    ensure that it continued to be covered up, to ensure that

9    basically nobody knew what he was doing because it would cause

10   the fall of TWC which is what ultimately happened.

11         So, your Honor, for purposes of pleading, we have

12   absolutely taken this Court's instructions to ensure that we

13   have specifically delineated with respect to each individual

14   defendant their participation.

15         Of course when the board acted together, we also talk

16   about board meetings collectively, but we're very specific

17   about who was on the board.

18         THE COURT:  I have your two arguments.  Thanks.  Let's

19   talk about statue of limitations.

20         MS. SERPE:  Your Honor, may I be heard briefly with

21   respect to Mark Gill.  Sylvia Serpe.

22         THE COURT:  Yes.

23         MS. SERPE:  Your Honor, Mark Gill was the president of

24   Miramax way back when, from 1994 to 2002.  And I just want to

25   briefly take us back to the basics because this is a very

1   serious allegation of RICO, of fraud.  As we know, RICO and

2   fraud allegations must be alleged with particularity, and that

3   is especially not true for someone like Mr. Gill.

4        I think the reasons behind particularity are worth

5   very quickly just going through.  First of all, they're to

6   protect individuals against the harm to their reputations.

7   Second of all, it's to give people like Mr. Gill notice of what

8   they're actually being alleged to have done wrong.  And third,

9   it's to inhibit the filing of a complaint as a mere pretext for

10  discovery for unknown wrongs.  And that all comes from the

11  Airlines case which I cite at page 3 of the Mark Gill case.

12       THE COURT:  Mr. Gill was alleged to be associated with

13  the enterprise.

14       MS. SERPE:  There are no allegations specific to

15  Mr. Gill with respect to RICO.  There is no predicate act --

16       THE COURT:  The entire board.

17       MS. SERPE:  He was the president of Miramax.  He is

18  not alleged to have engaged in sex trafficking.  He is not

19  alleged to have tampered with any witness.

20       THE COURT:  Ms. Fegan.

21       MS. SERPE:  And he's not alleged to have committed any

22  wire fraud.

23       THE COURT:  Ms. Fegan, what's the paragraph I should

24  look at?

25       MS. FEGAN:  Your Honor, I will have to look at a

1    specific paragraph.  I can tell you the quotes that I have with

2    respect to him that we allege in our complaint.

3              THE COURT:  Go ahead.

4              MS. FEGAN:  We do allege that he was the president of

5    Miramax.  He has admitted -- and this is his quote -- that

6    Weinstein's treatment of women was "the biggest mess of all."

7    He admitted that if a female executive was asked to go to a

8    meeting solo, she and a colleague would generally double-up so

9    as not to be alone with Mr. Weinstein.

10             We allege that he was engaged in mail and wire fraud

11   because he was engaged in the coverup of letting this happen

12   internally.  Your Honor, we cannot know under 9(b) the specific

13   times he used the fax machine and the specific emails he sent,

14   and that will come out in discovery.  But we do know, based on

15   his admissions and the quotes that we have in the complaint,

16   that he knew.  He covered it up.

17             THE COURT:  I think that's enough of an allegation,

18   Ms. Serpe.

19             MS. SERPE:  Respectfully, your Honor, that knowledge

20   is not in the particularity requirements which is required for

21   a civil RICO which is very serious.

22             THE COURT:  I think it's enough.

23             MS. SERPE:  Thank you.

24             MR. PUTNAM:  Your Honor, could I just state one thing.

25   I won't even get up.

1              THE COURT:  I've heard.

2              MR. SHILOH:  Your Honor, I'd like to address the

3     predicate acts on behalf of Harvey Weinstein.

4              THE COURT:  Yes.

5              MR. SHILOH:  Your Honor, with respect to the sex

6     trafficking claim we addressed earlier, we don't believe that

7     there was a commercial exchange.  If we adopt Judge Sweet's

8     opinion, the entire plaintiffs' employment bar would have to

9     amend all of their complaints if we apply his reasoning.

10             Moving on to the witness tampering, there was no

11    official proceeding.  With respect to the mail fraud, in

12    reading the transcript --

13             THE COURT:  Don't repeat arguments that were already

14    given.

15             MR. SHILOH:  Yes, your Honor.  With respect to the

16    wire and mail fraud component of predicate acts, there is a

17    heightened pleading standard under 9(b).  Going through the

18    allegations found --

19             THE COURT:  The allegation is that the people were

20    enticed to come to hotel rooms with a promise of jobs.

