UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                               :
LOUISETTE GEISS et al.,                                        :
                                                               :
                                        Plaintiffs.            :
                                                               :
              v.                                               :
                                                               :
THE WEINSTEIN COMPANY HOLDINGS LLC,                            :
et al.,                                                        :
                                                               :
                                        Defendants.            :
                                                               :
------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED: 4/18/19

**ORDER AND OPINION
DENYING IN PART AND
GRANTING IN PART
DEFENDANTS' MOTIONS TO
DISMISS**

17 Civ. 9554 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

This action by ten plaintiffs—Zoe Brock, Caitlin Dulany, Louisette Geiss, Larissa Gomes, Katherine Kendall, Nannette Klatt, Melissa Sagemiller, Sarah Ann Thomas, Melissa Thompson, and Jane Doe—individually and on behalf of a class, against Harvey Weinstein ("H. Weinstein"), his former companies, and certain officers and directors of those companies, charges that H. Weinstein sexually harassed and assaulted them between 1993 and 2011, and that the other defendants knew of, facilitated, and covered up his misconduct.  Defendants move to dismiss.

The First Amended Complaint ("FAC") contains eighteen counts, including four federal claims for violations of the Trafficking Victims Protection Act ("TVPA") (Counts I and II) and Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts V and VI), and fourteen state claims for negligent supervision and retention (Counts III and IV), battery (Counts VII and VIII), assault (Counts IX and X), false imprisonment (Counts XI and XII), intentional infliction of emotional distress (Counts XIII and XIV), negligent infliction of emotional distress

(Counts XV and XVI), and ratification (Counts XVII and XVIII). The state law claims fall into two categories: (i) allegations against Miramax Film NY LLC ("Miramax"); The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc. (together, "Disney"); and certain officers of these companies (together with Miramax and Disney, the "Miramax Defendants") for conduct occurring before September 30, 2005; and (ii) allegations against The Weinstein Company Holdings, LLC ("TWC") and certain officers and directors of TWC (together with TWC, the "TWC Defendants") for conduct occurring after September 30, 2005.

Defendants move to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (ECF Nos. 199, 239, 241, 246, and 254). For the reasons discussed below, H. Weinstein's motion to dismiss the TVPA claim against him (Count I) is denied. All other claims (Counts II-XVIII) are dismissed against all defendants, including H. Weinstein: the TVPA participation claims (Count II) fail to allege receipt of a benefit from participation in sex trafficking, the RICO claims (Counts V and VI) fail to allege injury to business or property caused by a RICO violation, and the state law claims (Counts III, IV, VII-XVIII) are untimely under the applicable statutes of limitations.

## BACKGROUND

### I.     Factual Background

#### a.   Harvey Weinstein's Film Empire

H. Weinstein and his brother, Robert Weinstein ("R. Weinstein"), co-founded Miramax in the late 1970s. FAC ¶ 60. Miramax grew from a small film-distribution company to become, by 1989, "the most successful independent [film] studio in America." *Id.* at ¶ 60. In

1993, the Weinstein brothers sold Miramax to Disney for $80 million and retained their leadership of Miramax following the acquisition. *Id.* at ¶ 61. Miramax released its first blockbuster film, *Pulp Fiction*, in 1994. *Id.* at ¶ 61. Many of the company's subsequent films achieved great commercial and critical success. *Id.* at ¶ 62.

On September 30, 2005, the Weinstein brothers left Miramax and Disney. *Id.* at ¶ 63. Their new company, TWC, had its own run of major film and television successes. *See* FAC, Ex. A. In the wake of the revelations concerning H. Weinstein's alleged misconduct, TWC filed for bankruptcy. FAC ¶ 758.

H. Weinstein's success put him among the most powerful and influential executives in the entertainment industry. *Id.* at ¶ 10. That power and influence included the "ability to make or break . . . careers," which he allegedly used to abuse and silence numerous young women who sought his help in advancing their careers. *Id.* at ¶ 65.

### b. Public Revelation of Accusations Against Harvey Weinstein

On October 5, 2017, *The New York Times* published an article revealing multiple allegations of sexual harassment against H. Weinstein. *Id.* at ¶ 11. In the wake of the article's publication, four TWC board members resigned and the board voted to terminate H. Weinstein's services. *Id.* at ¶¶ 433-437. Subsequent reporting, most notably in *The New York Times* and *The New Yorker*, described a pattern of sexual assaults and cover-ups by H. Weinstein, assisted or condoned by members of his inner circle.

### c. Plaintiffs' Allegations

Plaintiffs allege that H. Weinstein's "predatory and sexually harassing behavior toward women," *id.* at ¶ 84, followed a consistent pattern: H. Weinstein set up meetings with

women under the guise of assisting them with their careers, isolated them after they had arrived

for the meetings, and assaulted, battered, or attempted to assault them. *Id.* at ¶¶ 89-91. H.

Weinstein allegedly threatened and/or caused harm to the careers of women who refused his

advances, including by having them "blacklisted." The FAC further alleges that certain

employees of Miramax, Disney, and TWC had knowledge of and, in some cases, facilitated or

covered up Weinstein's misconduct.

Six plaintiffs—Katherine Kendall, Nannette Klatt, Caitlin Dulany, Zoe Brock,

Larissa Gomes, and Melissa Sagemiller (together, the "Miramax Subclass")—allege that H.

Weinstein assaulted them during his time at Miramax (1993 to 2005).[1] Four plaintiffs—

Louisette Geiss, Sarah Ann Thomas, and Melissa Thompson (together, the "TWC Subclass")

allege that H. Weinstein assaulted them during his time at TWC (2005 to 2017), with the most

recent assault alleged to have occurred in 2011.

