# EXHIBIT 2(C)

## THE WEINSTEIN COMPANY BANKRUPTCY GLOBAL SETTLEMENT AGREEMENT

This Settlement Agreement (the "Global Settlement Agreement") is made and entered into as of June 29, 2020 (the "Settlement Signing Date") by and between The Weinstein Company Holdings, LLC ("Holdings") and The Weinstein Company LLC ("TWC"), each a debtor and debtor in possession in the Chapter 11 Cases (as defined below), each affiliate of Holdings or TWC that is a debtor in the Chapter 11 Cases as identified on the signature pages hereto (Holdings, TWC and such affiliates, collectively, the "Debtors"), the Non-Debtor Affiliates, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "UCC"), Former Representatives, and the Insurance Companies (each as defined below; each a "Party" and collectively, the "Parties").

## RECITALS

WHEREAS, multiple individuals filed lawsuits, claims or class actions in federal courts, state courts and foreign tribunals alleging, inter alia, that Harvey Weinstein engaged in sexual harassment and abuse, facilitated by various companies (including the Debtors) and their respective officers and directors, in violation of federal, foreign and state law;

WHEREAS, the New York State Office of the Attorney General (the "NYOAG") filed a lawsuit in the Supreme Court of the State of New York, County of New York on behalf of the People of the State of New York in Case No. 0450293/2018 (N.Y. Sup. Ct.) (the "NYOAG Lawsuit") alleging that Harvey Weinstein, in his capacity as TWC's co-owner and co-CEO, created a hostile work environment at TWC by repeatedly and persistently sexually harassing female employees, including demanding sexual contact as a quid pro quo for continued employment or career advancement, subjecting female employees to verbal abuse and demeaning work tasks, and forcing female employees to engage in unwanted sexual contact, and alleging that Robert Weinstein and TWC aided and abetted these violations of law by failing to investigate and/or stop Harvey Weinstein's unlawful activities, all in violation of state and city human rights laws;

WHEREAS, on March 19, 2018 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, substantially all the assets of the Debtors were sold to Lantern Entertainment pursuant to a sale transaction approved by the Bankruptcy Court on May 9, 2018 that closed on July 13, 2018, with a substantial portion of the proceeds of such sale transaction being applied by the Debtors to satisfy secured debt obligations and other secured obligations of the Debtors in accordance with applicable bankruptcy and non-bankruptcy law;

WHEREAS, all Parties recognize that, having effectively ceased operations in late 2017 and sold substantially all assets and applying the proceeds thereof in accordance with applicable law in 2018, the financial resources of the Debtors (including available insurance) are limited; that civil litigation is expensive to prosecute and defend; and that litigation in a public

forum may cause emotional distress and emotional burden to the alleged victims of Harvey Weinstein;

WHEREAS, the Parties have engaged in extensive arm's-length settlement negotiations culminating in a non-binding confidential settlement term sheet dated as of November 15, 2019, as amended (the "Settlement Term Sheet"), which contemplated that such agreement in principle would be memorialized in definitive legally binding and enforceable documentation;

WHEREAS, prior to the Petition Date, the Debtors and certain of the Former Representatives procured or claimed to be insureds under certain of the Insurance Policies. The Debtors purchased certain directors and officers liability insurance policies and general liability policies from certain Insurance Companies, which policies provide coverage for, among other things, legal defense costs of and civil judgments entered against former and current directors and officers of the Debtors. Certain of the Former Representatives purchased or claim to be insureds under certain insurance policies from certain Insurance Companies providing coverage for, among other things, legal defense costs of and civil judgments entered against such Former Representative under certain circumstances. Under the Insurance Policies, the Insurance Companies may contest whether actions such as those alleged in the lawsuits against Harvey Weinstein are covered and require the Insurance Companies to reimburse the insureds under those policies for costs related to such lawsuits. Notwithstanding the scope of the Insurance Policies and the Insurance Companies' rights to contest coverage, the Insurance Companies have agreed to contribute certain of the proceeds available under certain of the Insurance Policies in consideration for the agreed upon terms reflected in this Global Settlement Agreement. Due to the circumstances described in the preceding Whereas clauses, certain proceeds of the Insurance Policies are the only significant funds available to facilitate consensual resolution of the various Claims against the Debtors and other Released Parties. Absent this Global Settlement Agreement and the contribution of certain proceeds of the Insurance Policies contemplated hereunder, the Debtors would be forced to convert their Chapter 11 Case to cases under Chapter 7 of the Bankruptcy Code, which would leave the Debtors' creditors with a recovery significantly lower than what is available due to this Global Settlement Agreement;

WHEREAS, accordingly, the Parties wish to enter into this Global Settlement Agreement to settle all actual and potential claims, disputes and controversies relating to, connected to or arising out of the allegations against the Debtors and the Former Representatives, and it is their intent to avoid the risk, expense and burden of litigation, and permanently to settle and resolve all disputes, matters, claims, controversies, issues, assertions and causes of action among them, whether known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, domestic or foreign, which have been or could have been alleged or asserted, by and between the Parties, without any admission of fault, liability or wrongdoing on the part of any Party;

WHEREAS, the Class Action Members (by and through the Class Action Counsel), the Former Representatives and the NYOAG have executed a separate settlement agreement dated June 29, 2020 (the "Class Action Settlement Agreement"), and the Individual Plaintiffs, the Debtors and the Former Representatives have executed a separate settlement agreement dated June 29, 2020 (the "Individual Plaintiffs' Settlement Agreement"), which agreements together

resolve all actual and potential disputes relating to, connected to or arising out of the allegations made against the Former Representatives in the individual and purported class action lawsuits and the NYOAG Lawsuit described in the first and second "Whereas" clauses above, the Class Action Settlement Agreement being subject to approval thereof by the United States District Court for the Southern District of New York (Hon. Alvin K. Hellerstein);

WHEREAS, this Global Settlement Agreement, the Class Action Settlement Agreement, and the Individual Plaintiffs' Settlement Agreement together are intended to represent a comprehensive global resolution of all matters arising in connection with, or related to, the allegations that gave rise to (i) the various lawsuits and Claims, (ii) the Chapter 11 Cases, and (iii) all other claims by the other Parties against the Former Representatives, which resolution includes the general and additional releases of the Released Parties (as defined below) by the Releasing Global Settlement Parties (as defined below);

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the Parties that subject to the occurrence of the Plan Effective Date, all Claims are settled and resolved pursuant to the terms and conditions set forth in this Global Settlement Agreement.

## DEFINITIONS

As used in this agreement, the following terms shall have the following meanings:

Affiliate or Affiliated With means (i) any entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with, a specified entity, and (ii) any entity that is an "affiliate" within the meaning of Bankruptcy Code § 101(2) of a specified entity. As used in clause (i) of this definition, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity (whether through ownership of equity of that entity, by contract, or otherwise).

Bankruptcy Code shall mean Title 11 of the United States Code.

Bankruptcy Court shall have the meaning set forth in the Recitals.

Bankruptcy Injunctions shall have the meaning set forth in the Chapter 11 Plan.

Business Day shall mean any day other than Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

Channeling Injunction shall mean the portion of the Confirmation Order providing that any and all Class Action Sexual Misconduct Claims shall receive payment, if any, solely from the Class Action Settlement Fund as the exclusive remedy for recovery and are subject to the procedures governing distribution of the Class Action Settlement Fund as set forth in the Class Action Settlement Agreement and the Chapter 11 Plan.

Chapter 11 Cases shall mean the jointly administered cases under Chapter 11 of the Bankruptcy Code, presently pending in the Bankruptcy Court and captioned *In re Weinstein Company Holdings, LLC*, Case No. 18-10601.

<u>Chapter 11 Plan</u> shall mean the plan under Chapter 11 of the Bankruptcy Code, jointly proposed by the Debtors and the UCC, incorporating the terms of this Global Settlement Agreement, which shall be consistent with the terms herein and shall be in a form and substance reasonably satisfactory to the Parties.

<u>Claim</u> shall include, without limitation, any and all past, present or future claims, cross- claims, counterclaims, third-party claims, contribution claims, indemnification claims, rights, causes of action, orders, liabilities, notices of liability or potential liability, arbitrations, actions, suits, damages, demands, disputes, obligations, judgments, duties, defenses, liens, administrative proceedings, costs, expenses, attorneys' (and other) fees, matters, requests or proceedings of any kind or nature whatsoever and any claim within the definition of "claim" in section 101(5) of the Bankruptcy Code, regardless of where arising or where brought, whether at law, equity, contract, statute, or otherwise direct, indirect, or derivative, known or unknown, actual or alleged, asserted or not asserted, suspected or unsuspected, anticipated or unanticipated, fixed or contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, domestic or foreign, disclosed or undisclosed, accrued or unaccrued, apparent or unapparent, existing under any federal, state, local, foreign, tribal, common law, ordinance, statute or regulation, which has been, could have been, or may be asserted by or on behalf of any person or entity against the Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, or any other Released Party, whether seeking damages (including compensatory, punitive or exemplary damages and all other potential elements of recovery or relief) or equitable, mandatory, injunctive, or any other type of relief, irrespective of the expiration of any applicable statute of limitations.

<u>Class Action Counsel</u> shall mean the attorneys who currently represent the Settling Tort Plaintiffs, including but not limited to Hagens Berman Sobol Shapiro LLP, Fegan Scott LLC, Brown Rudnick LLP, Morris James LLP, Kohn Swift & Graf, P.C. and Girard Sharp LLP.

<u>Class Action Litigation</u> shall mean the purported class actions, whether such classes remain purported or upon certification thereof, commenced by (i) Louisette Geiss, Sarah Ann Thomas (A/K/A Sarah Ann Masse), Melissa Thompson, Melissa Sagemiller, Nannette May (F/K/A Nannette Klatt), Katherine Kendall, Zoe Brock, Caitlin Dulany, Larissa Gomes and Jane Doe, in the Southern District of New York, captioned *Geiss et. al. v. The Weinstein Company Holdings LLC et. al.*, Case No. 1:17-cv-09554-AKH and (ii) Jill Doe in the Southern District of New York, captioned *Jill Doe v. Harvey Weinstein et al.*, Case No. 1:19-cv-03430.

<u>Class Action Members</u> shall mean all members of the Settlement Class, as defined in the Class Action Settlement Agreement.

<u>Class Action Notice Costs</u> shall mean that portion of the Class Action Settlement Fund applicable towards costs of notice and administration, as further described in Paragraph 113 of the Class Action Settlement Agreement.

<u>Class Action Settlement Agreement</u> shall have the meaning set forth in the Recitals.

<u>Class Action Settlement Fund</u> shall mean the $18,875,000 of the Settlement Amount allocated to a settlement fund on behalf of the Class Action Settlement Fund Claimants.

<u>Class Action Settlement Fund Claimants</u> shall mean the Class Action Members, which includes former female employees and/or female contractors of TWC as described in the NYOAG Lawsuit. The following are not considered Class Action Settlement Fund Claimants: (a) holders of Non-SMC Claims; (b) the Non-Settling Plaintiffs; (c) the Individual Plaintiffs; (d) holders of Male Sexual Misconduct Claims; and (e) the NYOAG.

<u>Class Action Sexual Misconduct Claim</u> shall mean any Sexual Misconduct Claim held by a Class Action Member.

