# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA THOMPSON, MELISSA SAGEMILLER, NANNETTE MAY (f/k/a NANNETTE KLATT), KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, and JANE DOE, individually and on behalf of all others similarly situated, | No. 1:17-cv-09554-AKH  Hon. Alvin K. Hellerstein |
| Plaintiffs, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, *et al.*, | |
| Defendants. | |
| JILL DOE, individually and on behalf of all others similarly situated, | No. 1:19-cv-3430-AKH |
| Plaintiff, | |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, *et al.*, | |
| Defendants. | |

**DECLARATION OF NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

Sandra Pullman declares and states as follows:

1.        I am an attorney in the Civil Rights Bureau of the New York State Office of

the Attorney General ("NYOAG").  I have personal knowledge of the facts set forth below, and

if called upon to do so, could and would testify competently thereto.

2.        On February 11, 2018, the NYOAG filed a lawsuit on behalf of the People of the State of New York against The Weinstein Company LLC, The Weinstein Company Holdings LLC (together "TWC"), Harvey Weinstein, and Robert Weinstein (collectively "Respondents"). *The People of the State of New York v. The Weinstein Company LLC, et al.*, Case No. 0450293/2018 (N.Y. Sup. Ct.) (the "NYOAG Lawsuit")

3.        The NYOAG Lawsuit alleged that Harvey Weinstein, in his capacity as TWC's co-owner and co-CEO, created a hostile work environment at TWC by repeatedly and persistently sexually harassing female employees, including demanding sexual contact as a quid pro quo for continued employment or career advancement, subjecting female employees to verbal abuse and demeaning work tasks, and forcing female employees to engage in unwanted sexual contact, and alleged that Robert Weinstein and TWC aided and abetted these violations of law by failing to investigate and/or stop Harvey Weinstein's unlawful activities, all in violation of state and city human rights laws.

4.        A true and correct copy of the Verified Petition filed in the NYOAG Lawsuit is attached hereto as Exhibit A.

5.        The NYOAG conducted an extensive fact investigation, including reviewing hundreds of thousands of documents produced by the Debtor and Former Representatives and interviewing more than a dozen witnesses, and considered the merits of its claims.  The NYOAG also consulted with bankruptcy and insurance experts about the sources for and availability of funds to compensate victims.

6.        The NYOAG actively participated in the numerous in-person and telephonic mediation sessions.  During these sessions and related discussions, the NYOAG vigorously

advocated for the interests of the female former employees of TWC who are covered by its lawsuit.  The NYOAG fought to ensure that the experiences of these female former employees of TWC were included at each step of the way, and to guarantee that these female former employees of TWC would be entitled to recover through a settlement with TWC and Respondents.  To further settlement negotiations, the NYOAG shared information obtained through its investigation and offered its view on the legal and factual challenges to ensuring victim compensation absent a settlement.

7.       Based on the foregoing, the NYOAG has concluded that this settlement is an appropriate resolution of the NYOAG Lawsuit because it will provide the potentially dozens of female former employees who were subjected to sexual harassment, gender based discrimination, and a hostile work environment at TWC with the opportunity to obtain restitution from the Class Action Settlement Fund.

8.       The female former employees whose interests are represented by the NYOAG Lawsuit are accordingly included in the definition of Post-2005 Subclass.

9.       The NYOAG negotiated the Allocation Appendix with Pre-2005 Subclass Counsel and Post-2005 Subclass Counsel to ensure that the claims of workplace harassment and discrimination asserted in the NYOAG's lawsuit, as well the impact of that harassment and discrimination on female former employees of TWC, were adequately addressed.  The NYOAG, Pre-2005, and Post-2005 Subclass Counsel discussed the Allocation Appendix by phone and in person on February 27, 2020, and exchanged revised drafts of the Appendix as part of the negotiation.  The NYOAG supports the Allocation Appendix that resulted from this process.

10.       The NYOAG worked with Class Counsel to develop a straightforward, confidential claims process.  Through this claims process, a Settlement Class Member is given

the option to submit a written Claim Form describing her experiences and the impact of Harvey

Weinstein's misconduct on her, the option to submit documentation in support of her written

Claim Form, and the option to be interviewed by the Special Master and/or his team.  In this

way, the Settlement Class Member may choose how and to what extent she wishes to engage

with the claims process.  The NYOAG also worked with Class Counsel to ensure that the notice

materials and Claim Form adequately address the NYOAG Lawsuit and encompass workplace

harassment and discrimination claims that may be submitted by female former employees of

TWC.  The NYOAG supports the claims process described in the Settlement Agreement and

Release.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 15, 2020

_____/s/ Sandra Pullman_____
Sandra Pullman
Senior Counsel, Civil Rights Bureau
Office of the NYS Attorney General

# EXHIBIT 3(A)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

<table>
<tr>
<td>
THE PEOPLE OF THE STATE OF<br>
NEW YORK, by ERIC T.<br>
SCHNEIDERMAN, Attorney General<br>
of the State of New York,<br>
<br>
                        Petitioner,<br>
<br>
        v.<br>
<br>
THE WEINSTEIN COMPANY LLC,<br>
THE WEINSTEIN COMPANY<br>
HOLDINGS LLC, HARVEY<br>
WEINSTEIN, and ROBERT<br>
WEINSTEIN,<br>
<br>
                     Respondents.
</td>
<td>
<br>
<br>
<br>
**VERIFIED PETITION**<br>
<br>
Index No.<br>
IAS Part<br>
Assigned to Justice
</td>
</tr>
</table>

The People of the State of New York, by their attorney, ERIC T. SCHNEIDERMAN, Attorney

General of the State of New York, respectfully allege, upon information and belief:

## INTRODUCTION

1.      The Attorney General, on behalf of the People of the State of New York, brings

this action to remedy a years-long gender-based hostile work environment, a pattern of *quid pro*

*quo* sexual harassment, and routine misuse of corporate resources for unlawful ends that

extended from in or about 2005 through at least in or about October 2017. The Attorney General

seeks to hold accountable Harvey Weinstein ("HW"), his brother Robert Weinstein ("RW"), and

the company for which they served as co-owners, co-Chairmen of the Board, and co-Chief

Executive Officers ("co-CEOs"), The Weinstein Company LLC and its parent holding company,

The Weinstein Company Holdings LLC (collectively, "TWC" or "The Company"), for repeated,

persistent, and egregious violations of law, to vindicate the rights of TWC's employees, and to

prevent future recurrence of such misconduct.

1

2.      TWC is a company headquartered in New York, New York, that produces and distributes films and television shows. At times relevant to this Petition, TWC employed upwards of 250 people in its New York office and satellite offices in Los Angeles, California, and London, England. TWC was at all times required to comply with New York State and New York City laws prohibiting sexual harassment and discrimination on the basis of gender.  HW and RW, as the company's owners and co-CEOs, were bound to abide by these laws and ensure that they were enforced at TWC. In addition, HW was prohibited from engaging in unlawful sex offenses, such as sexual misconduct, forcible touching, and coercion, and attempts to commit the same, in violation of various provisions of the New York Penal Law, and from using TWC employees, resources, and business opportunities to facilitate repeated and persistent illegality of this nature. *See* N.Y. Exec. Law § 63(12).

3.      The Attorney General initiated this investigation after learning of published reports that HW used his role as TWC's co-CEO and his power within the entertainment industry to sexually harass employees and abuse women. HW and TWC sought to shield these and additional facts from disclosure through routine use of Non-Disclosure Agreements ("NDAs") prohibiting individuals from speaking about their experiences at TWC. The Attorney General has used investigative authorities granted to the Office of the Attorney General ("OAG") under Section 63(12), including the OAG's investigative subpoena power, to begin uncovering these facts. While the OAG's investigation is ongoing, it has obtained documents and interviewed witnesses confirming that Respondents repeatedly and persistently violated the law.

