UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISETTE GEISS, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), MELISSA THOMPSON, MELISSA SAGEMILLER, NANNETTE KLATT, KATHERINE KENDALL, ZOE BROCK, CAITLIN DULANY, LARISSA GOMES, and JANE DOE, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX FILM NY LLC, THE WALT DISNEY COMPANY, DISNEY ENTERPRISES, INC., BUENA VISTA INTERNATIONAL, INC., HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MICHAEL EISNER, IRWIN REITER, DAVID GLASSER, FRANK GIL, RICK SCHWARTZ, FABRIZIO LOMBARDO, MARK GILL, NANCY ASHBROOKE, MIRAMAX DOES 1-10, TALENT AGENCY DOES 1-100, and JOHN DOES 1-50, inclusive,<br><br>        Defendants. | Case No. 1:17-cv-09554-AKH<br><br>Hon. Alvin K. Hellerstein |

**MEMORANDUM OF PLAINTIFF ZOE BROCK IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## **TABLE OF EXHIBITS**

1. Email from E. Fegan dated December 18, 2019

2. Letter from J. Clune dated January 24, 2020

3. Declaration and Report of James W. Hopper, Ph.D.

4. Curriculum Vitae of James W. Hopper, Ph.D.

Plaintiff Zoe Brock, by and through her undersigned counsel, Hutchinson Black and Cook, LLC, submits this memorandum in opposition to the Motion for Preliminary Approval of a Class Action Settlement ("Motion") (Dkt. # 333), and states as follows:

## INTRODUCTION

Named Plaintiff Zoe Brock was one of the women victimized by Harvey Weinstein. Ms. Brock, along with nine other Weinstein survivors, have joined together to bring this lawsuit both seeking compensation for themselves, and as proposed class representatives for all of the victims who were subject to Mr. Weinstein's sexual misconduct. (First Amended Class Action Complaint "Am. Compl." ¶ 729-30, 737)

While Ms. Brock is a named Plaintiff in this case and is listed in the Amended Complaint as a class representative, she was excluded from the settlement negotiations in this matter. It appears that proposed class counsel, Fegan Scott LLC ("Fegan") and Hagens Berman Sobol Shapiro LLP ("Hagens"), did not consider Ms. Brock to be a sufficiently deferential plaintiff. When proposed settlement terms were disclosed to Ms. Brock last fall, she vocally objected that the terms of the settlement were inadequate to hold Mr. Weinstein, his enablers, and his companies responsible for the harm they had caused. Ms. Brock also had voiced serious concerns that the compensation proposed for Fegan and Hagans was excessive and did not put their clients first. Once Ms. Brock voiced those concerns, Attorney Fegan notified Ms. Brock that she would no longer represent her. (*See* **Ex. 1**, email from E. Fegan dated Dec. 18, 2019.) Even after being fired as a client, Ms. Brock continued to attempt to advocate vigorously for the class and hired new counsel to do so.

Though Fegan had terminated her as a client, Ms. Brock remained a named Plaintiff and proposed class representative, and Fegan did not seek to amend the Amended Complaint to remove

1

Ms. Brock from either of those roles. Yet Ms. Brock's repeated requests, made through her new counsel, to participate in the settlement talks for this action, were simply ignored. (*See, e.g.,* **Ex. 2**, Letter from J. Clune dated January 24, 2020.)  Thus, while she remained listed as a putative class representative in the Amended Complaint, after raising serious concerns about the fairness of the evolving settlement, Ms. Brock was completely shut out of the process.

Having been excluded from the negotiating table, Ms. Brock could only hope that proposed class counsel would come to this Court with an improved settlement that she could support. That has not happened. The proposed class settlement has multiple deficiencies that should cause this Court to deny the motion for preliminary approval.  They include:

a) <u>No contribution from Mr. Weinstein and his enablers despite receiving a full release;</u>

b) <u>The claim process will further traumatize victims and discourage claims;</u>

c) <u>The plan of allocation will lead to arbitrary and unfair disbursements</u>

d) <u>The class notice may discourage class members from making claims; and</u>

e) <u>Ms. Brock should not be excluded from a service award in the event of settlement.</u>[1]

In light of these issues, this Court should deny preliminary approval of the proposed settlement. Ms. Brock's hope and desire is that after such an Order from this Court, Fegan and Hagans will include all parties in the settlement process and allow all counsel for Plaintiffs to work toward an acceptable resolution of the remaining problematic issues that can be presented to this Court with the support of all parties.

