**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUISETTE GEISS, KATHERINE KENDALL, ZOE BROCK, SARAH ANN THOMAS (a/k/a SARAH ANN MASSE), and MELISSA SAGEMILLER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>-v-<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX, LLC, HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JAMES, JEFF SACKMAN, JAMES DOLAN, and JOHN DOES 1-50, inclusive,<br><br>Defendants. | No. 1:17 CV 09554 (AKH)<br><br>**DECLARATION OF JAMES W. HOPPER PH.D.** |

I, James W. Hopper, Ph.D., make the following statements based on my personal knowledge:

1. I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts.

2. I earned a Doctoral degree (Ph.D.) in clinical psychology from the University of Massachusetts at Boston.

3. On July 10, 2020 I prepared a Report on the overall claims process proposed by the current Settlement Agreement and Release for claim submissions by victims of Harvey Weinstein's sexual harassment and/or assault.

4. I declare that the Report attached as Exhibit A is based on my expert qualifications and findings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the attached Report is true and correct.

DATED: July 10, 2020.

_____
James W. Hopper, Ph.D.

- 1 -

**EXHIBIT 3**

# James Hopper, Ph.D.
## Psychological Consultation Services

9 Henderson St. • Arlington, MA 02474
Phone/Fax 888.316.2125 • drhopper@jimhopper.com

**Report on the claim process for victims of Harvey Weinstein's sexual harassment and/or assault proposed by the "Settlement Agreement and Release"**

**Qualifications**

I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts. In 1997, I earned a Doctoral degree (Ph.D.) in clinical psychology from the University of Massachusetts at Boston. My graduate research focused on men with histories of childhood sexual and/or physical abuse. Most of my research, clinical work, and teaching over the past 23 years has focused on the effects of childhood abuse, including sexual abuse, and sexual assault.

Since 1996, when I launched jimhopper.com, I have provided extensive free information for adult survivors of child sexual abuse and sexual assault. My site has had millions of visitors and I have received help-seeking emails from thousands of survivors around the world. Over more than 25 years, I have provided brief phone consultations to hundreds of victims of sexual violence. Many of those seeking consultation with me have been previously misunderstood and betrayed by institutions (e.g., churches, companies, law firms) and professionals (e.g., supervisors, human resources staff, therapists) who should have protected them from violence and/or responded appropriately to their reports of victimization. Many have not previously disclosed their abuse or assault experiences to anyone else. Long ago, emailing and speaking with those survivors sensitized me to the experiences and needs of victims of sexual violence and associated institutional betrayals. Decades of such experiences have given me deep empathy and understanding of how sexual harassment and assault victims experience and respond to written and spoken communication – including communication that encourages or requires them to *report* their victimization experiences and/or *attempt to get their needs met* by institutions or professionals that (purport to and attempt to) help them achieve some healing and/or justice.

From 2000 to the present, I have given numerous invited teaching presentations on topics related to psychological trauma, childhood abuse, and sexual assault of adults for therapists,

1

EXHIBIT 3

higher education administrators, civilian and military investigators and prosecutors, senior military commanders, and other professionals. I have conducted assessments and provided therapy to adults suffering the effects of childhood abuse and sexual assault in a variety of settings. I have conducted research at Harvard Medical School, Boston University School of Medicine, and the University of Western Ontario on various aspects of psychological trauma and PTSD, and authored or co-authored sixteen papers published in peer reviewed journals.

In 2007, I was a founding board member of 1in6, Inc., a nonprofit with the mission of "helping men who have had unwanted or abusive sexual experiences in childhood live healthier, happier lives." From 2008 to 2011, I was an Advisory Board member and, as a paid consultant, I was managing director, editor, and writer for the comprehensive website 1in6.org. In my work with 1in6, including shaping the organization's philosophy and outreach practices, I drew from my understanding of survivors of sexual victimization and how they experience trauma-related information and invitations to seek help. As with my own website, via 1in6.org I received hundreds of emails from victims of child sexual abuse and adult sexual assault. Those messages, and the conversations I had with many of their senders, gave me additional insight into the experiences and needs of survivors of sexual victimization when they encounter written information encouraging them to seek help.