21             MR. SHILOH:  However, when alleging the specific

22    predicate acts by use of mail and wire fraud, they're supposed

23    to set forth those misrepresentations.  There are no

24    misrepresentations contained in the complaint, your Honor.

25             THE COURT:  That's the misrepresentation, the

 1    misrepresentation of the purpose is the enticement.  It's done

 2    by fraud, come to my hotel room to discuss a part.

 3            MR. PUTNAM:  But, your Honor, the who, what, where is

 4    not alleged.  The only basis is they're relying on a magazine

 5    article for the basis of their complaint.

 6            THE COURT:  It's sufficiently alleged at this point.

 7    Thank you.  Stay up for statute of limitations.

 8            MR. SHILOH:  Yes, your Honor.

 9            THE COURT:  Are you going to do that, or is someone

10    else going to do that?

11            MS. DAVIS:  Good afternoon, your Honor.  Abbey Davis

12    of Skadden, Arps.

13            Your Honor, I want to start with the RICO statute of

14    limitations here.  As you're well aware, it's a four-year

15    statute of limitations.  What plaintiffs have alleged here and

16    what they've argued in their opposition is that they need to

17    have known the full extent of this alleged RICO enterprise in

18    order for the statute of limitations to begin running.

19            So what they've argued in their opposition is that

20    that did not happen until 2017.  However, as Ms. Fegan pointed

21    out correctly earlier, paragraph 830 of the complaint lays out

22    in detail in subparagraphs for each plaintiff the alleged RICO

23    injury for each plaintiff.

24            Setting aside whether those allegations are sufficient

25    to allege RICO injuries, one thing becomes clear.  All of those

1    subparagraphs refer back without internal citations to earlier

2    parts of the complaint.

3         And if you look at the allegations in the earlier

4    parts of the complaint, all of those alleged RICO injuries took

5    place in or around 2011 or well before.  That means that the

6    RICO statute of limitations began to run at that time.

7         What Ms. Fegan had argued in prior oral argument for

8    the motion to dismiss originally is that the plaintiffs could

9    not have known the reason that they were "blacklisted" at the

10   time of these alleged RICO injuries.

11        However, the allegations in the complaint belie that

12   assertion.  We can walk through plaintiff by plaintiff.  For

13   Ms. Geiss, at paragraph 250 of the complaint:  "She concluded

14   that she could not perform sexual acts with Weinstein in

15   exchange for a career."

16        That is certainly knowledge or at least inquiry notice

17   that any harm to her career was caused by Harvey Weinstein and

18   her decision not to engage sexually with him.

19        Moving on next to Ms. Thomas.

20        THE COURT:  That's not an allegation of damage though

21   in 250.

22        MS. DAVIS:  Well, her allegation of damage,

23   your Honor, is that she lost a three-film deal and other

24   opportunities at TWC because of her unwillingness to enter into

25   this relationship with Mr. Weinstein.  And the fact that she

1    alleges --

2            THE COURT:  Well before the four-year period.

3            MS. DAVIS:  Exactly, your Honor.  So moving on next --

4            THE COURT:  What should I do with this blacklisting

5    argument that the plaintiffs discovered in 2017?

6            MS. DAVIS:  Well, your Honor, the problem with that

7    argument is that all of these plaintiffs within specific

8    paragraphs of the complaint allege that they either knew or

9    were told by Mr. Weinstein or others in the entertainment

10   industry or were at least on inquiry notice that any harm to

11   their careers was going to be caused by Mr. Weinstein and by

12   their unwillingness to enter into these relationships with

13   Mr. Weinstein.

14           Your Honor, I'd like to walk you through them if I

15   may.

16           THE COURT:  Okay.

17           MS. DAVIS:  Ms. Thomas.  Ms. Thomas was informed that

18   she did not receive a nanny job in 2008 shortly after the

19   meeting.  The specific allegation that I want to focus on is in

20   paragraph 263:  "A few days --"

21           THE COURT:  Give me a moment to find the paragraph.

22           MS. DAVIS:  Yes, your Honor.

23           THE COURT:  Okay.

24           MS. DAVIS:  So "A few days after that interview to

25   become Mr. Weinstein's nanny, she was informed that she did not

JDRYGEIC

1    get the job because she was an actor.  However, the fact that

2    Ms. Thomas was an actor was known to the assistants and

3    Weinstein before they interviewed her.  The reason Thomas was

4    not hired was because she did not respond to Weinstein's

5    propositions."