### i. Allegations of the Miramax Subclass

### 1. Nannette Klatt

In 1993 or 1994, Klatt had an interview for an audition on the first floor of a

building also occupied by Miramax. FAC ¶ 93. H. Weinstein walked past the room where Klatt

was interviewing and asked her interviewer to step outside. *Id.* at ¶ 94. The interviewer returned

and told Klatt that H. Weinstein wanted to meet with her in his office about a role in a film he

---

[1] There is also a Jane Doe plaintiff, as to whom the FAC alleges misconduct spanning H. Weinstein's time at both Miramax and TWC. "The title of [a] complaint must name all the parties." Fed. R. Civ. P. 10(a). "This requirement, though seemingly pedestrian, serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188-89 (2d Cir. 2008). The allegations relating to Jane Doe are stricken, with leave to show why she is entitled to proceed anonymously under the applicable standard. *See id.* at 190.

was working on. *Id.* at ¶ 95. At their meeting that night, H. Weinstein had Klatt read from a script, told her she would get the part, and told her he might have other projects for her as well. *Id.* at ¶ 97. At the end of the meeting, Weinstein asked to see Klatt's breasts. *Id.* at ¶ 98. When Klatt refused, H. Weinstein became enraged, told her she would "never work again," *id.* at ¶ 99, and "corralled her" into a dark stairwell. *Id.* at ¶ 100. Klatt alleges that she suffered emotional and physical distress, and lost the part H. Weinstein had offered, other opportunities at Miramax and TWC, and other professional opportunities as a result of the incident. *Id.* at ¶ 101.

### 2. Katherine Kendall

In 1993, Kendall met H. Weinstein about parts in two Miramax movies, which H. Weinstein told her she would get. *Id.* at ¶ 103. After the meeting, H. Weinstein invited Kendall to a movie screening and told her he would introduce her to other people there. *Id.* at ¶ 104. Instead, H. Weinstein took Kendall to a public movie theater, "bullied" Kendall into coming up to his apartment after the movie, trapped her, and attempted to assault her. *Id.* at ¶¶ 107-113. H. Weinstein called Kendall several times after the assault. *Id.* at ¶ 114. Kendall was traumatized by the assault and had to "remove herself completely from the entertainment industry. *Id.* at ¶ 115. In the summer of 2017, Kendall was contacted by agents of H. Weinstein as part of an attempt to surveil her and other "targets." *Id.* at ¶¶ 116-124.

### 3. Caitlin Dulany

In 1996, approximately two months after Dulany rejected an attempt by H. Weinstein to seduce her in her apartment, H. Weinstein invited Dulany to the premier of a Miramax film, followed by a benefit dinner. *Id.* at ¶ 135. After the dinner, H. Weinstein's assistant told Dulany there was a car outside waiting to take her to the after-party. *Id.* at ¶ 136.

Instead, Dulany ended up alone with H. Weinstein in his hotel room, where he imprisoned and sexually assaulted her. *Id.* at ¶¶ 138-139. Dulany alleges that she experienced personal and professional problems as a result of the assault. *Id.* at ¶¶ 146-150.

### 4.  Zoe Brock

In 1998, H. Weinstein, accompanied by Rick Schwartz of Miramax, sat next to Brock at a group dinner at which Fabrizio Lombardo, another Miramax employee, was also present. *Id.* at ¶ 153. After the dinner, H. Weinstein, Schwartz, and Lombardo separated Brock from her agent and friends, and took her to Weinstein's hotel room for a drink. *Id.* at ¶ 155. Shortly thereafter, Schwartz and Lombardo left the hotel room. *Id.* H. Weinstein attempted to assault Brock, who locked herself in the bathroom. *Id.* at ¶¶ 157-158. After H. Weinstein stopped threatening her, Brock left the bathroom and took a car back to the area where the dinner had taken place. *Id.* at ¶ 159. On the way, H. Weinstein told Brock he wanted to help her with her career. *Id.* The next day, at a private film screening, H. Weinstein entered the theater and sat directly behind Brock with his hand on her chair for the entire movie. *Id.* at ¶ 163. Brock alleges that she suffered emotional and physical distress as a result of the incident, and never received any work or professional support from H. Weinstein. *Id.* at ¶ 25.

### 5.  Melissa Sagemiller

In the summer of 2000, Sagemiller was acting in a Miramax film. *Id.* at ¶ 165. During production, one of H. Weinstein's assistants, who Sagemiller believes was Barbara Schneeweiss, told her to go to H. Weinstein's hotel room for a "very important" meeting. *Id.* at ¶ 167. When she arrived, H. Weinstein demanded a massage and a kiss. *Id.* at ¶ 170. After Weinstein threatened her career, Sagemiller ultimately submitted to a forcible kiss. *Id.* at ¶ 172.

6

The following day, H. Weinstein had Sagemiller's luggage transferred to his private plane without her consent, forcing her to travel with him. *Id.* at ¶ 175. Sagemiller alleges that she suffered emotional and physical distress as a result of the assault and believes she was denied several acting roles because she refused H. Weinstein. *Id.* at ¶¶ 177-179.

### 6.  Larissa Gomes

In 2000, when Gomes was in Ontario, Canada to act and dance in a Miramax movie, H. Weinstein told her he was impressed by her and wanted to meet with her. *Id.* at ¶ 180. At a meeting in H. Weinstein's hotel room with Gomes, the film's music director, and a Miramax executive, H. Weinstein expressed interest in having Gomes appear in future Miramax films to be shot in Canada. *Id.* at ¶ 185. At a subsequent meeting in his hotel room, H. Weinstein told Gomes she would be "perfect" for two upcoming Miramax productions. *Id.* at ¶ 188. Shortly thereafter, H. Weinstein demanded a massage and, when Gomes refused, H. Weinstein sexually assaulted her. *Id.* at ¶¶ 194-198. The assault allegedly "damaged Gomes physically and emotionally, and it damaged her career." *Id.* at ¶ 202.