<u>Confirmation Order</u> shall mean an order by the Bankruptcy Court, which shall be in form and substance reasonably satisfactory to the Parties, confirming the Chapter 11 Plan.

<u>Contract and Commercial Cases</u> shall include, without limitation:

(i) *Donald P. Borchers v. The Weinstein Company, LLC, et al.*, Case No. 2:17-cv-6263 (C.D. Cal.);

(ii) *Lesia Anson v. Harvey Weinstein et al.*, Case No. 2:17-cv-08360 (C.D. Cal.);

(iii) *Terence Williams v. Bob Weinstein, et al.*, Case No. 2:18-cv-10776 (E.D. Mich.);

(iv) *Tensor Law P.C. v. Harvey Weinstein et al.*, Case No. SC128650 (L.A. Super. Ct.);

(v) *EMJAG Productions, Inc., et al. v. The Weinstein Company LLC*, Case No. BC 685511 (L.A. Super. Ct.);

(vi) *AI International Holdings (BVI), Limited v. Harvey Weinstein et al.*, Case No. 656864-2017E (N.Y. Sup. Ct.);

(vii) *Entertainment One Films Canada, Inc. v. Weinstein Global Film Corp. et al.*, Case No. BC692352 (L.A. Super. Ct.);

(viii) *Brad Weston et al. v. The Weinstein Company*, Case No. BC679011 (L.A. Super. Ct.);

(ix) *Frank Gil v. Weinstein Live Entertainment LLC, et al.*, Case No. 653555/2019 (N.Y. Sup. Ct.); and

(x) *Sartraco et al v. Robert Weinstein, et al.*, Case No. 19 cv-00448 (Cal. Super. Ct.).

<u>Contract and Commercial Claims</u> shall mean any Claims arising from, connected or related to the Contract and Commercial Cases.

<u>Debtors</u> shall mean Holdings and TWC and each affiliate of Holdings or TWC that is a debtor in the Chapter 11 Cases as identified on the signature pages hereto.

<u>District Court</u> shall mean the United States District Court for the Southern District of New York.

District Court Final Approval Order shall mean an order of the District Court under Federal Rule of Civil Procedure 23 granting final approval of the Class Action Settlement Agreement.

District Court Final Approval Order Effective Date shall mean the date the District Court Final Approval Order becomes a Final Order.

District Court Preliminary Approval Order shall mean a preliminary order of the District Court under Federal Rule of Civil Procedure 23 approving the Class Action Settlement Agreement.

Final Order shall mean an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

Foreign Courts shall mean the courts of the United Kingdom, Ireland and Canada.

Foreign Court Approval Orders shall mean those orders of any Foreign Courts necessary to aid the implementation of the Channeling Injunction in the United Kingdom, Canada and Ireland (to the extent determined by the Parties that such orders are necessary), which orders shall be Final Orders that are reasonably satisfactory to the Parties.

Former Representatives shall mean, collectively, Harvey Weinstein, Robert Weinstein, Tarak Ben Ammar, James Dolan, Frank Gil, David Glasser, Richard Koenigsberg, Marc Lasry, Lance Maerov, Jeff Sackman, Tim Sarnoff, Barbara Schneeweiss, Paul Tudor Jones, and Dirk Ziff.

Global Escrow Agent shall mean Epiq Class Action & Claims Solutions, Inc. as it pertains to its role in distributing the Settlement Amount in accordance with Section 1 of this Global Settlement Agreement.

Global Settlement Agreement shall have the meaning set forth in the Preamble.

Holdings shall have the meaning set forth in the Preamble.

Individual Plaintiffs shall mean the group of plaintiffs consisting of Kadian Noble, Sandeep Rehal, Jane Doe in Case No. 17-585449 (Ont. Supr. Ct.); Kelly Sipherd, Jill Doe in Case No. CV-18-608425 (Ont. Sup. Ct.); ABC in CLAIM NUMBER: HQ17P04249 (U.K.); EFG in CLAIM NUMBER: HQ18P00908 (U.K.); CDE whose claim is scheduled under CLAIM NUMBER: HQ18P00908 (U.K.); GHI whose claim is scheduled under CLAIM NUMBER: HQ18P00908 (U.K.); JKL whose claim is scheduled under CLAIM NUMBER: HQ18P00908 (U.K.); LMN whose claim is scheduled under CLAIM NUMBER:

HQ18P00908 (U.K.); Paz De La Huerta; Pamela Ryan (Ireland); and Jane Doe in Case No. 18STCV08468 (Sup. Ct. Cal.).

Individual Plaintiffs' Settlement Agreement shall have the meaning set forth in the Recitals.

Individual Plaintiffs' Settlement Fund shall mean the $5,400,000 of the Settlement Amount allocated for distribution to the Individual Plaintiffs in accordance with the terms of the Individual Plaintiffs' Settlement Agreement.

Insured shall mean any person or entity covered under the policies sold to any Released Party by any Insurance Company.

Insurance Companies shall mean National Union Fire Insurance Company of Pittsburgh, Pa.; AIG Specialty Insurance Company; Steadfast Insurance Company; The American Insurance Company; Fireman's Fund Insurance Company; Zurich American Insurance Company; AXIS Surplus Insurance Company; The Travelers Companies, Inc.; Travelers Indemnity Company; Travelers Excess and Surplus Lines Company; Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company; Travelers Casualty and Surety Company of America; St. Paul Surplus Lines Insurance Company; St. Paul Fire & Marine Insurance Company; Gulf Insurance Company; Federal Insurance Company; Great Northern Insurance Company; Westchester Fire Insurance Company; Pacific Indemnity Company; Chubb Indemnity Insurance Company; Executive Risk Indemnity Inc.; Chubb National Insurance Company; ACE American Insurance Company, on behalf of themselves and their subsidiaries, Affiliates, parents, predecessors, or successors; provided, however, Insurance Companies shall not include AIG Europe Limited and AIG Europe SA.

Insurance Policies shall mean any insurance policy issued by an Insurance Company.

Judd Case shall mean the case commenced by Ashley Judd in the Central District of California, captioned *Ashley Judd v. Harvey Weinstein*, Case No. 2:18-cv-05724.

Lantern Entertainment shall mean Lantern Entertainment, LLC (K/N/A and D/B/A "Spyglass Media Group").

Liquidation Trust shall mean the liquidation trust established by the Chapter 11 Plan, as further described in the Chapter 11 Plan.

Liquidation Trust Settlement Payment shall mean $7,295,000 of the Settlement Amount, as further described in Paragraph 1.B.iii. of this Global Settlement Agreement.

Liquidation Trustee shall mean the individual initially selected by the trade claimant members of the UCC to act as trustee of the Liquidation Trust pursuant to the terms of the Liquidation Trust Documents (as defined in the Chapter 11 Plan) to administer the Liquidation Trust, and any successors thereto.

Male Sexual Misconduct Claims shall mean Sexual Misconduct Claims held by persons who were male at the time their Sexual Misconduct Claim arose.

<u>McGowan Case</u> shall mean the case commenced by Rose McGowan in the Central District of California captioned *Rose McGowan v. Harvey Weinstein et. al.*, Case No. 2:19-cv-09105-ODW-GJS.

<u>Mediator</u> shall mean Jed D. Melnick of JAMS.

<u>Non-Debtor Additional Affiliates</u> shall mean Scary Movie 4 LLC; Derailed SPV, LLC; Mrs. Henderson Presents SPV, LLC; The Matador SPV, LLC; Breaking and Entering SPV, LLC; Come Drink With Me SPV, LLC; SPV Film Distribution LLC; Butler Films LLC; Kristy Films LLC; and TWC Gold SPV, LLC.

<u>Non-Debtor Affiliates</u> shall mean The Weinstein Company (UK) Ltd.; Tulip Fever Films Limited; Current Films UK Limited; and MarcoThree, LLC.

<u>Non-Debtor Entities</u> shall mean all companies (other than the Debtors) that Harvey Weinstein was employed by, worked for, or held a position as an officer or director of between January 1, 1979 and October 1, 2017, as well as each of their parents, subsidiaries and Affiliates (including, without limitation, The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc., Miramax, LLC, Miramax Film Corporation and Miramax Film NY, LLC), or any of their respective equity holders or members, any of their Affiliates or any other independent contractor, current or former members of the board of representatives of the Non-Debtor Entities; <u>provided</u>, <u>however</u>, that Non-Debtor Entities shall not include (a) the Four Seasons Hotel Limited and Burton Way Hotels LLC, defendants in *Paz De La Huerta v. Harvey Weinstein et. al.*, Case No. 19-cv-02183 (C.D. Cal.)) or (b) the Four Seasons Hotel Limited, Burton Way Hotels LLC and Burton Way Hotels Ltd., defendants in *Paz De La Huerta v. Harvey Weinstein et. al.*, Case No. 18SCTV04723 (L.A. Sup. Ct.).

<u>Non-Debtor Persons</u> shall mean any and all individuals employed by or Affiliated With any of the Non-Debtor Entities against whom Sexual Misconduct Claims have or could have been made in their capacity as such, including, without limitation, Barbara Schneeweiss, Michael Eisner, Irwin Reiter, Rick Schwartz, Fabrizio Lombardo, Mark Gill and Nancy Ashbrooke.

<u>Non-Settling Plaintiffs</u> shall mean Alexandra Canosa, Wedil David and Dominique Huett.

<u>Non-Settling Plaintiffs' Cases</u> shall mean the cases commenced by (i) Alexandra Canosa in the Southern District of New York, captioned *Canosa v. Weinstein et. al.*, Case No. 18- cv- 4115; (ii) Wedil David in the Southern District of New York, captioned *Wedil David v. The Weinstein Company LLC et. al*., Case No. 18-cv-05414; and (iii) Dominque Huett in the Central District of California, captioned *Dominique Huett v. The Weinstein Company LLC et. al.*, Case No. 18-cv-6012.

<u>Non-Settling Sexual Misconduct Claims</u> shall mean all claims asserted against the Debtors and certain of the Former Representatives by the Non-Settling Plaintiffs in the Non-Settling Plaintiffs' Cases.

<u>Non-SMC Claims</u> shall mean all Claims that are not Sexual Misconduct Claims.

<u>Notice</u> shall mean the Notice of Pendency and Proposed Settlement of Class Action, as further described in the Class Action Settlement Agreement.

<u>NYOAG Lawsuit</u> shall have the meaning set forth in the Recitals.

<u>Party</u> or <u>Parties</u> shall have the meaning set forth in the Preamble.

<u>Petition Date</u> shall have the meaning set forth in the Recitals.

<u>Plan Documents</u> shall mean the Chapter 11 Plan and related documents, as further described in the Chapter 11 Plan.

<u>Plan Effective Date</u> shall mean the date upon which the Confirmation Order becomes a Final Order and all other conditions necessary to the occurrence of the effective date of the Plan are either satisfied or waived.