4.      The unlawful conduct took two primary forms:

    i.      *First*, HW, as co-CEO of TWC, repeatedly and persistently sexually harassed female employees at TWC by personally creating a hostile work environment

2

that pervaded the workplace and by demanding that women engage in sexual or demeaning conduct as a *quid pro quo* for continued employment or career advancement. Some of HW's sexual harassment involved unlawful sexual contact.

ii. **Second,** HW repeatedly and persistently used his position at TWC, female employees at TWC, and the resources at his disposal as a co-CEO of TWC, to serve his interests in sexual contact, some of which upon information and belief was unlawful in nature, with women seeking employment or business opportunities with TWC.

5.    TWC is responsible for the unlawful conduct described herein. HW committed these unlawful acts in his capacity as TWC's co-owner and co-CEO, making him the most senior person in the company. In that role, HW used TWC's corporate resources and employees to facilitate the unlawful conduct. Thus, as a matter of law, HW's unlawful activities are attributable to TWC.

6.    In addition, TWC and RW are liable because they were aware of and acquiesced in repeated and persistent unlawful conduct by failing to investigate or stop it. As described herein, RW, TWC's management, and TWC's Board of Directors (the "Board") were repeatedly presented with credible evidence of HW's sexual harassment of TWC employees and interns, and his use of corporate employees and resources to facilitate sexual activity with third parties, amidst allegations that HW had engaged in unlawful sexual conduct.

7.    RW and TWC's Board failed to: further investigate to discover the nature and extent of the misconduct; absolutely prohibit such misconduct; restrict HW's ability to hire or

INDEX NO. 450293/2018
RECEIVED NYSCEF: 02/13/2018

supervise employees and his use of corporate resources in order to avoid future recurrence of such misconduct; or terminate HW's employment altogether.

8.      Instead of investigating and taking prompt corrective action, TWC and RW used settlements that contained strict NDAs to keep law enforcement, the public, and even other TWC employees from discovering the extensive allegations of misconduct against HW. TWC itself entered into several of these NDA-containing settlements with company employees. Many witnesses to HW's unlawful conduct separately were subject to broad NDAs pursuant to their TWC employment agreements, preventing them from revealing their own observations of misconduct to law enforcement as well. In this way, TWC and RW enabled HW's unlawful conduct to continue far beyond the date when, through reasonable diligence, it should have been stopped.

## PARTIES

9.      Petitioner is the People of the State of New York, by its attorney, Eric T. Schneiderman, the Attorney General of the State of New York.

10.     Respondents The Weinstein Company LLC and its parent company The Weinstein Company Holdings, LLC (collectively, "TWC" or the "Company") are companies that were founded in or about 2005, with their principal offices and places of business at 99 Hudson Street, New York, New York, 10013, from which they have transacted business at all times mentioned herein. TWC also maintains office space at 375 Greenwich Street, New York, New York, and satellite offices in Los Angeles, California and London, England.

11.     Respondent HW is the co-founder, and was the co-Chairman and co-CEO of TWC from its inception in or about 2005 until his termination in October 2017. HW was terminated from the TWC Board and as co-CEO in October 2017. HW currently owns approximately 21% of the voting shares of TWC. As co-Chairman and co-CEO, HW also drew a

4

salary from TWC and had expenses covered by TWC. HW regularly transacted TWC business at TWC's headquarters in New York, New York, primarily using office space at TWC's 375 Greenwich Street location.

12.     Respondent RW is the co-founder and was co-Chairman and co-CEO of TWC with HW until HW's termination. RW remains on the TWC Board and owns approximately 21% of the voting shares of TWC. RW regularly transacted TWC business at TWC's headquarters in New York, New York.

### JURISDICTION AND VENUE

13.     The Attorney General brings this action on behalf of the People of the State of New York under the New York State Executive Law.

14.     Under the Executive Law, the Attorney General is authorized to bring a special proceeding in this Court seeking injunctive relief, restitution, damages, disgorgement, civil penalties where applicable, and costs on behalf of the People of the State of New York "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12).

15.     Venue is properly laid in New York County because Respondent TWC has its principal office within the county, and many of the events and omissions giving rise to the claims took place in the county.

16.     This Court may exercise personal jurisdiction over Respondents HW and RW because they conducted the business of TWC in New York, New York, and because they participated in events and omissions giving rise to the violations while in New York County.

5

Case 1:17-cv-09554-AKH   Document 333-9   Filed 06/30/20   Page 12 of 46

17.     The Court may exercise personal jurisdiction over Respondent TWC because it is a company with its principal office and place of business in New York County.

### OVERVIEW OF ATTORNEY GENERAL INVESTIGATION

18.     On October 23, 2017, the OAG issued a subpoena to TWC pursuant to Executive Law 63(12), for documents and testimony. The subpoena was issued as part of the OAG's investigation into reports that HW engaged in sexual harassment and sexual misconduct in the workplace, including at TWC's headquarters in New York; that TWC employees were enlisted to further and conceal the sexual harassment; and that all of this misconduct was hidden from law enforcement authorities and the public through aggressive use of NDAs and other efforts to conceal or distort the truth.

19.     The OAG has reviewed documentary evidence produced by Respondents and obtained from other sources, including correspondence, business records, financial records, and thousands of pages of documents produced pursuant to third-party subpoenas. It continues to receive documents responsive to its subpoenas and to review those documents. The OAG also has interviewed current and former employees, executives, and Board members of TWC, and it continues to interview additional witnesses. Its investigation remains ongoing.

20.     The OAG's ongoing investigation has so far confirmed that Respondents have engaged in multiple, repeated, and persistent violations of law that have harmed TWC employees, as well as individuals seeking business opportunities with TWC. These violations include unlawful gender discrimination and sexual harassment in violation of New York Executive Law § 296 *et seq*., New York Civil Rights Law § 40-c, New York City Human Rights Law, New York City Administrative Code § 8-107(1)(a), and violations of provisions of the New York Penal Law prohibiting forcible touching (Penal Law § 130.52), sexual abuse (Penal Law

6

§ 130.55), and coercion (Penal Law § 135.60), and attempts to commit the same, and upon information and belief, other sexual offenses.

21.    Even while its investigation continues, the OAG has instituted this proceeding at the present time in light of its factual and legal findings, and the possible imminent sale of TWC and/or its assets to purchasers in a transaction that could leave survivors of Respondents' unlawful conduct without adequate redress, enable perpetrators or enablers of misconduct to obtain unwarranted financial benefits, and fail to protect adequately TWC employees who would be reporting to some of the same managers (including TWC's Chief Operating Officer ("COO")) who failed to investigate HW's ongoing misconduct or adequately protect female employees from HW when HW served as co-CEO of TWC.

## FACTUAL ALLEGATIONS

22.    From the creation of TWC in 2005 through his forced exit from the company in October 2017, HW held extensive power and influence in the film and television industry. HW's support could open doors and launch award-winning careers, while his disapproval could permanently tarnish reputations and essentially blacklist a person across the industry.

23.    As described herein, HW repeatedly and persistently misused his power within TWC and in the film and television industry, and the employees and resources of TWC, to harm and exploit both TWC workers and third parties seeking to do business with TWC. Within TWC, HW wielded this power in a sexually discriminatory manner.

24.    HW personally created and perpetuated a work environment permeated with gender-based hostility and inequality. As described in Sections A and B below, HW engaged in *quid pro quo* sexual harassment; subjected female TWC employees and women seeking business or job opportunities with TWC to unwelcome and inappropriate physical contact and touching; subjected employees to a persistent stream of threats and verbal abuse, much of which was

7

sexual or gendered in nature; and menaced female employees with threats to their careers and of physical harm.