---

[1]  In a conferral call with proposed class counsel prior to filing this motion, proposed class counsel expressed a willingness not to oppose a service award for Ms. Brock.

## BACKGROUND

### a. Plaintiff Brock Was Assaulted By Harvey Weinstein.

In 1998, Ms. Brock attended the Cannes Film Festival at the suggestion of her then-modelling-agent in an effort to advance her modeling career. Like many other Weinstein victims, at an event as part of the festival, Ms. Brock was separated from her friends by Mr. Weinstein's handlers, isolated with Mr. Weinstein, and taken to his hotel "for a drink." (Am. Compl. ¶ 154, Dkt. # 140.) In his hotel suite, Mr. Weinstein left the room, and then reemerged naked, demanding a massage. (*Id.* ¶ 156.) When Ms. Brock refused, Mr. Weinstein physically maneuvered her into a bedroom. (*Id.*) Ms. Brock ultimately was able to elude Mr. Weinstein's grasp and escape, locking herself in a bathroom to avoid being attacked by Mr. Weinstein. (*Id.* ¶ 157.) The next day, Mr. Weinstein further harassed her in a threatening manner at a private film screening at Cannes. (*Id.* ¶ 163.) Ms. Brock was left highly traumatized and in fear of Mr. Weinstein, his entourage, and the Hollywood culture they stood for. This sexual assault has had deep and lasting impacts on Ms. Brock, including both harming her career and causing profound emotional distress. (*Id.* ¶ 164.)

### b. Plaintiff Brock Joins This Lawsuit.

When the "#MeToo" movement finally arrived, Ms. Brock believed it was time for her voice to be heard. She signed on as a Plaintiff and proposed Class Representative for this lawsuit out of a desire not only to secure fair compensation, but to hold Mr. Weinstein and his enablers accountable for the harm they perpetrated on all of Mr. Weinstein's victims, and to ensure that all of Mr. Weinstein's victims had the opportunity to receive some measure of recovery from the defendants. Ms. Brock and her co-plaintiffs were told by their counsel that this lawsuit was going to finally change how business was done in Hollywood.

### c. This Court Dismisses Multiple Claims Including Ms. Brock's.

By Order dated April 18, 2019, this Court denied a motion to dismiss Count 1 as to Mr. Weinstein, bringing claims under the Trafficking Victims Protection Act, and dismissed all other claims and Defendants on multiple bases. That Order had the effect of dismissing all claims brought by Ms. Brock and five other named Plaintiffs, which concerned conduct that occurred prior to 2005. Only a handful of claims against Mr. Weinstein survived the Order. Ms. Brock and these other named Plaintiffs retain an appeal right regarding that ruling.

### d. The Parties Engage in Settlement Negotiations Concerning Both the Remaining Claims/Parties, and the Dismissed Claims/Parties.

With the benefit of this Court's April 18, 2019 ruling, the parties engaged in settlement negotiations. Those negotiations included Plaintiffs with live claims under Count 1, as well as those whose claims had been dismissed. Likewise, the negotiations included all Defendants, not just Mr. Weinstein. Negotiating on behalf of those whose claims had been dismissed and those whose claims remained, as well as dismissed Defendants, was undertaken for three primary reasons. First, those with dismissed claims maintain their appeal rights. Second, Defendants presumably want these Plaintiffs included so that any class resolution would bind all putative class members as part of any final class settlement. Third, the dismissed Defendants provide a source of additional funding to contribute to the settlement.

### e. Ms. Brock Raises Concerns, is Terminated by Ms. Fegan, and is Excluded From Further Negotiation.

In approximately October 2019, Fegan and Hagens shared a then-current outline of a proposed settlement agreement with each of the class representatives and attempted to secure their consent to it. As noted above, Ms. Brock had serious concerns about that settlement, which she believed put counsel's interests ahead of those of the potential class members, and which otherwise did not appear to provide fair compensation for the class. The consequence of Ms. Brock

4

speaking up was that proposed class counsel Elizabeth Fegan, Esq., terminated her as a client. (**Exhibit 1.**) Alarmed by this development, Ms. Brock retained new counsel, Hutchinson Black and Cook LLC, and dismissed Ms. Fegan's co-counsel, the Hagens law firm, from continuing to represent her.