I have given many trainings and presentations to U.S. military commanders, investigators, prosecutors, sexual assault response coordinators, and victim advocates on providing trauma-informed services. For staff of the Department of Defense's *Safe Helpline*, I created trainings and consulted on how the *Safe Helpline* website can more effectively inform traumatized survivors and more effectively encourage them to report their assaults to military authorities.

Since 2015, I have been an Advisory Board member for Callisto, a nonprofit organization that allows people to anonymously record and report their sexual assault experiences on a secure website. Callisto staff have sought my advice on their online information and reporting form, specifically because I am a nationally recognized expert on how to present such information and solicit such reports *in trauma-informed and effective ways*.

Finally, from 2006 to the present, I have been an Instructor or Teaching Associate of Psychology in the Department of Psychiatry of Harvard Medical School.  Since 2013, I have regularly provided training to psychiatrists in a Harvard Medical School residency program.

For my full professional experience and qualifications, see my curriculum vitae.

EXHIBIT 3

**Scope of Assignment**

Attorney John Clune requested that, based on my expert knowledge and professional experience, I provide my opinions about several issues regarding the overall process and the specific procedures that are proposed, in the June 29, 2020 "Settlement Agreement and Release," as the methods for soliciting information from women who were victimized by Harvey Weinstein and the organizations complicit in his sexual harassment and assaults.

Specifically, I was asked to opine on (1) how *trauma informed* and, as a result of that factor, (2) how *effective* in achieving the Settlement Agreement's goals each of the following would be: (A) the overall approach, including its (i) "Tier 1" vs. "Tier 2" claim options, (ii) the notices provided to potential claimants, (iii) mandatory completion of an online or printable Class Action Claim Form with the option of assistance from Court-appointed attorneys, and (iv) access to "specialists trained in communicating with survivors of trauma with sensitivity and compassion" only for Tier 2 claimants and only after they've completed the Claim Form; (B) the Claim Form itself, whether or not plaintiffs have access, while completing it, to a Court-appointed attorney.

**Documents Reviewed**

I reviewed *parts* of the following document:

- The June 29, 2020 "Settlement Agreement and Release" ("Execution Version"), which consists of 52 pages plus another 319 pages of signatures and exhibits.

I reviewed *all* of the following documents:

- Exhibit A, "Allocation Guidelines"
- Exhibit B, "Tier 1 and Tier 2 Claim Form," including its general instructions page and sections A through I (total of 30 pages).
- Exhibits C though F, i.e., "Publication Notice," "Long-Form Notice," "Letter Notice," and "Email Notice"

**Expert Opinions**

As explained and documented below: (1) The proposed overall approach to the claim process is not trauma-informed and it will prevent some potential claimants from completing the submission of their claims. This includes the "Tier 1" vs. "Tier 2" claim options, mandatory

3

**EXHIBIT 3**

completion of a printed or online Class Action Claim Form with the option of assistance from Court-appointed attorneys, and access to "trained specialists" only for Tier 2 claimants and only after they've completed the Claim Form. (2) The Claim Form is not trauma-informed and will prevent some potential claimants from completing the submission of their claims.

Furthermore, it is my opinion that the survivors of Harvey Weinstein's sexual harassment and assaults who are the *most traumatized* and/or who have *never previously disclosed* their victimization are the *least likely* to tolerate, complete, and benefit from the process currently proposed by the Settlement Agreement and Release.

**Bases of Expert Opinions**

*What "Trauma-Informed" Means and Why It's Necessary*

The phrase "trauma-informed" has been defined concisely and expansively. In the classic book on the topic, trauma-informed services (including communications) are succinctly defined as those provided "in a manner that is welcoming and appropriate to the special needs of trauma survivors."[1] In this case, the service is the claim process associated with the Settlement Agreement, including its notices, forms, and potential spoken communication between staff and (potential) claimants. How trauma-informed the provision of those services are will depend on a variety of factors, many of which are addressed in this report. Critically, trauma-informed services must encompass everyone who interacts with trauma survivors, including not only attorneys and "specialist" interviewers but anyone who answers phones or responds to emails.