6         So she knew at the time in 2008 that the reason she

7    did not get that job was because she was unwilling to consent

8    to A sexual engagement with Mr. Weinstein.  So that's

9    knowledge.  It's not even just inquiry notice there.

10        MS. FEGAN:  Your Honor, may I respond to that on that

11   person?

12        THE COURT:  Why don't you take a note when Ms. Davis

13   finishes.

14        MS. FEGAN:  Okay.  Thank you.

15        MS. DAVIS:  Next, your Honor, moving on to the

16   subparagraph C of paragraph 830 which resolves around

17   Ms. Thompson.

18        Ms. Thompson alleged that --

19        THE COURT:  What paragraph?

20        MS. DAVIS:  If you want to look starting at paragraph

21   298 of the complaint.  She is allegedly here reporting the

22   alleged assault with Mr. Weinstein in 2011 because "she knew

23   that Weinstein could and would destroy her."  And a further

24   allegation of knowledge appears --

25        THE COURT:  So the cause of action arose in --

 1          MS. DAVIS:  2011.  There is a further allegation of

 2    knowledge, your Honor, at paragraph 271.  Weinstein "made clear

 3    that she had to play if she wanted his business."

 4          At paragraph 298:   "She knew that Weinstein could and

 5    would destroy her if she complained about his sexual

 6    misconduct."  So, again, knowledge or at least a storm warning,

 7    which is all that's required to start the clock running on a

 8    statute of limitations for a RICO claim.

 9          Next Ms. Gomes.  She alleged that she had an

10    interaction with Mr. Weinstein in 2000.  This is 830d. of the

11    complaint.  If you compare that to paragraph 202, which is her

12    alleged RICO injury, that she never worked with Miramax or

13    Weinstein again, knowledge is alleged at paragraph 199.

14          That paragraph alleges that at the time of the

15    assault:  "She was devastated that Mr. Weinstein's interest in

16    her had not been genuine and that she would never be part of

17    the Miramax talent pool."

18          So she knew -- and she alleges that she knew -- back

19    in 2000 that it was Mr. Weinstein and her failure to engage

20    with him sexually that would lead to this alleged harm to her

21    career.

22          THE COURT:  Let me stop you there, Ms. Davis.

23          Ms. Fegan.

24          MS. FEGAN:  Your Honor, several things.  Let's start

25    with Ms. Thomas who was the nanny.  We're not seeking recovery

 1   for the fact that she did not get the nanny job.  We're seeking

 2   recovery for the fact that in November 2017, she was told that

 3   she was blacklisted in the industry because of Mr. Weinstein --

 4            THE COURT:  What Ms. Davis said, reading out your

 5   allegations, is that she knew that well before.

 6            MS. FEGAN:  Your Honor, she knew she didn't get the

 7   nanny job.  She didn't know that he was going to prevent her

 8   from getting other parts and auditions.

 9            When she went back -- when she was told in

10   November 2017 that she had been blacklisted, she went back and

11   realized that she had an 86 percent drop in auditions.  She

12   could not have known.

13            THE COURT:  She knew the next year.

14            MS. FEGAN:  Your Honor, she didn't.  This is over

15   time.  That's why we pled -- we specifically pled that over

16   time.

17            THE COURT:  Because normally she had auditions, and

18   then auditions stopped.

19            MS. FEGAN:  The auditions didn't completely stop.  She

20   did get some auditions.  She didn't know why they stopped.

21   Your Honor, what they are suggesting is that every time a woman

22   doesn't get a part in the industry, they would have to file a

23   lawsuit.  They wouldn't even be able to allege on information

24   and belief that it was because they had been blacklisted.

25            In fact, your Honor, the Second Circuit said in Cohen

1  v. S.A.C. Trading Corp., 711 F.3d 353:  "Mere suspicions and

2  distrust do not trigger a duty to investigate under RICO.

3  In fact, it does not follow that reasonable diligence would in

4  all circumstances result in discovery of the underlying facts.

5  Distrust is not enough."

6       Did these women distrust Mr. Weinstein based on the

7  fact that he assaulted them; that he had enticed them to his

8  rooms or his office and assaulted them?  Of course they did.