## ii.  Allegations of the TWC Subclass

### 1.  Louisette Geiss

At the 2008 Sundance Film Festival in Park City, Utah, H. Weinstein asked Geiss about her career and proposed to meet her in the lobby of a hotel. *Id.* at ¶ 244. When the lobby bar closed, H. Weinstein invited her to his office inside the hotel, promising that he would not touch her. *Id.* at ¶¶ 244-245. Once inside, H. Weinstein told her he would "greenlight" her script if she watched him masturbate, and assaulted her. *Id.* at ¶¶ 247-249. In addition to suffering emotional and physical distress, Geiss lost a "three-film deal and other opportunities at

TWC" as a result of her refusal to work with and perform sexual acts for H. Weinstein. *Id.* at ¶ 251. Barbara Schneeweiss contacted her in 2017 "so that she would not speak to the press." *Id.* at ¶ 253.

### 2.  Sarah Ann Thomas (a/k/a/ "Sarah Ann Masse")

In 2008, H. Weinstein assaulted Thomas at his Connecticut home while she was interviewing for a position as a nanny. *Id.* at ¶ 261. As a result of the incident, Thomas suffered emotional distress, "manifest[ing] into physical symptoms," and was blacklisted from acting roles. *Id.* at ¶¶ 264-265.

### 3.  Melissa Thompson

On September 29, 2011, Thompson met with H. Weinstein at TWC's office in New York City to pitch an enterprise video platform. *Id.* at ¶ 268. H. Weinstein began touching her inappropriately during the meeting, and ultimately pinned her against a refrigerator. *Id.* at ¶¶ 273-277. Later that day, H. Weinstein took Thompson into a hotel room and raped her. *Id.* at ¶¶ 284-294. In October 2017, Thompson allegedly was targeted by agents working for H. Weinstein's legal team, who sought and obtained information from her about her claims against H. Weinstein. *Id.* at ¶¶ 302-312. These incidents "caused Thompson significant additional distress and fear, as well as damage to her business and property . . . ." *Id.* at ¶ 323.

### d.  Defendants

#### i.  Corporate Defendants

##### 1.  Miramax

Miramax is a New York corporation with its principal place of business in California. *Id.* at ¶ 34. H. Weinstein was a founder and co-chairman of Miramax. *Id.* at ¶ 40. Miramax employed, among others, defendants Lombardo and Schneeweiss. *Id.* at ¶ 55, 58.

8

According to the FAC, Miramax continued to work with Weinstein and TWC after Weinstein left to found TWC in 2005. *Id.* at ¶ 64.

### 2. Disney

The Walt Disney Company and Disney Enterprises, Inc. are Delaware corporations. *Id.* at ¶¶ 36, 38.  Buena Vista International, Inc., a subsidiary of Disney Enterprises, Inc., is a California corporation. *Id.* at ¶ 39.  Each of the Disney entities has its principal place of business in California. *Id.* at ¶¶ 38-39.  The FAC alleges that H. Weinstein had three employment agreements with Disney-affiliated entities, which together spanned the period from 1993 to 2005. *Id.* at ¶¶ 36, 38.  Disney allegedly paid the salaries of defendant Lombardo and other individuals who helped to facilitate the assaults. *Id.* at ¶ 39.

### 3. TWC

TWC is a Delaware LLC with its principal place of business in New York. *Id.* at ¶ 33.  Weinstein founded TWC and was co-chairman of the company until 2017. *Id.* at ¶ 40.  TWC employees allegedly procured erectile dysfunction shots for Weinstein, lured women into one-on-one meetings with him, and cleaned up after his assaults. *Id.* at ¶¶ 441-42.  TWC employed Gil and Schneeweiss.  TWC entered into employment contracts with H. Weinstein in 2005, 2010, and 2015. *Id.* at ¶¶ 423-25.

#### ii. Individual Defendants

Three individual defendants—H. Weinstein, R. Weinstein, and Barbara Schneeweiss—worked at both Miramax and TWC, and face counts from both subclasses of plaintiffs.  Schneeweiss began working at Miramax in 1996 and moved to TWC in 2005. *Id.* at ¶ 386.  The FAC alleges that R. Weinstein was aware of his brother's sexual misconduct,

authorized Miramax and TWC to settle claims relating to that misconduct, and personally paid one victim and the colleague who reported the assault. *Id.* at ¶ 351.

   The Miramax Subclass brings claims against five additional defendants. Of them, four are former Miramax officers: Nancy Ashbrooke (Vice President – Human Resources), Mark Gill (Head of Marketing), Fabrizio Lombardo (described as H. Weinstein's European "handler"), and Rick Schwartz (Senior Vice President – Production). The fifth, Michael Eisner, was the Chairman and Chief Executive Officer of Disney.[2]  The TWC subclass brings claims against eleven additional defendants, including nine former TWC directors—Tarak Ben Ammar, James Dolan, Paul Tudor Jones, Richard Koenigsberg, Marc Lasry, Lance Maerov, Jeff Sackman, Tim Sarnoff, and Dirk Ziff—and two former TWC officers—David Glasser (President and COO) and Frank Gil (Vice President – Human Resources).

   The FAC alleges that each of the individual defendants had knowledge of H. Weinstein's sexual misconduct. It also alleges that all of the individual TWC defendants knew of and/or participated in (i) settlements reached with some of H. Weinstein's victims and (ii) negotiations surrounding H. Weinstein's employment contracts, which made Weinstein partially liable for future settlements or judgments relating to sexual misconduct. It generally alleges that defendants facilitated H. Weinstein's assaults, but its facilitation allegations are non-conclusory with respect to only four defendants:

---

[2] Unlike the other Miramax Defendants, Eisner is not named in the RICO claims (Counts V and VI).