<u>Released Parties</u> shall mean (i) the Debtors, the TWC Estate, the Non-Debtor Entities, the Non-Debtor Persons, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, the Former Representatives and the Insurance Companies; (ii) professionals of firms specified in Schedule 3; and (iii) each such persons' or entities' current and former officers, directors and board representatives, predecessors, successors, assigns, insiders, subsidiaries, Affiliates, principals, equity holders, members, trustees, partners, managers, employees, agents, members of any boards or similar bodies of such persons, advisory board members, financial advisors, attorneys, insurers, reinsurers, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, and nominees, in each case, in their capacity as such, or any other person who rendered services for, or provided goods to, any of the Debtors or the Non-Debtor Entities, with respect to liability for the actions or inactions of the Former Representatives, the Debtors, the TWC Estate, the Non-Debtor Entities, the Non-Debtor Persons, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies; <u>provided</u>, <u>however</u>, those persons or entities who fall within subparagraph (iii) (other than persons or entities specified in subparagraphs (i) and (ii)) are not released with respect to their own actions related to Sexual Misconduct Claims, regardless of their relationship with the Former Representatives, the Debtors, the TWC Estate, the Non-Debtor Entities, the Non-Debtor Persons, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies, to the extent such action constitutes aiding, abetting or conspiracy to prevent the disclosure of or to cover up any Sexual Misconduct Claim (each a "<u>Non-Released Party</u>").[1]

<u>Releasing Global Settlement Parties</u> shall mean the Debtors, the TWC Estate, the Non-Debtor Affiliates, the Former Representatives, the UCC, the Insurance Companies, and each such persons' predecessors, successors, assigns, insiders, subsidiaries, Affiliates, current and former officers, directors and board representatives, principals, equity holders, members, trustees, partners, managers, employees, agents, members of any boards or similar bodies of such persons, advisory board members, financial advisors, attorneys, insurers, reinsurers,

---

[1] As specified above, AIG Europe Limited and AIG Europe SA are not Insurance Companies and as such, AIG Europe Limited and AIG Europe SA are not Released Parties.

accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, and nominees, in each case, in their capacity as such.

Segregated Defense Fund shall mean $1,500,000 of the Settlement Amount, as further described in Paragraph 1.B.iv(2) of this Global Settlement Agreement, plus any amounts provided in Paragraph 1.B.iv(3) in excess of the amounts necessary to satisfy the defense costs and/or damages (including amounts paid in connection with any settlement) for the Former Representatives in any Contract or Commercial Case.

Settlement Amount shall mean $46,786,000 as further discussed in Section 1 of this Global Settlement Agreement.

Settlement Parties shall mean all parties who are signatories to the Settlement Agreements.

Settlement Signing Date shall have the meaning set forth in the Preamble.

Settling Tort Plaintiffs shall mean the Class Action Members and the Individual Plaintiffs.

Sexual Misconduct Claims shall mean all Tort Claims that arise out of, connect to or relate in any way to any actual or alleged sexual conduct of Harvey Weinstein.

Tort Claim shall mean any Claim (including any Claim asserted against any Released Party by any Non-Released Party) that arises out of or connects or relates in any way to, any actual or alleged conduct of Harvey Weinstein, which shall include, without limitation: (i) actual or alleged sexual misconduct, nonconsensual interactions, harassment (including sexual harassment), uninvited or unwelcome conduct, predatory conduct, inappropriate conduct, degrading conduct, coercive or intimidating behavior, humiliation, tort, hostile work environment, sexual assault, rape, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, battery, assault, gender violence, false imprisonment, false arrest or detention, sexual abuse, sex trafficking or discrimination based on sex or gender or any similar or related actions, or (ii) defamation, witness tampering, mail fraud, wire fraud, negligent hiring, negligent supervision, negligent retention, negligence, failure to prevent harassment or ratification, in each case that took place in whole or in part prior to preliminary approval of the Class Action Settlement Agreement, whether based on direct or vicarious liability, whether domestic or foreign, whether based on breach of fiduciary (or other) duty or intentional or negligent conduct, including but not limited to allegations of failure to prevent or remedy, failure to disclose, aiding and abetting or efforts or conspiracy to prevent the disclosure, or cover up, of any of the preceding, against the Released Parties.

Tort Claimant shall mean any holder of a Tort Claim.

Tort Victims Bar Date shall mean the deadline for holders of Tort Claims to file proofs of claims in the Chapter 11 Cases.

TWC shall have the meaning set forth in the Preamble.

TWC Estate shall mean, collectively, the estates of the Debtors.

UCC shall have the meaning set forth in the Preamble.

## AGREEMENT

The Parties hereby agree as follows:

1.    Payment of Settlement Amount.

      A.     Initial Settlement Payment. The Insurance Companies, on behalf of the Released Parties, shall pay the Settlement Amount of $46,786,000 to an account controlled by the Global Escrow Agent in immediately available funds not later than ten (10) Business Days following occurrence of the Plan Effective Date. Each Insurance Company will fund its applicable portion in respect of the Settlement Amount, as specified in Schedule 1 attached to this Global Settlement Agreement (which shall be filed under seal), which shall collectively total the Settlement Amount.

      B.     Further Settlement Payments. Once payment of the Settlement Amount has been received by the Global Escrow Agent, the Global Escrow Agent shall promptly, and in any case no more than three (3) Business Days following receipt of the Settlement Amount, distribute by wire transfer the distributions described below (in each case to an account designated in writing by the applicable recipient).

           i.     Class Action Settlement Fund. From the Settlement Amount, $18,875,000 shall be distributed by the Global Escrow Agent to an account controlled by a designated representative selected by Class Action Counsel who shall distribute the funds in accordance with the Class Action Settlement Agreement and the District Court Final Approval Order.

           ii.     Individual Plaintiffs' Settlement Fund. From the Settlement Amount, $5,400,000 shall be distributed by the Global Escrow Agent to accounts specified by each Individual Plaintiff in accordance with the terms of the Individual Plaintiffs' Settlement Agreement.

           iii.     Liquidation Trust Settlement Payment.  From the Settlement Amount, $7,295,000 shall be distributed by the Global Escrow Agent to an account controlled by the Liquidation Trustee, to be further distributed in accordance with the Chapter 11 Plan by the Liquidation Trustee to the holders of Non-SMC Claims and Male Sexual Misconduct Claims.

           iv.     Defense Costs.

                (1)     Defense Costs for the Former Representatives. Pursuant to the terms and conditions of this Global Settlement Agreement and the Chapter 11 Plan, the Former Representatives have agreed, in consideration for the releases and injunctions contemplated hereunder and thereunder, to waive, in part, their entitlement to reimbursement of

all defense costs and expenses as a priority to payment of any liability or settlement amount pursuant to the terms of the applicable Insurance Policies. As a result of such waiver, the Former Representatives will be reimbursed an amount which, in the aggregate, approximates sixty percent (60%) of the fees and expenses incurred by the Former Representatives as of April 25, 2019 and thereafter (except as otherwise provided herein and in the Chapter 11 Plan), zero percent (0%) of the fees and expenses incurred by the Former Representatives. To effectuate such agreement and waiver, the Former Representatives have agreed to provide to the Insurance Companies the releases set forth in this Global Settlement Agreement, and to accept in the aggregate the sum of $12,216,000 from the Settlement Amount (the "Former Representatives Defense Costs"). The Global Escrow Agent shall distribute the Former Representatives Defense Costs to the Former Representatives (or their counsel) and Seyfarth Shaw LLP to satisfy the defense costs incurred by the Former Representatives and Seyfarth Shaw LLP (in its capacity as counsel to the Debtors) in connection with the defense of the applicable cases in the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement. The Former Representatives Defense Costs are to be allocated in accordance with the following principles: (i) the Former Representatives agree that the $12,216,000 shall be allocated amongst them (or their counsel) and Seyfarth Shaw LLP based upon fees and expenses incurred as of April 25, 2019, as submitted to the Mediator (provided, however, the payment of any post-petition fees and expenses of Seyfarth Shaw LLP shall be subject to final approval of the Bankruptcy Court), and assuming the amount available for reimbursement of defense costs was $12,500,000 and (ii) counsel for Former Representative Sarnoff shall reduce its allocated portion by an amount totaling $284,000 to account for the differential between the actual amount available for reimbursement of defense costs ($12,216,000) and the amount used for purposes of calculating the allocation ($12,500,000).

(2)     Costs for the Non-Settling Plaintiffs' Cases. Pursuant to the terms and conditions of this Global Settlement Agreement and the Chapter 11 Plan, Harvey Weinstein and Robert Weinstein have agreed, in consideration for the releases and injunctions contemplated hereunder and thereunder, to release the Insurance Companies from any other or further claims for coverage in respect of the Non-Settling Plaintiffs' Cases and as a result, with respect to the Non-Settling Plaintiffs' Cases, shall bear their own defense costs and/or damages in excess of the Segregated Defense Fund. To induce Harvey Weinstein and Robert Weinstein to provide such releases and assume the risk (if any) attendant to the continued prosecution of those cases without the benefit of insurance coverage, in lieu of

any such foregone insurance, the Parties have agreed to the establishment of a segregated account comprised of the Segregated Defense Fund from the Settlement Amount. The Global Escrow Agent shall distribute the Segregated Defense Fund to an account controlled by a representative selected by Harvey Weinstein and Robert Weinstein, and this representative shall distribute the funds to satisfy defense costs and/or damages (including amounts paid in connection with any settlement of a Non-Settling Plaintiff's Case executed independently or as provided in the Chapter 11 Plan).

(3) <u>Defense Costs for Contract and Commercial Cases</u>. Pursuant to the terms and conditions of this Global Settlement Agreement and the Chapter 11 Plan, the Former Representatives have agreed, in consideration for the releases and injunctions contemplated hereunder and thereunder, to provide the release to Westchester Fire Insurance Company pursuant to Section 3B(i)(4) of this Global Settlement Agreement. Westchester Fire Insurance Company has agreed to fund $1,500,000 into a segregated account for the benefit of Former Representatives who are or may be parties to any Contract or Commercial Case. Thus, from the Settlement Amount, $1,500,000 (the "<u>Contract and Commercial Defense Fund</u>") shall be distributed by the Global Escrow Agent to an account controlled by a representative selected by the Former Representatives who are currently parties to any Contract or Commercial Case, and this representative shall distribute the funds to satisfy the defense costs and/or damages (including amounts paid in connection with any settlement) for the Former Representatives in any Contract or Commercial Case.

C. The Parties further agree with respect to the Settlement Amount as follows:

i. <u>Contract and Commercial Defense Fund</u>. The Former Representatives and the Debtors shall not seek coverage from any Insurance Company for any cost or expense incurred in connection with any Contract or Commercial Claim unless and until the Contract and Commercial Defense Fund has been fully exhausted, and further agree that in no event shall they be entitled to recover costs and expenses more than once from the Contract and Commercial Defense Fund and/or any Insurance Company. With the exception of Harvey Weinstein, the Former Representatives and the Debtors who are currently or were previously named parties in the Contract and Commercial Cases waive all challenges to coverage positions taken by the Insurance Companies for each of the Contract and Commercial Cases due to the failure of such Former Representatives and Debtors to issue timely coverage dispute letters to the Insurance Companies, and such Former Representatives and Debtors shall not seek coverage from the Insurance Companies for any cost or expense incurred in connection with any Contract or Commercial Case for which a coverage position has been waived.