25.     HW also required multiple groups of TWC employees to facilitate his sexual encounters with women. In part, HW required executive assistants to schedule and help arrange sexual (or possible sexual) encounters for HW, even directing them to essentially badger women who refused or expressed reluctance into accepting a "meeting" with HW. Additionally, on multiple occasions, HW required junior executives to meet a woman and discuss working in the entertainment industry generally or on specific TWC projects, because he was interested in her sexually and wanted the executives to help put the woman at ease before he made any sexual advances or because she had already submitted to his advances.

26.     Through such conduct and other behavior detailed below, HW created what one former employee described as a "toxic environment for women" at TWC that persisted from the early days of TWC in 2005 to at least HW's termination as TWC co-CEO in 2017.

27.     HW's and TWC's unlawful activity persisted, at least in part, due to the effective acquiescence of RW and certain other members of TWC's management and Board. As explained in Sections C and D below, members of TWC's management and Board were aware of or had access to numerous complaints of HW's misconduct as well as, to TWC employees and records which could have confirmed the accuracy of the complaints and the scope of misconduct—yet the company failed to adequately investigate any of the claims, take common-sense measures to protect female employees and third parties from HW's illegal conduct, or terminate HW's employment. Furthermore, TWC lacked an effective process for reporting and investigating complaints of sexual harassment or other sexual misconduct, as is required by law: it did not train employees on sexual harassment policies or laws; it did not have a meaningful or consistent

process for documenting and preserving claims of sexual harassment or other misconduct; and, when individuals did complain, Human Resources was not empowered to address claims related to HW.

28. TWC's corporate governance was made aware of but chose not to end the abuse being facilitated through its company. TWC's Board had power to supervise HW, to limit his contact with female employees and third parties, and to take concrete steps to stop it. The Board also had the power to refuse to renew HW's employment contract in 2015, but failed to act, in part out of HW's power and influence on the Board and in part due to concern that HW's departure or a public battle over his contract would inflict financial harm on TWC. HW and Board members loyal to HW defeated any efforts by independent Board members to investigate claims of sexual misconduct, or to remove HW or prevent him from continuing to sexually harass and harm women.

## A.  Hostile Work Environment

### Obscenities and Insults

29. To work for Harvey Weinstein was to work under a persistent barrage of gender-based obscenities, vulgar name-calling, sexualized interactions, threats of violence, and a workplace generally hostile to women.  This conduct occurred throughout the relevant time period.

30. For instance, HW regularly berated women using gender-based obscenities and stereotypes.  He directed these comments to female employees and peppered ordinary conversation with vulgarities and gendered insults.

9

31.     HW regularly called female employees "cunt" or "pussy" when he was angry with them or felt they had done a task poorly or incorrectly, or even just instead of calling them by their first names.

32.     When HW wanted to particularly degrade or scold men, he called them cunt or pussy as well, and otherwise denigrated them in sexualized terms. For example, at a meeting attended by several TWC executives, HW criticized a male executive in the room for his alleged weakness. During the course of the criticism, HW turned to another TWC employee and said, "Can you smell [his] pussy?"

33.     On another occasion, HW told a male assistant he was fired for—as reflected in an email sent by the assistant to the head of Human Resources about the incident—being "just a fucking faggot boy, a stupid fucking faggot boy." HW routinely used similar epithets attacking employees' masculinity.

34.     HW regularly used gender stereotypes to insult and belittle female employees. For example, in a fit of rage against one female employee, he yelled that she should leave the company and make babies since that was all she was good for. He belittled other female employees using similar language.

35.     On other occasions, he asked female employees if they had their period, including asking an employee if her tampon was "up too far." He also accused female employees of wanting special treatment because of their gender.

36.     HW made these comments in one-on-one conversations, as well as in front of other TWC employees, including the company's most senior executives.

37.     Despite knowledge of HW's use of sexualized obscenities and gendered insults, TWC executives with responsibility for the matter and the Board failed to take any meaningful

10

steps to investigate allegations of such conduct or take remedial action to protect TWC employees or stop such behavior.

**Intimidation**

38.    HW, who stands over six feet tall, used his stature and threatening statements on numerous occasions to demean and frighten female employees. Multiple female employees have described HW's regular use of physical intimidation and threats to terrorize female employees generally, deter them from making formal or informal workplace complaints, and prevent them from describing his conduct to anyone outside TWC.

39.    Female employees described HW as yelling at them for purported incompetence, cursing in their faces, threatening to end their careers, and describing his intent to harm them, all while walking into them until his face was only inches from theirs.

40.    TWC's management was presented with several allegations of such misconduct. According to information contained within HW's personnel file, on one occasion in 2011, HW violently punched the back of a female employee's car seat while berating her. On a separate occasion, he backed the same employee up against a wall, standing intimidatingly close while berating her. This as well as other misconduct prompted the female employee to file a formal complaint with TWC. TWC resolved the complaint via an agreement that contained an NDA. TWC did not adequately investigate the complaint, act to protect employees, or prevent HW from engaging in recurring conduct.

41.    On another occasion in 2012, according to a formal complaint made to Human Resources, HW launched into a tirade against a female employee before a media interview in which he berated her viciously and at length in front of other TWC employees and threatened to "cut [her] loins," traumatizing the employee, making her feel "forced out" of her job, and

11

Case 1:17-cv-09554-AKH   Document 333-9   Filed 06/30/20   Page 18 of 46

causing her "severe stress." TWC resolved the complaint via an agreement that contained an NDA. TWC did not adequately investigate the complaint, act to protect employees, or prevent HW from engaging in recurring conduct.

42.     HW cornered another female employee in a hotel lobby in 2014, coming so close to her and screaming at her so loudly about being a failure that a patron and hotel staff member came to ask if she needed assistance after HW left. The female employee was traumatized by the interaction and felt physically unsafe around HW after its conclusion, as reflected in a formal complaint to Human Resources in 2015 that described this incident and other misconduct. TWC resolved the complaint via an agreement that contained an NDA. TWC did not adequately investigate the complaint, protect employees, or prevent HW from engaging in recurring conduct.

43.     HW told several employees throughout the relevant time period that, in substance, "I will kill you," "I will kill your family," and "You don't know what I can do," or words to that effect. HW touted his connection to powerful political figures and asserted that he had contacts within the Secret Service that could take care of problems. Female employees knew from observations of HW and from the experiences of other TWC employees that he was capable of fits of rage, including infliction of physical injury, and that he was sexually aggressive. Thus, they became fearful that they could suffer physical injury or worse if they did not satisfy his demands. With respect to all of these matters, TWC did not adequately investigate repeated credible complaints of misconduct or prevent HW from engaging in recurring conduct.

**Forcing Women to Serve in Sexualized and Demeaning Roles**

44.     HW forced female TWC employees to serve in in humiliating and demeaning roles that required them to facilitate and support his sexual activity with third parties or support

12

"domestic" activities. TWC employed one group of female employees whose primary job it was to accompany HW to events and to facilitate HW's sexual conquests. These women were kept on TWC's payroll in TWC's New York, Los Angeles, and London offices. While they had different titles, as a practical matter their primary responsibility included taking HW to parties at which he could meet young women, and introducing him to young women seeking opportunities at TWC with whom he could attempt to engage in sexual relations. These women were described by some witnesses as members of HW's TWC "roster" or his "wing women." One of the members of this entourage was flown from London to New York to teach HW's assistants how to dress and smell more attractive to HW, as described further herein.