After being retained, undersigned counsel requested multiple times to be included in settlement negotiations, including in writing by letter dated January 24, 2020 and reproduced as **Exhibit 2**. Those overtures were completely ignored. Undersigned counsel planned to raise this issue with the Court at the status conference set in this matter for February 28, 2020, but without consulting undersigned counsel, Ms. Fegan wrote to this Court on February 24, 2020 requesting that the status conference be continued. (*See* Dkt. # 327.) The Court agreed, and after a delay caused by COVID-19, the status conference was ultimately convened on June 26, 2020. Ms. Brock and her counsel were informed for the first time at that status conference when Ms. Fegan addressed the Court that a proposed settlement had been reached and that signatures of Ms. Fegan's remaining clients were being gathered. The Court also learned for the first time that a plaintiff and putative class representative was not included as a part of the proposed settlement. Therefore, for reasons outside of her control, this is Plaintiff Zoe Brock's and her counsel's first opportunity to have any input into this proposed agreement.

## ARGUMENT

**A. Legal Standard Governing Preliminary Approval of Class Settlements.**

Prior to 2018, the factors for courts to consider when determining whether to grant preliminary approval were those outlined in *City of Detroit v. Grinnell Corp.*, 495 F.2d 488 (2d Cir. 1974). Those factors are:

(1) the complexity, expense, and likely duration of the litigation;
(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery;
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (internal citations omitted).

In 2018, Rule 23(e), Fed. R. Civ. P., was substantially revised to ensure an appropriately searching inquiry before courts certify classes for settlement purposes. That rule, as revised, outlines the following considerations:

> ***Approval of the Proposal.*** If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> **(A)** the class representatives and class counsel have adequately represented the class;
>
> **(B)** the proposal was negotiated at arm's length;
>
> **(C)** the relief provided for the class is adequate, taking into account:
>
> > **(i)** the costs, risks, and delay of trial and appeal;
> >
> > **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > **(iv)** any agreement required to be identified under Rule 23(e)(3); and
>
> **(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). This revision was important, because when parties come to a court jointly proposing simultaneous certification of a class and approval of a settlement, "the Rule 23(a) requirements designed to protect absent class members 'demand undiluted, even heightened, attention.'" *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 246 (2d Cir. 2011) (quoting *Amchem*, 521 U.S. at 620)). While the revision to Rule 23(e) provides detailed factors to consider before approval of a settlement class, the prior list of factors for the court to

6

consider as outlined in *Grinnell* continue to apply, and "supplement" the new Rule 23(e)(2) factors. *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 2d 686, 692 (S.D.N.Y. 2019).

### B. The Settlement Should Be Rejected Because Mr. Weinstein and His Enablers Are Contributing Nothing.

The Motion on its face is oblique about the source of the $18,875,000 settlement fund, saying that the funds are coming from "Defendants or their Insurance Companies." Mot. 14. But there is no either/or about it. In addition to the class action settlement agreement, at Dkt. # 333-5, proposed Class Counsel has submitted a copy of a "The Weinstein Company Bankruptcy Global Settlement Agreement," which is the document that contains the agreements needed to resolve the bankruptcy action as well as fund the settlement for this case. That document defines the "Settlement Amount" on page 11 to mean $46,786,000, *to be paid by the insurers*, not by any individual. The class action settlement fund is described later on that same page as $18,875,000 of the $46.8 million Settlement Amount, which as noted above is wholly funded by the insurance companies, and which is the sole consideration at issue with respect the class settlement proposal before this Court. Mr. Weinstein is paying nothing. His brother, Robert Weinstein, who enabled the abuse by turning a blind eye (Am. Compl. ¶ 350), is paying nothing. The wealthy officers and directors of The Weinstein Company and Miramax, who allowed Mr. Weinstein's reprehensible conduct to continue for decades, are paying nothing.

Nor is there any disclosure as to what the limits are of the insurance polices that are funding the settlement. Without this information, it is impossible to determine whether the insurers have sufficiently stepped up to the plate.