A more expansive definition emerged from a large 5-year multi-site study, the Women, Co-Occurring Disorders and Violence Study (WCDVS), which was initiated in 1998 by the Substance and Mental Health Services Administration. The WCDVS trauma committee delineated ten general principles of trauma-informed services,[2] including recognizing the impact of violence and victimization on survivors' experiences and behaviors; striving to empower clients by maximizing their choices and control; creating an atmosphere that is respectful of their needs for safety and respect; minimizing potentials for re-traumatization; and soliciting input from survivors and involving them in the design and evaluation of services.

---

[1] Harris, M., & Fallot, R.D. (Eds.). (2001). *Using trauma theory to design service systems* (New Directions for Mental Health Services Series). San Francisco: Jossey-Bass.
[2] Elliott, D. E., et al. (2005). Trauma-informed or trauma-denied: Principle and implementation of trauma-informed services for women. *Journal of Community Psychology, 33,* 461-477.

EXHIBIT 3

All of those principles would be difficult keep in mind while reading this report. Fortunately, another classic text provides a pithy distillation of what makes services trauma-informed – and thus effective with severely traumatized people. In *Trauma and Recovery,*[3] Harvard psychiatrist Judith Herman explains that traumas of interpersonal violence involve the core dynamics of *disconnection* and *disempowerment*; and that healing from trauma, and seeking justice, must have connection and empowerment as their core dynamics. This requires that those who attempt to assist survivors relate to them in truly *connected* ways, in which they perceive their experiences and needs are genuinely understood and empathized with, and in ways that *empower* them, for example with clear information and genuine choices.[4]

When services are not connected and empowering, survivors experience them, and rightly so, as disconnected and disempowering. Their experiences of the services are not what those providing them intended. The services become, at least in part, *reenactments of trauma,* and their effectiveness is reduced or completely undermined. This simple and powerful explanatory framework is applied below to the currently proposed claim process and its components.

*Problems with the Overall Claims Process*

There are three main problems with the overall claims process as explained and manifested in the Settlement Agreement, all notices, and Claim Form. All of these problems stem from the procedures, documents, and staffing being insufficiently trauma-informed – to an extent that undermines the effectiveness of the process for generating claims.

The first main problem is that potential claimants will find the notices and Claim Form *disconnected* and *disempowering*. This would be particularly true for the most traumatized victims and/or those who have not previously disclosed their victimization experiences.

Here "disconnected" refers to a survivor's experience that the contents of the notices and Claim Form, including what's not said and the language used to say some things, demonstrate a lack of understanding and empathy for their experiences and needs. The documents – and by extension, those who have authored them and the system and organization(s) of which they are a part – will be perceived as uncaring, unsafe, potentially untrustworthy, even dangerous.

---

[3] Herman, J. L. (1992). *Trauma and recovery: The aftermath of violence – From domestic abuse to political terror.* New York: Basic Books.

[4] The word "empowerment" can be off-putting to some, and for good reasons. It may be helpful to think in terms of two key aspects: supporting the *autonomy* and *competence* of the person you are attempting to serve.

**EXHIBIT 3**

"Disempowering" refers to ways the notices and claim form fail to provide important *information*, fail to provide appropriate *options* for engaging with the process, and, when options *are* given, those options fail to support and actually *undermine* the survivor's needs in the claim process. If the notices and Claim Form are not revised to overcome their current problems and failures, those experiences of disconnection and disempowerment will greatly impact some potential claimants' willingness to seek more information about the claim process, to begin engaging in it, and to see their claim through to completion.

Certainly, the nature of the settlement agreement and the claims process are complex, for a variety of reasons, and it is no easy task to convey the necessarily information to those victimized by Harvey Weinstein in written form, let alone do so in a trauma-informed way. However, as explained below in sections on specific components of the process, there is much room for improvement, which will be essential for the settlement agreement to achieve its stated goals, especially for the most traumatized and vulnerable victims.