9  Does that mean for 20 years every time they don't get a part

10  they have to file a lawsuit?

11       THE COURT:  Does that mean that it's only in the 20th

12  year that they discovered this?

13       MS. FEGAN:  They had no idea that he had hired spies;

14  that he had gone to producers and told them off the record,

15  after these women got parts, to withdraw the part.  They did

16  not know that he had gone to casting directors and said, don't

17  cast them.

18       In fact, there are legitimate parts that they probably

19  didn't get, but what we have alleged here, your Honor, is not

20  that --

21       THE COURT:  The question is whether there was a

22  pattern of deprivation of opportunity following her rejection

23  of Weinstein.  You have to wait for the conclusion of the

24  period to have a cause of action.

25       MS. FEGAN:  You have to know that the deprivation of

1    that part was due to, at least on information and belief,

2    Mr. Weinstein.  If you look at actually the Cohen case --

3              THE COURT:  But there's no other known cause.

4              MS. FEGAN:  Well, that's not correct, your Honor.

5    There certainly could be parts that they didn't get because

6    they weren't right for the part.  We acknowledge that.

7              THE COURT:  You're talking about auditions.  They

8    didn't even get auditions.

9              MS. FEGAN:  For one particular person, that's true.

10   We also allege that for other people, they were promised

11   particular parts.  They were told they had particular parts,

12   and then those offers were withdrawn.  And we now allege --

13             THE COURT:  Last word, Ms. Davis.

14             MS. DAVIS:  Your Honor, I think what you were pointing

15   out is exactly the problem here.  You don't need to know the

16   full extent of a harm or the full extent of any alleged RICO

17   scheme in order to start the limitations period running.  That

18   simply is not what is required under the law here.

19             All you need is inquiry notice or knowledge, storm

20   warnings, that put you on notice that your alleged RICO injury

21   was caused because of this RICO violation.  And all of the

22   alleged RICO injuries, if you do look at paragraph 830 of the

23   complaint, are clearly laid out.

24             They all refer back to the specific paragraphs where

25   each plaintiff, each of which makes clear, that there was

1    notice, actual knowledge, or inquiry notice that all of these

2    purported RICO injuries were caused by the plaintiffs'

3    unwillingness to engage with Mr. Weinstein.

4         I just want to make one more allegation clear to the

5    Court.  If you look at paragraph 9 in the complaint, the

6    complaint alleges that:  "At all times, plaintiffs and the

7    class operated under duress and the credible and objective

8    threat of being threatened, deceived, or blacklisted by

9    Mr. Weinstein."  All of the class, all of the plaintiffs at all

10   times operated under the belief that they would be blacklisted.

11        THE COURT:  Thanks very much, Ms. Davis.

12        MS. DAVIS:  Thank you, your Honor.

13        THE COURT:  Aren't you glad you moved up to the jury

14   box?

15        MS. DAVIS:  I am, your Honor.

16        MS. FEGAN:  Your Honor, may I make one point just very

17   quickly?

18        THE COURT:  Yes, you may.

19        MS. FEGAN:  With respect to Ms. Thompson, I just want

20   to be clear that we allege that her RICO injury with respect to

21   the interference by Mr. Weinstein --

22        THE COURT:  Say that again, please.

23        MS. FEGAN:  Sure.

24        Ms. Thompson was contacted by Mr. Weinstein's criminal

25   lawyers in October 2017, and they solicited her information.

 1    So I just want to be clear with respect to her --

 2              THE COURT:  What's the harm there?  She's a witness

 3    presumably.

 4              MS. FEGAN:  No.  They contended that they would

 5    represent her.  They entered into an attorney-client privilege

 6    relationship.  Under that guise, they solicited information

 7    from her.  They told her not to worry about her statute of

 8    limitations.

 9              So that kind of information isn't in here.  The only

10    reason I bring it up is to make very clear that that is clearly

11    within the statute of limitations.

12              THE COURT:  I don't think that's a harm.  One minute,

13    please.

14              (Pause)

15              THE COURT:  Okay, folks.  Thank you for your

16    arguments.  There are a lot of issues under state law, but I

17    think they were well briefed, and they were covered also by

18    Judge Engelmayer.  So I don't think I need any further

19    arguments on that.

20              Thank you all for coming down and presenting your

21    arguments in such a cogent fashion.

22              MS. FEGAN:  Thank you, your Honor.

23              (Adjourned)

24

25