- Frank Gil allegedly authorized a bonus for an employee who procured erectile dysfunction drugs for Weinstein and destroyed evidence relating to Weinstein's abuse in 2017. FAC ¶¶ 626, 631.

- Fabrizio Lombardo, who worked for a European subsidiary of Miramax, allegedly "procured women for Weinstein's pleasure" during Weinstein's trips to Europe. *Id.* at ¶ 404.

- Barbara Schneeweiss allegedly facilitated assaults by scheduling appointments with Weinstein's victims and then moving those appointments to hotel rooms. *Id.* at ¶¶ 640-41.

- Rick Schwartz allegedly "lured" victims, including Brock, to Weinstein's hotel suites, led them to the meeting, and then left. *Id.* at ¶ 398.


## II.    Procedural Background

Plaintiffs filed their original complaint on December 6, 2017 (ECF No. 1). Defendants moved to dismiss, and I held oral argument on September 12, 2018. I dismissed the complaint with leave to replead and ordered that the two related cases—the *Geiss* class action, involving the TWC Subclass, and the *Dulany* class action, involving the Miramax Subclass, then under docket no. 18 Civ. 4857—proceed together via one amended complaint.

Plaintiffs filed the FAC on October 31, 2018 (ECF No. 140). Irwin Reiter, a Vice President at Miramax and then TWC, was dismissed from the lawsuit on December 13, 2018 (ECF No. 182). Defendants again moved to dismiss, and the court held oral argument on those motions on March 13, 2019.

## DISCUSSION

### I.    Standard on a Motion to Dismiss

In ruling on a motion to dismiss, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001), *as amended* (Apr. 20, 2001).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### II.    Sex Trafficking Claims Under 18 U.S.C. §§ 1591, 1595

The TWC Subclass brings claims against H. Weinstein (Count I) and the TWC Defendants (Count II) under the civil remedy created by the TVPA, 18 U.S.C. § 1595(a).  Under that provision, effective December 31, 2008, victims may bring an action against a "perpetrator" or against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" a qualifying offense.[3]

---

[3] The previous version of the statute, enacted in 2003, provided a civil action against only the "perpetrator" of a qualifying offense.  However, a perpetrator can be either a direct violator under 18 U.S.C. § 1591(a)(1), or a participant under 18 U.S.C. § 1591(a)(2), neither of which provisions have changed in any relevant way since 2003.  The 2008 Amendment also introduces the "should have known" language in the civil liability provision, thereby adding a constructive knowledge alternative to the existing actual knowledge standard.  Since this opinion assumes

12

Here, plaintiffs allege that H. Weinstein violated 18 U.S.C. § 1591(a)(1), which applies to direct violators, and that the TWC Defendants violated 18 U.S.C. § 1591(a)(2), which applies to participants.  18 U.S.C. § 1591(a) provides, in relevant part:

> Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . shall be punished . . . .

Under 18 U.S.C. § 1591(e)(3), "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person."  Subsection (e)(4) defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."  Subsection (e)(6) defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity."

### a. Harvey Weinstein

Plaintiffs allege that H. Weinstein enticed women to attend meetings with him by promising them a chance to work for him, and then assaulted them, in violation of 18 U.S.C. § 1591(a)(1).  Weinstein argues that these alleged assaults do not constitute "commercial sex acts" prohibited by the TVPA because they did not result in the exchange of something of value.

---

defendants' actual knowledge of a sex trafficking enterprise, whether the 2003 or 2008 version of the TVPA applies to a given claim is irrelevant.

Two district courts in this district have rejected this argument.  In the first of those cases, Judge Sweet reasoned:

> The opportunity . . . for [an] actress to sit down with [Weinstein] in a private meeting to review her film reel and discuss a promised film role carries value that is career-making and life-changing. The contention, therefore, that [plaintiff] was given nothing of value—that the expectation of a film role, of a modeling meeting, of "his people" being "in touch with her" had no value—does not reflect modern reality."

*Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018).  Judge Engelmayer later denied H. Weinstein's motion to dismiss a similar TVPA claim "[l]argely for the reasons persuasively given" in *Noble*.  *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *22 (S.D.N.Y. Jan. 28, 2019).

I join Judges Engelmayer and Sweet in holding that the TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity.  Accordingly, H. Weinstein's motion to dismiss the TVPA claim against him is denied.

### b.  TWC and the Individual Defendants

Plaintiffs allege that the TWC Defendants participated in H. Weinstein's sex-trafficking venture by helping to facilitate, clean up after, and cover up the assaults, and that they benefited from their participation because it

> ensured that Harvey Weinstein continued to produce movies, ensuring that TWC continued to make money or receive financing, the TWC Directors' investments . . . continued to make money, the Directors and Officers continued to receive the social benefits and power within the film industry, and the TWC Officers continued to receive their paychecks, bonuses and other incentives.

FAC ¶ 756.  They assert that the collapse of TWC following the public revelation of Weinstein's misconduct demonstrates the value the company had been receiving from its participation in the cover-up. *Id.* at ¶ 758.

Defendants argue that plaintiffs have failed to plead the "participation," "benefits," and "venture" elements of 18 U.S.C. § 1591(a)(2).  Although I agree that plaintiffs have failed to adequately allege participation as to nearly all of the TWC Defendants,[4] I focus on plaintiffs' failure to allege any benefits received by defendants from their participation, a deficiency that is fatal to all of plaintiffs' claims under 18 U.S.C. § 1591(a)(2).