Harvey Weinstein hereby releases all Claims against any Insurance Company that issued a general liability, umbrella liability and/or excess liability policy with respect to the Contract and Commercial Cases. Harvey Weinstein shall not seek coverage under any general liability, umbrella liability and/or excess liability policy issued by the Insurance Companies with respect to any Contract or Commercial Case.

2. Claims Recovery.

A. Channeling of Class Action Sexual Misconduct Claims. Pursuant to the terms of the Channeling Injunction, all Sexual Misconduct Claims held by Class Action Settlement Fund Claimants shall be channeled to the Class Action Settlement Fund. Further, as provided in the Class Action Settlement Agreement and in consideration for the Class Action Settlement Fund: (i) the Class Action Settlement Fund Claimants shall have no right to seek recovery for their Sexual Misconduct Claims from any portion of the Settlement Amount other than the Class Action Settlement Fund; and (ii) all Sexual Misconduct Claims held by Class Action Settlement Fund Claimants and the NYOAG shall be released against the Released Parties as provided for in Paragraph 110 of the Class Action Settlement Agreement.

B. Recovery of Sexual Misconduct Claims Held by Individual Plaintiffs. Pursuant to the terms of the Chapter 11 Plan and the Individual Plaintiffs' Settlement Agreement and in consideration for the Individual Plaintiffs' Settlement Fund, the Individual Plaintiffs shall have no right to seek recovery for their Sexual Misconduct Claims from any portion of the Settlement Amount other than from the Individual Plaintiffs' Settlement Fund. The Sexual Misconduct Claims held by the Individual Plaintiffs are not subject to the Channeling Injunction as such Claims are fully, finally, and forever satisfied by the Individual Plaintiffs' Settlement Agreement and the payment of the Individual Plaintiffs' Settlement Fund and the releases contemplated thereunder.

C. Recovery of Sexual Misconduct Claims Held by Non-Settling Plaintiffs. All Sexual Misconduct Claims held by the Non-Settling Plaintiffs are not subject to the Channeling Injunction as such Claims (i) will be released pursuant to the terms of the Confirmation Order; or (ii) are Sexual Misconduct Claims against Harvey Weinstein. Any portion of the Settlement Amount provided to a Non-Settling Plaintiff as consideration for resolving their Sexual Misconduct Claims shall come solely from the Segregated Defense Fund.

D. Recovery of Non-SMC Claims and Male Sexual Misconduct Claims. Holders of Non-SMC Claims and holders of Male Sexual Misconduct Claims may only recover from the Liquidation Trust Settlement Payment (or such other funds as may be made available for distribution to such holders under the Chapter 11 Plan). Holders of Non-SMC Claims and holders of Male Sexual Misconduct Claims shall have no right to seek recovery for their Claims from any portion of the Settlement Amount other than the Liquidation Trust Settlement Payment, and in consideration for the Liquidation Trust Settlement Payment, all Non-SMC Claims

(which includes, but is not limited to, all Tort Claims that are not Sexual Misconduct Claims) and Male Sexual Misconduct Claims shall be released pursuant to the terms of the Chapter 11 Plan. Distributions from the Liquidation Trust shall be made in accordance with the Chapter 11 Plan and shall be subject to the jurisdiction and approval of the Bankruptcy Court.

E.   <u>Recovery of Non-Released Parties' Contribution Claims Related to Tort Claims</u>. In the event a Tort Claimant has initiated (or initiates in the future) an action against a Non-Released Party related to a Tort Claim, any recovery in such action (or a related action) against a Released Party shall be deemed completely satisfied based on the Released Party's (and/or such Released Party's Insurance Companies') contribution to the Settlement Amount, regardless of the jurisdiction in which the Tort Claimant brings the Tort Claim or the applicable law that governs such Tort Claim, and the Parties reserve their rights under relevant state law.

3.   <u>Mutual Release and Dismissal of Claims</u>

In consideration of payment, distribution, and allocation of the Settlement Amount set forth in Section 1 of this Global Settlement Agreement and the other contributions of the Parties, the receipt and sufficiency of which are hereby acknowledged, the Releasing Global Settlement Parties hereby conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, disclaim and discharge the Released Parties and their respective property to the maximum extent permitted by law, as further set forth below.

A.   <u>General Release</u>.

i.   Except as otherwise set forth in Sections 3.B and 3.D herein, as of the Plan Effective Date, each of the Releasing Global Settlement Parties that is a signatory hereto releases (and each entity so discharged and released shall be deemed discharged and released by the Releasing Global Settlement Parties) each of the Released Parties that is a signatory hereto and its respective property from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any direct or derivative claims asserted or assertable by or on behalf of any of the Releasing Global Settlement Parties, any Claims or causes of action asserted by or on behalf of any of the Releasing Global Settlement Parties, or that any Releasing Global Settlement Party would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law or in equity, based on any matter, cause, thing, conduct or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities or the Chapter 11 Cases (including, but not limited to, Tort Claims) (the "<u>General Releases</u>").

B.  <u>Additional Releases</u>.

    i.    Additional Releases include the following:

    (1)    those releases specified in Section 1.C.i of this Global Settlement Agreement;

    (2)    those releases described in the Class Action Settlement Agreement;

    (3)    those releases described in the Individual Plaintiffs' Settlement Agreement;

    (4)    the Debtors and the Former Representatives hereby release the Insurance Companies from any and all past, present or future claims, demands, obligations, actions, causes of action, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever (including, without limitation, reimbursement of fees and costs of defense) in any way arising out of or related to the Tort Claims, whether in law, in equity or otherwise, and whether under contract, warranty, tort or otherwise, including but not limited to any claims for bad faith or breach of the implied covenant of good faith and fair dealing; <u>provided</u>, <u>however</u>, this release shall not include any (i) Claims that are not Tort Claims; (ii) Tort Claims that are not permanently released, discharged and enjoined pursuant to the Bankruptcy Injunctions and (iii) direct and indirect fees, costs and expenses incurred by the Debtors or the Former Representatives in excess of $25,000 per Claim in connection with (a) the enforcement of the Bankruptcy Injunctions and/or (b) any Claim or action by or against a Non-Released Party or Non-Settling Plaintiff (except as otherwise provided in Sections 3.B.i.(5)-(7) below); <u>provided further</u> that with respect to the Claims specified in subparagraphs (i)-(iii) above, the Debtors and the Former Representatives reserve their rights to seek insurance coverage from the Insurance Companies and the Insurance Companies reserve their rights to contest such coverage;

Notwithstanding the foregoing, and in exchange for the consideration herein, the Debtors and the Former Representatives fully release and forever relinquish any and all rights for coverage for defense costs or indemnification or otherwise under Policy No. G27085969 005 issued by Westchester Fire Insurance Company to the Named Insured The Weinstein Company Holdings. By this release, the Debtors and the Former Representatives agree that any duties or obligations of Westchester Fire Insurance Company under Policy No. G27085969 005 are fully and finally extinguished and terminated. The Debtors and the Former Representatives reserve no rights or benefits whatsoever under or in connection with Policy No.

G27085969 005 with respect to any past, present or future claims whatsoever;

(5)    the Former Representatives (except Harvey Weinstein) hereby release the Insurance Companies solely with respect to the Sexual Misconduct Claims in the Non-Settling Plaintiffs' Cases and the Judd Case, solely to the extent that such Sexual Misconduct Claims are enjoined and released vis-à-vis the Former Representatives (except Harvey Weinstein);

(6)    Harvey Weinstein hereby releases the Insurance Companies for all Claims arising in the Non-Settling Plaintiffs' Cases, the Judd Case and the McGowan Case;

(7)    the Debtors and Robert Weinstein hereby release the Insurance Companies for all Claims arising in the Non-Settling Plaintiffs' Cases;

(8)    the Debtors, the TWC Estate, the UCC and the Non-Debtor Affiliates hereby release the Former Representatives for all estate and other causes of action (as applicable);

(9)    the Former Representatives hereby release the Debtors with respect to any and all Claims, including, but not limited to, all Claims by any Class Action Member or any Former Representative or the NYOAG against the Debtors and/or the TWC Estate, which includes: (i) all general unsecured, priority and/or administrative expense claims that have been asserted or could be asserted against the Debtors (except as set forth herein); (ii) any and all claims for substantial contribution pursuant to Section 503(b)(3) of the Bankruptcy Code (provided that such substantial contribution claims shall only be available as consideration for any releases granted pursuant to the Chapter 11 Plan and the approval of the Channeling Injunction and shall not support the request for payments from the TWC Estate); and (iii) any and all contribution and indemnity Claims against the Debtors and/or their respective bankruptcy estates, except to the extent that any of the Debtors are nominally defendants in any insurance coverage litigation; upon occurrence of the Plan Effective Date, all proofs of claim filed by the Former Representatives shall be deemed disallowed and any amounts owed to the Former Representatives as reflected on the Debtors' schedules of assets and liabilities shall be deemed released and discharged;

(10)   the Debtors and/or any Former Representative hereby release any current or former TWC employees and/or contractors from any non-disclosure agreements (if any), arising from or relating to any Sexual Misconduct Claim;[2]

(11)   each Insurance Company hereby releases each and every other Insurance Company for Claims or causes of action, whether in law, in equity, or otherwise, and whether under contract, warranty, tort or otherwise, solely with respect to any claim for recovery of each Insurance Company's respective contribution to the Settlement Amount and any defense costs paid by any Insurance Company prior to the execution of the Global Settlement Agreement for the Claims and any criminal proceedings arising out of the Sexual Misconduct Claims from any other Insurance Company (unless otherwise agreed upon by and between any of the Insurance Companies), provided, however, (i) these releases shall not apply to any Insurance Company's obligations under any contract of reinsurance; (ii) these releases shall not apply to the Claims of Steadfast Insurance Company against AXIS Surplus Insurance Company solely with respect to defense costs paid by Steadfast Insurance Company prior to the execution of this Global Settlement Agreement for the matters referenced in this paragraph, and Steadfast Insurance Company's Claims regarding any such defense costs will be the subject of a separate agreement between Steadfast Insurance Company and AXIS Surplus Insurance Company; and (iii) in the event any Insured seeks coverage for any matters or claims not released herein, each Insurance Company reserves the right to challenge the exhaustion of any applicable policy;

(12)   except as provided in Section 3.B.i.(11) above, the Insurance Companies (on behalf of themselves and their subsidiaries, Affiliates, parents, predecessors, or successors) hereby release the other Released Parties from any and all past, present or future claims, demands, obligations, actions, causes of action, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever (including, without limitation, reimbursement of fees and costs of defense) in any way arising out of or related to the Claims or matters resolved by this Global Settlement Agreement, whether in law, in equity or otherwise, and whether under contract, warranty, tort or otherwise, including but not limited to any claims for bad faith or breach of the implied covenant of good faith and fair dealing; the Insurance Companies shall not seek recovery of the Settlement Amount or any portion

---

[2] On or about the Petition Date, the Debtors publicly announced such release as provided in the press release attached hereto as Exhibit A and the Debtors hereby reaffirm such release.

thereof paid by such Insurance Company from any other Released Party for any reason; <u>provided</u>, <u>however</u> the Insurance Companies do not release any rights, defenses or Claims against The Walt Disney Company, Disney Enterprises, Inc., Buena Vista International, Inc., Miramax, LLC, Miramax Film Corporation and/or Miramax Film NY, LLC.