45.     A second group of employees served as his assistants. Predominantly female assistants were compelled to take various steps to further HW's regular sexual activity, including by contacting "Friends of Harvey" ("FOH") and other prospective sexual partners via text message or phone at his direction and maintaining space on his calendar for sexual activity. Two TWC employee witnesses described having to procure HW's erectile dysfunction shots, one of whom received a TWC bonus for obtaining them and was at times directed by HW to administer the injections. Another TWC witness described how she had to ensure HW had an adequate supply of them in his travel bag—referred to within the company as his "go bag"—at all times. One TWC employee was tasked with preparing a room in TWC's offices for HW's sexual activity when he wished to have sexual encounters in the office, and with cleaning up when it was over. Articles of women's clothing were left behind on occasion after these incidents, making clear what transpired during these encounters and requiring TWC employees to make arrangements for their return.

46.     The common occurrence of sexual activity in the workplace by TWC's co-CEO, sometimes while or immediately after employees were working in office space adjacent to the room where the activity occurred, contributed to the hostile work environment.

47.     Certain of HW's assistants were threatened with termination of employment if they did not serve in gendered roles such as providing childcare to his young children, obtaining prescriptions for medicine, and performing other domestic labor such as assisting HW's wife or one of HW's adult daughters. One employee formally complained of this conduct to Human Resources in 2015, noting that she did "not appreciate being given work that my male counterparts are never asked to complete." Human Resources replied to this complaint as follows: "Please keep me updated on this…." The employee received no follow-up communications from TWC executives and no remedial actions was taken as a result of the complaint, reflecting that TWC conducted no meaningful investigation of the complaint.

48.     That same employee followed up the next month with an email entitled "Well, you asked me to keep you updated . . . ." in which the employee stated that rather than obtaining a promotion to executive, she was threatened with termination if she did not start taking care of personal tasks for HW such as dealing with HW's doctors—work that "the boys" at TWC were never asked to perform. When the employee refused to assume this domestic role, HW stated, according to the second written complaint to Human Resources, "if that's your attitude fuck you and get out." The employee received no response from TWC executives and no remedial action was taken as a result of the complaint, reflecting TWC conducted no investigation of this complaint either. The employee left the company, having been retaliated against for refusing to accede to HW's demands.

14

49.    A third group of predominantly female TWC employees—a group of female executives—also were forced to facilitate HW's sexual conquests. These female employees' job responsibilities should have been confined to using their expertise to help TWC produce films and television projects. Yet despite their skills and stated job responsibilities, HW required them to meet with prospective sexual conquests in order to facilitate HW's sexual activity, and to follow through on HW's promise of employment opportunities to women who met with HW's favor. This compelled service demeaned and humiliated the female executives, contributing to the hostile work environment.

50.    The practice of sending female TWC executives to meetings with HW's prospective sexual conquests was overt within the company. HW's assistants were aware that HW would want a female executive to be present at the outset of any such meeting with a prospective sexual conquest, and were trained to ask HW which executives HW would want to have present at the meetings.

51.    One female executive described her dismay at being compelled to take meetings clearly not for business purposes but for the purpose of facilitating HW's sex life. Male creative executives were not forced to take these kinds of meetings. As the executive reported to TWC's Human Resources department: "only female executives are put in these positions with actresses with whom HW has a 'personal friendship,' which to my understanding means he has either had or wants to have sexual relations with them. Female TWC employees are essentially used to facilitate his sexual conquests of vulnerable women who hope he will get them work." TWC took no steps to investigate these allegations or to prevent future recurrence of such conduct.

**B.**    ***Quid Pro Quo* Sexual Harassment**

15

52.     HW made *quid pro quo* offers or demands of sexual favors in exchange for career advancement at TWC, or to avoid adverse employment consequences at TWC. HW's overt *quid pro quo* sexual harassment further contributed to the hostile work environment within TWC.

53.     The *quid pro quo* harassment took several forms, including demands for sex or intimate physical contact in exchange for career advancement, or qualifying career opportunities on flirtatious or otherwise attractive dress and behavior.

54.     According to information provided to TWC employees interviewed by the OAG, in one instance in late 2014, HW approached a young female TWC intern, and told her to write her name and phone number on a slip of paper. The intern, who had not had interactions with HW before, was surprised and complied. HW asked her to join him for dinner that night but she declined, citing pre-existing plans. He told her to cancel them and that he would call her that night. When HW called, the employee again refused to meet him, and he ultimately proposed a meeting at 7:30a.m. at the Peninsula Hotel where he was staying. When she arrived at the hotel, HW made clear that he wanted a sexual relationship and proceeded to name famous actresses whose careers he purportedly had advanced after they agreed to his proposition. HW proposed a similar *quid pro quo* relationship to the intern. The intern spent an hour repeatedly saying no to his entreaties and refusing to come up to HW's hotel room. After the incident, the intern left the company. The complaint was reported to Human Resources and to company executives, but TWC took no institutional action to protect interns from HW or prevent future recurrence of such conduct.

55.     On another occasion in 2015, HW asked a female TWC employee to go to his hotel room at the end of the day to set up his phone and devices for the next day or some other alleged work reason (work that TWC employees referred to as "turndown service," and that was

generally assigned to female TWC employees). Upon her arrival at his hotel room, HW appeared naked under a bathrobe and asked her for a massage. When the employee said no, HW cajoled, badgered, and insisted until she relented and, against her wishes, submitted to massaging him out of fear of employment-based retaliation by HW. The incident was reported to Human Resources and to TWC executives and Board members in November 2015, but TWC took no action to formally investigate the complaint, to protect employees from HW, or to prevent future recurrence of such conduct.

56.    On other occasions in 2014 and 2015, HW exposed himself to a female employee and made her take dictation from him while he leered at her, naked on his bed. That same employee described how HW would insist that she sit next to him in the back seat of his chauffeured vehicle and would place his hand on her upper thigh and buttocks near her genitalia and rub her body without her consent. When she attempted to place bags or other barriers between them to make it harder for him to reach her, he moved the barriers or repositioned himself so that the unwelcome sexual contact could continue. This employee, and other TWC employees, believed that they would face adverse employment consequences unless they acquiesced to such demands.

57.    On one occasion, HW asserted that he might have to fire a female employee because his daughter (for whom the employee was providing assistance at HW's direction) was angry with her, and he asked the employee what she was "prepared to do" to keep her job—a proposition that the female employee understood as a demand for *quid pro quo* sexual activity. The employee quit rather than submit to the demand for sex in exchange for continued employment.

58.     Another TWC employee did succumb to HW's demands for sex. The former employee informed the OAG that the sexual activity was forced and unwelcome, and was compelled out of fear of career repercussions and HW personally.

59.     To avoid unwanted touching, leering, or remarks by HW, some female TWC employees took to wearing pants instead of skirts or dresses, or wearing clothes that provided greater physical coverage.

60.     To this HW made comments such as, "why don't you dress cute?," "you walk like a man," or "you can be pretty," making clear that physical attractiveness and femininity were necessary in order for the employee to be successful at TWC. As reported to Human Resources, company executives, and the Board in 2015, and as was known more generally within TWC, HW rewarded some female TWC employees with opportunities for career advancement (including access to meetings and other business opportunities) based on how attractive they appeared to him on that day, as he himself told the women. TWC did not take adequate steps to investigate these allegations or to prevent future recurrence of such conduct.

61.     At one point, as recounted by one witness, HW brought in a female member of the "roster" from TWC's London office to teach his female assistants in the New York City office on how to make him "happy." Her tips included wearing skirts or dresses, looking feminine, showing more leg or a shoulder, wearing high heels, smelling "good," and introducing him to women. Female assistants were thus made to understand that career opportunities were connected to the degree to which they were attractive to HW and facilitated HW's sexual contact with women.