The seventh *Grinnell* factor listed above is "the ability of the defendants to withstand a greater judgment." This factor weighs strongly in favor of rejecting this settlement. It defies credulity to suggest that neither of the Weinstein brothers nor other alleged conspirators have any

7

money to contribute to the settlement. Likewise, many of the officers and directors who facilitated or turned a blind eye to Mr. Weinstein's conduct appear to be very wealthy individuals, who could withstand a significant judgment even if The Weinstein Company were dissolved in bankruptcy and no indemnification was available because the relevant insurance policies were exhausted. The settlement papers before the Court do not explain why these wealthy men are being asked to contribute literally nothing to a settlement that releases them from the potential of huge damages judgments against them. The settlement should be rejected because it includes no meaningful contributions from the principal tortfeasors, even though they appear to have ample resources to satisfy judgments against them.

### C. The Settlement Should Be Rejected Based on the Flawed Claim Forms.

The new Rule 23 requires this Court to assess "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). The claim form proposed as part of the settlement will have serious deleterious effects on the effective distribution of funds to the class. For that reason, the proposed settlement should be rejected. *See Daniels v. Aeropostale W., Inc.*, 2014 WL 2215708, at *6-7 (N.D. Cal. May 29, 2014) (denying preliminary approval of class settlement in part because of "oppressive" claim form and notice, where notice was fourteen pages long, claim form was four pages, and both were "chock-full of legalese").

It is indisputable that the overwhelming majority of sexual assaults are never reported to anyone for reasons primarily tied to fear, shame and embarrassment. Thus, the claims process in this case, which requires survivor/claimants to disclose some of the most private and painful details of their lives either by use of a 30 page questionnaire or verbally with persons whose identities are unknown to them, is a task fraught with potential obstacles. The tenor of the communications with

these class members will be critical to providing a process that actually gets utilized by the victims of Mr. Weinstein. Upon review of the proposed documents, counsel for Plaintiff Brock asked for noted trauma expert James Hopper, Ph.D., to review the documents to identify how effective they will be to encourage victims of Mr. Weinstein to come forward and make a claim. As suspected, Dr. Hopper expressed multiple broad and specific concerns about the claims process which are detailed in his attached declaration and report. (**Exhibit 3**)

Though the report is highly detailed and specific in its concerns, the takeaway short summary is that the current process and forms offered to the Court will inhibit and obstruct the most traumatized potential claimants, many of whom may not have ever disclosed their abuse. Indeed, Dr. Hopper finds that those who "are the *most traumatized* and/or have *never previously disclosed* their victimization are the *least likely* to tolerate, complete, and benefit from the process currently proposed by the Settlement Agreement and Release." (**Exhibit 3**, Hopper Rpt. at 4 (emphasis in original).) To provide just a couple of the many examples explained in the report:

1. The notices and claim forms are not trauma informed and if not corrected, will greatly impact whether some class members are able to make a claim. The length and tone of the questionnaire itself is a challenge that may not be overcome by some class members.

2. There is no avenue for class members to get any assistance by persons with requisite trauma expertise until arguably the Tier 2 process where an undefined "specialist" is available. As such, some class members efforts to make a claim, including the most traumatized, may be thwarted prior to ever reaching such individuals.

The result of this and the other issues Dr. Hopper outlines may mean that many potential class members do not ever make a claim out of fear of an unsafe process, a result that presumably

no one would consider tolerable. These issues would affect both the "reasonableness" factors as well as the "reaction of the class" factor as stated in *Grinnell*. For the multiple reasons identified by Dr. Hopper, this process must be redesigned with the input of trauma experts. If class members' decision of whether to make a claim is based upon fear of a retraumatizing claims process, the settlement fails to achieve its purpose.

### D. The Plan of Allocation Is Unfair and Will Lead to Arbitrary Awards.

As noted above, Fed. R. Civ. P. 23(e)(2)(D) requires that, before a proposed class settlement is approved, this Court find that "the proposal treats class members equitably relative to each other." The proposed settlement here fails that test.

Initially, the settlement documents filed with the Court do almost nothing to identify the criteria that will be used to assess the value of the claims presented. Any class member reviewing the notice provided will have little sense whether their claim will be worth the minimum of $7500 or the maximum which is 100 times the minimum or $750,000.