The second problem with the overall claim process is also its greatest flaw: *who potential claimants are and are not allowed to speak with by phone, and when.* Before addressing that problem, I need to explain the third and related main problem: *how the notices and Claim Form communicate (and don't communicate)* options for getting information and other assistance by phone, and their failure to reveal the *qualifications* of people with whom they might speak. For starters, the publication, email, and letter notices simply say, "For more details, call toll free 1-800-000-0000." Nowhere do they say anything about who will or might answer the phone (e.g., an administrative assistant, paralegal, law firm intern, junior attorney). Nor do those notices give any indication of whether, if the person answering the phone is unable to answer their questions completely and/or effectively, for example because they aren't sufficiently skilled at assisting survivors of sexual trauma, the caller can be connected to a sufficiently trauma-informed and qualified person. Also, unlike the Long-Form Notice and the Claim Form, those three (relatively short) notices say nothing about the option of speaking with a Court-appointed attorney, at no cost, for assistance with filling out the Claim Form.[5] This lack of information about options for speaking with someone about the claims process would be experienced by

---

[5] Indeed, even on the Claim Form itself, this option of speaking with an attorney about the Claim Form and how to complete it is not mentioned until the fifth page of the form (i.e., the first page of "Section D: Workplace Harassment and Discrimination"). Also, it is unclear whether the attorneys who can answer questions about the Claim Form (an 888-number is indicated) are different from the people who can answer other questions about the process and can be reached via the 800-number indicated on the publication, email, and letter notices.

many traumatized survivors as evidence that the people who created the notices don't really understand or care about their experiences and needs. Some will fear, perhaps correctly, that whoever does answer the phone will not be qualified to help them.

Of the notifications, only the Long-Form Notice[6] reveals the circumstances under which a potential claimant could speak with (a) an attorney, about completing the Claim Form, and (b) a "specialist," who might understand their experience and needs (as well as the claim process). Even the Long-Form Notice, however, does not reveal until its third page that "The Court has appointed attorneys to represent Settlement Class Members, and those attorneys are available at no cost to you to help you make your claim." Unclear at that point, however, is whether those attorneys are different from the "specialists and experts who make up the team administering and evaluating the Settlement claims," mentioned on the page before and described as having been "trained in communicating with victims of trauma and harassment," and as people who will, if a claim is submitted, "ensure your experience is as safe, compassionate, and confidential as possible and that you will be heard." And *not until page 13* of the Long-Form Notice – strangely, in the answer to "How much will my payment from the settlement be?" – does the reader learn, in a brief paragraph on the "Tier 2 Claim Award," that only after submitting the Claim Form and choosing to participate in an interview (required for Tier 2 claims) would they will be interviewed by "a specialist who is trained in communicating with survivors of trauma with sensitivity and compassion."

What that language actually means is unclear. Were those "specialists" only recently trained, because they previously didn't know how to communicate with traumatized people in that way? Despite such training, might they not actually be sufficiently experienced and *skilled* at such communication? For severely traumatized people, such information vacuums are likely to be filled with thoughts and fantasies of fear and distrust. The answers to those questions – and many others about the "attorneys," "specialists," and whoever might answer the toll-free numbers – are entirely unclear. If this is all unclear and confusing to us, then just imagine how confusing it would be to (severely) traumatized readers of the current versions of the notices.

Which brings us back to the second and most serious flaw in the entire claim process: *who potential claimants are and are not allowed to speak with by phone, and when.* Critically, *some of potential claimants' most important experiences and needs are those associated with*

---

[6] How potential claimants will get access to the Long-Form Notice is not revealed by the Settlement Agreement, which only mentions the Long-Form notice in passing (in paragraph 25, page 11).

**EXHIBIT 3**

(legitimate) trauma-based fears – of betrayal by the claims process and its agents, due to ignorance, incompetence, or lack of empathy; of being frustrated and thwarted in their attempt to seek justice through the claims process; and, ultimately, fear of being retraumatized by that process and left worse off than they were before encountering any notice of the Settlement Agreement. Therefore, for the success of the claims process as a legal remedy, it is essential that potential claimants be given access via *telephone* (or videoconference), *as soon as possible*, to professionals who are not only *trained* to communicate with severely traumatized people with "sensitivity and compassion," but *very experienced* and *very skillful* at doing so.