Unlike direct perpetrators of sex trafficking, aiders and abettors of sex trafficking are liable under the TVPA only if they knowingly "*benefit*[], financially or by receiving anything of value, from participation in a venture which has engaged in" sex trafficking.  18 U.S.C. §§ 1591(a)(2), 1595(a) (emphasis added).[5]  The participation giving rise to the benefit must be

---

[4] As to most of the Individual Defendants, the only purported participation alleged by the FAC is involvement in the hush payments to Harvey's victims. Participation, however, requires "assisting, supporting, or facilitating" sex trafficking. 18 U.S.C. § 1591(e)(4). Accordingly, involvement in making hush payments to cover up sex trafficking is not sufficient to trigger liability under the TVPA. *See Lawson v. Rubin*, No. 17 Civ. 6404 (BMC), 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018) (holding that lawyer paid by defendant to draft non-disclosure agreements between plaintiffs and perpetrator was not liable under § 1591(a)(1)), *appeal withdrawn*, No. 18-2047, 2018 WL 4945704 (2d Cir. Sept. 17, 2018).

[5] Apart from the constructive knowledge provision, the operative language of the TVPA civil remedy and underlying criminal statute are identical. I therefore consider the "benefits" element to have the same content in both provisions. I note, however, that a Magistrate Judge recently adopted a broader interpretation of "benefits" under section 1595(a). *See Gilbert v. United States Olympic Comm.*, No. 18 Civ. 981 (MEH), 2019 WL 1058194, at *15, 19 (D. Colo. Mar. 6, 2019) (holding that female taekwondo athletes alleging sexual abuse by prominent members of the United States taekwondo community adequately pleaded that USA Taekwondo and the U.S. Olympic Committee received a benefit under Section 1595(a) from their mere relationship with

participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture. *See United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) ("§ 1591(a)(2) targets those who participate in sex trafficking; it does not target [those] who turn a blind eye to the source of their financial sponsorship."). In other words, there must be a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with actual or, in the civil context, constructive knowledge of that causal relationship.

In *Canosa*, the court held that the complaint adequately alleged a causal relationship between the companies' participation in sex trafficking and their purported benefit, *i.e.*, that facilitating H. Weinstein's misconduct "as a means of keeping him happy, productive, and employable" helped the companies "achieve fame and reap financial benefits" by keeping him as an employee. 2019 WL 498865, at *24. Another court permitted a similar TVPA claim to proceed against TWC without discussing the "benefits" element, possibly because plaintiff claimed TWC was liable as a direct participator under 18 U.S.C. § 1591(a)(1). *See Huett v. Weinstein Co. LLC*, No. 2:18 Civ. 6012 (SVW), 2018 WL 6314159, at *2-3 (C.D. Cal. Nov. 5, 2018).

The TWC Defendants undoubtedly benefited from H. Weinstein's continued employment at TWC. His movies and influence generated revenue, and some of that revenue flowed to TWC's officers and directors. The controlling question, however, is whether H. Weinstein provided any of those benefits to TWC *because of* TWC's facilitation of H.

---

one of the perpetrators, who competed for those organizations in the Olympic Games and World Championships).

Weinstein's sexual misconduct. The FAC pleads no facts that would plausibly support such a conclusion. To the contrary, plaintiffs' allegations suggest that H. Weinstein benefited TWC *in spite of* his alleged predations, which caused many women not to work with TWC, diverted company resources toward supervision of H. Weinstein and away from business activities, and exposed TWC to potential liability.

The FAC does not allege that H. Weinstein secured TWC's alleged complicity in his sexual violence as a condition of his employment. In fact, H. Weinstein's employment agreements made conviction for such an offense grounds for termination. Likewise, the FAC does not allege that any directors or officers to whom TWC paid a salary were compensated for their participation in H. Weinstein's assaults.[6] *See Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10 Civ. 4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013) ("The fact that sexual abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds is simply not sufficient to establish a violation of 18 U.S.C. § 1591."); *cf. Ricchio v. McLean*, 853 F.3d 553, 555-56 (1st Cir. 2017) (holding that plaintiff adequately alleged TVPA liability against motel owners and operators who allegedly received rent payments from a guest they knew was holding plaintiff hostage and "grooming her for service as a prostitute"). The FAC therefore fails to state a claim against the TWC Defendants for participation in sex trafficking.

---

[6] One employee, Sandeep Rehal, allegedly received a bonus for procuring erectile dysfunction drugs for Harvey. FAC ¶ 626. Rehal is not named as a defendant, however.

17

### III.   Civil RICO Claims Under 18 U.S.C. §§ 1962(c), (d), 1964(c)

Both subclasses assert RICO (Count V) and RICO conspiracy (Count VI) claims against all defendants except Disney and Eisner.  Although these claims appear to be deficient for several reasons, I focus my analysis on plaintiffs' failure to establish standing under 18 U.S.C. § 1964(c)—a deficiency common to each of the RICO claims against each of the defendants.

"RICO provides a civil remedy to '[a]ny person injured in [her] business or property by' a RICO violation." *Canosa*, 2019 WL 498865, at \*25 (quoting 18 U.S.C. § 1964(c)).  "The phrase 'business or property' . . . exclude[s] personal injuries suffered." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  "The overwhelming weight of authority interprets *Reiter* to exclude the economic consequences of personal injuries." *Zimmerman v. Poly Prep Country Day School*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012) (collecting cases and holding that former students' diminished career opportunities and lost earning potential flowing from personal injuries caused by former coach's sexual abuse were not compensable RICO injuries).

Additionally, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation.*" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985) (emphasis added).  Thus, "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct . . . ." *Id.* (quoting *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985)).  In other words, "a plaintiff 'does not have standing if he suffers an injury that was indirectly (and hence not

18

proximately) caused by the racketeering activity or RICO predicate acts, even though the injury was proximately caused by some non-RICO violation committed by the defendants.'" *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08 Civ. 6150 (PAC), 2010 WL 3026510, at *8 (S.D.N.Y. Aug. 2, 2010) (quoting *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003)).