C.     Certain Plan Releases.

    i.     If a Non-Settling Plaintiff accepts the Chapter 11 Plan, such Non-Settling Plaintiff shall receive $150,000 from the Segregated Defense Fund in full satisfaction, discharge, and release of any and all Sexual Misconduct Claims held by such Non-Settling Plaintiff.

    ii.     Alternatively, if a Non-Settling Plaintiff votes to reject the Chapter 11 Plan, does not vote on the Chapter 11 Plan, or fails to file a proof of claim, pursuant to the provisions of the Chapter 11 Plan, all Sexual Misconduct Claims held by the applicable Non-Settling Plaintiff shall be conclusively, absolutely, unconditionally, irrevocably, and forever discharged and released against all Released Parties other than Harvey Weinstein, including any Sexual Misconduct Claims against all Released Parties other than Harvey Weinstein that are revived or reinstated on appeal. In full satisfaction of their Sexual Misconduct Claims and in consideration for this release, each Non-Settling Plaintiff shall receive $25,000 from the Segregated Defense Fund.

    iii.     On the Plan Effective Date, all Claims for contribution (including Claims for contribution arising from, related to or connected to Tort Claims) held by a Non-Released Party shall be conclusively, absolutely, unconditionally, irrevocably, and forever enjoined, discharged and released against all Released Parties pursuant to the terms of the Chapter 11 Plan.

D.     Exclusions and Waivers.

    i.     Notwithstanding the foregoing, the releases set forth herein shall not include or constitute a release of (i) any Claims in Section 3.B of this Global Settlement Agreement that are specifically excluded from the releases set forth in Sections 3.A and 3.B or (ii) any of the following:

    (1)     any Former Representatives' and/or their respective affiliates' or representatives' Claims (other than Claims released in Sections 1.C.i and 3.B.i), including any claim for indemnification, against any Released Party other than the Debtors, the TWC Estate and the Former Representatives;

    (2)     Robert Weinstein's and Harvey Weinstein's Claims for indemnification against Non-Debtor Entities that arise from, relate to or connect to Tort Claims;

(3)    the Debtors', Harvey Weinstein's, Robert Weinstein's, Frank Gil's and David Glasser's claims and counterclaims against the Debtors, Harvey Weinstein, Robert Weinstein, Frank Gil and David Glasser, arising out of the actions entitled *Frank Gil v. Weinstein Live Entertainment LLC, et. al.*, Supreme Court of the State of New York, County of New York, Case No. 653555/2019, and *Sartraco et. al. v. Robert Weinstein, et. al.*, Superior Court for the State of California, County of Los Angeles, Case No. 19- cv- 00448;

(4)    Claims to enforce the terms of the Chapter 11 Plan and any related documents;

(5)    Claims for professional fees, as further described in the Chapter 11 Plan.

ii.    The Releasing Global Settlement Parties hereby expressly, knowingly and voluntarily waive the provisions of Section 1542 of the California Civil Code (or any comparable statutory or common law provision of any other jurisdiction with respect to the Claims released pursuant to this Global Settlement Agreement), which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Releasing Global Settlement Parties expressly waive and relinquish any and all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory that is similar, comparable, or equivalent to Section 1542, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Claims. In connection with such waiver and relinquishment, the Releasing Global Settlement Parties hereby acknowledge that they are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those that they now know or believe exist with respect to the Claims, but that it is their intention to hereby fully, finally, and forever settle and release all of the Claims known or unknown, suspected or unsuspected, matured or unmatured, disclosed or undisclosed, contingent or absolute, liquidated or unliquidated, accrued or unaccrued, apparent or unapparent, that they have against the Released Parties. In furtherance of such intention, the release herein given by Releasing Global Settlement Parties to the Released Parties shall be and remain in effect as a full and complete general release as to the Claims, notwithstanding the discovery or existence of any

such additional different claims or facts. Each of the Parties expressly acknowledges that he/she/it has been advised by his/her/its attorney of the contents and effect of Section 1542, and with knowledge, each of the Parties hereby expressly waives whatever benefits he/she/it may have had pursuant to such section.

4.      Dismissal of Pending Cases.

Any pending litigation relating to any Non-SMC Claim that is subject to this Global Settlement Agreement shall be dismissed with prejudice. Each applicable plaintiff shall take all necessary actions to effect such dismissals within 21 days following the Plan Effective Date.

5.      No Admission.

By entering into this Global Settlement Agreement, no Released Party is admitting any wrongdoing, liability, fault or violation of law and no Insurance Company is admitting coverage under any policy of insurance. Rather, the Parties agree and acknowledge that (i) Debtors and Former Representatives deny all allegations and Claims asserted against them, (ii) this Global Settlement Agreement is without prejudice to any coverage position taken or that may be taken by any Insurance Company or any Former Representative in the event this Global Settlement Agreement does not become effective, and (iii) the Parties are entering into the Settlement to avoid the risk, burden, and expense of continued litigation.

6.      Costs

A.      Class Action Counsel Fees and Costs.  All attorneys' fees and costs to Class Action Counsel as well as any fee award and related matters will be resolved as specified in the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement.

B.      Expenses of TWC Estate Implementation and Administration.  All costs of implementing this Global Settlement Agreement and of administering the TWC Estate, including without limitation costs attendant to notice and implementing the Channeling Injunction in the United States, shall be paid by the TWC Estate. Matters relating to obtaining court approval of the Class Action Settlement Agreement and administering the Class Action Settlement Fund shall be handled as specified in the Class Action Settlement Agreement.  Matters relating to administration of the Individual Plaintiffs' Settlement Fund shall be handled as specified in the Individual Plaintiffs' Settlement Agreement. No Former Representative or Insurance Company shall have any obligation to fund any expense incurred by or in the course of the administration of the TWC Estate; provided, however, the TWC Estate shall not bear the costs of seeking enforcement of the Channeling Injunction or the Chapter 11 Plan in any foreign jurisdictions.

7.    <u>Cooperation in Litigation Against Lantern Entertainment.</u>

The Debtors (and any liquidating or similar trust of the TWC Estate established by the Debtors pursuant to any confirmed Chapter 11 Plan) shall provide reasonable cooperation (which cooperation shall be limited to the reasonable cooperation of any counsel who is advising or representing the Liquidation Trustee) to Robert Weinstein in connection with Robert Weinstein's prosecution of claims against Lantern Entertainment for monies for breach of that asset purchase agreement by and among TWC and Lantern Entertainment, among others, entered into on March 19, 2018, and for Lantern Entertainment's allegedly unlawful refusal to pay monies past due and owing on account of Robert Weinstein's participation interest in the movie Scream 4. In consideration for such cooperation, Robert Weinstein shall pay to the Debtors (or any liquidating or similar trust established by the Debtors pursuant to any confirmed Chapter 11 Plan) 20% of the net proceeds recovered from Lantern Entertainment (or any successor thereto) on account of such participation interest and any reasonable attorneys' costs associated with such cooperation. For purposes of this provision, the term "net proceeds" shall mean the gross proceeds actually recovered less the actual costs and expenses incurred by Robert Weinstein in connection with the prosecution of such claims (including any appeals). This Section 7 shall not affect or create any obligation of any of the other Parties to this Global Settlement Agreement.

8.    <u>Chapter 11 Plan Support; Channeling Injunction Support; Other Support.</u>

So long as the Global Settlement Agreement shall not have been terminated in accordance with Section 22, the Parties shall not support any Chapter 11 Plan in the Chapter 11 Cases that is inconsistent with this Global Settlement Agreement and the terms hereof, and the Parties agree that:

A.    The Debtors shall (i) file the Chapter 11 Plan with the Bankruptcy Court by July 1, 2020 and (ii) use best efforts to obtain confirmation of the Chapter 11 Plan as soon as reasonably practicable in accordance with the Bankruptcy Code and on terms consistent with this Global Settlement Agreement.

B.    The Debtors shall, as promptly as practicable following entry of the District Court Final Approval Order, file a motion seeking entry of the Confirmation Order.

C.    Each Party shall support entry of the Confirmation Order so long as such order and underlying settlements and/or Chapter 11 Plan is consistent with the terms of this Global Settlement Agreement (each a "<u>Conforming Settlement</u>" or "<u>Conforming Chapter 11 Plan</u>").

D.    Each Party entitled to vote on the Chapter 11 Plan will (i) support and vote to accept the Chapter 11 Plan to the extent it is a Conforming Chapter 11 Plan and (ii) opt-in to any consensual releases thereunder.

E.    Each Party shall use best efforts to support and cooperate with the Debtors to obtain confirmation of the Chapter 11 Plan and any regulatory or other approvals necessary for confirmation or effectiveness of the Chapter 11 Plan to the extent it is a Conforming Chapter 11 Plan.

F.     No Party shall: (i) object to, delay, impede, or take any other action to interfere with acceptance, confirmation or implementation of the Chapter 11 Plan so long as it is a Conforming Chapter 11 Plan; (ii) directly or indirectly solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of liquidation or reorganization for the Debtors other than the Chapter 11 Plan so long as it is a Conforming Chapter 11 Plan or (iii) otherwise take any action that would interfere with, delay, impede, or postpone (a) the solicitation of acceptances, consummation or implementation of the Chapter 11 Plan so long as it is a Conforming Chapter 11 Plan, or (b) the Plan Effective Date.

G.     In the event a person or entity asserts a Claim or commences an action against a Released Party and such Claim or action arises from, connects to or relates to a Tort Claim, the Released Party (or Released Parties) against whom such Claim or action is asserted shall take all commercially reasonable actions to enforce or otherwise have recognized the terms of the Confirmation Order and the Chapter 11 Plan (including, but not limited to, the Bankruptcy Injunctions), which provide that such Claim or action is discharged, released and enjoined pursuant to the Confirmation Order and the Chapter 11 Plan.

H.     The Parties to this Global Settlement Agreement shall support the entry of a Bankruptcy Court order approving the Channeling Injunction.

9.     Further Assurances.

       The Parties hereto acknowledge and agree that they will each cooperate in the execution and delivery of any other or further documentation that may be reasonably necessary to carry out the intentions of this Global Settlement Agreement.

10.    Tort Victims Bar Date.

       On the day the motion seeking entry of the District Court Preliminary Approval Order is filed, the Debtors shall file a motion to establish a Tort Victims Bar Date for all Tort Claims against the TWC Estate (including all Claims that constitute Sexual Misconduct Claims). To the extent feasible, the Tort Victims Bar Date shall be the same date as the claim forms deadline for the Class Action Litigation established by the District Court for Class Action Members.

11.    Effectiveness.

A.     This Global Settlement Agreement shall be binding on all Parties upon the Settlement Signing Date; provided, however, that none of Section 1 (Payment of Settlement Amount); Section 2 (Claims Recovery); Section 3 (Mutual Release and Dismissal of Claims); or Section 4 (Dismissal of Pending Claims), shall be effective until the occurrence of the Plan Effective Date.

B.     Upon the Settlement Signing Date and until the Plan Effective Date, the Parties shall proceed in good faith to seek Bankruptcy Court approval of this Global Settlement Agreement and the Parties shall not, directly or indirectly, propose, file,

support, solicit, encourage or participate in any settlement agreement other than this Global Settlement Agreement, the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement; provided, however, the Parties may continue any settlement discussions with the Non-Settling Plaintiffs regarding the settlement of their Sexual Misconduct Claims.