**C.      HW's Use of TWC Employees and Resources in Supporting His Sexual Misconduct**

18

FILED: NEW YORK COUNTY CLERK 02/11/2018 04:04 PM
NYSCEF DOC. NO.

INDEX NO. 450293/2018

RECEIVED NYSCEF: 02/13/2018

Case 1:17-cv-09554-AKH   Document 333-9   Filed 06/30/20   Page 25 of 46

62.     HW's assistants were exposed to and required to facilitate HW's sex life as a condition of employment. HW employed a team of up to five assistants at any given time. Over the relevant time period, over a dozen people served in these positions due to frequent turnover and promotions of assistants who met with his favor. HW typically tasked his female assistants with scheduling, arranging, and facilitating his sexual encounters, which were referred to within the company as "personals."

63.     HW's assistants learned of two categories of HW's prospective or consummated sexual encounters. Over time, the assistants had compiled one list that was maintained on TWC's electronic shared directory and consisted of names of women, organized by city, whom HW contacted regularly for sexual encounters. This list was known internally as the "Friends of Harvey" or "FOH" list. This list was maintained in the HW Office electronic shared folder, and was accessible to TWC employees. This list categorized women by city, so that upon arriving in a particular city with HW, his assistants could readily find the contact information for the women he demanded that the assistants contact on his behalf.

64.     The assistants also utilized a second common method for keeping track of the women in whom HW was interested sexually or with whom HW had had a sexual liaison, noting them in HW's electronic TWC contact list with an asterisk. The asterisk was used by assistants to make it easier to distinguish women with whom HW typically scheduled "personals" and people with whom HW had non-sexual relationships.

65.     HW's assistants developed these methods of tracking of the objects of HW's sexual desire because they were keenly aware that an inability to quickly identify and contact the specific woman HW referenced posed a risk to their careers. HW made this clear by regularly threatening assistants and their jobs for any perceived mistakes.

19

66.     In HW's schedule, maintained collectively by his assistants, meetings with "FOHs" or other would-be sexual contacts were explicitly dubbed "HW personal" or were deliberately excluded from his schedule; in the latter case other communications among assistants and HW made clear that a time slot had to remain open for HW's "personal."

67.     All HW assistants were required to send emails dictated by HW as part of their job duties. However, in addition to sending emails to business contacts or as part of business operations, HW required his assistants to send emails and text messages, sometimes dictated, to would-be sexual partners and relay their responses to him, using TWC email accounts and phones.

68.     At times, assistants were required to write multiple emails or text messages in the course of a single hour—using TWC equipment and email accounts—to an intended sexual interest if she did not respond or if she rebuffed HW's initial advances.

69.     HW required his assistants to schedule "personals" for sexual activity both during the workday and after work. Upon arranging a "personal," assistants were required to clear or adjust any and all other scheduled plans that potentially conflicted with the "personal," sometimes at great difficulty. If an assistant failed to do so, HW became enraged and made clear to assistants that compromising a "personal" appointment also compromised their careers.

70.     Assistants possessed copies of a document known as the "Bible," an assistant-created guide to working for HW that was passed down through Assistants. The document sat in hard copy on several Assistants' desks, and was accessible to and known to exist by some TWC executives. The Bible included information about HW's likes and dislikes, and a list of his "friends" with directions for assistants on how to arrange HW's extensive and frequent "personals."

71.     Knowledge of "personals" was not limited to HW's assistants or HW's office suite. As co-Chair and co-CEO of TWC, HW's unavailability for periods of time during the workday for "personals" was well known to TWC executives. According to one witness who handled calls from TWC executives to HW, executive staff became familiar enough with "personals" to know that they generally lasted anywhere from twenty-five minutes to one hour. Thus, upon learning HW was with a "friend," some executives who reached his assistants during "personals" often inquired what time his "personal" began in order to estimate when HW's sexual encounter would conclude and contact him at that time.

72.     TWC funds paid for the office space and for the hotel rooms used for many of these personal encounters, which were booked using TWC's travel agent. In addition, while HW often initially held out job opportunities, invitations or tickets to events, and other access to the entertainment industry to young women in exchange for sexual relations, he also required that assistants help purchase flowers, gifts, robes, lingerie, and other gifts for his "friends." These purchases frequently were made on TWC corporate credit cards.

73.     A female employee who was once responsible for coding HW's expenses as "business" or "personal" recounted being told by HW to categorize as many of HW's expenses as "business" as possible. She gave the example that if HW had a sexual encounter with a woman, and that same woman had once auditioned for a TWC project, then she understood that she was expected to categorize expenses related to the sexual encounter as "business."

74.     HW made it clear to his female employees that anyone who protested his demands to orchestrate these encounters would suffer retaliation.

75.     Several of TWC's female creative executives were exposed to and required to facilitate HW's sex life as a condition of employment. HW demanded that female executives

21

fulfill tasks for him such as obtaining the contact information of his sexual targets and meeting with these women in order to put them at ease and facilitate them into private meetings with him.

76.      Additionally, female executives were frequently forced to meet with women with whom HW had sexual relations or hoped to have sexual relations, in order to discuss their "career trajectory" and opportunities that HW instructed them to address with the women.

77.      HW frequently targeted vulnerable, aspiring models, actresses, and entertainers as sexual conquests, using access to TWC and other industry opportunities that purportedly would be made available by his female executives, acting at his direction, as a bargaining chip in return for sexual favors. HW used female executives' participation in these meetings to make clear that his contact with these women was in his professional capacity as CEO of TWC and to lend an "official" air to the encounters.

78.      Female executives quickly came to understand that some of the meetings that they were required to attend were not for legitimate business purposes. For example, on some occasions, female executives were instructed to discuss with HW's actual or intended sexual conquests career opportunities that the executives knew were not appropriate for the women, *e.g.*, English-speaking roles with women who did not speak fluent English.

79.      Other women came onto TWC payroll at HW's demand, upon information and belief because HW had or sought to have sexual relations with them and promised them a position at TWC. It was not uncommon for young women to appear at TWC's New York City or Los Angeles office on the understanding that they were to be given a paid position, although they did not appear to have participated in standard interview processes and to fill an unspecific job position with no clear role or responsibilities. These women would then be given a desk and put on payroll, much to the dismay and annoyance of other TWC employees. Upon information and

22

belief, TWC's management asked for a list of these women at one point, pursuant to a review of company finances. These women, however, were not immediately removed from payroll by TWC upon completion of the review.

80.    HW also used TWC's financial resources to fly women with him or to him for engaging in or facilitating sexual encounters.

81.    Additionally, HW's drivers in both New York City and Los Angeles were required to keep condoms and erectile dysfunction injections in the car, in order to provide them to HW as needed.

82.    Certain of HW's erectile dysfunction injections were charged to HW's corporate credit card, and at least one bonus paid by TWC to an assistant for her assistance in procuring HW's erectile dysfunction drugs for him.

83.    It is during these TWC-funded and -facilitated "personal" encounters in his office and hotel rooms that, upon information and belief, HW engaged in unlawful sexual conduct with numerous women.

## D.    TWC and RW Acquiesced to HW's Misconduct

84.    TWC is responsible for the unlawful conduct described herein. When the legal violations described herein were committed, HW was a co-owner, co-CEO, and co-Chairman of TWC. As the most senior member of TWC management, the actions taken by HW in the course of managing TWC and conducting TWC business are attributable to TWC.