Moreover, the little guidance that is provided is deeply flawed. First, the "Allocation Guidelines for the Special Master" ("Guidelines") suggests a system whereby a determination is based upon a crude assessment of the *type* of sexual misconduct perpetrated on the claimant. These guidelines list the specific descriptions of examples of sexual misconduct, which list is clearly not exhaustive of the experiences that claimants may describe to the special master. As an example, Plaintiff Brock herself will describe an attempted sexual assault where she had to run from Mr. Weinstein and hide, locked in his hotel bathroom for an extended period of time in fear of attack. No such "attempt" provision is listed in the "Guidelines" and there is no disclosure as to whether in light of that, she would be excluded from any recovery. Other women may be similarly excluded, or left in the dark as to how their claim would be valued, as the Guidelines

10

can't possibly be construed to have contemplated all of the dozens or hundreds of experiences that may be shared with the special master from class members still unknown to any party (other than Mr. Weinstein).

Additionally, the Guidelines indicate that 80% of the determination will be based upon the crude "type of sexual misconduct" assessment while only 20% of the determination is based upon the actual impact to the individual. Such a valuation of claims makes no sense. The only rational method for allocation of money as *compensation* for injuries would have the lion's share of the determination based upon the impact to the class member/claimant and not some presumption that certain types of conduct by one of the Defendants are necessarily worth a certain amount of dollars. Not even the most expert of mental health providers would dare to make such a generic and comparative assessment based upon types of sexual misconduct.

The Guidelines also suggest that "The Special Master will consider the likelihood that the Claimant would have been able to prove her claims in court, including the application of the relevant statutes of limitation and any other relevant considerations." Guidelines, p1. Considering that this Court has indicated that, for multiple reasons, all claims pre-2005 are dismissed, and that all claims post-2005 are dismissed against every defendant other than Mr. Weinstein, it is likely that a majority of claims will suffer from this "provability" discount. Such a concept is counter to the very notion of settlement whereby the Defendant still denies any liability and Plaintiffs are forgoing their right to challenge the Court's order.

Indeed, given how much of this action has been dismissed by the Court, and given that all parties – including those with surviving claims and those with dismissed claims – came to the table to settle, there is no good reason to devalue claims based on legal barriers such as statutes of limitations. The point of the settlement is to provide compensation for injuries sustained, and legal

bars such as the statutes of limitations do not affect that calculus. Having chosen to include both live claims and previously-dismissed claims in the settlement, claims should not be devalued based on the statute of litigations and similar legal bars to recovery that are unrelated to the harm Mr. Weinstein perpetrated and the impact of that harm on each of putative class member.

Equally troubling is the lack of any reference as to the amount of the "provability" discount other than to say that it "shall not be used as a total bar to recovery in the Class Claims Process." Id. Potential claimants thus have no idea if their award under the Claims Process will be reduced by 5% or 95% due to this "provability" discount.

Lastly, the appeals process for any decision made by the Special Master is an appeal to the same Special Master. Such a process gives the Court and claimant no assurance that any arbitrariness in the award can be corrected by any independent individual or body. Plaintiff Brock appreciates that many of these "streamlined" provisions may be cost effective, but such cost savings cannot be had at the expense of a credible claim process.

In summary, the "Guidelines" terms are fraught with significant problems that will create a nightmare for the Special Master, and will make it impossible for claimants to make a rational assessment as to whether or not to: submit a claim, oppose the settlement, or opt out entirely.

### E. The Class Notice May Discourage Class Members From Making Claims.

A principal deficiency of the proposed class notice is that, while it tells recipients that they could receive awards capped at $150,000 for Tier 1 or $750,000 for Tier 2, subject to *pro rata* reductions based on the number of claimants, it fails to provide class members with information sufficient to estimate what any such reductions would be. That is particularly concerning here based on the small size of the settlement fund. Assuming about $13 million remains in the fund after payment of costs and attorney's fees, if there were, for example, 500 claimants, the mean

award would be only $26,000. Such a small mean award would dictate that substantial *pro rata* reductions from the top-line offers of up to $750,000 or $150,000 would be required. Thus, given the real likelihood of material *pro rata* reductions in the amount of any award to any class member, this missing information is highly material.

In the principal case relied on in the Motion for Preliminary Class Approval, concerning sexual assaults by a student health physician at the University of Southern California, the court in that case initially rejected approval of the settlement based on a similar deficiency. That court explained:

> The parties have not provided any estimate in the settlement agreement, nor in the notice to class members, of the expectations as to the number of claimants that may seek a Tier 2 or Tier 3 claim. These figures do not need to be estimated with precision, but it would be necessary to explain to the Court, even in a rough sense, what the parties believe the ultimate number of claims will be as relevant to the potential likelihood and quantity of a pro rata adjustment to the Tier 2 and Tier 3 awards.