Yet in the currently proposed claim process, survivors would be forced to complete the (flawed) Claim Form *before* having the option to speak with a "specialist," who *might* have sufficient training and experience to understand people severely traumatized by sexual harassment and assault, and *might* have sufficient skill to communicate effectively with them (based in such understanding, not just training on how to do so). The role of the "specialist" is *not* to help potential claimants complete the Claim Form. Nor are claimants given the option of not completing the Claim Form in writing; specifically, they cannot have an interview with a specialist who is fully qualified *to elicit and record the same information* that the Claim Form was (poorly) designed to elicit. Instead, the function of the "specialist," as currently envisioned, is only to conduct a follow-up interview – only after the Claim Form has been completed and submitted for a Tier 2 claim, and only to collect more information "regarding your experience and the impact on you, including the harm you suffered."[7]

In short, the very type of professional from whom severely traumatized and highly fearful and distrusting potential claimants most need help to understand and navigate the claims process are, despite being part of the process, withheld from potential claimants unless and until they've completed the Claim Form for a Tier 2 claim. This would leave many potential claimants feeling misunderstood, mistreated, and betrayed by the claim process and those who devised and implement it.

In summary, the currently proposed overall claim process deprives potential claimants of the option to speak with a qualified expert in psychological trauma (who also understands the claim process) *precisely when they most need such assistance*: as they attempt to understand

---

[7] Long-Form Notice, page 14. The only other mention of the "specialist" conducting the interview after the submission of the Claim Form for a Tier 2 claim is on the first page of the Claim Form: "To make a Tier 2 claim, you also need to be interviewed by phone or videoconference by a specialist from the Special Master's Team."

EXHIBIT 3

the information contained in the notices; as they try to make sense of the Tier 1 vs. Tier 2 claim options; and as they confront the lengthy and deeply flawed Claim Form. Those are the times when potential claimants are most likely to have their traumatic memories, symptoms, and emotions, especially their fears, activated and exacerbated. Those are the times when their distrust and vulnerability render them particularly vulnerable to experiences of the claims process and its agents as retraumatizing – experiences likely to be *elicited and increased* by depriving them of the option to speak with a qualified professional from the outset. Failure to correct that huge flaw in the process will result in some legitimate and deserving potential claimants being prevented from successfully completing the submission of their claims.

Furthermore, that major flaw is associated with – and synergistically amplified by – the two other main problems, both with written materials associated with the claim process: (1) An *over-arching* problem, that the notices and Claim Form in their entireties will be experienced as *disconnected* and *disempowering*, especially by some severely traumatized potential claimants. (2) A *details problem*, with how the notices and Claim Form are plagued by language that (a) communicates poorly (or not at all) *options* for getting information, answers, and other appropriate assistance via phone or video conversations, and (b) fails to reveal the actual *qualifications* of anyone with whom they might speak at successive stages of the claim process.

*Problems with the Publication, Email, and Letter Notices*

The short notices and the Long-Form Notice are not trauma-informed documents. But unlike the latter (addressed below), the publication, email, and letter notices include no language that acknowledges the traumatic nature of the abuse potential claimants have suffered or the ways that reading the notices and engaging in the claims process could activate and worsen posttraumatic memories, symptoms, emotions, and ways of relating to others, especially people with power over them (e.g., people creating, imposing, and implementing the claim process). Nothing in the short notices acknowledges legitimate fears about the process and those administering it. Those omissions quickly send the message that whoever wrote the notice doesn't really understand their experience or know how to connect with them via writing. That experience of *disconnection* will lead many potential claimants to experience the process, from the outset, as likely to be retraumatizing and unlikely to bring justice.

The short notices are also *disempowering*, the other key dynamic of traumatic experiences and their posttraumatic reenactments. When someone with power over your needs (e.g., to

EXHIBIT 3

achieve some justice) communicates with you in a way that demonstrates a lack of understanding and regard for your experience and needs, you are immediately put on notice that you have less power in the situation than you would if they *did* understand and address your experience and needs. Of course, the short notices must be relatively short; they can't cover everything. But omitting any empathic acknowledgment of the reader's potential trauma-related experiences, needs, and fears will have immediate impacts on potential claimants and their abilities to engage in the process. The more traumatized, fearful, and distrusting they already are, the greater the negative impacts and the less likely they will complete the process.