Plaintiffs allege that defendants' blacklisting caused them to lose professional opportunities in the entertainment industry, including, in some cases, roles in specific productions. FAC ¶ 830. Blacklisting, however, is not a RICO violation. *See* 18 U.S.C. § 1961(1) (listing conduct that constitutes "racketeering activity" under 18 U.S.C. § 1962). Thus, even if, as alleged, defendants were part of an association-in-fact ("the Weinstein Sexual Enterprise") that conspired to commit a pattern of RICO violations against plaintiffs, plaintiffs do not have standing to assert RICO claims against defendants for economic injuries not caused by those RICO violations.

Plaintiffs' other alleged injuries are personal injuries, or economic injuries flowing from those personal injuries. As plaintiffs appear to acknowledge in their brief, they do not have standing to pursue civil RICO claims based on those injuries. Plaintiffs' RICO claims therefore are dismissed.

## IV.    Timeliness of State Law Claims

### a.   Statutes of Limitations

Each subclass brings seven claims under New York law: negligent supervision and retention, civil battery, assault, false imprisonment, intentional infliction of emotional

distress, negligent infliction of emotional distress, and ratification.[7]  The New York limitations

periods are three years for negligence claims, including negligent supervision and retention, and

negligent infliction of emotional distress, N.Y. C.P.L.R. § 214(5), and one year for intentional

torts, including battery, assault, false imprisonment, and intentional infliction of emotional

distress.[8]  N.Y. C.P.L.R. § 215(3).

      The limitations periods for each of these causes of action begin to run from the

date of the injury. *See, e.g., Universitas Educ., LLC v. Bank*, No. 15 Civ. 5643 (SAS), 2015 WL

9304551, at *3 (S.D.N.Y. Dec. 21, 2015) (holding that New York's three-year limitations period

for negligent supervision "begins to run at the time and place of injury"); *Baker v. Bank of Am.,

N.A.*, No. 16 Civ. 488 (AKH), 2016 WL 9409022, at *3 (S.D.N.Y. Oct. 31, 2016) (holding that

the limitations periods for intentional and negligent infliction of emotional distress begin to run

"on the date of the injury"), *aff'd*, 706 F. App'x 43 (2d Cir. 2017); *Tchatat v. City of New York*,

No. 14 Civ. 2385 (LGS), 2015 WL 5091197, at *14 (S.D.N.Y. Aug. 28, 2015) (holding that

"[a]ssault and battery claims alleged under New York law accrue on the date of the alleged

incident of 'offensive touching'" and that "IIED claims, based on harm allegedly incurred from

an assault, accrue on the date of the alleged assault"); *Moreno v. Town of Greenburgh*, No. 13

---

[7] The Miramax Subclass brings Counts III, VII, IX, XI, XIII, XV, and XVII against the Miramax and Disney defendants.  The TWC Subclass brings Counts IV, VIII, X, XII, XIV, XVI, and XVIII against the TWC defendants.

[8] In their opposition brief, plaintiffs do not contest the limitations periods asserted by defendants, and do not mention N.Y. C.P.L.R. § 213-c, "which permits civil claims against a person who could be charged with criminal liability for rape, criminal sexual act, or aggravated sexual abuse to be brought within five years." *Canosa*, 2019 WL 498865, at *12.  Even under a five-year statute of limitations, all of plaintiffs' state law claims would be untimely unless a tolling theory applies.

Civ. 7101 (VB), 2014 WL 3887210, at *5 (S.D.N.Y. June 9, 2014) ("[F]alse imprisonment

claims under New York law have a one-year statute of limitations . . . , which begins to run when

the plaintiff is released from custody.") (internal citations omitted).[9]

       The *Geiss* action was filed on December 6, 2017.[10]  Accordingly, unless any of

the limitations periods are tolled, intentional tort claims accruing before December 6, 2016 and

negligence claims accruing before December 6, 2014 are untimely.  The most recent alleged

assault, against Thompson, took place in September 2011.  FAC ¶¶ 268-295.  Any post-assault

conduct is relevant, if at all, only to plaintiffs' tolling arguments.

---

[9] I construe plaintiffs' "ratification" claim in Counts XVII and XVIII as an alternative theory of liability rather than an independent cause of action. *See Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.") (quoting Restatement (Second) of Agency § 82 (1958)).  Although defendants are alleged to have known of Weinstein's assaults, there is no indication that Weinstein carried out the assaults on behalf of the corporate defendants or any of their agents, or that he purported to be acting on their behalf in committing the assaults.  To the contrary, defendants allegedly attempted to cover up, rather than ratify, Weinstein's misconduct. *See Canosa*, 2019 WL 498865, at *13-14 (dismissing the ratification claims against all defendants, reasoning that, "even if Weinstein was in a principal-agent relationship with certain defendants, and even if these defendants knew of his crimes," the defendants did not authorize Weinstein's assaults, and Weinstein did not purport to be acting on behalf of any of the defendants in committing the assaults).  Accordingly, I dismiss ratification as an invalid alternative theory of liability on these facts, and do not consider what statute of limitations would apply to Counts XVII and XVIII.

[10] The *Dulany* class action was filed on June 1, 2018 and the FAC, which was filed on October 31, 2018, includes some claims not asserted in the original complaint.  Because using the earlier, December 6, 2017 filing date does not affect the timeliness of any claims, I do not consider whether some claims should be considered to have a June 1, 2018 or October 31, 2018 date of commencement.

### b. Tolling Doctrines

Plaintiffs do not dispute these limitations periods, and argue instead that three tolling doctrines—equitable tolling, continuing wrongs, and duress—apply to render their state law claims timely.