C.      Upon the Plan Effective Date, which shall occur only following entry of the District Court Final Approval Order, this Global Settlement Agreement (including all of Section 1, Section 2, Section 3 and Section 4) shall become fully effective.

D.      Any Foreign Court Approval Orders, as may be mutually deemed necessary and agreed upon by the Former Representatives and the Insurance Companies, and the costs of which shall be borne exclusively by those Former Representatives who seek such orders, may be obtained at any time and from time to time following the Plan Effective Date (as determined by the Former Representatives and the Insurance Companies), but shall not constitute a condition to this Global Settlement Agreement becoming fully effective as provided in the immediately preceding section. The Debtors and other Parties will reasonably cooperate with the obtaining of any such Foreign Court Approval Order, but will not be required to incur any unreimbursed costs or expenses related thereto (including attorneys' fees).

E.      In the event the Bankruptcy Court declines to enter the Confirmation Order, unless the Parties agree otherwise, this Global Settlement Agreement shall be deemed terminated, null and void, and the Parties will be excused from any future performance thereunder. In such event, nothing in this Global Settlement Agreement shall be admissible as evidence in any case or proceeding for any purpose, it being the intent of the Parties that in such circumstance all discussions and negotiations related to the Global Settlement Agreement will be treated as inadmissible settlement discussions protected under Federal Rule of Evidence 408 and its state law equivalents.

12.    Tolling.

Any unexpired statute of repose, statute of limitations, limitation or laches period, or other provision that requires, mandates, or establishes any deadline for the commencement or filing of any matter, proceeding or other action, or the assertion of any right, claim or defense related thereto, by or on behalf of the Debtors against the applicable Former Representatives, or any of them, applicable to any of the Excluded Actions (as defined in the Asset Purchase Agreement with Lantern Entertainment dated March 19, 2018) covered under sections 108 and 546 of the Bankruptcy Code (collectively, the "Limitation Deadline"), are hereby tolled until the earlier of (i) the Plan Effective Date or (ii) forty-five (45) days after the first hearing at which the Bankruptcy Court declines to approve the Confirmation Order.

13.    Jurisdiction.

This Global Settlement Agreement shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is applicable,

the laws of the State of New York shall govern, without giving effect to the choice of law principles thereof, including as to all matters of the construction, validity and performance of this Global Settlement Agreement.

14. <u>Dispute Resolution.</u>

In the event of a dispute arising out of this Global Settlement Agreement after the Plan Effective Date, such dispute shall first be referred to the respective senior representatives or counsel of the Parties, who shall in good faith endeavor to amicably resolve the dispute. Any such dispute, controversy or claim arising out of, relating to, or in connection with this Global Settlement Agreement, or the breach, termination of validity thereof that is not resolved by the Parties pursuant to the preceding sentence, shall be adjudicated or otherwise resolved in the Bankruptcy Court; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, controversy or claim, the New York State courts located in New York County and/or the federal courts of the United States of America located in New York County will have sole jurisdiction over such dispute, controversy or claim. Upon the Plan Effective Date, the Parties consent to venue and personal jurisdiction over them in those courts solely with regards to any such dispute, controversy or claim and shall not object to or otherwise challenge the same.

15. <u>Public Statements; Confidentiality.</u>

No Party shall issue any press release or make any public statement regarding this Global Settlement Agreement prior to the Settlement Signing Date without the prior consent of the other Parties. Notwithstanding anything in this Global Settlement Agreement to the contrary, prior to the filing of this Global Settlement Agreement with the Bankruptcy Court, nothing in this Global Settlement Agreement shall require any Party to take or refrain from taking any action that it determines in good faith would be inconsistent with applicable law.

16. <u>Entire Agreement.</u>

This Global Settlement Agreement, along with the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement, represents the entire agreement of the Parties with respect to the matters and transactions that are the subject of this Global Settlement Agreement, the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement.

17. <u>Integration.</u>

This Global Settlement Agreement, along with the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement, supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, between any or all of the Parties with regard to the matters and transactions that are the subject of this Global Settlement Agreement, the Class Action Settlement Agreement and the Individual Plaintiffs' Settlement Agreement, including without limitation the Settlement Term Sheet.

18.    <u>Amendments.</u>

        No amendment to this Global Settlement Agreement shall be effective unless made in writing and signed by all Parties.

19.    <u>Construction.</u>

        As this Global Settlement Agreement was jointly drafted by the Parties, no provision of this Global Settlement Agreement shall be construed against or interpreted to the disadvantage of any Party by any court or other governmental or judicial authority by reason of such Party having or being deemed to have structured or drafted such provision.

        With respect to any matters that are subject to this Global Settlement Agreement, the Class Action Settlement Agreement, and the Individual Plaintiffs' Settlement Agreement, in the event of an asserted conflict between this Global Settlement Agreement and the Class Action Settlement Agreement or this Global Settlement Agreement and the Individual Plaintiffs' Settlement Agreement, the terms of the Global Settlement Agreement shall control (<u>provided</u>, <u>however</u>, with respect to any matters relating to rights or obligations of the (i) Class Action Members, the Class Action Settlement Agreement shall control and (ii) Individual Plaintiffs, the Individual Plaintiffs' Settlement Agreement shall control).

20.    <u>Notices.</u>

        Should any notice be required or sent with respect to this Global Settlement Agreement, such notice shall be in writing and be given in person by means of electronic mail (with request for assurance of receipt in a manner typical with respect to communications of that type), by recognized overnight courier that maintains written confirmation of delivery or by registered or certified mail, and shall become effective:  (i) on delivery if given in person; (ii) on the date of transmission if sent by electronic mail; (iii) one (1) Business Day after delivery by overnight courier; or (iv) three (3) Business Days after being mailed, with proper postage and documentation, for first-class registered or certified mail, prepaid. Notices shall be addressed as specified in Schedule 2.

21.    <u>Voluntary Signing of Agreement.</u>

        The Parties acknowledge that they each have voluntarily entered into this Global Settlement Agreement.  The Parties further acknowledge that they each have read this Global Settlement Agreement and understand all of its terms, including the mutual release and dismissal of claims in Section 3 of this Global Settlement Agreement. The Parties acknowledge that they may hereafter discover claims or facts in addition to or different from those they now know or believe to exist with respect to the subject matter of this Global Settlement Agreement which, if they had known or suspected at the time of execution of this Global Settlement Agreement, may have materially affected the Settlement embodied herein.  The Parties nevertheless agree that the mutual release and dismissal of claims in Section 3 applies to any such additional or different claims or facts.

22.  <u>Consent, Withdrawal and Termination Rights</u>.

Each Former Representative and each Insurance Company may withdraw from this Global Settlement Agreement, solely as to itself, by written notice stating the Former Representative's or Insurance Company's intention to withdraw from this Global Settlement Agreement pursuant to this Section 22 and the basis for such withdrawal, on or after the occurrence of any of the following (at which time this Global Settlement Agreement shall be deemed to be terminated and null and void):

A.  the Chapter 11 Plan or Confirmation Order is amended, modified or otherwise changed in a manner that adversely affects its rights in any material respect, including but not limited to with respect to any of the following: (i) the provisions of the Chapter 11 Plan that relate to the exculpation and release of the Former Representatives or the Insurance Companies contemplated in this Global Settlement Agreement, including, without limitation, any non-consensual releases of any holders of Tort Claims against any Former Representative and the waiver of any such Former Representative's rights to seek full reimbursement under the Insurance Policies; and (ii) the form of Channeling Injunction attached hereto as Exhibit B;

B.  the noticing and claims procedures and other implementation in connection with the Channeling Injunction effectuated pursuant to the Chapter 11 Plan are not reasonably satisfactory to a Former Representative or an Insurance Company;

C.  any Party has failed to perform any of their obligations set forth in this Global Settlement Agreement, which failure to perform (i) would adversely and materially affect such Former Representative's or Insurance Company's rights under this Global Settlement Agreement and (ii) is incapable of being cured, or if capable of being cured, has not been cured within 10 calendar days following receipt by the breaching Party of written notice of such failure to perform from such Former Representative or such Insurance Company; or

D.  the Pre-2005 Subclass Opt-Out Agreement (as defined in the Class Action Settlement Agreement) is not consummated, or the right to withdraw from this Global Settlement Agreement under the terms of the Pre-2005 Subclass Opt-Out Agreement is triggered; <u>provided</u>, <u>however</u>, any Insurance Company that elects to withdraw from and thereby terminate this Global Settlement Agreement shall provide written notice to Class Action Counsel, the NYOAG, the UCC, the Debtors and the Former Representatives, within ten (10) Business Days following the Pre-2005 Subclass Opt-Out Deadline (as defined in the Class Action Settlement Agreement), and at least 72 hours before providing written notice, the applicable Insurance Company shall confer in good faith with Class Action Counsel and the NYOAG; or

E.  the Confirmation Order is not entered on or before December 31, 2020.

23. <u>Cross-Termination</u>.

This Global Settlement Agreement shall automatically terminate and become null and void upon any Party's withdrawal from this Global Settlement Agreement and/or termination of the Class Action Settlement Agreement or the Individual Plaintiffs' Settlement Agreement. The Parties agree that if this Global Settlement Agreement is terminated for any reason, the Parties and the applicable litigations will return to the status quo immediately preceding the date of this Agreement. In such event, nothing in this Global Settlement Agreement shall be admissible as evidence in any case or proceeding for any purpose, it being the intent of the Parties that in such circumstance all discussions and negotiations related to this Global Settlement Agreement will be treated as inadmissible settlement discussions protected under Federal Rule of Evidence 408 and its state law equivalents.

24. <u>Authority</u>.

Each individual executing this Global Settlement Agreement in a representative capacity represents and warrants that he/she is duly authorized to do so and that his/her signature so binds the represented Party, its former, current, and future Affiliates, predecessors, successors, privies, assigns, members, partners, employees, agents, representatives, heirs, administrators and executors, and all others who are acting or have acted on its behalf and that the representations made herein are true and correct. Each Party represents and warrants that, solely as to itself and solely in respect to any claims asserted by or against such Party that are settled herein, no other person or entity currently possesses any interest in the respective claims being settled herein.

25. <u>Severability</u>.

If a provision of this Global Settlement Agreement is determined by a court of competent jurisdiction to be unenforceable under applicable law, that provision will be enforced to the maximum extent permitted by applicable law and the remaining provisions of this Global Settlement Agreement will continue in full force and effect; <u>provided</u>, <u>however</u>, nothing in this Section 25 shall in any way affect or limit the consent, withdrawal and termination rights specified in Section 22 of this Global Settlement Agreement.

26. <u>Counterparts.</u>

This Global Settlement Agreement may be executed in one or more counterparts, each of which will be deemed an original and part of one and the same document. Signatures delivered in PDF format shall be deemed original signatures.

****

IN WITNESS WHEREOF, the Parties have caused this Global Settlement Agreement to be executed in a manner legally binding upon them as of the Settlement Signing Date.