85.    Moreover, HW was only able to engage in repeated and persistent unlawful conduct because of the failure of key members of TWC's management and Board to ensure that the company complied with relevant nondiscrimination laws and prevent its executives from engaging in unlawful conduct while representing the company. The company's acquiescence

renders it responsible for HW's misconduct on separate grounds. RW also is liable as a co-owner and co-CEO of TWC who was aware of HW's misconduct and who failed to take reasonable steps to investigate and end it.

**Failures of Management**

86.     Key members of TWC management were fully aware of HW's creation of a hostile work environment and his sexual harassment of others, yet they did not take reasonable steps to investigate or stop it, or to protect TWC employees from ongoing victimization. To the contrary, certain members of TWC management deliberately looked the other way or took actions that enabled HW to retaliate against employees who complained of misconduct.

87.     The OAG has learned that, while TWC had a policy manual that contained a policy prohibiting sexual harassment and discrimination, the policy was flouted in practice. Employees who might have had reporting responsibilities, such as employees with supervisory responsibilities, did not receive any training or guidance about TWC's sexual harassment and discrimination policies, including what constituted unlawful harassment or discrimination, how to assist or personally report or otherwise handle a harassment or discrimination complaint, how investigations were conducted, or what remedial actions and privacy or anti-retaliation protections existed, were provided to any employees interviewed by the OAG.

88.     According to the policy manual, complaints of harassment were to be submitted to the head of Human Resources (the "Human Resources Director"), who had the authority to decide whether a complaint had sufficient merit to warrant investigation. The Human Resources Director's regular practice was to escalate any complaints deemed to be significant to the TWC COO, to whom the Human Resources Director directly reported.

24

89.     For example, in a May 2015 email obtained by the OAG, the Human Resources Director forwarded a complaint to the COO from a woman who worked for TWC, but who was expected primarily to serve as assistant to HW's daughter. In the email, the Human Resources Director stated to the COO: "we need to discuss a settlement and nda." According to material in HW's personnel file, such a settlement agreement was negotiated soon after the email from the Human Resources Director to the COO.

90.     On more than one occasion, upon forwarding a complaint or information about a complaint to the COO, the Human Resources Director was not involved in any investigation or resolution process. Based on documents obtained by the OAG to date, such matters were handled by the COO and other members of TWC senior management, as well as counsel retained to contact victims of misconduct.

91.     On numerous occasions during the relevant time period, victims of HW's misconduct complained to the Human Resources Director or to other TWC management about various aspects of the conduct described herein. On not a single occasion was HW subject to a formal investigation or to restrictions on his behavior or adverse employment consequences, as a result of any complaint.

92.     Evidence gathered during the course of the investigation reflects that the Human Resources Director was not empowered to take any steps to address HW's ongoing sexual harassment of female employees. Victims of HW's misconduct have stated that when they complained to Human Resources about HW's efforts to intimidate them, use sexually demeaning language to refer to them, and issue verbal threats of sexual or physical harm, the Human Resources Director stated, in substance, that he "sympathized" with their plight, that they had a "tough job" working for HW, but that there was nothing he could do to address the misconduct.

25

FILED: NEW YORK COUNTY CLERK 02/11/2018 04:04 PM
NYSCEF DOC. NO. Case 1:17-cv-09554-AKH   Document 333-9   Filed 06/30/20   Page 32 of 46

INDEX NO. 450293/2018

RECEIVED NYSCEF: 02/13/2018

93.     On another occasion, a complainant who described serious misconduct was informed, in substance, that the Human Resources Director was "going to have to speak to HW" about the complaint. When the complainant expressed concern that she would be subjected to retaliation by HW if he were informed about the complaint, the Human Resources Director said that while "technically" HW could not retaliate in this manner, he could not prevent HW from doing so, stating, in substance "but I mean his name is on the sign." Individuals who complained to Human Resources were in fact subject to retaliation by HW as a result of their complaints.

94.     On certain occasions when individuals did complain to Human Resources, those complaints were not treated confidentially, nor were they investigated. For example, on one occasion, an assistant to HW wrote an email to Human Resources complaining of certain misconduct by HW. Soon thereafter, the assistant, who had access to HW's email account due to her role at TWC, saw that her complaint had been forwarded directly to HW via HW's email account.

95.     On several occasions when TWC employees complained about serious misconduct by HW, TWC took steps to separate the employee from the company while securing an NDA that would prevent the employee from disclosing the misconduct to others or warning others about the misconduct. These NDAs were contained within settlement agreements entered into by TWC itself. While the source of the funds used to pay for the monetary component of any settlement remains under investigation, TWC's participation as a party to settlements, and its receipt of complaints concerning misconduct leading to those settlements, reflect that members of TWC's management were fully aware of numerous settlements involving claims of misconduct by HW brought by TWC employees.

26

96.     Members of company management also understood that HW was using company resources to facilitate his sexual exploits, including his employment on the payroll of the "roster" of women described above and his use of company resources for sexual encounters. On certain occasions, company employees expressed concerns about HW's improper charges to company accounts, but would be dissuaded from following through by fear of angering HW. At a meeting in 2015, TWC's management requested that HW take his "roster" of women off of the payroll, and that he desist from using corporate cards and accounts for inappropriate expenses. While HW's use of corporate cards after this 2015 meeting remains under investigation, certain members of the "roster" remained on staff after that date, and HW suffered no adverse employment consequences as a result of his misuse of corporate resources.

97.     RW, as co-owner, co-Chairman, and co-CEO, was responsible for maintaining a safe workplace, free of sexual harassment and other unlawful conduct. Yet instead of doing so, RW acquiesced in allowing HW to create a hostile work environment and engage in sexual misconduct that was known to RW, or which he was responsible for preventing.

98.     For example, RW knew that HW used sexually explicit and demeaning slurs to refer to female employees, having participated in meetings in which HW used those terms. Upon information and belief, RW also has admitted to the press that he paid for prior settlements of claims made by women against HW, after those claims were made known to him as a member of management of RW's and HW's prior company, Miramax.

99.     RW also received by email in late 2014 and 2015, and was otherwise informed of, claims of repeated and persistent sexual harassment and misconduct, but he took no measures to further investigate the claims of misconduct, to terminate HW's employment, to restrict or prohibit HW from supervising women or having or seeking sexual contact with TWC employees

27

or women seeking to do business with TWC, or from HW having private meetings with employees or women seeking opportunities in hotel rooms or TWC office space, or any other concrete measure that may have avoided HW's ongoing misconduct.

100.    In addition, other members of company management understood that HW acted inappropriately towards women and sexually harassed them. They personally observed numerous occasions on which HW referred to women using sexually demeaning terms in front of others. They had opportunity to observe the presence of the "roster" on TWC's payroll. They also received or otherwise were made aware of information from complainants. Yet no adverse employment action was taken against HW due to his power within the company and his perceived importance to the company's financial results.

### Failures of Corporate Oversight

101.    TWC's Board also failed to inquire adequately into, or to restrain or prevent, the repeated and persistent unlawful conduct occurring at TWC. In part this was due to HW's and RW's effective control of the Board through their own participation on the Board and their ability to appoint or influence the appointment of others to the Board, leaving a small minority of the Board truly independent of HW and RW. In part these failings were due to concerns that HW's removal, or even exposure of his misconduct, would risk harming the financial interests of company ownership, which included Board members or Board members' employers. Finally, in part the reluctance to restrict or remove HW was due to personal relationships that many Board members had with HW. The Board's decision to avoid investigating credible claims of misconduct, and to shield HW from consequences of that misconduct, enabled HW to continue victimizing employees of TWC until his misconduct was revealed by press reports.

28

102.    Reflecting the failings of the Board, the Board failed to investigate adequately credible claims of HW's misconduct presented to it by members of TWC management and an independent Board member, and to terminate or place meaningful restrictions on HW's continued employment at TWC when presented with the opportunity to do so.