*Chi v. Univ. of Southern Calif.*, 2019 WL 3064457 at *2 (C.D. Cal. Apr. 18, 2019).[2] The notice here is similarly deficient and should therefore not be approved in its current form.

Moreover, the notice fails to provide any class member a reasonable way to gauge what her individual claim might be worth. By saying the range of awards is $7,500 to $750,000, but without providing any illustrative weighting of claims, a potential claimant cannot meaningfully assess whether she should opt out of the class and pursue a claim on her own.

Finally, the notice fails to comply with this Court's local rules with respect to disclosures concerning compensation for class counsel. The current proposal is to leave such information out of the notice to the class, other than to say fees are capped at 25% of the total recovery and note that a motion for attorney's fees will be forthcoming. This Court's Local Rule 23.1, however,

---

[2] The *Hagens* firm also served as Plaintiff's counsel in *Chi.*

13

requires that the notice to class members "include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone."  The proposed notice filed with the settlement agreement does not list the names of each of the law firms that will seek fees, the amounts each firm will seek, or what the agreements are between the multiple law firms that have represented various of the plaintiffs in this case.  Without this information, class members cannot fully assess and, if appropriate, object to, the fairness of the proposed attorney's fee allocation in this case.

### F. Ms. Brock Should Not be Excluded from Receiving a Service Award.

As noted above, Fegan and Hagens are proposing to deny Ms. Brock a service award because she did not support the ultimate settlement reached in this matter. They are taking that position although she actively cooperated with counsel with respect to the bringing of this action, and faithfully performed her duties to put the interests of absent class members at the forefront of her decision making with respect to this case.

The purpose of a service award for named plaintiffs in a class action is to recognize: "the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (*e.g.*, factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim and, of course, the ultimate recovery." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D. N.Y. 1997).  Plaintiff Brock undertook these burdens in the same manner as the other nine named Plaintiffs in this action. Indeed, by standing up to counsel when the terms of a proposed settlement seemed unfair, Plaintiff Brock arguably took more risk, and faced a heavier burden, than the other plaintiffs.  She has fully earned a service award in this case.

That Plaintiff's counsel discharged Ms. Brock as a client when she raised objections provides a particularly strong case for a service award for Ms. Brock. In *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), plaintiff's counsel eliminated as named plaintiffs persons who objected to a proposed settlement that included a handsome payment to plaintiff's counsel. In that case, the Seventh Circuit explained that the trial judge "rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it." *Id.* at 723. The court explained that while the settlement agreement provided for an award only for the plaintiffs who supported the settlement, that limitation had "created a conflict of interest" because "any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative." *Id.* Consistent with *Eubank*, service awards here should not be contingent on supporting the ultimate settlement, and Ms. Brock should not be denied her service award even if putative class counsel chose to discharge her as a client.

## CONCLUSION

Ms. Brock continues to believe that a global settlement to this case is the right resolution. The settlement that has been brought to this Court, however, is so flawed that it should not garner preliminary approval. This Court should reject it, and set a status conference for 60 to 90 days out for the parties to determine whether a settlement addressing the issues outlined above is possible to resolve this case.

Dated:  January 8, 2020.

                                            Respectfully Submitted,
                                                    */s/ Daniel D. Williams*
                                            Daniel D. Williams
                                            John C. Clune
                                            Hutchinson Black and Cook, LLC
                                            921 Walnut Street, Suite 200
                                            Boulder, CO  80302
                                            Phone:  (303) 442-6514
                                            williams@hbcboulder.com

**CERTIFICATE OF SERVICE**

      I, Daniel D. Williams, an attorney, affirm that the foregoing was filed on this day on ECF, which automatically served all counsel of record.

Dated: July 10, 2020

                                        Respectfully Submitted,

                                        */s/ Daniel D. Williams*
                                        Daniel D. Williams
                                        Hutchinson Black and Cook, LLC
                                        921 Walnut Street, Suite 200
                                        Boulder, CO  80302
                                        Phone:  (303) 442-6514
                                        williams@hbcboulder.com