Critical factual information that is missing or confusing also disempowers readers. One glaring example found in all three short notices is this sentence: "Both types of claims can be filed at www.weinsteinclaims.com." But nowhere else in the short notices does it say anything about there being two different kinds of claims (i.e., Tier 1 and Tier 2). Many more examples of missing and confusing information in the short notices could be cited, but that would exceed the scope of this report. However, identifying and correcting those problems will be essential to ensuring that those notices are trauma-informed and effective for their intended purpose: giving potential claimants enough information that they will feel informed, safe, and motivated *enough* to speak with a qualified expert who understands their experience and needs. And the only way to do that is to have traumatized people, including severely traumatized victims of sexual violence (and associated institutional betrayal), provide feedback on the notices and how to improve them enough so that they can effectively serve their purpose. Indeed, one of the most important principles of trauma-informed service provision is soliciting input from the people who receive the communication and utilize the services, including involving them in design and evaluation.[8] While there may be practical limitations to applying that principle here (e.g., perceived conflict of interest), to the extent possible such design input and evaluation should be incorporated into the revisions of these documents and the entire claim process.

*Problems with the Long-Form Notice*

The Long-Form Notice includes a few statements intended to acknowledge, validate, and otherwise address the posttraumatic experiences and needs of potential claimants – but not until the second page, after readers have encountered, on the first, "The Defendants deny all

---

[8] Elliott et al. (2005).

**EXHIBIT 3**

charges of wrongdoing and liability." The notice's second page has six bulleted paragraphs, and five have information and language that appears intended to help the reader feel *connected* to the document's writer (and by extension, to the agents of the claim process represented by the document) and *empowered* by the provision of critical information and options. Those paragraphs, however, are best understood as *starting points* for improving the Long-Form Notice, shorter notices, and Claim Form. Those passages must be revised and expanded upon, appropriately for the documents in which they appear (and any writing or videos[9] provided on the pages of www.weinsteinclaims.com).[10] For the purposes of this report, I will quote those five bulleted trauma-informed paragraphs and offer brief commentary on each.

- "While no Settlement can ever undo what happened or erase the anger, pain, and anguish you may feel about the harassment and abuse you may have endured, it can provide a measure of resolution, as well as a punitive and deterrent effect."

As an expert on psychological and sexual assault trauma, this seems like a very helpful passage that could also be included in the short notices (and as close as possible to their very beginning, not paragraphs or pages in). However, the word "can" should be replaced with "may," because "can" implies that it *will* "provide a measure of resolution, as well as a punitive and deterrent effect," but experienced trauma therapists and experts, and people who have had the experience themselves, know all too well that survivors sometimes feel *worse* after completing a legal process, even when they've "won" a verdict or received a settlement, even a substantial one.[11] Importantly, as noted previously, this passage and those quoted below, as well as any new ones added to improve the trauma-informed nature of the notices and their effectiveness at eliciting completed claims, should be vetted by traumatized survivors of sexual assault.

- "It is critical that you read this entire Notice carefully because it contains information about the Settlement and the lawsuit, and because your legal rights are affected

---

[9] The creation and provision of one or more brief videos that provide critical information, in a trauma-informed way, on the claim website, would greatly improve the effectiveness of the notice process and the claims process. This is especially true for the most traumatized, fearful, and distrusting potential claimants – provided that the videos are truly trauma-informed and explain, in honest ways (not "false advertising"), just who it is that potential claimants can talk to and when (as addressed elsewhere in this report).

[10] This work should be within the purview of the "experts" mentioned in the fifth of those six bullets on page 2 of the Long-Form Claim, i.e., "experts who make up the team administering and evaluating the Settlement claims."

[11] And in this case, several facts, including that Harvey Weinstein has made no admission of wrongdoing, nor contributed any of his own considerable fortune to the settlement fund, may have negative impacts of claimants, even those who receive relatively large sums of money (which may feel "tainted" and "corrupted" to them).

**EXHIBIT 3**

> whether or not you choose to act. That said, given the traumatic nature of the abuse you may have suffered, please take breaks as you read and seek support if you need it. While it may be difficult, please read this entire Notice carefully so that you can arrive at a clear understanding of your legal rights."

This passage conveys an understanding that information is empowering, and that the writer(s) of the notice *appreciate the importance of the reader being informed and empowered to make decisions that are right for them*. Signaling that appreciation also helps the reader feel *connected* to the writer(s), and by extension to other agents of the claim process, because they have exhibited such understanding and empathy. That is also true of the language describing the "traumatic nature" of the "abuse" which the reader may have "suffered"; of the encouragement to attend to their needs and wellbeing while reading the notice; and of the acknowledgement of the tension between the notice being "difficult" to read and being helped to understand their "legal rights." Again, however, the entire notice must be reviewed, evaluated, and improved by input from people traumatized by sexual victimization to ensure it actually does help potential claimants to understand their rights and the claim process – and to ensure the process is sufficiently trauma-informed and effective to achieve its goals.