### i. Equitable Estoppel

"The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense." *Zumpano v. Quinn*, 6 N.Y.3d 666, 673, 849 N.E.2d 926, 929 (2006). It is "fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." *Id.* at 674. Such actions must entail "affirmative steps to prevent a plaintiff from bringing a claim." *Id.* Under New York Law, equitable estoppel is an "extraordinary remedy" that should be "invoked sparingly and only under exceptional circumstances." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.) (internal citations and quotation marks omitted), *aff'd*, 579 F. App'x 7 (2d Cir. 2014). The doctrine's application is narrow "because if applied too liberally it threatens to undermine the purpose of statutes of limitations of allowing potential defendants predictability and ultimate repose." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

Recent statements of the doctrine of equitable estoppel typically refer to wrongful inducement by "fraud, misrepresentation, or deception." *See, e.g.*, *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Doe v. Holy See (State of Vatican City)*, 17 A.D.3d 793, 795, 793 N.Y.S.2d 565, 568 (3d Dep't 2005)). Some earlier statements, however, list "deception, concealment, *threats or other misconduct*" as possible forms of wrongful inducement. *See, e.g.*,

22

*Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) (emphasis added) (quoting *Zoe G. v. Frederick F.G.*, 208 A.D.2d 675, 617 N.Y.S.2d 370, 371 (2d Dep't 1994)).

In this circuit, fear of retaliation has been recognized as a basis for equitable estoppel in at least one context: litigation by prison inmates under 42 U.S.C. § 1983. *See Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) (holding that, given the "unique context and the substantial control that correction officers exert over inmates," an inmate's "reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling"). Outside of those unique circumstances, however, New York law strongly disfavors equitable tolling based on fear of retaliation, except where duress is an element of the cause of action. *See, e.g.*, *Baratta v. Kozlowski*, 94 A.D.2d 454, 459, 464 N.Y.S.2d 803, 806 (2d Dep't 1983) (holding that death threats did not toll the statute of limitations on a conversion action and reasoning that "[w]here the underlying action is unrelated to duress, . . . the Statute of Limitations is not tolled by duress"); *Pietri v. N.Y.S. Office of Court Admin.*, 936 F. Supp. 2d 120, 136 n.14 (E.D.N.Y. 2013) (holding that, in the context of employment claims, "[f]ear of retaliation is not a basis for equitable tolling").

Furthermore, even if certain extreme forms of intimidation, such as specific threats of violence, could trigger equitable estoppel outside of the prison context, "[f]ear of harm to a plaintiff's career cannot justify equitably estopping a defendant from asserting a time limitation period." *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1318 (S.D.N.Y. 1997) (holding that equitable estoppel was not triggered where defendant told plaintiff "negative things" would happen if he pursued his copyright claim).

23

Plaintiffs argue that defendants "took affirmative steps" to prevent victims from (i) "learning of the defendants' knowledge" of Weinstein's misconduct and (ii) asserting claims against defendants. Pls.' Opp'n Mem. 75, ECF No. 243. The first theory sounds in fraud and misrepresentation, the most common grounds for equitable estoppel; the second appears to invoke the disfavored "fear of retaliation" theory, though plaintiffs do not press that point. For the reasons discussed below, neither theory is viable on the facts alleged in the FAC.

### 1. Fraud, Misrepresentation, or Deception

As to the first theory, plaintiffs do not explain how concealment of defendants' awareness of H. Weinstein's misconduct prevented them from bringing their state law claims. At the time of H. Weinstein's alleged assaults, plaintiffs were aware of their injuries—from assault, battery, false imprisonment, and/or infliction of emotional distress—and of the identities of the company or companies that might be vicariously liable to them for those injuries.[11]

The only claims to which plaintiffs' concealment theory conceivably could apply are the negligent supervision and retention claims, since one element of those claims is that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotation marks omitted). In *Zimmerman*, a case on which plaintiffs rely, the court held that a school was equitably estopped from asserting a statute of limitations defense to negligent supervision and retention claims arising from a former football coach's sexual abuse. *Zimmerman*, 888. F. Supp. 2d at 340. The court held that the

_____

[11] As discussed above, plaintiffs' attempt to hold defendants liable under an alternative "ratification" theory fails to state a claim. *See supra* n.9.

plaintiffs adequately alleged that the school had wrongfully prevented them from filing suit by making public statements falsely suggesting that the school was unaware of the coach's misconduct. *Id.*

Plaintiffs argue that this case is similar to *Zimmerman*, pointing to numerous alleged instances of affirmative conduct by various defendants: enforcing a "Code of Silence" on employees, making hush payments to victims, instructing victims to stay quiet, assigning a top executive to cover up Weinstein's misconduct, sending threatening text messages, forwarding victim complaints to H. Weinstein, retaining legal and other professional services to assist in the cover-up, blacklisting victims, and intimidating journalists. Pls.' Opp'n Mem. 75-76, ECF No. 243.  These actions, although reprehensible, did not use fraud, misrepresentation, or deception to prevent plaintiffs from filing suit.[12]  *See Canosa*, 2019 WL 498865, at *8 (Reprehensible though acts of intimidation to achieve a victim's silence would be, they do not trigger [equitable estoppel]."); *Zumpano*, 6 N.Y.3d at 675, 849 N.E.2d at 930 ("[Plaintiffs] also allege that, for over 40 years, [Catholic diocese] defendants did not report abuse by priests to law enforcement officials; reassigned offending priests without disclosure of their offenses; and, when victims complained, made private payments to them so that the charges would not be publicized. Conduct like this might be morally questionable . . . , but it is not fraudulent

---

[12] Plaintiffs allege that a member of Harvey's former legal team contacted Thompson under false pretenses in October 2017 and falsely told her that she did not need to worry about the statute of limitations for bringing her claim.  FAC ¶ 309.  By October 2017, however, the statutes of limitations on Thompson's claims based on an assault alleged to have occurred in 2011 had long since run.  *See, e.g.*, *Zimmerman*, 888 F. Supp. 2d at 341 ("[O]nly misrepresentations occurring during the limitations period are relevant; equitable estoppel cannot revive a claim that is already time-barred.").

concealment as a matter of law."); *Twersky*, 993 F. Supp. 2d at 444 (holding that "allegations that [high school] defendants failed to report known abuse to the authorities, failed to warn students and their families of the known risk of abuse, and failed to disclose the abuse publicly" constituted "passive concealment [that] falls short of the sort of specific and affirmative misrepresentation required to trigger an equitable estoppel defense"), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).