[*signature pages follow*]

*For the Debtors*


By: _____

Name: Ivona Smith
Title:  Director, The Weinstein Company
        Holdings, LLC


The Weinstein Company Holdings LLC,
a Delaware Limited Liability Company

The Weinstein Company LLC,
a Delaware Limited Liability Company

Avenging Eagle SPV, LLC,
a Delaware Limited Liability Company

Branded Partners LLC,
a Delaware Limited Liability Company

Check Hook LLC,
a Delaware Limited Liability Company

CTHD 2 LLC,
a Delaware Limited Liability Company

Cues TWC (ASCAP), LLC,
a Delaware Limited Liability Company

Current War SPV, LLC,
a Delaware Limited Liability Company

DRT Films, LLC,
a Delaware Limited Liability Company

DRT Rights Management LLC,
a Delaware Limited Liability Company

FFPAD, LLC,
a Delaware Limited Liability Company

HRK Films, LLC,
a Delaware Limited Liability Company

InDirections LLC,
a Delaware Limited Liability Company

InteliPartners LLC,
a Delaware Limited Liability Company

ISED, LLC,
a Delaware Limited Liability Company

MarcoTwo, LLC,
a Delaware Limited Liability Company

One Chance LLC,
a Delaware Limited Liability Company

PA Entity 2017, LLC,
a Delaware Limited Liability Company

Paddington 2, LLC,
a Delaware Limited Liability Company

PS Post LLC,
a Delaware Limited Liability Company

Scream 2 TC Borrower, LLC,
a Delaware Limited Liability Company

Small Screen Productions LLC,
a Delaware Limited Liability Company

Small Screen Trades LLC,
a Delaware Limited Liability Company

Spy Kids TV Borrower, LLC,
a Delaware Limited Liability Company

Team Players LLC,
a Delaware Limited Liability Company

The Actors Group LLC,
a Delaware Limited Liability Company

The Giver SPV, LLC,
a Delaware Limited Liability Company

Tulip Fever LLC,
a Delaware Limited Liability Company

TWC Borrower 2016, LLC,
a Delaware Limited Liability Company

TWC Domestic LLC,
a Delaware Limited Liability Company

TWC Fearless Borrower, LLC,
a Delaware Limited Liability Company

TWC Library Songs (BMI), LLC,
a Delaware Limited Liability Company

TWC Loop LLC,
a Delaware Limited Liability Company

TWC Mist, LLC,
a Delaware Limited Liability Company

TWC Polaroid SPV, LLC,
a Delaware Limited Liability Company

TWC Production-Acquisition Borrower
2016, LLC,
a Delaware Limited Liability Company

TWC Production, LLC,
a Delaware Limited Liability Company

TWC Replenish Borrower, LLC,
a Delaware Limited Liability Company

TWC Short Films, LLC,
a Delaware Limited Liability Company

TWC Untouchable SPV, LLC,
a Delaware Limited Liability Company

TWC Waco SPV, LLC,
a Delaware Limited Liability Company

Twenty O Five Holdings, LLC,
a Delaware Limited Liability Company

W Acquisition Company LLC,
a Delaware Limited Liability Company

WC Film Completions, LLC,
a Delaware Limited Liability Company

Weinstein Books, LLC,
a Delaware Limited Liability Company

Weinstein Development LLC,
a Delaware Limited Liability Company

Weinstein Global Funding Corp.,
a Delaware Corporation

Weinstein Global Film Corp.,
a Delaware Corporation

Weinstein Productions LLC,
a Delaware Limited Liability Company

Weinstein Television LLC,
a Delaware Limited Liability Company

WTV Guantanamo SPV, LLC,
a Delaware Limited Liability Company

WTV JCP Borrower 2017, LLC,
a Delaware Limited Liability Company

WTV Kalief Browder Borrower, LLC,
a Delaware Limited Liability Company

WTV Scream 3 SPV, LLC,
a Delaware Limited Liability Company

WTV Yellowstone SPV, LLC,
a Delaware Limited Liability Company

*For Current Films UK Limited*
*a Delaware Limited Liability Company*

By: _____

Name: Ivona Smith
Title:   Director, The Weinstein Company
         Holdings, LLC

*For MarcoThree, LLC,*
*a Delaware Limited Liability Company*

By:_____

Name: Ivona Smith
Title:   Director, The Weinstein Company
         Holdings, LLC

*For Tulip Fever Films Limited,*
*a Delaware Limited Liability Company*

By:_____

Name: Ivona Smith
Title:   Director, The Weinstein Company
         Holdings, LLC

*For The Weinstein Company (UK) Ltd.,*
*a UK Private Limited Company*

By:_____

Name: Ivona Smith
Title:   Director, The Weinstein Company
         Holdings, LLC

For the Official Committee of Unsecured
Creditors

By: _____
Name: Louisette Geiss
Title: Committee Co-Chair

*For the Official Committee of Unsecured Creditors*

By:_____

Name: Lori Wentworth Odierno,
      William Morris Endeavor
      Entertainment
Title: Committee Co-Chair

*For Harvey Weinstein*

By:

Name:  Elior D. Shiloh, Esq.

Title:

*For Robert Weinstein*

By:__ _____
Name:
Title:

DocuSign Envelope ID: 5E9E475C-6603-4D67-9E84-B82D974E77F7

*For James Dolan*

By: _____
Name:
Title:

*For Frank Gil*

By: _____
Name:
Title:

*For David Glasser*

By:  /s/ Douglas E. Grover
Name:  Douglas E, Grover
Title:    Partner
            Schlam Stone & Dolan LLP

*For Paul Tudor Jones*

By:_____
Name:
Title:

*For Marc Lasry*

By:_____

Name:

Title:

*For Jeff Sackman*

By: _____
Name:
Title: jeff sackman

For Barbara Schneeweiss

By:
Name:
Title:

Scanned with
Mobile Scanner

*For Lance Maerov*

By:_____
Name:
Title:

*For Tarak Ben Ammar*

By:_____
Name: Tarak BEN AMMAR
Title:

*For Richard Koenigsberg*

By:_____

Name: Richard Koenigsberg

Title:

*For Dirk Ziff*

By: _____

Name: _____

Title:

*For Tim Sarnoff*

By: _____

Name:

Title: TIM SARNOFF

*For AIG Claims, Inc., on behalf of*
*AIG Specialty Insurance Company*

By:     /s/ J. Bryan McCarthy
Name:   Bryan McCarthy
Title:   Assistant Vice President

*For Fireman's Fund Insurance Company*

By: _____

Name: IAN GALLOWAY

Title: CLAIM DIRECTOR

*For The American Insurance Company*

By: _____

Name: IAN GALLOWAY

Title: CLAIM DIRECTOR

For ACE American Insurance
Company

By:_____
Name:  Christopher J. Celentano
Title:  Senior Vice President,
          Coverage & Complex Claims

*For AXIS Surplus Insurance Company*

By:_____
Name: Kim W. West
Title:   Partner, Clyde & Co US LLP

*For Chubb National Insurance Company*

By:_____
Name: Christopher J. Celentano
Title:  Senior Vice President,
        Coverage & Complex Claims

*For Executive Risk Indemnity Inc.*

By:_____
Name:  Christopher J. Celentano
Title:   Senior Vice President,
            Coverage & Complex Claims

*For Federal Insurance Company*

By:_____
Name:  Christopher J. Celentano
Title:   Senior Vice President,
          Coverage & Complex Claims

*For Great Northern Insurance Company*

By:_____
Name: Christopher J. Celentano
Title: Senior Vice President,
        Coverage & Complex Claims

*For National Union Fire Insurance
Company of Pittsburgh, PA.*

By: *Richard F. Dziedziula*

Name: Richard F. Dziedziula

Title: Vice President Financial Lines

*For Pacific Indemnity Company*

By:_____
Name:  Christopher J. Celentano
Title:   Senior Vice President,
          Coverage & Complex Claims

*For Steadfast Insurance Company*

By: John A Shane

Digitally signed by John A Shane
Date: 2020.06.29 16:00:29 -05'00'

Name:

Title:

*For Westchester Fire Insurance Company*

By:_____
Name: Christopher J. Celentano
Title:  Senior Vice President,
        Coverage & Complex Claims

*For Zurich American Insurance*
*Company*

By: __John A Shane__ Digitally signed by John A Shane
Date: 2020.06.29 16:01:35 -05'00'

Name:

Title:

*For Chubb Indemnity Insurance
Company*

By:_____
Name:  Christopher J. Celentano
Title:   Senior Vice President,
          Coverage & Complex Claims

*For The Travelers Companies Inc.*
*Travelers Casualty and Surety*
*Company, formerly known as The*
*Aetna Casualty and Surety Company*
*St. Paul Surplus Lines Insurance*
*Company*
*Gulf Insurance Company*
*Travelers Indemnity Company*
*St. Paul Fire & Marine Insurance*
*Company*
*Travelers Excess and Surplus Lines*
*Insurance Company*
*Travelers Casualty and Surety*
*Company of America*

By:

Name: Martin P. Lavelle
Title: Managing Counsel
        Travelers Claim Legal

## <u>EXHIBIT A</u>

The Weinstein Company Press Release of March 19, 2018



**TWC and Lantern Capital Partners Enter Into Stalking Horse Agreement
for Section 363 Sale**

**Deal Contemplates Business Continuing as a Going Concern**

**TWC Releases NDA Obligations**

FOR IMMEDIATE RELEASE – March 19, 2018

The Weinstein Company Holdings LLC today entered into a "stalking horse" agreement with an affiliate of Lantern Capital Partners, a Dallas-based private equity company. TWC entered into the agreement with Lantern in conjunction with the filing of a voluntary petition under the United States Bankruptcy Code in the United States Bankruptcy Court in the District of Delaware. Under the agreement, Lantern will purchase substantially all of the assets of the Company, subject to certain conditions including approval of the Bankruptcy Court. The Board selected Lantern in part due to Lantern's commitment to maintain the assets and employees as a going concern. The Company hopes that this orderly sale process under the supervision of the Bankruptcy Court will allow it to maximize the value of the Company's assets for the benefit of its creditors and other stakeholders.

Today, the Company also takes an important step toward justice for any victims who have been silenced by Harvey Weinstein. Since October, it has been reported that Harvey Weinstein used non-disclosure agreements as a secret weapon to silence his accusers. Effective immediately, those "agreements" end. The Company expressly releases any confidentiality provision to the extent it has prevented individuals who suffered or witnessed any form of sexual misconduct by Harvey Weinstein from telling their stories. No one should be afraid to speak out or coerced to stay quiet. The Company thanks the courageous individuals who have already come forward. Your voices have inspired a movement for change across the country and around the world.

"While we had hoped to reach a sale out of court, the Board is pleased to have a plan for maximizing the value of its assets, preserving as many jobs as possible and pursuing justice for any victims," said Chairman Robert Weinstein. The Board also expressed its great appreciation to New York Attorney General Eric Schneiderman, and his colleagues, for helping the Company achieve these objectives.



Lantern co-founders Andy Mitchell and Milos Brajovic stated: "We are honored to be selected as the bidder to acquire the company's businesses as an ongoing concern. In the last several months, Lantern has evaluated the company and is proud to provide a solution to the board. As with all our businesses, Lantern will improve the performance of the company's businesses with the utmost respect to all employees and promote a diverse and transparent environment. We are grateful for everyone involved in the transaction and look forward to following through on our promise to reposition the business as a preeminent content provider, while cultivating a positive presence in the industry."