103.    Specifically, by early 2015, certain corporate executives at TWC who had received and handled numerous claims of misconduct from TWC employees, including the COO, became so concerned about HW's misconduct towards women, as well as his expenditure of company resources on improper items, that they decided they needed to notify an independent member of the Board about the misconduct.

104.    In the private meeting with an independent Board member, certain members of TWC management carried with them and described complaints contained in HW's personnel file, as well as their general concerns about HW's treatment of women and his financial misconduct. They suggested that HW had become harmful to TWC and his conduct presented a risk to the company. This information should have been cause for immediate follow-up interviews and investigation, but no such investigation took place.

105.    Instead, that information became relevant to negotiations between the Board and HW concerning extension of HW's employment contract.  HW's original employment contract with TWC, entered into in or about 2005, explicitly provided for his termination from the company only in extreme circumstances, including conviction of a felony offense. (It did not explicitly prevent the Board from taking actions that would help prevent future recurrence of misconduct, such as limiting his managerial authority or restricting his ability to supervise employees or interact with women in his hotel room, but the Board did not undertake any of these actions.) That original employment contract expired at the end of 2015. The Board was

29

under no obligation to renew the contract; thus, HW's continued employment could have been terminated in 2015, or the Board could have insisted that HW take a reduced non-supervisory role with greater oversight that presented lower risk to the company.

106.    In response to the information obtained from TWC management, independent Board members sought access to HW's personnel file so that counsel representing it could use the personnel file and other information to evaluate whether the Board would recommend renewal of HW's contract. HW resisted the independent directors' efforts to obtain a copy of his personnel file and otherwise investigate his misconduct, on the purported grounds that the contents of the file would be leaked to the press if disclosed to the Board. There was no basis for this claim; instead, HW sought to prevent access to his personnel file to avoid discovery of the extent of his own misconduct. A majority of the Board refused to back the independent Directors' efforts to obtain HW's personnel file; thus, the Board failed to undertake efforts that may have resulted in discovery of at least a portion of HW's misconduct.

107.    Rather than investigate claims of misconduct by HW or take appropriate steps to protect TWC employees from HW's unlawful conduct, the Board in 2015 negotiated a contract extension with HW that placed no effective restrictions on his activity. The Board did require HW to, as of 2016, promise to comply prospectively with a Code of Conduct that was written to address what the Board understood to be HW's prior misconduct, including sexual harassment and financial impropriety. HW's 2015 contract extension, however, only permitted termination of HW's employment due to a Code of Conduct violation if the violation was "willful" and a majority of the Board, as well as RW, determined that the willful violation had "caused serious harm to the company."

108.    HW's contract extension also contained an unusual provision that effectively
monetized, rather than prohibited, ongoing acts of sexual harassment and misconduct. In
particular, it stated that if TWC had to "make a payment to satisfy a claim that you [i.e., HW]
have treated someone improperly in violation of the Company's Code of Conduct," he would
face escalating financial penalties: $250,000 for the first such instance, "$500,000, for the second
such instance, $750,000 for the third such instance, and $1,000,000 for each such additional
instance." This contract contained no provision for any penalties if HW personally covered the
costs of any payments necessary to satisfy claims of improper treatment, and it provided for no
adverse employment consequences in the event that one, two, three, or even four or more such
payments had to be made by TWC and/or HW as a result of HW's sexual harassment or
misconduct. Thus, pursuant to HW's employment contract, HW could continue engaging in
sexual harassment and misconduct with impunity, provided that he paid the costs of any
settlements and that he avoided disclosure of misconduct that might risk causing "serious harm
to the company."

109.    Board minutes reflect that the Board ratified HW's new employment contract
unanimously. No future efforts were undertaken by the Board to investigate HW's misconduct or
TWC's practices concerning that conduct until HW's termination in October 2017. Any efforts
by independent directors to restrain HW's conduct were overcome by HW, RW, and directors
friendly to HW and RW. No penalty payments ever were made by HW pursuant to the
employment contract, and HW was not terminated until after his misconduct was revealed to the
public in October 2017.

110.    In November 2015, after renewal of HW's employment contract, TWC was
presented with specific and detailed allegations of sexual harassment and misconduct by a TWC

31

employee. Those allegations referenced other witnesses and victims within the company who could have been interviewed about the claims. That employee also was available to be interviewed and questioned.

111.    Out of fear of retaliation and adverse career consequences, the employee agreed to withdraw the complaint in exchange for a settlement with TWC—not HW personally—that included an NDA. In connection with that settlement, however, the employee specifically informed TWC through its counsel that she was not withdrawing any of the allegations contained in the complaint; TWC's counsel agreed to confirm this understanding in writing, informing the complainant's counsel in a November 6, 2015 letter that in connection with the settlement, "your client's withdrawal of the Complaint she previously made does not imply any retraction of the statements made in that Complaint." Despite this reaffirmation, no effort was made to investigate any of the allegations contained within the complaint. To the contrary, upon information and belief, TWC's Human Resources Director was instructed to remove the complaint from HW's personnel file because it had been withdrawn, and the issues identified by the complaint remained unexamined and unremedied until HW's expulsion from the company almost two years later.

112.    Absent these failings of corporate management and oversight described herein, HW would not have been able to continue to engage in the repeated and persistent unlawful conduct described herein for several years with impunity.

### FIRST CAUSE OF ACTION
**Pursuant to Exec. Law § 63(12)**
**Violation of NYSHRL § 296(1)**
**Against Respondents HW and TWC**

113.    The Attorney General repeats and re-alleges, as though fully set forth herein, all of the preceding paragraphs.

32

114.    New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §

296(1)(a), provides that it is an unlawful practice for "an employer . . . because of the . . . sex . . .

of any individual, to refuse to hire or employ or to bar or to discriminate against such individual

in compensation or in terms, conditions or privileges of employment." The NYSHRL is violated

when a workplace is permeated by discriminatory intimidation, ridicule, or insult sufficient to

alter the conditions or employment ("hostile workplace harassment").

115.    The NYSHRL is also violated when a managerial or supervisory employee trades

or attempts to trade favorable employment terms, conditions, or privileges for sexual favors

("quid pro quo harassment").

116.    Through the actions and inactions described above, Respondents HW and TWC

repeatedly and persistently violated the NYSHRL by subjecting employees to a sex-based hostile

work environment, targeting female employees for *quid pro quo* harassment, and otherwise

discriminating against female employees in the terms, conditions, and privileges of employment.

117.    Such conduct was willful, wanton, and malicious.

118.    By reason of the conduct alleged above, Respondents HW and TWC engaged in

repeated and persistent illegal conduct in violation of NYSHRL § 296(1).

### SECOND CAUSE OF ACTION
### Pursuant to Executive Law § 63(12)
### Violations of NYSHRL § 296(6)
### Against Respondents RW and TWC

119.    The Attorney General repeats and re-alleges, as though fully set forth herein, all

of the preceding paragraphs.

120.    The NYSHRL, N.Y. Executive Law § 296(6), provides that it is "an unlawful

discriminatory practice for any person to aid, abet, [or] compel … the doing of any of the acts

forbidden under this article."

33

121.     As alleged above, Respondents RW and TWC repeatedly and persistently aided and abetted conduct that violates the NYSHRL, namely, the gender-based hostile work harassment of, *quid pro quo* harassment of, and discrimination against female employees by HW.

122.     RW holds an ownership interest in TWC and was a senior executive of the company at all times relevant to the allegations set forth above.

123.     TWC, through the actions and inactions of its executives and senior management, condoned and/or acquiesced in HW's sexual harassment of and gender-based discrimination against female employees.