- "As described in more detail below, the Settlement has a two-tier structure based on your choice of whether – and how much – you feel comfortable sharing with the Settlement program. You are eligible to make a claim for Tier 1 benefits (by filling out the enclosed Claim Form) or Tier 2 benefits (by filling out the Claim Form and participating in an interview by phone or videoconference). You may also submit supporting documents if you choose in support of a Tier 1 or Tier 2 claim."

This is a particularly important passage, because it refers to the two different claim options and frames them in terms of the potential claimant's "choice of whether – and how much – you feel comfortable sharing with the Settlement program." Unfortunately, in the context of the rest of the contents of this notice, as well as the Claim Form and a claim process that severely limits potential claimants' ability to speak with a (potentially) qualified expert in psychological trauma and sexual assault, this passage will be confusing and send a mixed and disturbing message to some readers. That is, although the option to speak to a "specialist" after completing the Claim Form for a Tier 2 claim is framed here as empowering (because it enables them to choose, based on their comfort level, whether and how much they want to share with Settlement

program staff), the fact that the entire process *prevents* everyone else from talking with such an expert or "specialist" is massively disempowering – and, especially for the most traumatized and vulnerable potential claimants, runs counter to the goal of the claim process.

- "All the specialists and experts who make up the team administering and evaluating the Settlement claims have been trained in communicating with victims of trauma and harassment. Should you choose to engage with the Settlement program by submitting a Tier 1 or Tier 2 Claim, they will ensure your experience is as safe, compassionate, and confidential as possible and that you will be heard."

Again, while intended to help potential claimants feel understood and safe, in the context of the entire notice and claim process, which includes *denial* of direct contact with specialists or experts, for some readers this passage will ring hollow and, far from allaying fears and distrust, will only trigger and heighten them.

- "We recognize you may not want to be identified publicly. Accordingly, women who submit a Claim Form will not be publicly identified. Your identity will be kept confidential by the class settlement administrators and in the TWC Bankruptcy Proceedings."

This is a straightforward provision of empathic, empowering, and reassuring information.

In summary, while the Long-Form Notice (unlike the short notices) includes some trauma-informed passages, they appear too late and, in the larger context of the entire notice and the overall claim process, several of them will be experienced by potential claimants as confusing, disconnected, and disempowering. Therefore, the Long-Form Notice (like the short ones) must be revised in collaboration with both qualified experts and *survivors* of sexual trauma (and institutional betrayal), to ensure it is truly trauma-informed and effective at facilitating claims.

*Problems with the Claim Form*

For a variety of reasons, the Claim Form and the limited options that potential claimants have for competing it are among the least trauma-informed and most counterproductive aspects of the proposed claim process. Those reasons include (1) depriving claimants of the option to provide the same information via *interview* by a qualified trauma specialist who knows the claim process and is very experienced and highly skilled at serving trauma survivors; (2) depriving claimants of the option to speak with such an expert before, during, and after completing the form (whether for a Tier 1 or Tier 2 claim), including just to receive assistance

**EXHIBIT 3**

and support with *anything* in the claim process; (3) the form's absence of vital trauma-informed information, language, and messages; (4) the *presence* of confusing, disconnected, and disempowering language and messages likely to trigger and worsen posttraumatic symptoms, fears, and distrust; and (5) its extreme length and repetitiveness. Individually, but especially collectively, those problems will cause many potential claimants to experience the Claim Form and the process for completing it as unsafe and the claim administrators as untrustworthy. The result: Some potential claimants, especially the most traumatized and those who have not previously disclosed their victimization, will be prevented from completing the claim process.

I have previously addressed the lack of an option to provide the same information via an interview conducted by a qualified trauma specialist. Here I will add that the offer to speak to an attorney about whom they know virtually nothing, if they "want or need any assistance filling out the Claim Form" (which doesn't even appear until the form's fifth page, i.e., the first page of Section D), is not at all trauma-informed, is unlikely to reassure potential claimants, and is likely to scare some away. Indeed, being offered that option as the *only* one for verbal assistance with the Claim Form is likely to worsen fears and distrust; and for some survivors, exercising that option would make completing the form even more difficult or impossible.