## 2. Fear of Retaliation

Much of the affirmative conduct relied on by plaintiffs goes to the second potential ground for invoking equitable estoppel—fear of retaliation. The parties not having briefed the issue, I do not express a view as to whether, when duress tolling does not apply, extreme acts of intimidation by a perpetrator or supervisor of sexual assault can estop that defendant from asserting a statute of limitations defense. Even if the doctrine of equitable estoppel extends to such circumstances, the doctrine's other requirements do not fall away: there must be threats or intimidation against each plaintiff by each defendant that plaintiff seeks to estop, the conduct must occur within the limitations period, and the plaintiff must bring suit within a reasonable period of time after the conduct ceases. Here, no plaintiff's allegations come close to meeting those requirements as to any defendant. Some allegations describe intimidation in the immediate aftermath of an assault. *See, e.g.*, FAC ¶ 163 (alleging that, in 1998, Weinstein sat behind Brock at a movie theater the night after he assaulted her and held her chair in an attempt to intimidate her). Other allegations describe intimidation long after the limitations period had run. *See, e.g.*, FAC ¶ 411 (alleging that, in 2017, Lombardo sent threatening text messages to an unidentified victim whom Weinstein had assaulted in the late 1990s). None,

however, describe a pattern of continual and egregious acts of intimidation sufficient to toll the statute of limitation for years or, in some cases, decades. In the absence of such a pattern, fear of retaliation does not toll the statutes of limitations for the duration of a famous defendant's power and influence, even for the most despicable wrongs. Plaintiffs' equitable estoppel arguments therefore fail.

### ii. Duress and Continuing Wrongs

Plaintiffs assert that the statutes of limitations are tolled by duress only as to their RICO and infliction of emotional distress claims. FAC ¶ 693. The RICO claims having been dismissed, the only remaining question is whether duress tolling saves plaintiffs' negligent and intentional infliction of emotional distress claims.

In this context, the doctrine of duress and the doctrine of continuing wrongs are interconnected. Duress must be "part of the cause of action alleged," and therefore "the duress that forms the cause of action is then considered a continuing wrong." *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1444 (S.D.N.Y. 1986). "Duress tolling is not triggered, however, simply because duress constitutes an element of the underlying tort." *Overall v. Estate of Klotz*, 52 F.3d 398, 405 (2d Cir. 1995). Both elements of duress, "threats or force by the defendant, and the submission of the plaintiff's free will to those threats," must be met. *Id.* at 404. "Furthermore, the tortious conduct must continue uninterrupted." *Id.* at 405.

In *Canosa*, the court held that the complaint adequately alleged "a course of intimidating and abusive conduct by Weinstein," the most recent instances of which occurred in August 2017, thus constituting "continuing wrongs" that brought each instance of alleged misconduct within the limitations period. 2019 WL 498865, at *8. The court held that the

27

continuing wrongs applied only to the plaintiff's intentional infliction of emotional distress claims; assault and battery claims are "treat[ed] as distinct, non-continuous wrongs." *Id.*

Here, for the reasons discussed in the section above concerning equitable estoppel, plaintiffs' allegations are manifestly insufficient to support duress tolling. Plaintiffs allege little or no threatening behavior by defendants—much less a course of conduct involving threats or force that continued without interruption—between the time immediately surrounding each assault and 2017. By contrast, the plaintiff in *Canosa* alleged numerous, frequent threats and assaults against her throughout the limitations period, which persisted up until a few months before she filed her lawsuit. *See* 2019 WL 498865, at *2-3. Accordingly, the duress and continuing wrongs doctrines do not render plaintiffs' state law claims timely.

### c.   Jane Doe

The Child Victims Act ("CVA"), effective February 14, 2019, added section 214-g to the New York Civil Practice Law and Rules. Section 214-g provides, in pertinent part:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, . . . or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months

> after, and not later than one year and six months after the effective
> date of this section.

Jane Doe alleges that H. Weinstein sexually assaulted her in 2002, when she was sixteen years old.  FAC ¶¶ 201-211.  That conduct, as alleged, would constitute a sexual offense under section 130.  Accordingly, Jane Doe is situated differently from the other plaintiffs with respect to the New York statutes of limitations.  She has not, however, demonstrated compliance with the filing requirements of section 214-g or, in light of the dispositions of her federal claims, a sufficient basis of jurisdiction.

Plaintiff's claims are dismissed, without prejudice to asserting claims when they become timely under section 214-g.

## CONCLUSION

For the reasons discussed in this decision:  (i) Harvey Weinstein's motion to dismiss the TWC Subclass's TVPA claim (Count I) is denied, and (ii) all other claims against all other defendants (Counts II-XVIII) are dismissed.  Accordingly, the Miramax Subclass has no remaining claims, there are no remaining claims against any of the Corporate Defendants, and no remaining claims against any of the Individual Defendants, except Count I against Harvey Weinstein.  Jane Doe's state law claims are dismissed without prejudice.  All other dismissals are with prejudice.

       The Clerk shall terminate the open motions (ECF Nos. 199, 239, 241, 246, 254, and 272).  The remaining parties shall appear for a status conference on June 4, 2019 at 11:00 a.m.

       SO ORDERED.

Dated:      April ___, 2019
           New York, New York

                                    ALVIN K. HELLERSTEIN
                               United States District Judge