The Company regrets that it cannot undo the damage Harvey Weinstein caused, but hopes that today's events will mark a new beginning. Even as the Company heads into bankruptcy, the Company remains committed to doing whatever it can to maximize value for its creditors and, in cooperation with Attorney General, continue its pursuit of justice for any victims.

## <u>About Lantern Capital Partners</u>

Founded in 2010, Lantern is a private equity firm that has managed and/or acquired over $2 billion in assets across a diverse range of industries. As a true partner to investors with a commitment to providing solutions to complicated business problems, Lantern believes in hands-on investment management and partnership with leading industry executives and complete integrity. Lantern has earned the reputation for its turnaround capabilities because of the history of investing in and contributing to the growth of businesses that foster long-term value. Led by Co-Founders Andy Mitchell and Milos Brajovic, Lantern Capital Partners is headquartered in Dallas, TX, with its affiliate, Lantern Asset Management. For more information about Lantern, please visit www.lanternam.com.

## EXHIBIT B

Form of Channeling Injunction

From and after the Effective Date: (i) all Class Action Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Chapter 11 Plan, the Global Settlement Agreement, the Class Action Settlement Agreement, and the Confirmation Order; and (ii) upon the funding of the Class Action Settlement Fund by the Insurance Companies on behalf of the Released Parties, the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with any Class Action Sexual Misconduct Claim, provided, however, that nothing in the Chapter 11 Plan shall preclude any action by the Settlement Parties to enforce the Chapter 11 Plan. Further, nothing in this Section 5.11 of the Chapter 11 Plan or the Channeling Injunction shall constitute or be deemed a waiver of any claim, right or Cause of Action by any Settlement Party against any entity that is not a Released Party in connection with any Class Action Sexual Misconduct Claim. For the avoidance of doubt, the Channeling Injunction shall be binding upon, and enforceable by its terms against, all holders of Class Action Sexual Misconduct Claims, irrespective of whether any such holder (i) has voted to accept the Chapter 11 Plan, (ii) has signed the Class Action Settlement Agreement, or (iii) has agreed to be bound by the Channeling Injunction. In order to supplement the injunctive effect of the Bankruptcy Injunctions, and pursuant to sections 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

I.  **Channeling Injunction Terms**. In order to (i) preserve and promote the Settlement Agreements and the Chapter 11 Plan and (ii) supplement, where necessary, the effect of the injunctions and the releases described in Sections 7.2 and 7.3 of the Chapter 11 Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code and of the District Court, all Persons that have held or asserted, or that hold or assert, or that may hold or assert in the future, any Class Action Sexual Misconduct Claim against the Released Parties, or any of them, shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any such Released Party with respect to any such Class Action Sexual Misconduct Claim, including, but not limited to:

    A.  commencing or continuing, in any manner, whether directly or indirectly, any suit, actions or other proceedings of any kind with respect to any Class Action Sexual Misconduct Claim against any of the Released Parties or against the property of any of the Released Parties;

    B.  enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, whether directly or indirectly, from any of the Released Parties, or the property of the Released Parties, any judgment, award, decree or other order with respect to any such Class Action Sexual Misconduct Claim against any of the Released Parties, or any other person;

C. creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind relating to any Class Action Sexual Misconduct Claim against any of the Released Parties, or the property of any of the Released Parties;

D. asserting, implementing or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any Class Action Sexual Misconduct Claim of any kind, whether directly or indirectly, against (i) any obligation due to any of the Released Parties, (ii) any of the Released Parties; or (iii) the property of any of the Released Parties; and

E. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Class Action Sexual Misconduct Claim.

II. **Reservations**. Notwithstanding anything to the contrary in Section 5.8.1 of the Plan, this Channeling Injunction shall not enjoin or affect the rights of any persons or entities to the treatment afforded to them under the Plan, including the right of Holders of Class Action Sexual Misconduct Claims to assert such Claims in accordance with the Class Action Settlement Agreement and the Plan.

III. **Modifications**. Notwithstanding an order by the Bankruptcy Court modifying this Channeling Injunction to comply with the Bankruptcy Code, the scope of this Channeling Injunction may not be amended, modified, or limited in any material respect without the prior consent of the Settlement Parties.

IV. **Authorization for Recognition and Enforcement of Channeling Injunction.** The Settlement Parties (and each of them) are authorized to take all necessary or appropriate actions, in accordance with the terms of this Plan and the agreements incorporated herein, to enforce, or otherwise have recognized, the Confirmation Order, the Plan, the Channeling Injunction, or any other related document, in any jurisdiction worldwide and without limitation; provided, however, the cost of such actions shall be borne by the Party seeking enforcement or recognition unless otherwise provided in the Plan or the applicable Plan Document.

## **SCHEDULE 1**

Individual Insurance Company Funding Amounts
[SEALED]

## <u>SCHEDULE 2</u>

To the extent any notice is required with respect to the Global Settlement Agreement, notices shall be addressed as follows:

i.      if to Debtors and the Non-Debtor Affiliates:

Paul H. Zumbro
Lauren A. Moskowitz
CRAVATH SWAINE & MOORE, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Phone: (212) 474-1000
pzumbro@cravath.com
lmoskowitz@cravath.com

and

Paul N. Heath
RICHARDS, LAYTON & FINGER, PA
920 N King St.
Wilmington, DE 19801
Phone: (302) 651-7700
heath@RLF.com

ii.     if to the NYOAG

Sandra Pullman
NEW YORK OFFICE OF THE ATTORNEY GENERAL
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8252
Sandra.Pullman@ag.ny.gov

iii.    if to the UCC

Robert Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue
New York, NY 10017
Phone: (212) 561-7700
rfeinstein@pszjlaw.com

iv.     if to Former Representatives

Elior Shiloh
LEWIS BRISBOIS BISGAARD & SMITH, LLP
77 Water Street, Suite 2100
New York, NY 10005
Phone: (212) 232-1300
elior.shiloh@lewisbrisbois.com

and

Adam Harris
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
Phone: (212) 756-2253
adam.harris@srz.com

and

Lawrence S. Spiegel
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
lawrence.spiegel@skadden.com

and

Marvin Putnam
LATHAM & WATKINS LLP
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Phone: (424) 653-5588
marvin.putnam@lw.com

and

Mark Silverschotz
ANDERSON KILL P.C.
1251 6th Avenue
New York, NY 10020
Phone: (212) 278-1000
msilverschotz@andersonkill.com

and

Kathy Jorrie
PILLSBURY WINTHROP SHAW
PITTMAN LLP
725 South Figueroa Street
Suite 2800
Los Angeles, CA 90017
Phone: (213) 488-7100
kathy.jorrie@pillsburylaw.com

and

Israel David
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY 10004
Phone: (212) 859-8000
israel.david@friedfrank.com

and

James D. Wareham
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
Phone: (202) 639-7000
james.wareham@friedfrank.com

and

Ann Kramer
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 521-5400
akramer@reedsmith.com

and

James V. Masella, III
Daniel A. Lowenthal
Alejandro H. Cruz
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 6th Avenue
New York, NY 10036
Phone: (212) 336-2000
jmasella@pbwt.com
dalowenthal@pbwt.com
acruz@pbwt.com

and

John J. Rosenberg
ROSENBERG, GIGER & PERALA P.C.
1330 Avenue of the Americas
Suite 1800
New York, NY  10019
Phone:  (646) 494-5000
jrosenberg@rglawpc.com

and

Douglas E. Grover
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, NY 10004
Phone: (212) 344-5400
dgrover@schlamstone.com


v.     If to the Insurance Companies:

Kim W. West
CLYDE & CO US LLP
101 Second Street, 24th Floor
San Francisco, CA 94105
Phone: (415) 365-9880
Kim.West@clydeco.us

and

Martin P. Lavelle
TRAVELERS
One Tower Square
Hartford, CT 06183
Phone: (860) 277-0710
mplavell@travelers.com

and

Joseph A. Hinkhouse
Smita Mokshagundam
HINKHOUSE WILLIAMS WALSH LLP
180 N. Stetson Ave., Suite 3400
Chicago, IL 60601
Phone: (312) 784-5474
jhinkhouse@hww-law.com
smokshagundam@hww-law.com

and

Andrew Margulis
ROPERS, MAJESKI, KOHN & BENTLEY, P.C.
750 Third Avenue, 25th Floor
New York, NY 10017
Phone: (212) 668-5927
andrew.margulis@rmkb.com

and

E. Joseph O'Neil
PEABODY & ARNOLD LLP
600 Atlantic Avenue
Boston, MA 02210
Phone: (617) 951-4705
eoneil@peabodyarnold.com

and

Alex Fooksman
AIG
80 Pine Street 5th Floor
New York, NY 10005
Phone: (646) 857-2168
alex.fooksman@aig.com

and

David Simantob
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
555 South Flower Street Suite 2900
Los Angeles, CA 90071
Phone: (213) 330-8819
david.simantob@wilsonelser.com

and

Sherry L. Pantages
ALLIANZ GLOBAL CORPORATE & SPECIALTY
2350 West Empire Avenue, Suite 200
Burbank, CA  91504  USA
Phone: (818) 972-5204
sherry.pantages@agcs.allianz.com

and

Christopher Celentano
CHUBB
10 Exchange Place, 9th Floor
Jersey City, NJ 07302
Phone: (201) 479-6398
Christopher.celentano@chubb.com

and

Edward Gibbons
Joyce Noyes
WALKER WILCOX MATOUSEK LLP
One North Franklin Street
Chicago, IL 60606
Phone: (312) 244-6700
egibbons@walkerwilcox.com
jnoyes@walkerwilcox.com

## SCHEDULE 3

Released Professionals

1.  *For the Debtors*
    Cravath, Swaine & Moore LLP
    Richards Layton & Finger, PA

2.  *For the UCC*
    Pachulski Stang Ziehl & Jones LLP

3.  *For Marc Lasry*
    Anderson Kill P.C.
    Paul Weiss Rifkind Wharton & Garrison LLP

4.  *For Barbara Schneeweiss*
    Barta Tate

5.  *For Jeff Sackman and Lance Maerov*
    Fried, Frank, Harris, Shriver & Jacobson LLP

6.  *For Tim Sarnoff*
    Latham & Watkins LLP

7.  *For Harvey Weinstein*
    Lewis Brisbois Brisgaard & Smith LLP
    Pasich LLP

8.  *For Paul Tudor Jones*
    Patterson Belknap Webb & Tyler LLP

9.  *For Tarak Ben Amar*
    Pillsbury Winthrop Shaw Pittman LLP

10. *For Richard Koenigsberg*
    Reed Smith LLP

11. *For James Dolan*
    Rosenberg, Giger and Perala P.C.
    Skadden Arps Slate Meagher & Flom LLP

12. *For Dirk Ziff*
    Skadden Arps Slate Meagher & Flom LLP

13. *For David Glasser*
    Schlam Stone & Dolan LLP

14. *For Robert Weinstein*
    Schulte Roth & Zabel LLP
    Sauer & Wagner LLP

15. *For Frank Gil*
    White, Hilferty & Albanese, P.C.
    Ween & Kozek
    Bowles, Liberman & Newman