124.     Such conduct was willful, wanton, and malicious.

125.     Through such unlawful conduct, Respondents RW and TWC engaged in repeated and persistent illegal conduct in violation of NYSHRL § 296(6).

**THIRD CAUSE OF ACTION**
**Pursuant to Executive Law § 63(12)**
**Violation of NYCHRL § 8-107**
**Against All Respondents**

126.     The Attorney General repeats and re-alleges, as though fully set forth herein, all of the preceding paragraphs.

127.     The New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-107(1)(a), prohibits discrimination on the basis of gender.

128.     The NYCHRL is violated when employees are treated "less well" than others, because of their gender.

129.     As alleged above, Respondents repeatedly and persistently treated female employees less well than male employees through gender-based hostile workplace harassment, quid pro quo harassment, and discrimination.

34

130.     Pursuant to N.Y.C. Admin. Law 8-107(13)(b), TWC is liable for the violations of the NYCHRL because the individual who personally engaged in the harassment and discrimination, Harvey Weinstein, was an executive employee with managerial responsibilities.

131.     TWC is also liable because its executives and senior management knew of HW's harassing and discriminatory conduct but through their actions and inactions, acquiesced in such conduct.

132.     TWC is also liable because TWC executives and senior management failed to take immediate and appropriate investigative or remedial action despite knowledge of HW's unlawful conduct.

133.     Alternatively, TWC is liable for HW's unlawful conduct because it should have known of HW's actions and failed to exercise reasonable diligence to prevent his sexual harassment of and gender-based discrimination against employees.

134.     The unlawful discriminatory practices described herein were the result of the Respondents' willful, wanton, and malicious acts.

135.     By reason of the conduct alleged above, Respondents engaged in repeated and persistent illegal conduct in violation of NYCHRL § 8-107.

**FOURTH CAUSE OF ACTION**
**Pursuant to Executive Law § 63(12)**
**Denial of Equal Protection Under the New York Civil Rights Law**
**Against All Respondents**

136.     The Attorney General repeats and re-alleges, as though fully set forth herein, all of the preceding paragraphs.

137.     New York Civil Rights Law § 40-c provides that "No person shall, because of race, creed, color, national origin, sex, marital status or disability . . . be subjected to any

35

discrimination of his civil rights . . . by any other person or by any firm, corporation or institution

. . . ."

138.    Respondents have knowingly, repeatedly, and persistently, deprived women of

equal treatment in terms, conditions, and privileges of employment and of the right to be free

from severe or pervasive hostile treatment because of their sex.

139.    By reason of the conduct alleged above, Respondents discriminated against

persons based on sex in violation of New York Civil Rights Law §40-c.

## FIFTH CAUSE OF ACTION
### Pursuant to Executive Law § 63(12)
### Persistent or Repeated Illegal Business Conduct
### Against All Respondents

140.    The Attorney General repeats and re-alleges, as though fully set forth herein, all

of the preceding paragraphs.

141.    A violation of state, federal or local law constitutes illegality within the meaning

of Executive Law § 63(12) and is actionable thereunder when persistent or repeated.

142.    HW, operating in his capacity as TWC's co-owner and co-CEO, and using TWC

employees and resources to facilitate his unlawful activities, repeatedly and persistently violated

New York Penal Law provisions prohibiting forcible touching (Penal Law § 130.52), sexual

abuse (Penal Law § 130.55), and coercion (Penal Law § 135.60), unlawful sexual misconduct

(Penal Law § 130.20), criminal sexual acts (Penal Law § 130.40), and attempts to commit the

same.  TWC is liable for such misconduct.

143.    Through the conduct, policies, and/or practices described herein, Respondents

engaged in persistent and repeated violations of NYSHRL, NYCHRL, NYCRL, and NY Penal

Law in the carrying on, conducting, and transaction of business in violation of New York

Executive Law § 63(12).

**WHEREFORE**, Petitioner requests an order and judgment pursuant to Executive Law § 63(12) and NYSHRL § 296(1) & 296(6), CRL § 40(c), and NYCHRL § 8-107(1)(a):

1. Permanently enjoining Respondents from violating Executive Law §63(12), NYSHRL § 296(1) & 296(6), CRL § 40(c), NYCHRL § 8-107(1)(a), and relevant provisions of the Penal Law, and from engaging in the illegal acts and practices alleged in the Verified Petition;

2. Directing Respondents to pay a civil penalty to the State of New York in the sum of $100,000 for each violation of NYSHRL § 296(1) and of NYSHRL § 296(6), $250,000 for each violation of NYCHRL § 8-107(1)(a), and $500 for each violation of CRL § 40(c);

3. Directing Respondents to pay restitution and damages in the amount of the harm to the victims of Respondents' illegal conduct in connection with its hostile workplace environment and sexual harassment of women;

4. Ordering such remedial equitable relief as is warranted based on the illegal acts and practices described above, including judicial or other supervision of compliance with the prohibitions on continued unlawful conduct; freeing women who signed NDAs negotiated by Respondents from those NDAs; prohibiting any corporate or financial transaction that would enable Respondents to evade the continued jurisdiction of the Attorney General and this Court, undermine compliance with the terms of any judgment, or conceal proceeds of any sale of TWC or any of its assets;

5. Awarding Petitioner the costs of this proceeding pursuant to CPLR § 8303(a)(6); and

6. Granting such other and further relief as the Court deems just and proper.

37

Dated:  February 11, 2018
        New York, New York

Respectfully Submitted,


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Petitioner
120 Broadway
New York, NY 10271
212-416-8250


By:  _____/s_____


ANJANA SAMANT
Assistant Attorney General
Civil Rights Bureau
Anjana.samant@ag.ny.gov

HOWARD MASTER
Senior Enforcement Counsel

AMANDA ADDISON
Volunteer Assistant Attorney General
Civil Rights Bureau

38

INDEX NO. 450293/2018

RECEIVED NYSCEF: 02/13/2018

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

THE PEOPLE OF THE STATE OF
NEW YORK, by ERIC T.
SCHNEIDERMAN, Attorney General
of the State of New York,

              Petitioner,

    v.

THE WEINSTEIN COMPANY LLC,
THE WEINSTEIN COMPANY
HOLDINGS LLC,  HARVEY
WEINSTEIN, and ROBERT
WEINSTEIN,

              Respondents.

---

ATTORNEY AFFIRMATION
IN SUPPORT OF
VERIFIED PETITION

Index No.
IAS Part
Assigned to Justice

ANJANA SAMANT, an attorney duly admitted to practice before the courts of this State, makes

the following affirmation under the penalties of perjury:

    1.     I am an Assistant Attorney General in the Office of Eric T. Schneiderman,

Attorney General of the State of New York (the "State" or "NYAG"), assigned to the Civil

Rights Bureau, and am duly authorized to make this verification.

    2.     I have read the foregoing Petition and know the contents thereof, which are to my

knowledge true, except as to matters stated to be alleged upon information and belief, and as to

those matters, I believe them to be true.

    3.     The basis for my belief as to all matters stated upon information and belief are the

investigatory materials contained in the files of the Civil Rights Bureau of the New York State

Office of the Attorney General.

    4.     The reason this verification is not made by the Petitioner is that the Petitioner is a

body politic and the Attorney General is their duly authorized representative.

Case 1:17-cv-09554-AKH   Document 333-9   Filed 06/30/20   Page 46 of 46

WHEREFORE, it is respectfully requested that the petition be granted in all respects.


Dated:  February 11, 2018
        New York, New York

                              Respectfully Submitted,



                        By: _____/s_____

                              ANJANA SAMANT
                              Assistant Attorney General
                              Civil Rights Bureau
                              Anjana.samant@ag.ny.gov

2