While the Claim Form's lack of critical trauma-informed information, language, and messages cannot be addressed fully within the scope of this report, I can say this: There is literally no language – anywhere on the entire form – that acknowledges, validates, or otherwise addresses the trauma-related experiences and needs of potential claimants. Again, the only candidate language, on the option of speaking with a lawyer they don't know about something so traumatic and personal, is unlikely to be experienced as helpful or supportive.

It is also beyond the scope of this report to address all or even most of the confusing, disconnected, and disempowering language and messages of the Claim Form. From the outset, the first page of "General Instructions" is quite confusing. First of all, why are there "Tier 1" and "Tier 2" claims? Only the Long-Form Notice attempts to explain this, but even there the full explanation must be pieced together (from information on pages 3, 4, and 14)[12] and the Long-Form Notice isn't referenced anywhere on the Claim Form. Second, why "must" they describe, on this long and extremely detailed form, their experience of harassment and/or assault, retaliation, etc. and its impact on them? What if they don't feel comfortable writing it down like

---

[12] Even if the reader reads those passages, they are unlikely to have the intended empowering effect (see above).

EXHIBIT 3

that? Why is this long and extremely detailed form their *only* option for sharing what happened and its impact? On these questions, the form is silent, and in the vacuum fears and distrust are sure to escalate. Third, why must they be interviewed by a "specialist from the Special Master's team" to make a Tier 2 claim? Again, readers can only guess, and many will get the message that, in order for their trauma and suffering to be seen as valid, they must submit to being interrogated by a specialist (of unstated qualifications, except those found in the Long-Form Notice, which will not be reassuring to many potential claimants).

In sections D and E of the Claim Form, claimants are required to answer many questions about what may be the most traumatic and embarrassing experiences of their lives. Yet there is no acknowledgement there, or anywhere else on the form, that doing so might be traumatic or embarrassing. Then, for the very first question, about "verbal sexual harassment," the claimant is asked to "please provide any details that you can recall, including the time, place, and substance of the comments." This is the first of many places on the form where such a prompt for more information should be accompanied by a clarifying and reassuring statement, along these lines: "Please know that we understand people's memories for such experiences can be fragmentary, vague with respect to some details, and lacking information about time and place." Similarly, for the next question, on how they *reacted* to his comments "at the time they occurred," claimants need clarification and reassurance, e.g., "We understand that people can react in many different ways to such experiences, including ways that may lead them or others to doubt that the experience was as stressful or traumatic and harmful as it actually was." For the next question, too, on how they *felt* at the time, clarification and reassurance are in order, e.g., "We understand that people can have many feelings at the time, including feelings of self-blame, but also no feelings at all, and we will not assume that such experiences are evidence of little or no harm being caused." And for the next question, "how do you feel about his comments now?" clarification and reassurance are essential, so survivors know that those reviewing their answers and claims will not "use against them" how they feel now (compared to how they may have felt for years or decades between the sexual victimization and now, which is inquired about, albeit with the same lack of trauma-informed language, in section F).

Indeed, it cannot be stressed enough that those questions, especially when potential claimants are told they "must" answer them, in writing, as the *only* way to participate in the claim process of this Settlement Agreement, will be extremely triggering of posttraumatic memories, feelings, and fears – including fears about simply writing down such traumatic and

personal experiences, and of being misjudged. The form's complete lack of acknowledgement of those fears, let alone its complete lack of any attempt to assuage them, would surely result in some potential claimants feeling too unsafe and distrustful to complete the form.

And this too cannot be stressed enough: The form has *page after page* of such questions, all unaccompanied by any trauma-informed language.

Finally, even a form that's perfectly constructed – with all the right trauma-informed acknowledgements, clarifications, and reassurances – is *still* going to leave some potential claimants feeling insufficiently safe to complete it. And one last time: offering the option to speak to a lawyer they don't know, and about whose understanding and skill with such issues is equally unknown, is not a solution. They must be given an interview option, as explained above.

_____                               __July 10, 2020__
James W. Hopper, Ph.D.

**EXHIBIT 3**